UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ENRIQUE SALINAS, ALFREDO RODRIGUEZ, ANGEL CEDENO, CHRISTIAN URGILES, FRANCISCO LUGO, JOSE AMEZQUITA, LUIS ROBALLO, MIGUEL CERVANTES, NAHUN FLORES, PABLO ALVARADO, PABLO FRANCISCO-LOPEZ, VALENTIN XOCHIPILTECATL, and VICENTE LEON, individually and on behalf of others similarly situated,

Plaintiffs,

-against-

STARJEM RESTAURANT CORP., (d/b/a FRESCO BY SCOTTO), MARION SCOTTO and ANTHONY SCOTTO,

Defendants.

Index No. 13-cv-2992 (AT)

---

**DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

---

LITTLER MENDELSON, P.C.
Attorneys for Defendants
900 Third Avenue
New York, New York 10022-4834
(212) 583-9600

Of Counsel:
Craig R. Benson, Esq.
Naveen Kabir, Esq.

Defendants Starjem Restaurant Corp. d/b/a Fresco by Scotto ("Fresco" or "the Restaurant"), Anthony M. Scotto, Jr. and Marion Scotto (collectively, "Defendants") submit the following proposed findings of fact and conclusions of law pursuant to Fed. R. Civ. P. Rule 52:

## FINDINGS OF FACT

### The Restaurant

1.      Plaintiffs all worked at the Fresco by Scotto Restaurant located at 34 East 52nd Street in Manhattan ("Fresco," "the Restaurant" or the "Company").  Fresco is a single, family-owned, restaurant, and is not part of any chain or large corporation.  (Trial Affidavit of Anthony Scotto ("A. Scotto Aff.") ¶ 3.)

2.      The Restaurant can seat up as many as 231 patrons at any given time: 58-70 in the VIP section at the front of the Restaurant, 131 in the main dining room, and an additional 30 in the Tuscan Room located upstairs.  There are 44 tables in the main dining room, 18 tables in the VIP area, and 8 tables in the Tuscan Room.  The Tuscan Room is typically used to seat regular guests during lunch and primarily used for private parties during dinner.  (A. Scotto Aff. ¶ 20.)

### Service At The Restaurant

3.      The Restaurant is open for lunch and dinner on Monday through Friday and for dinner only on Saturday.  (A. Scotto Aff. ¶ 4.)

4.      The Restaurant utilizes a tiered service team to provide its customers with a special experience every time that they are in the Restaurant for a meal or a private function.  For meals on the main dining room floor, it is a five-tiered system that utilizes a maître d/service manager position, a floor captain, waiters, food runners, and bussers.  For private events, there are four tiers of service that include a party captain, waiters, runners, and bussers.  Service is the primary duty of everyone who works in the front-of-the-house, regardless of whether they are a busser, runner, waiter, floor captain, party captain, or maître d'/service manager.  Everyone is

part of the service, interacts in some way with the customers throughout each shift, and is expected to help one another regardless of their title or position.  (A. Scotto Aff. ¶ 19; Trial Affidavit of Attilio Vosilla ("Vosilla Aff.") ¶¶ 28-29.)

5.      The level of service, in addition to quality of the food at the restaurant, contributes to the overall tips that are received.  Everyone who works at Fresco restaurant in a tipped capacity receives the overwhelming portion of their overall income from tips.  Given the size of the team and the hours in the Restaurant, the amount of tips that front-of-house service employees are able to earn, per actual hour worked, makes it a very competitive overall wage as compared to most other restaurants.  (A. Scotto Aff. ¶ 19.)

6.      The workday at is split into two shifts.  Individuals who are scheduled for the lunch shift arrive at 10 AM.  Individuals scheduled to close are designated on the schedule for the "late" call time.  Although this start time has varied throughout the years it has typically been around 11 AM for the lunch shift.  (A. Scotto Aff. ¶ 40.)

7.      From 10:30-11 AM a family meal is served.  (A. Scotto Aff. ¶ 40.)  The staff does not perform any work during the 30 minute meal period.  During this time, all of Fresco's employees are welcome to help themselves to the food served by the kitchen in the "Rose Room" section of the dining room.  They are also free to bring their own food or spend that time however they see fit; if they wish to leave the Restaurant they are free to do so.  (A. Scotto Aff. ¶ 11.)

8.      At 11:30 AM, the restaurant is open for business and the lunch service typically ends somewhere between 2 PM and 3 PM.  Individuals are free to leave once there are no longer patrons in their section of the Restaurant.  (A. Scotto Aff. ¶ 40.)

9.      Individuals who are assigned to the dinner shift are supposed to arrive at 4 PM. (A. Scotto Aff. ¶ 41.)

10.     From 4:30 PM to 5 PM, a family meal is served.  (A. Scotto Aff. ¶ 41; Vosilla Aff. ¶ 11.)

11.     The staff does not perform any work during the 30 minute meal period.  During this time, all of Fresco's employees are welcome to help themselves to the food served by the kitchen in the "Rose Room" section of the dining room.  They are also free to bring their own food or spend that time however they see fit; if they wish to leave the Restaurant they are free to do so.  (A. Scotto Aff. ¶ 11.)

12.     At 5:30 PM, the restaurant is open for business and the service lasts until the last customer leaves.  The end time of a given shift is different every night, but the last guests usually leave the Restaurant somewhere between 9:30 PM and 11 PM.  Runners and bussers typically start leaving as the dining room starts to empty out.  Usually there is only one runner and one or two bussers who stay until the end of service.  (A. Scotto Aff. ¶ 41.)

13.     Before every lunch and dinner shift, Anthony Scotto decides how many sections there will be in the dining room.  It varies depending on the reservations and whether or not there is a private party booked at the Restaurant so the Restaurant may have four (4) to seven (7) different sections in the main dining room; sometimes more.  Anthony Scotto instructs the host or the maître d'/service manager to fill out the appropriate section chart.  Wait staff is assigned by Anthony Scotto to their respective section(s) and/or assignments each shift.  (A. Scotto Aff. ¶ 16; Vosilla Aff. ¶¶ 13, 27.)

14.     The main dining room is usually staffed as follows: one waiter is assigned to each section; one or two bussers cover all of the sections in the front, back and middle of the floor;

and one busser is assigned to the bar area as a bar back.  The floor captain is assigned to cover the whole dining room, as is the maître d'/service manager position.  There are typically two or three runners scheduled for each shift; they cover the entire Restaurant, along with the busser(s) assigned to the coffee station and as the "stocker."  Staffing and section assignments are adjusted by Anthony Scotto as the business needs require.  (A. Scotto Aff. ¶ 21.)

15.     The runners are responsible for delivering appetizers, entrees and desserts from the kitchen to the entire Restaurant, including to the Tuscan Room upstairs.  They also assist the waiters and bussers by running beverages, coffee and bread.  When a waiter puts an order into the POS system, the ticket prints out at one of four stations, *i.e.*, the cold appetizer/salad station, the hot appetizer/entrée station, the coffee station or the dessert station.  The hot appetizer/entrée station is also known as the "expediter" station because the sous-chef stands next to the chef and calls out orders, or "expedites."  The Runners stand near this station to wait for orders to bring out to the dining room.  They are all responsible for helping the kitchen coordinate the orders and get the plates ready and are constantly communicating with the chef and sous chef at the hot appetizer/entrée station about the timing of the next course for each table.  The table positions on the ticket correspond to the numbers on the seating charts.  By the time a runner leaves the kitchen, he knows exactly where to serve each plate, and also knows if he needs to coordinate with any of the other runners or bussers to help them bring all of the food to the table at the same time.  When Runners serve food, they explain the dish to the customer and bring condiments like cheese and pepper to the table upon request.  If they bring out the wrong dish, they typically apologize to the customer and alert the nearest waiter, captain or maître d'/service manager; they take all of the dishes back to the kitchen and then bring out the correct orders for the entire table once the kitchen prepares the correct dish.  This is an important aspect of the service at Fresco;

we want to make sure that the entire table is enjoying their meal at the same time.  (A. Scotto Aff. ¶ 22; Vosilla Aff. ¶¶ 14, 17.)

16.     If the runners are bringing food upstairs to a private party in the Tuscan Room, they organize the plates on trays in the kitchen before carrying them upstairs all together. Because this often requires more than three people, the bussers help the runners bring the trays upstairs, and the bussers also serve food in the dining room while the runners are occupied with the party.  If the Restaurant is going to be especially busy, *i.e.*, during shifts where we expect 150-200 people or more, then Anthony Scotto sometimes schedules a fourth runner.  On every shift, the most senior runner takes the lead in coordinating the orders to help keep the timing of the service under control, especially when there is a large volume of orders coming into the kitchen at once, like for private parties or large tables in the dining room.  This runner stands next to the chef or sous chef to help coordinate large orders during the busiest hour of the service, but he is really more of a lead runner.  His primary duty is still the same as the other runners; he runs food to the dining room for the majority of his shift.  To the extent he spends more time in the kitchen than the other runners, it is only during the peak of service, which lasts no more than an hour.   He is still playing a vital role in the service as he is working as a runner, with the other runners, to coordinate how the food is to be presented on the dining room floor. (A. Scotto Aff. ¶ 23; Vosilla Aff. ¶¶ 14-20.)

17.     The expediting function is performed by a member of the kitchen staff — usually the chef or the sous chef.  There are certain occasions where we are short staffed in the kitchen and have no one to perform the full time expediting functions performed by the chef or sous chef.  On those occasions, a runner fills in and expedites throughout an entire shift.  In those

situations, because that individual is not participating in the front of the house service, that individual does not participate in the tip pool.  (A. Scotto Aff. ¶ 24.)

18.     During the first hour or hour and a half of each shift, the bussers assigned to the coffee station and stocker role participate in the service, in part, by assisting in the running of bread and other appetizers to the tables.  They also help the runners serve appetizers and entrees to the large tables in the main dining room that seat parties of 12 or more.  All the food in the dining room is served by hand, so even when there are three (3) runners on duty it is necessary for the bussers to help run food so that all of the dishes can be served at the same time.  (A. Scotto Aff. ¶ 25; Vosilla Aff. ¶¶ 20-21.)

19.     In addition to helping the runners, the busser assigned to the coffee position makes tea, coffee and espresso beverages and brings them to the tables on the dining room floor with milk, sugar and/or lemon to the table.  If there is a private party, then the busser assigned to the party makes the tea and coffee drinks for the entire party and brings them upstairs, in order to serve the entire party at the same time.  (A. Scotto Aff. ¶ 26; Vosilla Aff. ¶ 30.)

20.     In addition to helping the runners, the busser assigned as the "stocker" during a particular service, performs all of the same service duties of the other bussers (*i.e.*, clearing and re-setting the service items between each course and bringing dirty dishes and silverware back to the kitchen).  (A. Scotto Aff. ¶ 27.)

21.     To help make sure that the service items are replaced quickly, clean dishes and silverware are stored in four (4) stocking stations located throughout the Restaurant on the service floor: three (3) on the main floor located in the front, middle and back of the room and one (1) upstairs outside the door to the Tuscan Room.  The stocking stations on the main dining floor are interspersed throughout the room.  As a result, the busser-stocker is always cycling

between the kitchen and the entire dining room; the stocker assignment is a true front-of-house service position.  There are four stocking stations in the Restaurant.  There is a POS terminal on top of or next to each stocking station.  (A. Scotto Aff. ¶ 28; Vosilla Aff. ¶ 15.)

22.     All of the bussers are responsible, during the service, for making sure the stocking station is re-filled; in reality, all of the staff pitches in, including the waiters, captains, and the maître d'.  The general rule is that nobody should come back from the kitchen empty-handed.  That is because promptly re-setting the table is a vital part of the service.  The busser assigned to the stocker assignment continues to help clear tables, bring service items to the kitchen, as well as run food throughout the entire shift.  (A. Scotto Aff. ¶ 29; Vosilla Aff. ¶ 15.)

23.     The busser position is integral to the overall service in the Restaurant.  A busser's primary responsibility is to assist the servers in waiting on the customers.  The bussers insure that the dining room is equipped for the service and that the tables are set and cleared in a timely manner.  They help insure a pleasant dining experience by paying close attention to each table and proactively re-filling water glasses and clearing and re-setting service items before the customers have to ask.  They will also assist in the presentation of certain food items and chip in as necessary to make sure that the service is timely.  It is a busser's responsibility to insure that his station, and the dining room as whole, is equipped (stocked) with all things necessary for the service.  (A. Scotto Aff. ¶ 6.)

24.     All of the bussers are responsible, during the service, for making sure the stocking station is re-filled; in reality, all of the staff pitches in, including the waiters, captains, and the maître d'.  The general rule is that nobody should come back from the kitchen empty-handed.  That is because promptly re-setting the table is a vital part of the service.  The busser assigned to

the stocker assignment continues to help clear tables, bring service items to the kitchen, as well as run food throughout the entire shift. (A. Scotto Aff. ¶ 29.)

25. The runner position is also an integral position to the overall service. A runner interacts with the chefs to insure that the food is presentable before it is sent out to the dining room floor. Runners are responsible for taking the food from the dining room and delivering the right dish, at the right temperature, to the right patron in an efficient and timely manner. Runners do not utilize trays and bring out plates on an individual basis utilizing a towel when they serve food in the dining room. Because there are only two (2) or three (3) runners for the entire Restaurant, they are constantly going back and forth from the kitchen to the dining room during the course of a service. That is also why it is important for the bussers to pitch and in and help the runners bring food out to the large parties seated in the dining room, and also to carry trays of food from the kitchen to the private events hosted upstairs. (A. Scotto Aff. ¶ 7.)

26. At no point in time, have bussers or runners been assigned to wash dishes in the kitchen or clean the dining room. All of this work is done by the dishwashers/porters. The Restaurant employs six (6) dishwashers/porters and there are two (2) or three (3) of these individuals scheduled to work at the Restaurant from early in the morning until after the Restaurant closes. Every morning at 7 AM, they vacuum the dining room floor, clean the bar area, clean the windows and wash the bathrooms. They also clean the dining room every afternoon at 4 PM; and clean the kitchen and take out the garbage every night at 11:30 PM. They are the last employees to leave the Restaurant and typically leave every night around midnight before the next shift of porters/dishwashers return the next day at 7 AM. (A. Scotto Aff. ¶ 45; Vosilla Aff. ¶ 26.)

27.     Attilio Vosilla is employed as a maître d'/service manager.  He spends the entire shift on the dining room floor and his primary function is to insure that the service runs smoothly.  In this role, he greets guests, takes wine or food orders, explains the wine list, opens and pours wine at the table, monitors the service needs of each table, addresses customer complaints about the food or service, and generally is responsible for the overall service on the main floor.  When there is a private function, he often serves as a party captain.  In that role, he provides many, if not all, service functions in connection with the particular party, including, but not limited to, being the main point of contact for the host of the party and performing all aspects of the service.  (A. Scotto Aff. ¶ 30; Vosilla Aff. ¶¶ 4, 22.)

28.     Although he may nominally be considered a manager, his supervisory authority is strictly limited to the service.  He does have discretion to supervise the service staff in terms of what needs to be done to create a great guest experience during a meal or catering function.  However, during a particular meal, there are many individuals who have supervisory discretion in connection with the service.  A captain, for example, can direct the waiters and runners.  Even a waiter, has discretion to direct the bussers.  Thus, while Mr. Vosilla had supervisory authority in connection with the service, it was limited in this respect.  (A. Scotto Aff. ¶ 31; Vosilla Aff. ¶ 42.)

29.     Although he could have lawfully been a participant in the tip pool based on his participation in the service and his limited supervisory authority in this regard, Mr. Vosilla did not participate in the tip pool when he served on the main restaurant floor as the maître d'/service manager.  While he certainly could have done so based on his overall service responsibilities, Anthony Scotto made the decision that this position would be paid by the house, in order to benefit the rest of the members of the service staff, as the result was more money for them to

share in the tip pool. Likewise, when other members of the service staff (including, on occasion, waiters) performed this function, they did not participate in the tip pool for that particular shift and were, instead, paid by the house. (A. Scotto Aff. ¶ 33.)

30. When Mr. Vosilla (or any other individual) served as a party captain, he did receive a modest portion of the service charge. There was nothing unlawful about this practice because he always participated in the service. When the hospitality laws changed in 2011, the party captain portion of the service charge was changed to a 3% administration fee to comply. In any event, because the position clearly participates in the service at all times relevant to this lawsuit (and is, in fact, the most integral part of the service) and neither Mr. Vosilla, nor anyone else who served as a party captain, was an "Employer," it is perfectly lawful for them to participate in the sharing of the service charge. (A. Scotto Aff. ¶ 34; Vosilla Aff. ¶¶ 31-33.)

31. Mr. Vosilla, notwithstanding his title, had no ability to hire or fire employees, determine employees pay rates, maintain (other than at my direction) employment records, set hours or methods of operations or take any action with respect to the terms and conditions of the employees at Fresco. (A. Scotto Aff. ¶ 35; Vosilla Aff. ¶¶ 43-45.)

32. Brent Drill was formerly employed by Fresco. Mr. Drill was, for many years, a floor captain. He had a particular expertise in wine and had extensive interactions with customers on a daily basis concerning wine sales. In fact, Mr. Drill had the highest wine sales out of any employee in the entire Restaurant. Mr. Drill's wine sales benefitted all of the participants in the tip pool by increasing the amount charged on each check; as a result, customers tipped significantly more than they would have had they not purchased the wine. Mr. Drill also performed all aspects of service during a meal. He greeted guests, took food orders, delivered food, bussed tables, and addressed any concerns that a guest might have. Mr. Drill had

the authority to supervise and direct waiters, runners, and bussers, in all aspects of the service, but only in this regard.   He had no ability to hire and fire employees, determine pay rates, maintain employment records, set hours or methods of operation or take any action with respect to the terms and conditions of the employees at Fresco.   In his function as floor captain, Mr. Drill rightfully participated in the tip pool.   (A. Scotto Aff. ¶ 36; Drill Dep. at 33:2-34:10.)

33.     In January 2013, Mr. Drill received a promotion.   He became, in effect, the maître d'/service manager for the lunch shift.   This was similar to the position held by Mr. Vosilla with respect to the dinner shift.   In this role, although he continued to participate in the service, like Mr. Vosilla or anyone else that served in that role during a particular shift, he did not share in the tip pool and was paid by the house.   Mr. Drill no longer works at Fresco; his last day of employment was on or around July 25, 2014.   (A. Scotto Aff. ¶ 37.)

34.     Fresco has always been a "pooled house," in that the entire front-of-house service team pools and splits their tips.   This has always been the case since the Restaurant opened.   The tips are distributed on a point-based system that corresponds to each position within the service hierarchy, *i.e.*, 0.5 points for bussers, 0.6 points for the coffee station, 0.75 points for the runners, 1.0 point for the waiters, and 1.5 points for the floor captain (although the waiters later voted to reduce the floor captain's share to 0.5 points for certain shifts).   This system was set by and implemented by the waiters; management has never played any role in the operation or administration of the tip pool.   The busser and runner positions have always been front-of-house positions who participate in the tip pool.   (A. Scotto Aff. ¶ 8.)

35.     There has never been—not for a single shift—an individual who participated in the tip pool who did not participate in some aspect of the service.   The Restaurant has never

taken a single penny from the tip pool.  All of the money is lawfully distributed to individuals who participated in the service without exception.  (A. Scotto Aff. ¶ 43.)

36.     Since the Restaurant first opened, management has had no involvement in the administration of the tip pool.  Anthony Scotto is the only individual with the authority to hire and fire, determine pay rates, maintain employment records, set hours or methods or take any meaningful action with respect to employees' terms and conditions of employment.  Any individual who is a supervisor or manager at the restaurant is solely focused on the service — nothing else.  Individuals who participate in the service and have limited supervisory authority in connection therewith do participate in the tip pool.  (A. Scotto Aff. ¶ 44.)

**Employment Practices**

37.     Anthony Scotto is the sole person at the Restaurant with the authority to hire or fire employees at Fresco.  This is true among both the owners of the Restaurant, as well as the staff.  He personally made the decision to hire all of the Plaintiffs in this case, and also made the decision to terminate the employment of those who did not voluntarily resign.   He also personally interviews every candidate looking for a front-of-house position, from the bussers and runners to the waiters, bartenders, and captains.  This has been true since the Restaurant first opened in 1993.  (A. Scotto Aff. ¶ 5; Vosilla Aff. ¶ 4.)

38.     Anthony Scotto meets with all new hires to explain how much and how often they will be paid by the Restaurant.  For front-of-the-house employees, he explains how the tipped minimum wage rate works, *i.e.*, that they will be paid additional makeup pay if they do not earn enough tips.  He also tells them that they will get a paycheck every Friday from the Restaurant, but that they will receive their tips directly from the waiters, who calculate and distribute them after every shift without management involvement.  In the event Anthony Scotto is unable to

communicate with the bussers and runners in English, he has his assistant, Wilmer Baltodano, sit in as a translator.  (A. Scotto Aff. ¶ 9.)

39.     Anthony Scotto also makes all the decisions related to staffing and scheduling employees.  He decides how many waiters, runners and bussers are needed each shift based on the expected number of reservations in the Restaurant.  The business volume at Fresco varies because it is not in a residential neighborhood.  There is more traffic in the Restaurant at lunch. Some nights we may be open for dinner until 11 PM and some nights the last customer is gone by 9 PM.  It depends on the season and fluctuations in the economy.  The busiest time of the year is November and December.  Runners and bussers are typically scheduled for no more than six (6) or seven (7) shifts per week.  To the extent the Restaurant needs to add or cut staff, Anthony Scotto is the only person with the authority to make that call.  (A. Scotto Aff. ¶ 10; Vosilla Aff. ¶¶ 34, 37.)

40.     The Restaurant regularly pays overtime to individuals (mostly in the back of the house) who are entitled to same based on their hours worked.  The front-of-the-house staff has never, by design, worked anything close to the hours worked by the back-of-the-house employees. (A. Scotto Aff. ¶ 39; Vosilla Aff. ¶¶ 23-24.)

41.     Prior to 2011, the Restaurant utilized a shift pay concept.  The service staff was paid a set number of hours depending on whether they worked a lunch or dinner shift.  Anthony Scotto set the number of hours to insure that the shift pay compensated the staff for all hours worked.  In fact, it was overly generous in this regard. Anthony Scotto also controlled the number of shifts that each individual worked so that no one spent more than 32 or 35 hours in the Restaurant per week.  It has always been the Restaurant's policy to generously compensate the employees and the shift pay concept was to their advantage.  When business picked up, the

Restaurant increased the shift pay to reflect the increased volume of customers and longer service hours.  In all cases, the employees were fairly and lawfully compensated for all hours worked.  (A. Scotto Aff. ¶ 13; Gelman Aff. ¶ 27-38, 40-41.)

42.     For example, the longest lunch shift for bussers or runners would last from 10 AM to 3 PM, which included the 30-minute family meal.  Accordingly, the Restaurant paid them for five (5) hours for each lunch shift, regardless of whether an employee started late, left early, or if the Restaurant was slow and all the bussers and runners were gone by 2 PM.  The same reasoning applied for dinner, although there was much more variation with respect to the length of the shift.  When the Restaurant was busy, dinner shifts for bussers and runners typically lasted from 4 PM until 11 PM, the Restaurant paid seven (7) hours of minimum wage for 6.5 hours of work; when business declined and the dining room was empty by 8:30 PM or 9 PM, the Restaurant paid five (5) or six (6) hours per shift, again accounting for 30 minutes of unpaid break time for the family meal and thus properly compensating all employees.  (A. Scotto Aff. ¶ 14; Gelman Aff. ¶ 34.)

43.     In 2011, Anthony Scotto made the decision to put in a time clock at the Restaurant because it came to his attention that front-of-house employees were being paid for more hours than they actually worked.  (A. Scotto Aff. ¶ 15.)

44.     Even though shift pay was designed to cover any spread-of-hours pay owed for double shifts that extended past 10 hours, out of an abundance of caution he also instructed Fresco's book keeper to pay an extra hour's pay for all double shifts starting in February 2011. Anthony Scotto, Jr. also decided to upgrade the Restaurant's POS systems at that time so employees could record their time electronically.  This system was rolled out in June 2011.  (A. Scotto Aff. ¶ 49; Gelman Aff. ¶ 28-42.)

45.     Individuals are supposed to clock in when they arrive and clock out when they leave.  Employees are not required to clock in or out during the 30 minute meal period, notwithstanding the fact that they do not perform any work during this time.  (A. Scotto Aff. ¶ 15.)

46.     Initially employees had to type in a code; now they can clock in by scanning their fingerprint.  (A. Scotto Aff. ¶ 49.)

47.     Anthony Scotto trains all new employees on how to clock in and out.  Every time employees clock in or out, the machine prints a slip of paper that shows their time punches.  In the event they forget to punch in or out, it has always been my practice to credit them the largest amount of time worked possible and pay them for that time.  Aside from this lawsuit, Anthony Scotto has received no complaints from employees about their time punches or amount of weekly pay being inaccurate.  (A. Scotto Aff. ¶ 49; Gelman Aff. ¶ 15, 43.)

48.     Anthony Scotto sets the rates of pay for all of the employees in the Restaurant. The payroll is prepared weekly by the Restaurant's bookkeeper, Natasha Gelman, who is instructed by Anthony Scotto on how much and on what basis each employee is paid.  On Fridays, Natasha distributes the paychecks during lunch and again during dinner.  Employees who are not at the Restaurant can pick up their check from Natasha on another day.  The Restaurant does not use direct deposit; live checks are distributed every week.  (A. Scotto Aff. ¶ 17.)

49.     The employment records are maintained by Anthony Scotto in the office located in the basement downstairs.  This includes all of the new hire documentation, as well as their personnel files, the annual wage notices we distribute every year, and also all of the documentation Natasha uses to prepare payroll.  While other individuals may be responsible for

compiling certain documents, it is only at the direction of Anthony Scotto, Jr., and the task is administrative in nature.  No one in the restaurant, other than Anthony Scotto, Jr., has the authority to take any meaningful actions when it comes to employment records or what needs to be done in this respect.  (A. Scotto Aff. ¶ 18.)

50.     In March of 2011, in compliance with the Hospitality Wage Order, the Restaurant began providing its employees with notices of their pay rates.  (A. Scotto Aff. ¶ 48.)

51.     Posters reflecting the wage laws are posted in English and in Spanish, at the top of the stairway in the kitchen of the Restaurant.   (A. Scotto Aff. ¶ 38.)

52.     In 2011, the Restaurant also stopped paying the party captains from the 20% service charge imposed on private parties.  At that time, the service charge was changed from a 20% service charge to a 17% service charge and 3% administration fee.  We make it clear to the host of the party that the 3% administration fee is not a gratuity and is not shared with other members of the service (*i.e.*, front-of-house) staff.   The form used to book private parties changed to reflect this change.  The 3% administration fee is used to pay the party captain, while the waiters collect the 17% service charge in cash from the bar and distribute it through the tip pool.  The 3% fee is used to pay all party captains, not just Mr. Vosilla.  These changes were made to insure that the Restaurant was taking whatever measures possible to insure that it would not be subject to continued lawsuits and to avoid any ambiguity going forward.  (A. Scotto Aff. ¶ 50.)

53.     Bussers and runners have always been provided with shirts and ties, free of charge, to be worn during their shifts.  Wilmer Baltodano is also responsible for taking down employees' shirt sizes so that they can receive the shirts and ties issued to all front-of-house employees free of charge.  In the event the Restaurant does not have their shirt size, Anthony

Scotto personally purchases the shirts in the correct size.  Bussers and runners, including the Plaintiffs, have never been required to pay for these clothing items themselves.  (A. Scotto Aff. ¶ 9.)

54.   In 2011, the Restaurant began paying uniform maintenance pay to front-of-house employees.  Because the Restaurant has always furnished two shirts and a tie to employees, Anthony Scotto decided to pay for the maintenance costs to err on the side of caution and also as a courtesy to the employees.  At no point in time have employees been required employees to pay for these items.  (A. Scotto Aff. ¶ 51.)

## CONCLUSIONS OF LAW

## I.   STATUTE OF LIMITATIONS

### Limitations Periods Applicable to Each Plaintiff

1.   The statute of limitations under the Fair Labor Standards Act (FLSA) is two (2) years, unless Plaintiffs are able to prove that any violations are "willful," in which case the limitations period would be three (3) years.  The statute of limitations under the New York Labor Law (NYLL) is six (6) years.  (*See* Stips. of Law 1-5.[1])

2.   The limitations period(s) applicable to Plaintiff Enrique Salinas is May 5, 2007 until April 15, 2013 for his NYLL claims, and either May 4, 2011 until April 15, 2013, or May 4, 2010 until April 15, 2013, for his FLSA claims.

3.   The limitations period(s) applicable to Alfredo Rodriguez is March 1, 2011 until the present for his NYLL claims, and either May 4, 2011 until the present, or May 4, 2010 until the present, for his FLSA claims.

---

[1] The stipulations of law cited herein are set forth in the Parties' Joint Pretrial Order ("JPTO") § VII.C.

4.      The limitations period(s) applicable to Angel Cedeno is March 1, 2011 until the present for his NYLL claims, and either May 4, 2011 until the present, or May 4, 2010 until the present, for his FLSA claims.

5.      The limitations period(s) applicable to Christian Urgiles is May 5, 2007 until April 23, 2013 for his NYLL claims, and either May 4, 2011 until April 23, 2013, or May 4, 2010 until April 23, 2013, for his FLSA claims.

6.      The limitations period(s) applicable to Francisco Lugo is November 2, 2011 until February 7, 2014 for his NYLL claims, and either May 4, 2011 until February 7, 2014, or May 4, 2010 until February 7, 2014, for his FLSA claims.

7.      The limitations period(s) applicable to Jose Amezquita is January 1, 2012 until August 27, 2013 for his NYLL claims, and either May 4, 2011 until August 27, 2013, or May 4, 2010 until August 27, 2013, for his FLSA claims.

8.      The limitations period(s) applicable to Luis Roballo is December 1, 2009 until April 4, 2013 for his NYLL claims, and either May 4, 2011 until April 4, 2013, or May 4, 2010 until April 4, 2013, for his FLSA claims.

9.      The limitations period(s) applicable to Miguel Cervantes is May 5, 2007 until February 1, 2013 for his NYLL claims, and either May 4, 2011 until February 1, 2013, or May 4, 2010 until February 1, 2013, for his FLSA claims.

10.     The limitations period(s) applicable to Nahun Flores is May 5, 2007 until May 1, 2013 for his NYLL claims, and either May 4, 2011 until May 1, 2013, or May 4, 2010 until May 1, 2013, for his FLSA claims.

11.     The limitations period(s) applicable to Pablo Alvarado is May 5, 2007 until November 1, 2012 for his NYLL claims, and either May 4, 2011 until November 1, 2012, or May 4, 2010 until November 1, 2012, for his FLSA claims.

12.     The limitations period(s) applicable to Pablo Francisco-Lopez is November 1, 2007 until January 15, 2012 for his NYLL claims, and either May 4, 2011 until January 15, 2012, or May 4, 2010 until January 15, 2012, for his FLSA claims.

13.     The limitations period(s) applicable to Valentin Xochipiltecatl is June 17, 2009 until November 3, 2010 for his NYLL claims, and either May 4, 2011 until August 1, 2010, or May 4, 2010 until November 3, 2010, for his FLSA claims.

14.     The limitations period(s) applicable to Vicente Leon is May 5, 2007 until the present for his NYLL claims, and either May 4, 2011 until the present, or May 4, 2010 until the present, for his FLSA claims.

## II.     NO LIABILITY ON PLAINTIFFS' TIPPED MINIMUM WAGE CLAIMS

### Plaintiffs Were Adequately Informed of the Tip Credit

15.     Under the FLSA, an employer is allowed to take a "tip credit" with respect to tipped employees if it (1) informs such employees of the provisions of FLSA § 203(m) and (2) permits the employees to retain all tips they receive. 29 U.S.C. § 203(m).

16.     An employer may satisfy its obligation to inform employees of the "tip credit" by, *inter alia*, posting wage-and-hour notices and explaining the tip credit orally. *See* U.S. Department of Labor ("USDOL") Wage and Hour Division ("WHD") Fact Sheet #15; *see also* Ex. 9, Excerpts from S. Rep. No. 93-690 at 43 (1974) (legislative history to 1973 amendments to

§ 203(m) reflects that an employer may satisfy the notice requirement by "explain[ing] the tip provision" to an employee).[2]

17.     Here, the evidence establishes each Plaintiff was orally informed of Fresco's tip makeup policy and the waiter-run tip pool by Anthony Scotto in English and his assistant, Wilmer Baltodano, in Spanish, at the time of hire.  In addition, Anthony Scotto posted notice of the requirements of FLSA § 203(m) at the Restaurant.   This is sufficient to meet the requirements of FLSA § 203(m) because "[e]mployers do not have to 'explain' the tip credit to employees … it is enough to 'inform' them of it." *Alvarado v. Five Towns Car Wash, Inc.*, 2014 WL 4678258, at *3 (E.D.N.Y. Sept. 19, 2014) (internal citations omitted).   Furthermore, Plaintiffs all had notice of the tip pool, and received their distributions from the tip pool directly from the waiters in cash after every shift.  *See Arencibia v. 2401 Rest. Corp.*, 831 F. Supp. 2d 164, 180 (D.D.C. 2011) (finding no violation of FLSA's notice requirements where "employees commonly understood that there was a tip pool" that was explained to them "at the time of hire and from time to time during [their] employment.").

18.     Prior to January 1, 2011, notice of the "tip credit" was not required as a condition of paying the tipped minimum wage to "food service workers" under the NYLL.   *See* 12 N.Y.C.R.R. § 137-1.5 (2009) (repealed).  Since January 1, 2011, written notice of the "tip credit" must be provided as a prerequisite of paying a tipped minimum wage rate under the NYLL.   12 N.Y.C.R.R. § 146-1.3 (2011); *see also* Ex. 6, Order of the Comm'r of Labor M. Patricia Smith on the Rep. & Recs. of 2009 Wage Board (Nov. 5, 2009) (accepting recommendation to adopt notice requirement as precondition for paying tipped wage rate).   Employers were given a three-month grace period to comply with the new provisions of the Hospitality Wage Order

---

[2] The legal and regulatory authorities cited as exhibits herein are attached to the accompanying Declaration of Craig R. Benson dated November 11, 2014.

promulgated by the New York State Department of Labor ("NYSDOL") that became effective on January 1, 2011.  *See* Ex. 8, NYSDOL Hosp. Industry Min. Wage Info. Pub. LS209.  It is stipulated that the Restaurant provided written notices beginning in March 2011.  (*See* Fact Stip. No. 14.[3])  Accordingly, Plaintiffs were adequately informed of the tip credit during the time period applicable to their NYLL minimum wage claims, *i.e.*, January 1, 2011 until the present time.

### Plaintiffs Were Tip-eligible Service Employees

19.    Under the FLSA, a "tipped employee" is defined as an employee engaged in an occupation who "customarily and regularly" receives more than $30 a month in tips.  29 U.S.C. § 203(t).  Bussers and other service employees who do not directly receive their tips from customers qualify as "customarily and regularly tipped" employees under the FLSA.  29 C.F.R. § 531.54 (explaining that bussers who split tips with waiters are considered tipped employees for the purposes of FLSA §§ 203(m), (t)); *see also* USDOL WHD Op. Ltr, 2009 WL 649014, Jan. 15, 2009 (discussing bar backs as an example of "bus persons" traditionally recognized as indirectly tipped employees under the FLSA); USDOL WHD Op. Ltr, 1997 WL 998047, Nov. 4, 1997 ("It is customary for waiters/waitresses to receive gratuities and share them with the busboys/busgirls who assist in serving the patrons"); Ex. 10, USDOL WHD Field Operations Handbook ("FOH") § 30d04(a) (Dec. 9, 1988) (identifying "busboys/girls (server helpers)" as an example of an indirectly tipped occupation); Ex. 9, Excerpts from S. Rep. No. 93-690 at 43 (1974) (identifying "busboys" and service bartenders as "customarily and regularly tipped" occupations).

---

[3] JPTO § VII.B.

20.     Under the NYLL, "food service worker" eligible to be paid a tipped minimum wage is defined as an employee "primarily engaged in the serving of food or beverages to guests, patrons or customers … including but not limited to, wait staff, bartenders, captains and bussing personnel." *See* 12 N.Y.C.R.R. § 137-3.4(a) (2009) (repealed); 12 N.Y.C.R.R. § 146-3.4(a); *see also* 12 N.Y.C.R.R. §§ 146-2.14(d), (e), (3), (6)-(7) ("indirectly tipped" employees are tip-eligible if they "perform, *or assist in performing*, personal service to patrons at a level that is a principal and regular part of their duties" and listing bus persons, bar backs, and food runners as examples) (emphasis added).

21.     The Court must examine whether Plaintiffs "had more than a *de minimis* interaction with customers as part of their employment and/or whether they were ordinarily engaged in personal customer service" for the purposes of the analyzing their tip eligibility under both the FLSA and NYLL.  *See Schear v. Food Scope Am., Inc.*, 297 F.R.D. 114, 132 (S.D.N.Y. 2014) (Torres, J.) (internal citations omitted).  "Custom in the locality and industry is considered [when] determining whether employees" at a particular type of establishment are eligible to receive tips.  USDOL WHD Op. Ltr, 2009 WL 649014, Jan. 15, 2009 (citing 1989 USDOL Opinion Letter); Ex. 10, FOH § 30d04(d).

22.     The evidence presented at trial establishes that the Plaintiffs worked in tip-eligible occupations throughout their entire employment at Fresco.

23.     Plaintiffs Pablo Alvarado and Vincente Leon worked as runners.  There is ample evidence in the record that the runners at Fresco had extensive customer interaction during each shift, as their primary duty was bringing food from the kitchen and serving the customers in the dining room.  There were typically only two or three runners scheduled to hand-deliver food to a Restaurant that can seat over 200 people during any given seating.  For shifts the Restaurant was

especially busy, additional runners were scheduled to help manage the influx of customer demands.  The most senior runner stands next to the expeditor and during busy times throughout the shift takes the lead in coordinating the orders to help keep the timing of the service under control.  Although Plaintiffs claim that this senior runner was primarily a kitchen-based employee, the record establishes that this individual spent most of their time running food.  Furthermore, during whatever time was spent not running food, the senior runner performed the same duties ordinarily required before the runners bring food to customers at the Restaurant, *i.e.*, "garnish[ing] plates, mak[ing] sure the plates are in order by seat number, [] organiz[ing] the plates[] for easy, organized and quick service to the tables … so that the food remains hot." *Lentz v. Spanky's Rest. II, Inc.*, 491 F. Supp. 2d 663, n.3 at 667 (N.D. Tex. 2007).  All of these duties "can be said [to] assist the waitstaff in providing efficient and prompt customer service" and therefore make all of the runners tip-eligible, even when serving in the senior runner role. *Id.; see also Giuffre v. Marys Lake Lodge, LLC*, 2012 WL 4478806, at *2 (D. Colo. Sept. 28, 2012) (describing "expeditor" as a "front of house" position responsible for checking plates to match the tickets, organizing plates before delivering them to tables, exchanging food if a customer complains, and "assisting the wait staff in any other way necessary," *i.e.*, "very similar to [] a waiter"); *see also* Ex. 12, Details Report of Core Duties for Waiters and Waitresses (identifying garnishing dishes and serving food as waiter duties).  The fact that the runners divided their time between the dining room and kitchen does nothing to diminish their status as true "front-of-the-house" employees.  *Santana v. RCSH Ops., LLC*, 2012 WL 463822, at *3 (S.D. Fla. Feb. 13, 2012) (food runners "who evenly split their time in the kitchen and the dining room" to assist waiters serve food at high-end steakhouse had more than "*de minimis*" interaction with customers).  To the extent any Plaintiff was assigned to fill in for a kitchen employee,

(which happened only on occasions when a chef or sous chef was not present to expedite) the record evidence shows that this individual did not participate in the tip pool and was paid additional wages for that shift.

24.     Plaintiffs Salinas, Rodriguez, Cedeno, Urgiles, Lugo, Amezquita, Roballo, Caravantes, Flores, Francisco-Lopez, Xochipiltecatl and Leon all worked as bussers at Fresco. Like the runners at Fresco, they also had extensive interaction with customers over the course of performing typical busser duties, *i.e.*, clearing used service items after each course, re-setting the table with clean service items, and clearing and re-setting the table after the guests finish their meal.  In addition, the evidence establishes that the bussers at Fresco performed many of the same duties traditionally performed by waiters at less high-end dining establishments, *i.e.*, re-filling water glasses, bringing bread and appetizers to the table, and checking in with customers periodically throughout the meal.  *See Santana*, 2012 WL 463822 at *3 (food runners delivered bread, salads, appetizers and desserts to guests while waiters typically served the entrees brought by the food runners to the dining room); *Giuffre*, 2012 WL 4478806 at *2 ("expeditor" who delivered food to customers, checked in with them about their meals and re-filled beverages was eligible to receive tips); *see also* Ex. 9, Details Report of Core Duties for Waiters and Waitresses (identifying checking in with customers and clearing an setting up tables as waiter duties).

25.     Like bussers at other fine dining establishments, the Plaintiffs performed a suite of typical waiter duties.  This is true for both the bussers assigned to different sections of the dining room, as well as to those rotated through the bar back, coffee station and stocker assignments.  Plaintiffs' claim that bussers employed in these assignments were not in true service occupations is not supported by the evidence in the record.  Each of these assignments required the Plaintiffs to perform additional service duties in addition to their regular busser

duties.  Instead of being assigned to one section of the dining room, the bussers in each of these assignments were required to support the entire Restaurant by enhancing the service in some capacity.  The busser assigned to the bar back role was responsible for clearing and re-setting the tables at the bar and in the front of the Restaurant, and also assisted the bartender in re-stocking the bar with beverages and service items, in filling beverage orders, and also in delivering drinks to customers.  The busser assigned to the coffee station is responsible for making coffee and tea drinks (*e.g.*, coffee, cappuccino, iced tea, espresso) and delivering them to customers with various accompaniments (*i.e.*, sugar, cream, honey, lemon, etc.).  All of these duties make the bussers assigned to the bar back role and coffee station eligible to receive tips.  *See Garcia v. La Revise Associates LLC*, 2011 WL 135009, at *2, 7 (S.D.N.Y. Jan. 13, 2011) (bartenders who "made and delivered drinks for patrons, including mixed drinks, coffee, tea, and wine" for customers seated at in the dining room and at the bar); *see also* 12 N.Y.C.R.R. §§ 146-2.14(e)(3), (4), (6) (listing "bus persons," bartenders and "barbacks" as tip-eligible occupations).

    26.    Plaintiffs' claim that the busser assigned to the stocker assignment was a kitchen-based occupation is belied by ample evidence in the record.  The busser assigned to this role was responsible for making sure that the four (4) service stations located throughout the Restaurant were replenished over the course of each service, in addition to performing his regular busser duties.  This was not solely his responsibility; the record indicates that all members of the front-of-house service staff pitched in to re-fill the stocking stations over the course of each shift by bringing clean service items with them every time they left the kitchen.  The busser-stocker also assisted the runners in bringing food to large parties seated in the dining room or in the private party room located upstairs.  Like the runners, the busser-stocker was constantly moving between the kitchen and the dining room, directly interacting with customers when serving food

and removing or replacing service items.  The record is also clear that maintaining a steady supply of clean service items in the stocking stations is an integral part of the service and benefitted the entire front-of-house staff by ensuring that the bussers could promptly re-set tables between courses without having to go back to the kitchen, thereby allowing them to provide more attentive service to the tables in their assigned sections.  Enabling the bussers to spend more time providing the same sort of direct service often performed by waiters helped to generate more tips "and sweeten the pot for everyone."  *Turner v. Millennium Park Joint Venture, LLC*, 767 F.Supp. 2d 951, 954–55 (N.D.Ill. 2011) ("when a busboy performs a task that would have to be carried out by the waitperson if there was no busboy," it helps cut down on the time and effort the waitperson would have spent on indirect customer service duties and helps them earn more tips); *see also* USDOL Op. Ltr. FLSA2009-12, 2009 WL 649014 (Jan. 15, 2009) (explaining that a "barback" whose primary duty was to support the bartender by restocking the bar and bussing the service counter was eligible to receive tips).  Finally, Plaintiffs' contention that the busser-stocker assignment was akin to a non-service dishwasher role is contradicted by the fact that the Restaurant employed two to three other individuals — whose schedules were staggered to ensure adequate coverage before, during and after service — to work as dishwashers in the kitchen throughout the day.  All of the bussers — not just the busser-stocker — spent time going back and forth between the kitchen and the dining room floor because they had to bring dirty service items back by hand each time they cleared a table, instead of bringing them to a service station or using bus tubs to carry items from more than one table at a time.  Given the locations of the stocking stations throughout the Restaurant, it would not be possible to perform the busser-stocker role by being confined to the kitchen.  Therefore, Plaintiffs were eligible to receive tips during those shifts they were assigned to the stocking assignment.

27.     Plaintiffs who worked in the busser

**Plaintiffs Spent the Majority of their Time Performing Service Duties**

28.     Under the FLSA, an employee who works in a tipped and non-tipped occupation may only be paid a tipped minimum wage for the time spent in the tipped occupation.  29 C.F.R. § 541.56(e).  Time spent performing duties "related" to a tipped occupation "need not by themselves be directed toward producing tips" in order to qualify for the tip credit, *i.e.*, such as a "waitress who spends part of her time cleaning and setting tables, toasting bread, making coffee and occasionally washing dishes or glasses."  *Id.*; *see also* Ex. 10, FOH § 30d00(e) (explaining that "prepatory or closing activities" that are not direct toward producing tips may be counted towards the tip credit so long as they are "incidental to the [service employee's] regular duties and are generally assigned to" service employees so long as they do not spend "a substantial amount of time (in excess of 20 percent)" on such duties); *see also* USDOL WHD Op. Ltr. WH-502, 1980 WL 141336 (Mar. 28, 1980) (describing "after-hours clean-up" duties performed by wait staff as "tipped employment"); *but see* USDOL WHD Fact Sheet #15 (reflecting change in enforcement policy for "related duties"); *see also* Ex. 11, USDOL WHD Op. Ltr., FLSA2009-23 (Jan. 16, 2009) (offering list of "core" waiter/waitress duties as guidance for the dividing  line between "dual jobs" and "related duties," *attached as* Ex. 12) (withdrawn Mar. 2, 2009).

29.     Under the NYLL, since January 1, 2011, an employee does not qualify as a tipped "food service worker" "on any day … in which [] he [is] assigned to work in an occupation in which tips are not customarily received for 2 hours or more or for more than 20 percent of [] his shift, whichever is less."  12 N.Y.C.R.R. § 146-3.4(b).

30.     Here, it is clear that the work performed by the Plaintiffs at the beginning and end of their shift was directed towards enhancing the service and producing tips.  The so called "side

work" performed by the Plaintiffs who worked as bussers was essentially setting up the dining room for service, *i.e.*, folding napkins, filling the stocking stations, lighting candles, and filling the wine buckets located throughout the dining room with ice. Similarly, the Plaintiffs who worked as runners arranged their station to prepare for service by stocking the necessary plates and garnishes and re-filling any condiments they would serve to guests. Although the Restaurant set aside 30 minutes at the beginning of each shift for setup, the evidence establishes that it often took much less time to complete these tasks, and the individuals who were scheduled for the "late" call time did not perform any pre-shift side work at all. To the extent Plaintiffs had to wrap up their stations to prepare for the next shift, they have similarly failed to establish that this took more than 10 or 15 minutes.

31.     Plaintiffs have also failed to establish that they regularly spent time doing any cleaning unrelated to the service during their shift. The Restaurant employed porters who regularly vacuumed the dining room and mopped the bar area every morning at 7 AM and cleaned the dining room every afternoon at 4 PM. To the extent any of the Plaintiffs had to set up tables in the private dining room or wipe down surfaces while bussing tables, these were directly related to their customer service duties and did not take longer than 5 or 10 minutes to complete. Plaintiffs have therefore failed to establish that they spent more than 2 hours or 20% of their workday performing non-tipped duties. *See Mendez v. Int'l Food House Inc.*, 2014 WL 4276418, at *4 (S.D.N.Y. Aug. 28, 2014) (declining to credit plaintiffs' inflated estimates regarding the amount of time they spent cleaning, particularly when the restaurant employed a porter to mop and clean every morning).

## III.    NO LIABILITY ON PLAINTIFFS' TIP POOL CLAIMS

32.     Under the FLSA, an employer may not pay an employee a tipped minimum wage if it permits the sharing of tips with (1) managers who do not participate in the service and are

more akin to an employer's agent or (2) non-service employees.  *See* 29 U.S.C. § 203(m); *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 240 (2d Cir. 2011).

33.     Under the NYLL, gratuities may not be distributed to an "employer or his agent" or with employees who do not constitute "a waiter … [or] busboy or similar employee."  NYLL § 196-d; *see also Barenboim v. Starbucks Corp.*, 21 N.Y.3d 460, 471-72, 927 N.Y.S.2d 191 (2013) (defining "similarly employee" as employees who are "ordinarily engaged in personal customer service.").

<u>No Liability on Brent Drill or Attilio Vosilla Receiving Gratuities</u>

34.     Brent Drill participated in the tip pool at Fresco as a Floor Captain until January 1, 2013.  (Fact Stip. No. 17.)  When Attilio Vosilla served as a party captain (prior to June 2011), he received a portion of the service charge for the party; since Fresco began imposing a 3% administration fee, he and other party captains have only been paid from the administration fee when he has served as a party captain (since June 2011).  (A. Scotto Aff. ¶ 50; Vosilla Aff. ¶¶ 31-33.)

35.     The evidence presented at trial establishes that at all times, the primary duty of Mr. Drill and Mr. Vosilla has been providing service to the Restaurant's customers.

36.     For the time period when Brent Drill participated in the tip pool and Attilio Vosilla received a portion of the service charge when he worked as a party captain, courts applied an "economic reality" test to "determine whether a person acts as an 'employer' under the FLSA and the NYLL so as to preclude tip sharing." *Garcia v. La Revise Assocs. LLC*, 2011 WL 135009, at *6 (S.D.N.Y. Jan. 13, 2011) (collecting cases).

37.     "While no single factor is dispositive, courts consider whether [1] the alleged employer had the power to hire and fire employees, [2] supervise and control their work

schedules or conditions of employment, [3] determine their rates and methods of payments, or [4] maintain their employment records." *Id.* (citing *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984)).  At all times relevant to this lawsuit, Anthony Scotto has performed all of these functions and is thus the only individual who qualifies as an "employer" in this respect. (A. Scotto Aff. ¶¶ 5, 10, 16-18, 21.)

38.     Furthermore, under the NYLL, "supervisory employees who regularly provide direct service to patrons remain tip-pool eligible <u>even if</u> they exercise a limited degree of supervisory responsibility."  *Barenboim v. Starbucks Corp.*, 21 N.Y.3d 460, 472, 927 N.Y.S.2d 191 (2013); *see also* 12 N.Y.C.R.R. § 146-2.14(e)(8) (identifying "captains who provide direct food service to customers" as tip-eligible employees); Ex. 4 N.Y. DOL Op. RO-08-0049 (Feb. 13, 2009) ("[T]he sole criteria in determining whether [a supervisory] employee may be included" in a tip pool is "the extent of direct service provided to patrons," regardless of how that individual is compensated or classified); Ex. 1, NYSDOL Inter-Office Memorandum, Sept. 5, 1972 (explaining that under § 196-d, "[a]n employer's agent is a person who stands in the shoes of the employer, including a[] general manger of the business, but does not include a mere supervisory employee who does not have the authority to hire or fire.").  The evidence presented at trial establishes that providing service to patrons was the "principal" responsibility for both Mr. Drill and Mr. Vosilla and that their supervisory authority was strictly limited to directing Plaintiffs in providing service.  (A. Scotto Aff. ¶¶ 30-31, 36-37; Vosilla Aff. ¶ 41; Drill Dep. at 26:5-29:25, 100:11-102:23, 103:19-104:12, 104:18-105:24, 108:17-115:22.)

<u>No Liability on Attilio Vosilla's Receipt of Service Charges as Party Captain (Pre-June 2011)</u>

39.     Prior to January 1, 2011, the question of whether a mandatory service charge constitutes a gratuity within the meaning of NYLL § 196-d depends upon a showing that

"employers represented or allowed their customers to believe that the charges were in fact gratuities for their employees." *Samiento v. World Yacht Inc.*, 10 N.Y.3d 70, 854 N.Y.S.2D 83, 883 N.E.2d 990 (2008).  This is "weighed against the expectation of the reasonable customer," *id.* at 79, based on the "totality of the circumstances." *Spicer v. Pier Sixty LLC*, 369 F.R.D. 321, 331 (S.D.N.Y. 2010).

40.     Plaintiffs have not established that the 20% service charge imposed prior to June 2011 was purported to be a gratuity that private party customers expected to be fully distributed to all of the service employees in the Restaurant.  Therefore, this is an alternative reason why Attilio Vosilla's receipt of a portion of the service charge when he served as party captain does not taint the overall tip pool.

<u>No Liability on Attilio Vosilla's Receipt of Administration Fee (Post-June 2011)</u>

41.     Effective January 1, 2011, the NYSDOL imposed a rebuttable presumption that a service charge is "a charge purported to be a gratuity" within the meaning of NYLL § 196-d.  12 N.Y.C.R.R. § 146-2.18(b).

42.     However, "a charge for the administration of a banquet [or] special function … [that is] clearly identified" in accordance with NYSDOL regulations is not deemed a gratuity under NYLL § 196-d.  12 N.Y.C.R.R. §§ 146-2.19(a), (c).  Fresco has complied with this notification requirement since June 2011.  (*See* Trial Affidavit of Marion Scotto ("M. Scotto Aff.") ¶ 26, Ex. 3-A; A. Scotto Aff. ¶ 50, Ex. 1-J.)  Accordingly, since that time there can be no misdirected tip liability for any private parties where Attilio Vosilla served as the party captain.

## IV.   NO LIABILITY ON PLAINTIFFS' UNPAID MINIMUM WAGE AND OVERTIME CLAIMS

43.     Plaintiffs bear the burden of proving that they performed work for which they were not properly compensated and that Defendants had actual or constructive knowledge of that

work.  *Mendez v. Int'l Food House Inc.*, 2014 U.S. Dist. LEXIS 121158 (S.D.N.Y. August 28,

2014) (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686-87 (1946)).  Plaintiffs

may satisfy this burden by "producing sufficient evidence to show the amount and extent of that

work as a matter of just and reasonable inference." Id. (citing *Anderson*, 328 U.S. at 687.).

Where an employer fails to maintain records of work performed, Plaintiffs are permitted to rely

on "estimates based on [their] own recollection." *Kuebel v. Black & Decker Inc.*, 643 F.3d 352,

362 (2d Cir. 2011) (citations omitted).  "The burden then shifts to the employer to come forward

with evidence of the precise amount of work performed or with evidence to negative the

reasonableness of the inference to be drawn from the employee's evidence." *Anderson*, 328 U.S.

at 687-88.

44.    Plaintiffs have the burden of demonstrating that they performed off-the clock

work that was more than *de minimis*, for which they were not compensated, and that Fresco was

aware that they were performing such unpaid off-the-clock work. *See Holzapfel v. Town of

Newburgh*, 145 F.3d 516, 524 (2d Cir. 1998).  Plaintiffs have not satisfied that burden.

### No Liability on Plaintiffs' Time-Shaving Claims

45.    NYLL § 191 "is the statutory provision that entitles workers to full payment of

wages for all *time worked*."  *Hinterberger v. Catholic Health System*, 299 F.R.D. 22, 36

(W.D.N.Y. 2014) (emphasis in original).  "Section 193, on the other hand, prohibits employers

from making deductions from *wages earned* unless the deduction benefits the employee or

otherwise is authorized by law."  *Id.* (emphasis in original).  Thus, the failure to pay wages for

time worked cannot support a §193 claim.  *Id.  See also Ellis v. Common Wealth Worldwide

Chaueffuered Transp. of NY, LLC*, 2012 WL 1004848, at *10 (E.D.N.Y. Marc. 23, 2012)

("Section 193 . . . does not cover failure to pay an employee for time worked") (citations omitted).

46.     First, Plaintiffs have not established that they performed any work after punching out at the end of their shift.  Upon review of their time punch records, it is clear that each of their shifts ended at different times, even when working on the same shift.  This is consistent with Defendants' evidence that shift times ended depending on when the tables in their section (or the customers in the Restaurant generally) emptied out during that shift.  The Restaurant's long-standing practice had been to assign minimal closing duties, and the time punch records reflect the fact that only a few employees stayed until the end of the service to "close."

47.     Second, there is no evidence to support Plaintiffs' claim they were instructed to perform any work "off the clock" or that their time entries were altered so as to credit them less time worked.  The Court's analysis of Plaintiffs' time and payroll records confirms Defendants' account that the Restaurant's practice with respect to irregular punches was to credit more time so as to presume they worked the full shift.  Furthermore, this contention is also undermined by the fact that during certain times of the year, *i.e.*, during the holiday season, Plaintiffs worked more than 40 hours per week.

48.     Finally, Plaintiffs' claim that Fresco was not entitled to deduct for the family meal breaks has no merit.

49.     Under the FLSA, an employer's timekeeping policies are lawful as long as they "allow[] for the complete and accurate recording of all time worked."  *Zivali v. AT & T Mobility, LLC,* 784 F. Supp. 2d 456, 459 (S.D.N.Y. 2011). There is no prohibition against requiring an employee to report having worked in order to receive pay for time worked and where an employer sets up a "reasonable process for an employee to report uncompensated time," it "is not

liable for non-payment if the employee fails to follow the established process.".  *DeSilva*, 2014

U.S. Dist. LEXIS 77669 *citing White v. Baptist Mem'l Health Care Corp.*, 699 F.3d at 876;

*Kuebel,* 643 F.3d at 355-57.  This is true even where an employer's timekeeping policies include

an auto-deduct policy. *DeSilva*, 2014 U.S. Dist. LEXIS 77669 at * 20 ("It simply cannot be the

case that merely establishing a process for an employee to report overtime worked transforms a

legal policy, namely 'auto-deduct,' into an illegal one."); *see also* Ex. 4: NYSDOL Op. Ltr., RO–

08–0049 (Feb. 13, 2009) (explaining that meal breaks automatically deducted by timekeeping

software is not unlawful under the NYLL so long as employees are paid for all time worked).

        50.     The undisputed evidence in this case establishes that a family meal is scheduled

during lunch from 10:30 am to 11:00 am every day and a second family meal is scheduled from

4:30 pm to 5:00 pm every day.  Employees are not required to remain at the restaurant during the

family meal and many Plaintiffs admit that they do not perform any work during family meal.

(A. Scotto Aff. ¶ 11; Drill Dep. at 85:22-86:7.)  Because the credible evidence establishes that

Plaintiffs did not perform work during the family meal periods, Plaintiffs are not entitled to

wages under the FLSA for the 30-minute family meal periods.

        51.     Under NYLL, employees are entitled to at least one 30-minute unpaid meal break

per day, depending on the timing of their workday.  Section 162 of NYLL provides, in pertinent

part:

> Every person employed in or in connection with a mercantile or other
> establishment or occupation coming under the provisions of this chapter
> shall be allowed at least thirty minutes for the noon day meal, except as in
> this chapter otherwise provided. The noon day meal period is recognized
> as extending from eleven o'clock in the morning to two o'clock in the
> afternoon.  An employee who works a shift of more than six hours which
> extends over the noon day meal period is entitled to at least thirty minutes
> off within that period for the meal period.  NYLL § 162.

52.     Under well-established law there is no private right of action for violations of NYLL § 162. *Ellis v. Common Wealth Worldwide Chaueffuered Transp. of NY, LLC*, 2012 U.S. Dist. LEXIS 40288 (E.D.N.Y. Mar. 23, 2012) (granting summary judgment in favor of defendant because there is no private right of action to enforce NYLL n 162); *Cyr v. Berry Plastics Corp.*, 2011 U.S. LEXIS 145468 (N.D.N.Y. Dec. 19, 2011); *McElroy v. New York*, 50 Misc. 2d 223, 225, 270 N.Y.S.2d 113, 115 (N.Y. Sup. Ct. 1966) ("Though there is no question that the defendant illegally denied them 15 minutes of lunchtime which they otherwise were entitled to, plaintiffs may not recover the value thereof since under the statute [Section 162] they are given no right of action for any violation thereof."), *aff'd*, 29 A.D.2d 737, 287 N.Y.S.2d 352 (2d Dep't 1968); *Browne v. I.H.O.P.*, 2005 WL 1889799 (E.D.N.Y. Aug. 9, 2005); *Carrube v. New York City Transit Auth.*, 291 A.D.2d 558, 738 N.Y.S.2d 67 (2d Dep't 2002); *Gain v. Eastern Reinforcing Serv., Inc.*, 193 A.D.2d 255, 603 N.Y.S.2d 189, 191-92 (3d Dep't 1993); *Livingston v. Todd Shipyards Corp.*, 187 Misc. 672, 62 N.Y.S.2d 45 (N.Y. Sup. Ct.), *aff'd*, 271 A.D. 864, 66 N.Y.S.2d 626 (1st Dep't 1946); *E.E.O.C. v. Wal-Mart Stores, Inc.,* No. 99-CV-453, 2001 WL 1725300, at *7 (W.D.N.Y. Sept. 28, 2001).

53.     To establish liability under NYLL with respect to meal breaks, Plaintiffs must prove that they performed work during their meal break for which they were not properly compensated. *Hinterberger v. Catholic Health Sys.*, 299 F.R.D. 22 (W.D.N.Y. 2014) (citing *Wolman v. Catholic Health Sys. of Long Island, Inc.*, 853 F. Supp. 2d 290, 300-301 (E.D.N.Y. 2012)(aff'd in part and rev'd in part on other grounds sub nom); *Lundy v. Catholic Health Sys. of Long Island, Inc.*, 711 F.3d 106 (2d Cir. 2013); *Gordon v. Kaleida Health*, 299 F.R.D. 380, 396 (W.D.N.Y. 2014)).

54.     Plaintiffs in this case received a 30 minute meal break, albeit not between 11 am and 2 pm when they worked a lunch shift.  However, because there is no private right of action for meal break violations, Plaintiffs are not entitled to a finding of liability or damages with respect to the timing of the meal break. Plaintiffs also are not entitled to a finding of liability or damages because the credible evidence as set forth above establishes that Plaintiffs did not perform work during the family meal periods.

<u>No Liability on Plaintiffs' Shift Pay Claims</u>

55.     Plaintiffs have not established as a matter of just and reasonable inference that prior to the Restaurant's installation of an electronic timekeeping system in June 2011, their shifts lasted longer than for the hours that they were paid.

56.     Prior to 2011, the Restaurant paid the service staff a set number of hours depending on whether they worked a lunch or dinner shift.  The hours were set by Anthony Scotto, to insure that staff was compensated for all hours worked.  (A. Scotto  Aff. ¶ 13; Trial Affidavit of Natasha Gelman ("Gelman Aff.) ¶ 27-29.)

57.     These hours were adjusted based on business volume.  Anthony Scotto would set the number of paid based on the longest shift at the Restaurant.  (A. Scotto Aff. ¶ 13; Gelman Aff. ¶ 31.)

58.     When the Restaurant was at its busiest, the longest lunch shift for a busser would be from 10 AM to 3 PM.  With the 30-minute family meal break, the Restaurant paid the employees for 5 hours, regardless of an employee showed up late, had to leave early, or if all the bussers and runners were gone by 2 PM.  Similarly, the longest dinner shift would be from 4 PM to 11 PM.  The Restaurant paid them for 7 hours of minimum wage for six-and-a-half hours worked, regardless of they left at 9 or 9:30 PM.  (A. Scotto Aff. ¶ 14; Gelman Aff. ¶ 31-32.)

59.     When business declined during the summer of 2008, the last lunch customer would be gone by 2 PM and the last dinner customer would be gone by 9 PM or 9:15 PM. During these period of time the number of hours paid for five (5) hours per shift.  When the economy picked back up in or around December 2010, this was increased to six (6) hours for each dinner shift.  (Gelman Aff. ¶ 34-35.)

60.     A review of Plaintiffs' pay records indicate that their punch-out times are consistent with the staggered shift end times that are characteristic of the service at Fresco.  (*See* Gelman Aff. ¶ 9, Ex. 2-B.)

61.     Moreover, overtime was rare both before and after the time clock was implemented.  (Gelman Aff. ¶¶ 40-42, Ex. 2-E.)  A comparison of the number of shifts worked versus the number of hours worked per week reflects that the Plaintiffs often worked many more than the typical six (6) or seven (7) shifts a week and averaged less than 38 hours.  More often than not, even when they worked eight shifts, they still did not work more than 40 hours.  (*See* Defs. Exhibit  F.)

62.     Anthony Scotto also controlled the number of shifts that each individual worked so that no one spent more than 32 or 35 hours in the Restaurant per week.  When business picked up, the shift pay was increased to reflect the increased volume of customers and longer service hours.  Given Anthony Scotto 's strict control over the timing and number of shifts worked by the Plaintiffs, and the unpaid family meal break time that the amount of pay each shift was designed to cover, Plaintiffs have not shown that they were not properly compensated for the amount of time worked during the shift pay era.  In all cases, the employees were fairly and lawfully compensated for all hours worked.  (A. Scotto Aff. ¶¶ 13-14; Gelman Aff. ¶¶ 25-43.)

## V.     NO LIABILITY ON PLAINTIFFS' UNIFORM PURCHASE CLAIMS

63.     Before January 1, 2011, "uniform" was defined as "clothing worn by an employee, at the request of the employer, while performing job-related duties" and did not "include clothing that may be worn as part of an employee's ordinary wardrobe."  12 N.Y.C.R.R. § 137-3.13 (repealed January 1, 2011).

64.     Since January 1, 2011, "ordinary wardrobe," has been defined as "ordinary basic street clothing selected by the employee where the employer permits variations in details of dress" for the purposes of the uniform regulation.  12 N.Y.C.R.R. § 146-3.10.

65.     The dress code for the bussers and runners — consisting of black pants, black shoes, a yellow button-down shirt, and a tie — has never constituted a "uniform" as a matter of law.  *See Roach v. T.L. Cannon Management Corp.*, 889 F. Supp. 2d 364, 373 (N.D.N.Y. 2012) (black pants, black shoes and black button-down shirt did not constitute a uniform, as all are items that "from an objective perspective, … are within the category of clothes 'that may be worn as part of an employee's ordinary wardrobe.'").  The fact that Plaintiffs chose not to wear the dress code items outside of work is of no consequence.  *Id*.  Indeed, many Plaintiffs admitted they chose to wear these clothing items outside of work.

66.     Even if the clothing items described by Plaintiffs constituted a uniform, Plaintiffs never actually paid for the shirts and ties issued by the Restaurant or purchased any of these items themselves.  If the Restaurant did not have the correct sizes on hand, the owner and general manager personally purchased these items for the Plaintiffs himself.  While Plaintiffs claim that they purchased various clothing items, they have failed to offer any evidence of the cost of these items; in fact, they failed to offer any proof that they in fact purchased the items at all.  In the absence of this proof, it is clear that Plaintiffs are not entitled to recovery for their uniform purchase claims prior to January 1, 2011.  *Garcia v. La Revise Associates LLC*, 2011 WL

135009, at *9 (S.D.N.Y. Jan. 13, 2011) (granting summary judgment, dismissing plaintiffs' uniform and laundering claims where plaintiffs "proffered no evidence showing that any employee incurred ... expenses or that any such expenses would have reduced such employee's compensation below the statutory minimum wage rate").

## VI.    NO LIABILITY ON PLAINTIFFS' NYLL § 195 CLAIMS

67.    Prior to October 26, 2009, there was no written wage notice requirement under New York law.  Effective October 26, 2009, NYLL § 195 was amended to require written notice to employees at the time of hire: "of the rate of pay and of the regular pay day designated by the employer."   NYLL § 195(1) (eff. Oct. 26, 2009, repealed).   Prior to April 9, 2011, NYLL required that employers provide a statement (pay stub) with every payment of wages, listing "gross wages, deductions and net wages, and upon the request of an employee furnish an explanation of how such wages were computed."  NYLL § 195(3) (repealed April 9, 2011).

68.    On April 9, 2011, the Wage Theft Prevention Act ("WTPA") was enacted, which amended the wage notice and pay stub requirements under NYLL § 195 and the remedies available for a violation of these requirements under NYLL § 198.  NYLL § 195(1) now requires that written notices of pay to be issued to employees at the time of hire and annually thereafter, in English and in the primary language of the employee, which includes the following information:

> "the rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; allowances, if any, claimed as part of the minimum wage, including tip, meal, or lodging allowances; the regular pay day designated by the employer in accordance with section one hundred ninety-one of this article; the name of the employer; any "doing business as" names used by the employer; the physical address of the employer's main office or principal place of business, and a mailing address if different; the telephone number of the employer; plus such other information as the commissioner deems material and necessary."  NYLL § 195(1)(a).  If an employee identified his or her primary language as a language that the Commissioner of Labor had not issued a dual-

language template form, an employer could satisfy its obligation by issuing an English-language notice.  NYLL § 195(1)(c).

69.    NYLL § 195(3) now requires that the following information be included on the employee's pay stub:

> "the dates of work covered by that payment of wages; name of employee; name of employer; address and phone number of employer; rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; gross wages; deductions; allowances, if any, claimed as part of the minimum wage; and net wages."  NYLL § 195(3).

70.    Prior to the enactment of the Wage Theft Prevention Act ("WTPA") on April 9, 2011, the only remedy available for a violation of NYLL § 195 was recovery for the underpayment of wages.  *See* N.Y. Lab. L. § 198 (providing for the recovery of "wages, benefits and wage supplements."); *Rice v. Scudder Kemper Invs., Inc.*, 2003 U.S. Dist. LEXIS 14239, at *12 (S.D.N.Y. Aug. 14, 2003) (citing *Gottlieb v. Kenneth D. Laub & Co., Inc.*, 82 N.Y.2d 457, 463 (N.Y. 1993) ("§ 198 provides relief for failures to 'pay the wage required by this article.'")).  There is no evidence in the record of any underpayment of wages; therefore, Plaintiffs cannot recover on their claim prior to April 9, 2011.

71.    For the first time, upon the enactment of the WTPA, NYLL § 198 provided for statutory penalties for violations of NYLL § 195, but also provided for an affirmative defense if the employer can show that the employee was paid all wages due.  N.Y. Lab. L. § 198(1-b, 1-d).  The statutory penalties available for a violation of NYLL § 195(1) are "fifty dollars for each work week that the violations occurred or continue to occur, but not to exceed a total of two thousand five hundred dollars."  N.Y. Lab. L. § 198(1-b).  The statutory penalties available for a violation of NYLL § 195(3) are "one hundred dollars for each work week that the violations occurred or continue to occur, but not to exceed a total of twenty-five hundred dollars"  N.Y. Lab. L. § 198(1-d).

72.     It is undisputed that the Plaintiffs who were employed at Fresco in 2011 received English-language notices in 2011 and dual-language notices in English and Spanish in 2012 and 2013.  (JPTO Stip § _.)  Accordingly, Defendants are not liable for failure to comply with the annual notice requirement of NYLL § 195 (1).   Even assuming, *arguendo*, that Defendants failed to comply with NYLL § 195 (1), there is no evidence in the record of any underpayment of wages and therefore, Defendants are entitled to the benefit of the affirmative defense and Plaintiffs are not entitled to any statutory penalties.

73.     It is also undisputed that the Plaintiffs who were employed at Fresco from 2011 to the present received pay stubs with all of the information required by NYLL § 195(3).  Plaintiffs only take issue with the number of hours listed on their pay stubs, as they claim they were not compensated for off-the-clock work. By definition, off-the-clock work is not reflected on employer records.  Assuming that any errors on Plaintiffs' paystubs attributable to incorrect time records actually presents a cognizable injury under NYLL § 195(3), Plaintiffs are still not entitled to any statutory damages because there is no evidence in the record of any underpayment of wages and therefore, Defendants are entitled to the benefit of the affirmative defense.

**VII.    MARION SCOTTO IS NOT INDIVIDUALLY LIABLE AS AN EMPLOYER**

74.     Individual liability under the FLSA is premised upon "personal responsibility for making decisions about the conduct of the business that contributed to the violations of the Act." *Baystate Alternative Staffing, Inc. v. Herman*, 163 F.3d 668, 678 (1st Cir. 1998).

75.     In order for a person within a company that employs a worker to be personally liable for damages, that individual must exercise "operational control" over the employees so as to "directly affect the nature or conditions of the[ir] employment." *Irizarry v. Catsimatidis*, 722 F.3d 99, 105, 110 (2d Cir. 2013).

76.     "Evidence that an individual is an owner or officer of a company, or otherwise makes corporate decisions that have nothing to do with an employee's function, is insufficient to demonstrate 'employer' status.  Instead, to be an 'employer,' an individual defendant must possess control over a company's actual 'operations' in a manner that relates to a plaintiff's employment." *Irizarry v. Catsimatidis*, 722 F.3d 99, 109 (2d Cir. 2013).

77.     "The *Carter* factors [] provide guidance for courts when an individual's actions rise to this level," *i.e.*, (1) the power to hire and fire, (2) supervising and controlling employee work schedules or conditions of employment, (3) determining employees' rate and method of pay and (4) maintaining employment records. *Id.* at 110.

78.     Here, there is no evidence to suggest Marion Scotto performed any of these functions.

79.     Marion's primary role is customer-oriented.  (M. Scotto Aff. ¶¶ 7-8; Brent Dep. at 116:21-117:11.)

80.     Marion Scotto did not have the power to hire and fire, or exercise any authority with respect to Plaintiffs in this regard.  Anthony Scotto hired both Brent Drill and Attilio Vosilla, as well as all of the busboys at the Restaurant.  He is the only person at the Restaurant with this authority.  (A. Scotto Aff. ¶ 5; M. Scotto Aff. ¶¶ 4-6; Vosilla Aff. ¶¶ 3-4; Depositions of Brent Drill ("Drill. Dep.") at 12:25-13:34, 13:24-14:18, 40:19-19.)

81.     Marion Scotto does not influence employee schedules.  This is solely Anthony Scotto's domain.  (M. Scotto ¶ 13; A. Scotto Aff. ¶ 10; Vosilla ¶ 36-38; Brent Dep. at 36:18-26.)

82.     Marion Scotto did not exert any influence over employee pay; in fact, Anthony Scotto is only individual who can set employee pay.  (A. Scotto Aff. ¶ 17; Gelman ¶ 25.)

83.     Anthony Scotto maintains all of Plaintiffs' employment records.  (A. Scotto Aff. ¶ 18; Vosilla Aff. ¶ 39-40.)

84.     Anthony Scotto manages the business and runs the day-to-day operations at Fresco, especially with respect to Plaintiffs' employment and the wage-and-hour practices, whereas Marion has no role whatsoever .  (A. Scotto Aff. ¶¶ 3, 9-10.)

## VIII.   WILLFULNESS AND GOOD FAITH

85.     The statute of limitations on FLSA claims is two years; it may be extended to three years only for "willful" violations.  29 U.S.C. § 255(a).

86.     Plaintiffs carry the burden of proving that a violation is willful.  *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 135 (1988); *Young v. Cooper Cameron Corp.*, 586 F.3d 201, 207 (2d Cir. 2009).

87.     An FLSA violation is "willful" only if the employer "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988).  "Plaintiffs must prove more than that defendant 'should have known' it was violating the law … [they must prove] actual knowledge of a legal requirement, and deliberate disregard of the risk that one is in violation." *Damassia v. Duane Reade, Inc.*, 2005 WL 1214337, at *3 n.2 (S.D.N.Y. May 20, 2005).

88.     "If an employer acts unreasonably, but not recklessly, in determining its legal obligation" then its actions "should not be … considered willful."  *McLaughlin*, 486 U.S. at 135 n.13.  A good-faith belief regarding the legality of certain practices may be found non-willful if the state of the law was in flux.  *See Reich v. Waldbaum, Inc.*, 52 F.3d 35, 41 (2d Cir. 1995) (finding willful violation of the FLSA only where "the law was clear at all relevant times"). Adhering to "a practice in the face of legal risk" does not imply a finding of recklessness.  *Hart v. Rick's Cabaret Intern., Inc.*, 967 F.Supp. 2d 901, 938 (S.D.N.Y. 2013).

89.     Prior to November 24, 2009, NYLL § 198(1-a) stated that to receive liquidated damages, it was the burden of the employee to show that the "employer's failure to pay the wage required by this article was willful."

90.     The willfulness standards for the FLSA statute of limitations and NYLL liquidated damages do not differ to any appreciable extent.  *Kuebel v. Black & Decker Inc.,* 643 F.3d 352, 366 (2d Cir.2011).

91.     The Court has discretion on whether to award liquidated damages under the FLSA "where the employer shows that, despite its failure to pay appropriate wages, it acted in subjective 'good faith' with objectively 'reasonable grounds' for believing that its acts or omissions did not violate the FLSA." *Barfield v. New York City Health and Hospitals Corp.,* 537 F.3d 132, 150 (2d Cir.2008).

92.     For any violations of the NYLL accruing on or after November 24, 2009, a plaintiff-employee is not entitled to recover liquidated damages under NYLL § 198-(1-a) if the employer can establish that it acted in good faith for having failed to pay the required wages, *i.e.*, the same standard applicable to liquidated damages under the FLSA.  N.Y. Lab. Law § 198(1-a); *Gold v. N.Y. Life Ins. Co.*, 730 F.3d 137, 143 (2d Cir. 2013).

93.     Here, Plaintiffs have not satisfied their burden of demonstrating that Fresco willfully disregarded their rights under the FLSA or NYLL.   Defendants took active steps to ascertain their obligations under the law and make good-faith efforts to comply.

94.     With respect to informing employees about the tipped minimum wage: Anthony Scotto reviewed the tipped minimum wage, tip makeup policy and waiter tip pool with Plaintiffs at the time of hire in English with the assistance of a Spanish-speaking employee, Wilmer

- 44 -

Baltodano.  He regularly updated the wage-and-hour notices posted in the Restaurant in English and Spanish, and issued written notices of pay.  (A. Scotto Aff. ¶ 9.)

95.     In January 2013, Mr. Drill received a promotion.  He became, in effect, the maître d'/service manager for the lunch shift.  This was similar to the position held by Mr. Vosilla with respect to the dinner shift.  In this role, although he continued to participate in the service, like Mr. Vosilla or anyone else that served in that role during a particular shift, he did not share in the tip pool and was paid by the house.  Mr. Drill no longer works at Fresco; his last day of employment was on or around July 25, 2014.  (A. Scotto Aff. ¶ 37.)

96.     Anthony Scotto is responsible for legal compliance.  He took steps to keep updated on developments in the law, including consulting with Fresco's accountant and attorneys.  He purchased updated wage-and-hour posters for the Restaurant when there were changes in the minimum wage.  Fresco has never been investigated or fined by the United States Department of Labor or the New York State Department of Labor for any wage and hour violations.  (A. Scotto Aff. ¶ 38.)

97.     Anthony Scotto took steps to create the weekly schedule for front-of-house employees to limiting bussers and runners to no more than six or seven shifts each week so as to create a 28-35 hour workweek.  The front-of-the-house staff has never, by design, worked anything close to the hours worked by the back-of-the-house employees.  (A. Scotto Aff. ¶ 39.)

98.     Anthony Scotto also structured the workday at the Restaurant to make sure that Fresco was complying with the law.  He minimalized the amount of preliminary service functions so that they were designed to take only 10 or 15 minutes to complete, and scheduled a 30-minute window for them to be completed.  He also scheduled a half-hour meal break afterwards and gave employees the option to participate in the family meal or use the time as

they would otherwise see fit.  Lunch service typically runs from 11:30 AM until between 2 PM

and 3 PM.  At 5:30 PM, the restaurant is open for business and the service lasts until the last

customer leaves.  The end time of a given shift is different every night, but the last guests usually

leave the Restaurant somewhere between 9:30 PM and 11 PM.  Individuals are free to leave once

there are no longer patrons in their section of the Restaurant.  Runners and bussers typically start

leaving as the dining room starts to empty out.  Usually there is only one runner and one or two

bussers who stay until the end of service.  (A. Scotto Aff. ¶¶ 41-42; *see also* Drill Dep. at 24:2-

18.)

99.     Anthony Scotto scheduled the half-hour family meal break based upon the unpaid

meal break requirement under the NYLL. Employees are free to bring their own food or spend

that time however they see fit; if they wish to leave the Restaurant they are free to do so.

Employees do not perform any work during family meal times.  (A. Scotto Aff. ¶ 42.)

100.     The tip pool at Fresco has always been run by the waiters without any interference

from management whatsoever.  There has never been—not for a single shift—an individual who

participated in the tip pool who did not participate in some aspect of the service.  No member of

the Scotto family nor the Restaurant has ever taken any money from the tip pool.  All of the

money is distributed to individuals who participated in the service without exception.  (A. Scotto

Aff. ¶ 43.)

101.     Since the Restaurant opened, Anthony Scotto has made sure that management has

abstained from involvement with the tip pool.  This was based on his understanding that only

service employees could participate and that anyone whose duties might deem them an

"Employer" under the law would be disqualified.  Throughout the entirety of his career, he has

understood this to mean individuals who have authority to hire and fire, determine pay rates,

maintain employment records, set hours or methods or take any meaningful action with respect to employees' terms and conditions of employment, which is why he has taken steps to make sure he is the only individual in the Restaurant who has in those regards.  It has always been the case that any supervisors or managers at Fresco are solely focused on the service —nothing else. It was his understanding that individuals who participate in the service and have limited supervisory authority can properly be included in a tip pool, which has always been the case at Fresco Restaurant.  (A. Scotto Aff. ¶ 44.)

102.   It was also Anthony Scotto's understanding that service employees who participate in a tip pool are not supposed to perform maintenance or "back-of-the-house" tasks. At no point in time, have bussers or runners been assigned to wash dishes in the kitchen or clean the dining room.  All of this work is done by the dishwashers/porters.  The Restaurant employs six (6) dishwashers/porters and there are two (2) or three (3) of these individuals scheduled to work at the Restaurant from early in the morning until after the Restaurant closes.   Every morning at 7 AM, they vacuum the dining room floor, clean the bar area, clean the windows and wash the bathrooms; clean the dining room every afternoon at 4 PM; and clean the kitchen and take out the garbage every night at 11:30 PM.   They are the last employees to leave the Restaurant and typically leave every night around midnight before the next shift of porters/dishwashers return the next day at 7 AM. (A. Scotto Aff. ¶ 45; Vosilla Aff. ¶ 6.)

103.   The Restaurant was first sued in August 2010 by a former waiter, Gary Gillian, and was successful in defeating class treatment.  After settling that action on an individualized basis, the same attorneys brought a nearly identical lawsuit on behalf of another waiter, Ron Megason.  Prior to these actions, the pay practices at Fresco had not been challenged.  (A. Scotto Aff. ¶ 46.)

104.     Shortly after the first lawsuit was filed, Anthony Scotto met with the Restaurant's accountant ant attorneys regarding Fresco's pay practices, as well as compliance with the 2011 amendments to the NYS Hospitality Wage Order, which went into effect March 2011.  (A. Scotto Aff. ¶ 47; *see also* Ex. 8, NYSDOL Hops. Industry Min. Wage Info Pub. LS-209.)

105.     Beginning in March of 2011, Anthony Scotto began providing employees with written notices of their pay.  (A. Scotto Aff. ¶ 48; Stip. Fact. No. 14.)

106.     Fresco began paying spread-of-hours pay for all double shifts beginning in February 2011. (A. Scotto Aff. ¶ 49; Gelman Aff. ¶ 19-20, 39, Ex. 2-D.)

107.     Fresco upgraded to an electronic timekeeping system in June 2011.  Anthony Scotto trains all new employees on how to clock in and out.  Employees are able to see their time punches on a printout every time they clock in or out.  If an employee forgets to punch in or out the Restaurants practice is to credit them the maximum amount of time worked.  Outside of this lawsuit Fresco has not received any complaints from employees regarding their ability to punch in or out.  (A. Scotto Aff. ¶ 49; Gelman Aff. ¶¶ 13, 14, 27; Drill. Dep. at 66:25-68:4.)

108.     In June 2011, Anthony Scotto  also decided to change the service charge amount paid to party captains to a 3% administration fee in order to avoid any appearance that this amount was an assumed gratuity that would be subject to distribution with other service staff. The form used to book private parties was updated for all private party bookings going forward. Anthony Scotto did so as a measure against continued lawsuits to avoid   any ambiguity going forward.  (A. Scotto Aff. ¶ 50.)

109.     Fresco also began paying uniform maintenance pay to front-of-house employees, even though the clothing items issued to bussers and runners were not considered "uniforms" under the law, *i.e.*, generic items of clothing that could be worn anywhere and are quite common

among employees in the Restaurant industry, *i.e.*, black pants and shoes, a button-down shirt and tie.  At all times relevant to this lawsuit, the shirt color worn by busboys has been yellow.  (A. Scotto Aff. ¶ 51.)

<u>Plaintiffs are not Entitled to Double Recovery on Their Liquidated Damages Claims</u>

110.    Even if the Court were to find that Plaintiffs were entitled to liquidated damages on any of their claims, Plaintiffs would only be entitled to liquidated damages under the NYLL for the 3 or 4 years preceding the FLSA statute of limitations.  Plaintiffs cannot recover liquidated damages under both the FLSA and NYLL for the same time period.  *See, e.g., Li Ping Fu v. Pop Art Int'l Inc.*, 2011 U.S. Dist. LEXIS 113614, at *17-18 (S.D.N.Y. Sept. 19, 2011) ("Because both forms of liquidated damages serve the same purpose and have the same practical effect of deterring wage violations and compensating underpaid workers, this Court will award only the greater amount of liquidated damages under the FLSA."); *Jin v. Pac. Buffet House, Inc.*, No. CV-06-579, 2009 U.S. Dist. LEXIS 74901, at *25 (E.D.N.Y. Aug. 24, 2009) (Rejecting double recovery because "[r]egardless of the purpose, the award under the FLSA is four times the award under state law, and thus is more than sufficient to satisfy any punitive purpose the state law is intended to serve."); *Pineda-Herrera v. Da-Ar-Da, Inc.*, 2011 U.S. Dist. LEXIS 57121, at *16 (E.D.N.Y. May 26, 2011); ("[B]oth forms of damages seek to deter wage-and-hour violations .... Both do so in a manner calculated to compensate the party harmed....  Because this Court finds no persuasive basis to distinguish the two forms of damages, ... the Court will award the greater of the two where both forms of damages are otherwise available for the same violations.").  Therefore, Plaintiffs are not entitled to recover up to 100% liquidated damages for the applicable limitations period under the FLSA.  To the extent liability is found on any NYLL claims, 100% liquidated damages would only available between April 9, 2011 (*i.e.*, the date

liquidated damages under the NYLL increased from 25%) and May 4, 2011 (upon a finding of non-willful FLSA violations).

### Prejudgment Interest (FLSA)

111.  The Second Circuit has held that plaintiffs may not recover both liquidated damages and prejudgment interest under the FLSA.  *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1064, 1988 U.S. App. LEXIS 4338, at *1-2 (2d Cir. 1988).  Therefore, if the Court were to award liquidated damages, it would not also award prejudgment interest to Plaintiffs.

112.  If prejudgment interest is awarded, courts generally find that the start date for calculating prejudgment interest is the midpoint date of the period for which wages were awarded.  *Cesario v. BNI Constr., Inc.*, 2008 U.S. Dist. LEXIS 103155, at *26 (S.D.N.Y. Dec. 15, 2008) (GWG).  Therefore, any prejudgment interest award will not cover the full two or three year statute of limitations under the FLSA or the full six year statute of limitations under the NYLL.

### Prejudgment Interest (NYLL)

113.  The Court does have discretion to award prejudgment interest to Plaintiffs under the New York Labor Law.  However, courts often deny prejudgment interest under the New York Labor Law if liquidated damages are awarded to plaintiffs.  *See, e.g., Rodriguez v. Queens Convenience Deli Corp.*, 2011 U.S. Dist. LEXIS 120478, at *17 (E.D.N.Y. Oct. 18, 2011).  If the Court were to award liquidated damages, it would exercise its discretion not to award prejudgment interest to Plaintiffs under the NYLL.

Date:   November 11, 2014
        New York, New York              Respectfully submitted,


                                        /s/ Craig R. Benson
                                        Craig R. Benson
                                        Naveen Kabir
                                        LITTLER MENDELSON, P.C.
                                        900 Third Avenue
                                        New York, NY  10022.3298
                                        212.583.9600

                                        Attorneys for Defendants