EC8ASAL1ps

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    --------------------------------x

3    ENRIQUE SALINAS, *et al.*,

4              Plaintiffs,

5         v.                              13-cv-2992 (AT)

6    STARJEM RESTAURANT CORP., *et al.*,

7              Defendant.

8    --------------------------------x

9                                        New York, N.Y.
                                         December 8, 2014
10                                       9:30 a.m.

11   Before:

12                   HON. ANALISA TORRES

13                                        District Judge

14

15                        APPEARANCES

16   MICHAEL FAILLACE & ASSOCIATES, P.C.
          Attorneys for Plaintiffs
17   BY:  JOSHUA S. ANDROPHY, ESQ.
          SHAWN R. CLARK, ESQ.
18
     LITTLER MENDELSON, P.C.
19        Attorneys for Defendants
     BY:  CRAIG R. BENSON, ESQ.
20        NAVEEN KABIR, ESQ.

21

22

23

24

25

EC8ASAL1ps

```
 1                    (In open court)

 2              THE CLERK:  Salinas, et al. v. Starjem Restaurant

 3    Corp., et al.  Counsel please state your name for the record.

 4              MR. ANDROPHY:   Joshua Androphy of Michael Faillace &

 5    Associates for plaintiffs.

 6              MR. CLARK:  And Shawn Clark, also of Michael Faillace

 7    & Associates, for plaintiff.

 8              MR. BENSON:  Craig Benson for all defendants.

 9              MS. KABIR:  Naveen Kabir for all defendants.

10              THE COURT:  Good morning.  Those are your clients,

11    seated with you?

12              MR. BENSON:  They are, your Honor.  I'd like to

13    introduce Marion Scotto and Anthony Scotto Jr., your Honor.

14              THE COURT:  All right.  Good morning.  I understand

15    that there are certain housekeeping matters that needed to be

16    taken care of this morning, but I expect to start at 9 a.m. for

17    the rest of the trial.

18              During our conference last Thursday on December 4th,

19    we discussed among other things plaintiff's spread of hours

20    claim.  Specifically, plaintiffs stated that they would not be

21    pursuing this claim with respect to the period after February

22    2011.  Defendant in turn conceded that plaintiffs did not

23    receive any spread of hours pay prior to February 14th, 2011.

24    Is that correct?

25              MR. BENSON:  That is correct, your Honor.
```

EC8ASAL1ps

1                 MR. ANDROPHY:  Yes, that's correct, your Honor.

2                 THE COURT:  All right, then.  We can then start with

3     the plaintiff's first witness.

4                 MR. ANDROPHY:  Plaintiffs call Enrique Salinas.

5      ENRIQUE SALINAS,

6           a plaintiff herein, having been duly sworn through the

7           interpreter, testified as follows:

8                 THE COURT:  You may inquire.

9                 THE INTERPRETER:  Your Honor, am I put under oath too

10    or not?  I'm already part of the -- I do for the interpreters

11    office.  But I've been independently contracted this time, so I

12    wonder if I need to be put under oath too or not, your Honor.

13                THE COURT:  Very well.  We shall swear the

14    interpreter, then.

15                THE INTERPRETER:  Thank you, your Honor.

16                (Interpreter sworn)

17                THE INTERPRETER:  My name is G. Eugene Alvarez,

18    A-l-v-a-r-e-z.  And I am a certified federal court interpreter.

19                Good morning, your Honor.

20                THE COURT:  Good morning.

21                You may inquire.

22                MR. ANDROPHY:  May I hand the witness his declaration?

23                THE COURT:  You may.

24    DIRECT EXAMINATION

25    BY MR. ANDROPHY:

EC8ASAL1ps                         Salinas – direct

1    Q.   Good morning, Mr. Salinas.

2    A.   (Through interpreter) Good morning.

3    Q.   I've just handed you a document.  Is this document your

4    declaration that shall serve as your testimony in this case?

5    A.   Yes, I understand.

6    Q.   And can you turn to the last page of that.

7    A.   OK, perfect.

8    Q.   Is that your signature on the last page?

9    A.   Yes, sir.

10            MR. ANDROPHY:  We ask that this be accepted as the

11   witness's direct testimony, and we've marked it Plaintiff's

12   Exhibit 104.

13            MR. BENSON:  I have a foundation objection and I'd

14   like to voir dire.

15            THE COURT:  Go ahead.

16            MR. BENSON:  Thank you.

17   VOIR DIRE EXAMINATION

18   BY MR. BENSON:

19   Q.   Good morning, Mr. Salinas.

20   A.   Good morning, sir.

21   Q.   Do you speak English?

22   A.   (In English) Not that much.

23            THE INTERPRETER:  Please wait until the interpreter

24   has fully finished his translation before you answer.

25   Q.   Can you read and fully comprehend English?

EC8ASAL1ps                          Salinas - direct

1  A.  (Through interpreter) No.

2  Q.  Did you ever receive a translated version of what's been

3  introduced into evidence as your declaration?

4  A.  Yes.

5  Q.  You did receive it.  Was it in writing?

6  A.  Yes.

7  Q.  Do you have it with you?

8  A.  No.

9  Q.  Was there a translator available to you to authenticate

10  that the English version was the same as the Spanish version?

11  A.  Yes, sir.

12  Q.  Is there any reason why you don't have the Spanish version

13  with you?

14  A.  No, no.

15          MR. BENSON:  Your Honor, I don't understand, if there

16  was a translated version and it was certified by the

17  translator, why that has not been introduced into evidence as

18  the foundation for the declaration in English.  That would be

19  the basis of my objection.

20          THE COURT:  Overruled.  It is admitted.

21          (Plaintiff's Exhibit 104 received in evidence)

22          THE INTERPRETER:  In case of an objection, do not

23  reply until her Honor has ruled.

24          THE COURT:  Will there be any direct beyond the

25  admission of the affidavit?

1           MR. ANDROPHY:  No, there is not.  I do ask, based on

2    the affidavit, that exhibits, Plaintiff's Exhibits 65, 66, and

3    67 be admitted.  These documents, they are identified in the

4    affidavit in paragraphs 92, 93, and 94 by this witness.

5           THE COURT:  They are admitted.

6           (Plaintiff's Exhibits 65, 66, and 67 received in

7    evidence)

8           MR. ANDROPHY:  Thank you, your Honor.

9           THE COURT:  Cross-examination.

10          MR. BENSON:  Yes.  Thank you.

11   CROSS EXAMINATION

12   BY MR. BENSON:

13   Q.  Good morning again, Mr. Salinas.  My name is Craig Benson.

14   A.  Good morning.

15   Q.  And I will be questioning you this morning.

16          Prior to working at Fresco Restaurant, you had

17   experience in the restaurant industry, did you not?

18   A.  Correct.

19   Q.  In fact, several years of experience, correct?

20   A.  Correct.

21   Q.  And that was as a busser?

22          As a busser, b-u-s-s-e-r.

23   A.  Correct.

24   Q.  What kind of restaurant did you work at?

25   A.  Michael Jordan Restaurant, in Grand Central.

EC8ASAL1ps                          Salinas - cross

```
 1   Q.  Did you get paid the tipped minimum wage in that position?

 2   A.  That is so.

 3   Q.  And in addition to that you received tips, correct?

 4   A.  Correct.

 5   Q.  And that is standard in the industry, is it not?

 6           MR. ANDROPHY:  Objection.  This is not a test for --

 7   in the industry.

 8           THE COURT:  Sustained.

 9   Q.  Was Michael Jordan a busy restaurant?

10   A.  That is so.

11   Q.  And as a result, was the service important?

12   A.  Of course.

13   Q.  Is that because a lot of people come in at once?

14   A.  That is so, sir.

15   Q.  And they expect their food in a timely manner, correct?

16   A.  Correct.

17   Q.  Now, Fresco is also a busy restaurant, is it not?

18   A.  On the weekends.

19   Q.  So it's your testimony that it's only busy on the weekends?

20   A.  During the summer.  During the winter, starting from

21   November, it is always busy.  It depends.  It depends on the

22   season.

23   Q.  Isn't it always busy at lunchtime?

24   A.  Yes, that is so.  That is correct.

25   Q.  And that is throughout the entire year, correct?
```

1   A.  Not all the time.  It depends on the season, I might

2   explain again.  During the summer it comes down quite a bit,

3   perhaps 50 percent.

4   Q.  There are high standards of service at Fresco Restaurant,

5   are there not?

6   A.  Yes, that is so.

7   Q.  And the service team is a coordinated well-oiled machine,

8   is it not?

9   A.  That is so, because -- yes, because the rollers are rollers

10  and the busboys are the busboys, and they all do their

11  individual, independent jobs by themselves.

12  Q.  They all work together to make sure that the service is

13  smooth and quick, correct?

14  A.  It is correct, but each busboy has his or her station.  The

15  rollers work more as a team because they take the food too, to

16  the main, to the main -- what can I say, what can I say -- to

17  the main, main dining room.

18  Q.  By the rollers, you mean the runners, correct?

19  A.  Correct.

20  Q.  And each of those positions has a role in the service, do

21  they not?

22  A.  That is so.

23  Q.  And they all rely on one another to do their jobs, correct?

24  A.  I repeat once again, each busboy, each station has their

25  own personal job, or chore, to do.

EC8ASAL1ps                         Salinas - cross

1    Q.  I understand that.  But they work with the runners and the

2    waiters and the captains to ensure timely and efficient

3    service, correct?

4    A.  Well, personally, in my case, my mates that are bussers,

5    they take care personally of their own job.  The runners have a

6    very different job from the busboys.  Never I did see a

7    captain, never did I see a captain.  I always only saw

8    managers.

9           THE COURT:  What do you mean by you saw them?

10          THE WITNESS:  I saw the managers work on the floor,

11   and to take orders.  They are the ones who would designate

12   which order each -- and station each busboy would take.

13          MR. BENSON:  I'm not sure that's responsive.

14   A.  That would vary.  The jobs would vary.  Sometimes my mates,

15   sometimes they would work as runners and sometimes they would

16   work as busboys.

17   Q.  But they all worked together to provide the best service to

18   the customers, correct?

19   A.  Correct, but, with the exception of the stockers and the

20   coffee makers or baristas, the baristas, they do not work

21   directly before the people, the customers.

22          MR. BENSON:  I move to strike as nonresponsive.

23          THE COURT:  Overruled.

24   Q.  So it's your testimony, so I understand, that the stocker

25   and the coffee person have no -- they are not part of the

EC8ASAL1ps                    Salinas - cross

 1    service.

 2              THE INTERPRETER:  They weren't part of?

 3              MR. BENSON:  Of the service.

 4    A.  Part of the service because they were paid from the tips,

 5    from the tip, yes.

 6              THE COURT:  What do you mean by "part of the service"?

 7              MR. BENSON:  That they serve a role in the overall

 8    service of the customer as they come into Fresco Restaurant.

 9    They participate in the service.

10              THE COURT:  Isn't the goal of a restaurant to provide

11    food to a customer?

12              MR. BENSON:  In a --

13              THE COURT:  Isn't that the overarching role, counsel?

14              MR. BENSON:  In a timely and efficient manner, and

15    there are certain individuals who are integral to making that

16    happen.

17              THE COURT:  So I think you need to make your questions

18    more specific, because the person who is to greet someone at

19    the door, the person who takes their coat, that's all a part of

20    providing the service to an individual who wants to eat food at

21    a restaurant.  And so you need to be more specific, counsel, if

22    you want this to be meaningful for the trier of fact.

23              MR. BENSON:  I understand, and I certainly will get

24    there, your Honor.

25    Q.  Good service equals better tips, correct?

1   A.  Correct.

2   Q.  And the customers at Fresco expected high standards of the

3   people who they interact with when they're getting their food,

4   correct?

5   A.  Correct.

6   Q.  Now, you have worked at Fresco Restaurant as a busser,

7   correct?

8   A.  Correct.

9   Q.  And as a busser, you were assigned to work at a particular

10  section of the dining room; isn't that right?

11  A.  Correct.  All my mates, or fellow workers, had their own

12  stations.

13  Q.  All bussers wear the same clothing; isn't that right?

14  A.  That is correct.

15  Q.  And that's regardless of their assignment?

16  A.  Correct.

17  Q.  And that's the same clothing also worn by the runners,

18  correct?

19  A.  That is so.

20  Q.  Now, when you come to the restaurant for a shift, you have

21  to check for your assignment on a chart posted at the host

22  stand, correct?

23  A.  No, never.  No, no -- no, no, no, never.  That came

24  after -- that came after, came after 2013 -- no, 2012 -- no, if

25  I remember correctly, that came after June 2012.

EC8ASAL1ps                    Salinas - cross

1   Q.  So it's your testimony that assignments were only posted

2   after June of 2012?

3   A.  First you asked me whether we would clear something with a

4   cart.  We never checked the cart for so.

5           THE INTERPRETER:  The interpreter would like to

6   correct, perhaps the interpreter did not translate correctly.

7   Maybe that provokes his wrong accent.  So I would like to

8   correct the record.  When I -- when you mentioned that

9   something had been mentioned, as I'm not that familiar with

10  this case and precisely everything about the restaurant

11  business, it might have been a mistake by the interpreter, who

12  might have induced his wrong mistake.

13          So if you rephrase your question, I will say now

14  exactly as he said that there was a map or whichever way you

15  choose.  But I would like the record not to show a mistake.  If

16  it does, it is a mistake from the interpreter.

17          MR. BENSON:  Can the court reporter read back the

18  question the question.

19          (Record read)

20          THE COURT:  One moment.  I'm going to ask the

21  interpreter and the attorneys to step up, please.

22          (Discussion held off the record at the sidebar)

23          THE COURT:  All right.  If you would read back that

24  question that we just referred to.

25          (Record read)

1   A.  Correct.  Yes, correct.  There is always a map there.

2   Q.  Let's go through a typical lunch.  The restaurant opens for

3   the customers for lunch at 11:30 a.m., correct?

4   A.  That is correct.

5   Q.  The first thing that a customer sees is a waiter greeting

6   them at their table, correct?

7   A.  That is correct.

8   Q.  And the waiter asks the table what kind of water they would

9   like to drink, correct?

10  A.  Yes, that is so.

11  Q.  And offers to take the drink order, correct?

12  A.  That is so.

13  Q.  And also asks them if they would like regular bread or the

14  grilled Fresco bread, which is a specialty bread.

15  A.  Yes, that is so.

16  Q.  If they wanted tap water, the waiter would direct the

17  busser to go get the water, correct?

18  A.  That is so.  That is correct.

19  Q.  And then as the busser, you would go to the table and fill

20  the water glass, correct?

21  A.  That is correct.

22  Q.  And if the table wanted regular bread, as opposed to the

23  grilled Fresco bread, the waiter would tell the busboy that

24  too, correct?

25  A.  That is correct.

1    Q.  So you as the busboy could serve it to the table, correct?

2    A.  That is correct.

3    Q.  Now, when you're getting bread from the kitchen, you walk

4    into the kitchen and go to the left where there's a bread

5    station, correct?

6    A.  That is correct.

7    Q.  And that's next to the coffee station, is it not?

8    A.  That is correct.  That is true.

9    Q.  And you fill a basket with the sliced bread and crackers

10   and bread sticks, and there's also a bean dip, correct?

11   A.  (In English) Yes.

12          (Through interpreter) That is correct.

13   Q.  At some point the waiter goes over the specials with the

14   table, right?

15   A.  That is correct.

16   Q.  And then takes the order of the table, correct?

17   A.  Yes, that is so.

18   Q.  Punches the order into a computer, correct?  And that

19   goes --

20   A.  That is correct.

21          MR. BENSON:  My apologies.

22   Q.  And that goes to the kitchen.

23   A.  Correct.

24   Q.  Now, as a busser, it's your responsibility to watch the

25   tables in your section once they are seated, correct?

1    A.  That is correct.

2    Q.  To see if they need water --

3    A.  Yes.

4    Q.  -- and check if they have finished their appetizers and the

5    plate needs to be removed.

6    A.  That is so.

7    Q.  And eventually you would look and see if their napkin was

8    folded over their plate, because that was a signal to you, was

9    it not?

10   A.  That is correct, yes.

11   Q.  And that meant that you had to reset the table for their

12   entrée, correct?

13   A.  That is correct.

14   Q.  And then you would go to the table and ask them if they

15   were finished.

16   A.  That is correct.  That is the service.

17   Q.  And if they said yes, you removed the used dishes, correct?

18   A.  That is correct.

19   Q.  And the silverware.

20   A.  Practically everything.  Silverware, plates.

21   Q.  And you would have to replace that with other clean

22   silverware and materials that were in the dining room at the

23   stocking stations, correct?

24   A.  Yes, because we have two stations where we have -- yes,

25   because we have two stations where we have silverware, plates,

EC8ASAL1ps                    Salinas - cross

napkins, that the stocker is always bringing from the kitchen

to the main dining room.  Correct.  Plates, silver, napkins,

glasses.  Correct.

Q.  In order to make sure that those materials are there for

the bussers to use to do their job, correct?

A.  That is correct.

Q.  And once you take the dishes from the table, you bring them

back to the kitchen, correct?

A.  Correct.

Q.  And at Fresco, you do that by hand, as opposed to a tray or

a bin, correct?

A.  That is correct.

Q.  And as a result, when there are big tables, you need more

than one person to take all the dishes back to the kitchen,

correct?

A.  That is correct, when there are more than four persons,

because it's part of the service.

Q.  It's an important part of the service to remove the dishes

in a timely manner, is it not?

A.  That is correct.  But, but not all stations are for four

persons.  Not all require assistance or help from other

persons.  If you're trying to say that we worked as a team, not

everyone required help or assistance.

Q.  But you do require help or assistance on a larger table, do

you not?

1    A.  That is so.

2    Q.  Now, you bring those dishes back to the kitchen, not to a

3    station in the dining room, correct?

4    A.  That is correct.

5    Q.  And on your way back from the dining room, do you ever

6    bring clean silverware or dishes?

7    A.  No.  It was always the stocker who would do it.

8    Q.  And those stations need to be constantly replenished during

9    the course of the service, correct?

10   A.  That is correct.  That is correct, because not always did a

11   stocker work by himself or herself.  They would have an

12   assistant.

13   Q.  Because it was important to constantly keep the dining room

14   replenished with the material for the service, correct?

15   A.  That is why they have two persons.  That is correct.

16   Q.  They don't always have two persons, do they?

17   A.  Not always.  Not always is it as such.

18            THE COURT:  Did they always have two people?

19            THE WITNESS:  Normally in the morning they had the

20   stocker and the helper, because the helper would assist the

21   coffee person, because the coffee -- the coffee person would

22   prepare the coffee and the person who would take the coffees to

23   the dining room was the helper, and he would also help the

24   stocker to refill or have the silverware, the glasses, the

25   plates, and to take it to the stations that are in the dining

EC8ASAL1ps                    Salinas - cross

1    room.  And before they would leave, they would also have to

2    clean the station, and the machine with which they used -- the

3    work -- or they used to work -- I don't know nowadays --

4    cleaning glasses, restocking the chemicals that the machine

5    has -- requires for it to work properly.  And before they would

6    leave, they would have to sweep the rugs -- or the small rugs,

7    and to clean the bread station.  This was normal during the

8    lunch, the mornings.  And on weekends, usually in this season,

9    they normally do use two stockers.  That is the job, or the

10   assignment, that the helper has, to assist or help the coffee

11   maker and the stocker.  There is no time.  It is -- it is much

12   too busy for just one person.  That is why they place a helper

13   there.

14          THE COURT:  Are you saying that there is always a

15   helper for the coffee man and for the stocker during lunch?  Is

16   that what you're saying?

17          THE WITNESS:  Not always, not always.  But normally

18   for this season, they have it.

19          THE COURT:  What season?

20          THE WITNESS:  Now during this season, November,

21   December, winter.  January, it goes down a bit.  But normally

22   when it's very low too -- during the summer it's not busy.  The

23   coffee maker, sometimes he also, he or she also works as a

24   stocker, he does the two jobs, because it is not very busy.

25   But during this season, normally, usually, they use two, two

EC8ASAL1ps                    Salinas - cross

1    persons.

2    Q.   Now, as a busser, you also assist the runners in running

3    food, correct?

4    A.   Sometimes, but not really.

5    Q.   Yes or no?

6    A.   Yes, but I do not understand, because really no.

7    Q.   I'm sorry.  The answer was -- could you please read back

8    the answer.

9              (Record read)

10   Q.   I'll ask the question again.  I don't mean to confuse you.

11   As a busser, do you assist the runners in taking the food from

12   the kitchen to the customers?

13   A.   OK.  Now my question is whether you are trying to say all

14   the time, because I repeat again, sometimes it is busy,

15   sometimes it is not busy.  I cannot say yes or no, because

16   sometimes I did do it and some other times I did not do it.

17             THE COURT:  Is your answer, it depends?

18             THE WITNESS:  Because of the season.

19   Q.   So is it your testimony that --

20   A.   Because you asked me -- of --

21   Q.   I'm confused.

22   A.   OK.  Sometimes.

23   Q.   Is it your testimony that you only, as a busser, assist

24   with the running of the food during busy season?

25   A.   I would place more attention at my station as a busboy.

1    The rollers, runners, the runners are always in the kitchen.

2    Sometimes they would come out from there with a plate that was

3    kind of hot or something, they would request or ask for some

4    help.

5    Q.  Is it your testimony that the only time that you assist

6    with the running of the food is once it's out of the kitchen,

7    when a runner asks you to do so?

8    A.  Sometimes we were asked, obligated, asked in an obligation

9    manner by the chef to do so.  He would tell us, take this

10   plate, take that food.

11   Q.  OK.  So in addition to assisting the runners once they are

12   outside of the kitchen, you also run the food directly from the

13   kitchen to the table, correct?

14   A.  Yes, because we were obligated by the chef to do so.

15   Q.  And is it your testimony that you're only obligated by the

16   chef to do so if -- strike that -- by "obligated by the chef,"

17   do you mean that he asks you to take the food out to the

18   customers?

19   A.  Yes, because we would clean the tables, and then we would

20   take the dirty dishes back to the kitchen.  And then the chef

21   would send the busboy, or whomever was closer to him, he would

22   say, take this plate over to the table.

23   Q.  So anybody who is in the kitchen, with a busser or a runner

24   uniform on, is asked by the chef during the service to bring

25   food to the table, correct?

1   A.  That is correct.

2   Q.  And that would include the coffee person?

3   A.  I would see that he would do -- he would run or take the

4   food sometimes.  He would run it there.  But I would see that

5   he was forced by the, either by the chef or the sous-chef.

6   Q.  And by "force," do you mean "asked"?

7   A.  Forced.

8   Q.  How does he force him to do it, him or her?

9   A.  I don't know how they are, because I don't know them, but

10  sometimes even a busser might have been there, and he wouldn't

11  ask he or she.  He would say to the coffee maker, you take it.

12  He would force him.  I do not know if -- whether he had more

13  food, but he would send the coffee maker.

14  Q.  Did he physically force him?

15  A.  No, no, not physically, but he's forcing you.  You have to

16  take it.

17  Q.  Well, he's asking you to take it, is he not?

18  A.  Yes, but it was not in a proper manner.

19          THE INTERPRETER:  "Adequate," your Honor?

20  Q.  And that would also be true, meaning that whoever was in

21  the kitchen and had free hands would bring out the food to the

22  table.  That was also true with respect to the stocker

23  position, correct?

24  A.  Personally, when I was working there as a stocker and if he

25  wanted me to run some food and if I was drying a glass or

EC8ASAL1ps                          Salinas – cross

1    something, he would tell me, leave that, drop it there and

2    take, or run, this food over there.  I would run the food.

3    But, me, what I wanted to do was to help or assist my fellow

4    workers.  But when I was very busy on my own jobs, it was very

5    difficult for me to do it, and he or she knew that we were all

6    busy.  He would force me to take, to run the food.  You have to

7    take it.  You have to take it.

8            My fellow workers do know that I was always busy.  And

9    it was the same for me, that I could just as well have helped

10   the runners, but towards the end, but towards the end, they did

11   not in turn help me, so it turned out that I was doing somebody

12   else's job, being forced to it.  I would, I would do it, yes, I

13   would run food.  But I want to clear up: I was forced to do it.

14   That is clearly so.

15           (Continued on next page)

16

17

18

19

20

21

22

23

24

25

EC85sal2                              Salinas – cross

BY MR. BENSON:

Q.  And by forced you mean asked by the chef, correct?

A.  There were several ways of doing it.  I think, I believe --
if one does not want to do it then next day or perhaps another
two days afterwards you would be suspended because they
would -- it is not a busy day today so, go ahead, take a free
day today.  But this was the way that they would get even for
their disappointment or anger, upsetness.

Q.  As a stocker you ran food between the kitchen and the
customers?

A.  No.

Q.  Well, you previously testified, sir, that you did run food
from the kitchen to the customers when you were a stocker.

A.  Can I reply to the question?  I am going to reply to the
question.

        I am going to say yes or no but I want it to be clear
that I did do it but I was forced.  No, I wanted to help my
fellow workers but -- but always that I ran food, it was
forced.  You have to do it.

Q.  I'm confused by your answer, Mr. Salinas.

        THE COURT:  Don't testify, counsel.  Ask questions.

Q.  Did you run food because you were asked to do so, or
because you wanted to assist your fellow service workers?

A.  I wanted to assist my fellow workers but the chef would
force me.  He did not ask me, he was forcing --

1          INTERPRETER:  If somebody may it please, instruct him,

2     I have to hear myself and him and sometimes I miss something

3     and I try to time him.  So, if I would be allowed, or somebody

4     else, because I'm trying to get his rhythm but unfortunately

5     sometimes it is becoming a little bit difficult for me.  So, if

6     either I or somebody else would instruct him to either wait for

7     me or to, if I start speaking, not to interrupt me.  Please.  I

8     do this very respectfully.  So, if your Honor would decide

9     to --

10         THE COURT:  I am not quite sure what you are asking me

11    to instruct.

12         INTERPRETER:  The rhythm, your Honor.  I have been

13    finding that I wait for him when he makes a pass and then I

14    come in, but as soon a start speaking I have to hear.  I have

15    to hear what he says on top of my voice and it is becoming a

16    little bit too frequent for me to remember what he said.  So,

17    if you would instruct him to not to interrupt me is the easy

18    answer.

19         THE COURT:  So, Mr. Salinas, the interpreter wants you

20    to not speak when he is speaking.

21         THE WITNESS:  Correct.

22         INTERPRETER:  Thank you, your Honor.  I apologize.

23         MR. ANDROPHY:  If we can just make sure the witness

24    also understands that if he is testifying and then the

25    interpreter begins giving an interpretation, once the

1   interpreter is finished he can continue with his answer if

2   there is more to his answer.

3          INTERPRETER:  I said -- well, you heard what they

4   said.

5          THE WITNESS:  Correct.

6   BY MR. BENSON:

7   Q.  Mr. Salinas, especially at lunch Fresco gets very busy all

8   at once, correct?

9   A.  Correct.

10  Q.  And as many as 150 people could all come in within a half

11  an hour of one another?

12  A.  It is correct.

13  Q.  Now, on any lunch shift there are usually three runners,

14  correct?

15  A.  Three runners and an expediter.

16  Q.  Three runners, or is it your testimony that it is four

17  people who are in runner uniforms assigned on the schedule as

18  runners?

19  A.  That is so.  Correct.

20  Q.  So, when you say four you mean that there are four runners

21  who are assigned on the schedule to work on a lunch shift?

22  A.  That is correct.

23  Q.  And whether it is three runners or four runners, that is

24  either six hands or eight hands, correct?

25  A.  Correct, but allow me to explain.

EC85sal2                        Salinas - cross

1              Normally the restaurant, we know when it is going to

2       be busy on account of the reservations.  You asked me before,

3       you asked me about the roll, roll map which is at the stand at

4       the entrance.  When we are busy there are people who are

5       on-call to see whether they might need them to work or work.

6              THE COURT:  What do you mean by on-call?

7              THE WITNESS:  Normally -- normally -- there was always

8       people who are on call.  By on-call I mean that there are

9       people that need to be called and there are normally two

10      busboys and one roller, if it is very busy, that are waiting to

11      be called so that they can come and work because normally they

12      might have to be called to work that day because it is very

13      busy.

14             THE COURT:  So the people who are on call are at home?

15             Why don't you repeat the question.

16             THE WITNESS:  Yes.  Correct.

17             THE COURT:  And so my question is, do you get paid to

18      be on call?

19             THE WITNESS:  No.  And that is lunch and dinner, too.

20

21             THE COURT:  The same person would be on call for lunch

22      and dinner?

23             THE WITNESS:  Yes.  That is so.

24             THE COURT:  So you can't work on a day that you are

25      on-call, work at a different job?

1         THE WITNESS:  I could not work and I couldn't even go,

2    let us say, just go to the movies.

3         THE COURT:  So it is a day that you have to stay at

4    home and wait?

5         THE WITNESS:  Working.  Working all day being whatever

6    it was in the morning or in the afternoon, whatever time it

7    might have been.

8    BY MR. BENSON:

9    Q.  Is it your testimony that when you are on call it is always

10   for lunch and dinner?

11   A.  Yes.

12        THE COURT:  So now I have a question for the lawyers.

13   Does the law provide a category for on-call?  Is that a wage

14   category, counsel, for experts in this law?

15        MR. BENSON:  They have the ability to say no.

16        THE COURT:  No, but that's not my question.

17        MR. BENSON:  Yes.

18        THE COURT:  My question is whether or not the law

19   provides for an on-call status.

20        MR. BENSON:  Are you asking me?

21        THE COURT:  I'm asking the lawyers in this room who

22   proclaim that they are experts in wage and hour law.

23        MR. BENSON:  Yes.  Well, it depends on what they can

24   and can't do and what on-call means.

25        THE COURT:  So explain it to me, counsel.

EC85sal2                              Salinas - cross

1          MR. BENSON:  So, if they have an obligation to be at a

2     certain place and they can't, you know, they have to be at a

3     certain place and there are movements and activities are

4     restricted --

5          THE COURT:  I would like you to translate this,

6     please.

7          INTERPRETER:  And now you are saying, please?

8          MR. BENSON:  -- under those circumstances it would be

9     compensable.

10         THE COURT:  So where a person is required -- I want

11    you to say this out loud.

12         INTERPRETER:  Okay.

13         THE COURT:  When a person is required to be at home,

14    on-call, waiting to find out whether they're going to be

15    required to work at the restaurant and they're not permitted to

16    leave their home, the law requires that they be compensated for

17    that time.

18         That is what you are telling me, Mr. Benson; is that

19    correct?

20         MR. BENSON:  No.  They need to actually report in

21    order to be eligible for payment and that is the hospitality

22    reg Section 146-1.5 called call-in pay.

23         I was answering a general question to your Honor.

24         THE COURT:  What do you mean they have to report?

25         MR. BENSON:  So Section 146-1.5 of the New York Reg

EC85sal2                          Salinas - cross

1    says call-in pay.  An employee who, by request or permission of

2    the employer, reports for duty on any day, whether or not

3    assigned to actual work, shall be paid at the applicable wage

4    rate and then it goes and lists different wage rates and hours

5    depending on the situation.

6             THE COURT:  And so it is your position, then, where a

7    worker is required to stay at home and wait for the employer's

8    call, wait all day long for an employer's call but does not

9    show up to work, that person then is not entitled to be paid?

10   Is that correct?

11            MR. BENSON:  Your Honor, if a person is required to be

12   in a place and can't move and wait for a call, yes, you would

13   be right, but that's not the situation that we have in the

14   instant case.

15            THE COURT:  Well, from my understanding the witness

16   has testified that the worker is required to stay at home --

17            Would you please translate?

18            INTERPRETER:  Yes.

19            THE COURT:  My understanding is that the worker is

20   required to stay at home until the worker receives a call.

21   That is what on-call status means according to this witness.

22            MR. BENSON:  The witness is incorrect, your Honor.

23   They call in at 10:00 and they're told yes or no.

24            THE COURT:  Okay.

25            If you would please translate what I just stated?

1          INTERPRETER:  Yes, your Honor, if I may?

2          THE COURT:  My understanding from the witness is that

3     the on-call worker is required to be at home waiting for a call

4     and only when the call comes does the worker know whether the

5     worker is required to work in the restaurant on that day.  Are

6     you saying that that is or what he is stating is incorrect?

7          MR. BENSON:  Yes.  What he is stating is incorrect.

8          THE COURT:  In other words, it is your position then

9     that workers at this restaurant do not have to stay at home and

10    wait for a call?

11         MR. BENSON:  Yes.  I never said that they did.

12         THE COURT:  The witness is stating that an on-call

13    worker must stay at home and wait for a call, and if that call

14    does not come until the end of the day that person has been

15    waiting there the entire day so that person does not get paid

16    and your position, counsel, is that the law does not provide

17    for the payment of such an individual; is that correct?

18         MR. BENSON:  No.  That's incorrect, your Honor.  And I

19    apologize if it is confusing.

20         What I am suggesting is that there is an obligation on

21    the part of an on-call worker for the lunch shift at 10:00 and

22    for the dinner shift at 4:00 to call in to the restaurant and

23    be told whether they are needed or not.

24         THE COURT:  So you are saying the onus is on the

25    worker?

EC85sal2                          Salinas - cross

1          MR. BENSON:  To call.  Make a phone call.

2          THE COURT:  Okay.  And if the worker does not call the

3    worker does not get paid; is that correct?

4          MR. BENSON:  If the worker doesn't call and doesn't

5    come in, the worker doesn't get paid but the worker is not --

6          THE COURT:  So, the attorney is stating that the

7    obligation -- I want you to translate this for the witness --

8    is for the worker to call the restaurant to find out whether or

9    not he is needed.

10         Is that correct?

11         THE WITNESS:  That is correct.

12         THE COURT:  So it is not that you are waiting all day

13   long to find out if you are going to work.

14         THE WITNESS:  I have to call if the schedule says that

15   I am on call and his question was how many runners work.  They

16   always have persons on call.  If it is busy, then they call the

17   persons on call.  They would call, like, me.  That is why it

18   says that there were three, it was really four.  It is because

19   they called the person who was on-call because it was busy.

20   That is why there were four.

21         MR. BENSON:  May I resume questioning, your Honor?

22         THE COURT:  You may.

23   BY MR. BENSON:

24   Q.  Whether there are three runners or four runners,

25   Mr. Salinas, that is either six hands or eight hands, correct?

EC85sal2                    Salinas - cross

1    A.  That is correct.

2    Q.  And if there are 150 people eating at the same time, those

3    people can't bring out all the people on their own, can they?

4    A.  That is correct but I do not believe that at the same time

5    because at the same time they do not all eat at the same time.

6    Q.  Even if there is a table of 10 people, it is important that

7    people who are eating at the same time get their food at the

8    same time, correct?

9    A.  That is correct.

10   Q.  And there is eight of those tables in Fresco restaurant,

11   are there not?

12   A.  That is correct.

13   Q.  And it is not uncommon for all of those tables to be filled

14   at the same time, is it not?

15   A.  No, it is not common.

16   Q.  The entire restaurant isn't usually full during lunch?

17   A.  I repeat once again, not all the time.  Sometimes.

18   Q.  In any event, more than just the runners are needed to

19   ensure that the food gets out in a timely and efficient manner,

20   correct?

21   A.  That is correct.

22   Q.  And the coffee person assists in that respect, correct?

23   A.  Well, I always saw him as forced.  Certainly he does

24   assist, but I certainly saw him as being forced.

25   Q.  And the stocker also assists in that respect, correct?

A.  Personally, me at Fresco restaurant, I work 75 percent to
95 percent as a stocker.  And, I want to state that I always
wanted to help my friends but I was always being forced to run
the food.  I did it forced, as I previously answered.

THE COURT:  When you use the word "forced," the
person, the chef or the sous chef that you say asked you to
take the food to the table, is it your understanding that you
could say: *No.  That is not my job.*

THE WITNESS:  No, I never did it but I would like to
be clear:  I never said that.  I never said I wouldn't take it.
I never said that.  Two times I was cleaning silver and he took
it away from my hands and he told me you have to take it.  You
have to take it.

THE COURT:  But my question is did you feel that you
had the right to say: *No.  I'm not going to do that.  That's
not my job.*

THE WITNESS:  I could do it, I tried to do it, but I
wanted to do it in such a way so that the job would come up in
a good way, in a proper way.  But, I always wanted,
furthermore -- at one time he took some glasses away from me
there so that I would take the plates over.  That.  I ran food
but I was forced by them.

BY MR. BENSON:

Q.  Now, I believe it was your testimony that you only ran food
when the restaurant was busy.  Is that your testimony?

EC85sal2                          Salinas - cross

1  A.  Yes.  When we were two runners.  In fact, I want to clear

2  up -- two stockers, I'm sorry.  The helper, he would run food

3  more but the stocker normally -- normally -- almost never did

4  we run food.  Only if we were forced but normally --

5  normally -- we would not run food.

6  Q.  Isn't it true, Mr. Salinas, that you ran food as a stocker

7  on every shift, whether it was lunch or dinner, that you ever

8  worked at Fresco Restaurant?

9  A.  I repeat once again:  Run food?  No.  I repeat again:  This

10  would happen maybe once every 15 days, maybe twice a month.

11  But to run food, no, that was not frequent.

12  Q.  So it is your testimony that the only time that you took

13  plates from the kitchen to the customers was once every 15

14  days?

15  A.  That I state because, specifically, my job was not that

16  one.  Specifically, my job was as a stocker.  I repeat:  If I

17  ran food it was because I was forced by the chef.  I am not a

18  runner.  I am not a runner that is looking at the tickets to

19  see how the food is coming.  My job is to see that my machine

20  is running; to see that my silverware is clean, that everything

21  is running properly, and that my glasses are clean, and to

22  restock my station.

23          MR. BENSON:  Move to strike as non-responsive, your

24  Honor.

25          THE COURT:  Sustained.  It is stricken.

EC85sal2                         Salinas - cross

1    BY MR. BENSON:

2    Q.  I ask you again, Mr. Salinas, is it your testimony that the

3    only time that you ran food meaning taking the food from the

4    kitchen to the customers, only happened once every 15 days?

5    A.  No, no, no.  There were days -- sometimes days.  Yes,

6    sometimes we would run it sometimes seven or eight times.

7    Q.  Seven or eight times a day, correct?

8    A.  No.  I repeat:  There were days that were busy and some

9    days that were not.  It can be on the weekends, it can be when

10   it is busy, it can be during the weekends but Mondays, Tuesdays

11   and Wednesdays I do not believe so.

12   Q.  I just want to understand your testimony, Mr. Salinas.

13           Is it your testimony that you only run food once every

14   15 days?  Seven or eight times every 15 days?  Seven or eight

15   times a day?

16           I just want to be clear.

17   A.  Okay.  I want to clear it up because I said it wrongly.

18   Not every 15 days.  Maybe I ran it seven or eight times.  I'm

19   going to say Fridays and Saturdays because those were the days

20   that it was the busiest.  The rest of the days I do not think

21   that I ran food because those days they had the runners.

22   Q.  Mr. Salinas, aren't Fridays and Saturdays the slowest days

23   of the week for the restaurant?

24   A.  For lunch, yes.  For dinner, no.  In fact, on Saturdays

25   they do not open during the late afternoon, evenings.  For

1   lunch they do not open.  Saturdays –– on Saturdays, in fact, I

2   would run food but only for dinner.

3   Q.  Run food for only dinner on Saturday?

4   A.  Fridays.  I repeat:  Fridays and Saturdays.

5   Q.  So, it is your testimony that Monday through Thursday of

6   every week you didn't run any food on any day that you worked

7   as a stocker?

8   A.  That I can recall now, perhaps.  But it was always Fridays

9   and Saturdays.  Normally.

10  Q.  And if your fellow plaintiffs testified that it happened

11  all the time, they would not be telling the truth?

12          MR. ANDROPHY:  Objection.  He is asking him to answer

13  some hypothetical that hasn't been established.

14          THE COURT:  Overruled.  You may answer.

15          THE WITNESS:  When they would work I couldn't see them

16  because I wasn't free.  There was nobody covering me so I was

17  working.  I couldn't see them.  In fact, as a stocker on

18  Saturdays –– on Saturdays we were forced to wash dishes, two

19  hours, because he would send the dishwasher back home and force

20  us to wash the dishes and he would say don't worry, it is only

21  for two hours, there are no clients, nothing is happening, and

22  he would force us to wash plates.  And, in fact, a fellow

23  worker of mine was fired by the manager Attilio because he

24  refused to wash dishes.  So, he said, okay, if you don't like

25  it, just get out.  Leave.

EC85sal2                          Salinas - cross

1              That would happen more during the summer when it was

2      slow.  That can also be said by my fellow workers who worked

3      there and who also washed dishes.

4              MR. BENSON:  Move to strike as non-responsive, your

5      Honor.  I believe the question was if his other plaintiffs

6      testified that they observed him running food always -- or

7      stockers running food always -- would they be lying.

8              THE WITNESS:  No, because sometimes they saw me with

9      the plates.  Sometimes they saw me with the plates and they

10     said, What are you doing there?  And you are not to do this.

11             THE COURT:  Mr. Benson, your objection is sustained

12     and the prior answer is stricken as non-responsive.

13             MR. BENSON:  May I respectfully request the court

14     reporter to read back the last answer?

15             (Record read)

16     BY MR. BENSON:

17     Q.  So, it is your testimony that other of the plaintiffs told

18     you when they saw you running food to not do it and questioned

19     why you were doing it?

20     A.  Yes, because I say, well, I was sent there by the chef.

21     Q.  When did this happen?

22     A.  Every time the chef would send me.  I repeat, again, I did

23     not pick up the tickets.  I did not know where the food was to

24     go to, the chef had to send me.

25             THE COURT:  Because we started a little bit late we

EC85sal2                          Salinas - cross

1   are going to take our break a little bit late, so instead of

2   11:15 to 11:45 we will take it from 11:45 to 12:15.

3              MR. BENSON:  That's non-responsive to my question.  I

4   move to strike.

5              THE COURT:  Overruled.

6   BY MR. BENSON:

7   Q.  When did your fellow plaintiffs or any of your fellow

8   plaintiffs tell you that you should not be running food from

9   the kitchen to the dining room?

10  A.  Because once or twice it so happened that they needed at

11  the stations the silverware and they said, Why are you running

12  food if we need silverware?  And I said the chef sent me.  What

13  do you want me to do?

14             That is what is.

15  Q.  So, the waiters were telling you that they needed your help

16  for the service, correct?

17  A.  Okay, that was when I was working as a busboy, not as a

18  stocker, because the stocker normally is always in the kitchen,

19  not at the -- not in the dining room.

20  Q.  So, none of the plaintiffs ever told you that you shouldn't

21  be running food from the kitchen to the dining room, correct?

22  A.  Correct.

23  Q.  As a stocker, your role is to assist the other service

24  people in the dining room, correct?

25  A.  No.  I only had my own personal job as -- to clean

EC85sal2                        Salinas - cross

1  silverware, to clean glasses, to take the plates out and to

2  keep my station always ready and complete because normally I am

3  inside the kitchen.  Can you understand me?  Normally I do not

4  have much contact with the waiters.

5  Q.  Is it your testimony that you never help out a waiter,

6  another busser or a runner during service?

7  A.  Yes.  Yes.  It wasn't normal.  Perhaps sometime at one time

8  I might have taken a glass or taken a table cloth or a plate,

9  but if I would see that a person was there cleaning six or

10 seven plates I would go by there and I would say perhaps, and

11 then maybe I would clean one or two plates, but not really.  I

12 was always paying attention to my own job because I was

13 always -- because the glasses -- the glasses are not supposed

14 to come out hot, they had to be properly dried out and cleaned,

15 they couldn't come out hot.

16        I was always at my station.  Always.  Always.

17 Q.  So, in addition to running food you also helped your fellow

18 bussers clear the tables and bring the dishes back to the

19 kitchen, correct?

20 A.  Only once, perhaps.  Maybe I did it twice or thrice but it

21 is not normal.

22 Q.  But, you testified that if you saw they needed your help

23 and it was busy you would offer your hands to help out,

24 correct?

25 A.  Not all the time.  But I repeat, again, maybe once or twice

1   but not -- no.  No.

2   Q.  And you would also help, if you saw that it was needed, in

3   helping the bussers reset the tables, correct?

4   A.  No.  I did not have time for that.

5   Q.  So it is your testimony that you never did that?

6   A.  Perhaps.  But that I can recall?  No.

7   Q.  Just so we are clear, it is your testimony that while you

8   were working as a stocker you never reset a table after a

9   customer was done eating at the restaurant?

10  A.  That I can recall?  No.  Perhaps but eh, maybe, I think

11  not.

12  Q.  Did you take a deposition in this case?

13  A.  Yes.  That is so.

14  Q.  And were you sworn to tell the truth in that deposition?

15  A.  Yes.  That is so.

16  Q.  And did you tell the truth in that deposition?

17  A.  That is the same that I am saying today.  I think that

18  perhaps maybe one time or another perhaps I had said but let me

19  repeat:  I repeat, again, my job was to wash and clean very

20  properly and polish the glasses in the machine.  Perhaps at

21  some time to help my fellow workers, but perhaps because that

22  was not my job.

23          MR. BENSON:  It is non-responsive to the question.  I

24  was asking him about whether he took a deposition.

25          THE COURT:  The question was whether or not you told

EC85sal2                              Salinas - cross

1    the truth at your deposition.

2                THE WITNESS:  I think that I said the truth, right?

3    BY MR. BENSON:

4    Q.  Did that deposition take place December 23rd, 2013?

5                INTERPRETER:  What year did you say, counsel?

6                MR. BENSON:  2013.

7    A.  Correct.

8    Q.  I direct your attention -- could we provide the witness

9    with a copy of his deposition, please?  I think your Honor has

10   a copy.

11               THE COURT:  You are asking me to give up my copy?

12               MR. BENSON:  No, no, no, no.  No, I'm not asking you

13   to give up your copy at all.  I believe I was suggesting in

14   addition that your Honor has a copy.  I have two here.

15               THE COURT:  What volume is that?

16               MR. BENSON:  It says Deposition Transcript of Enrique

17   Salinas.

18               (Continued on next page)

19

20

21

22

23

24

25

EC8ASAL3ps                          Salinas - cross

1           (Pause)

2                   MR. BENSON:  Your Honor, I have --

3                   THE COURT:  Yes.

4    Q.  I direct your attention to page 65, specifically line 18.

5    Were you asked the following question and did you give the

6    following answer:

7    "Q. While you were working as a stocker, have you ever reset

8    the table after a customer was done eating at the restaurant?

9    "A. Yes."

10   A.  I want to clear up, in this question they told me not to

11   specify.  They told me for me just to simply say yes or no.  I

12   said yes, but they never allowed me -- but they never allowed

13   me to specify that perhaps two or three times, perhaps two or

14   three times per week, on a week.

15   Q.  So your answer is that happened two or three times in a

16   week?

17   A.  I think or I believe so, that I can remember or recall.  I

18   never do it.

19           (Pause)

20                   THE COURT:  Is there a question?

21                   MR. BENSON:  There is not.  I'm sorry, your Honor.

22   Q.  So you testified that you run food from the kitchen, you

23   bus tables between the customer tables and the dining room, you

24   help reset tables.  Isn't it true that you do all of those

25   things as a stocker on every shift that you're assigned as a

EC8ASAL3ps                    Salinas - cross

```
1   stocker?
2   A.  No.  I repeat no.  I did not have much time.  I could not
3   be for a long time in the dining room.  I was always at my
4   station.  I was always at my job.  Normally the bus boys do
5   help themselves amongst each other.  Perhaps if I walked by
6   there and I saw a tablecloth, I took it, but, but not really,
7   because I didn't have any time.  I don't have.  How can one do
8   that?  How can one run food?  How can one run tables?  I
9   cannot.
10  Q.  Now, you were in and out of the kitchen throughout the
11  entire service, correct?
12  A.  Correct.
13  Q.  When you were in the kitchen and the chef needed help, he
14  would ask for your help, correct?
15  A.  Yes, forced, because I didn't have much time.
16  Q.  And when you were in the dining room, either your fellow
17  bussers or you on your own assisted the bussers in clearing the
18  tables and resetting the tables, correct?
19  A.  No, not really, no, no.  I repeat, if I would be walking by
20  there or passing by there and I would see a dirty glass and I
21  would see a dirty glass, I would pick it up.  But -- or a
22  dirty, or a dirty tablecloth.  If I went by there and I saw
23  something, perhaps I just passed by there and I tried to help.
24  But, no, on the contrary, to state it better, more of the time
25  they would help me because they would see that I was very, very
```

1  busy, because they would go into the kitchen when they would go

2  there to drop maybe a plate.   They would ask me, are the plates

3  ready, are they dry there, they would ask me, because I would

4  have to restock the station.   And I would say, yes, they are

5  ready, yes.   Yes, they would try to help me out because they

6  would say, and I would say, yes, they are ready.   Perhaps at

7  one time or another I might have opened or stretched out or

8  extended one of those tables because they were tables for four

9  or two, but it wasn't really that I would be doing their job,

10  me, no, no.

11  Q.   So you helped each other, correct?

12  A.   Sometimes, not always.

13  Q.   And you did that because you were a team, correct?

14  A.   It is not correct, because, because the waiters did not

15  help us set the tables.   The busboys did not either help us set

16  the tables.   I never saw a waiter take -- I never saw a waiter

17  take glasses, silverware, or plates into the kitchen.   I cannot

18  know how you can say that we were a team.   That is not a team.

19  Q.   Were you a busser team?

20  A.   Only the bussers, the ones who worked in the dining room.

21  Q.   The bussers worked as a team?

22  A.   Only the bussers.

23  Q.   And you helped each other out?

24  A.   Only the busboys in the dining room.

25  Q.   And the --

EC8ASAL3ps                    Salinas – cross

1    A.  Not in the kitchen.  Only they, they had to be at their

2    station looking at the tables.  They had to be looking at the

3    clients to see whether they had water, whether they had

4    finished the appetizers, whether they had to clear plates.

5    That was their thing to see.  They were never in the kitchen.

6            THE COURT:  All right.  We're going to stop here until

7    12:15, and the cross-examination will continue at that time.

8    You may step down, Mr. Salinas.

9            (Recess)

10           (Continued on next page)

EC8ASAL3ps                    Salinas — cross

1              A F T E R N O O N   S E S S I O N

2                        12:15 p.m.

3   ENRIQUE SALINAS, Resumed.

4              THE COURT:  You may continue.

5              MR. BENSON:  Thank you, your Honor.

6              THE COURT:  And remember, sir, that you are still

7   under oath.

8   CROSS EXAMINATION (Cont'd)

9   BY MR. BENSON:

10  Q.  Good afternoon, Mr. Salinas.  Just prior to the break, I

11  believe you testified that you helped the bussers, but they

12  never helped you.  Is that accurate?

13  A.  No.  I said about the runners that the runners did not help

14  me, not about the bussers.  The busboys, they were always at --

15  the ones that were there were always at their stations, but the

16  ones that were closer -- they never came to me.  But the ones

17  that were closer to me were the runners.  They were always

18  there near me.  But they, they never helped me.

19  Q.  OK.  I'll ask again because I don't -- I think maybe you

20  misunderstood the question.  I'm asking about other bussers,

21  not the runners.  I'm asking whether other bussers helped you

22  perform your assignment as a stocker.

23  A.  No.  No, no, they didn't help me.  That's why they had the

24  helper, the helpers to help the stockers.

25  Q.  I think that before you testified that, talking about the

1   other bussers, that they helped you more than you helped them.

2   Do you remember that testimony?

3   A.   Yeah, yeah, maybe I heard -- I did say that, because

4   perhaps if they walked back there and they might have brought a

5   dirty plate or if they saw a clean one they might have taken

6   it.  But that was it.

7   Q.   So which is it, Mr. Salinas?  Do the other bussers help you

8   in your stocker responsibilities, or do they not help you?

9   A.   Really they did not help me.  Only if they saw that I had

10  other things -- no, no, but really, really no.

11  Q.   So that when you previously testified that they helped you

12  more than you helped them, that was incorrect.

13  A.   It wasn't really incorrect.  Well, only if they saw

14  something like that that was there.  But no, no, not really,

15  all to the contrary.  Maybe if they did see something that was

16  there, maybe perhaps they took it out.

17  Q.   So they did help you in your responsibilities of making

18  sure that the dining room had the proper materials to provide

19  the services.

20  A.   Not really.  But, again, I'm going to repeat that -- no,

21  all right.  No, but sometimes -- no, well, if they would come

22  up there and they would see something, perhaps two or -- one or

23  two plates, but it really was not a help.

24  Q.   So they took the materials to the dining room, but your

25  testimony is it wasn't a help to you.

EC8ASAL3ps                    Salinas - cross

1    A.  No, that was not help.  I had a helper.

2    Q.  But that was part of your responsibility for that

3    particular assignment, was to take those things from the

4    kitchen and make sure that the dining room was fully stocked,

5    correct?

6    A.  That was my job, correct.

7    Q.  Now, I think you testified also that at times you also had

8    the assignment of a coffee person; is that correct?

9    A.  Yes, correct.

10   Q.  And that was also an assignment that was rotated amongst

11   the bussers, correct?

12   A.  That is correct.

13   Q.  And they wore the same uniform as the bussers?

14   A.  Yes, that is correct.

15   Q.  Now, when you're assigned to the coffee station, it's your

16   responsibility to make and deliver beverages to the customers,

17   correct?

18   A.  Yes.  The waiter takes the order from the clients and he

19   takes it into -- puts it into the computer.  And the proper

20   order comes out and the coffee or the iced tea or whatever they

21   order is prepared.

22   Q.  And you take that yourself to the people in the dining

23   room.  You serve it to them directly.  Correct?

24   A.  It is correct, but I want to explain.  Not every time,

25   because I want to repeat, there was the helper.  When it's very

EC8ASAL3ps                          Salinas - cross

 1  busy, when it's very busy, then it is the helper, the helper,

 2  when it's very busy, the one who takes it there.  The same

 3  thing happens with the stocker.

 4  Q.  OK.  But generally a coffee person delivers iced tea --

 5  correct?

 6  A.  Yes, correct.

 7  Q.  And the busser assigned to the coffee station delivers

 8  regular coffee, correct?

 9  A.  Yes, correct, when he is not busy.  Correct.

10  Q.  And he also delivers espresso, cappuccino, hot teas; isn't

11  that also correct?

12  A.  It is correct, yes.

13  Q.  And also, when you deliver those drinks, you need to bring

14  milk and sugar and lemon if they have ordered teas, correct?

15  A.  That is correct.

16  Q.  And the customers sometimes ask you to bring additional

17  things, like honey or a specific kind of sugar, and you would

18  listen to them and bring them what they requested, correct?

19  A.  Correct.

20  Q.  Now, because there's such a rush, especially at lunch, the

21  orders for the coffee and tea and espresso tend to all happen

22  in a relatively short time period, correct?

23  A.  That is correct.

24  Q.  And the person who has the assignment of the coffee station

25  can't possibly deliver all of that on their own, correct?

EC8ASAL3ps                    Salinas - cross

1   A.  That is correct.

2   Q.  It's not a one-person job, is it?

3   A.  That is why the helper is there.

4   Q.  It's not even a two-person job, is it?

5   A.  No, no, no.  No, the same thing is -- with the helper --

6   no, no.  The stocker, no.

7   Q.  I'm not sure that was responsive.  I'll try to ask the

8   question again, in a way that you'll understand it.  My

9   question is, because so much beverages have to be delivered to

10  the table at the same time, it is not possible for even two

11  people to do that job.  They must get help from others to run

12  the coffee and the espresso and the tea to the tables, correct?

13  A.  I always only saw the -- no, no, excuse me.  I only saw the

14  helper and the coffee maker deliver coffee and iced tea.

15  Q.  So only the helper and the coffee maker are the two people,

16  you're telling me, deliver all of that to people in the

17  restaurant, without getting help from the busser, the other

18  bussers, or the runners, or the waiters, the captains, or the

19  owner?  Is that your testimony?

20  A.  I only saw the helper and the coffee maker make the coffee

21  because the space was very reduced, and the helper and the

22  coffee maker, the coffee maker makes the coffee, and the helper

23  delivers the coffees to the table.

24  Q.  So it's your testimony that only one person delivers all of

25  those drinks to the entire restaurant?

EC8ASAL3ps                     Salinas - cross

1   A.  That is what I saw.  I saw no one else.

2           THE COURT:  I would like the attorneys and the

3   interpreter to approach.

4           (Discussion held off the record at the sidebar)

5           MR. BENSON:  I believe there is a question pending,

6   your Honor.

7           THE COURT:  Did you interpret the question?

8           I'm asking the interpreter.

9           THE INTERPRETER:  I don't know.  He just -- I

10  interpreted whatever counsel said, your Honor.

11          Sometimes they can't hear me when I'm doing

12  simultaneous, unfortunately, but --

13          THE COURT:  No, there is no question before you.

14          MR. BENSON:  There isn't?

15          THE COURT:  No.

16          MR. BENSON:  I apologize.  I thought there was.

17  Q.  So is it your testimony that when you were a stocker, that

18  you never assisted the coffee person in delivering coffees and

19  whatever other beverages come from that station to the main

20  dining room?

21  A.  I can't recall right now, no.  Stocker, because I had no

22  time, no time.

23  Q.  Weren't there sometimes that you were assigned to stocking

24  duties and coffee duties in the same shift?

25  A.  I repeat, when it was slow during the summer, they would

1    place me at the two stations by the check -- on a shift, on a

2    shift -- and I would work as a stocker and as a coffee maker.

3    It is there at the schedules, it is at the maps.  I would work

4    at the two stations, when it wasn't busy.

5    Q.  And on those occasions, you did run beverages from the

6    coffee station to the dining room, correct?

7    A.  Really yes, because -- during the summer, I repeat, only

8    two, two or three times per week, but not, not, not -- it

9    was -- I thought it was two, two jobs combined in one, because

10   one had to make coffee and to take it over to the main dining

11   room, and to go to clean -- to wash the dishes, and to wash the

12   glasses, and to clean the silverware, and to take them over to

13   the main dining room.  I think it was two jobs combined into

14   one.

15   Q.  So it's your testimony that while you were performing that

16   dual role, that you couldn't run all of the beverages because

17   you had other responsibilities as well?

18   A.  Are you asking me -- when I was a coffee maker or when I

19   was a stocker?

20   Q.  When you were the coffee/stocker, when you did both at the

21   same time.

22   A.  I repeat, if there was no helper, then I had to do it by

23   myself.

24   Q.  I don't understand that.  Is it your testimony that when

25   you worked to help the coffee person, that the person you were

1    helping never ran any beverages from the coffee station to the

2    dining room?

3    A.  OK.  I'm going to clear this up.  Sometimes I was the

4    helper.  Yes, when I was a helper.  I cannot say not.  I did

5    help the helper -- I'm sorry -- the coffee maker when I was a

6    helper, and the stocker.  But never the stocker helped the

7    coffee maker or the coffee maker.  There was no time.

8    Q.  And when you helped, is it your testimony that the person

9    that you were helping didn't join you in delivering the

10   beverages to the customers?

11   A.  No, that I know of, no.

12   Q.  So I'm clear, it's your testimony that, in those

13   circumstances, you were the only person in the restaurant who

14   was delivering beverages -- coffee, tea, espresso, cappuccino,

15   iced tea -- from the coffee station to the main dining room.

16   A.  Yes.  I repeat, when I was working at only -- there was no

17   helper.  I had to do it by myself.

18   Q.  How is it possible for all of the beverages to get there,

19   for so many people, at the proper temperature, with just one

20   person?

21   A.  One person, I repeat, makes the coffee and a person, one

22   other person, delivers the coffees over to the table.  It is

23   very clear.

24   Q.  I'm sorry.  Could --

25   A.  Excuse me.  But if you mean you're trying to ask me, when

1   the coffee maker and the helper are busy, that's two persons.

2   I repeat.  When it's not busy, the coffee maker delivers

3   everything to the tables.

4   Q.  So are you testifying that the coffee person and the helper

5   both deliver beverages from the coffee station to the dining

6   room?

7   A.  I saw, I only saw the helper take coffee to the customers,

8   to the clients.  I never saw the coffee maker, when two persons

9   were working.

10      MR. BENSON:  Your Honor, I'm sorry.  I can't hear the

11   interpreter.  I can't hear the answer.

12      THE COURT:  OK.  Could you get closer to the

13   microphone, please.

14      MR. BENSON:  Could the court reporter read back the

15   last answer, please.

16      (Record read)

17   Q.  And it's your testimony that there was no one else who

18   helped out to deliver those beverages, correct?

19   A.  The job was for the helper and the coffee maker.

20   Q.  I'm talking about the delivery of the beverages.

21   A.  I'm telling you that the helper would take the beverages,

22   the coffee maker who makes the coffee, the two of them are

23   taking the coffee and the iced tea and rest of the thing and

24   the sugar.  I could not believe that the waiters do it.  The

25   coffee maker was always at the machine, and the helper would

1   take it over to the table.

2   Q.  When you were a coffee person, did you also run food?

3   A.  It was the same, the same, the same as the stocker, forced

4   by the chef.

5   Q.  The coffee person --

6   A.  The sous-chef.  They are behind there.  They are in the

7   kitchen, next to the chef, where the food is there.

8   Q.  So the coffee person would assist in running food.

9   A.  They would force the coffee maker to take the food out.

10  Personally, when I worked as a coffee maker, as I was -- when

11  it was never busy, I never, I never ran food when I was a

12  coffee maker, but I could -- I did see, when my fellow worker,

13  the coffee maker, did run food, he was forced by the chef to

14  take the food out.  You had to take it.

15  Q.  You also spent some time in the bar-back assignment,

16  correct?

17  A.  Bar-back assignment.  Oh, the bar assistant?

18  Q.  The front-of-the-house station.

19  A.  Yes, correct.

20  Q.  And in that there are approximately -- there are 15 tables

21  that are located in front of the bar, correct?

22  A.  Correct.

23  Q.  And part of the responsibility of that assignment is to bus

24  those tables, correct?

25  A.  Correct.

```
1    Q.  And so the person in that assignment does all of the same

2    things that a busser does with respect to any assignment in the

3    main dining room.

4    A.  Correct.  Only the bar.  The bar.

5    Q.  Now, I'd like you to take a look at your declaration,

6    specifically paragraph 31.  Now, you say that when you work a

7    lunch shift, you arrive at 10 a.m., correct?

8    A.  Ask what page, because I don't have the page.

9    Q.  Paragraph 31.  No page numbers -- oh, 6.  6.

10            THE COURT:  You have not handed up the affidavit,

11   counsel.

12            MR. BENSON:  I'm sorry.  I thought he had that in

13   front of him.  Wasn't it introduced into evidence?

14            THE WITNESS:  (In English) I got it here.

15            MR. ANDROPHY:  I think he had it.

16            THE COURT:  No.  He's looking at the deposition

17   transcript.

18            THE WITNESS:  Oh, this one?

19            (Through interpreter) Is this one the one?

20            MR. BENSON:  Yes.

21   Q.  So, paragraph 31, states, and I quote, "When I worked the

22   lunches, I would arrive at 10 a.m."  Was that always the case?

23   A.  Yes, yes.  That was the way it was.  But it would vary

24   sometimes.

25   Q.  And how would it vary?
```

1   A.  Because I would be, when one is on call, when one is on

2   call, or -- well, well, when Saturday, Saturdays it wasn't --

3   yes, yes, before we would always work until the last customer

4   would leave, yes, approximately 10, 10 to, to 3, 3:30.

5          MR. BENSON:  I move to strike as nonresponsive, your

6   Honor.  I'm just asking him now if there were any other

7   starting times.

8          THE COURT:  I am reluctant to strike the answer.  But

9   I'm willing to repeat the question.

10  Q.  Was it always a 10 a.m. starting time?

11  A.  Lunch, yes.

12  Q.  Isn't it true that sometimes you started after 10 a.m.?

13  A.  That I know of, it was always -- it was always -- it was

14  always at 10 o'clock in the morning.

15  Q.  And that's -- that was --

16  A.  Only the ones on call.

17  Q.  So other than being on call, it's your testimony that every

18  shift you worked at Fresco that was a lunch shift started at

19  10, correct?

20  A.  That is correct.

21  Q.  And your -- paragraph 32 goes on to read "and worked until

22  approximately 3:30 p.m."  Is that correct?

23         THE INTERPRETER:  Did you read 4 p.m., counsel?  I

24  couldn't hear.

25  Q.  3 --

1         THE COURT:  Counsel, you're at paragraph 32?

2         MR. BENSON:  Paragraph 31.

3  Q.  "When I worked a lunch shift, I would arrive at 10 and work

4  until approximately 3:30 p.m."

5  A.  Correct.

6  Q.  And that is correct?

7  A.  Yes, it is correct.

8  Q.  And in fact in your deposition, you testified that you

9  never leave earlier than 3:15.  Is that accurate?

10 A.  That is correct.  Before 2011, I always left 3:30, 3, half

11 past 3.

12        THE COURT:  Counsel, will you direct the witness to

13 his deposition testimony.

14 Q.  OK.  Yes.  Specifically, I'm referring you to page 132,

15 line 6, and were you asked the following questions and did you

16 give the following answers:

17 "Q. All right.  And if you were working a lunch shift and you

18 arrived at 10, what time did you leave?

19 "A. 3:30.

20 "Q. Always at 3:30?

21 "A. 3:15, but normally 3:30.

22 "Q. Any time before 3:15?

23 "A. Never."

24        Were you asked those questions and did you give those

25 answers?

1   A.  Yes, correct.

2   Q.  OK.  Now, I believe you stated that this was only true

3   prior to June of 2011.  Is that correct?

4   A.  Correct.

5   Q.  And in June 2011, it had changed all of a sudden?

6   A.  Yes, because we started to -- we started to, in the

7   computer we started to punch in our, our -- the time we came in

8   and the time we left.

9   Q.  OK.  And is it your testimony that the time you left

10  changed after June of 2011 as compared to before 2011?

11  A.  Yes.  Completely.

12  Q.  And so that the times that are listed for leaving after the

13  time clock was put in place are not indicative -- that may be

14  too big a word -- are not -- are not the same as would have

15  been the case before the time clock.

16  A.  I did not understand the question.  I didn't understand the

17  question well.

18  Q.  Is it your testimony that after the time clock was put in

19  place, all of a sudden, your times, your end times of the lunch

20  shift changed?

21  A.  Yes.  They changed.

22  Q.  And what did they change to?

23  A.  Because before, we all had to arrive at 10 o'clock in the

24  morning, and if you would arrive a little bit later, be it

25  seven or eight minutes, they would send you back home.  All,

1    all my fellow workers will bear witness, that.  And they would

2    call then the person who was on call so that they would -- he

3    or she would work.  No one before, no one before, before they

4    used the machine, the clock, the punch clock, no one would

5    go -- would be sent home.  Before that we would all stay then.

6    When we started with the machine, the time clock, there were

7    persons who would come in at 11 a.m., some of those at 12 noon,

8    and if they would finish at 2 in the afternoon, at 2, there was

9    one who was the closer, but never before, before we punched the

10   card.  Never before.

11   Q.  So I believe it's your testimony, then, that on one day, on

12   the day that the time clock got put in place, everything

13   changed with respect to the time you were allowed to leave the

14   restaurant.  Is that correct?

15   A.  Correct.

16   Q.  And that before, if a station was clear at 2 o'clock, to

17   use your example, and there were still people in other

18   stations, is it your testimony that you had to stay?

19   A.  Yes.  All my fellow workers know.  Everyone.  Everyone.

20   Q.  I'm just asking you.

21   A.  Yes, they had to stay.

22   Q.  And so if a customer came in right at the end, and sat

23   there eating until 4 o'clock, you would have to stay there for

24   two hours, even though your customers were gone.

25   A.  We had to all remain there until the last client had left.

EC8ASAL3ps                      Salinas – cross

1          Now I think that there were too many hands for two

2    customers.  But that was the way that the policy, their policy

3    was.

4    Q.  So it's your testimony that all the bussers, even though

5    they had nothing to do, would have to stay there and wait until

6    the last customer left.

7    A.  Correct.

8    Q.  Now, would that be because you were voluntarily waiting for

9    the tips to be distributed?

10   A.  Normally no, because the managers would say no one can

11   leave.  There were, yes, people waiting for tips.  Sometimes it

12   was -- I had to do that too.  But normally, no, no, the

13   question was not -- had to do with the tips.  It was that we

14   had to remain there until the last client left.

15   Q.  So the tips would be distributed at the end of each shift,

16   correct?

17   A.  That is correct.

18   Q.  And if you wanted to collect your tips for that particular

19   shift on that day, you had to wait until the last customer left

20   and the closing's waiter prepared the tip to be distributed,

21   correct?

22   A.  I think that if you want to make money you have to wait.

23   But the situation was that one would have to leave and remain

24   there until the last client had left.

25   Q.  OK.  But if you didn't wait, you could always collect your

1   tips the next day, correct?

2   A.  Correct.

3   Q.  OK.  So many bussers, including yourself, decided, on many

4   occasions, to wait until the end of the shift to collect the

5   tips, correct?

6   A.  Yes.  Yes, I could collect them every night.  But -- or,

7   or -- any day.  But you could not go home if there was one

8   client still.

9   Q.  Now, there are late stations in the restaurant, correct?

10  A.  No, no.  No, that I know now, I don't know, but when I was

11  there, when I worked there, there was never late stations.

12  Q.  OK.  So, for example, you're not aware that anybody who

13  would come in past a certain time would be seated specifically

14  in certain sections?

15  A.  Well, really I don't know who took those decisions.

16  Q.  So you don't know one way or the other.

17  A.  No, no, no.  The only thing I do know is that, is that we

18  had, we had -- we could not leave until the last client left

19  the restaurant.

20  Q.  Was that also true with respect to the runners?

21  A.  When I said everyone, I am referring to runners, stockers,

22  coffee makers, waiters.

23  Q.  Waiters also?

24  A.  Yes.

25  Q.  So it's your testimony that no tipped employee could leave

EC8ASAL3ps                        Salinas – cross

1   Fresco Restaurant before the last customer left on any shift?

2   A.  Yeah.  I would only see that -- the only one that would

3   leave would be the waiters, and they were working on a private

4   party.  Only them.  Only them.  The rest had to remain.

5   Q.  Whether there was a private party aside --

6   A.  Because you asked me if -- whether I had seen.  Yes.  Yes.

7   I did see that waiters would leave, but, but, but no, no one

8   else that was working, that was working at the main dining

9   room.

10  Q.  OK.  Just so we understand, then, bussers, waiters, runners

11  all had to stay until the last customer left before they could

12  leave Fresco Restaurant on any shift; is that your testimony?

13  A.  That is correct.  Before 2011.  Yes, June.  June.

14               (Continued on next page)

EC85sal4                          Salinas – cross

1   BY MR. BENSON:

2   Q.  Isn't it true, Mr. Salinas, that before June of 2011 that

3   there were specific individuals who were assigned as late

4   runners and late waiters?

5   A.  Right now I don't know but that -- while during the time

6   that I was working there, I repeat:  We had to remain, all of

7   us.

8   Q.  It is your testimony that never did you ever leave before

9   3:15?  Is that your testimony?

10  A.  It may be at one time it could have happened, but, no,

11  normally it was always 3:30.

12  Q.  And according to your testimony, never, meaning there were

13  no exceptions, before 3:15; correct?

14         INTERPRETER:  Sometimes I can't really clearly hear

15  counsel whether you are saying 3:15 or 3:30.  You said 3:15,

16  correct?

17         MR. BENSON:  I apologize.

18  Q.  I said never prior to 3:15?

19         INTERPRETER:  Correct.  I did hear him properly.

20  A.  It could have happened.  Once, maybe, but never -- always

21  normally 3:30.

22  Q.  Now, after the time clock was put in you had to punch in

23  and out, correct?

24  A.  Correct.

25  Q.  And it is your testimony that after that time clock was put

EC85sal4                    Salinas - cross

1   in you all of a sudden had to work less hours, correct?

2   A.  Yes; less hours.

3   Q.  And why, all of a sudden, were you not working as many

4   hours?

5   A.  That is a good question that you should make to them

6   because now that we are checking, we don't have the same

7   shifts, the same schedules.  We don't have the same hours.  Now

8   we are getting sent home at 9:00, 9:30, and then there are

9   people who are running late and before 4:00 or 5:00, 5:30, 6:00

10  with a question.

11  Q.  So it is your testimony that your responsibilities toward

12  the customers were over earlier?

13  A.  Yes, earlier.

14  Q.  But it still depended on the customers, correct?

15  A.  Where now we are punching, then there were people who were

16  working late.  Now people were being sent home but there were

17  people who would remain to close.

18  Q.  So, the question that I asked you before about there being

19  specifically people who were designated as late waiters and

20  late runners, is it your testimony that that was a new

21  practice?

22  A.  There were no late persons before 2011.  Now, yes.  Now,

23  since we started punching -- since we started with the punching

24  the card, the time card, nowadays there are people 9:00, 9:30

25  are going back home, but never before June 2011.

EC85sal4                          Salinas - cross

1    Q.  Okay.

2            So, it is your testimony that the restaurant's use of

3    late runners and waiters was only from the time that the time

4    clock was put in, forward, correct?

5    A.  Correct.

6    Q.  So, when your declaration at paragraph 31 says:  When I

7    worked on a lunch shift I would arrive at 10:00 and work until

8    approximately 3:30?

9            INTERPRETER:  I'm sorry, your Honor.

10   A.  What page?

11   Q.  I'm sorry.  Page 6, paragraph 31.

12           When it says:  When I worked a lunch shift I would

13   arrive at 10:00 and work until approximately 3:30 p.m., it

14   should have said prior to June of 2011, correct?

15   A.  Yes.

16   Q.  And when it goes on to say:  I could not leave until the

17   last customer left.  So, the time -- I believe there is a typo

18   but it probably meant to say "I," so the time I left would

19   vary.  That should have also said prior to June of 2011?

20   A.  I'm talking about lunch.

21   Q.  I understand.

22   A.  From 10:00 to 3:30.  For dinner I'm talking about when the

23   last client left and you're talking about the lunch and I said

24   it could vary; perhaps 3:15, 3:30.  3:30 was normal.

25   Q.  Okay.  Maybe there is some confusion.

1              In paragraph 31 of your declaration, that deals with

2       the lunch shift, correct?

3       A.   Yes.

4       Q.   And you testified that it should have said until June of

5       2011 I would arrive at 10:00 and work until 3:30, correct?

6       A.   Yes, but --

7       Q.   Okay, and according to your testimony --

8       A.   When it was until June 2011 it was that I worked as such;

9       10:00 until 3:30, approximately.

10      Q.   After June 2011, what were your hours, then, for lunch?

11      A.   It changed.  It changed a lot because now we did not have

12      the double shifts, now we only, during the last two years or

13      year and a half we worked only three lunches, two dinners,

14      three dinners.  But I think that because now, now we were

15      checking.  My question was why, or how come now when we were

16      never able to get overtime and how come now that we are

17      punching we only work 28, 30 hours and they pay two hours

18      overtime.

19      Q.   I apologize, Mr. Salinas.  Perhaps you didn't hear or

20      understand the question I asked.  The question that I asked you

21      pertains specifically to the times that your lunch shift ended

22      and specifically why they would end early.  What practice

23      changed?

24      A.   Well, I think that now they are paying the hours as I think

25      that they were not doing before and now they do send the people

EC85sal4                    Salinas - cross

1    back earlier, and I think that as they were not paying the

2    hours as they were, everyone had to remain there.  Now I think

3    as you say, many hands for two customers.  Well?

4    Q.  Now, is it true that you could leave -- after June of 2011

5    that you could leave before the last customer left?  Did that

6    practice allegedly change?

7    A.  That changed because now they are sending the people back

8    home early because I think that they are paying the hours.  I

9    think that.

10   Q.  Now, going to paragraph 32 of your declaration which is on

11   page 7, you state that the dinner shift would start at 4:00.

12              Is that correct?

13   A.  Correct.

14   Q.  And was that prior to 2011 or the entire time?

15   A.  Before 2011.

16   Q.  And after 2011, what time was your starting time?

17   A.  Well, me, I would always at 4:00, right?  Now they would

18   send the people back earlier but never -- never before 2011 and

19   now always at 4:00, now there is people who come in at 5:00 --

20   me.  Sometimes I did come in at 5:00 in the afternoon but

21   normally always at 4:00.

22   Q.  And in your deposition -- strike that.

23              You also state that you also, like the lunch shift,

24   had to work until the last customer left; is that correct?

25   A.  Yes.  That is correct.

EC85sal4                    Salinas – cross

1   Q.  And is it your testimony that that practice also changed

2   from June of 2011, on?

3   A.  Correct.

4   Q.  And that prior to June 2011 that you stayed until 12:00?

5   A.  Well, normally on Saturdays or those days that I had to

6   clean the rugs, then we would all remain because we had to wait

7   until the last client left and then move chairs, tables over to

8   the area, over to the bar area while waiting for the cleaning

9   company to arrive.  And, as I said before, we would always

10  leave when the last client left.  Now I do not know if things

11  have changed.

12  Q.  The kitchen always closed at 11:00, correct?

13  A.  Yes.

14  Q.  And many times it closed before 11:00, correct?

15  A.  Well, I repeat, on weekends, yes, it would be 11:00 and

16  during the week workdays, Monday, Tuesdays, the kitchen would

17  close early.

18  Q.  Somewhere between 9:00 and 10:00 on those days?

19  A.  10:00 at night.

20  Q.  So, on Monday and Tuesday it is your testimony that it

21  closed at 10:00?

22  A.  You said it.

23  Q.  I'm asking you, sir.

24  A.  At 10:00.  At 10:00.  But, I repeat:  A client could have

25  arrived 10 minutes before 10:00 and then they'd take the order

EC85sal4                          Salinas - cross

1   and the food would come out and, I would repeat, we cannot

2   leave and go back home until after the last client had left.

3   Q.  Now, the practices that you have described for dinner also

4   changed after June of 2011, correct?

5   A.  Correct.

6   Q.  And so, is it your testimony that you are leaving much

7   earlier once the time clocks were put in?

8   A.  Yes.  In fact, only once, me, I had to leave earlier but

9   then everybody would -- because as 75 percent or 90 percent I

10  was a stocker, I had to wash the last glass, the last

11  silverware, the last knife.  That is why.  Perhaps once or

12  twice it was my turn to leave early to go home, but no.  No.

13  Normally, I would remain.  I would remain working until the

14  last client had left.  I could not leave not even a single

15  glass that was dirty or a fork that was dirty.  I had to remain

16  there until the last client and I had to clean my rugs and to

17  clean the glass cleaning machine and to take the water out and

18  to clean the walls and to sweep the rugs.  I could not leave

19  before, that's why because, I repeat:  That is why I would work

20  75 percent to 90 percent as a stocker.

21  Q.  Okay.  And so your shifts, your personal shifts as stocker

22  were the same before and after the time clock because you

23  testified you had to stay, always, until the last customer

24  left, correct?

25  A.  Okay, that was -- that was -- that was -- I want it clear.

EC85sal4                          Salinas - cross

1    I want to clear up that was when I was a stocker.  But, when I

2    was working as a busboy, I said it before, there were days that

3    I did leave early but not as a stocker, as a busboy, and that

4    is why I am repeating I did leave at 9:00, 9:30, perhaps

5    earlier.  Let that be clear.

6    Q.  Okay.  I understand.

7              So it is your testimony that, first of all, you say

8    you were a stocker almost all the time, correct?

9    A.  Not all the time.

10   Q.  But most of the time?

11   A.  That is why I am repeating, yes, it is -- I would leave

12   before the last client would leave or whatever after 2011.

13   Why?  Because I was working as a busboy and nowadays at my

14   station there are no clients, so then one would go and see the

15   manager Attilio.  *At my station there are no clients.*  So then

16   they would say, okay, punch the clock and leave.

17   Q.  Okay.

18             So, before 2011 whenever you were a stocker or it

19   didn't matter if you were a busser or a stocker, it is your

20   testimony that you had to stay until the last customer was

21   there, correct?

22   A.  I repeat:  Me and all my fellow workers.

23   Q.  Okay.

24             And after 2011, when you were a stocker, it is your

25   testimony that you still had to remain until the last customer

EC85sal4                          Salinas - cross

1    left, correct?

2    A.  Well, in my case I had to leave my station clean.  Yes, I

3    did leave, I repeat, and I repeat again:  As a busboy I did

4    leave perhaps before 9:00 p.m. but never as a stocker.  Perhaps

5    nowadays the last customer perhaps leaves at 9:00, 9:50 or 9:59

6    and they say, okay.  Okay, before 10:00 p.m.  I don't know.

7    Q.  So, Mr. Salinas, you would agree that there should be no

8    difference between the end times before 2011 and after 2011

9    when you were a stocker?

10   A.  I repeat:  They changed because they have the requirements

11   or the need for the waiters, right?  And we never did punch.

12   Now that we're checking they are sending us earlier home.

13   Things changed and they changed quite a bit.

14          MR. BENSON:  Your Honor, I believe that is

15   non-responsive to my question.

16          THE COURT:  Overruled.

17   Q.  Was there a difference in the time that the last customer

18   left before the time clock and after the time clock?

19   A.  What is the question?  I did not understand it correctly.

20   What are you asking me?

21   Q.  I'm trying to get a sense.  Your declaration testifies or

22   states that you had to stay until the last customer left,

23   correct?

24   A.  Correct.

25   Q.  And you testified that that was the practice before June of

EC85sal4                          Salinas - cross

1   2011, correct?

2   A.   Correct.

3   Q.   Now, you also testified that when you have the stocker

4   assignment, whether it was before or after, you always had to

5   wait until the last customer left.

6   A.   No, no.   That was before.   Now, nowadays -- that was after.

7   After we started checking they changed it.   Before I had to

8   wash the last glass, the last plate, the last knife, the last

9   fork.   Nowadays I believe they'll send us home even 20 plates

10  remain there dirty, or just go home.

11  Q.   So it is your testimony now that after --

12  A.   2011.

13  Q.   -- 2011 you didn't have to finish your job responsibilities

14  in the same way you did prior to June 2011?

15  A.   I believe that they wanted, now, to save money so that not

16  to be there.   Now we are checking.   Before we were not checking

17  the checks.

18  Q.   Is it your testimony that now, after the time clock, you

19  never finished your responsibilities as a stocker and you were

20  always sent home even before those responsibilities were

21  finished?

22  A.   Well, me?   I always did my job.   Me, I didn't work a lot of

23  time after 2011.   They would see that there was no -- now, if

24  there were two or three customers remaining they would say now

25  you can go back home because, as my responsibility, it was to

EC85sal4                     Salinas - cross

1  clean everything but the manager is sending me home even though

2  there are two or three clients at the dining room.

3  Q.  So, is it your testimony --

4  A.  So, what can I do?  If the manager sends me home my

5  responsibility is to have everything clean and finish my job.

6  Okay?  But now I'm checking and now they're telling me to go

7  home early.  Why didn't they do that earlier?  Why didn't they

8  do that years before?

9  Q.  Is it your testimony that after 2011 you were never able to

10  finish the job responsibilities of your job as a stocker?

11  A.  Well, what is regarding my share, yes, I did finish mine.

12  And I am reminding you that I did leave -- if I did leave two

13  or three times earlier I was not a stocker, I was a busboy.

14  Q.  Okay.  But when you are a stocker it is your responsibility

15  to stay until the last person has been served and those dishes

16  are cleared and you need to restock the dining room, correct?

17  A.  Correct, but no -- but not now.  From before it was until

18  the last client but they now, they didn't place too much

19  attention whether there were three or four persons, they would

20  say just leave.  You can leave, you can leave things as they

21  are.

22  Q.  So, again, so we are clear I want to understand what your

23  testimony is.  After 2011 was there ever a time where you

24  waited for the last customer to leave and you finished your

25  responsibilities?

1    A.  It could have been, can be.  I repeat to you it can be

2    because if many a time, sometimes the normal, the regular

3    clients left but they were private parties, 30 or 40 persons.

4    I cannot leave until -- there are way too many glasses to

5    clean.  I have to remain there until the last client had left.

6              THE COURT:  I just want to clarify something for the

7    record and this is a question for the interpreter.

8              You have been translating, when he says *ponchando* --

9    and I will spell it, P-O-N-C-H-A-N-D-O.

10             INTERPRETER:  Correct.

11             THE COURT:  You have been using the word "checking."

12   Do you mean punching the clock?

13             INTERPRETER:  When I use "checking" I do mean punching

14   the clock and not referring to the word as to in a different

15   semantical meaning.  Thank you, your Honor.  And *ponchando* was

16   spelled as your Honor very precisely spelled out.

17             THE COURT:  Thank you.

18             INTERPRETER:  I will try to say punching the clock now

19   instead of checking.

20   BY MR. BENSON:

21   Q.  I would like to show you what's been identified as

22   Plaintiff's Exhibit 23.  Would you like a separate copy, your

23   Honor?

24             Do you recognize that document, Mr. Salinas?

25   A.  Yes.  I believe so.

EC85sal4                    Salinas - cross

1   Q.  And it has your punch-ins and punch-outs, correct?

2   A.  Correct.

3   Q.  And this shows the times that you left the restaurant and

4   arrived at the restaurant after June of 2011, correct?

5   A.  Correct.

6           MR. BENSON:  I would like to move this into evidence,

7   your Honor.

8           THE COURT:  Any objection?

9           MR. ANDROPHY:  No objection, your Honor.

10          THE COURT:  It is admitted.

11          (Plaintiff's Exhibit 23 received in evidence)

12  BY MR. BENSON:

13  Q.  The time clock allowed you to print out a record of each

14  punch-in and punch-out, correct?

15  A.  Correct.  We had a number where we would also see the hours

16  that we had worked but the managers forbid us to do so.  How

17  many hours we worked during the week we could do it, but we

18  were forbidden to do so.  They changed, they switched the

19  numbers.  All my fellow workers know it.  All my fellow workers

20  know that we would arrive at 10:00 in the morning and the

21  computer sometimes was not working so we had to wait until

22  manager Brent would arrive so he would fix the computer.  That

23  could have been half an hour or an hour and then they would

24  tell us now you can punch, now it is correct.  But why.  And my

25  question is:  How come was it never that the computer stopped

EC85sal4                           Salinas - cross

1    working when we were leaving, when we were punching or leaving

2    time?  It was always not working in the mornings.  I do not

3    know why.

4    Q.  In the beginning of the time clock there were some problems

5    with it, correct?

6    A.  I understand that, but what I do not understand is when we

7    wanted to see the total of hours for the week at the beginning

8    we could see it and then, afterwards, we couldn't, because it

9    was forbidden.  They switched the numbers from us.

10   Q.  So it is your testimony that somehow you were forbidden

11   from printing --

12            INTERPRETER:  Two people are speaking at the same time

13   so it is very hard for me, too.  Believe me so.

14            MR. BENSON:  I apologize, but I wasn't finished with

15   my question.

16            INTERPRETER:  Thank you.

17   BY MR. BENSON:

18   Q.  It is your testimony that at some point you could no longer

19   get records of the hours that you worked?

20   A.  They never provided me with records.  The one who had

21   access to them was the manager but he never showed them, gave

22   us.  He never showed them to us.

23   Q.  Each time that you punched in or out you could print out

24   your own record, correct?  Or it came out automatically?

25   A.  That is what I'm explaining.  Then they said no more, no

1   more.

2   Q.  So, it is your testimony that at some point the time clock

3   stopped giving you a receipt of your hours?

4   A.  During the week, yes, correct.

5   Q.  Okay.

6          Again, just so we understand and the record is clear,

7   it is your testimony that when the time clock was put in and

8   you punched in or out it would automatically print out the

9   record, correct?

10  A.  Correct, but not when we would punch-in and it was not

11  working.

12  Q.  Okay.

13  A.  And supposedly the manager would fix it but you could

14  never -- never it showed us what time we punched.  He would fix

15  it one hour afterwards, later.

16  Q.  I understand that when it wasn't working you wouldn't get a

17  receipt and in those situations it was up to the managers or

18  Mr. Scotto to fix it, correct?

19  A.  Correct.

20  Q.  And is it your testimony that they didn't fix the hours?

21          INTERPRETER:  Say again, please?

22  Q.  That they didn't fix the machine to solve the problem?

23  A.  Yes.  Yes, they would fix it, but one hour afterwards.  My

24  question always was why?  How come it doesn't work when we --

25  when we come during the morning to punch to come in, the

EC85sal4                        Salinas - cross

1   entrance time, and when we would leave it was always working

2   correctly.

3   Q.   At some point there were no more problems, correct?

4   A.   Correct.

5   Q.   And it was working when you punched in and when you punched

6   out?

7   A.   Sometimes it was not working during the mornings.

8   Q.   Okay.

9          But always, for the entire time that you were working,

10  it always printed out a record for you every time you punched

11  in and out, correct?

12  A.   I repeat:  At the beginning, yes, it would provide us with

13  the total of hours but they said that no more.  They changed,

14  switched the numbers and never more could we see, find out how

15  many hours I had worked during the week.

16  Q.   So, is it your testimony that at some point the machine

17  stopped providing you with a record?

18  A.   The total.  Because if it was working normally it would

19  say, okay, I arrived at 10:15, 10:10, and I left at 3:00, 2:15.

20  Yes, it would provide each record or -- he said the word

21  checked.

22          THE COURT:  I think he means the word sheet.

23          INTERPRETER:  Ah, sheet.  Thank you, your Honor.

24  BY MR. BENSON:

25  Q.   In the morning you would get a record of the punch-in time,

EC85sal4                         Salinas – cross

1   correct?

2   A.  Yes.  Correct.

3   Q.  And in the evening you would get a record of the punch-out

4   time and the total hours, correct?

5   A.  That is correct.  Of course.  What I'm trying to explain is

6   that the total of the hours it wouldn't provide -- they were

7   not provided to me because they changed -- if before they were

8   provided to me because why did they switch the numbers or

9   change?  Each shift -- each shift -- each shift they would

10  change but it wouldn't provide me with the totals.

11  Q.  Okay, but it always provided you with a record -- let me

12  finish, please -- it always provided you with a record of when

13  you punched in and when you punched out and the total hours for

14  the day?

15  A.  Correct, but I'm explaining why were there days that they

16  were not providing it because the machine was not working and

17  how can we prove how many hours I did work during the week.

18  The machine -- for each shift it would provide it for us but

19  not the total for the week.

20  Q.  Okay.

21          Did you keep the receipts from each shift?

22  A.  No.  Unfortunately not.

23  Q.  Because you could have added them up and determined your

24  hours, correct?

25  A.  Yes, but why?  Why did they switch the numbers, take the

EC85sal4                           Salinas - cross

1   numbers away?  I don't know.

2   A.  (In English)  I don't know.

3   Q.  Let's talk about your schedule; it varied, correct?

4   A.  Correct.

5   Q.  And it has always varied, correct?

6   A.  Correct.

7   Q.  Some weeks you have more shifts than others, correct?

8   A.  Correct.

9   Q.  And that was true the entire time you worked at Fresco?

10  A.  Correct.

11  Q.  The schedule comes out every Friday, correct?

12  A.  Correct.

13  Q.  Now, at paragraph 30 of your declaration the third sentence

14  reads --

15  A.  Which page?

16         THE COURT:  6.

17  Q.  6.

18  A.  Where is he?  Where is he at?  30?  31?

19  Q.  30.  It says:  At first I usually worked five or six dinner

20  shifts and three lunches.

21         Do you see that?  What does "at first" mean?

22  A.  When I started to work.  When I started to work.  When I

23  began working at the restaurant.  That's at the beginning when

24  I started, when I started working at the corporation.

25  Q.  So, what year was that?

EC85sal4                         Salinas - cross

1    A.  In 2006.

2    Q.  And so, for how long did you work eight or nine shifts?

3    A.  As you said, it would vary.  The same thing as always

4    during the seasons.  When I said six dinners and three lunches

5    I'm talking of October, November and also December.  It could

6    have been 11 shifts.  But, during the summer, possibly three

7    dinners and three lunches.

8    Q.  So, is it your testimony that those number of shifts during

9    those periods of time took place throughout your employment at

10   Fresco?

11   A.  Yes.  I repeat that, that that season, for example December

12   I would work 11 shifts, five days, doubles from Monday to

13   Friday, and Saturdays I would start at 2:30 and we would close

14   at perhaps 12 midnight during that season.  And during the

15   summer it would decrease a lot.  So then three or four dinners

16   and two lunches.  I'm talking about July, June, but yes.  Yes.

17   Q.  And this was the same for every year that you worked?

18   A.  Yes, it was the same.  In other words in November,

19   December, yes, the 11 shifts, November and December.

20   Q.  So, it is your testimony that in November and December of

21   every year that you worked 11 shifts a week?

22   A.  Yes, I worked 11 shifts, but it could have varied from

23   between nine and 1 because that was the season that was very --

24   but normally -- normally -- it was five dinners and three

25   lunches.

EC85sal4                      Salinas - cross

1    Q.  So normally your schedule during the not busy times was

2    eight shifts a week?

3    A.  During the low time, yes.  Yes.  The schedule might say you

4    have five dinners and three lunches but if it was very slow

5    they would say somebody has to go home because it is not very

6    busy but we are talking about what is December, yes, it was all

7    the shifts, there were no -- there were no free days, there

8    were no holidays.  It was only on Sundays that they would

9    close.

10   Q.  And your testimony, just so we are clear, is during the

11   entire time you worked at Fresco?

12   A.  Yes, it was as such during the seven years that I worked

13   there.

14   Q.  Okay.  So your schedule varied from eight shifts a week to

15   11 shifts a week, correct?

16   A.  Yes.  Yes.  It could have been there, it might have been

17   one that perhaps I might have taken two days off and then there

18   could have been some days where I only worked six or five but,

19   no.  No, it is no -- normally -- normally it was about eight.

20   Eight.

21   Q.  Now, it is your testimony that certain times you worked 11

22   shifts, correct?

23   A.  Correct.

24   Q.  And the restaurant is only open for 11 shifts, correct?

25   A.  Yes, correct.  Five lunches and six dinners.

EC85sal4                          Salinas - cross

1   Q.  So if you worked 11 shifts you worked every single shift

2   that the restaurant is open?

3   A.  Correct.  I'm going to explain now.

4            During this month of December the restaurant keeps

5   very busy, stays very busy.  Normally when I say 3:30 we had

6   tow come back at 4:00, 4:30, take a break then eat and eat

7   during that time.  During many a time during that season there

8   was no break.

9   Q.  So, it is your testimony that during the busy season you

10  worked 11 shifts a week with no break?

11  A.  With no breaks because the kitchen -- the kitchen wouldn't

12  close during this period the kitchen does not close, it is

13  always open.  It doesn't close between lunch and dinner, it

14  is -- it continues open.  Open.

15  Q.  So you wouldn't even punch-in and punch out, you would just

16  report for work in the morning and stay until you left?

17  A.  No, no.  That's what I'm talking about, about before

18  2011 -- from 2006 when I started to work.  I'm talking about

19  that.  Now I don't know how it is now.  I don't know but that

20  was specifically had this month.  There is no break.

21  Q.  Is it your testimony that the practice changed after 2011

22  and that after 2011 you did punch-out when you worked 11 shifts

23  and before you didn't?

24  A.  No, no.  No, no.  I was not able to work had I left.  In

25  December then after I started to punch-in, I never worked more

1   than nine or eight shifts.  They changed a lot.  I'm explaining

2   that after June of 2011 we didn't have any -- everything

3   changed.  Now I only had about five shifts, six shifts.

4   Everything changed very much.  I'm talking about 2007, 2008,

5   2009 and 2010 December we didn't have any -- we didn't have

6   breaks during the month of December.

7   Q.  So, when you testified previously that these practices or

8   this schedule was for the entire seven years that wasn't

9   accurate?

10  A.  No.  No.  I'm saying that specifically only about December,

11  that's when I am saying that.

12  Q.  I understand that.  In December you are saying you worked

13  11 shifts, right?

14  A.  Not every year yet, but yes.

15  Q.  But if we look at the schedules we would see that you

16  worked 11 shifts sometimes in December?

17  A.  During the last months I worked only five or three -- five

18  or three shifts.  It all changed.

19  Q.  So it is not your testimony that you were scheduled for

20  more shifts before 2011 than you are after 2011?

21  A.  It changed.  Yes.

22  Q.  You testified previously that the practices -- the eight

23  shifts and your 9:00 to 11:00 shifts were the same for all

24  seven years?

25  A.  I'm clearing for you.  I told you in December some weeks I

EC85sal4                          Salinas - cross

1    did work 11 shifts, sometimes perhaps nine but normally I had

2    five dinners and three lunches.  That was the normal.

3    Q.  And that was true before 2011 and after 2011, correct?

4    A.  After 2011, only I only had five or six shifts, no more.

5    Q.  So now you're testifying that you were scheduled nor more

6    shifts before 2011 than you were after 2011?

7    A.  I am repeating:  I had nine to 11 starting in 2006 during

8    the month of December and after 2011 only five.

9    Q.  So, if we looked at your schedules before 2011 and after

10   2011 is it your testimony that there should be more shifts

11   before 2011 than after 2011?

12   A.  That is all right.  Correct.  Only you must specify what

13   month.  Okay?

14   Q.  So is it only December that it was different or was it

15   different for the whole year?

16   A.  It was different all year but I am repeating --

17   Q.  So, it is your testimony --

18   A.  -- I am repeating that because it is going to now appear

19   there that the schedule I was on-call and the on-call was

20   working.  It is shown there that I had seven shifts but the

21   rest were on-calls and they called for working during the month

22   of December and perhaps also during the month of November.

23   Q.  Now, on-call depends on how many, what they call, covers

24   are at the restaurant, right?  And by covers I mean

25   reservations.

1           INTERPRETER:  Beg your pardon?  I mean --

2   Q.  And by covers I mean reservations, so that if there are a

3   certain number of reservations and you call in you are told

4   come on in.  Correct?

5   A.  Correct.

6   Q.  And that was the practice before 2011 and after 2011,

7   correct?

8   A.  Correct.

9   Q.  So the amount of on-call shifts depends on how busy the

10  restaurant is, nothing else, correct?

11  A.  Yes.  But, I repeat, November and December is very busy.

12  Q.  Now, at Fresco Restaurant there is a family meal period,

13  correct?

14  A.  Correct.

15  Q.  And that is both on the lunch shift and the dinner shift,

16  correct?

17  A.  Correct.

18  Q.  And the family meal is 30 minutes on both the lunch and the

19  dinner shift, correct?

20  A.  Correct.

21  Q.  And during that 30 minutes you performed no work, correct?

22  A.  Correct.

23  Q.  And you could leave the restaurant if you want, correct?

24  A.  Yes.  That is so.

25          MR. BENSON:  Your Honor, are we going to stop at 2:15?

EC85sal4                          Salinas – cross

1            THE COURT:  We will.

2            MR. BENSON:  I am about to go into a different area

3    and I would prefer to just start with this than stop in the

4    middle, if your Honor is okay with that.

5            THE COURT:  That's all right.

6            The witness may step down.

7            Counsel, would you approach, please?

8            (Witness steps down)

9            (At side bar; discussion off record)

10           (Adjourned to 9:00 a.m., December 9, 2014.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

ENRIQUE SALINAS

Direct By Mr. Androphy . . . . . . . . . . . . 3

Cross By Mr. Benson  . . . . . . . . . . . . . 6

Cross By Mr. Benson  . . . . . . . . . . . . .46

                    PLAINTIFF EXHIBITS

Exhibit No.                                    Received

 65, 66, and 67  . . . . . . . . . . . . . . . 6

 23    . . . . . . . . . . . . . . . . . . . .76