EC95sal1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    ENRIQUE SALINAS , ALFREDO
     RODRIGUEZ, ANGEL CEDENO,
4    CHRISTIAN URGILES, FRANCISCO
     LUGO, JOSE AMEZQUITA, LUIS
5    ROBALLO, MIGUEL CERVANTES,
     NAHUN FLORES, PABLO ALVARADO,
6    PABLO FRANCISCO-LOPEZ,
     VALENTIN XOCHIPILTECATL AND
7    VICENTE LEON, individually and
     on behalf of others similarly
8    situated,

9                    Plaintiffs,

10             v.                        13 Civ. 2992 (AT)

11   STARJEM RESTAURANT CORP (d/b/a
     FRESCO BY SCOTTO) MARION
12   SCOTTO and ANTHONY SCOTTO,

13                  Defendants.

14   ------------------------------x
                                        New York, N.Y.
15                                      December 9, 2014
                                        9:20 a.m.
16
     Before:
17
                       HON. ANALISA TORRES,
18
                                        District Judge
19
                            APPEARANCES
20
     MICHAEL FAILLACE & ASSOCIATES, P.C.
21        Attorneys for Plaintiffs
     BY:  JOSHUA ANDROPHY
22        SHAWN CLARK

23   LITTLER MENDELSON, P.C.
          Attorneys for Defendants
24   BY:  CRAIG BENSON
          NAVEEN KABIR
25
     ALSO PRESENT:   EUGENE ALVARES, Spanish interpreter

EC95sal1

```
 1              (Trial resumed)
 2              THE COURT:  Good morning.
 3              Good morning, Mr. Salinas.  You are very late.
 4              THE WITNESS:  (In English) I apologize.
 5              THE WITNESS:  I apologize.  I very much apologize.
 6              THE COURT:  You must make sure that you get here on
 7   time because this is too much of a delay.
 8              You may continue with cross-examination.
 9              MR. BENSON:  Thank you, your Honor.
10    ENRIQUE SALINAS, resumed.
11   CROSS EXAMINATION
12   BY MR. BENSON:
13   Q.  Good morning, Mr. Salinas.
14   A.  Good morning.
15   Q.  Mr. Salinas, I put back a copy of your deposition and I
16   direct your attention to page 46 of that deposition,
17   specifically line 6.  Were you asked the following questions
18   and did you give the following answers:
19   "Q  Mr. Salinas, do you know what I mean when I am referring to
20   side work?
21   "A  Yes.  That is correct.
22   "Q  So, what was your side work as a busboy?  Let's limit it to
23   side work prior to the shift beginning, if any.
24   "A  Okay.  Normally are you talking about the side work, are
25   you not?  Normal?
```

EC95sal1                          Salinas – cross

1    "Q  At the beginning of the shift.

2    "A  Folding napkins, put glasses at the station.  That's

3    normal."

4            And then I direct your attention to the next page, 47,

5    specifically line 4:

6    "Q  All right.  That's what I'm asking about.  How long does

7    that take, the side work at the beginning of the shift?

8    "A  Half an hour."

9            Were you asked those questions and did you give those

10   answers?

11   A.  Correct.

12   Q.  Is that testimony truthful and accurate?

13   A.  Correct.

14   Q.  Now, folding napkins is something that assists in the

15   service, correct?

16   A.  Correct.

17   Q.  And putting glasses at the station, that also assists in

18   the service, correct?

19   A.  Correct.

20   Q.  They both directly affect the busser's ability to service

21   the customers, correct?

22   A.  Correct.

23   Q.  Now, I direct your attention to the same page, 47,

24   specifically line 10:

25   "Q  Okay.  And was there side work at the end of the shift as a

EC95sal1                          Salinas - cross

 1  busser?

 2  "A  To clean the stations.  I forgot to tell you that we had

 3  ice buckets at stations in order to put ice.  At the end of the

 4  night we had to dump the ice and clean the stations clean, keep

 5  stations clean.

 6  "Q  So, that side work you are saying at the end of the shift,

 7  right?

 8  "A  Yes.

 9  "Q  How long did that take?

10  "A  Let's say between 20 and 30 minutes."

11            Were you asked those questions and did you give those

12  answers?

13  A.  Correct.

14  Q.  And is that testimony truthful and accurate?

15  A.  Correct.

16  Q.  Now, keeping a station clean out on the service floor is a

17  essential function of a busser's job, correct?

18  A.  Correct.

19            THE COURT:  Mr. Benson?

20            MR. BENSON:  Yes.

21            THE COURT:  If you would make sure that you bring the

22  mic closer to you so that you can be heard better from here?

23            MR. BENSON:  Okay, your Honor.  I apologize.  I

24  usually never have a problem with my voice carrying.  In fact,

25  I have been, on several occasions, told to tone it down.  So, I

1   will oblige.

2   BY MR. BENSON:

3   Q.  Now, Mr. Salinas, you know who Anthony Scotto, Jr. is,

4   correct?

5   A.  Correct.

6   Q.  He is the head of the restaurant, is he not?

7   A.  Correct.

8   Q.  You see him there every day, correct?

9   A.  Correct.

10  Q.  He is there all the time, is he not?

11  A.  That is so.

12  Q.  You have heard him yelling and screaming around the

13  restaurant?

14  A.  Correct.

15  Q.  Telling people what to do?

16  A.  Correct.

17  Q.  And he does that all the time, doesn't he?

18  A.  That is so.

19  Q.  He is very involved in all of the decisions in the

20  restaurant, correct?

21  A.  I do not know about all the decisions but largely so,

22  correct.

23  Q.  So you don't have -- based on your observation, though, he

24  is involved in all major decisions in the restaurant, is he

25  not?

EC95sal1                          Salinas – cross

```
 1   A.  Correct.
 2   Q.  And do you know his role in hiring and firing at the
 3   restaurant?
 4   A.  I do not know.
 5   Q.  Do you know his role in setting wages at the restaurant?
 6   A.  No.  No, I do not know that.
 7   Q.  And do you know who keeps employment records at the
 8   restaurant and whether Mr. Scotto has any role in that?
 9   A.  I was provided with a paper in 2013, not before 2006.  Six
10   years afterwards I was provided with a paper on how much I was
11   paid by the hour, never before.
12           THE COURT:  Sustained.  The answer is unresponsive.
13           Mr. Salinas, I want you to listen carefully to the
14   question and answer the question that he has asked without
15   giving additional information.
16           THE WITNESS:  Correct.
17           THE COURT:  You may read back the question.
18           (Record read)
19           THE WITNESS:  I do not know, sir.
20   BY MR. BENSON:
21   Q.  Now, most people who come to work at Fresco Restaurant have
22   to work for several days training before they are officially
23   hired; is that correct?
24   A.  I do not know that.
25   Q.  And during that time they are observed by Mr. Scotto to
```

1   determine whether they are suitable to work at the restaurant,

2   correct?

3         MR. ANDROPHY:  Objection.  The witness says he doesn't

4   know if people train so now he is being asked what happens

5   during this training period but he said he doesn't know if

6   there is training.

7         THE COURT:  Mr. Benson?

8         MR. BENSON:  I will withdraw the question, your Honor.

9   BY MR. BENSON:

10  Q.  Do you know who Marion Scotto is?

11  A.  Yes.

12  Q.  She is also a member of the Scotto family, correct?

13  A.  Correct.

14  Q.  And she sits at the front of the restaurant and greets

15  customers, correct?

16  A.  Correct.

17  Q.  Do you know what role, if any, that Marion Scotto plays in

18  employment decisions at Fresco?

19  A.  I do not know that.

20  Q.  Do you know if she has any role in setting wages?

21  A.  No.  I do not know.

22  Q.  Do you know if she has any role in keeping employment

23  records?

24  A.  No.  No, I do not know that.

25  Q.  Do you know if she plays any role in scheduling?

EC95sal1                    Salinas – cross

1    A.  I do not know.  What I do know is that the manager did

2    that.

3              MR. BENSON:  Move to strike, your Honor; again, not

4    responsive.  I am asking what Marion Scotto --

5              THE COURT:  Sustained.

6              Listen to the question and answer the question,

7    Mr. Salinas.

8              THE WITNESS:  Okay.  I do not know so.  I do not know

9    so.

10   BY MR. BENSON:

11   Q.  Do you know what role, if any, Marion Scotto plays in any

12   employment decision in the restaurant?

13   A.  I do not know that.  I believe that she would hire the

14   hostesses.  That's what I think, believe.

15   Q.  But you don't know that, do you?

16   A.  Not exactly.

17   Q.  Not exactly meaning you don't know?

18   A.  I do not know it.  I do not know it.

19   Q.  Thank you.  Now, let's talk about your hiring at the

20   restaurant.

21             You claim that you just walked into the restaurant,

22   correct?

23   A.  Correct.

24   Q.  Did you have a resume with you?

25   A.  Correct.

EC95sal1                          Salinas - cross

1   Q.  So you did have a resume?

2   A.  Yes, correct.

3   Q.  And you were told to come back the next day, correct?

4   A.  That is so.

5   Q.  And you were supposed to come back to train, correct?

6           INTERPRETER:  I didn't --

7   Q.  I said you were supposed to come back to train, correct?

8   A.  Correct.

9   Q.  Now, it is your testimony that you didn't speak to

10  Mr. Scotto during that time when you dropped your resume off?

11          INTERPRETER:  Did or did not?

12  Q.  During the time when you dropped your resume off.

13          INTERPRETER:  Did or did not speak to Mr. Scotto.

14  Q.  Is it your testimony that you did not speak to Mr. Scotto?

15  A.  Correct.

16  Q.  And you did come back to the restaurant the next day,

17  correct?

18  A.  Correct.

19  Q.  Do you know whether Mr. Scotto was there or not the day you

20  came back?

21  A.  I did not see him that day.

22  Q.  Do you know if he was there or not?

23  A.  I did not see him that day.  He was not there --

24  Q.  What time of year was -- sorry.

25          What time of year was that?

EC95sal1                    Salinas - cross

1   A.  If I remember correctly it was November, December.  Must

2   have been.

3   Q.  And that is the busiest time of the year for the

4   restaurant, is it not?

5   A.  Correct.

6   Q.  And you have since come to know that Mr. Scotto is at the

7   restaurant every day, have you not?

8   A.  Some days he was not there.

9   Q.  Is it your testimony that Mr. Scotto wasn't there during

10  the busiest days of the year?

11  A.  He was always there but there were some days that he was

12  not.

13  Q.  And is it your testimony that he wasn't there on the days

14  that you were called back to train?

15  A.  The first day that I had to be trained I did not see him.

16  In my testimony on my first day of training I never trained

17  because the subway, they had a strike at the subway.  I had to

18  wait for a person so that he/she would give me training and

19  they told me that there were five busboys but there was only

20  one and the manager Brent told me:  Today you don't train, from

21  today you will start working.

22          That's what happened.  That's the way, but that day I

23  did not see Mr. Scotto.

24          MR. BENSON:  Other than the not seeing Mr. Scotto I

25  would move to strike as non-responsive.  I simply asked him

EC95sal1                    Salinas - cross

1   when he saw Mr. Scotto there.

2            MR. ANDROPHY:  Mr. Benson was asking him questions

3   about when he came to train and so I think it is proper for the

4   witness to clarify the record to explain that he didn't

5   actually train.

6            THE COURT:  Overruled.

7   BY MR. BENSON:

8   Q.  Okay, Mr. Salinas.

9            So you can't testify for certain that he was not at

10  the restaurant that day, can you?

11           THE COURT:  Asked and answered, counsel.  You asked

12  this question repeatedly.

13  Q.  Now, Mr. Salinas, isn't it true that you don't know who

14  made the decision to hire you?

15  A.  No.  I do not know so.

16  Q.  Mr. Salinas, do you know who Brent Drill is?

17           INTERPRETER:  Brent Rill?

18  Q.  Brent Drill.  D-R-I-L-L.

19  A.  For me he was a manager.

20  Q.  His title was floor captain, was it not?  Floor captain?

21  A.  For me he always was the manager.  I do not know.  Nobody

22  explained to me whether he was a captain but for me he was a

23  manager.

24           I don't want to extend this but I will give you an

25  example.  He was the one who would discipline us and he would

EC95sal1                     Salinas – cross

1    make decisions as to who would be working at the stations.  He

2    was the manager.

3              MR. BENSON:  Your Honor, I asked what his title was.

4              THE COURT:  So this is going to come out on the

5    redirect but I will, if you want, if you are asking me to

6    strike it, I will strike it.

7              MR. BENSON:  All right.  That's fine.  Fair enough.

8    BY MR. BENSON:

9    Q.  Now Mr. Drill, when he worked, was on the service floor the

10   entire time, correct?

11   A.  Correct.

12   Q.  And he stayed mostly in the VIP section, correct?

13   A.  Correct.  Correct.

14   Q.  That is station 1, correct?

15   A.  1 and 2 it is.

16   Q.  Mr. Drill was also very knowledgeable in wine, correct?

17   A.  Correct.

18   Q.  And he would go around the whole restaurant to explain and

19   serve the wine, correct?

20   A.  Correct, but not only he, Attilio too, the other manager.

21   Q.  Attilio also explained the wine to the customers and poured

22   the wine for the customers, correct?

23   A.  The same way as the waiters, correct.

24   Q.  Now, Mr. Drill, as part of his responsibilities, would take

25   the drink orders in the VIP section as well, correct?

EC95sal1                          Salinas - cross

1   A.  Correct.

2   Q.  And he put in orders for special requests.

3   A.  Correct.

4   Q.  Like if a guest wanted something that wasn't on the menu?

5   A.  That is so.  Correct.

6   Q.  So he would take care of those food orders directly,

7   correct?

8   A.  Correct.

9   Q.  And he did that every shift that he was on duty, didn't he?

10  A.  Correct.

11  Q.  So, in the stations where he worked it was like there were

12  two waiters, correct?

13  A.  Correct.

14  Q.  Now, you know who Attilio Vosilla is?

15  A.  The manager, because he would arrange our schedules, he

16  would make our schedules.  And, he also took decisions which

17  waiters would work at the private parties or who would work at

18  the VIP section or at the regular stations; he would, at the

19  major dining room.

20          MR. BENSON:  Same objection.

21          THE COURT:  Are you asking me to strike it?

22          MR. BENSON:  No.  I will try to save us all time.

23  BY MR. BENSON:

24  Q.  Mr. Vosilla was also on the service floor the whole time,

25  correct?

EC95sal1                      Salinas - cross

1    A.  Correct.

2    Q.  And he did the same things as Mr. Drill did that you just

3    testified to, correct?

4    A.  Correct.

5    Q.  And he also worked as a party captain, correct?

6    A.  Correct.

7    Q.  And you also worked those sometimes, parties; did you not?

8    A.  That is so.  I said that yesterday.

9    Q.  So, you have seen Mr. Vosilla during those parties greet

10   the host and interact with the host of the parties, correct?

11   A.  Correct.

12   Q.  Check in with them throughout the meal?

13   A.  Correct.

14   Q.  Answer questions about the menu or the wine list?

15   A.  Yes.  That is so.

16   Q.  Take the food and drink orders to the guests at the party?

17   A.  Well, during the parties the waiters would take the orders

18   for the beverages and the food, yes.  Yes, he did serve it.

19   Q.  You would see Mr. Vosilla open wine and serve wine for the

20   parties?

21   A.  Normally he would say which wines were going to be sold and

22   he would take them over to the party area and he would tell the

23   waiters what type of wine they had ordered.  But, the ones who

24   poured the wine at the private parties, were the waiters.

25   Q.  Is it your testimony that you never saw Mr. Vosilla pouring

EC95sal1                    Salinas - cross

1   wine at the parties?

2   A.  A few times I did see him.

3   Q.  Now, Mr. Vosilla also, in the presence of the customers,

4   plates the pasta course, does he not?

5   A.  Yes.  Correct.

6   Q.  And he coordinates all the dishes that are served, correct?

7   A.  Correct.

8   Q.  Do you know who Marco is?

9   A.  Yes.

10  Q.  He also works as a party captain, correct?

11  A.  Sometimes, yes.

12  Q.  And as a party captain -- not as a party captain -- did I

13  say party captain or floor captain?

14          Did he also act as a floor captain?

15  A.  I want to clear something here.  I don't want to extend

16  myself too much.  When he was placed as a captain they did

17  explain to us, yes, he is the captain.  They would tell us that

18  they were the managers, Attilio or Marco.  Marco did work as a

19  captain but that was told to us by the managers, Brent or

20  Attilio.

21  Q.  And when he worked as a captain he did the same things that

22  Brent and Attilio do, correct?

23  A.  He wouldn't make decisions who would work at the stations

24  when he would work as a captain, he would only pour the wine,

25  serve the wine.

EC95sal1                     Salinas - cross

1   Q.  So it is your testimony that when he was a floor captain he

2   did not -- he did different service-related things than Brent

3   and Attilio did?

4   A.  Repeat that?

5   Q.  Service-related, serving the customers.

6   A.  As a captain he would serve the wine but, I repeat, he

7   would pour the wine.  If a client would want a special bottle

8   of wine he would recommend or what type of water they wanted,

9   but as a captain it didn't go father than that, from what I

10  observed.

11  Q.  So, Marco did less direct service to the customers than

12  Brent and Attilio, is that your testimony?

13  A.  I believe so, yes.

14  Q.  I direct your attention, Mr. Salinas, to page 13 of your

15  declaration, specifically paragraph 79.

16  A.  What page did you say?

17  Q.  13, paragraph 79; not the deposition, the declaration.

18          Now, it is your belief that your co-worker named

19  Patricio was terminated by Attilio Vosilla, correct?

20  A.  Correct.

21  Q.  But you don't know who made the decision to terminate him,

22  correct?

23  A.  At that moment I would think it was the manager because I

24  was there and the sous chef told Patricio, *Wash the dishes.*

25  And Patricio said, *That is not my job.  I'm a stocker.*  And

EC95sal1                    Salinas - cross

1   Raul told Patricio, *You don't want to do it?  I'm going to go*

2   *get the manager.*  And he went to get the manager and he asked

3   him, *You do not want to wash the dishes?*  And Patricio said,

4   *No.*  So then he said, *Okay.  Get out from here, we do not need*

5   *you anymore.*  I did not see that the manager spoke to someone

6   or someone else any further.

7   Q.  So you don't know whether the sous chef spoke to

8   Mr. Scotto, correct?

9   A.  Correct.

10  Q.  And you don't know whether Mr. Vosilla talked to

11  Mr. Scotto, correct?

12  A.  It all happened within three to four minutes.  I do not

13  know whether he spoke to someone or if they spoke to anyone

14  else.

15  Q.  You worked there seven years, correct, Mr. Salinas?

16  A.  Correct.

17  Q.  And that's the only individual who you even allege was

18  terminated by Mr. Vosilla, correct?

19  A.  I did not understand the question.  Can you repeat it for

20  me?

21  Q.  You worked in the restaurant for seven years, correct?

22  A.  Correct.

23  Q.  And this is the only time in seven years that you think

24  Mr. Vosilla allegedly participated in a decision to terminate

25  someone?

EC95sal1                        Salinas - cross

1    A.  Correct.

2    Q.  I draw your attention to paragraph 17 of your declaration

3    that starts on page 3.  Now, you say that --

4    A.  You said 17 and it is not here.

5    Q.  Paragraph 17 is not there?  Page 3, paragraph 17.

6    A.  Correct.

7    Q.  You say, and I quote:  "Additionally, sometimes when I

8    worked as a stocker I was required to do the job of a

9    dishwasher."

10            Correct?

11   A.  Correct.

12   Q.  So that doesn't happen all the time?

13   A.  No.  No, it didn't happen all the time.

14   Q.  In fact, you say at the end on the next page that this

15   would often happen during times when Fresco was less busy such

16   as the summer months.

17   A.  Correct.

18   Q.  So are we talking about the summer months?

19   A.  Yes.  Correct.

20   Q.  And yesterday you said that that happens on Saturdays.

21   A.  Correct.

22   Q.  So we are talking about Saturdays in the summer months,

23   correct?

24   A.  That is so.  Correct.

25   Q.  Now, you also state in paragraph 17 of your declaration

EC95sal1                         Salinas - cross

1   that this happens; after the lunch shift was completed on some

2   days the dishwasher would be sent home around 2:30 p.m. and not

3   return until 5:00 p.m.

4           Is that correct?

5   A.  That is correct but not specifically on Saturdays.  It was

6   also Fridays.  It was Fridays and Saturdays.

7   Q.  And so, it is your testimony now that happened on both

8   Fridays and Saturdays?

9   A.  Yes.  Normally Saturdays, but Fridays also.

10  Q.  Because there is no lunch shift on Saturday, correct,

11  Mr. Salinas?

12  A.  Correct.  There is not.  This is not.  There isn't one for

13  lunch.

14  Q.  Okay.  So, is it your testimony -- strike that.

15          Mr. Salinas, there have been times when you called in

16  sick, correct?

17  A.  Correct.

18  Q.  And you were never disciplined for that, correct?

19  A.  Correct.

20  Q.  Now, going back to the dish washing, is it your allegation

21  that you would wash dishes during the whole time that you were

22  employed?

23  A.  No, not all the time.

24  Q.  No, I mean all the years.

25  A.  It started in 2008 to tell us that we would have to wash

EC95sal1                         Salinas - cross

1   dishes.

2   Q.  And did it happen after 2008 as well?

3   A.  Yes.  From there onwards until I ended my relationship as a

4   worker at Fresco.

5   Q.  Now, going back to your declaration in paragraph 17, in the

6   second sentence you say:  After the lunch shift was completed

7   the dishwasher would be sent home around 2:30.  So, is it your

8   testimony that the lunch shift was completed at 2:30 and then

9   the dishwasher would leave?

10  A.  He would send the dishwasher back to his house, but as I

11  was working as a stocker he would tell me there are not many

12  clients, wash dishes.  Wash dishes.  Do not worry.  Do not

13  worry.  The same thing happened with the stocker that was there

14  during the afternoons:  Wash dishes.  There are not many

15  people.  When the dishwasher arrives between 6:00 and 7:00 p.m.

16  you leave and then you can do your job as a stocker.  You

17  get -- you go back on the Fridays.

18          MR. BENSON:  Move to strike as non-responsive, your

19  Honor.

20          THE COURT:  Sustained.

21  BY MR. BENSON:

22  Q.  So, is it your testimony that there were times when the

23  lunch shift ended at 2:30?

24  A.  Normally it was at 3:00, 3:30.

25  Q.  So, is this not accurate when it says the dishwasher would

EC95sal1                          Salinas - cross

1   be sent home at 2:30 after the shift was completed?

2   A.   No.  My shift would end at 3:30 and the manager, Brent,

3   would tell me:  Wash dishes.  Wash dishes, there is not much to

4   do.  Wash dishes.  You take care of your station, you watch out

5   after your station and you wash dishes.  And the same thing

6   would happen when the stocker would arrive at 4:00, he would

7   tell him the same thing:  Wash dishes until the dishwasher

8   would arrive at 6:30, 6:00, 7:00.

9              That is what happened.

10             MR. BENSON:  Move to strike as non-responsive, your

11  Honor.

12             THE COURT:  I just want to remind you, Mr. Salinas, to

13  listen to the question and answer the question that is before

14  you.

15             The answer is stricken.

16             MR. BENSON:  Could the court reporter please read back

17  the last question?

18             (Record read)

19  A.   My shift would end at 3:30.  The sous chef would send him

20  back at 2:30.

21  Q.   So it is not accurate, you said here, that the shift was

22  completed at 2:30?

23  A.   No.  My shift always, 3:30.

24  Q.   Now, at Fresco Restaurant all the bussers wore the same

25  clothes, correct?

EC95sal1                    Salinas - cross

1   A.  Correct.

2   Q.  Black shoes, black pants, a button down shirt; correct?

3   A.  Correct.

4   Q.  And these are clothes that you could wear as a personal

5   matter if you so chose?

6   A.  Correct.

7   Q.  Now, it is your testimony that you were required to

8   purchase shirts, correct?  Shirts?

9   A.  Correct.

10  Q.  And is it your testimony that for the entire time you

11  worked at Fresco Restaurant you were required to pay for

12  shirts?

13  A.  Correct.

14  Q.  And that you never received those shirts for free?

15  A.  Never.

16  Q.  How did you pay for those shirts?

17  A.  Well, he would give us two shirts and a tie for $50.

18  Q.  Who is he?

19          I apologize.  Perhaps you misunderstood me.  You just

20  said, "He would charge $50."  I want to know who you were

21  referring to.

22  A.  The manager, Brent.  And we would pay -- at the office we

23  would pay Natasha.

24  Q.  So, it is your testimony that Brent gave you the shirts?

25  A.  That is so.

EC95sal1                          Salinas - cross

1    Q.  It wasn't Willy?

2    A.  Sometimes Willy also.

3    Q.  Who is Willy?

4    A.  I think that it was a person who took care of maintenance

5    at the restaurant.

6    Q.  Willy speaks Spanish, does he not?

7    A.  That is so.

8    Q.  So, it is your testimony that Brent and Willy gave you

9    these shirts?  Did they ask you for any money when they gave

10   you those shirts?

11   A.  They would tell us that we had to go and pay Natasha,

12   though, $50.

13   Q.  Okay.  And who is Natasha?

14   A.  And I think that she works for them at the office or she

15   takes care of the control, I don't know, of what must be paid

16   to the delivery or for the delivery.  I do not know, but she

17   would always collect from all of us, from all the busboys and

18   the runners and also from the waiters.

19   Q.  Would she collect all at once?

20   A.  No.  If we wanted an extra tie, she would charge us $15 or

21   you could pay it by installments.

22   Q.  You could pay installments?

23          INTERPRETER:  Little by little were his precise words,

24   counselor.

25   Q.  Would that be a reduction on your check?

EC95sal1                    Salinas – cross

1   A.  No.  It was to pay in cash.  Otherwise, they wouldn't

2   provide you with a shirt.

3   Q.  So they told you you had to pay in cash?

4   A.  That is so.

5   Q.  Did you ever get a receipt?

6   A.  No.

7   Q.  Did you ever ask for one?

8   A.  We asked but they were never given.  But, well, in my case

9   I was never provided with a receipt.

10  Q.  And if Natasha testifies that she never charged anybody for

11  a shirt, she would be lying?

12  A.  I do not believe that more than 20 workers would lie, or

13  the bussers and the runners and the waiters, because we all

14  paid $50.

15  Q.  Okay.  Now, your complaint said that you paid $30 for a

16  shirt?

17  A.  No.

18  Q.  Is that wrong?

19  A.  No.  No, we were given two shirts and a tie for $50.

20  Q.  Did you read the --

21  A.  If you needed an additional shirt it was $17.50.

22  Q.  So, at no time were you ever charged $30 for a shirt,

23  correct?

24  A.  I believe so.  I believe the first time, yes, because it

25  was one shirt and one tie and this was every -- every six

EC95sal1                         Salinas - cross

1   months we would change the color and we would change the tie.

2   Q.  Did you ever pay $30 for a shirt?

3   A.  That I can recall, yes, the first time.

4   Q.  So it is your testimony that the first time you were

5   charged $30 for a single shirt?

6   A.  Yes; and the tie.

7   Q.  And what year was that?

8   A.  In 2006.

9   Q.  So it was the shirt and the tie for $30?

10  A.  That is what they collected from me, charged me for it.

11  Q.  And that was only once?

12  A.  Yes.  Yes.  The rest of the years it was $50 for two shirts

13  and one tie.

14          MR. BENSON:  I have no further questions at this time.

15          THE COURT:  Redirect?

16  REDIRECT EXAMINATION

17  BY MR. ANDROPHY:

18  Q.  Good morning, Mr. Salinas.

19  A.  Good morning.

20  Q.  Do you recall yesterday Mr. Benson asked you if all the

21  Fresco employees worked together as a team to provide service,

22  correct?

23  A.  Correct.

24  Q.  And you said they do, correct?

25  A.  Correct.

EC95sal1                    Salinas - redirect

1    Q.  Now, do the Fresco employees work as a team by regularly

2    doing each others' jobs like, for example, the busboy doing the

3    job of a food runner?

4              INTERPRETER:  Busboys?

5    Q.  Busboys doing the job of a food runner?

6    A.  Correct, but each one had their own tasks, jobs.  As a team

7    I would think that each player -- in this case each person had

8    their own job.  I do not understand why they are trying to say

9    that the coffee maker would run food or would do the job of the

10   busboy.  Many a time we did not have enough time.

11   Q.  So, is it your testimony that if you were working as a

12   stocker you mostly did the work of a stocker?  Is that your

13   testimony?

14             MR. BENSON:  Objection to the leading, your Honor.

15             THE COURT:  Sustained.

16             So, this is a direct examination so you can't lead.

17             MR. ANDROPHY:  Okay.

18   BY MR. ANDROPHY:

19   Q.  Were there specific assignments at Fresco for the employees

20   who worked as busboys?

21   A.  Correct.

22   Q.  And as an employee did you do the assignments you were

23   given?

24   A.  Correct.

25   Q.  Okay.

EC95sal1                    Salinas - redirect

1          You were also asked about whether there are better

2     tips if there is good service.  Do you recall that, if there is

3     good service?

4     A.  That is so.

5     Q.  Are there more tips if the food is good?

6          MR. BENSON:  Objection, your Honor.

7          THE COURT:  Overruled.

8          You can answer, if you know.

9          THE WITNESS:  No.

10    BY MR. ANDROPHY:

11    Q.  Okay.

12         You were asked about when you worked as a stocker and

13    whether you had to bring food out to tables.  Do you recall

14    that?

15    A.  Yes.  Yes, I remember.

16    Q.  Would it happen on every shift that you would be required

17    to take food out when you were working as a stocker?

18    A.  No.  Sometimes.  I think that perhaps seven or eight times.

19         THE COURT:  But as a percentage of the time.  What

20    percentage of the time?

21         THE WITNESS:  Are you referring to minutes?

22         THE COURT:  No.  I'm saying as a percentage of your

23    whole shift, so you could say 50 percent, 70 percent, 15

24    percent.

25         THE WITNESS:  No, it is only -- it is only 3, 4

EC95sal1                          Salinas – redirect

1    percent.

2    BY MR. ANDROPHY:

3    Q.   Is that 3 or 4 percent of a shift you would be taking out

4    food?

5    A.   Correct.

6    Q.   How about as the coffee person; what percentage of the

7    shift would the coffee person take food out?

8    A.   I think that it is the same.  The same.  No, not much time.

9    Perhaps seven minutes during the whole shift.

10          THE COURT:  But as a percentage of the shift, how

11   much?

12          THE WITNESS:  Almost -- a little bit more because they

13   would send the coffee maker more to take the food over there,

14   almost 5 percent or -- not more.

15   BY MR. ANDROPHY:

16   Q.   When you worked as a stocker, how often did you have to

17   reset a table?

18   A.   About --

19          THE COURT:  Counsel, as the finder of fact it is

20   percent of the time that is meaningful because I don't know how

21   many minutes there are in a shift.

22          THE WITNESS:  Okay --

23          THE COURT:  And I am speaking to the attorney.

24          THE WITNESS:  Sorry.

25   BY MR. ANDROPHY:

EC95sal1                    Salinas - redirect

1   Q.  Let me ask you a question.

2            When you worked as a stocker, did you have to reset a

3   table on every shift that you worked as a stocker?

4   A.  No.  Perhaps once or less than 1 percent, I would think, or

5   1 percent.  It could be 1 percent.  It could happen once during

6   the whole shift.

7   Q.  To be clear I'm asking did it happen on every shift.

8   A.  No.

9   Q.  Approximately how often did it happen on a shift?

10  A.  Two, three times, but not much time.

11  Q.  Is that two or three shifts over your entire period of work

12  or is that over a specific period of time?

13            MR. BENSON:  Objection.  Asked and answered.

14            THE COURT:  Counselor, I am the finder of fact so you

15  need to ask questions that are going to be meaningful to me.

16  BY MR. ANDROPHY:

17  Q.  On the shifts where you had to set a table as a stocker,

18  approximately what percentage of your shift was spent doing

19  that?

20  A.  1 percent.

21  Q.  Do you recall you were asked about jobs of the coffee

22  person and the coffee helper?

23  A.  Correct.  Yes.

24  Q.  Can you clarify what the job of the coffee person was and

25  what the job of the coffee helper was?

EC95sal1                     Salinas – redirect

1    A.  Okay.

2              MR. BENSON:  Object to the form of the question.  It

3    is two questions.

4              THE COURT:  So just do one at a time.

5              What is the job of the coffee preparer?  We will do

6    that one first.

7              You can answer, sir.

8              THE WITNESS:  Okay.  The coffee maker was in charge of

9    to prepare coffee, to make coffees, tea at the time the service

10   had to be made, served, and then the tickets would appear there

11   for him so that he would see how many coffees he would have to

12   prepare at that moment; and iced teas.  Iced teas and all of

13   that, he would prepare or get the sugars ready and do it, place

14   everything on a tray with the corresponding ticket to see to

15   which table it was going to go to.  That is what the coffee

16   maker would mainly do.

17             And with regards to the stocker, I am sorry, excuse

18   me --

19             THE COURT:  No, the next one is the assistant, the

20   helper to the coffee maker.

21             THE WITNESS:  Yes.

22             When they were on the tray the helper, the assistant

23   or the helper would take it over to the corresponding table

24   according to the ticket and to the corresponding person because

25   one cannot ask who ordered coffee and who did not.  But,

EC95sal1                         Salinas - redirect

1    instead, in the ticket it is specified, the position of each

2    person, place where each person is appropriately there, and the

3    helper was the one who would come in and out because the coffee

4    maker had to remain preparing espressos, coffee, and

5    everything.  He was always there.  This is an area where only

6    the coffee maker would work and the helper was at a table

7    behind and he would place everything there so that he would

8    take it -- so that the helper would take it.

9    BY MR. ANDROPHY:

10   Q.  Thank you.

11           Do you recall being asked if sometimes there were

12   runners or waiters who were assigned as the late runner and

13   late waiter?

14   A.  Yes.  Correct.

15   Q.  Were you ever a food runner or a waiter?

16   A.  No.

17   Q.  Did you concern yourself with knowing the schedules for the

18   runners and the waiters?

19   A.  Not exactly.

20   Q.  Okay.

21           You spoke today about side work that you did at the

22   beginning of your shift, correct?

23   A.  Correct.

24   Q.  And did side work always take the same amount of time each

25   day?

EC95sal1                          Salinas - redirect

1   A.  Yes.  Correct.

2   Q.  Was Anthony Scotto always at the restaurant for the entire

3   shift?

4   A.  Not always.  No.

5   Q.  Did he sometimes leave before it closed?

6   A.  Normally he would leave at 9:00 p.m.

7   Q.  And would someone be in charge after he left?

8   A.  Yes.  If Brent was there it was Brent, but normally Attilio

9   was the one, because he would -- the orders, the checks from

10  the waiters, the chits -- the orders that the waiters have, the

11  orders, the little pieces of paper for the chits.

12          MR. ANDROPHY:  I think it is chits, I think C-H-I-T-S.

13          THE COURT:  I said it right from the beginning,

14  fortunately.

15  BY MR. ANDROPHY:

16  Q.  When you first started working at Fresco, did you meet

17  Anthony Scotto?

18  A.  No.

19  Q.  Did you meet him the first day you worked there?

20  A.  No.  I believe it was on the second day.

21  Q.  You testified earlier that Brent Drill was a manager?

22          INTERPRETER:  Brent Grill?

23  Q.  Drill, D-R-I-L-L; how do you know that he was a manager?

24  A.  Because when I arrived there asking about the job, the

25  person that was at the front as a hostess, I asked whether the

EC95sal1                    Salinas - redirect

1    manager was there.  And he or she said wait for a moment and

2    Mr. Brent came over towards me and he asked me where I had

3    worked.  And he read the paper and he said, okay, come over

4    tomorrow for training and he told me that it was going to be

5    three days for training only and that is the way it was.  And I

6    asked, Who should I ask for tomorrow?  And he said I'm going to

7    be here.  Do not worry, I am going to be here.  Don't worry.  I

8    am the manager here.  Okay.

9              So then that happened during the first day.

10   Q.  During that conversation with Brent Drill, did Mr. Drill

11   ever leave your conversation to go speak with anyone else?

12   A.  No.  That happened only -- I only spoke to him four five

13   minutes but not more than that.

14   Q.  You testified today about when you saw an employee named

15   Patricio who was fired.  Do you recall that?

16   A.  Yes.  Correct.

17   Q.  And when Mr. Vosilla came to speak with Patricio, did he

18   leave that conversation to go speak with anyone else?

19   A.  No.  Only I only saw him and Patricio.

20   Q.  Did you ever receive any directions at work from Marion

21   Scotto?

22   A.  Yes, sometimes.

23   Q.  What types of directions would you receive from her?

24   A.  Regarding or at the section or part that is the bar area.

25   There are many, many times.  They have private bars at the bar

EC95sal1                        Salinas - redirect

1   area and sometimes one has to -- one has to serve appetizers to

2   guests before they sit down to eat and sometimes she would send

3   us to serve the appetizers such as calamari, pizza.  If she

4   would say a busboy she would say -- she would say -- but, yes,

5   she would tell us and send us to do those things.

6   Q.  And how often was she at the restaurant?

7   A.  Well, during the mornings she arrives at 10:00 also and she

8   would leave approximately at 3:00 p.m.  She would leave and she

9   would come back at 5:00 p.m.

10  Q.  Was that every day that the restaurant was open?

11  A.  Yes.  That is so.

12  Q.  Did you ever see her interviewing anyone for a job?

13  A.  I would think so only for the hostesses.

14  Q.  You testified earlier about sometimes when the dishwasher

15  would be sent home.

16  A.  Yes.  That is so.

17  Q.  When the dishwasher was sent home, would that be the end of

18  your shift or the dishwasher's shift?

19  A.  No.  At the end of his shift he was sent home and I would

20  remain until the end of my shift, 3:30.

21        MR. ANDROPHY:  Thank you.  I have no further

22  questions.

23        THE COURT:  Recross?

24        MR. BENSON:  Can I have five minutes?

25        THE COURT:  Yes.

EC95sal1                          Salinas – redirect

1              (counsel conferring)

2              MR. BENSON:  I have no questions, your Honor.

3              THE COURT:  Mr. Salinas, I have a question for you.

4      How old are you?

5              THE WITNESS:  54 years old.

6              THE COURT:  And how long have you been working?  From

7      what age?

8              THE WITNESS:  I started when I was 18 years old.

9              THE COURT:  What do you do now for a living?

10             THE WITNESS:  I work as a busboy.

11             THE COURT:  Thank you.  You may step down.

12             THE WITNESS:  I would like to make a commentary.

13             THE COURT:  Unfortunately, sir, you answer the

14     questions but you can't offer commentary.

15             THE WITNESS:  Okay.  That is all right.  Perfect.

16             THE COURT:  You may step down.

17             THE WITNESS:  Okay.

18             (witness steps down)

19             THE COURT:  You may call your next witness.

20             MR. ANDROPHY:  Plaintiffs call Christian Urgiles.

21      CHRISTIAN URGILES,

22         called as a witness by the Plaintiffs,

23         having been duly sworn, testified through the interpreter,

24         as follows:

25             MR. ANDROPHY:  May I approach and hand him his

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    declaration?

2              THE COURT:  You may.

3    DIRECT EXAMINATION

4    BY MR. ANDROPHY:

5    Q.  Good morning, Mr. Urgiles.

6    A.  Good morning.

7    Q.  The document that I just handed you, is that your

8    declaration for this trial?

9    A.  Yes.

10   Q.  And if you turn to the last page, is that your signature?

11   A.  Yes.

12   Q.  And by signing this do you agree that this should be your

13   direct testimony at this trial?

14   A.  Yes.

15             MR. ANDROPHY:  We ask that the declaration of

16   Mr. Urgiles be admitted as Plaintiff's Exhibit 105.

17             THE COURT:  Any objection?

18             MS. KABIR:  No objection.

19             THE COURT:  It is admitted.

20             (Plaintiff's Exhibit 105 received in evidence)

21             MR. ANDROPHY:  And we also ask that Plaintiff's

22   Exhibits 68, 69 and 70 be admitted into evidence.  These are

23   documents that Mr. Urgiles identifies in his declaration.

24             THE COURT:  Any objection?

25             MR. BENSON:  Just give me one second to check?

1          MR. ANDROPHY:  Paragraphs 96, 97 and 98.

2          MS. KABIR:  No objection.

3          THE COURT:  They are admitted.

4          (Plaintiff's Exhibits 68, 69 and 70 received in

5  evidence)

6          MR. ANDROPHY:  We have no further questions and turn

7  it over to defendant for cross-examination.

8          THE COURT:  Cross-examination.

9  CROSS EXAMINATION

10 BY MS. KABIR:

11 Q.  Good morning, Mr. Urgiles.  I am sorry if I am not

12 pronouncing your name correctly.

13 A.  Good morning.

14 Q.  Mr. Urgiles, you worked as a busser at Fresco; isn't that

15 correct?

16 A.  Yes.

17         THE COURT:  Ms. Kabir, if you would bring that mic

18 closer to you so that you can be heard?

19         MS. KABIR:  Is that better?

20         THE COURT:  Yes.

21 BY MS. KABIR:

22 Q.  Since you left Fresco in April 2013, have you been working

23 at another restaurant?

24 A.  Yes.  Correct.

25 Q.  What is the name of the restaurant?

1    A.   Papillon Bistro.

2    Q.   And are you a busser at Papillon Bistro?

3    A.   No.  I'm not a busser anymore.

4    Q.   What is your position there?

5    A.   There I work as a food runner, and a waiter sometimes.

6    Q.   Before you left Fresco in April 2013, were you also working

7    shifts at another restaurant?

8    A.   Yes, Miss.

9    Q.   Was it at Papillon Bistro?

10   A.   Correct.

11          INTERPRETER:  Could he be instructed to please not

12   answer until I finish my translation, please?

13          THE COURT:  Please allow him to finish.

14   BY MS. KABIR:

15   Q.   By the time you left Fresco in April 2013, you were working

16   there only one or two shifts a week; isn't that correct?

17   A.   That is not correct.

18   Q.   How many shifts a week were you working?

19   A.   Five shifts.

20   Q.   Five shifts per week.

21          And what days were you working?

22   A.   Mondays, Tuesdays and Fridays.

23   Q.   And you had Wednesdays and Thursdays off, isn't that

24   correct?

25   A.   Correct.

EC95sal1                     Urgiles - cross

1   Q.  And you always had Wednesdays and Thursdays off when you

2   were working at Fresco, isn't that right?

3   A.  Correct.

4   Q.  That's from the time you started at the restaurant?

5   A.  No.

6   Q.  For how long then?

7   A.  I'm not recalling very well, but more or less about five or

8   six years.  I do not remember well.

9   Q.  I would like you to take a look at your statement that was

10  marked Plaintiff's Exhibit 105.  If you could turn to page 6

11  and look at paragraph 30?

12          INTERPRETER:  Paragraph?

13  Q.  30.

14          It says:  My schedule at Fresco varied throughout my

15  employment.  Before June 2011 I usually worked approximately

16  seven to 11 shifts per week.

17          Is it your testimony that you worked 11 shifts per

18  week when you had Wednesdays and Thursdays off?

19  A.  Okay.  I'm going to tell you something.  Sometimes the

20  manager would ask me for me to work Fridays and Saturdays in

21  the evenings on Saturdays.

22  Q.  So you would usually work five shifts a week, is that your

23  testimony, correct, but sometimes you would work additional

24  shifts on Fridays and Saturdays?

25  A.  Correct.

EC95sal1                      Urgiles - cross

1    Q.  So, is this statement in paragraph 30 of your declaration,

2    should it be corrected to say five to seven shifts per week?

3    A.  When I started there I started working there 11 shifts.

4    Q.  And what year was that?

5    A.  If I remember right it was 2005.

6    Q.  So since 2006 you worked five to seven shifts; is that your

7    testimony?

8    A.  Excuse me.  I did not understand your question.

9    Q.  So, I'm asking since 2006, is it your testimony that you

10   worked between five and seven shifts per week?

11   A.  No.  From 2005 or 2006, if I remember when I started

12   working there, I started working 11 shifts.  Afterwards, when I

13   found myself another job because, I saw that there they would

14   make us do a lot of jobs and wouldn't give us opportunities, I

15   found -- I went back to my previous job.

16   Q.  So, since you started working a second job you hadn't

17   worked 11 shifts a week at Fresco?

18   A.  No.  No, Miss.

19          THE COURT:  What do you mean they weren't giving you

20   opportunities?

21          THE WITNESS:  Because never did they -- if they would

22   need or require a runner, the busboys who worked a lot of time

23   would not grant them this position or give them that position.

24   They would hire -- they would prefer to hire a different person

25   to give those shifts to him, to that person.

1          THE COURT:  Would you consider the runner shift a more

2     desirable shift?

3          THE WITNESS:  Well, yes, because it is a bit more

4     money and if one has a family, well, one is looking for

5     something better.

6     BY MS. KABIR:

7     Q.  Mr. Urgiles, in paragraph 31 on page 6 of your declaration

8     it says:  When I worked a lunch shift I would arrive at 10:00

9     a.m. and work until approximately 3:30 p.m.

10         Was that true the whole time you worked at Fresco?

11    A.  If you were asking me about this question I'm going to

12    reply about that, yes, but when I -- when I started at Fresco,

13    we never had time to leave for our break and we never had a set

14    time to leave to go back home.

15         MS. KABIR:  Move to strike as non-responsive.

16         THE COURT:  Sustained.  Stricken.

17         And, Ms. Kabir, if you would raise your voice or bring

18    the mic closer to you?

19         MS. KABIR:  Okay.  I apologize, your Honor.

20    BY MS. KABIR:

21    Q.  Mr. Urgiles, I want to know if your lunch shift at Fresco

22    always lasted from 10:00 a.m. until 3:30 p.m.

23         Is that your testimony today?

24    A.  Yes.

25    Q.  The next sentence says:  I could not leave until the last

EC95sal1                         Urgiles - cross

1    customer left, so the time I left would vary.

2              Is it your testimony that sometimes you left before

3    3:30?

4    A.   Never could I leave before 3:30.

5    Q.   Mr. Urgiles, were you ever assigned to be the late busser

6    when you were working at Fresco?

7              (Record read)

8    A.   Yes.

9    Q.   And when you were the late busser, were you the last busser

10   who had to stay for the lunch shift?

11   A.   I can answer that question to you but I can explain it to

12   you.  Yes, we would leave at that time but that happened, but

13   then afterwards -- but that lapsed, and then after 2011,

14   because they gave us a schedule with set, scheduled, hourly

15   times who would close and who would not close.  Previously we

16   did not have that.

17   Q.   So, is it your testimony that prior to 2011 you were never

18   assigned on the schedule to be the late busser?  Is that right?

19   A.   Before 2011, no.

20   Q.   Is it your testimony that before 2011 all of the bussers

21   had to stay until the last customer left?

22   A.   Yes.

23   Q.   I would like to show you an exhibit that's been premarked

24   as Defendant's Exhibit A.  I am going to bring copies for the

25   translator and for the witness.

EC95sal1                        Urgiles - cross

1           If you open up the exhibit binder you will see that

2    the first page is page numbers in the left-hand column that are

3    printed in the top right-hand corner of each schedule.  If you

4    could please turn to page Exhibit A-5?

5           THE COURT:  This is an exhibit that I have also?

6           MS. KABIR:  Yes; it should be in the defendant's

7    exhibit binder as the first exhibit.

8           THE COURT:  What page are you on?

9           MS. KABIR:  Page A-5 in the top right-hand corner.

10   BY MS. KABIR:

11   Q.  Mr. Urgiles, is your name listed as "Christian" under the

12   busser's column on the schedule?

13   A.  Correct, Miss.

14   Q.  And if you look on the schedule for the shift under Friday,

15   February 6 it says L close, correct?

16   A.  No.

17   Q.  What does it say then?

18   A.  It says L.  It says L.

19   Q.  Are you looking on page A-5?

20           INTERPRETER:  8 or A-5?

21           MS. KABIR:  A-5.

22   A.  Yes.  Correct.  Now I see it.

23           (continued on next page)

24

25

EC9ASAL2ps                    Urgiles - cross

 1   Q.  So when you were scheduled for L close, that means you were

 2   the closing busser during lunch; isn't that right?

 3   A.  Correct.

 4   Q.  So if the customers in the other sections of the dining

 5   room left the section, then the other bussers could leave their

 6   shift when their section was empty, correct?

 7   A.  Yes, correct.

 8   Q.  So as a closing busser for this one shift, you were

 9   required to wait until the end of the shift when all the other

10   customers had left; isn't that right?

11   A.  Correct.

12   Q.  But the other bussers could leave earlier?

13   A.  Not all the time, because we had to -- during the busy

14   time, nobody could leave early, only during the summertime.

15   Q.  I'm just asking based on the schedule.  The other bussers

16   were not scheduled to close, did not have to stay through

17   another shift based on this schedule.  Isn't that right?

18          THE INTERPRETER:  I'm sorry.  I missed that

19   completely.

20   Q.  The other bussers listed on the schedule who were not

21   listed as a closing busser for the lunch shift, they were not

22   obligated to stay in the dining room until the last customer

23   left; only the closing busser was, correct?

24   A.  Yes, that's correct.

25   Q.  And if you continue looking on that page for Saturday,

134

EC9ASAL2ps                    Urgiles - cross

1    there's two Xs.  Does that mean you have that day off,

2    requested?

3    A.  Correct, Miss.

4    Q.  So every week, you would not be scheduled for a Saturday

5    shift, when this was noted on your schedule; isn't that right?

6    A.  Correct.

7    Q.  And the same goes for Wednesdays and Thursdays; isn't that

8    right?

9    A.  Correct, but as I told you, always the manager would ask us

10   if we would want to work, or whether you could work, so then

11   one would accept.

12   Q.  So you were not available to work on Wednesdays, Thursdays,

13   or Saturdays; is that right?

14   A.  Correct.

15   Q.  And if these schedules indicated that you were the closing

16   busser, you were the closing busser for any shift that you

17   worked prior to 2011, is it still your testimony that all of

18   the bussers were obligated to stay until the last customer left

19   the dining room?

20   A.  Well, Miss, when I started working there, we did not have a

21   schedule as we have after, we had afterwards, after what -- as

22   the -- on account of the problems that Mr. Scotto had, I don't

23   know what happened.  But then we were provided with a schedule

24   about who would open and who would close.

25   Q.  Mr. Urgiles, isn't it true that, after the restaurant

1    implemented a time clock, they would print the actual times on

2    the schedules?

3    A.  Yes, Miss.

4    Q.  So when the schedules just say "L close," that means there

5    was no time clock at the restaurant, but you were still

6    assigned to be the closing busser for the one shift, correct?

7    A.  We would arrive and then the ones who would close, we would

8    leave at –– we would arrive at 10:30 –– I'm sorry –– at 11.  We

9    would arrive at 11.  And those who would open would come in at

10   10 a.m.

11   Q.  So if the schedule said "L close," like on page A-5, you

12   knew that your shift started at 11 a.m., not 10 a.m.; isn't

13   that right?

14   A.  Correct.

15   Q.  So is it your testimony that before 2011, your lunch shift

16   would typically start at 10 a.m., unless you were scheduled to

17   be the closing busser, in which case it started at 11 a.m.

18   instead?

19   A.  Did you say 10 or 10:30?  Excuse me.  I did not hear you.

20   Q.  I'm asking you if your testimony is that prior to 2011,

21   your lunch shift started at 10 a.m. unless you were scheduled

22   to be the closing busser; isn't that right?

23   A.  Correct.

24   Q.  OK.  Would you be sometimes scheduled to be the closing

25   busser during the dinner shifts as well?

1    A.  No.

2    Q.  So during dinner shifts, since you were never scheduled to

3    close, your shift ended when the rest of the customers in your

4    section were gone; isn't that right?

5    A.  Yes, correct.

6    Q.  If you turn to page 7 of your statement -- of your

7    declaration, my apologies -- and look at paragraph 34 on page

8    7, it says, "On Saturdays I would work approximately from 3

9    p.m. to 12 a.m., though the end time varied depending on when

10   the last customers left the restaurant."  You previously

11   testified that you requested not to work on Saturdays; isn't

12   that right?

13   A.  Yes, correct.

14   Q.  So is this paragraph, 34, incorrect?

15   A.  I am going to --

16   Q.  I am not asking for an explanation.  I'm just asking you,

17   is this paragraph correct?

18   A.  Yes, it is correct.

19   Q.  So even though you requested never to work on Saturdays,

20   you still worked from 3 p.m. to midnight.  Mr. Urgiles, isn't

21   it true that you rarely worked Saturdays?

22   A.  Yes, correct.  When, when -- when I found the other job,

23   but previously I would work all shifts.

24   Q.  And when you worked on Saturdays, you only had to stay

25   until the end of the shift if you were the closing busser;

EC9ASAL2ps                    Urgiles – cross

```
 1   isn't that right?
 2   A.  No, ma'am.  Previously, there were -- there was no closer.
 3   All busboys, we all had -- we would all close.  Only the ones
 4   that schedule close were the waiters and the runners.
 5   Q.  That's every Saturday?
 6   A.  That was all, every day, every, all days.
 7   Q.  Is it your testimony that you were working during the
 8   entire time?
 9   A.  Yes.
10   Q.  You never finished your shift early and waited around for
11   your tips?
12   A.  No, ma'am.
13   Q.  So is it your testimony that even though there's an empty
14   dining room, or only one customer at a table, at 9 p.m. on a
15   Saturday night, all of the bussers had to stay until midnight?
16   A.  Yes, ma'am.
17   Q.  So is it your testimony there would be seven bussers
18   standing around an empty dining room between 9 p.m. and
19   midnight every Saturday?
20   A.  Yes, ma'am.
21   Q.  Mr. Urgiles, you testified that as a busser for Fresco, you
22   worked as a coffee preparer, correct?
23   A.  Correct.
24   Q.  And when you were a coffee preparer, you also testified
25   that one of the things you did was slice the bread for the
```

EC9ASAL2ps                    Urgiles - cross

1    bread basket.  Isn't that correct?

2    A.  Correct.

3    Q.  And was this so that the busboys could spend less time

4    preparing the bread basket before they brought it to the table?

5    A.  I do not understand the question, ma'am.

6    Q.  So when you were the coffee preparer, you were assigned to

7    the coffee station; isn't that correct?

8    A.  Correct.

9    Q.  And the coffee station at Fresco is located right next to

10   the station where the bread is for the bread baskets; isn't

11   that right?

12   A.  Correct, ma'am.

13   Q.  So during the early part of your shift when you were

14   waiting for iced tea and coffee orders to print at the coffee

15   station, you helped the bussers by preparing the bread baskets

16   at the bread station, correct?

17   A.  No, ma'am.  I did not have enough time for that.  What we

18   would do is, we would load or take up the bread in order to

19   heat it up or warm it up, because we did not have enough time

20   to do other things.

21   Q.  I'd like to direct you to page 5 of your declaration,

22   paragraph no. 26.  It says, "Sometimes I was assigned to work

23   at the coffee station preparing coffee, tea, and iced tea.

24   When I worked at the coffee station, I had to prepare iced tea,

25   bring milk upstairs to the station, bring ice upstairs to the

1   station, bring all the ingredients for coffee, espresso, tea,

2   and iced tea upstairs and to the coffee station, cut lemons,

3   bring up and polish spoons, cut bread for the busser to take to

4   table, cut butter, and bring bean dip from downstairs to the

5   station, and fill sugar containers."  Is that an accurate

6   statement?

7   A.   That is correct, but when one says "cut the bread," it does

8   not mean that we were actually preparing the basket for the

9   busboys.  To cut the bread was to cut it halfway, in half, in

10  order to put it in the basket so then it would be easier to be

11  cut.

12  Q.   So you would agree, then, by making it easier for the

13  busser, you helped the bussers bring the bread to the tables

14  more quickly, by having the sliced bread ready for them at the

15  bread station; isn't that right?

16  A.   No.  I do not know whether that was a help for my fellow

17  workers.  But none.  I also worked as a busboy.  I never had

18  enough time in order to, to say, in the way that you're saying,

19  whether we had time.  I do not understand what time you're

20  referring to, for the busboys, when, if the busboys had time.

21  Q.   All I'm asking you, Mr. Urgiles, is, when you were the

22  coffee preparer, you helped the busboys by getting the bread

23  station ready, correct?

24  A.   Correct.  Correct.

25  Q.   And the bean dip, that you were referring to the bread

1    station, that's also for the bread baskets that the bussers

2    served to the tables; isn't that right?

3    A.  I would just take the bean dip upstairs.  I would not

4    prepare it.

5    Q.  You would bring it to the bread station; isn't that right?

6    A.  Correct.

7    Q.  And when you worked as a --

8              THE COURT:  One moment.

9              THE INTERPRETER:  Can the interpreter be heard?  I

10   would like to just to precise my translation into Spanish.

11   When he says *subir*, does he just mean to put the bread inside?

12   Can I ask him what he means?

13             THE COURT:  Yes.

14             THE INTERPRETER:  Because it's not clear.  (Pause)

15             All right.  So I asked him, because it wasn't clear

16   for me as I'm not familiar with the case, what he meant by

17   *subir*, which means to take up.  And her Honor authorized me, so

18   he did explain that they were bringing it physically upstairs

19   from the basement "because we were coming from the basement."

20   Thank you, your Honor.

21   Q.  When you worked as a coffee preparer, you got more tips

22   from the tip pool than the other bussers for that shift; isn't

23   that right?

24   A.  That is true.  But it was only a little bit more.

25             MS. KABIR:  There was no question.  I'm sorry.

1          THE INTERPRETER:  I cannot hear two people.

2          MS. KABIR:  I said there was no question pending so

3   I'm not sure what Mr. Urgiles was explaining.

4          THE COURT:  Are you asking to strike the answer?

5          MS. KABIR:  Yes.

6          THE COURT:  The answer is stricken.

7   Q.  Mr. Urgiles, did you ever work as the coffee preparer on

8   shifts where there was also a coffee helper?

9   A.  Yes.

10  Q.  And usually this was during only lunch shifts; isn't that

11  right?

12  A.  Correct.

13  Q.  Where there was more than 200 reservations in the

14  restaurant?

15  A.  That's a lie.  After -- beyond a hundred and 125

16  reservations for the restaurant.

17  Q.  So when the restaurant was busy, then; is that your

18  testimony?

19  A.  Correct.

20  Q.  Because there would be more demand in the restaurant for

21  iced tea and coffee and espresso drinks?  Isn't that right?

22  A.  Correct.

23  Q.  And when you were the coffee preparer, isn't it true that

24  you would make the espresso drinks on the espresso machine

25  while the coffee helper helped you make the coffee and tea

1   drinks on the regular coffee machine, located right next to the

2   espresso machine?

3   A.  No, ma'am.

4          The helper --

5   Q.  There is no question, Mr. Urgiles.  Please wait until I ask

6   you a question.

7   A.  No.

8   Q.  So is it your testimony that the coffee helper didn't help

9   you prepare any drinks during those shifts?

10         THE INTERPRETER:  The --

11  Q.  Prepare any drinks.

12  A.  No.

13  Q.  So that isn't your testimony, or that is your testimony,

14  that the coffee helper does not prepare any drinks during the

15  shifts there is a coffee helper?

16  A.  No.  Many a time when we were very busy, perhaps 1 percent,

17  2 percent, they would help us, but beyond that, no.  We did not

18  have time, nor did the helper have time to help me, because

19  there were too many coffees, too many espressos, tea, iced tea,

20  iced coffee.

21         Oh.  The bean dip would be finished.  The ice would --

22  we needed more bean dip.  We needed more ice.  And I had to go

23  downstairs and come back upstairs so that the runners could

24  take all the orders that we had.

25  Q.  Let me try to ask this question in a different way.  Isn't

1    it your testimony that when there was a coffee helper on duty

2    and you were the coffee preparer, you made all the drinks that

3    printed out on the tickets at the coffee station?  Is that

4    right?

5    A.  Yes.

6    Q.  So while you were making all the drinks, was a coffee

7    helper running food with the runners?

8    A.  Sometimes yes.

9    Q.  So would the coffee helper also help the busboys run bread?

10   A.  Not many of the times.

11   Q.  And would the coffee helper help the stocker --

12          THE INTERPRETER:  The server?

13   Q.  The stocker -- bring clean dishes and silverware to the

14   dining room?

15   A.  No.

16   Q.  So the coffee helper --

17   A.  Excuse me.  I did not understand the question.

18   Q.  I'm asking you if the coffee helper also helped the

19   runners, the bussers, and the stocker, in addition to the

20   coffee preparer.

21   A.  Well, he had to principally help the stocker and the

22   runners, and every time that the check required him to do so.

23   Q.  So the coffee helper helped everybody; isn't that right?

24   A.  Correct.

25   Q.  So if the coffee helper was running food because the chef

EC9ASAL2ps                    Urgiles - cross

1   ordered him to, you would have to bring the iced teas and the

2   coffees to the table; isn't that right?

3   A.  No.  That is why I had a helper.

4   Q.  I'm asking you about your helper, the coffee helper.  Is

5   that your testimony?

6   A.  That the coffee helper also helps the runners and the

7   bussers and the stockers?  I do not understand your question,

8   ma'am.

9   Q.  You previously testified that on shifts there was a coffee

10  helper when you were working as a coffee preparer, the coffee

11  helper also helped the runners run food and helped the stocker

12  and helped the busboys, correct?

13  A.  Yes, correct.

14  Q.  So I'm asking you, if the coffee helper is in the dining

15  room helping the runners, for example, isn't it true that you

16  would have to serve the drinks that you prepared at the coffee

17  station?

18  A.  Many of the times I did not have time because there were

19  many, too many coffees, and that is why they would place me --

20  give me or grant me a helper.  If the helper would help or was

21  helping or the chef would call him because he needed for him to

22  take -- to serve that food and I was busy, he could not help

23  the chef.  He had to help me.  Only would he help when we would

24  be having not so much work, a slow time.

25          THE COURT:  When you were working as the coffee

EC9ASAL2ps                    Urgiles - cross

1    preparer and you had the helper, what percentage of the

2    helper's time was dedicated exclusively to delivering coffee

3    and tea and iced tea to the tables?

4                THE WITNESS:  90 percent of the time.

5    Q.  So is it your testimony that when you were the coffee

6    preparer and you had a helper, you never served the drinks

7    yourself?

8    A.  Every now and then, yes.

9                THE COURT:  What percent of the time, when you were

10   the coffee maker, did you dedicate to serving at the tables?

11               THE WITNESS:  Between 5 and 7 percent.

12   Q.  Would you agree that the percentage of time would vary

13   depending on the shift and the time of, I guess the time window

14   and the shift, like between 12:30 and 1 o'clock, you might be

15   running the coffee 1 percentage --

16               THE INTERPRETER:  12 percentage?

17   Q.  You might be running the coffee 5 percent of the time.

18   A.  Yes.

19   Q.  But between 1 p.m. and 2 p.m. on the same shift, you could

20   be running the coffee 20 percent of the time?

21   A.  No.

22   Q.  10 percent of the time?

23   A.  More or less 15 percent.

24   Q.  So it varied, depending on the time of the shift.

25   A.  Yes, depending what time within the shift.

EC9ASAL2ps                    Urgiles - cross

1    Q.  The coffee has to be served within ten minutes at Fresco

2    Restaurant; isn't that right?

3    A.  I cannot provide you with a specific time.  If you need

4    some -- if you need a coffee, the coffee is already made.  All

5    you do is, you pour it into the cup, and the helper takes it.

6    Q.  You would agree that it has to be served quickly, right?

7    Otherwise the customers would become impatient?

8    A.  Depending on how many orders there are.

9    Q.  So if you left the orders pile up at the coffee station,

10   they would get cold; isn't that right?

11   A.  Correct.

12   Q.  And the customers would be upset?

13   A.  I never saw an upset client.

14   Q.  Would you have to remake the drinks if they thought that

15   the coffee was too cold?

16   A.  Yes.

17   Q.  So you would agree it was important to have the coffees

18   made and served in a timely manner.

19   A.  Correct.

20   Q.  And that's part of the reason why the coffee preparer gets

21   a bigger share of the tip pool; isn't that right?

22   A.  Correct.

23   Q.  You also testified that you sometimes worked as a bar-back.

24   Isn't that right?

25                THE INTERPRETER:  Bar-back?

1          MS. KABIR:  Bar-back.

2          THE INTERPRETER:  Your Honor, I don't know what a

3   bar-back is.  The interpreter does not know what a bar-back is.

4          MS. KABIR:  If the witness is familiar with what a

5   bar-back is --

6          THE COURT:  Well, what does a bar-back do?

7          MS. KABIR:  Well, at Fresco Restaurant, the bar-back

8   performs two functions.  The first is waiting for anyone

9   serving at the bar and helping restock the bar.  And they also

10  provide busser functions to the 15 tables that are located at

11  the front of the restaurant by the bar.

12         Would the witness agree with that description?

13         THE INTERPRETER:  I said in Spanish, so then let us

14  just call it in English "bar-back," and I asked him whether he

15  understood, because he helps in stocking the bar and other

16  things.  Correct?

17  Q.  So you would help to stock the bar when you were assigned

18  as a bar-back; isn't that right?

19  A.  Correct.

20  Q.  You would stock it with clean glasses and silverware, and

21  also beverages that are served from the bar, like bottled

22  water?

23         MS. KABIR:  I said:

24  Q.  Like beverages stocked at the bar, such as bottled water,

25  sparkling water, ice.  So you did restock the bar with those

1   items, correct?

2   A.  Yes.

3   Q.  And for customers who decided to eat their meal at the bar,

4   you also removed their service items when they had finished

5   eating and cleaned the bar, correct?

6   A.  Correct.

7   Q.  And you also cleared and reset all of the 15 tables at the

8   bar area, correct?

9   A.  Well, let me say something, before I can give you an

10  answer.  When we were working at the bar, we had two jobs.  One

11  was as a bar-back, and as, as a busboy.  When I would work as a

12  bar-back, I would arrive at 10 a.m., and I would clean the

13  shelves, the glasses, the windows, the glass, windows, the

14  bottles.  I would have to clean before I would place the

15  glasses, to clean and make sure that the place where we would

16  place the glasses was clean, and to shine the bar itself, the

17  counter itself of the bar, to bring ice, if water was required

18  to bring water, to clean the entrance doors, to clean the large

19  windows, to sweep, to sweep the area of the bar, and to sweep

20  the outside part.

21  Q.  So you would --

22  A.  That was my job as a bar-back.  And when I needed to clean

23  the glass, we would wash the glasses with some hot water that

24  was soapy hot water, and then we would clean them till we would

25  shine them.  When we would work as busboys at the bar, many a

1   time we did not have time enough not even for ourselves, so

2   then we had to help to assist the waiter who was working in the

3   outer part.

4   Q.  So Mr. Urgiles, is it your testimony that you assisted the

5   bartender by preparing the bar area for service to customers

6   before they came in, and then you also helped assist the

7   waiters by busing the tables in the bar area; isn't that right?

8   A.  Yes, ma'am.

9   Q.  And the bar area is located at the front of Fresco

10  Restaurant, correct, when you walk in the door?

11  A.  Correct.

12  Q.  And all of the walk-in guests are seated in that area;

13  isn't that right?

14  A.  Correct.

15  Q.  So by noon or 12:30 during the lunch shift, all of the

16  tables are pretty much full with walk-in guests on a typical

17  lunch shift; isn't that right?

18  A.  Correct.

19  Q.  And that's where walk-in guests are also seated during

20  dinner; isn't that right?

21  A.  Correct.

22  Q.  And sometimes that area is also used to host private

23  parties in the restaurant; isn't that right?

24  A.  Correct.

25  Q.  So when you were the busser assigned to work as a bar-back,

EC9ASAL2ps                    Urgiles - cross

1   you had to provide service to all of the tables in the bar

2   area, which were usually full for service; isn't that correct?

3   A.  Correct.

4   Q.  All 15 tables?

5   A.  There were only 12 tables.

6   Q.  12 tables.

7   A.  Correct.

8   Q.  So when you worked as a bar-back, you spent at least the

9   two hours during the peak lunch service assisting the waiters

10  at the tables at the bar, by being the bussers for those

11  tables, correct?

12  A.  Yes.

13  Q.  And the same during dinner service, during the busy times

14  every dinner shift.

15  A.  Yes.

16  Q.  You performed all of your busser duties during those

17  periods of the shift.  Isn't that right?

18  A.  Not many of the times, most of the times.  To be a bar-back

19  there was a job where you really had to run, to bring glasses,

20  to wash glasses, to dry glasses.  I'm talking about the glasses

21  that are for expensive bottles.  Yes.  And I did help, I did

22  help the waiters when I had a little bit of time and I didn't

23  have many glasses to wash.

24  Q.  So when you were getting the glasses for the bar, as a

25  bar-back, who was bussing the tables at the tables located in

EC9ASAL2ps                  Urgiles – cross

1   the bar section?

2   A.  Many a time the waiters, they themselves would take them

3   out, bring them out.  But we would, we would, we would have to

4   help them many a time because they would tell us, if you do not

5   help me, I'm going to speak to the managers, or with Anthony.

6   Q.  So you would help the waiters and you would help the

7   bartenders, and then the waiters sometimes took over and helped

8   you; isn't that right?

9   A.  Never.

10  Q.  You didn't just testify that the waiters sometimes bussed

11  the tables in the bar section themselves?

12  A.  Yes.  But not to wash glasses or to bring glasses.  There

13  are 12 tables in that station.  And that station, when the

14  people would arrive and they were not ordering anymore or

15  eating anymore or drinking and we would need the table,

16  Mrs. Scotto would tell us for us to clean the table.  That is

17  why the waiter would clean the table, so that I could get it

18  ready again.

19          THE INTERPRETER:  To have it ready?  To have it ready?

20          THE COURT:  *Seter peyar la mesa*?

21          THE INTERPRETER:  *Seter oper*.  To reset it, I guess,

22  yes, reset like in English.  Derivation, to reset, set up, to

23  reset, set up, yes, maybe.

24          THE COURT:  *Seto peyar*.

25          THE INTERPRETER:  *Seto peyar*.

1            THE COURT:  Set up the table.

2   Q.  So the waiters clear the table and you reset the table; is

3   that right?

4   A.  Correct, but that is not usual, normal, that the waiter

5   would clean the table.

6   Q.  Did another busser sometimes help you clean the tables when

7   you were assigned to work as a bar-back?

8   A.  Well, there were two stations in the front part that, many

9   a time, they would see that I was way too busy, and they would

10  help me to -- and they would help me for a little bit.

11  Q.  So sometimes the bussers would help each other when one of

12  them was assigned to the bar-back assignment.  Correct?

13  A.  The busboys, we would always work as a team.

14  Q.  You mentioned Mr. Anthony Scotto.  Mr. Scotto is the owner

15  and manager of Fresco Restaurant, correct?

16  A.  Correct.

17  Q.  And you testified that when you came to Fresco to apply for

18  a job, you spoke with Mr. Scotto, correct?

19  A.  Correct.

20  Q.  Mr. Scotto hired you; isn't that right?

21  A.  He told me for me to come back the next day.

22  Q.  Do you know if Mr. Scotto made the decision to hire you?

23            THE INTERPRETER:  Your Honor --

24            THE COURT:  How could he possibly know what is in the

25  mind of another person?  Not a proper question.

1          MS. KABIR:  Withdrawn.

2          THE INTERPRETER:  Also, your Honor, also, if the

3    interpreter very respectfully may be heard: I have to hear

4    counsel on top of my voice too, so sometimes it is becoming

5    very difficult because I am, as I'm doing complete

6    simultaneous, and I don't have one -- and I'm going to try to

7    get one of those, go to the interpreter's office and request an

8    apparatus, sometimes, not that she's not speaking properly, but

9    it is difficult for me to hear her voice even on top of my

10   voice and try to keep the special procedure for a matter that

11   I'm not as familiar as counsel are that have been doing this

12   for over a year, and they know the facts.  So I'm not -- I'm

13   being very humble and, very respectfully, sometimes I cannot

14   hear counsel's voice on top of my voice, because I have to --

15          THE COURT:  Would it be easier for you to be seated

16   asking the questions?

17          MS. KABIR:  It might be easier.

18          THE INTERPRETER:  Thank you.  I have to hear two

19   voices plus my own.

20          Thank you, your Honor.

21   BY MS. KABIR:

22   Q.  Mr. Urgiles, you testified that when you came to look for a

23   job, you met with Mr. Scotto, correct?

24   A.  Correct.

25   Q.  And he told you to come back to train?

1    A.  He told me for me to come back the next day, correct.

2    Q.  And when you came back to train the next day, you trained

3    with another busser, correct?

4    A.  When I arrived there, they made me talk to the manager,

5    Brenner or Brent.  He introduced me to another busboy, with

6    whom I was going to train.

7    Q.  So is it your testimony that Brent introduced you to the

8    busboy for the training?

9    A.  Correct.

10   Q.  It wasn't James, the host, who introduced you to the other

11   busser?

12   A.  James introduced me to manager Brent.

13   Q.  And you trained for three shifts; isn't that right?

14   A.  Correct.

15   Q.  And do you recall if these were lunch shifts?

16   A.  No.

17   Q.  You trained during dinner?

18   A.  Yes.

19   Q.  All days?

20   A.  No.  No, the days varied.  One day he would make us train

21   during lunch.  Another day he would make us train during

22   dinner.  And another day he would make us train as a stocker.

23   Q.  And when you were training, was Mr. Scotto observing you

24   train in the restaurant?

25   A.  I suppose so, because he was -- he would -- he would walk

1   by there or come by there when I was training.

2   Q.   Because he's usually in the restaurant most days, correct?

3   A.   Almost always, yes.

4   Q.   He's almost always there.

5   A.   Yes.

6          THE COURT:  All right.  Let us take our

7   half-of-an-hour break at this time.  We will reconvene at

8   12:25.

9          (Recess)

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EC9ASAL2ps                    Urgiles – cross

1                    A F T E R N O O N   S E S S I O N

2                              12:25 p.m.

3    CHRISTIAN URGILES, Resumed.

4              THE COURT:  Remember, sir, that you are still under

5    oath.

6              THE WITNESS:  Yes.

7              THE COURT:  You may continue the inquiry.

8    CROSS EXAMINATION (cont'd)

9    BY MS. KABIR:

10   Q.  Mr. Urgiles, if you could turn to page 10 of your

11   declaration and look at paragraph 51, you testified that "I

12   observed Brent Drill interview and hire some bussers."  Isn't

13   that right?

14   A.  Yes, correct.

15   Q.  And when you say you observed these interviews, do you

16   recall how many times you observed Mr. Drill interviewing any

17   bussers?

18   A.  Yes.  Two times.

19   Q.  On both of these times, do you recall if it was during a

20   lunch shift or during a dinner shift?

21   A.  That was in between shifts.  Excuse me.  That was after we

22   finished lunch.

23   Q.  So after the lunch shift, that would be approximately

24   between 2:30 and before 4 p.m.?

25   A.  Correct.

EC9ASAL2ps                    Urgiles - cross

1    Q.  And during this time, did Mr. Drill speak with these

2    potential bussers in the front of the restaurant?

3    A.  Yes.

4    Q.  Where were you in the restaurant when these interviews

5    happened?

6    A.  I was working as a bar-back.

7    Q.  So you were in the front of the restaurant.

8    A.  Correct.

9    Q.  So isn't it true that during the afternoons between lunch

10   and dinner, Mr. Scotto leaves the restaurant for a short time?

11   A.  Correct.

12   Q.  Do you recall if Mr. Scotto was in the building when you

13   observed these interactions occur?

14   A.  I do not remember.

15   Q.  Do you remember if Mr. Drill asked these individuals for a

16   résumé?

17   A.  Yes.

18   Q.  And do you know what he did with those résumés?

19   A.  No.

20   Q.  And do you know if Mr. Scotto interviewed those individuals

21   at a later time?

22   A.  No.

23   Q.  And do you know if Mr. Scotto observed these bussers train?

24   A.  I would suppose so, I believe so, I think so, because he is

25   there at the restaurant.

1   Q.  And do you know if Mr. Scotto checked these individuals'

2   references by calling their last employer on their résumé?

3   A.  Honestly I cannot tell you because I do not know.

4   Q.  Do you know if Mr. Drill actually hired these individuals?

5   A.  I would suppose that he hired them because I saw them

6   during training.

7   Q.  But you don't know what Mr. Scotto had to do with the

8   decision to actually hire them as employees in the restaurant,

9   do you?

10  A.  Honestly, I do not know.

11  Q.  So is it still your testimony that you observed Mr. Drill

12  actually hire these individuals?

13  A.  Yes, ma'am.

14  Q.  That's based on your belief, correct?

15  A.  I do not -- I do not understand what you mean by "belief."

16  Q.  You believe that Mr. Drill made the decision, but you also

17  testified that you don't know if Mr. Scotto made the decision;

18  isn't that right?

19  A.  Correct.

20  Q.  So other than your belief that Mr. Drill hired them, do you

21  have any other basis for testifying, in paragraph 51 of your

22  declaration, that you observed Mr. Drill hire these

23  individuals?

24  A.  Well, one of those that he hired was a cousin of mine, male

25  cousin.  He himself told him for him to come back the next day

1  for training.  So I do not know whether it was he who took --

2  made the decision.

3  Q.  And other than these --

4  A.  -- or --

5        THE COURT:  I have a question.  When you use the word

6  "hire," what do you mean?  When you use the word "hire," what

7  do you mean?

8        THE WITNESS:  That it was he who told them that he --

9  that they -- that he could work, for him to come for training.

10  When one is called for training, it almost practically means

11  that one is going to work.  If one does not have, well, no

12  problems or if the owner did not like the way that he or she

13  worked and he does work well or he is training well, so then

14  they give him the job.

15  Q.  And in the approximately seven years you worked at Fresco,

16  these were the only two incidents where you observed Mr. Drill

17  interview any potential busboy candidates; is that right?

18  A.  Correct.

19  Q.  Mr. Drill was a floor captain at the restaurant; isn't that

20  right?

21  A.  Honestly, truly, really, I, I, when I met him, I met him as

22  a manager.

23  Q.  I'm not asking if you met him as a manager or as a floor

24  captain.  I'm asking you if he worked as a floor captain at

25  Fresco.

1          THE INTERPRETER:  Floor cap --

2          MS. KABIR:  A floor captain.

3     A.   That is why I answered, I do not know whether he was a

4     floor captain or he was a manager.

5     Q.   Do you know if other waiters also worked as a floor captain

6     at Fresco, like Marco?

7     A.   Yes.

8     Q.   And Peter?

9     A.   Yes.

10    Q.   And Chuck?

11    A.   I cannot remember about Mr. Chuck.

12    Q.   So when somebody filled the floor captain role during,

13    let's say, a dinner shift, that person was in charge of

14    overseeing the service in the entire main dining room

15    downstairs; isn't that correct?

16    A.   The captain was only in charge of asking about wines, and I

17    cannot remember that he did anything else.

18    Q.   So when you say the captain was in charge of the wine, do

19    you mean that the captain would go to the table and review the

20    wine list with the customer --

21    A.   Correct.

22    Q.   -- and advise them on what bottle they should serve?

23    A.   Correct.

24    Q.   And they would go to the basement and bring the bottle

25    upstairs to serve the table, correct?

EC9ASAL2ps                    Urgiles - cross

1    A.  Correct.

2    Q.  And Mr. Drill was one of the individuals that you saw do

3    this during dinner shift, correct?

4    A.  I would see him.  I would also see him doing it.  But, but,

5    but he was introduced to me as a manager, not as a captain.

6            MS. KABIR:  Move to strike as nonresponsive.

7            THE COURT:  I will strike everything from "but."

8    Q.  And you saw Marco and Peter when they were floor captains;

9    they would do the same thing, correct?  They would review the

10   wine list.

11   A.  Correct.

12   Q.  And they would open and serve the wine at the table.

13   A.  Correct.

14   Q.  And you saw Mr. Vosilla do this as well, correct?

15   A.  Yes, I've seen him.

16   Q.  And especially during dinner shifts, when there are good

17   wine sales, that means more money in the tip pool, correct?

18   A.  Correct.

19   Q.  Is this because customers usually tip at least 20 percent

20   of the entire bill?

21   A.  Correct.

22   Q.  So the more wine they buy or the more expensive wine they

23   buy, the better it is for everybody in the tip pool.

24   A.  Correct.

25   Q.  If you could turn to page 8 of your declaration, paragraph

1  no. 45, you testified, "One time in December 2012, Brent Drill

2  told me to come in and work the next day so that I would work

3  and receive tips, but not to punch in."  Is that correct?

4  A.  Correct.

5  Q.  You go on to state in that paragraph, "I received tips but

6  was not paid by Fresco for my work that day.  This was for a

7  dinner shift on a Friday."  Is it your testimony that Brent

8  Drill told you, on a Thursday, to come in and work on a Friday,

9  but not to punch in?

10  A.  He called me to tell me that, I will make you come to work

11  the next day.

12  Q.  And is it your testimony that you did work on a Friday in

13  December 2012 without punching in?

14  A.  Excuse me.  I, I withdraw from what I said before.  It was

15  not on a Thursday that he called me.  I was working Friday

16  morning, and he told me whether I could work that day, that

17  same day, but for me to come back, but for me not to punch the

18  clock.

19  Q.  And is it your testimony that you did in fact work a dinner

20  shift on a Friday and receive tips?

21  A.  Correct.

22  Q.  If we were to review records of the amount of tips you were

23  paid and you did not receive tips during a certain shift, you

24  would agree that you didn't actually work or receive tips for

25  that shift; is that correct?

1          THE COURT:  Are you asking if the records are

2   accurate?

3          MS. KABIR:  I guess I want to know if his testimony is

4   that he actually received tips from the trip pool on a night

5   that he did not punch in.

6          THE WITNESS:  I accepted tips.  But I was not paid

7   hours because I accepted to work for tips.  When one has

8   requirements, necessities, one does it.  I have family.  And

9   that is why I did it.

10         THE INTERPRETER:  "when one has needs" would have been

11  a better word, your Honor.

12  Q.  So is it your testimony you that worked for a lunch shift

13  on a Friday and you clocked in and out, but you stayed for a

14  dinner shift and received tips but did not clock in and out?

15  A.  Correct.

16  Q.  And other than this one time in December 2012, was there

17  another time that you also worked for just tips?

18  A.  No, ma'am.  As I said previously, when we worked there

19  before, we did not have, we didn't have a clock for us to punch

20  and for us to punch when we left.  When they would need us,

21  require us, all they did was, they would tell us whether we

22  could work or whether we would want to work, and that is why we

23  came to work.

24  Q.  So is it your testimony that this was a single isolated

25  incident?

1    A.  For me, yes.

2    Q.  Do you know if it happened to anybody else?

3    A.  I do not know, ma'am.

4    Q.  And did you typically work Friday dinner shifts at Fresco?

5    A.  Yes.

6    Q.  You also testified, on page 11 of your declaration, in

7    paragraph 68, that you were suspended by Brent Drill for coming

8    late one day because a train was not running.  Do you recall

9    when this happened?

10   A.  I do not recall exactly, but, yes, it did happen to me

11   once.  I arrived late, and I explained to him that the train --

12   I do not know what happened in the train.  What happened is

13   that the doors remained open and when I arrived to work I

14   arrived there a little bit late and I told him.  And he said,

15   I'm not going to need you today, so then you can go back home.

16   Q.  Do you recall if this was a lunch shift or a dinner shift?

17   A.  This was during lunch, during one lunch.

18   Q.  So when you testified that you were suspended by Mr. Drill,

19   you mean that he told you that you were not needed for that one

20   lunch shift, correct?

21   A.  Yes, correct.

22   Q.  And you're sure that it was Mr. Drill who advised you of

23   this and not James, the host?

24   A.  It was Mr. Brent.

25   Q.  So in paragraph 68, when you testified, "I did not see

1   Brent Drill speak with Anthony Scotto first before suspending

2   me," you were referring to this incident where Mr. Drill just

3   told you that he didn't need you for that shift.  Correct?

4   A.  Correct.

5   Q.  So Mr. Drill didn't actually suspend you, did he?

6   A.  It was he who suspended me because, if Anthony would have

7   been there, Anthony would have told me.

8   Q.  Anthony would have told you that he didn't need you for

9   that shift?

10  A.  Yes.  If he would have been up front, in the front portion.

11  But at that time, moment, it was Brent who was up at -- in the

12  front.

13  Q.  Were you ever issued a write-up for being late that day?

14  A.  No.

15  Q.  And do you recall how late you were for the lunch shift

16  that day?

17  A.  I cannot remember at this moment, but it must have been

18  about 30, 30 minutes or 30 -- 40 minutes approximately.

19  Q.  Do you recall if they had another busser working for that

20  shift in your place, by the time you got there?

21  A.  No, I cannot recall exactly, but at that time, well, then

22  already we already had, we already had in the schedules the

23  home call.  So then in the home call we had -- when one other

24  person was on call, we had to wait until 10 -- until 10:30 or

25  11 o'clock a.m. in order to call and to see whether they would

EC9ASAL2ps                    Urgiles - cross

1    need us.  So then I suppose that -- I suppose that they may

2    have used someone that was on call.  I do not know.

3    Q.  So when you're saying that the bussers had to call the

4    restaurant to see if they were needed, that was to speak to the

5    host James, correct?

6    A.  Yes.  But James always -- we always had to talk to Brent

7    or, or any other manager that was there.  So always the manager

8    that was there during the morning.  And that was Brent who was

9    there during the morning.

10   Q.  In paragraph 68 of your declaration, you testified, "On

11   another day, one of my co-workers, Abel Reyes, was similarly

12   suspended by Drill for arriving late, and I did not see Drill

13   speak with Anthony Scotto before suspending him."  Is that

14   correct?

15   A.  Correct.

16   Q.  And when you say that he was -- he had arrived late, do you

17   recall how late he was for his shift?

18   A.  I had already more or less finished, finished bringing the

19   glasses, bringing them over to the bar, so it must have been

20   somewhat between 30 minutes or 40 minutes.  And he sent him

21   back home.  Because I was there when he sent him.

22   Q.  So in your testimony in paragraph 68, when you said that

23   you saw your co-worker, Abel Reyes, get suspended, you were

24   also referring to him being told he wasn't needed anymore

25   because there was another busser performing his duties that

EC9ASAL2ps                     Urgiles - cross

1   shift, correct?

2   A.  During that shift he was just sent home.

3   Q.  And you testified previously you were already done doing

4   your busser work by the time he showed up at the restaurant,

5   correct?

6           MR. ANDROPHY:  Objection, mischaracterizes the

7   testimony.

8           THE COURT:  Sustained.

9           MS. KABIR:  I will rephrase.

10  Q.  You testified previously that Mr. Reyes was 30 or 40

11  minutes late for his shift.

12  A.  Yes.

13  Q.  Is it your testimony that his services were no longer

14  needed because the restaurant had enough bussers by the time he

15  came to the restaurant for that shift?

16  A.  He suspended him only for that shift.

17  Q.  Do you recall if another busser had called in to the

18  restaurant and told to come in because Mr. Reyes was late?

19  A.  I, I repeat to you once again, ma'am, I do not know, but

20  during those times, there was already an on-call busser.  So I

21  do not know whether they called, they called the on-call so

22  that he would come to work.

23  Q.  So is it your testimony that Mr. Reyes was just sent home

24  for that one shift?

25  A.  Correct.

EC9ASAL2ps                    Urgiles – cross

1    Q.  And is it your testimony that you don't recall the specific

2    reason why he was sent home but it was only for that one shift,

3    correct?

4    A.  Correct.  Yes, ma'am.

5    Q.  And that's similar to when Mr. Drill had told you, when you

6    had come in late, that they didn't need you for that shift.

7    A.  Yes, ma'am.

8    Q.  And is that what you mean by the term "suspended"?

9    A.  Correct.

10   Q.  Mr. Urgiles, if you could turn to page 12 of your

11   declaration, paragraph 80, you testified, "but similarly, the

12   employee schedule at Fresco, if there was an issue I or other

13   employees had with the schedule, like if I could not work a

14   particular day, I would speak with Vosilla."  Is that correct?

15   A.  Correct.

16   Q.  And by "Vosilla," you're referring to Attilio Vosilla; is

17   that right?

18   A.  Correct, ma'am.

19   Q.  And you testified previously that for some time period you

20   had a request to not work on Wednesdays or Thursdays.  Correct?

21   A.  Correct.

22   Q.  And is it your testimony that you communicated this request

23   to Mr. Vosilla?

24   A.  Correct.

25   Q.  And did you see Mr. Vosilla create the schedule every week

EC9ASAL2ps                      Urgiles - cross

1    at Fresco?

2    A.  Well, he was the one who, who would make the schedules.

3    Q.  And did you see him make the schedules?

4    A.  Yes.  I had seen him in the office.

5    Q.  Did you ever see Mr. Vosilla discuss the schedule with

6    Anthony Scotto?

7    A.  I cannot recall, ma'am.

8    Q.  Do you know if Mr. Vosilla was making the schedule --

9    strike that.

10          What days are the schedules posted every week at the

11   restaurant?

12   A.  On Fridays or Saturdays.

13   Q.  And you testified previously that you sometimes worked on

14   Fridays, correct?

15   A.  Correct.

16   Q.  But that you had a standing request not to work on

17   Wednesdays or Thursdays.  Correct?

18   A.  Correct.

19   Q.  So you never saw Mr. Vosilla meet with Anthony Scotto to

20   discuss the schedule on Thursdays, did you?

21   A.  Could you repeat the question for me, please, again,

22   because I did not understand you.

23   Q.  If you didn't work in the restaurant on Thursdays -- strike

24   that.

25          Did you ever see Mr. Vosilla meet with Mr. Scotto to

EC9ASAL2ps                    Urgiles – cross

1   discuss the weekly schedule every week?

2   A.   Honestly I never saw him.  But when one, when one would

3   fill in or request something, one would tell Attilio, but

4   Attilio would tell us that he had to ask Anthony.  But I never

5   saw him have a meeting with him.

6   Q.   And when you worked in the restaurant on Fridays, the

7   schedule had already posted, correct?

8   A.   Correct.

9   Q.   And that's posted near the coat-check stand where James is?

10  A.   It was placed there and we had, we had another schedule at

11  the stocker's area.

12               (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

EC95sal3                     Urgiles - cross

1   BY MS. KABIR:

2   Q.  So, in paragraph 80 of your declaration when you say that

3   Vosilla was in charge of the employees' scheduling, that's not

4   accurate, is it?

5   A.  Could you please repeat the question for me?

6   Q.  You testified previously that when you would communicate

7   your scheduling requests to Mr. Vosilla he said that any of

8   your requests had to be approved by Mr. Scotto; isn't that

9   right?

10  A.  Correct.  I suppose so because -- I suppose because one

11  would tell Attilio and Attilio would tell us that he had to

12  talk to Anthony.  But, I do not know whether he met with him or

13  he would make the decision, I do not know, sir.

14  Q.  So, would it be more accurate to say that Mr. Scotto was in

15  charge of employee scheduling at Fresco?

16  A.  No.  Because why?  Because the one who would give us the

17  schedules was Mr. Attilio.

18  Q.  Mr. Urgiles, when you worked on Fridays you testified

19  previously that you already saw the schedule posted for the

20  following week by the time you started your shift, correct?

21  A.  Correct, but Fridays the schedules were posted when

22  Mr. Attilio arrived to the restaurant, at the restaurant.

23  Q.  So, you didn't see Mr. Scotto actually print the final

24  schedule on Friday mornings, did you?

25          MR. ANDROPHY:  Objection.  Is counsel testifying as to

EC95sal3                        Urgiles - cross

1    who printed the schedule?

2              THE COURT:  Well, it is a question.  Overruled.

3              THE WITNESS:  No.

4    BY MS. KABIR:

5    Q.  You didn't actually see Mr. Scotto post the schedule

6    either, right?  Because it was there by the time you started

7    your shift?

8    A.  No.

9    Q.  So, isn't it true that you don't know who was in charge of

10   employee scheduling at Fresco?

11   A.  Well, with whom I had to speak to for my schedule, it was

12   with Mr. Attilio.

13   Q.  So, would it be more accurate to state that Mr. Vosilla was

14   in charge of collecting employees' scheduling requests from the

15   bussers at Fresco?

16   A.  Well, we had to tell Mr. Attilio whether we wanted to,

17   whether we would have one day off or an afternoon off or what

18   have you.  But, he would tell us that we would have to wait

19   until he would speak to Papa because he would call him -- he

20   would call Mr. Anthony Scotto, he would call him papa.

21   Q.  In paragraph 82, page 12 of your declaration, you testified

22   that you saw, you observed Mr. Vosilla fire an employee on at

23   least one occasion, correct?

24   A.  I saw him only once.

25   Q.  And you saw it firsthand?

EC95sal3                          Urgiles - cross

1   A.  Yes, correct.

2   Q.  And you testified that you saw him fire a busser named

3   Patricio, correct?

4   A.  Correct.

5   Q.  Mr. Vosilla is the manager you were describing on the

6   dinner shifts, correct?  Correct?

7   A.  Correct.

8   Q.  So, is it your testimony that you saw him fire this busser

9   named Patricio during dinner?

10  A.  Correct.

11  Q.  You also testified that Patricio was assigned to the

12  stocker position and was required, by the Chef Raul, to do the

13  dishes and that they had an argument, correct?

14  A.  Correct.

15  Q.  And did you witness this argument firsthand?

16  A.  Correct.

17  Q.  Mr. Urgiles, isn't it true that the sous chef at Fresco,

18  Raul Ramirez, worked during the lunch shifts?

19  A.  He works until 5:00 p.m.

20  Q.  And 5:00 p.m. is when the dinner shift starts, correct?

21  A.  Correct.

22  Q.  You previously testified that this occurred during the

23  dinner shift?

24  A.  Yes, correct, but I'm going to explain something to you.

25  Mr. Raul Ramirez, the sous chef, there were days when he had to

EC95sal3                          Urgiles – cross

1   work dinner because, for whatever reason, the chef -- I think

2   that they would have certain interchangeability between the

3   chef and the sous chef that he would work on Saturdays and he

4   would work Friday evenings.  So then that day he worked Friday

5   evening.

6   Q.  You also testified that Anthony Scotto was not in the

7   restaurant at the time, correct?

8   A.  Correct.

9   Q.  Do you know if he may have been in another part of the

10  building?

11  A.  I do not know so.

12  Q.  You just didn't see him there, correct?

13  A.  I did not see him there.

14  Q.  And do you know if Mr. Vosilla made the decision to fire

15  Patricio?

16  A.  I saw him when he dismissed him.

17  Q.  So you don't know if he was in contact with Mr. Scotto?

18  A.  Honestly, no.  I do not know because it was something that

19  happened so quickly.  He did not want to wash some plates and

20  he said that he would not work as a dishwasher, so then the

21  sous chef told him if you do not want to work, he called the

22  general manager and that was Attilio and he told him and he

23  said, okay, so then I'm not going to need you.

24  Q.  When you testified that he said I'm not going to need you,

25  who are you describing?

EC95sal3                          Urgiles - cross

1    A.  Mr. Patricio.

2    Q.  And who told him that I'm not going to need you?

3    A.  Mr. Attilio.

4    Q.  And do you recall approximately how long ago this was?

5    A.  Honestly, I cannot recall at this moment.

6    Q.  Do you recall if Mr. Vosilla was sending Patricio home for

7    that shift?

8    A.  No.  No.  No, he told him that he was not going to need him

9    anymore if he was not going to wash dishes and he told him that

10   he was not -- and he, in turn, said that he was not a

11   dishwasher.

12   Q.  Do you know if Patricio quit?

13   A.  No.

14           THE COURT:  Where did this happen?  What part of the

15   restaurant did this happen in?

16           THE WITNESS:  At the area of the stocker's area.

17           THE COURT:  And did you observe the sous chef call

18   Attilio?

19           THE WITNESS:  Yes.

20           THE COURT:  You heard him call him?

21           THE WITNESS:  Yes.

22           THE COURT:  And so how much time lapsed between the

23   time that the sous chef told Patricio to wash dishes and the

24   time that Attilio told him that he was fired?

25           THE WITNESS:  About 10 minutes.

1          They were arguing, Patricio and the sous chef Raul,

2     because when one would come in as a stocker we had to both work

3     as a stocker and to wash dishes because we didn't have a

4     dishwasher for approximately one or two hours.  So then, when

5     one would or when he would come in, he told him, oh, aren't you

6     going to wash the dishes?  And he said, no, I made my

7     application here as a busboy.  And then he said then, okay.

8     You have to wash the dishes or otherwise I will call the

9     manager.  And he said if you want to do so, you can call him

10    but I'm not going to wash dishes.

11         So, then they continued going on with that and so then

12    he called Mr. Attilio and he told him.  So then Attilio asked

13    him, Are you going to wash the dishes or are you not going to

14    wash them?  And then he said no.  So then he said no, so then

15    he said, you know what?  I'm not going to need you anymore if

16    you are not going to wash dishes.  So then he said, okay, then

17    I'm just leaving.  Because we all have to do -- well, when we

18    were working as stockers we had to do that there.  Also they

19    made us do that.  Those who worked during the morning, the

20    dishwasher would leave at 2:30 and we had to wash the dishes,

21    the glasses and the silverware, and from there we had to go in

22    the kitchen -- excuse me, we had to go into the dishwasher room

23    and wash what was there and to take them out and then for us to

24    wash them once again, in other words, before our time to leave

25    would be our time for us to leave.  And then he would come.  So

EC95sal3                    Urgiles - cross

1    then to wait until the other stocker would come in to find

2    everything nice and ready we had to clean the walls, we had to

3    clean the bags, we had to clean the rug.  Everything that was

4    dirty surrounding the -- there was a station kind of like where

5    they made the special salads, whatever they had there, we had

6    to sweep all of that.

7            So then we had to throw away the bags where the

8    bottles had been, the empty bottles.  We had to take them to

9    the basement.  All of that is what we had to do.  So, that was

10   a lot of work for us to do, for us to wash the silverware --

11   I'm sorry, for us to perform as dish washers.  So then my

12   friend told him no.  So then they said, okay, so then I don't

13   need you.

14   BY MS. KABIR:

15   Q.  Mr. Urgiles, do you remember what day of the week this

16   occurred?

17   A.  I do not remember.

18   Q.  And do you remember what year this occurred?

19   A.  I do not recall that either at this moment.

20   Q.  And it is your testimony that you were a first-hand witness

21   to the argument between Patricio and the sous chef Mr. Raul

22   Ramirez?

23   A.  Yes.  Correct.

24   Q.  And that you also testified that Mr. Vosilla told Patricio

25   that he wasn't needed anymore, correct?

EC95sal3                    Urgiles - cross

```
 1    A.  Correct.

 2    Q.  Mr. Urgiles, do you recall if this occurred on a Saturday?

 3    A.  I do not recall, ma'am.

 4    Q.  Do you recall whether or not this occurred on Saturday, May

 5    16th, 2009?

 6    A.  I cannot recall, ma'am.

 7    Q.  And if this incident occurred on May 16th, 2009, is it your

 8    testimony that you worked that shift during dinner on Saturday?

 9            THE COURT:  So he just testified that he didn't know

10    what date it occurred on.

11    Q.  Mr. Urgiles, on page 3 of your declaration, paragraph 17,

12    you testified that on some days you were required to wash

13    dishes and in the last sentence it says, "this would often

14    happen during times when Fresco was less busy, mostly in the

15    summer months."

16            Correct?

17    A.  Correct.

18    Q.  So, isn't it your testimony that you were asked to wash

19    dishes when you were assigned to work in the stocker position

20    only on rare occasions when the restaurant was slow?

21    A.  Every week the shifts would change so each person had their

22    day as a stocker.  When it was my turn to be a stocker it was

23    my turn to wash dishes because I was told that I had to wash

24    dishes.  When I worked as the coffee maker, also when it was a

25    slow time, they made me work as a coffee maker and as a
```

1   stocker, both jobs in one.

2   Q.  I am asking specifically about your testimony about when

3   you were asked to wash dishes.  In paragraph 17 of your

4   declaration it says you were only asked to wash dishes when you

5   were assigned to be a stocker and only when the restaurant was

6   less busy, mostly in the summer.

7           Is that accurate?

8           MR. ANDROPHY:  Objection.  Mischaracterizes the

9   declaration testimony.

10          THE COURT:  Sustained.

11  BY MS. KABIR:

12  Q.  Mr. Urgiles, how often were you assigned to work as a

13  stocker?

14  A.  It would depend on the weeks, it would depend on the days.

15  We would have one shift, two shifts.  It would depend.

16  Q.  It would be rotated amongst the bussers, correct?

17  A.  Not amongst all of the bussers.

18  Q.  It would be rotated amongst bussers at Fresco, correct?

19  A.  Not amongst all of the bussers.

20          We had a fellow worker, I do not know whether he works

21  there, his name is Chris, he is European.  We never saw him

22  work not as a stocker, neither as a helper, nor coffee maker,

23  barback or up front at the bar.  We never saw that.  We always

24  saw him work on the floor and during private parties.

25  Q.  I am going to ask you about when you worked as a stocker.

EC95sal3                        Urgiles - cross

1  How often were you asked to wash dishes?

2  A.  The times that I was working there, if it happened, during

3  the summertime -- if it was during the summertime.

4  Q.  So, during the summertime you were assigned as a stocker,

5  some summers you would never be asked to wash dishes.  Is that

6  your testimony?

7  A.  Yes, correct.

8  Q.  So, can you estimate whether or not you were asked to wash

9  dishes more than three times when you were assigned to work as

10 a stocker?

11 A.  Those times that I would work as a stocker it could have

12 been two times, one time when I was a stocker.  It would depend

13 where we would be placed within the floor because we were here,

14 for example, here in the schedules that you provide to us,

15 there it said stocker.  Before it didn't say stocker, it said

16 Section 9.  Before it would say Section 9.

17 Q.  On page 4 of your declaration, paragraph 21, you testified

18 about a busser named Chris?

19 A.  Yes.  Correct.

20 Q.  And that you never saw Chris working as a stocker or a

21 coffee preparer or a coffee helper, correct?

22 A.  And neither as a barback but, yes, it is correct.

23 Q.  And the coffee preparer gets more than the busser in the

24 tip pool, correct?

25 A.  That is correct.  But there was more work to be done at the

EC95sal3                          Urgiles - cross

1   coffee station.

2   Q.  So the coffee station was a more desirable assignment

3   because you could earn more tips in that assignment, correct?

4   A.  Well, if we are talking about tips, yes, but if we were

5   walking about workload, many of the people wouldn't want to

6   work there.

7   Q.  You also testified that Chris was assigned two parties,

8   correct?

9   A.  Yes, ma'am.

10  Q.  And by parties are you referring to the private events

11  hosted in the room upstairs called the Tuscan Room?

12  A.  Correct.

13  Q.  And for parties that are hosted in the Tuscan Room

14  sometimes there would be multiple bussers assigned to that

15  room, correct?

16  A.  Correct.

17  Q.  Were you ever assigned to work in that room?

18  A.  Yes, ma'am.

19  Q.  And for the bussers that were assigned to work in that

20  room, they have to provide the same service to the tables in

21  the private party room as the bussers on the floor downstairs,

22  correct?

23  A.  Correct.

24  Q.  So, when you are working upstairs in the party room you

25  still have to go back and forth between the kitchen to carry

1   bread and appetizers and also restock the clean silverware and

2   dishes in time to reset the tables upstairs, correct?

3   A.  Correct.

4   Q.  So, being assigned to the Tuscan room upstairs can be very

5   demanding during a shift because you are always going back and

6   forth through the restaurant carrying these items up and down

7   the stairs, correct?

8   A.  Correct, but I want to explain something to you.

9            Yes, what you are saying, it is true, that we had to

10  run up and down the stairs, but it was never a party of 20 or

11  30 persons, just one person working in these parties when 20 or

12  30 persons were there.  There were 16 or 12 persons of 120 are

13  going to come and 10 would arrive and it was for only one

14  busboy.  And it wasn't a very heavy load because for a busboy

15  because I also worked there but when I -- when there was a

16  party with a lot of 30 or 40 persons, two busboys, we would

17  work there in the upstairs carrying plates, glasses, carrying

18  glasses, silverware, bread, bean dip.

19  Q.  So you would agree that the bussers would help each other

20  when they were assigned to the party room, correct?

21  A.  Correct.

22  Q.  And for the food that is served in the private party room,

23  the runners from the restaurant bring it from the kitchen

24  upstairs, correct?

25  A.  Correct.

1    Q.  And if there is a party of 30 or 40 people, the runners

2    need help carrying those trays up the stairs, correct?

3    A.  Correct.

4    Q.  So the bussers who are assigned to the stocker or the

5    coffee stations or the barback stations or the dining room

6    floor help the bussers carry that food upstairs to the private

7    party room, correct?

8    A.  No.  No, I do not remember that I would have -- that we

9    would take those things up.  We always had the runners who were

10   the ones that were taking the food up.  When we would take the

11   food upstairs it was because the chef would tell us go upstairs

12   and take that and leave everything that you have else to do.

13   Q.  So, is it your testimony that the chefs made bussers help

14   the runners carry the food upstairs to the private party room

15   for large parties?

16   A.  Well, that would depend how busy the restaurant was.  But,

17   generally, he wanted for us to take the plates over or the

18   dishes over to the tables or to the party.  It was the chef who

19   would tell us to leave everything else that you might have and

20   you take that there.  Of course, he wouldn't say to us, please

21   or something like that.  He would just say "take it" because

22   you have to take it.

23   Q.  So when you were assigned as a busser in the private party

24   room upstairs, your responsibility was to set and reset the

25   tables in the private party room, correct?

EC95sal3                          Urgiles - cross

1    A.  Correct.

2    Q.  And if the party wanted to order coffee or tea, you would

3    take the orders for the room and go downstairs to the coffee

4    station and prepare those drinks, correct?

5    A.  Yes.  Correct.

6    Q.  And then you would bring those drinks upstairs back from

7    the kitchen to the private party room?

8    A.  Correct.

9    Q.  But you didn't actually run the appetizers or entrees from

10   the kitchen upstairs to the private party room, correct?

11   A.  Well, what happens is that the runners would take the food

12   upstairs to the Tuscan Room.  We had a big table there and

13   there the manager who would work with us would tell us, here,

14   take this.  Take this to a certain table.  And then sometimes

15   one was very busy even when one was busy.

16   Q.  Did you carry those trays upstairs with the food when you

17   were assigned as a busser to that private party room?

18   A.  Sometimes when they needed a salad that hadn't been taken

19   upstairs or a dish that had remained there, then they would

20   send me.

21   Q.  So sometimes, if they needed help carrying that food

22   upstairs, correct?

23   A.  Correct.

24   Q.  And you had to help serve the food once it was brought

25   upstairs, correct?

1  A.  Correct.

2  Q.  And you testified that a manager instructed you where to

3  serve the food when you were serving as a party busser,

4  correct?

5  A.  Correct, because we had a manager -- a party manager and he

6  would go -- he would only go -- once the food was already ready

7  was when he would go up there.  And then, for example, where

8  there was a salad or there was pasta, he would go upstairs and

9  he would give it to us and then we would place it on the table.

10 The pasta would be served there in the back part because we had

11 a small kitchen there and we would take it out from there to

12 place it on the tables with the help of the waiters.

13 Q.  And by party manager, are you referring to the party

14 captain?

15 A.  Yes.

16 Q.  Did the party captain also take food and drink orders from

17 the private party?

18 A.  Honestly, I never saw that.  I only saw the waiter take

19 orders for drinks and food.

20 Q.  Did you see the party captains pour wine for the guests?

21 A.  Sometimes.

22 Q.  Did you see the party captains submit all the food orders

23 to the kitchen for the entire party room?

24 A.  I did not understand your question.

25 Q.  Strike that.

EC95sal3                          Urgiles - cross

1          Did you see the party captain coordinate the orders

2     taken by the waiters and submit the ticket for the party to the

3     kitchen?

4     A.  Yes.

5     Q.  And did you see the party captains interact with the guests

6     throughout the meal?

7     A.  I didn't -- the ones who were there was always us, the

8     busboy, and the waiter.  When the persons would arrive and the

9     party captain would arrive, we would be there when he was

10    bringing the wine bottles so then that we would know what

11    bottles we were going to serve.

12    Q.  Did you see the party captain present the bill to the host

13    of the party at the end of the night?

14    A.  Yes.

15    Q.  And did you see Marco working as a party captain?

16    A.  Downstairs?  Yes.

17    Q.  Did you see Peter working as a party captain?

18    A.  Downstairs?  Yes.

19    Q.  Did you see Brent Drill working as a party captain?

20    A.  Yes, I saw him.

21    Q.  And did you see Attilio Vosilla working as a party captain?

22    A.  Yes, I saw him.  But, the one who performed most as a party

23    captain was Mr. Attilio.

24    Q.  And are you referring to parties during dinner shifts?

25    A.  Correct.

EC95sal3                    Urgiles - cross

```
 1   Q.  Mr. Urgiles, you testified earlier that the runners at

 2   Fresco get a slightly larger share of the tip pool, correct?

 3   A.  Correct.

 4   Q.  And when you worked at Fresco, the runners at the

 5   restaurant had been working at Fresco for a long time, correct?

 6   A.  Correct.

 7   Q.  And the runners at Fresco, at some point, used to work as

 8   busboys, isn't that right?

 9   A.  Correct.

10   Q.  And there is fewer runners than bussers at Fresco, correct?

11   There are fewer positions?

12   A.  Well, honestly I do not know, but there are very few

13   runners, but they did use busboys also as runners.

14            MS. KABIR:  May I have a minute, your Honor?

15            (Counsel conferring)

16            MS. KABIR:  We have no more questions.

17            THE COURT:  Mr. Urgiles, you started at Fresco in

18   January 2006, correct?

19            THE WITNESS:  Yes, ma'am.

20            THE COURT:  There came a time when you took a second

21   job at another restaurant and so you were working at both

22   restaurants at the same time, correct?

23            THE WITNESS:  Correct.

24            THE COURT:  When did you take the second job?

25            THE WITNESS:  I do not recall exactly, whether it was
```

EC95sal3                        Urgiles – cross

1    2008 or 2009 or 2010.  I do not remember very well.

2              THE COURT:  Redirect?

3              MR. ANDROPHY:  Yes, your Honor.

4    REDIRECT EXAMINATION

5    BY MR. ANDROPHY:

6    Q.  Mr. Urgiles, do you still have in front of you Defendant's

7    Exhibit A?

8    A.  Yes.

9    Q.  Can you turn to page, Defendant's Exhibit A-57?

10   A.  Yes.

11   Q.  Do you see on the schedule, can you tell us whether you

12   were scheduled to work Saturday that week?

13   A.  Correct.  Yes.

14   Q.  How about on page 58?  Were you scheduled to work dinner on

15   the week -- that is page 58 -- on Saturday?

16   A.  Yes.

17   Q.  And on page 59?

18   A.  Yes.

19   Q.  When your job was -- when you worked as the coffee

20   preparer, did you take food to tables on every shift that you

21   worked as a coffee preparer?

22   A.  Perhaps about 5 percent, 10 percent.

23   Q.  So that is 5 or 10 percent of the shifts that you worked as

24   a coffee preparer that you did that at all?

25   A.  Yes.

EC95sal3                    Urgiles - redirect

1   Q.  If you were working as a coffee preparer, did anyone help

2   you prepare the coffee and tea and iced tea and similar drinks?

3   A.  No.

4   Q.  When you worked as a barback you testified that part of the

5   time you had busboy duties in the bar area; is that correct?

6   A.  Correct.

7   Q.  And part of the shift you would be assisting and preparing

8   things in the bar itself, correct?

9   A.  Correct.

10  Q.  Do you know approximately what percentage of your time on

11  those shifts you spent doing busboy duties at the tables in the

12  bar area?

13  A.  Excuse me.  I did not understand the question.

14  Q.  When you worked when you were assigned to work as a

15  barback, what percentage of your shift would you be performing

16  regular busboy duties for the tables in the bar area?

17  A.  As a busboy, about 20 to 25 percent, more or less.

18  Q.  And what were you doing the rest of your time on the shift?

19  A.  It was my turn for me to work at the bar, at the counter,

20  because we had different glasses that we had to wash.  There

21  were pinot glasses, cabernet glasses, champagne glasses,

22  martini glasses, water glasses.  All of those we had to wash by

23  hand and we had to dry them and to place them back and replace

24  it -- the decanters -- and we had to bring glasses from the

25  back part, from the stock room back to the bar area because the

EC95sal3                    Urgiles - redirect

1    glasses that were used for sodas were very different from those

2    than the ones that we usually had to wash.

3    Q.  Thank you.

4           Was Anthony Scotto the only owner at Fresco by Scotto,

5    to your knowledge?

6    A.  I do not know whether he was the only owner, but

7    Mrs. Scotto was always there and the sisters would go there and

8    Mr. Scotto would also go.  So, I do not know whether he was the

9    only owner.

10   Q.  Do you know if Mr. Scotto was the only manager at Fresco by

11   Scotto?

12   A.  I was introduced to Mr. Attilio also as a general manager

13   and Mr. Brent as a manager.  Morning -- morning ones.  I also

14   knew about that.

15   Q.  When you were training at Fresco by Scotto, did Mr. Scotto

16   follow you around your entire shift to observe your training?

17   A.  Are you asking me whether Mr. Scotto was looking, observing

18   me?

19   Q.  Yes.  Was he spending his entire time of your shift

20   observing you?

21   A.  Yes.  He would come by there.

22   Q.  Was he also doing other things at the restaurant?

23   A.  He -- many a time he was at the VIP section.  Many a time

24   he would take care of the VIP customers.

25   Q.  You were asked about other people who worked as captains, a

EC95sal3                         Urgiles - redirect

1  Peter and Marco; do you recall that?

2  A.  Yes.

3  Q.  Were Peter and Marco introduced to you as managers?

4          MS. KABIR:  Objection.  Leading question.

5          THE COURT:  Sustained.

6  BY MR. ANDROPHY:

7  Q.  You testified that the schedule was usually posted on

8  Friday, correct?

9  A.  Correct.

10  Q.  Do you recall at what point during the day on Friday the

11  schedule would be posted?

12  A.  Always when Mr. Attilio would arrive and, if not, during

13  the evening.  So then, during the evenings, he would take it

14  out and he would place it -- he would place one at the kosher

15  room.

16  Q.  Coat check, I believe.

17          THE COURT:  Coat check.

18  A.  In the coat check room and the other in the section of the

19  stockers.

20          INTERPRETER:  My apologies.

21  Q.  Do you recall approximately how many times during the total

22  time you worked at Fresco that you were asked to wash dishes?

23  A.  Always during the summer.  Always when I was working as a

24  stocker.  It could have been twice a week, once.  It would

25  depend according to how the stocker was -- whether the manager

 1   would designate or assign me to which section for me to go.

 2              MR. ANDROPHY:  Thank you.  I have no further

 3   questions.

 4              THE COURT:  Recross?

 5              MS. KABIR:  Can we have five minutes?

 6              THE COURT:  Five minutes?

 7              MS. KABIR:  Two minutes.

 8              MR. BENSON:  Three minutes.

 9              (Counsel conferring)

10   RECROSS EXAMINATION

11   BY MS. KABIR:

12   Q.  Mr. Urgiles, you testified previously that you spent two

13   hours a day when you were assigned as a barback, two hours a

14   shift, busing the tables in the bar section, correct?

15              MR. ANDROPHY:  I believe that mischaracterizes

16   testimony.  I don't have the transcript in front of me but I

17   don't recall.

18              THE COURT:  I don't recall what his testimony was so

19   you may ask him whether he spent two hours.

20   BY MS. KABIR:

21   Q.  Did you spend two hours, at least, clearing and resetting

22   the tables and the place settings at the bar and performing

23   other busser duties when you were assigned to the barback

24   position?

25   A.  I repeat once more, I would spend two hours only -- no,

EC95sal3                    Urgiles - recross

1   excuse me, only 45 minutes to one hour I would spend doing my

2   side work at the bar.  After that it was my turn, when the

3   clients would arrive, it was my turn to wash glasses, to bring

4   ice, to bring water, to bring iced tea, to bring many things.

5   So, I would spend more than two hours as a barback.  That is

6   why when you asked me whether I was helping the waiters, I told

7   you, yes, but not much.  You asked me whether the busboys would

8   help me.  I told you, yes, a little bit, because I had two

9   busboys in Sections 1 and 2.

10  Q.  So, I believe you testified earlier, Mr. Urgiles, that the

11  waiters would clear the tables but that you would reset them,

12  correct?

13  A.  Yes, ma'am.  But, when I had the time to do so.

14  Q.  And you also testified that when you were spending 20

15  percent of your shift as a barback you were washing glasses and

16  decanters and other types of glasses that are kept at the bar,

17  correct?

18  A.  Correct, but I did not come out with a percentage of when I

19  was bringing water upstairs and bringing everything else

20  upstairs.

21  Q.  Isn't it true that at Fresco the bartenders also washed the

22  glasses at the bar?

23  A.  Me?  That I remember that they helped me?  Never.

24  Q.  But you would agree that they washed glasses too, correct?

25  A.  I never said that.

EC95sal3                    Urgiles - recross

1  Q.  Is it your testimony that the bartenders at Fresco never

2  washed glasses?

3  A.  During the time that I worked there?  To me, they never

4  helped me.

5  Q.  So, when you testified previously that you were washing

6  decanters and wine glasses, that was pertaining to the dinner

7  shifts when you worked as a barback, correct?

8  A.  Lunch or dinner.

9  Q.  I am asking if you were referring to a dinner shift in the

10  prior testimony.

11          MR. ANDROPHY:  The witness answered the question.

12          THE COURT:  I heard an answer:  "Lunch or dinner."

13  Q.  So, is it your testimony that you also had to wash and

14  replace decanters and wine glasses during the lunch shift?

15  A.  Yes, ma'am.

16  Q.  Isn't it true that there are not very much wine orders

17  during the lunch shift?

18  A.  That is true, but there are many persons, VIPs, that who

19  would be served the house wine in the glasses -- in the

20  glasses -- let's call them the more elegant glasses for them

21  and we had to wash them.

22  Q.  And I believe you previously testified that between noon

23  and around 2:00 p.m. the tables during the lunch shift in the

24  bar area are full, correct?

25  A.  Correct.

EC95sal3                    Urgiles - recross

1   Q.  And that the walk-in guests are seated in that area of the

2   restaurant, correct?

3   A.  Correct.

4   Q.  And for that period of time when you were assigned as a

5   barback, is it your testimony that you didn't provide busser

6   services to those tables?

7   A.  I had two jobs there, ma'am.  70 percent or 80 percent of

8   that was as a barback and 20 or 25 percent was as a busboy.

9   Why?  And I'm going to explain to you why.  Because the

10  waiters -- it is true that they would assist and take and clean

11  the tables and remove dishes from the tables, but they never

12  wanted to take them over to the backbar.  They would always

13  just leave them there at the counter of the bar.

14  Q.  So, is it your testimony that from between noon and 2:00

15  p.m., when you were assigned as a barback, there was more

16  demand from customers to have clean wine glasses during lunch

17  than having their tables cleared and reset in that area of the

18  restaurant?

19  A.  I did not understand your question.  Could you repeat it

20  again, please?

21  Q.  For those two hours between noon and 2:00 p.m., isn't it

22  true that you spent most of those two hours providing your

23  busser duties to the tables at the bar?  Isn't that right?

24  A.  At the bar?  Yes.

25  Q.  And isn't it also true that between 12:00 and 2:00 there

1   are not very much wine or other alcoholic beverage orders in

2   the restaurant, correct?

3   A.   Yes.   There is always orders for things to drink.   There

4   were always people who had wanted to drink alcoholic beverages.

5   If I didn't have to clean glasses I had to wash, I had to bring

6   glasses, I had to bring plates, I had to bring silverware for

7   the bar because we needed it because we needed ice, because we

8   needed beer if we needed it.   So, it is not only to be in the

9   back part just washing glasses, there are many things that we

10  have to do behind the bar counter.

11  Q.   I asked you specifically between 12:00 and 2:00 during the

12  lunch rush, isn't it true that you were providing assistance to

13  the waiters in that area of the restaurant by busing the tables

14  and resetting the tables?

15          MR. ANDROPHY:   Objection.   Asked and answered.

16          THE COURT:   Sustained.

17          MS. KABIR:   We have nothing further.

18          MR. ANDROPHY:   If I can have just one minute?

19          THE COURT:   No.   I am not going to have re-redirect.

20  There are too many witnesses for that.   But, you are going to

21  call your next witness.

22          Mr. Urgiles, you may step down.

23          THE WITNESS:   Thank you, your Honor.

24          (witness steps down)

25          MR. ANDROPHY:   If I may have one minute to make sure

EC95sal3                          Urgiles - recross

1     the next witness I am going to call will also be available

2     tomorrow so there won't be disruption?

3             (Pause)

4             MR. ANDROPHY:  We call Pablo Alvarado.

5      PABLO ALVARADO,

6          called as a witness by the Plaintiffs,

7          having been duly sworn, testified through the interpreter,

8          as follows:

9             THE DEPUTY CLERK:  Please state your name for the

10    record.

11            THE WITNESS:  Excuse me, I'm a little bit sick.  My

12    name is Pablo Alvarado.

13            THE COURT:  Do you feel well enough to testify?

14            THE WITNESS:  Yes.

15    DIRECT EXAMINATION

16    BY MR. ANDROPHY:

17    Q.  Mr. Alvarado, do you recognize the document I just handed

18    up to you?

19    A.  Yes.

20    Q.  And is that the declaration that you signed as your direct

21    testimony for this case?

22    A.  Yes.

23    Q.  And if you can turn to the last page, is that your

24    signature?

25    A.  Yes, sir.

EC95sal3                    Alvarado - direct

1              MR. ANDROPHY:  We ask that this be admitted as

2       Plaintiff's Exhibit 106.

3              MR. BENSON:  No objection, your Honor.

4              THE COURT:  It is admitted.

5              (Plaintiff's Exhibit 106 received in evidence)

6              MR. ANDROPHY:  And we also ask that Plaintiff's

7       Exhibits 27, 29, and 30, and also Plaintiff's Exhibit 86 be

8       admitted.

9              THE COURT:  Those are referred to in the declaration?

10             MR. ANDROPHY:  Yes.

11             THE COURT:  Any objection?

12             MR. BENSON:  Just checking to make sure that we know

13      what we are agreeing to.

14             MR. ANDROPHY:  And if I can also add to that

15      Plaintiff's Exhibit 92?

16             MR. BENSON:  No objection, your Honor.

17             THE COURT:  All of those items are admitted.

18             (Plaintiff's Exhibits 27, 29, 30, 86 and 92 received

19      in evidence)

20             THE COURT:  Sir, you may step down.  You must return

21      tomorrow to testify at 9:00 a.m. sharp.

22             THE WITNESS:  Yes.  Yes, ma'am.  Thank you.

23             THE COURT:  We are going to alter the trial schedule

24      because it is going too slow.  We will start at 9:00, we will

25      break between 1:00 and 2:00, and we will go until 5:00.  If the

1   pace does not pick up I will add more hours to each day.

2           See you tomorrow at 9:00.

3           (Adjourned to 9:00 a.m., December 10, 2014.)

1                      INDEX OF EXAMINATION

2    Examination of:                              Page

3    ENRIQUE SALINAS

4    Cross By Mr. Benson . . . . . . . . . . . . . .91

5    Redirect By Mr. Androphy . . . . . . . . . . 114

6    CHRISTIAN URGILES

7    Direct By Mr. Androphy . . . . . . . . . . . 125

8    Cross By Ms. Kabir . . . . . . . . . . . . . 126

9    Cross By Ms. Kabir . . . . . . . . . . . . . 156

10   Redirect By Mr. Androphy . . . . . . . . . . 188

11   Recross By Ms. Kabir . . . . . . . . . . . . 192

12   PABLO ALVARADO

13   Direct By Mr. Androphy . . . . . . . . . . . 197

14                      PLAINTIFF EXHIBITS

15   Exhibit No.                              Received

16    105   . . . . . . . . . . . . . . . . . . 125

17    68, 69 and 70  . . . . . . . . . . . . . . 126

18    106   . . . . . . . . . . . . . . . . . . 198

19    27, 29, 30, 86 and 92  . . . . . . . . . . 198

20

21

22

23

24

25