Eca2sal1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------------x

 3   ENRIQUE SALINAS, et al.,

 4                    Plaintiffs,

 5            v.                             13 Civ. 2992 (AT)

 6   STARJEM RESTAURANT CORP., et al.,

 7                    Defendants.

 8   ------------------------------------x

 9                                          New York, N.Y.
                                            December 10, 2014
10                                          9:00 a.m.

11   Before:

12                      HON. ANALISA TORRES

13                                          District Judge

14

15                          APPEARANCES

16   MICHAEL FAILLACE & ASSOCIATES, P.C.
          Attorneys for Plaintiffs
17   BY:   JOSHUA S. ANDROPHY, ESQ.
          SHAWN R. CLARK, ESQ.
18
     LITTLER MENDELSON, P.C.
19        Attorneys for Defendants
     BY:   CRAIG R. BENSON, ESQ.
20        NAVEEN KABIR, ESQ.

21
     Also Present:  G. Eugene Alvarez
22                  Spanish Interpreter

23

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Eca2sal1

```
 1              (Trial resumed)
 2              THE COURT:  Good morning.
 3              MR. ANDROPHY:  Good morning, your Honor.
 4              MR. BENSON:  Good morning.
 5              THE COURT:  I want the parties to know that I am
 6     prepared to continue into the week of December 22 if we are not
 7     finished.
 8              Sir, I want to remind you that you are still under
 9     oath.
10              THE WITNESS:  It is all right.
11              MR. ANDROPHY:  Your Honor, speaking with counsel, we
12     have a couple logistical matters we want to discuss.  I don't
13     know if your Honor would prefer to be on the record or off the
14     record.
15              THE COURT:  You can go ahead.
16              MR. ANDROPHY:  So several things.  One, I think both
17     attorneys, all attorneys agree it might be helpful if the
18     interpreter has a microphone, because sometimes if he is
19     translating simultaneously, the witness is speaking into the
20     microphone and it is somewhat difficult for us to hear him.
21              THE COURT:  Yes, we will put the microphone over
22     there.
23              (Pause)
24              MR. ANDROPHY:  Second, on Friday, because I am an
25     observer of the Jewish sabbath, I don't work or travel after
```

Eca2sal1

1    sundown, so I know we are now planning to go until 5:00.  I

2    would just respectfully request if we could end at

3    approximately 3:30 on Friday.

4                  THE COURT:  Fine.

5                  MR. BENSON:  I would also add, we have been trying to

6    confer and work out a schedule.  We anticipate the witnesses

7    are going to go a lot more quickly than they have.  I am sure

8    your Honor is very pleased to hear that.  And we are also

9    trying diligently, we would like to get plaintiffs' case done

10   by the end of this week, which I am sure you also would be very

11   happy about.

12                 We are running into a bit of a logistical issue in

13   terms of that only certain witnesses are available tomorrow,

14   and we are trying to work that out to fill a whole day, but it

15   may not -- might not be able to given the availability of

16   plaintiffs' witnesses, and I wanted to alert your Honor to

17   that.

18                 And, also, finally, on defendants' case, we are

19   putting in direct by affidavit.  Will your Honor allow us to

20   continue with live direct based on what's transpired in the

21   trial so far and then -- so the order would be we would

22   continue with direct, and then they would cross and redirect,

23   etc., or would you prefer it to be the order in which -- or the

24   procedure that we have used thus far, which is just start with

25   cross?

Eca2sal1

```
 1              THE COURT:  So you are saying that an issue may have
 2    come up that you want to address first on direct.
 3              MR. BENSON:  Yes, several.
 4              THE COURT:  My preference is that you discuss amongst
 5    yourselves specifically what you are going to address so that
 6    it is not just an unending, undefined direct.
 7              MR. BENSON:  Okay.  But assuming that we come to some
 8    agreement in that respect, would your Honor prefer us to do it
 9    that way?
10              THE COURT:  Yes.
11              MR. BENSON:  Okay.
12              THE COURT:  All right, then.  You may continue.
13              MR. BENSON:  Is it my turn?
14              THE COURT:  With your cross-examination, yes.
15     PABLO ALVARADO,
16    CROSS EXAMINATION
17    BY MR. BENSON:
18    Q.  Thank you.  Good morning, Mr. Alvarado.
19    A.  Good morning.
20    Q.  I would like to show you what has been marked for
21    identification as Defendants' Exhibit H.
22              THE COURT:  Where is that in my volumes?
23              MS. KABIR:  It should be one of the last tabs in
24    volume 2.
25              THE COURT:  Volume 2.  Where in volume 2?
```

Eca2sal1                      Alvarado – Cross

1              MS. KABIR:  One of the last tabs in the back, perhaps

2      the second to the last.

3              MR. CLARK:  Tab 55 is where we have it in our version.

4              THE COURT:  Okay.

5      BY MR. BENSON:

6      Q.  Mr. Alvarado, have you had a chance to review that

7      document?

8      A.  Yes.

9      Q.  Is that your signature on the second page of the document?

10     A.  Yes.

11             MR. BENSON:  We move it into evidence, your Honor.

12             THE COURT:  Any objection?

13             MR. ANDROPHY:  No objection, your Honor.

14             THE COURT:  It is admitted.

15             (Defendants' Exhibit H received in evidence)

16     BY MR. BENSON:

17     Q.  Mr. Alvarado, you were hired to work at Fresco Restaurant

18     by Anthony Scotto, correct?

19     A.  Correct.

20     Q.  And that was back in 1998, right?

21     A.  Towards the latter part of '98.

22     Q.  Did you have prior experience in the restaurant industry

23     before that?

24     A.  Correct.

25     Q.  Where was that experience?

Eca2sal1                        Alvarado - Cross

1   A.  I had jobs at a restaurant and the name of it was Aya and

2   Limoncello Restaurant, and I worked also for a few months at

3   Le Bernadin.

4   Q.  Did you have a résumé when you came to Fresco for the first

5   time?

6   A.  No.

7   Q.  So did you share your prior job experience with Mr. Scotto?

8   A.  Well, when I went to the restaurant, I went directly with a

9   friend who worked as a bartender, his name Julio.  He spoke

10  with Mr. Anthony, and Mr. Anthony was at the bar, and it was

11  such that he introduced me to him so I could speak to him.

12  Q.  And did you share with him your prior job experiences?

13  A.  Yes, sir.

14  Q.  And did you provide him with references to check?

15  A.  Well, when I went to the restaurant I requested a job as a

16  runner.  He told me that at that moment there was not a

17  vacancy, there was one for a busboy.  So I said, okay, I will

18  take it.

19  Q.  Perhaps you didn't understand my question, but I simply

20  asked you, did you provide him with references to check?

21  A.  No.

22  Q.  He didn't ask you for any references?

23  A.  Only he just asked me where I had worked.  And he told me

24  that the restaurant Fresco was a very busy one.

25  Q.  Did he ask you to fill out a form that would have listed

Eca2sal1                        Alvarado - Cross

1   those references?

2   A.  I cannot recall.

3   Q.  So you don't know, then, whether he checked the references

4   or not, do you?

5   A.  I do not know.

6   Q.  Then you came to train, correct?

7   A.  Yes.  I came not that next day, but the day after that.

8   Q.  And you understood that the training was sort of a test

9   period to determine whether you would be hired, correct?

10  A.  Correct.

11  Q.  And during that test period, Anthony would observe your

12  skills, correct?

13  A.  Correct.

14  Q.  And determine whether you were suitable for a permanent

15  position.

16  A.  Correct.

17  Q.  After a short period of time you actually became a runner,

18  correct?

19  A.  Correct.

20  Q.  So you started as a busser, and then did you consider that

21  a promotion?

22  A.  I do not understand the question.

23  Q.  Did you consider runner to be a more desirable job?

24  A.  Yes, sir.

25  Q.  So how long after you started working as a busser were you

Eca2sal1                    Alvarado - Cross

 1    given the runner position?

 2    A.   Approximately six months.

 3    Q.   Now, the lunch service begins for the customers at Fresco

 4    at 11:30, correct?

 5    A.   Correct.

 6    Q.   Your job as a runner is to initially run what is called

 7    Fresco bread, correct?

 8              THE COURT:  Counsel, I want to ask you a question.

 9    When you say "lunch service," do you mean the time at which

10    patrons may start eating lunch?

11              MR. BENSON:  That's correct, your Honor.  I believe I

12    put that in my question and I purposefully tried to because I

13    want that clear, the part about when the customers come, for

14    purposes of this line of questioning.

15    Q.   I think there is a question pending.

16    A.   Okay.  I want just to ask whether you asked me as a busboy

17    or when did I start as a runner.

18    Q.   As a runner.  Thank you, because that's an important

19    clarification.

20    A.   Correct, I would bring out the Fresco bread.

21    Q.   Fresco bread is a special bread that is actually done by

22    the cooks, correct?

23    A.   Correct.

24    Q.   Now, how many runners usually are on a shift?

25    A.   During periods when the restaurant was slow, they would

1    place or use two to three runners.  When it was busy, they

2    would use four runners.  One of the runners, at certain times

3    he would make it, he would perform as an expediter.

4             MR. BENSON:  Nonresponsive to the question, your

5    Honor.  I ask that he respond --

6             THE COURT:  Are you asking me to strike the answer?

7             MR. BENSON:  Just a portion that -- I am just not

8    sure --

9             THE COURT:  So the part where he talks about one of

10   the runners acting as the expediter is stricken.

11   BY MR. BENSON:

12   Q.  At Fresco, you do not use trays in the main dining room,

13   correct?

14   A.  Correct.

15   Q.  You deliver with your hands, do you not?

16   A.  Correct.

17   Q.  And there is always more food to deliver than hands to

18   deliver it, correct?

19   A.  Correct.

20   Q.  So others help out with respect to the running of the food,

21   correct?

22   A.  I do not understand.

23   Q.  Because you testified that you deliver the food by hand and

24   that there is more food to deliver than hands to do it, other

25   positions in the service staff help out in the delivery of that

Eca2sal1                    Alvarado - Cross

1   food, correct?

2   A.  Correct.

3   Q.  And that is true right from the very beginning of the

4   service when the customers arrive, correct?

5   A.  Excuse me.  I am a little bit confused because I cannot

6   hear well.

7   Q.  Would you like me to repeat the question?

8   A.  Please.

9           MR. BENSON:  Would the court reporter please read back

10  the question.

11          (Record read)

12  A.  Not always.  Because when we start to work, each one at his

13  own position, we all have different things to do when the

14  customer arrives.  For example, the coffee maker, if the

15  customer orders iced tea, they have to take it or to run it.

16  When we are waiting for the waiter to place the order into the

17  computer, in order for us to start taking what is our job to

18  take out, that is, if a customer orders pizza, Fresco bread,

19  calamari, or salads, or simply if it is a main course.

20  Q.  And people tend to come to Fresco Restaurant, especially at

21  lunch, all at once, do they not?

22  A.  Well, gentlemen, if we have 100 persons, not all the

23  persons arrive at the same time.  They arrive during a period

24  from 11:30 to 2:30 p.m.

25  Q.  I understand, sir, but doesn't, on every lunch, the

Eca2sal1                    Alvarado - Cross

1    restaurant gets very busy in a very short time period, does it

2    not?

3    A.  Sometimes, yes.

4    Q.  And when that happens, the food orders come in very fast,

5    correct?

6    A.  Correct.

7    Q.  And the chefs are working very hard to get the food out in

8    a fast manner, correct?

9    A.  I want to specify "chef."  During lunch, the chef and

10   sometimes he is called a chef, sometimes he would work -- the

11   most of the chef would work -- mostly the chefs would work for

12   dinner.  In the lunch, the person who was in charge normally

13   regularly was Mr. Raoul; and if he was busy, some of the times

14   the chef would arrive.

15   Q.  I don't mean to interrupt you, and this is my fault.  I

16   said "chefs."  I meant "cooks."  Cooks get the food out very

17   fast.

18   A.  Correct.

19   Q.  And that food needs to be delivered in a fast manner,

20   correct?

21   A.  Correct, but --

22   Q.  And --

23   A.  -- sometimes we had to take two turns in order to deliver

24   all of the food to one table.

25   Q.  And there were many tables that you were responsible for,

1    correct?

2    A.  Correct.

3    Q.  And some of those tables were very large, correct?

4    A.  Sometimes.

5    Q.  As many as ten at a table.

6    A.  It could have been.

7    Q.  And there were several of those large tables, are there

8    not?

9    A.  One or two tables.

10   Q.  Is it your testimony that there are one or two tables that

11   are large in the restaurant?

12   A.  I specify at the restaurant there are several tables where

13   six to ten persons can be seated, because the tables stretch

14   out.  They can be extended, and there are also some tables

15   where you place some extra sections on top of certain tables

16   where 12 persons can be seated.  And sometimes, if they are

17   tight, you can seat 15 persons.

18   Q.  Okay.  But my point is that there were several large tables

19   in the restaurant on every service, correct?

20   A.  Possibly.

21   Q.  And there is more food to deliver than runners to do it,

22   correct?

23   A.  Correct.

24   Q.  And you previously testified that other help out, correct?

25   A.  Correct.

1   Q.  So whoever is free in the kitchen will deliver food to the
2   tables with you, correct?
3   A.  Correct, but I want to make clear in the kitchen sometimes
4   waiters would come in and some of which -- they were requested
5   for them to help us run the food and they would pretend that
6   they did not hear us, and they would take whichever person was
7   nearby them and they would use them as busboys, as stockers, or
8   whomever might be free.
9   Q.  Right.
10          I think you said you, or at least it was translated as
11  "use them."  I think you meant use the stockers, the busboys,
12  the quasi-persons, anyone who is available to run food, is that
13  correct?
14  A.  Yes, but I want it clear, certain waiters would help us.
15  Q.  And I appreciate that.
16          Now, the chef or the sous chef stands before a
17  microphone in the kitchen, correct?
18  A.  Correct, only --
19  Q.  And -- you will have an opportunity, but please let me ask
20  my questions.
21          And that position takes the food orders and speaks to
22  the cooks about those orders, correct?
23  A.  Correct.
24  Q.  And that is a position that is usually either the chef or
25  the sous chef, correct?

1   A.  Correct, and I want it clear --

2   Q.  Again, please let me ask my questions.

3        That position is different than a position when the

4   food comes back from the cooks and it is ready to be served,

5   correct?

6   A.  Excuse me.  I do not understand "it comes back."

7   Q.  I will clarify.  So there is one person who is at the

8   microphone during a service, correct?

9   A.  Correct.

10  Q.  And that person never leaves the kitchen?

11  A.  Leave the kitchen?  Yes, sometimes.

12  Q.  Okay.  So, well, the chef or the sous chef don't leave the

13  kitchen, do they?

14  A.  They shouldn't, but sometimes they would be.

15  Q.  But it is important that there always be a person at the

16  microphone taking the orders and communicating with the chefs,

17  correct, or with the cooks?

18  A.  Yes.

19  Q.  Now, that person sometimes has a person next to them,

20  correct?

21  A.  Sometimes.

22  Q.  And the person next to them has a different responsibility,

23  correct?

24  A.  Correct.

25  Q.  And that responsibility is to help in the delivery of the

Eca2sal1                    Alvarado - Cross

1   food to the dining room, correct?

2   A.  I do not understand, the person.  The person that is next,

3   that is running food?  Are you speaking about a runner?

4   Q.  I am speaking about a person next to the person with the

5   microphone who is in charge of sending the food out of the

6   kitchen in the proper order so that it can be delivered in the

7   proper manner.

8          Do you understand?

9   A.  Yes, I understand.

10  Q.  And that is a different person than the person at the

11  microphone, correct?

12  A.  Correct.  I would do it sometimes.

13  Q.  Now, usually the chef or the sous chef is the person at the

14  microphone, correct?

15  A.  When they had to leave to go pick up something, it was two

16  persons of us who would do it if we were working during that

17  shift.  And it was --

18  Q.  My question is, is it usually the chef or the sous chef?

19  A.  Sometimes.

20  Q.  Okay.  And sometimes the chef is the person talking in the

21  microphone and the sous chef is the person assisting the

22  runners and the servers to get the food out?

23  A.  Correct, but I want it clear, when the restaurant during

24  lunchtime is not busy, the chef is not there.

25  Q.  Okay.

Eca2sal1                      Alvarado - Cross

1           Now, sometimes a head runner will assist the person

2      with the microphone or be next to the person with the

3      microphone and assist in putting the plates in the proper

4      order, correct?

5      A.  Sir, there is not a head runner.  The person who is there

6      in the name, that person is called an expediter, not a head

7      runner.

8      Q.  Well, okay, but it is a runner with a lot of experience,

9      correct?

10     A.  It could be so.

11     Q.  It is, is it not?

12     A.  It is so.

13     Q.  And that person is the person that you are calling the

14     expediter, correct?

15     A.  Correct.

16           THE COURT:  Is the word "expediter" a word that was

17     used in a restaurant?

18           THE WITNESS:  Expo.

19     Q.  When you assisted in putting the plates in the proper order

20     on the trays or -- strike that.

21           What you do is tell the runners the proper seat and

22     table location to deliver the food, correct?

23     A.  Yes, correct.

24     Q.  When you are in that position, you are also running the

25     food to the tables just like the other runners.

Eca2sal1                     Alvarado - Cross

1    A.  Sometimes when it was busy and everyone in the kitchen was

2    busy and there were not enough hands, so then I would take the

3    food out.

4              THE COURT:  Are you saying, sir, you did that when you

5    were serving as an expo?

6              THE WITNESS:  Yes, ma'am.

7    Q.  And when you were in this position, you had the same runner

8    uniform that you normally have, correct?

9    A.  Correct.

10   Q.  Now, there are other occasions when you would be asked to

11   take the place of the person at the microphone, correct?

12   A.  Correct.

13   Q.  And in those situations you could not leave the kitchen,

14   correct?

15   A.  Correct.

16   Q.  And in those situations, you were paid a higher salary by

17   the restaurant and did not participate in the tip pool,

18   correct?

19   A.  Okay.  I want to explain this question.  During the time

20   when I worked as an expediter, I would take the same -- the

21   same amount of money as the regular runners.  I did not make

22   any extra money.

23             MR. BENSON:  That's not responsive to the question,

24   your Honor.  I am asking him about when he serves in the

25   position of the person at the microphone and he doesn't leave

Eca2sal1                        Alvarado - Cross

1    the kitchen.

2    Q.  Isn't it true that you are paid by the restaurant a higher

3    amount and that you do not participate in the tip pool?

4    A.  No, no, that is not correct.

5    Q.  Is it your testimony that you are not paid by the

6    restaurant when you serve the position at the microphone?

7    A.  When I worked, those were a few times when I was in front

8    of the microphone, I would receive the same salary as the

9    runners and the same salary that the house was paid.  I did not

10   receive anything different, no.

11   Q.  But my question is not the amount that you received, my

12   question is where you received it from.  And isn't it true that

13   you received that money from the restaurant and that it did not

14   come out of the tip pool?

15   A.  Gentlemen, sometimes they would pay me -- they would take

16   me down to the office and they would give me the same amount

17   that I made and some of the times I would receive from the

18   house pool.

19   Q.  So you --

20   A.  Did I reply to your question?

21   Q.  Well, not really, but I will ask you additional questions.

22          So you admit that when you served at the microphone

23   and didn't leave the kitchen, you were paid by the restaurant?

24   A.  No, sir.

25          MR. ANDROPHY:  Objection.  He is always paid a salary

Eca2sal1                    Alvarado - Cross

1    by the restaurant.  I think this question, if it is confusing

2    to me, I think it is confusing to the witness.

3            THE COURT:  Are you distinguishing between sharing in

4    the tip pool and not?

5            MR. BENSON:  Yes, I am, and that's a fair

6    clarification.

7    BY MR. BENSON:

8    Q.  Isn't it true that when you work at the microphone only and

9    don't leave the kitchen, you do not participate in the tip

10   pool?

11   A.  I want to make clear I would not remain a whole shift in

12   front of the microphone.  I would stay there only if the person

13   who was in charge of the microphone had to leave quickly to

14   pick up something from the basement.

15   Q.  There were some shifts where you had to stay in the kitchen

16   because either the chef was gone, the sous chef was gone, or

17   they were both gone, correct?

18   A.  Correct.

19   Q.  And on those shifts, where you did not leave the kitchen,

20   you did not participate in the tip pool, correct?

21   A.  I was paid from the tip pool.

22   Q.  Always?

23   A.  The large majority of times.  We are talking about 75

24   percent.

25   Q.  So you admit that there were 25 percent of the times that

Eca2sal1                        Alvarado - Cross

1     you were paid -- or that you did not participate in the tip

2     pool, correct?

3              THE WITNESS:  He is asking me when I would remain in

4     front of the microphone?

5     Q.  I am asking you now a more broad question; that is, there

6     were times when you stayed in the kitchen the entire time,

7     correct?

8     A.  Sometimes, yes.

9     Q.  And on those occasions, or at least you allege on some of

10    those occasions, you did not participate in the tip pool?

11    A.  Sometimes.

12             (In English) Yes, that's correct.

13             THE COURT:  What percentage of the time was that?

14             THE WITNESS:  Approximately between 15 to 20 percent.

15             THE COURT:  Is there a name for the person who stands

16    at the microphone.

17             MR. BENSON:  Expediter.

18             THE COURT:  I am asking the witness.

19             MR. BENSON:  Sorry.

20             THE WITNESS:  The sous chef.

21             (Continued on next page)

22

23

24

25

ECA5sal2                    Alvarado - cross

1   Q.  There are also individuals whose job it is to serve the

2   coffee, correct?

3   A.  Correct.

4   Q.  And you, as runners, assist those people in delivering the

5   beverages, correct?

6   A.  Some of us.  Or some.

7   Q.  Do you?

8   A.  Sometimes.

9   Q.  The runners, as a whole, assist the coffee person in

10   running beverages to the dining room, do they not?

11   A.  I want to make clear we supposedly worked as a team.  When

12   they would place a coffee maker that had certain fellow workers

13   near him who were runners, they would help him.  If that

14   person, the coffee maker, did not get along with certain

15   runners, those runners would not help him.

16   Q.  So you are saying that, as a general matter, the runners

17   would help the coffee persons unless there was a personal

18   conflict between a runner and a coffee person and he was not

19   cooperating?

20   A.  Correct.

21   Q.  And it is also true that the coffee persons helped the

22   runners because all the food must be delivered in a timely

23   manner?

24   A.  Sometimes when they had the time.

25              THE COURT:  How much time would the coffee maker

ECA5sal2                    Alvarado - cross

1   devote to bringing food to the table?  What portion or what

2   percent?

3            THE WITNESS:  If it was busy, between 5 to 10 percent.

4   BY MR. BENSON:

5   Q.  Okay, and they were also delivering their beverages,

6   correct?

7   A.  If there was a helper, a helper for the coffee maker, he or

8   she would run the beverages and that was the person who helped

9   us more to take the food out and deliver the food.

10  Q.  That was very rare that there was a coffee helper, correct?

11  A.  If it was busy, the coffee maker had no time.  And if there

12  were just a few customers and things were slow, if we required

13  help he would help us but those were just a few times.

14  Q.  Now, you worked at Fresco for a long time, correct?

15  A.  Approximately 14 years.

16  Q.  And you observed the restaurant the entire time that you

17  were there, correct?

18  A.  Correct.

19  Q.  And you looked at the schedule each week, correct?

20  A.  Okay.  The schedule, regarding to my person, to my

21  person -- in my person, regarding my person, my schedule, it

22  did not vary very much.  And as the person who was in charge of

23  the schedule would place it, would bring it out on Fridays or

24  Saturdays, I knew that I would be working on Mondays.

25  Q.  Was that true, your schedule stayed the same for the entire

ECA5sal2                    Alvarado - cross

1   time you worked at Fresco?

2   A.  No, sir.

3   Q.  But was that largely true for the entire time?

4   A.  When I started to work at Fresco as a busboy I would work

5   more shifts than when I started to work as a runner.  As a

6   runner, I would work seven shifts and sometimes I would have

7   one or two on-calls.

8   Q.  So, would that be true by the time you became a runner

9   sometime in 1999 all the way through the end of your employment

10  in 2012?

11  A.  It was not '99, it was the beginning of '98, towards the

12  end.

13  Q.  From whenever you became a runner until your employment

14  ended in 2012, was that largely your schedule?

15  A.  Yes; seven shifts.

16  Q.  Now, there is a 30-minute meal period on each shift,

17  correct?

18  A.  Correct.

19  Q.  And you performed no work during that 30 minutes, correct?

20  A.  Sometimes I did not finish, for whatever reason the side

21  work, but most of the time I had 30 minutes.  Most of the times

22  I had 30 minutes.

23  Q.  And you are required to perform no work during that 30

24  minutes, correct?

25  A.  Some rare times when it was -- for instance, if I would

ECA5sal2                        Alvarado - cross

1    arrive for dinner and they needed, for example, we were during

2    the mealtime for the dinner, the meal break and, for instance,

3    they would order a Fresco bread or a pizza, we would take it

4    out.

5    Q.  But that is very rare, correct?

6    A.  Correct.

7    Q.  During that 30 minutes you can leave the restaurant if that

8    is your choice, correct?

9    A.  Correct.  Correct.  But I never left.  I never went out.

10   Q.  I draw your attention to paragraph 16 of your declaration,

11   not the affidavit that I introduced into evidence but the trial

12   declaration.

13           MR. ANDROPHY:  I'm not sure if he has that in front of

14   him.

15           THE WITNESS:  Excuse me, what paragraphs?

16           MR. ANDROPHY:  We took it back from the witness stand

17   after yesterday.

18           THE WITNESS:  Excuse me.  What was the question?

19   BY MR. BENSON:

20   Q.  I direct your attention to page 3, paragraph 16 --

21           THE COURT:  This is Mr. Alvarado, correct?

22           MR. BENSON:  Yes.

23           THE COURT:  You said page 3, paragraph?

24   BY MR. BENSON:

25   Q.  16; specifically to the last line where it says, and I

1   quote:  We were not allowed to leave the restaurant during the

2   family meal.

3           Do you see that?

4   A.  Yes, I see it.

5   Q.  That is correct, is it not?

6   A.  Okay.  I want to clarify.

7           During the meal we would not leave because sometimes

8   we had -- they would give us half an hour which was the

9   mealtime but we had -- sometimes we would come back quickly in

10  order to continue doing our side work so as not to affect -- so

11  that it would not have an effect when the first clients would

12  arrive.  Customers.

13  Q.  Sir, with all due respect, that's not my question to you.

14  My question to you is during the 30-minute meal -- I will

15  strike that question.

16          You previously testified that during the 30-minute

17  meal you were free to leave the restaurant.  Do you recall that

18  testimony?

19  A.  Yes.  Yes.  I do recall.

20  Q.  And to say that you were not allowed to leave the

21  restaurant during the family meal is not true, is it?

22  A.  For us we were always there.

23          THE COURT:  That's not the question, sir.  The

24  question is whether you were permitted to leave by the boss.

25          THE WITNESS:  Well, they never told us whether we

1   wanted to leave or not so then we would remain there.

2              THE COURT:  Did they tell you that you weren't allowed

3   to leave?

4              THE WITNESS:  No, they didn't tell me.

5   BY MR. BENSON:

6   Q.  In paragraph 10 of the exhibit that I introduced as

7   Defendant's Exhibit 7, do you see that?

8   A.  I do not understand.

9              INTERPRETER:  Your Honor, the witness is having a

10  problem trying to find out what document counsel is referring

11  to.

12  Q.  Defendant's Exhibit 7, *Declaración de Pablo Alvarado.*

13             THE COURT:  Are you talking about the document that is

14  in Spanish or in English?

15             MR. BENSON:  Well, I introduced all of it, the same

16  exhibit, yes.  And I am directing his attention to paragraph

17  10.

18             THE COURT:  On page 2?

19             MR. BENSON:  Yes.  There is a Bates stamp D 006201 on

20  the bottom.

21  BY MR. BENSON:

22  Q.  Paragraph 10 reads in the second sentence, and I quote:  I

23  don't do any work during this time and I can go out if I want

24  to.

25             Is that accurate, Mr. Alvarado?

ECA5sal2                    Alvarado - cross

1    A.  Yes.

2    Q.  Thank you.

3         Now, in June 2011 the restaurant started using a time

4    clock, correct?

5    A.  Correct.

6    Q.  And after some early problems for the first few weeks it

7    accurately reflected your time punches, did it not?

8    A.  How many weeks are you talking about?

9    Q.  You tell me.

10   A.  Okay, because it was not weeks, it was more time; that when

11   we would arrive in the morning and we were specified a number

12   at the beginning it was not working, the machine was not

13   working.  We made it known to them -- I personally made it

14   known to the host, James, and he knew already if Brent, the

15   manager, would arrive, he would tell him that the computer was

16   not working; or Mr. Anthony, if he was there.

17   Q.  Now, wasn't the protocol or the proper procedure, if the

18   time clock wasn't working, for you to notify James who would

19   then communicate that to Anthony Scotto?

20   A.  Correct.  It was notified.

21   Q.  At some point the time clock was working on a regular

22   basis, correct?

23   A.  Correct.

24   Q.  And that was, let's say, two months after it was put into

25   place?

1    A.  I do not understand.

2    Q.  Okay.

3          After a certain amount of time the time clock was

4    working consistently, correct?

5    A.  Correct.

6    Q.  What period of time was it before it was working correctly?

7    A.  Well, during the time that I worked there which was just

8    briefly, a year -- a year and a half when, towards the end of

9    the part that I was working at Fresco, the machine worked well

10   for a certain amount of time and then some other times it was

11   not working.  Two or three months would go by and the machine

12   was perfect and then, afterwards, it would have some flaws.

13   Q.  But then it would be fixed, correct?

14   A.  Well, yes.

15   Q.  Now let's talk about your shift times.  What time did the

16   lunch shift begin?

17   A.  Okay.  I would arrive at 10:00 a.m. for lunch.

18   Q.  And if you were the late runner that would be 11:00,

19   correct?

20   A.  Correct.

21   Q.  And it would typically end, if you weren't the late runner,

22   at about 2:30, correct?

23          INTERPRETER:  If he were or not?

24   Q.  If he were not.

25   A.  Correct.

ECA5sal2                    Alvarado - cross

1    Q.  And if you were the late runner, somewhere between 3:30 and

2    4:00, correct?

3    A.  Correct.

4    Q.  Now let's talk about dinner.  You usually start at 4:00,

5    correct?

6    A.  Correct.

7    Q.  That's the early runner's start time, is it not?

8    A.  Correct.

9    Q.  And there is also a late runner start time, correct?

10   A.  Correct.

11   Q.  And that shift starts at 5:00, correct?

12   A.  Correct.  I want to clarify:  About what scheduled time are

13   you talking to me about?  About late runners with regards to

14   opening -- in other words, the one he or it opened?

15   Q.  I direct your attention to paragraph 32 of your trial

16   declaration and I apologize for going back and forth.  It is on

17   page 6.

18   A.  What paragraph, please?

19   Q.  32.

20        Now, you say here that when your shift starts at 4:00

21   you normally finish around 11:00 or 11:30, correct?

22   A.  Correct.  In this clarification --

23   Q.  There is no question.  I will give you plenty of

24   opportunity.

25   A.  Thank you.

1   Q.  It is not accurate to say that your shift time finishes

2   around 11:00 or 11:30, is it?

3   A.  What is written here is when I started working as a runner,

4   afterwards I would start at 4:00 p.m. and I would leave at

5   10:30 p.m. or, at the latest, at 11:00.

6   Q.  So when you first started working back in 1999 are you

7   talking about?

8   A.  Yes.

9   Q.  Is it your testimony that at some point you stopped working

10  until 10:30 or 11:00?

11  A.  Of course so.  Clearly so.

12  Q.  What year was it that you stopped working until 10:30 or

13  11:00?

14  A.  If I can remember correctly it was 2000, 2001, when the

15  restaurant was really busy.

16  Q.  So, from the time in 1999 that you became a runner until

17  2000 or 2001, you say you worked until 10:30 or 11:00 because

18  it was very, very busy.  Is that your testimony?

19  A.  Yes.  Clearly so.

20  Q.  Then, is it your testimony that after 2000 or 2001 it was

21  less busy and you therefore left earlier than that?

22  A.  Not busier.  The problem, there were runners when I started

23  working as a runner, as a runner that had been working there

24  for many years before.  Sometimes they would ask me for me to

25  stay there for a little while longer.  When I started after

1   2000 -- and also before 2001, but I would remain as one of the

2   runners which was -- that was one of the ones I had been there

3   with most seniority there.  I would leave at 10:30 and

4   sometimes, rarely so, 11:00.  Rarely so.

5   Q.  I appreciate that, sir.  I respectfully suggest that it was

6   not responsive to my question.

7           I understand your testimony that you say it was busy

8   and that sometimes you worked as late as 11:00 until 2001.  My

9   question to you is:  After that time is it your testimony that

10  you worked less or you would leave earlier than that?

11  A.  When, for example, they would arrive.  When we were busy we

12  had parties at the private room.  We, the runners, if there was

13  a large party, we would remain to help the closer.

14  Q.  Sir, again, I respectfully suggest that that is not

15  responsive to my question.  If you don't understand the

16  question, I will be more than happy to rephrase it but I would

17  ask that you answer the question.

18  A.  Please.

19  Q.  And the question is:  I believe you were testifying that

20  for some reason the restaurant was busier until 2001 and that,

21  as a result, you worked until 10:30 and sometimes 11:00?

22  A.  Correct.

23  Q.  And you testified that you did that until 2000 or 2001,

24  correct?

25  A.  I do not remember exactly but, but correct.

ECA5sal2                       Alvarado - cross

1    Q.  Now, after that time, let's say from 2002 to the present,

2    is it your testimony that you did not or that you were able to

3    leave earlier than 10:30 or sometimes 11:00?

4    A.  Sometimes.

5    Q.  What time, sir, do you testify -- strike that.

6            Going back to the last year that you worked, what time

7    would you work until when you arrived at 4:00?

8    A.  Until 10:30.

9    Q.  So, when you arrived at 4:00 it is your testimony you

10   didn't leave before 10:30?

11   A.  At 10:30 I would leave.

12   Q.  Not earlier?

13   A.  Okay; 10:30, but if there were not that many customers and

14   we were three or four runners they would send the ones who had

15   open.  Why?  Because we punched the clock.  That is my

16   question.

17   Q.  Is it your testimony that you started leaving earlier once

18   the time clock got put in place?

19   A.  Sometimes yes.

20   Q.  Were you told to leave?

21   A.  Yes.  They sent us, they ordered us, they told us so.

22   Q.  So, you would leave even though there were customers and

23   work to be done?

24   A.  That is why we had a person that was a closer.

25   Q.  I will show you what has been marked for evidence as

ECA5sal2                    Alvarado - cross

1   Plaintiff's Exhibit 13.

2             Do you recognize that document, sir?

3   A.  This document I do not recognize.

4   Q.  Well, it was marked for evidence as your punch report.  I

5   would ask that you review the document, please, and tell me if

6   you think it accurately reflects the times that you punched

7   out.

8             THE COURT:  What exhibit are we referring to?

9             MR. BENSON:  Plaintiff's Exhibit 13.  I can give your

10  Honor a separate copy, if you would like.

11            MR. ANDROPHY:  Is the question whether the witness

12  knows what time he punched out each day in a 16-month period?

13            MR. BENSON:  The question is whether it accurately

14  reflects the times that he punched out.

15            THE WITNESS:  I have one question.  Alvarado, dining,

16  busser?

17            INTERPRETER:  He is showing me something, but maybe he

18  should show it to counsel.

19  BY MR. BENSON:

20  Q.  It is just a generic job description.

21  A.  But busser, I wasn't a busser.

22  Q.  I understand, sir.  I am asking whether this accurately

23  reflect the times you punched out.

24  A.  I am now confused with all of this.

25  Q.  Does this refresh your recollection, sir, that it was very

234

ECA5sal2                        Alvarado - cross

1   rare that you even worked until 10:00?

2   A.  Whether I worked until 10:00?  10:30?  Whether this

3   refreshes my memory?  My memory is fresh.

4   Q.  So, is it still your testimony that you worked until 10:30

5   on a regular basis?

6   A.  A lot, many.  In other words, the larger part of the times.

7   The majority of the times.

8   Q.  Is it your testimony, sir, that the punch-out times on this

9   punch report are inaccurate?

10  A.  Well, sometimes we would punch the time we came in and then

11  we would punch the time we went out, and if the machine was not

12  working when we would punch the time we left, we would hand the

13  ticket over to the manager.  That was an order we received.

14  Q.  But if it wasn't working then you wouldn't be able to

15  punch-out, correct?

16  A.  Yes.  Of course.  Clearly so.

17  Q.  So these are occasions that it does have a time where you

18  punched out.  My question to you, sir:  Do you have any reason

19  to believe that these numbers are not accurate?

20  A.  Correct.  I have some.  I can see some that are all right.

21  When we started to punch the time clock Mr. Andrew would send

22  me -- or before he would give an order to his manager for us to

23  be told to leave --

24          INTERPRETER:  Your Honor, can I, please, respectfully,

25  ask the witness?  Your Honor, he is saying in Spanish

ECA5sal2                    Alvarado - cross

1    Mr. Scotto or his manager would *mandar*, M-A-N-D-A-R.  That can

2    be interpreted in Spanish two ways; either he ordered us or he

3    was sending us, perhaps, somewhere.  So, if I am authorized by

4    your Honor to ask him what he means by *mandar*?

5              (clarifying)

6              INTERPRETER:   *Mandar*, in this time in the context that

7    he was using it, is he would send us home.

8              I apologize, said the witness.

9    BY MR. BENSON:

10   Q.  So, is it your testimony he would send you home before your

11   job was completed?

12   A.  But my job was finished.

13   Q.  Well, if your job was finished you were free to leave the

14   restaurant, correct?

15   A.  We had to ask the managers.

16   Q.  Sir, isn't it true that you rarely, if ever, worked past

17   10:00?

18   A.  Correct.

19   Q.  So, it is also true, sir, that when it says in paragraph 32

20   that when I worked a dinner shift I would usually start work at

21   4:00 and finish around 11:00 or 11:30, that that is not

22   accurate?

23   A.  Well, if that is what you think or believe then it is all

24   right.

25   Q.  I'm asking you, sir.

ECA5sal2                    Alvarado - cross

1   A.  Correct.

2   Q.  Meaning that it is not accurate?

3   A.  If I say correct -- what do you understand by correct?  I

4   am giving you the answer to your question or do you want me to

5   say yes or no?

6          THE COURT:  So, Mr. Alvarado, it is for you to answer

7   the questions, not to ask them.

8          THE WITNESS:  Excuse me.

9   BY MR. BENSON:

10  Q.  Now, Anthony Scotto, Jr. runs the restaurant, does he not?

11  A.  Correct.

12  Q.  He's the boss?

13  A.  Correct.

14  Q.  And he is involved in every facet of the running of the

15  restaurant based on your observations during the many years

16  that you worked there?

17  A.  It could be so.

18  Q.  He hires people, correct?

19  A.  Correct.

20  Q.  He fires people, correct?

21  A.  Correct.

22  Q.  He sets the wages, correct?

23  A.  Correct.

24  Q.  In fact, he is so hands-on that he once took your neck

25  measurement, didn't he?

1    A.  Clearly so.  Of course that happened.

2    Q.  Anthony would also tell you about your compensation,

3    correct?

4           INTERPRETER:  Your Honor, you used the -- the

5    interpreter sometimes wants to be overly precise.

6           Counsel used the word "compensation."  So, instead of

7    saying salary or wages, I said *compensación* in Spanish, which

8    is a word, and he didn't understand it.  And then I said salary

9    or wages and then he got confused.  So, the interpreter

10   apologizes for that.

11   BY MR. BENSON:

12   Q.  It is important, for my perspective, that it be

13   compensation.

14   A.  I do not understand the question.

15   Q.  Do you know what compensation is?

16   A.  For us *compensación*, C-O-M-P-E-N-S-A-C-I-Ó-N, for us,

17   *compensación* is something that you give or extra for something

18   that you have done.

19   Q.  Let me ask it a different way.  Did Mr. Scotto provide you

20   with information concerning how you would be compensated while

21   employed at Fresco?

22   A.  That happened once when we were told that we had to sign

23   the paper where there, in that paper, it described how much was

24   the minimum.

25   Q.  Do you know who Marion Scotto is?

ECA5sal2                    Alvarado - cross

1   A.  Yes.

2   Q.  Marion Scotto is positioned at the host stand in the

3   restaurant, correct?

4   A.  Correct.

5   Q.  And she greets guests?

6   A.  Well, the few times that I was running the food when I was

7   starting, yes.

8   Q.  Now, are you not aware of what role, if any, that Marion

9   Scotto plays in matter of hiring and firing, correct?

10  A.  No.  No.  No.

11  Q.  And you don't know what role she plays in the setting of

12  wages, do you?

13  A.  Well, I would see her signature on the checks.

14  Q.  Other than her signature on a check do you know what, if

15  any, role she played with respect to wages?

16  A.  Well, I would see that she would hire hostesses and she

17  would be in charge of, to draw up the contracts or to make the

18  contracts for the parties.

19          MR. BENSON:  Move to strike as non-responsive, your

20  Honor.  The question pertained to wages.

21          THE COURT:  Sustained.  It is stricken.

22  BY MR. BENSON:

23  Q.  Sir, the question is do you know what role, if any, she

24  plays in the setting of wages?

25  A.  No.  No.  I do not know.

ECA5sal2                      Alvarado - cross

1    Q.  Do you know what role she plays, if any, with respect to

2    the terms and conditions of employment of the bussers, the

3    waiters, the runners, or any of the tipped employees?

4    A.  Perhaps with the busboys or the waiters, because as the

5    runners we were always in the kitchen.

6    Q.  Now, in your declaration at paragraph 50 -- page 8, sir --

7    you talk about an incident involving George Steinbrenner,

8    correct?

9    A.  Correct.

10   Q.  Now you, yourself, did not witness that incident, did you?

11   A.  I was a witness.

12   Q.  Isn't it true that you only know about this because

13   somebody told you?

14   A.  No.  There were several persons.

15   Q.  So, is it your testimony that you didn't learn about this

16   incident from a waiter?

17   A.  Well, when Mr. Steinbrenner gave an envelope to the waiter,

18   when Mrs. Scotto received it the waiter said that it was $1,000

19   which had been given to us --

20   Q.  Sir, my question is just whether you witnessed this

21   yourself or whether you were told this by a waiter.

22   A.  I was a witness.  I was a witness and the waiter told me

23   also.

24   Q.  So, this is something that you have personal knowledge of?

25   A.  Clearly so.  Yes.  Of course.

1   Q.  I direct your attention to page 98 of your deposition, I

2   don't think you have it.  I direct your attention to page 98,

3   specifically line 21:

4   "Q  Again, this is not something that you have personal

5   knowledge of and are just going on what somebody told you,

6   right?"

7   A.  Correct.

8   "A  Well, what someone else said.

9   "Q  And who was the waiter who told you this?

10  "A  I don't remember the waiter's name."

11  A.  That is clearly so.  I do not remember that.

12  Q.  Were you asked those questions and did you give those

13  answers?

14  A.  Yes.

15  Q.  Does that refresh your recollection that this incident was

16  told to you as opposed to something you personally witnessed?

17  A.  I was there present in front of -- I was there present.  I

18  was at the antipasto section there.

19  Q.  You were present that day, correct?

20  A.  Yes.

21  Q.  But you were not present when this situation took place,

22  correct?

23  A.  I do not understand the question.

24  Q.  Were you there when Mr. Steinbrenner supposedly told the

25  waiter that it was for you guys for the service?

1    A.  Yes, because it was near Christmas and he was one -- it was

2    the only time when I saw, during the time that I worked at

3    Fresco, that I saw that an envelope was handed over to a

4    waiter.  Because when Mr. Steinbrenner would arrive to the

5    restaurant and the Yankees had won, had won the championship,

6    he would go to the restaurant and Mr. Anthony would tell us all

7    to go over to welcome him as the champion that he was.

8    Q.  Sir, is it your testimony that you heard him say the

9    words --

10   A.  I -- I heard.

11   Q.  -- that he said:  It is for -- and I put in quotes -- you

12   guys for the service.

13   A.  Yes.  Me, yes.  I heard that.

14   Q.  So you were standing right there when Mr. Steinbrenner gave

15   the waiter the envelope?  Is that your testimony?

16   A.  Yes.

17   Q.  How close were you?

18   A.  Some -- meter and a half.

19   Q.  And you just happened to be walking by when that happened?

20   A.  Because we were sent to bring asparagus, vegetables, for

21   the table when there were no more available in the kitchen and

22   they had none that were cooked, prepared, they would send us

23   over there.

24   Q.  And were you there when you say you saw Marion Scotto take

25   $100 for herself?  Is that your testimony?

ECA5sal2                        Alvarado - cross

1   A.  When she saw the envelope I did not see her.  It was when

2   the waiter told me they gave us $1,000 and the money was

3   divided amongst $100 for the host -- hostess, and $100 for the

4   female hostess, $100 for Mr. Raul, $100 for Mr. -- for the

5   chef, $100 for Mr. Scotto, and there remained $500 and those

6   were divided amongst $300 for the dinner and $200 for the

7   lunch.

8   Q.  So that's the part that you did not witness but learned

9   this from somebody else?

10  A.  From the waiter, male, to whom the envelope was given to.

11  Q.  And you have no personal knowledge as to what, if anything,

12  happened to that money or how much money was in that envelope,

13  correct?

14  A.  Okay, because Mr. Brent told the waiters, the closer

15  waiters that those $300 were -- that Mr. Steinbrenner had given

16  for dinner and $200 were for lunch which is what Mr. Scotto

17  said, that they were to give $300 for the dinner and $200 for

18  the lunch.  That's what Mr. Scotto said.

19  Q.  So you didn't learn that from a waiter?

20  A.  What I had knowledge about was I saw the envelope that he

21  gave to him and when Mrs. Scotto picked it up.

22  Q.  So when you were asked questions at your deposition about

23  this, how come you did not provide those details?

24          MR. ANDROPHY:  Objection.  This mischaracterizes his

25  deposition testimony.

ECA5sal2                    Alvarado - cross

1           THE COURT:  Sustained.

2   Q.  Sir, in paragraph 66 of your declaration -- strike that.

3           Did you ever witness Brent Drill send someone home?

4   A.  Well, I cannot recall exactly.

5   Q.  Thank you.

6           Is it your testimony, Mr. Alvarado, that you had to

7   pay for shirts and the tie at Fresco restaurant?

8   A.  Correct.

9   Q.  And you gave that testimony during your deposition,

10  correct?

11  A.  Correct.

12  Q.  And at your deposition all of the other plaintiffs in this

13  case were present, correct?

14  A.  I do not understand "present."

15  Q.  Were witnesses attending your deposition when it was taken?

16  A.  Some of them.

17  Q.  Many of them?

18  A.  Yes.

19  Q.  Did you ever pay $30 for a shirt at Fresco?

20  A.  Me, personally, as a runner, I always, when we were going

21  to change uniforms, they demanded us that we must have two

22  shirts and one tie.  Me, personally, when I would need a shirt

23  I would ask Mr. Willy for it.  Sometimes Willy would give them

24  to me and I wouldn't pay.  And sometimes he would tell me we do

25  not have any more shirts your size.

ECA5sal2                    Alvarado - cross

Q.  Okay.  So, you admit that willy told you that you didn't

have to pay for the shirts, correct?

A.  No.  No.  No.  No.

        The shirts, when we would change uniforms they would

ask us about the size for each shirt and they would tell us --

they would put our names in the list, the size of the shirt,

and they would tell us that there were two shirts and one tie.

When the shirts would be delivered, Willy would place them in a

package consisting of two shirts and one tie.  He would tie it

with a tape, our name, so then we would take the shirts and we

would go to Natasha who is the person who was in the office and

she is the one that handles all the administrative and

administration of monies.  So then we would pay her the amount

of $50 in cash.

Q.  It was always $50?

A.  Only -- I want to specify.

        When we would change uniforms, in that uniform the two

shirts and a tie were included.  As time went by, shirts

started wearing out so then we would request more shirts.  In

my case -- in my case -- sometimes they did not have my size.

So, I would use the same shirts and when they did have shirts I

would tell Willy:  Hey, Willy.  Do you have shirts my size?

And he would say, Let me look and see.  And sometimes he would

find one and me, to me personally, he would give them to me and

I wouldn't pay.  I want to clarify, for me personally.

1  Q.  So, sometimes you did pay and sometimes you didn't pay.  Is

2  that your testimony?

3  A.  What I am making clear is that each time that we had to

4  exchange -- change uniforms, I paid $50 for two shirts and one

5  tie.

6  Q.  And you paid that in cash to Natasha?

7  A.  Yes, sir.  Sir, yes.

8  Q.  Did you ask her for a receipt?

9  A.  Receipt?  We were not given one.

10 Q.  Did you ever ask for one?

11 A.  I told her and she said that Anthony would tell us that

12 there were the hard checks, those are the checks when there are

13 parties that were given to the waiters when they take orders,

14 they write down the amount of the food that they asked for

15 during the parties and they have a copy -- and it has a copy.

16 And they told us if he wants it, I can make it for the amount

17 in order to fill it up for taxes.  Yes.  So, for when we want

18 them so when we file taxes in January for us to use it as an

19 expense.

20 Q.  I am asking, sir, about receipts for your alleged payment

21 to Natasha of cash for the shirts.

22         Do you understand the question?

23 A.  Yes.  We paid Natasha.

24 Q.  I know.  Did you ever ask for a receipt?

25 A.  Me personally?  No.  Just simply when we would go -- when I

1    went, once, only once, to pick up from -- I do not remember

2    whether it was a waiter male or a busboy and he was -- and they

3    asked for a receipt and she said she didn't have any receipts.

4    They said for this check, to write the amount there.

5    Q.  Now, isn't it true, sir, that at one point you told

6    Mr. Scotto that you needed a new shirt?

7    A.  Yes.

8    Q.  And that was when he measured your neck, correct?

9    A.  Correct.

10   Q.  And then -- let me finish my question, sir.

11           And then he, himself, went to a department store to

12   buy you a shirt?

13   A.  Yes.

14   Q.  And he gave you that shirt, correct?

15   A.  Yes, he gave it to me.

16   Q.  And you didn't pay for that shirt, did you?

17   A.  No.  No, I did not pay.

18           THE COURT:  What do you mean when you said that you

19   changed uniforms?

20           THE WITNESS:  Okay.  To change uniforms is when his

21   sister would come and tell him about the colors of the shirts,

22   the polo shirts.  Then they would draw up a plan or make a plan

23   and they would explain to us and schedule that on certain days

24   the uniforms would change.

25   BY MR. BENSON:

ECA5sal2                    Alvarado - cross

1    Q.   How often did that happen, sir?

2    A.   Sometimes twice during the year, sometimes once.

3    Q.   Do you remember?

4    A.   Not exactly.

5    Q.   And it is your allegation that every time that happened you

6    had to pay Natasha $50, correct?

7    A.   That is correct.

8    Q.   Now, you never paid her $30, correct?

9    A.   That I can recall.

10   Q.   So if the complaint says that you paid $30 for a shirt,

11   that would be incorrect?

12   A.   No, no.  I do not remember.

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.  Now, I draw your attention to paragraph 57 of your

2    declaration.  That is on page 9, sir.

3          You say there, and I quote, "I recall a couple of

4    times when a waiter lost a check."  What do you mean by "a

5    waiter lost a check"?

6    A.  Okay.  The waiters, male, at Fresco, they have a little,

7    small book where, when they would close the checks, they would

8    place them there, so that at the end, when they do the

9    cash-out, everything is in order.  And when I say that they

10   lose or lost, it is that the waiters, certain male waiters,

11   would go and call on the telephone, going when they went to the

12   bathroom, which is on the second floor, they would be coming --

13   they would be walking everywhere with the checks placed inside

14   of.

15          THE COURT:  Placed where?

16          THE WITNESS:  They were would place them inside their

17   vest, in their, in their apron.

18   Q.  Sir, what do you mean?  Do you mean to say that because the

19   waiter lost the check, the customer could not be charged for

20   the meal?

21   A.  No, because the waiter would keep the copy.

22   Q.  I don't understand, sir.

23   A.  Okay.  When the waiter ends -- finishes the service at that

24   table, the customer requests the check.  So then they print it

25   on the computer.  So then the total is printed out of what the

1    customer is going to pay.  So then they place it inside a

2    folder, and they turn it over to the customer to give it to the

3    customer.  So then the customer signs for it.  So then the

4    customer keeps their copy of it, and he leaves another one,

5    which is the one that the waiters keep in order to keep their

6    records.  There is where the amount is specified of how much

7    was spent by the customer and how much he left as a tip.

8         THE COURT:  So are you saying that the waiter would

9    keep that particular sale a secret?

10        THE WITNESS:  What happens is each waiter has its own

11   station with his designated tables.  So then they -- when the

12   customer is leaving and he signs his check --

13        THE INTERPRETER:  Voucher, perhaps would be a better

14   word.

15        THE WITNESS:  -- they keep a folder for those

16   vouchers, checks, and at the end of the shift they check in the

17   computer to make sure that all of those checks match in the

18   computer.  And it is then that the manager would verify with --

19   and check with each waiter the number of the check against the

20   number of the check that they made at each station.

21        THE COURT:  What are you saying, that they sometimes

22   lose a check?

23        THE WITNESS:  Yes, because I saw one waiter, male, who

24   was looking for the -- in the garbage cans because he had lost

25   a check.  And with that check, when it was lost, Mr. Anthony,

Eca2sal3                    Alvarado - Cross

1    he said, I am not going to lose any money.  I am going to take

2    it out from your tips.  So then he withdrew once money from our

3    pool.  That is what I did in my declaration in this part.

4    Q.  Do you understand, sir, that in order for the restaurant to

5    be paid, that they must show American Express a signed check, a

6    signed receipt?

7    A.  But not all pay with a card, credit card.  There are some

8    clients who sometimes pay cash.

9    Q.  So is it your testimony that on the day in question, when

10   the waiter was looking for the receipt and couldn't find the

11   receipt, that that customer paid in cash and that Mr. Scotto

12   still wouldn't pay the tip or wouldn't let the tip be included

13   in the tip pool?

14   A.  In my declaration that I made, it was when I was asked

15   whether I -- because of the time that I had been there, whether

16   I knew of something, the attorneys who interviewed us, if you

17   can look at the example that I gave, it is because they would

18   not allow us to explain the things properly.  We would start to

19   say something and then immediately, immediately we were cut

20   off.

21       That is why this example I gave it, because

22   Mr. Anthony told the waiters, Each check, you are responsible

23   for your work, your job.  Because at that time he became aware

24   that that check that was lost, and he said, Okay, so that you

25   paid more attention to your job, any check that's lost, if the

1   amount is $200, it's going to come out of the tip -- of the

2   house tip pool so that you will pay attention, so you can see

3   how we are working.

4   Q.  Because the restaurant loses the entire amount of the check

5   if you can't produce a signed receipt, correct?

6   A.  Correct.  I am not clear --

7               MR. BENSON:  Thank you.  I have no further questions.

8               THE COURT:  At this time we will take a bathroom

9   break.  We will come back in a few minutes.

10              (Recess)

11              THE COURT:  Remember, sir, that you are still under

12   oath.

13              THE WITNESS:  Yes, your Honor.

14              THE COURT:  So, sir, are you saying that the waiter

15   lost the cash money that was paid by the diner.

16              THE WITNESS:  She lost the check.  I did not see

17   whether it was cash or with a card credit.  All that I saw was

18   that Mr. Anthony withdrew the amount from our tip pool, the

19   house tip pool.  Thank you.

20              THE COURT:  So your cross-examination is over, is that

21   it?

22              MR. BENSON:  Yes, your Honor.

23              THE COURT:  Redirect.

24   REDIRECT EXAMINATION

25   BY MR. ANDROPHY:

Eca2sal3                    Alvarado - Redirect

1    Q.   Good morning, Mr. Alvarado.

2    A.   Good morning.

3    Q.   In your experience at the restaurant, were food runners

4    ever assigned to work as what the restaurant called an

5    expediter?

6    A.   I do not understand the question.

7    Q.   Were food runners ever given the assignment to work as an

8    expediter?

9    A.   Whether we were assigned?

10   Q.   Correct.  Were food runners ever given the assignment for a

11   shift to work as expediters?

12   A.   Yes.

13   Q.   And can you explain what the food runner would do as an

14   expediter?

15   A.   Okay.  A food runner is the one who takes the food out from

16   the kitchen and takes it over to the customer.  And the

17   expediter is the person that is right next to the sous chef or

18   the chef, and he is in charge of to check the food dishes and

19   to place the dishes in the corresponding manner with --

20   according to the positions which are specified according to the

21   number assigned to the table, and then he sends the runners

22   over there with the food.

23   Q.   I believe you testified that sometimes the expediter runs

24   food himself.  Would that happen on every shift?

25   A.   Sometimes when it was busy.

Eca2sal3                    Alvarado - Redirect

1   Q.  Were there some shifts when that did not happen?

2   A.  Excuse me?

3          MR. BENSON:  Asked and answered, your Honor.

4          THE COURT:  Overruled.

5   BY MR. ANDROPHY:

6   Q.  Were there some shifts when the expediter did not run the

7   food?

8          THE INTERPRETER:  Did not?

9          MR. ANDROPHY:  Run food.

10  A.  Yes, exactly.  The expediter was in charge of remaining in

11  the kitchen.

12  Q.  Now, on shifts where the expediter did run food, what

13  percentage of his time working on the shift would he spend

14  running food?

15  A.  Approximately between 5 to 10 percent.

16  Q.  So would he be in the kitchen the rest of the shift?

17  A.  Yes, sir.

18  Q.  You testified earlier today about the coffee maker helping

19  the runners.  Do you recall that?

20  A.  When just the coffee maker was working only, yes.

21  Q.  And would it happen on every shift that the coffee maker

22  would help the runners?

23  A.  Yes.

24  Q.  If there was a coffee helper and a coffee maker on a shift,

25  would the coffee maker help run food?

Eca2sal3                    Alvarado - Redirect

```
 1    A.  A few times.

 2    Q.  Would he usually help run food?

 3    A.  When the coffee maker was there and there were no people,

 4    yes.  And when the helper was there, the helper would be more

 5    active.

 6    Q.  When Fresco began having you and the other food runners

 7    clock in and clock out, were there any changes to the time that

 8    you would usually leave?

 9    A.  Correct.

10    Q.  What changes were those?

11    A.  The changes were that they were sending us home earlier a

12    little bit, so . . .

13    Q.  And that is around June 2011 when they began using the time

14    clock?

15    A.  Correct.

16    Q.  Did you ever see Marion Scotto interview any employees?  I

17    am not asking only busboys, but any employees.

18    A.  The hostesses.

19              MR. ANDROPHY:  Thank you.  I have no more questions.

20              THE COURT:  Any recross?

21              MR. BENSON:  Yes, just briefly, your Honor.

22    RECROSS EXAMINATION

23    BY MR. BENSON:

24    Q.  When I questioned you on cross-examination, sir, you

25    testified that even after the time clock was put in, you still
```

Eca2sal3                    Alvarado - Cross

1     worked until the completion of your assignment.  Is that

2     accurate?

3     A.  Sometimes they would send us back home earlier.

4     Q.  So it is your testimony that you were sent home while there

5     was still work for you to do, or was the restaurant not crowded

6     and therefore the late runner could handle it?

7     A.  That was what I answered, that it is correct.  If we were

8     three runners with a closer, they would say, when we asked,

9     which person wanted to go back home, and they would say send

10    one of the runners back home, so then the closer would remain

11    and the other person would help him a bit more.

12    Q.  There was a late runner before the time clock was put in

13    place, correct?

14    A.  Yes, correct.

15    Q.  And that same practice existed before the time clock went

16    in, correct?  And the same practice of sending the earlier

17    runners home earlier always existed.

18    A.  Well, with regard to me, I would work all the dinners.

19    While I would --

20    Q.  But when there was a late runner prior to 2011 and you were

21    not that late runner, you left earlier, correct?

22    A.  Sometimes.

23              MR. BENSON:  No further questions.

24              THE COURT:  Thank you, sir.  You may step down.

25              THE WITNESS:  Thank you, your Honor.

1          (Witness excused)

2               THE COURT:  You can call your next witness.

3               MR. ANDROPHY:  Plaintiffs call Valentin

4     Xochipiltecatl.

5      VALENTIN XOCHIPILTEACATL,

6          called as a witness by the plaintiffs

7          having been duly sworn, testified as follows:

8               MR. ANDROPHY:  May I provide the witness with his

9     declaration?

10              THE COURT:  Yes.

11    DIRECT EXAMINATION

12    BY MR. ANDROPHY:

13    Q.  Do you recognize the document I just placed in FRONT of

14    you?

15    A.  Yes.

16    Q.  And is this the declaration that you signed to serve as

17    your direct testimony in this action?

18    A.  Yes.

19    Q.  And is your signature on the last page?

20    A.  Yes.

21              MR. ANDROPHY:  We ask that this be admitted as

22    Plaintiff's Exhibit 107.

23              THE COURT:  Any objection?

24              MS. KABIR:  No objection.

25              THE COURT:  It is admitted.

1            (Plaintiff's Exhibit 107 received in evidence)

2            MR. ANDROPHY:  We have no more direct examination.

3            THE COURT:  Cross-examination.

4    CROSS EXAMINATION

5    BY MS. KABIR:

6    Q.  Good morning, Mr. Xochipiltecatl.

7    A.  Good morning.

8    Q.  You worked at Fresco until November 2010, isn't that right?

9    A.  Yes.

10   Q.  And you haven't worked at Fresco since November 2010,

11   correct?

12   A.  Yes.

13   Q.  Since you left Fresco, have you worked at another

14   restaurant?

15   A.  Yes.

16   Q.  Are you currently working at another restaurant?

17   A.  Yes.

18   Q.  Which one?

19           MR. ANDROPHY:  Objection as to relevance.

20           THE COURT:  Overruled.  You may answer.

21   A.  I am now working at Scarpetta Restaurant.

22   Q.  What is your position at Scarpetta Restaurant?

23   A.  I am a busboy.

24   Q.  And were you working at a restaurant in addition to Fresco

25   when you were working at Fresco?

Eca2sal3                    Xochipiltecatl - Cross

1    A.   Whether I worked before?  Yes, at a restaurant that's

2    called Papillon.

3    Q.   So when you worked at Fresco from June 2009 to November

4    2010, were you also working shifts at Papillon Bistro?

5    A.   Yes.

6    Q.   You testified that while you were working at Fresco, you

7    worked typically five shifts per week, correct?

8    A.   Yes.

9    Q.   You never worked more than five shifts per week at Fresco,

10   did you?

11   A.   No.

12   Q.   You testified that when you worked up to five shifts per

13   week, you estimated that you worked as many as 27 hours for

14   those five shifts, correct?

15   A.   Yes.

16           MR. ANDROPHY:  Objection.  I think that is

17   mischaracterizing his testimony.

18           MS. KABIR:  I apologize.  I can direct the witness to

19   his declaration.

20   Q.   Please turn to page 6, paragraph 35.  Paragraph 35 says,

21   "However, Fresco often or always undercounted the number of

22   hours we actually worked.  For example, although I often worked

23   between five shifts" --

24           THE INTERPRETER:  The interpreter can't keep with

25   counsel when she is reading so fast.

1          MS. KABIR:  My apologies.

2  Q.  The second sentence says, "For example, although I often

3  worked between five shifts in a week, and therefore worked as

4  many as 27 hours in a week, I was only paid for approximately

5  20 hours in the week."

6  A.  Yes.

7  Q.  So the second sentence that says, "Although I often worked

8  between five shifts per week," would it be correct to say that

9  it should read, "Although I often worked up to five shifts per

10 week"?

11 A.  I do not understand your question.

12 Q.  Is it your testimony that you worked a maximum of five

13 shifts per week?

14         THE INTERPRETER:  Your Honor, would somebody please

15 instruct the witness not reply while still I am doing

16 simultaneous to what counsel is asking?

17         THE COURT:  Sir, so wait until the interpreter is

18 finished speaking.

19         THE WITNESS:  All right.

20 Q.  Is it your testimony that you worked a maximum of five

21 shifts per week?

22 A.  Yes.

23 Q.  When you worked at Fresco, there was no electronic time

24 clock used at the restaurant, isn't that right?

25 A.  That is correct, yes.

Eca2sal3                    Xochipiltecatl - Cross

1    Q.  So in your -- in paragraph 35 of your declaration, where

2    you testified, "Although I often worked" --

3    A.  Yes.

4    Q.  -- "between four and five shifts per week and therefore

5    worked as many as 27 hours per week" --

6    A.  Yes, it is.

7    Q.  -- that is an estimate based on your recollection, correct,

8    the 27 hours?

9    A.  Yes.

10   Q.  Did you keep any records yourself estimating how many hours

11   you worked while you were working at Fresco?

12   A.  Well, well, records I never had, but an example, me,

13   Mondays I would come in at 10, 10:00 in the morning and that

14   was lunch, and I would leave at about 3 and I would return at 4

15   and I would finish at 10, 10:15, 10:30.

16              MS. KABIR:  Move to strike as nonresponsive.

17              THE COURT:  Sustained.  Start again.

18   BY MS. KABIR:

19   Q.  This number is based on your memory, correct?

20   A.  Yes.

21   Q.  It is not based on any documents that you kept of your time

22   there, correct?

23   A.  Correct.

24   Q.  Is it accurate to state that you are not claiming that you

25   worked more than 40 hours per week at Fresco when you worked

Eca2sal3                    Xochipiltecatl - Cross

1   there?

2   A.  No.

3   Q.  Are you claiming that you worked any more than 27 hours in

4   a week at Fresco?

5   A.  Yes.

6   Q.  When you worked at Fresco, you worked as a busser and a

7   stocker, is that right?

8   A.  Yes.

9   Q.  And you testified that you worked approximately once a week

10  as a stocker, is that correct?

11  A.  Yes.

12  Q.  And when you worked at Fresco, there was a schedule posted

13  for all the shifts the following week at the front of the

14  restaurant, correct?

15          THE INTERPRETER:  He said "yes" before.  "Yes" again.

16  Q.  Did this schedule indicate whether or not you would be

17  working as a busser or stocker?

18  A.  Yes.

19  Q.  And did this schedule also indicate whether you would be

20  scheduled to work as a late busser?

21  A.  Yes.

22  Q.  And if you were scheduled to work as a late busser during

23  lunch shifts, that means you shift would start at 11 a.m.,

24  correct?

25  A.  No, at that time there wasn't any -- that didn't happen,

Eca2sal3                    Xochipiltecatl - Cross

 1   about the -- about the closer, there wasn't -- there wasn't a

 2   closer, a busboy closer.  We all came in at the same time.

 3          MS. KABIR:  I would like to show the witness the

 4   binder containing Defendant's Exhibit A.  If the witness could

 5   please turn to page A28 in the right-hand corner of the page.

 6   Q.  If you look under the busser section of this schedule,

 7   there is a name listed as Valentin.

 8   A.  Yes.

 9   Q.  Does this refresh your recollection of a schedule from your

10   time at Fresco?

11   A.  Yes.

12   Q.  Next to your name for this week, for the Wednesday dinner

13   shift, it says "D close," correct?

14   A.  Yes.

15   Q.  And at the bottom of the schedule it says, next to "call

16   times," "dinner equals 4 p.m. (late 5:00)."

17          Does this refresh your recollection as to whether or

18   not there was a closing or a late busser schedule during your

19   employment at Fresco?

20   A.  During the dinner, yes.  But one example, as I worked --

21   Q.  There is no question pending.

22          THE COURT:  Sustained.  Just wait for a question.

23          THE INTERPRETER:  I am also trying -- he tends to

24   address the answer to me, so I am -- whatever.

25          MS. KABIR:  If the witness could please turn to the

Eca2sal3                    Xochipiltecatl - Cross

1    page stamped in the right-hand corner A30.  Withdrawn.

2              Is it your testimony that you worked until -- sorry,

3    withdrawn.

4    Q.  Isn't it true that you worked as a closing busser at

5    Fresco?

6    A.  Some shifts.

7    Q.  And is it true on some shifts you were not assigned to be

8    the closing busser, correct?

9    A.  I do not understand your question.

10   Q.  Isn't it true that some shifts you were not scheduled as a

11   late busser, correct, so your shift times started at 10 a.m.?

12             THE INTERPRETER:  I could not hear his answer, so I

13   didn't say anything in English, and there was no answer.

14             THE WITNESS:  Correct.

15             THE INTERPRETER:  Thank you.

16   Q.  So when you were scheduled to be a busser during the lunch

17   shift, you would start at 10 a.m., correct?

18   A.  Yes.

19   Q.  And only if you were scheduled to be the closing busser

20   would your shift start at 11 a.m. for lunch, correct?

21   A.  No.

22   Q.  Is it your testimony that your shift started at 11 a.m.?

23   A.  No, I started at 10.

24   Q.  Is it your testimony that you started at 10 a.m. even

25   though you were scheduled to be the late busser?

Eca2sal3                    Xochipiltecatl - Cross

1   A.  Me, I was never -- to open -- to open -- it was always --

2   to open at lunch.  I would open lunch.  Because I worked

3   double.

4   Q.  On occasion you were scheduled to be the closing busser

5   during dinner, correct?

6   A.  Yes.

7   Q.  And when you were scheduled to be the closing busser during

8   dinner, your start time for your dinner shift would be at 5

9   p.m., correct?

10  A.  Correct.

11  Q.  Otherwise if you were scheduled to be a busser during

12  dinner, your start time would be scheduled for 4 p.m., correct?

13  A.  Yes.

14  Q.  With all the other opening bussers.

15  A.  Yes.

16  Q.  When you were working as the closing busser, you had to

17  stay until the dinner shift was -- withdrawn.

18          When you were scheduled to work as a closing busser,

19  you had to stay until the last customer left the dining room,

20  correct?

21  A.  Correct.

22          (Continued on next page)

23

24

25

1    BY MS. KABIR:

2    Q.   And there was also a closing waiter or two closing waiters,

3    correct?

4    A.   Yes.  Correct.

5    Q.   And usually one closing runner as well, correct?

6    A.   Correct.

7    Q.   The opening bussers were permitted to leave once their

8    sections cleared out and there were no longer patrons seated in

9    their assigned sections, isn't that right?

10   A.   Correct.

11   Q.   So, when you were scheduled to work as an opening busser,

12   the end of your shifts varied depending on when the customers

13   left; isn't that right?

14   A.   Yes.  Correct.

15   Q.   If you could turn to page 2 of your declaration, paragraph

16   11?

17   A.   Okay.

18   Q.   You testified that:  I worked approximately once a week as

19   a stocker.

20   A.   Yes.  Correct.

21   Q.   And you also testified that sometimes, if the restaurant

22   was busy there would be another busser assigned to the stocker

23   position as well, correct?

24   A.   A helper?  Something like that?

25   Q.   If you could turn to page 3 of your declaration and look at

ECA5sal4                    Xochipiltecatl - cross

1   paragraph 12?  You testified:  On some shifts when the

2   restaurant is very busy, Fresco would assign two people to work

3   as stockers.

4   A.   Correct.

5   Q.   When you were assigned to work as a stocker, was there ever

6   another busser assigned to work as a second stocker during your

7   shift?

8   A.   Yes.

9   Q.   And when you were both assigned to work as a stocker --

10  A.   Yes.

11  Q.    -- did you help the coffee person run coffee to the dining

12  room?

13  A.   No.

14  Q.   Did you assist the runners running Fresco breads or

15  appetizers to patrons in the dining room when you worked as a

16  stocker?

17  A.   No.

18  Q.   Did you assist the busboys in resetting and clearing tables

19  when you worked as a stocker?

20  A.   No.

21  Q.   So, is it your testimony that when you were working as a

22  stocker, even if there was another stocker assigned that shift,

23  all you did was stocker duties, correct?

24  A.   Yes.

25  Q.   Would the other stocker assist you in performing your

ECA5sal4                    Xochipiltecatl - cross

1   duties?

2   A.  Yes.

3   Q.  Did that individual assigned to the second stocker role

4   help any of the other bussers perform their duties?

5   A.  Yes.

6   Q.  So, is it your testimony that the second stocker actually

7   helped other positions as well?

8   A.  Yes.  A little bit.

9   Q.  Do you recall approximately how many shifts you worked as a

10  stocker where there was a second stocker on duty?

11  A.  Well, it was on rare times because I only worked one shift.

12  Q.  So not every week?

13  A.  No.

14  Q.  Only when the restaurant was very busy, correct?

15  A.  Correct.

16  Q.  And the restaurant is busiest usually during November and

17  December, correct?

18  A.  Yes.

19  Q.  Do you recall working with a second stocker any time other

20  than November or December?

21  A.  Can you repeat the question?

22  Q.  Do you recall working as a stocker on a shift where the

23  restaurant assigned the second busser to be his a stocker as

24  well, outside of the November to December busy period?

25  A.  That I can recall, no.

ECA5sal4                    Xochipiltecatl - cross

1    Q.  You also testified that sometimes when you worked as a

2    stocker you had to do the job of a dishwasher, correct?

3    A.  Correct.

4    Q.  Can you recall how many times you were required to do that

5    job of a dishwasher when you were assigned to be the stocker?

6    A.  Every day that I worked as a stocker, me -- me, I would

7    wash dishes.

8    Q.  If you can look to page 3 of your declaration, paragraph

9    16?

10   A.  What page?  Excuse me?

11   Q.  Page 3, paragraph 16.

12   A.  Okay.

13   Q.  Additionally, sometimes, when I worked as a stocker, I was

14   required to do the job of a dishwasher.

15          Is it your testimony that you sometimes had to do the

16   job of a dishwasher when you were a stocker?

17   A.  Yes.

18          THE COURT:  What percentage of the time did you have

19   to be a dishwasher?

20          THE WITNESS:  It was, I would think, about 15 percent

21   to be a dish washer.  An example:  The times that the guy that

22   would do the dish washing would arrive late so then I don't

23   know, so then all of the dishes that would be used for the

24   whole dining room, the chef or the sous chef would tell us that

25   we had to wash them because everything had to be clean when the

ECA5sal4                    Xochipiltecatl - cross

1    dishwasher would arrive, that would have to be clean.

2    BY MS. KABIR:

3    Q.   Is it your testimony that when the dishwasher arrived you

4    would go back to working as a stocker for the remainder of your

5    shift?

6    A.   Yes.

7    Q.   What time did the dishwasher arrive?

8    A.   It wasn't much, I would think 30 to 40 minutes that it was

9    my turn for me to take the dishes, to do the dishes that were

10   dirty inside the machine.

11   Q.   So, for example, on a dinner shift, if you were working as

12   a dishwasher, what time would you start doing that job?

13   A.   Surely I was not a dishwasher.  I would start, I would come

14   in -- I would go and use the machine because it was full of

15   dishes because there was a part there that was full of dishes.

16   So, then the chef would tell me for me to take care of them

17   because, otherwise, they would fall off because things were

18   going to fall, if not.

19   Q.   What time during your dinner shift did this occur?

20   A.   It was after we had finished eating the dinner.  In other

21   words it was about 4:30, 5:00.  I don't know 5:00.  5:00.  All

22   the time there was -- it was to 5:00.

23   Q.   So, after the family meal ended at 5:00 p.m. --

24   A.   Yes.

25   Q.   -- is it your testimony you spent until 5:30 or 5:40

ECA5sal4                    Xochipiltecatl - cross

1   washing dishes?

2   A.   Somewhere around there.  I cannot remember very well.

3   Q.   And the restaurant opens for dinner to customers at 5:30,

4   correct?

5   A.   Yes.

6   Q.   And you only did this sometimes when you were assigned to

7   the stocker role, correct?

8   A.   Yes, when I was stocker.

9   Q.   You testified that it was approximately 13 percent of the

10  shifts that you worked as a stocker?

11  A.   Can you repeat the question?

12  Q.   Is it your testimony that out of all the shifts that you

13  were assigned to work as a stocker, you only had to wash dishes

14  15 percent of the time?

15  A.   Well, yes, that can be so.  Yes.

16  Q.   If you can look to paragraph 16 on page 3 of your

17  declaration?  The last sentence says:  Sometimes another

18  stocker would also have to wash dishes with me.

19  A.   Yes.

20  Q.   You previously testified that the restaurant would only

21  assign a second busser to the stocker role when the restaurant

22  was very busy, correct?

23  A.   That is correct.  That's when there were two of us so then

24  the two of us would do the job.

25  Q.   So, is it your testimony that when the restaurant was very

 1   busy both stockers had to wash dishes?

 2           INTERPRETER:  He was talking.

 3   Q.  Is it your testimony that when the restaurant was very busy

 4   and there were two stockers, both stockers had to wash dishes?

 5   A.  It was either one or the two of us.  Eh, the two of us.

 6   Q.  Was it one or was it two?

 7   A.  I cannot remember well.  If it wasn't him, it was me, in

 8   other words.

 9   Q.  So, is the last sentence of paragraph 16 incorrect:

10   Sometimes another stocker would also have to wash dishes with

11   me.

12   A.  If it wasn't him, it was me.

13   Q.  So, is it your testimony only one of you had to do this,

14   washing dishes?

15   A.  Well, yes.  Correct.

16   Q.  So paragraph 16 is incorrect?

17   A.  Well, on one part, yes.  In other words, the last part, the

18   last paragraph, 4.

19   Q.  Is it your testimony that the dishwasher returned at 5:30

20   during dinner shifts?

21   A.  Approximately.

22   Q.  If you could turn to page 1 of your declaration, paragraph

23   4?  You testified, quote, I found my job at Fresco because a

24   friend of mine used to work at Fresco and he recommended that I

25   come and apply for a job.

ECA5sal4                          Xochipiltecatl - cross

1    A.  Correct.

2    Q.  Was your friend a busser at Fresco?

3    A.  Yes.

4    Q.  What was the name of your friend?

5    A.  His name is Antonio.

6    Q.  And when you discussed the job at Fresco with Antonio, did

7    you discuss the tip pool with him?

8    A.  No.

9    Q.  If you could turn to page 8 of your declaration and look at

10   paragraph 51?  You testified:  As I said above, when I came to

11   Fresco looking for a job and asked to meet with a manager to

12   apply for a job I met with Brent Drill.

13   A.  Correct.

14   Q.  Do you recall whether you met with Mr. Drill during a lunch

15   shift or a dinner shift?

16   A.  Yes.  It was between lunch and dinner.

17   Q.  And when you met with Mr. Drill, did you give him a resume?

18   A.  No.

19   Q.  Do you recall if Mr. Scotto was in the restaurant at the

20   time?

21   A.  No.  He was not there.

22   Q.  Do you remember that he was not there?

23   A.  Yes.

24   Q.  The second sentence of paragraph 51 says:  Mr. Drill did

25   not leave and go to speak to anyone else during my interview?

1   A.  Yes.

2   Q.  By interview are you referring to your meeting with Brent

3   Drill the afternoon you came in to apply for the job?

4   A.  Yes.

5   Q.  The next sentence in paragraph 51 you testify:  Brent Drill

6   told me to come back the next day and begin training as a

7   busser.  I did not meet with Anthony Scotto at all when I was

8   hired, only Brent Drill.

9   A.  Correct.

10  Q.  Is it your testimony that when you were asked to come back

11  to train you were hired by the restaurant?

12  A.  I trained two days first and then after the two days they

13  told me that the job was mine.

14  Q.  And do you recall if Mr. Scotto observed you while you were

15  training?

16  A.  I do not remember, honestly.

17  Q.  And the purpose of the training is to see if you could

18  perform the busser job at Fresco, correct?

19  A.  Correct.

20  Q.  And if you are unable to do the job during your training

21  period, then you would not be hired by the restaurant; isn't

22  that right?

23  A.  I would think so.  Yes.

24  Q.  So, is it still your testimony that Brent Drill hired you

25  when he asked you to come back to train?

ECA5sal4                    Xochipiltecatl – cross

```
 1   A.  Yes.

 2   Q.  Do you know who made the decision to hire you?

 3   A.  I do not know but the person -- the person that told me

 4   when I was there that the job was mine, it was Brent.

 5   Q.  So, Mr. Drill communicated the job offer to you, correct?

 6   A.  Correct.

 7            THE COURT:  Were you paid while you were training?

 8            THE WITNESS:  No.

 9   BY MS. KABIR:

10   Q.  Is it your testimony that you were not paid any wages

11   during your training period?

12   A.  No.  No, no.

13   Q.  Are you not sure whether you were paid wages during your

14   training period?

15   A.  Yes, I am certain that they did not.

16   Q.  Isn't it true that you did not receive tips from the tip

17   pool during your training period?

18   A.  No.  I did not receive them.

19   Q.  But you did receive wages in your paycheck for the full

20   minimum wage for the shifts you trained as a busser, correct?

21   A.  That I can recall?  No.

22   Q.  Did you ever look at your paycheck to see if you were paid

23   for your training shifts that week?

24   A.  I was not given a check for training.

25   Q.  Were you given a check during your first week worked at the
```

ECA5sal4                    Xochipiltecatl - cross

1    restaurant?

2    A.  No.

3    Q.  Is it your testimony that you were not paid for the entire

4    first week you worked at Fresco?

5    A.  No.

6    Q.  It is not your testimony that you -- did you or did you not

7    receive a paycheck the first week you worked at Fresco?

8    A.  No.  No, I did not receive it.

9    Q.  Isn't it true that the paychecks are distributed every

10   Friday during lunch and dinner shifts at the restaurant?

11   A.  Yes.

12   Q.  And if you don't pick up your paycheck on Friday you can

13   pick it up from the bookkeeper in the office of the restaurant

14   any time after that, correct?

15   A.  Correct.

16   Q.  And if you don't pick up your paycheck for more than one

17   week in a row, isn't it true that the bookkeeper keeps all of

18   the paychecks?

19   A.  Correct.

20   Q.  So, is it possible that you forgot to pick up your paycheck

21   for that first week?

22        THE COURT:  Sustained.  Don't ask him a hypothetical

23   question.

24   BY MS. KABIR:

25   Q.  Do you recall getting a paycheck for your first week at

1    Fresco?

2    A.  For when I worked, really worked?  Yes.  But for the

3    training?  No.

4    Q.  Do you recall whether you were paid for your training

5    shifts in your first regular work paycheck from Fresco?

6    A.  I can recall and there were only 20 hours the ones that I

7    worked, for every week that I worked for three days, five

8    shifts.

9    Q.  Do you recall checking to see whether on your first

10   paycheck your training shifts were also included in that check?

11   A.  Yes.  Yes, I did check it and received it but the training

12   was not there.

13          MS. KABIR:  We have no further questions for this

14   witness.

15          THE COURT:  Redirect?

16          MR. ANDROPHY:  No redirect for this witness.

17          THE COURT:  Thank you, sir.  You may step down.

18          THE WITNESS:  (In English)  Thanks so much.

19          THE WITNESS:  Thank you, your Honor.  Thank you very

20   much.

21          (Witness steps down)

22          THE COURT:  Please call your next witness.

23          MR. CLARK:  Your Honor, plaintiffs call Mr. Pablo

24   Francisco Lopez to the stand.

25    PABLO FRANCISCO LOPEZ,

ECA5sal4                    Xochipiltecatl - cross

1          called as a witness by the Plaintiffs,

2          having been duly sworn, testified through the interpreter,

3          as follows:

4              THE DEPUTY CLERK:  Please state your full name and

5     spell it slowly for the record.

6              THE WITNESS:  Pablo Francisco Lopez.  P-L-O --

7     P-A-B-L-O, F-R-A-N-C-I-S-O, L-O-P-E-Z.

8     DIRECT EXAMINATION

9     BY MR. CLARK:

10    Q.  Good afternoon, Mr. Francisco Lopez.

11    A.  Good afternoon.

12             MR. CLARK:  May I approach the witness in order to

13    give him his declaration?

14             THE COURT:  You may.

15    Q.  Do you recognize the document that I just handed you?

16    A.  Correct.

17    Q.  And is this the declaration that you intend to use as your

18    direct testimony in this action?

19    A.  Yes.

20    Q.  Now, can you please turn to the last page?  Is this your

21    signature here on the last page?

22    A.  That is correct.

23             MR. CLARK:  At this point, your Honor, I would like to

24    admit this as Plaintiff's Exhibit 108.

25             THE COURT:  I didn't hear what you said.

ECA5sal4                    Francisco Lopez – direct

1          MR. CLARK:  We move to admit this into evidence as

2     Plaintiff's Exhibit 108.

3          THE COURT:  Any objection?

4          MS. KABIR:  No objection.

5          THE COURT:  It is admitted.

6          (Plaintiff's Exhibit 108 received in evidence)

7          MR. CLARK:  We would also seek to correspondingly

8     admit Plaintiff's Exhibits 45, 46 and 47, all of which are

9     identified in the declaration.

10         THE COURT:  Any objection?

11         MS. KABIR:  Just a second?  (pause)  No objection.

12         THE COURT:  They're admitted.

13         (Plaintiff's Exhibits 45, 46 and 47 received in

14    evidence)

15         MR. CLARK:  With those exhibits admitted we have no

16    further direct for this witness.

17         THE COURT:  Cross-examination.

18    CROSS EXAMINATION

19    BY MS. KABIR:

20    Q.  Is it Mr. Francisco or Mr. Lopez?

21    A.  Francisco is my first last name.

22    Q.  Do you prefer that I call you Mr. Francisco then?

23    A.  Yes.

24    Q.  Mr. Francisco, you worked at Fresco for approximately four

25    years or so; is that right?

1    A.   Four years and two and a half months.

2    Q.   You were primarily a busser at Fresco, correct?

3    A.   That is correct.

4    Q.   And you were also assigned to work as a stocker, a barback,

5    and also the coffee preparer; correct?

6    A.   Correct.

7    Q.   Approximately how many shifts would you be assigned to work

8    as a stocker?

9    A.   As a stocker, at some times during the week it was three

10   times, and there were some weeks when it was two times.

11   Q.   Is that true for the entire time you worked at Fresco?

12   A.   Yes.

13   Q.   So, sometimes you would work once a week and other times

14   you would work twice a week as a stocker, correct?

15   A.   More than three times.  More than two times and two, three

16   times.

17   Q.   More than two times -- two to three times a week every week

18   you were assigned to work as a stocker?

19   A.   Yes.

20   Q.   And you also testified that on some shifts there was more

21   than one busser assigned to the stocker role, correct?

22   A.   Yes.  That is correct.

23   Q.   Approximately how often did this occur?

24   A.   Largely mainly when the restaurant was very busy.

25   Q.   And would that be when there was more than 200 reservations

ECA5sal4                          Francisco Lopez – cross

1   expected in the restaurant?

2   A.   Approximately.  Between 150 to 200.

3   Q.   And when you worked as a stocker was there a second stocker

4   assigned on some of your shifts?

5   A.   Excuse me.  Repeat the question?

6   Q.   When you worked as a stocker, how often was a second

7   stocker assigned to work with you during your shift?

8   A.   The days that were very busy.

9           THE COURT:  So, what percentage of the time was that?

10          THE WITNESS:  It would depend from the days that were

11  very busy during the winter, approximately 5 percent, 10

12  percent.

13  BY MS. KABIR:

14  Q.   So, is it your testimony that if you worked two to three

15  shifts a week as a stocker there was a second stocker 5 to 10

16  percent of those shifts?

17  A.   Can you repeat the question?

18  Q.   Is it your testimony that there was only a second stocker 5

19  to 10 percent of the time that you were assigned to the stocker

20  role?

21  A.   Yes.

22  Q.   And on those occasions did the second busser assigned to

23  the stocker role also assist the coffee preparer and the

24  runners and other bussers?

25  A.   Sometimes.

ECA5sal4                    Francisco Lopez - cross

1   Q.  Is it your testimony that the second stocker assisted you

2   performing the stocker duties?

3   A.  Yes.

4   Q.  If you could look at page 3 of your declaration, paragraph

5   18; you testified:  Additionally, on a few occasions when I

6   worked as a stocker, I was required to do the job of a

7   dishwasher.

8           Is that correct?

9   A.  Yes.  That is correct.

10  Q.  When you testified that this happened only on a few

11  occasions --

12  A.  It's correct.

13  Q.  -- can you estimate approximately how many times that

14  occurred?

15  A.  The time that I was working as a busboy -- ooh, excuse me,

16  stocker.

17  Q.  Are you testifying that it happened every time you worked

18  as a stocker?

19  A.  After -- after a year that I have been in there, yes?

20  Q.  So, the first sentence in paragraph 18 that reads:

21  Additionally, on a few occasions when I worked as a stocker, I

22  was required to do the job of a dishwasher; is that incorrect?

23  A.  Yes.  I was asked, yes, to work as a dishwasher.

24  Q.  And it is your testimony that after your first year at

25  Fresco you were asked to work as a dishwasher on every shift

1   that you worked as a stocker, correct?

2   A.  Yes.  He said before.

3   Q.  So you were asked to work as a dishwasher during lunch

4   shifts and dinner shifts?

5   A.  Yes.

6   Q.  And that would be regardless of the time of year, correct?

7   A.  It was any -- at any time.  It could be during the summer,

8   it was during the winter.

9   Q.  The next sentence in paragraph 18 of your declaration

10  reads:  Towards the end of the lunch shift in the afternoon, on

11  some days, the dishwasher would be sent home early and I would

12  be required to wash dishes instead.

13          Is it your testimony that the dishwasher was sent home

14  early every day that you worked as a stocker or only certain

15  days?

16  A.  No, no, no.  Not on Sundays.

17          INTERPRETER:  Did you say Sundays or some days?

18  Q.  Some days.  Some days.

19          INTERPRETER:  The interpreter made a mistake.  I heard

20  some days as Sundays.

21  A.  Some days.

22  Q.  So, is it your testimony that you were asked to wash dishes

23  when the dishwasher was not sent home early?

24  A.  Yes.

25  Q.  So, on some days there would be a dishwasher in the

1    restaurant and you were still requested to wash dishes?

2    A.   Yes.

3    Q.   Did you wash those dishes side by side with the dishwasher

4    on those shifts?

5    A.   I want to underscore something.  The chef would send the

6    dishwasher to peel potatoes for at least half an hour during

7    the morning shift.

8    Q.   And was this before the customers came into the restaurant

9    at 11:30 a.m.?

10   A.   Correct.

11   Q.   So there had been no dishes from the lunch service that you

12   were required to wash dishes for during lunch and you say you

13   were assigned to work as a dishwasher before the lunch service

14   started.  Is that your testimony?

15            INTERPRETER:  Could you repeat, please, counsel?

16   Q.   Is it your testimony that during lunch shifts you were

17   asked to wash dishes before any customers had been served lunch

18   in the restaurant?

19   A.   Not exactly.  It wasn't at that moment but it was after.

20   It was after 11:30 because at that moment we did not have a lot

21   of work to do as a stocker.

22   Q.   So that was at 11:30 a.m. that you were asked to wash

23   dishes?

24   A.   Yes, and at some times during the afternoon.

25   Q.   So, at 11:30 a.m. the restaurant opens for customers for

ECA5sal4                     Francisco Lopez - cross

1    lunch, correct?

2    A.  Yes.

3    Q.  And it is your testimony that as a stocker you had no job

4    duties to perform once the dining room was open?

5    A.  No.  It was too much at the beginning, the shift -- the

6    lunch shift.

7    Q.  You previously testified that you were asked to wash dishes

8    at 11:30 when the sous chef assigned the dishwasher to peel

9    potatoes; isn't that right?

10   A.  Yes.

11   Q.  So, is it your testimony that you had no stocker duties to

12   perform at that time so that is why you were washing dishes,

13   correct?

14   A.  Yes.  Yes, because I tried to do my job as quickly as I

15   possibly could.

16   Q.  And how long would you wash dishes for at 11:30 during

17   luncheon?

18   A.  I explained to you, it was about half an hour.

19   Q.  So, from 11:30 to 12:00 you were not performing stocker

20   duties, you were washing dishes, correct?

21   A.  That is correct.

22   Q.  And you were washing dishes in the dish washing station,

23   correct, in the kitchen?

24   A.  It is correct.

25             INTERPRETER:  It is correct, he said.

1    Q.  And you were dressed in your busser clothing, correct,

2    while you were washing dishes?

3    A.  That is correct.

4    Q.  And how often would this occur when you worked as a

5    stocker?

6    A.  I already told you.  All the times that I worked as a

7    stocker when I was cleaning the silverware.

8    Q.  So, after you finished washing dishes at approximately noon

9    you resumed your stocker duties, correct?

10   A.  Yes.  That is correct.

11   Q.  So, you had to go into the dining room to refill the

12   stocking stations as part of your stocker duties, isn't that

13   right?

14   A.  That is correct.

15   Q.  And if you were washing dishes beforehand your uniform may

16   have been splashed with water, correct?

17   A.  Yes, it is correct.

18   Q.  So, is it your testimony that you walked in and out of

19   Fresco's dining room on a regular basis in a wet uniform

20   because you were washing dishes before performing your stocker

21   duties?

22   A.  It wasn't white, it was the busboys uniform.  It was not

23   white.

24           MS. KABIR:  Not responsive.  The question was whether

25   his uniform was wet, not white.

1           INTERPRETER:  I'm sorry.  I might not have heard you

2    correctly.

3    BY MS. KABIR:

4    Q.  Is it your testimony that you regularly walked out onto the

5    dining room in a wet uniform when you were assigned to work as

6    a stocker because you were washing dishes for 30 minutes before

7    noon during lunch?

8    A.  No.  Me, I would use an apron and I would change it.  I had

9    to.

10   Q.  So, between 11:30 and noon if you were washing dishes, who

11   was refilling the stocking stations?

12   A.  I repeat again, it was already restocked.  All the

13   silverware was in its place; glasses, silverware and dishes --

14   the appetizer dishes that are used at the main dining room of

15   the restaurant.

16   Q.  Because none of the customers had yet been served their

17   first course?

18   A.  No, but there were dishes that needed to be washed that the

19   cooks were using, those that they used for the lunch for the

20   family lunch.

21   Q.  Is it your testimony that the dishwasher returned to the

22   dish washing station at noon during lunch shifts?

23   A.  Yes.  Not always, but yes.

24   Q.  Every day during lunch shift?

25   A.  Again, I'm going to repeat once again:  Not always.

ECA5sal4                    Francisco Lopez – cross

1   Q.  You previously testified that every day you worked as a

2   stocker you had to wash dishes from 11:30 to noon, correct?

3   A.  Yes.

4   Q.  So, is it your testimony that you had to wash dishes every

5   day you worked as a stocker but the dishwasher only sometimes

6   came back at noon?

7   A.  No.  He would come back.  Only that many on the times he

8   went over he was sent over, he had been sent by the chef to

9   peel potatoes.

10  Q.  The last sentence of your paragraph 18 of your declaration

11  says:  Other times the dishwasher arrived approximately an hour

12  later than when his dinner shift would normally begin and I or

13  another stocker would have to do his job.

14  A.  Excuse me.  During the dinner shift?

15  Q.  The last sentence of paragraph 18 you testified:  Other

16  times the dishwasher would arrive approximately an hour later

17  than his dinner shift would normally begin and I or another

18  stocker would have to do his job.

19  A.  That is correct.

20  Q.  What time did the dishwasher -- withdrawn.

21          What times would the dishwasher arrive for his dinner

22  shift?

23  A.  I was not paying attention to what time the dishwasher

24  would arrive, but I would come in and me, I would come in at

25  4:00 in the afternoon for the evening shift and I would wash at

1    least one hour of -- during the afternoon -- during the evening

2    shift.

3    Q.  Was this every dinner shift you were assigned to work as a

4    stocker?

5    A.  Sometimes.

6    Q.  So not every dinner shift but every's shift you worked as a

7    stocker you had to wash dishes?

8    A.  No.  No, not in the evening shift.  No.

9    Q.  So you only sometimes had to wash dishes during dinner

10   service as a stocker, correct?

11   A.  Yes.

12   Q.  When would that be?

13   A.  That would happen at any time or moment.  There was no

14   specific day.

15   Q.  Would it be when the restaurant was slow?

16   A.  Yes.

17   Q.  Would it happen when the restaurant was busy?

18   A.  Also.

19   Q.  What would determine whether or not you needed to wash

20   dishes during the dinner shift if you only had to do them

21   sometimes.

22   A.  No, me, I would do it sometimes.

23   Q.  Can the court reporter please read back the question?

24           (Record read)

25   A.  The chef would ask me to, that I had to wash dishes.

1   Q.  And is it your testimony that the chef would ask you to

2   wash dishes on your shifts regardless of whether or not the

3   restaurant was slow or whether the restaurant was busy?

4   A.  Yes.  Yes.

5   Q.  And approximately what percentage of the time where you

6   worked as a stocker during dinner shifts did this occur?

7   A.  I have just told you that it was approximately between half

8   an hour and an hour.

9   Q.  I'm sorry.  What percentage of the shifts that you worked

10  as a stocker during dinner did the chef ask you to wash dishes?

11  A.  I do not have an idea of what percentage.

12  Q.  Do you know how many dishwashers the restaurant employs?

13  A.  I would see one there always.

14  Q.  Didn't you previously testify that sometimes the dishwasher

15  would not be there?

16  A.  No; during the time that the chef was sending him to do

17  some other things over to the basement.

18  Q.  If you could read paragraph 18 of your declaration, the

19  second sentence says:  Towards the end of the lunch shift in

20  the afternoon, on some days, the dishwasher would be sent home

21  early.

22          This was prior to the dinner shift, correct?  In the

23  afternoons?

24  A.  Yes.  At the beginning, before the afternoon shift would

25  start, yes.  That's correct.

1    Q.  So, on some days the dishwasher was sent home early?

2    A.  I do not know that I had –– did see?  No.

3    Q.  So, this sentence in your declaration was incorrect, that

4    some days the dishwasher would be sent home early?

5    A.  I do not know whether he would send him.

6    Q.  It says:  On some days the dishwasher would be sent home

7    early.

8            Is it your testimony that that never happened?

9    A.  No, no, no.  At some times the chef would tell me that the

10   dishwasher, he had sent him home on some occasions but, me, I

11   wasn't aware of that.

12   Q.  You previously testified that you always saw one dishwasher

13   there, correct?

14   A.  Yes.  Yes, there was always a dishwasher.

15   Q.  If you could turn to page 4 of your declaration, paragraph

16   24?  You testified previously:  When I worked as a busser, I

17   would also regularly have to perform side work at the beginning

18   of my shift before customers arrived.  The side work included

19   jobs like folding napkins, putting glasses at their proper

20   stations and bringing ice buckets to their proper stations.

21   A.  That is correct.

22   Q.  And these were functions that you performed prior to the

23   family meal, correct?

24   A.  Yes.

25   Q.  And these were functions that were related to setting up

ECA5sal4                        Francisco Lopez – cross

1    the dining room for service, correct?

2    A.   That is correct.

3    Q.   And you would finish these tasks prior to the start of the

4    family meal, isn't that right?

5    A.   Yes.

6             THE COURT:   All right.   We are going to take our

7    one-hour lunch break at this time.   We will return at 2:00 to

8    continue with the cross-examination of the witness.

9             (Luncheon recess)

10            (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Eca2sal5                    Francisco Lopez – Cross

1              A F T E R N O O N   S E S S I O N

2                            2 p.m.

3           THE COURT:  You may continue.

4     BY MS. KABIR:

5     Q.  Mr. Francisco, when you worked as a busser during lunch

6     shifts, the family meal occurred between 10 and 10:30 a.m.,

7     correct?

8     A.  Yes.

9     Q.  And from 10:30 to 11 a.m., you completed your opening side

10    work, correct?

11    A.  Yes.

12    Q.  And from 11 to 11:30 the bussers reset the tables in the

13    Rose Room section of the dining room, correct?

14    A.  Correct.

15    Q.  That's where the family meal takes place?

16    A.  Correct.

17    Q.  And at 11:30 a.m., the restaurant opens for customers,

18    correct?

19    A.  Correct.

20    Q.  So the bussers assigned to the dining room wait on tables

21    between 11:30 a.m. and until the last customer leaves during

22    lunch, correct?

23    A.  Correct.

24    Q.  What time did the last customer typically leave during the

25    lunch shift?

Eca2sal5                    Francisco Lopez – Cross

1   A.  Sometimes the one who would close was between 3:30 and 4 in

2   the afternoon.

3            THE COURT:  Mr. Francisco, I just want to remind you

4   that you are still under oath.

5            THE WITNESS:  Yes.

6   BY MS. KABIR:

7   Q.  Mr. Francisco, my question wasn't what time the closers

8   left.  My question was when does the last customer leave during

9   a lunch shift?

10  A.  No, I wasn't looking at my watch or a clock to see what

11  time the last customer would leave.

12  Q.  At some point during the lunch shift, the dining room

13  starts to empty out, isn't that right?

14  A.  Yes.

15  Q.  So if you were a busser assigned to a particular section of

16  the dining room, your section could be emptied, but there still

17  could be customers in other sections, correct?

18  A.  Yes.

19  Q.  At approximately what time were there no more customers

20  left in the dining room during the lunch shift?

21  A.  Approximately at 4.

22  Q.  So is it your testimony that the dining room at Fresco

23  during lunch is not empty until 4 p.m.?

24  A.  Some customers would leave at approximately 4 p.m., but not

25  all the time.

Eca2sal5                       Francisco Lopez - Cross

1   Q.  So some of the time there may be a customer who stays until

2   4, is that your testimony?

3   A.  That is correct.

4   Q.  Isn't it true that most times the last customer leaves by 2

5   p.m.?

6   A.  The last customer?  No.

7   Q.  The dining room is usually empty during lunch shifts by 2

8   p.m., isn't that right, Mr. Francisco?

9          MR. CLARK:  Objection.  I don't think that represents

10  the testimony that he has been giving.

11         THE COURT:  Sustained.

12  BY MS. KABIR:

13  Q.  By 2:30 p.m. during lunch shifts, isn't it true there are

14  only one or two tables of customers seated in the dining room

15  on most days?

16  A.  No.

17  Q.  So your testimony is that the dining room is full at 2:30

18  p.m. during every lunch shift?

19  A.  Sometimes, not too much, but there are several clients at

20  that time.

21  Q.  It varies every day, isn't that right?

22  A.  Correct.

23  Q.  So on some days, your section could be empty at an earlier

24  time than on other days.

25  A.  Yes.

1   Q.  And as your section starts to empty out, you can start

2   doing some of your closing side work tasks, isn't that right?

3   A.  No.  Naturally they had established that after 2:30 we

4   could, not in all stations.

5   Q.  Mr. Francisco, you testified that at the end of your

6   shifts, you had to perform tasks that included dumping ice

7   buckets at the station when you were working as a busser,

8   correct?

9   A.  Yes.

10  Q.  Isn't it true that you could start performing some of your

11  closing shift tasks as your section of the dining room began to

12  empty out?

13  A.  Yes.

14  Q.  Approximately how long would it take you to do your closing

15  side work tasks as a busser?

16  A.  Ten, 15 minutes.

17  Q.  If I could direct you to page 5 of your declaration,

18  paragraph 25, the second sentence reads, "The end-of-shift side

19  work" --

20          THE INTERPRETER:  Hold on, please.  Yes.

21          THE COURT:  One second.

22          What page are you on?

23          MS. KABIR:  Page 5, paragraph 25.

24  Q.  The second sentence reads, "The end-of-shift side work

25  usually took approximately 30 minutes."  That's not correct, is

Eca2sal5                    Francisco Lopez - Cross

1    it?

2    A.  I said 30 minutes during the starting of the shift, between

3    30 to 35 minutes at the beginning of the shift.

4    Q.  Mr. Francisco, this sentence at the end of paragraph 25

5    reads, "The end-of-shift side work usually took approximately

6    30 minutes."  You previously testified that it only took you

7    ten to 15 minutes, correct?

8    A.  Yes.

9    Q.  Mr. Francisco, at approximately what time did your lunch

10   shift end when you were working as a busser?

11   A.  Lunch, did you say?

12   Q.  Yes.

13   A.  It would vary.

14   Q.  It would vary?

15   A.  Yes.

16   Q.  And that's true the entire time you worked at Fresco,

17   correct?

18   A.  Before 2011.  Afterwards it was -- it varied a lot.  In

19   other words it varied a lot when we started punching the clock.

20   The hours varied.

21   Q.  You previously testified that the time the last customer

22   left the dining room during lunch varied, isn't that right?

23              THE INTERPRETER:  Can I hear the last part?

24              MS. KABIR:  Varied.

25   A.  Yes.

Eca2sal5                    Francisco Lopez - Cross

1    Q.  Did that change after the restaurant started using a time

2    clock?

3    A.  Correct.

4    Q.  So it's your testimony that after the restaurant started

5    using a time clock, the customers started emptying out of the

6    dining room at variable times.

7    A.  Correct.

8    Q.  You also previously testified that on most days when you

9    worked as a busser you were required to do work that did not

10   involve customer service, correct?

11   A.  Yes.

12   Q.  And you also previously testified that you had to bring

13   dishes, chairs, and room dividers up and down between the main

14   dining room and the party room upstairs, correct?

15   A.  That is correct.

16   Q.  And setting up tables in the dining room or the private

17   party room is part of your busser work, correct?

18   A.  That's the way it was interpreted by the restaurant.

19   Q.  Is it your testimony that setting up tables for a private

20   party is not customer service?

21   A.  Yes.

22   Q.  Is it your testimony that setting up tables is not part of

23   your busser duties at Fresco?

24   A.  It was not part of the job.  When we would stay, when there

25   were certain times when they were washing the rug, but that was

1   normally during the, that I can recall, that was just every

2   three months.  It was when all bussers and the runners that we

3   had to remain and we had to take the tables upstairs in order

4   to keep the chairs in that room.

5   Q.  But you would agree that on most days, when you were

6   setting up for a private party by arranging the tables in the

7   private dining area, that was part of your normal busser

8   duties, correct?

9              MR. CLARK:  Objection.  Asked and answered.

10             THE COURT:  Overruled.  You may answer.

11  A.  Yes.

12  Q.  And there were also tables in the main dining room that

13  needed to be taken apart and reset depending upon the number of

14  guests that would be seated, correct?

15  A.  Yes.

16  Q.  And resetting those tables was also part of your busser

17  duties, isn't that right?

18  A.  I would believe so, yes.

19  Q.  You also testified that on most days you were required to

20  do work that included cleaning walls, cleaning pictures, and

21  paintings when you were a busser, correct?

22  A.  To wash the walls and to wash pictures and clean pictures

23  that were in the back part in a small room and they are

24  photographs.

25  Q.  Are you referring to the paintings, walls, and pictures in

1  the main dining room of Fresco?

2  A.  As I said, walls before, which were surrounding the main

3  dining room, and at that part where the photographs are.

4  Q.  Is it your testimony that you had to clean the paintings

5  hanging on the wall of the main dining room of the restaurant?

6  A.  Yes.

7  Q.  How did you do that?

8  A.  It was with a rag with -- in other words, moist or wet rag

9  and sometimes we would use Windex.

10  Q.  So is it your testimony that you cleaned these paintings

11  with a wet rag?

12  A.  Wet, yes.

13           THE COURT:  He is using the word, the word that I hear

14  is "damp," "damp cloth."

15           THE INTERPRETER:  Damp, *humido*, moist or wet.

16           THE COURT:  I don't know if the interpreter agrees

17  with me.

18           THE INTERPRETER:  If I can ask him, because it could

19  be translated, but it depends upon the amount of wetness of the

20  rag.

21           (Interpreter and defendant consult)

22           THE INTERPRETER:  How wet or moist was the rag?

23           THE WITNESS:  It is not wet.  In other words, it is

24  damp, so that the picture would not get stained.

25  BY MS. KABIR:

Eca2sal5                    Francisco Lopez - Cross

1   Q.  How often would you clean these pictures with this rag?

2   A.  I did not count the times, but in several occasions.

3   Q.  So it is not true that you cleaned these paintings every

    day, correct?

5   A.  Not always.

6   Q.  Did you need any other equipment to clean these paintings?

7   A.  No.

8   Q.  What time of day did you clean these paintings?

9   A.  When the restaurant -- when the clients would start coming

10  into the restaurant and it was not as busy that not all the

11  stations of the main dining room were busy, and at one of the

12  dining room areas that it was my turn, there were no clients

13  there yet.  That is when Mr. Willie would tell me and he said

14  that the manager had said that we had to clean the pictures

15  that were on the walls.

16  Q.  So is it your testimony that you cleaned these pictures

17  while there were patrons in the dining room?

18  A.  On several occasions, yes.

19  Q.  How often?

20  A.  Sometimes.

21  Q.  Every month?

22  A.  No.

23  Q.  Every six months?

24  A.  I at least did it at least twice every two weeks.

25  Q.  Is that every week?

1    A.  Yes.

2    Q.  How long did it take you to clean these paintings?

3    A.  It wasn't too much.

4    Q.  How many minutes?

5    A.  Approximately ten, 15 minutes.

6    Q.  And was this during lunch shifts?

7    A.  Yes.

8    Q.  Was this also during dinner shifts?

9    A.  It was never my turn to do it during the dinner.

10   Q.  And by Willie, you are referring to Willie Baltadano,

11   correct?  He does maintenance at the restaurant?

12   A.  All I know him is as Willie.

13   Q.  Did you have to use a special technique or method for

14   cleaning these paintings?

15   A.  No.

16   Q.  Isn't it true that these paintings are original oil

17   paintings?

18   A.  No, they are photographs.

19   Q.  So it is not your testimony that you had to clean the

20   paintings hanging in the dining room?

21   A.  There are the walls.

22          THE INTERPRETER:  Your Honor, if I may, the word

23   "picture" can go into Spanish as *quadros*, photographs,

24   paintings.  So, unfortunately, I have been using all the

25   different ones, and I haven't been clear.  Neither have the

Eca2sal5                    Francisco Lopez – Cross

1    attorneys tried to specify it.  So if I would be authorized

2    to -- perhaps somebody would specify?  Now it turns out that it

3    was specified now as oil paintings, but according to the way it

4    was used generally, unfortunately, into Spanish --

5            THE COURT:  The word that the interpreter has been

6    using is "picture," and it's the same in English.  The picture

7    could be a photograph, it could be an oil painting.  So perhaps

8    you have to be more specific about which -- you should ask him

9    what pictures he is referring to.  What did they look like?

10           THE INTERPRETER:  It is a privilege to work for a

11   bilingual federal judge.

12           THE COURT:  Thank you very much.

13           I will ask the witness, what pictures are you

14   referring to, sir?

15           THE DEFENDANT:  Photographs that were taken by -- with

16   a camera.

17           THE COURT:  These are not paintings that you are

18   referring to.

19           THE WITNESS:  No, no.

20           THE INTERPRETER:  I said in Spanish, You are not

21   referring to paintings that are framed, literally, I said in

22   Spanish, and his reply was No, no.

23   BY MS. KABIR:

24   Q.  So you spent no time cleaning any of the paintings in

25   Fresco, is that correct?

Eca2sal5                      Francisco Lopez - Cross

1   A.  No, the walls that are surrounding the main dining room of

2   Fresco, the walls.

3   Q.  If you could turn to page four of your declaration, look at

4   paragraph 23.  You testified --

5          THE INTERPRETER:  It takes him some times to find.

6   Thank you.

7   A.  Paragraph 23, page 4.

8   Q.  In the second sentence, you testified, "This work included

9   cleaning walls, cleaning pictures, and paintings," correct?

10  A.  It would be interpreted that it could be included because

11  that was at the time that we had our shift and it was included

12  with our job.

13  Q.  Is it your testimony that cleaning the oil paintings on the

14  walls in the main dining room was part of your job?

15  A.  It can be interpreted as such.

16  Q.  Is it your testimony that you had to clean the oil

17  paintings as part of your job at Fresco?

18  A.  Yes.

19  Q.  So it's not your testimony that your job was only -- only

20  required you to clean the photographs in the dining room, is

21  that right?

22  A.  Sometimes it was the pictures, the photographs, and

23  sometimes it was the walls.

24          MS. KABIR:  If I could show the witness a photograph

25  of the dining room so he can identify what he is referring to.

Eca2sal5                    Francisco Lopez – Cross

1   Q.  Mr. Francisco, you recognize this as a photograph of the

2   dining room at Fresco Restaurant, correct?

3   A.  Yes.

4   Q.  On the right-hand side there is a large oil painting

5   hanging on the right wall, correct?

6   A.  Yes.

7   Q.  Is it your testimony that you had to clean this oil

8   painting as part of your job as a busser?

9   A.  No, no.  It wasn't this frame.  We are speaking of pictures

10  that had been taken with a camera.

11  Q.  So it is not correct that you had to clean the paintings

12  hanging on the walls shown in this photograph, correct?

13  A.  No, no, no, no.

14        THE INTERPRETER:  Okay, here.

15  A.  Not this as a painting.  What we are talking about is

16  paint, the paint that you use for painting the walls.  I had to

17  clean the paint that was covering the walls, the paint that is

18  used for painting the walls.

19  Q.  So is it your testimony you had to clean the paint shown on

20  the walls in this photograph?

21  A.  That is correct.

22  Q.  And is it your testimony you did this while patrons were

23  eating in the dining room?

24  A.  No.  I repeat, sometimes there were no customers very

25  early.  Not all the time did the customers arrive early.

Eca2sal5                    Francisco Lopez - Cross

1   Q.   Did you have to clean the paint on these walls using a

2   ladder?

3   A.   No.

4   Q.   How often did you have to clean the paint on these walls?

5   A.   On some occasions.

6   Q.   How many occasions?

7   A.   Sometimes twice per week when I would work the lunch.

8   Q.   It was only during lunch shifts?

9   A.   When it was my turn, yes.

10  Q.   And how long did it take you?

11  A.   I repeat, between ten to 15 minutes.

12  Q.   Is it your testimony you cleaned the paint from all of the

13  walls in the dining room?

14  A.   Not all of it, because that is way too much.  We were

15  several busboys, and at each station that corresponded for them

16  to clean a part of it.

17  Q.   Mr. Francisco, are you referring to fingerprint smudges on

18  the walls in the section of your dining room?

19           THE COURT:  Fingerprints.

20           THE INTERPRETER:  Fingerprint smudges.

21  A.   Not exactly.  Willie would come, the manager had told him

22  that we were to clean the walls.

23  Q.   Mr. Francisco, you also testified that you worked as a

24  coffee preparer, correct?

25  A.   That is correct.

Eca2sal5                          Francisco Lopez - Cross

1   Q.  On some shifts, you testified that you had a helper at the
2   coffee station correct?
3   A.  That is correct.
4   Q.  How many times did that occur?
5   A.  The -- most times, most times.
6   Q.  Is it your testimony that when you were assigned to work as
7   a coffee preparer, most shifts you also had a coffee helper,
8   correct?
9   A.  Yes, during the morning shifts.
10  Q.  You only had a coffee helper during the lunch shifts, isn't
11  that right?
12  A.  Yes.
13  Q.  Isn't it true that a coffee helper is only assigned during
14  especially busy shifts, like during November and December?
15  A.  Yes.
16  Q.  You also testified that you worked as a bar-back, isn't
17  that right?
18  A.  That is correct.
19  Q.  And when you worked as a bar-back, you were responsible for
20  bussing the seats at the bar and resetting the table settings
21  for the customers eating at the bar, correct?
22  A.  That is correct.
23  Q.  And you also assisted the bartender serving drinks for the
24  customers in the dining room and at the bar, correct?
25          THE INTERPRETER:  He said that's correct before.

1   A.  That is correct.

2   Q.  And you also bussed the tables in the bar section of the

3   dining room, correct?

4            THE INTERPRETER:  Dining room or bar?

5            MS. KABIR:  The tables in the bar area.

6   A.  That is correct.

7   Q.  There were approximately 13 or 15 tables in that area of

8   the restaurant, isn't that right?

9   A.  Less than 15, yes.

10  Q.  And those tables were full during lunch and dinner, isn't

11  that right?

12  A.  Yes.

13  Q.  If you could turn to page 5 of your declaration and look at

14  paragraph 28.  You testified, "Sometimes I was assigned to work

15  as a bar-back.  As a bar-back, my job was to wash glasses,

16  clean bottles, clean the bar area, clean mirrors, bring up ice

17  and beverages from the basement to the bar, sweep the floor

18  around the bar, and sweep the sidewalk in front of the

19  restaurant."  Correct?

20  A.  That is correct.

21  Q.  But that is not a complete listing of your duties as a

22  bar-back, is it?

23  A.  No.  It was a lot more.

24  Q.  Is there any reason why your other duties as a bar-back

25  weren't listed?

Eca2sal5                        Francisco Lopez - Cross

1            MR. CLARK:  Objection.

2            THE COURT:  Overruled.  You may answer.

3  A.  Because when I made this declaration, it was not -- I could

4  not remember everything, but I can say some more otherwise.

5            THE COURT:  Did you write this?

6            THE WITNESS:  No.

7            THE COURT:  Did you type it up?

8            THE WITNESS:  No.

9  Q.  Mr. Francisco, did you read this declaration before you

10  signed it?

11  A.  Yes.

12  Q.  Is it your testimony you didn't remember performing your

13  other duties as a bar-back when this was prepared?

14  A.  As I repeat to you once again, I could not recall

15  everything at that moment.

16            MS. KABIR:  No further questions.

17            THE COURT:  Redirect.

18            MR. CLARK:  We have no redirect for the witness at

19  this time.

20            THE COURT:  Thank you, sir.  You may step down.

21            THE WITNESS:  Thank you.

22            (Witness excused)

23            THE COURT:  You may call your next witness,

24  plaintiffs.

25            THE INTERPRETER:  Counsel, may I keep this photograph?

Eca2sal5                    Francisco Lopez – Cross

1   It actually helps me interpret.  If I can keep this here, it

2   gives me a very nice reference, if that is proper.

3           MR. ANDROPHY:  Plaintiffs call Alfredo Rodriguez.

4    ALFREDO RODRIGUEZ,

5        called as a witness by the plaintiffs,

6        having been duly sworn, testified as follows:

7           MR. ANDROPHY:  May I hand the witness his declaration?

8           THE COURT:  Yes.

9   DIRECT EXAMINATION

10  BY MR. ANDROPHY:

11  Q.  Good afternoon, Mr. Rodriguez.

12  A.  Good afternoon.

13  Q.  Is the document I just handed you your declaration which

14  you have prepared to be your direct testimony in this case?

15  A.  Yes.

16  Q.  On the last page, did you sign this declaration?

17  A.  Yes.

18          MR. ANDROPHY:  We ask that this declaration be

19  admitted as Plaintiff's Exhibit 109.

20          MR. BENSON:  No objection.

21          THE COURT:  It is admitted.

22          (Plaintiffs' Exhibit 109 received in evidence)

23          MR. ANDROPHY:  We also ask that exhibits 60, 61, 62,

24  84, and 88 be admitted as well, as these are documents

25  identified in the declaration.

1          THE COURT:  Any objection?

2          MR. BENSON:  No objection.

3          THE COURT:  They are also admitted.

4          (Plaintiff's Exhibits 60, 61, 62, 84, and 88 received

5  in evidence)

6          MR. ANDROPHY:  I have no further questions of this

7  witness.

8          THE COURT:  Cross-examination.

9          MR. BENSON:  Yes, thank you, your Honor.

10  CROSS EXAMINATION

11  BY MR. BENSON:

12  Q.  Good afternoon, Mr. Rodriguez.

13  A.  Good afternoon.

14  Q.  You were hired in 2011 at Fresco, correct?

15  A.  Yes, correct.

16  Q.  Prior to that time did you have any experience working in

17  the restaurant industry?

18  A.  Yes.

19  Q.  What was that experience?

20  A.  I worked at a restaurant called Convivio Restaurant.

21  Q.  In what position?

22  A.  Busboy.

23  Q.  How long did you hold that job?

24  A.  From 2009 until 2011.

25  Q.  Were you working there right before you applied to work at

1  Fresco Restaurant?

2  A.  Yes.

3  Q.  You came to Fresco Restaurant and you met with Anthony

4  Scotto, correct?

5  A.  Correct.

6  Q.  Did he interview you?

7  A.  Correct.

8  Q.  And he asked you where you worked?

9  A.  Yes.

10  Q.  Did he ask you for a reference?

11  A.  No.

12  Q.  But did you tell him the restaurant that you worked in?

13  A.  Yes.

14  Q.  And do you know if he checked with the restaurant?

15          MR. ANDROPHY:  Objection, I don't know how the witness

16  would know.

17          MR. BENSON:  I am asking him if he knows.

18          THE COURT:  He can testify as to whether he learned

19  that.

20  A.  I do not believe so.  Because when I was interviewed with

21  Mr. Anthony, he asked me what had happened with my other job,

22  and I told him that they had closed.

23  Q.  Mr. Scotto invited you back to train, correct?

24  A.  Yes, that was --

25  Q.  And you understood that during that training time you would

Eca2sal5                          Rodriguez - Cross

1    be evaluated to determine whether you would be hired full-time,

2    correct?

3    A.   Correct.

4    Q.   And during that time, you were aware that Mr. Scotto was

5    evaluating your performance, correct?

6    A.   Correct.

7    Q.   You testified that for some shifts you were assigned to the

8    stocker role, correct?

9    A.   Yes, that was so.

10   Q.   And how often would that happen?

11   A.   At the beginning they would place me as two times per week.

12   Q.   In the beginning twice a week, and how long did that last?

13   A.   Approximately perhaps half a year.

14   Q.   And after six months you no longer were assigned as a

15   stocker?

16   A.   No, me, I continued being a stocker.  I still do it, just

17   that now it is once a week.

18   Q.   Once a week.

19        You were also assigned to the bar station, correct?

20   A.   Correct.

21   Q.   And part of that assignment is bussing the bar and the

22   tables in the bar, correct?

23   A.   Correct.

24   Q.   And especially at lunch, it is a very busy section,

25   correct?

1  A.  Correct.

2  Q.  Because that's where walk-in customers come, correct?

3  A.  Yes, correct.

4  Q.  If you don't have a reservation, that's where you sit?

5  A.  Yes, that is so.

6  Q.  And that section turns over very quickly, does it not?

7  A.  Yes.

8  Q.  Even more frequently than the tables in the main dining

9  room, correct?

10  A.  Yes.

11  Q.  So when you were assigned to that shift, you have to spend

12  an especially -- strike that.

13        You have to make a special effort to clear all of the

14  dishes during the course of the service, correct?

15  A.  Yes.

16  Q.  And because there are multiple seatings in the front

17  tables, you spend more of your shift actually bussing the

18  tables than you even do in the main dining room, correct?

19  A.  Well, that would depend as to what season we are talking

20  about also, and whether we are talking about a season when it

21  is busy.  I have to go to clean tables and then run over and be

22  a runner and take the dirty glasses over to the kitchen and

23  then come back running, and then I would have to bus or clean

24  the table because Mrs. Scotto would say I need tables, I need

25  tables, so that it was that I had to kind of move myself even

Eca2sal5                         Rodriguez - Cross

1    faster.

2    Q.  Okay.  And so you would agree with me that when you were

3    assigned to the bar-back assignment, you would spend the great

4    majority of the shift doing what you just described.

5    A.  Let's say regarding a certain part, yes, but also I had to

6    bring glasses over to the bar to wash glasses.  At the

7    beginning I had to prepare -- I had to be ready with my ice.

8    If I ran out of ice, I had to run downstairs and bring some

9    more ice and I had to be ready with my two pitchers of iced

10   tea, a pitcher of water, and the water bottles had to be ready

11   with ice and everything.

12   Q.  I understand that.  Those are responsibilities of that

13   section, correct?

14   A.  Correct.

15   Q.  And it is a very demanding section, correct?

16   A.  Correct.

17   Q.  Because from when the restaurant first starts serving

18   customers to when the last customer leaves, you still have to

19   bus the tables, correct?

20   A.  Correct.

21   Q.  And that's the main aspect of that assignment?

22   A.  Yes.

23   Q.  I direct your attention to paragraph 28 of your

24   declaration.  It reads, and I quote, "Sometimes I was assigned

25   to work as the bar-back.  As a bar-back, my job was to wash

1    glasses, clean bottles, clean the bar area, clean mirrors and

2    sweep the floor around the bar."  There is no mention, sir, of

3    any of those bussing responsibilities that you just described.

4    Can you please tell us why those responsibilities are not

5    listed.

6    A.  Can you repeat the question?

7            MR. BENSON:  Can the court reporter read back the

8    question.

9            (Record read)

10   A.  That I would not know how to answer to you why they were

11   not there listed, because when I went to apply for a job, I

12   applied as a busboy, not as a bar-back.

13           THE COURT:  Did you write this document, sir?

14           THE WITNESS:  No.

15   Q.  You would agree, would you not, that those should have been

16   included in the description of your job responsibilities as a

17   bar-back?

18   A.  If it would have been explained to me, you are going to do

19   a job as a bar-back and you must perform all of this, I would

20   have understood it and I would have agreed to that.

21   Q.  Now, when you were a stocker, you also ran food to the

22   dining room, correct?

23   A.  Yes, when the sous chef would ask me so.

24   Q.  It is also your testimony that as a stocker you washed

25   dishes.

Eca2sal5                    Rodriguez - Cross

1   A.  Yes, I washed dishes and I also would wash silver.

2   Q.  Is it your testimony that you took the place of a

3   dishwasher in the restaurant?

4   A.  It could be said that, yes.

5   Q.  When did you allegedly do that?

6   A.  Like, for example, in the mornings when it was my turn to

7   be performing as a stocker or for when we had the meals for

8   lunch, all people, we all used the fork and the knife and then

9   afterwards when we are going to get the room ready for the

10  lunch, there is not enough seating, so I have to go inside and

11  wash the forks and the knives and the plates that we use for

12  bread, because we don't have enough in the outside part because

13  they have been used, and we have to do it because the rest of

14  the guys tell us that we need them, so we have to go get them.

15  Q.  And how often did this happen?

16  A.  Well, it would be on the day that I was working as a

17  stocker.

18  Q.  Every day that you worked as a stocker?

19  A.  No.

20  Q.  How often?

21  A.  I repeat to you sometimes it was once or twice per week.

22  Q.  You testified that you only worked once or twice a week as

23  a stocker.  Maybe you misunderstood me, and I don't mean to

24  confuse you.  I am trying to understand how many times you

25  would have to do the dishes when you were assigned to the

Eca2sal5                      Rodriguez – Cross

1  stocker assignment.  Was it once in a while?  Was it every day?

2  Just tell us what you did.

3  A.  It would depend on the days when I was a stocker.  For

4  example, once or twice per week.

5  Q.  So if you were a stocker once or twice a week, which is

6  what your testimony was, is it safe to assume that you are

7  saying that every time you were a stocker that you played some

8  role in replacing the dishwasher?

9  A.  Yes.

10           (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  While you were a stocker, what percentage

2     of time were you involved in washing dishes?

3          THE WITNESS:  Between 15 to 25 minutes.

4          THE COURT:  I'm not asking the amount of minutes, I'm

5     asking the percent of the total time that you were working as a

6     stocker, how much time did you devote to dish washing?

7          THE WITNESS:  One could say between 25 to 30 percent.

8     BY MR. BENSON:

9     Q.  So, it is your testimony that 25 to 30 percent of every

10    shift that you worked as a stocker was spent replacing the role

11    of the dishwasher?

12    A.  Yes.

13    Q.  And that was true all throughout the year?

14    A.  Yes.

15    Q.  And was that true of all of the other bussers who you

16    observed who took the stocker role?  Or was that just limited

17    to you?

18    A.  No.  The rest of the busboys would also do it.

19    Q.  So, it is your testimony that every stocker in the

20    restaurant spends 25 to 30 percent of their daily job replacing

21    a dishwasher; is that correct?

22    A.  I cannot answer for the rest of the persons because there

23    are some that do it faster than other ones so I cannot tell you

24    about the rest of them, whether they would do more than 50 to

25    20 percent.  I'm talking about me, myself, personally.

ECA5sal6                         Rodriguez - cross

1   Q.  Okay.  I understand you did 25 to 30 percent.

2              So, would it be safe to say that all the other bussers

3   on every shift spent at least 20 percent of their shift

4   replacing a dishwasher?

5              MR. ANDROPHY:  Objection.  Calls for speculation.

6              THE COURT:  Sustained.

7              He says he doesn't know.  He doesn't know about the

8   others.  Are you asking him to guess?

9              MR. BENSON:  No.  I'm asking what he observed with

10  respect to the other -- I will ask it this way.

11  BY MR. BENSON:

12  Q.  Did you observe your fellow bussers who are assigned to the

13  stocker assignment on the shifts where you're also working not

14  as a stocker?

15  A.  Yes.

16  Q.  And, based on your observations, do you know whether or not

17  that those other individuals who were assigned to the stocker

18  assignment spent some portion of every day replacing a

19  dishwasher?

20  A.  Yes, I did see that they would replace a dishwasher, but I

21  cannot tell you exactly the percentage of time that they did

22  that.

23  Q.  That's fair.  Thanks.

24             But, it is your testimony that a core part of a

25  stocker's assignment is to replace the dishwasher for some

ECA5sal6                        Rodriguez - cross

1   portion of the shift?

2   A.  It could be stated that yes.

3   Q.  And that is true for the entire time that you were

4   employed?

5   A.  Yes.  That is correct.

6   Q.  And are there times when there are two stockers assigned?

7   A.  Personally, for me, it happened to me about a couple of

8   times, yes.

9   Q.  Where you worked with another stocker on the same shift?

10  A.  Yes, sir.

11  Q.  And on those shifts did you both wash dishes at the same

12  time?

13  A.  Personally, me?  No.  Because, as I am repeating to you, it

14  would depend on at what time and there was a stocker who might

15  have arrived, for example at 4:00 and the other one would have

16  arrived at 5:00 or 6:00, and I could not be certain whether the

17  first guy had gone in there to start washing dishes or not.

18  Q.  Okay.  What time do you allege that you washed the dishes?

19  First tell me about the lunch shift.

20  A.  Okay.  During the lunch shift I would wash them from about

21  11:00 until 11:15.  That is when I went into the washing

22  machine and I would wash them there, and then I would have to

23  dry them and then I would have to have all my stations ready

24  with plates and silverware.  That was before the lunch service

25  would start.

1   Q.   So, is the answer 11:00 to 11:15 that you were washing

2   dishes?

3   A.   Yes.

4   Q.   Any other times during the lunch shift?

5   A.   Towards the end of the lunch.

6   Q.   And what time was that?

7   A.   The exact time I could not tell you, but it could be from

8   about 3:00 to 3:20.

9   Q.   Would that be every time that you worked as a stocker?

10  A.   I would not say that every time, but mostly all times, yes.

11  Q.   Okay.

12          So, it is your testimony that during the lunch shift

13  you would wash dishes from 11:00 to 11:15 and from 3:00 to

14  3:20?  Is that fair?

15  A.   Yes.  That is correct.

16  Q.   And that's every shift, correct?

17  A.   Personally, for me, when I was working as a stocker, yes.

18  Q.   When you worked on the dinner shift, when did you wash

19  dishes?

20  A.   Between from 4:30 -- no, no.  Excuse me.  No, because 4:30

21  was the time for the meal.  It was between 5:00 and 5:20.  It

22  would have been before the dinner service started.  As I

23  repeat, we used the plates and the forks so then we don't have

24  enough to set the room ready.  So, it was at that time when I

25  would wash my forks and my plates.

ECA5sal6                         Rodriguez - cross

1    Q.  So, it is your testimony that the dishes that are used for

2    the family meal must be washed right away in order to proceed

3    with the service and that that is when you washed the dishes?

4    Is that your testimony?

5    A.  Yes.

6    Q.  That was about 20 plates?

7    A.  Let us say maybe a few more.

8    Q.  When else do you claim to have replaced the dishwasher when

9    you were a stocker?

10   A.  When that young person would go downstairs to peel potatoes

11   or he was sent somewhere to clean.

12   Q.  When was that?

13   A.  Are you asking me for an exact day or are you telling me?

14   Q.  Time.  Time.

15   A.  Approximately half an hour.  25 minutes, half an hour.

16   Q.  I apologize.  I'm asking when.

17          You testified that from 5:00 to 5:20.  Is there any

18   other time during the evening shift that you replaced the

19   dishwasher?

20   A.  No.

21   Q.  So, it was only at the beginning of the shift, correct?

22   A.  Correct.

23   Q.  So now is it your testimony that replacing the dishwasher

24   for these time periods is just part of your normal

25   responsibilities that you have any given day when you have the

ECA5sal6                          Rodriguez – cross

1   stocker assignment?

2   A.  Can you repeat the question?

3           MR. BENSON:  Could you please read it back?

4           (Record read)

5   A.  Well, my responsibility as stocker would be to wash the

6   silver, the plates, and the glasses.  I think that it is not my

7   responsibility to do the dishwasher's job.

8   Q.  Perhaps you misunderstood my question.

9           Is it your understanding, without being told to do so

10  on an every time basis where you have the stocker assignment,

11  that you are to replace the dishwasher during the time periods

12  you described?

13  A.  Yes, because we need them for -- in order to continue with

14  the service.

15  Q.  So, you are not directed to do these -- you are not

16  directed to replace the dishwasher, you just know to do it on

17  your own, correct?

18  A.  Correctly so.

19  Q.  So, the sous chef or the chef is not directing you to do

20  that, correct?

21  A.  Personally for me?  To me?  No.

22  Q.  You testified that you observed Brent Drill sending someone

23  named Julian home; is that correct?

24  A.  Yes.  That is correct.

25  Q.  Did that take place after January 1st of 2013?

ECA5sal6                      Rodriguez – cross

1  A.  I'm not certain whether that happened after 2013 or during

2  2012, but I did see it.

3  Q.  And do you know, regardless of when it was, whether

4  Mr. Drill consulted with Mr. Scotto first?

5  A.  Oh no, because Mr. Scotto was at his office.  This happened

6  in the dining room.

7  Q.  Mr. Scotto was in the restaurant?

8  A.  Yes.  He was in his office.

9  Q.  Was that Mr. Amezquita that you are talking about?

10  A.  Jose Amezquita?

11  Q.  Amezquita.  A-M-E-Z-Q-U-I-T-A?

12  A.  Yes.

13  Q.  You testified that Mr. Vosilla once wrote you up for being

14  late, correct?

15  A.  Yes.  Correct.

16  Q.  And that was in May of 2013, correct?

17  A.  Yes.

18  Q.  And you say that you observed Mr. Vosilla fire an employee

19  named Nosario; is that correct?

20  A.  Yeah.  That is correct.

21  Q.  That took place this year, correct?  This year?

22  A.  Yes, it happened this year.

23  Q.  Do you recall any incidents where Mr. Drill disciplined

24  somebody prior to January of 2013?

25  A.  I cannot remember.

ECA5sal6                    Rodriguez - cross

1    Q.  And are you aware of any alleged incidents where

2    Mr. Vosilla disciplined anybody prior to that time?

3    A.  Not that I can recall.

4              MR. BENSON:  I have no further questions, your Honor.

5              THE COURT:  Any redirect?

6              MR. ANDROPHY:  Yes.  If I can have two minutes to

7    confer?

8              THE COURT:  Okay.

9              (counsel conferring)

10   REDIRECT EXAMINATION

11   BY MR. ANDROPHY:

12   Q.  Mr. Rodriguez, you just testified earlier about sometimes

13   you would wash dishes during the dinner shift.  Other than from

14   approximately 5:00 p.m. to 5:20 p.m., did you sometimes have to

15   wash dishes?

16   A.  No.

17   Q.  Were there ever any times that you had to wash dishes where

18   you have to wash dishes -- withdraw that.

19             Are there ever times other than the usually scheduled

20   times that you have to wash dishes?

21             MR. BENSON:  Objection, your Honor.  He previously

22   asked him whether he did it any other time from 5:00 to 5:20

23   and he said no.

24             THE COURT:  He said?

25             MR. BENSON:  No.

1            THE COURT:  This is redirect.

2            MR. BENSON:  No, on redirect he gave that answer.

3            THE COURT:  You are saying that this is an asked and

4    answered question; is that what you are saying?

5            MR. BENSON:  Yes.

6            THE COURT:  Sustained.

7            MR. ANDROPHY:  I have no further questions.

8            THE COURT:  Any re-recross?

9            MR. BENSON:  No.

10           THE COURT:  Thank you, sir.  You may step down.

11           (witness excused)

12           THE WITNESS:  Thank you.

13           THE COURT:  Do you have other witnesses, Mr. Androphy.

14           MR. ANDROPHY:  Your Honor, the other witnesses who I

15   expected to possibly be testifying today, one of them did have

16   to leave.  They did have to leave to go back to work.  Before

17   yesterday we did not know we would be continuing until 5:00

18   p.m. and so Mr. Flores, he had arranged to be away from work

19   until about 3:00 or 4:00.  So, he had been scheduled for

20   potentially today but he did have to return to work.  I think

21   in the more rapid pace that we have reached today I am fairly

22   confident that we will be able to finish with plaintiffs by

23   Friday with the exception of Mr. Lugo, who is in Mexico, and we

24   are still, I think, coordinating both -- I don't believe the

25   defendants have sent him the exhibits that they intend to use

1    during his examination.  So, I think his testimony might have

2    to wait until next week.  But, otherwise, I am confident that

3    we will be finished with the other plaintiffs on Friday.

4              And I apologize that I don't have any witnesses at

5    this moment who are available.

6              THE COURT:  Mr. Benson, what about getting the

7    materials to Mr. Lugo?

8              MR. BENSON:  We may not send him any, your Honor, so

9    you can schedule him whenever.

10             THE COURT:  So can he be scheduled then for tomorrow?

11             MR. CLARK:  Your Honor, we still need to prepare, do a

12   check whether or not we can hook up our computer to this

13   projector and then also have a microphone and make sure that

14   there are no snags in the testimony.  I had reached out to the

15   AV office here at the court and my plan was that we would do a

16   run-through either early tomorrow morning or after our

17   testimony tomorrow and do that run-through, and then hopefully

18   be able to do the testimony on Friday.

19             THE COURT:  Okay.  All right then.  So, we will stop

20   for today and continue tomorrow morning at 9:00.

21             MR. BENSON:  Your Honor, you should also, for your own

22   schedule, understand that I believe there are only three

23   witnesses available tomorrow; Mr. Flores, Mr. Cedeno and

24   Mr. Roballo; is that correct, Josh?

25             MR. ANDROPHY:  Yes.  That's correct.  Then we have

ECA5sal6                    Rodriguez – redirect

1    another three witnesses who we would expect to testify on

2    Friday with the possible addition of a fourth, and Mr. Lugo.

3              THE COURT:  So Flores, Cedeno and who else tomorrow?

4              MR. ANDROPHY:  Luis Roballo.

5              THE COURT:  Thank you.  Good night.

6              (Adjourned to 9:00 a.m., December 11, 2014.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

PABLO ALVARADO

Cross By Mr. Benson  . . . . . . . . . . . . . 204

Redirect By Mr. Androphy . . . . . . . . . . 251

Recross By Mr. Benson  . . . . . . . . . . . 254

VALENTIN XOCHIPILTEACATL

Direct By Mr. Androphy . . . . . . . . . . . 256

Cross By Ms. Kabir . . . . . . . . . . . . . 257

PABLO FRANCISCO LOPEZ

Direct By Mr. Clark  . . . . . . . . . . . . 277

Cross By Ms. Kabir . . . . . . . . . . . . . 278

ALFREDO RODRIGUEZ

Direct By Mr. Androphy . . . . . . . . . . . 309

Cross By Mr. Benson  . . . . . . . . . . . . 310

Redirect By Mr. Androphy . . . . . . . . . . 325

```
1                        PLAINTIFF EXHIBITS

2    Exhibit No.                                    Received

3     107   . . . . . . . . . . . . . . . . . . 257

4     108   . . . . . . . . . . . . . . . . . . 278

5     45, 46 and 47   . . . . . . . . . . . . . 278

6     109   . . . . . . . . . . . . . . . . . . 309

7     60, 61, 62, 84, and 88   . . . . . . . . . 310

8                        DEFENDANT EXHIBITS

9    Exhibit No.                                    Received

10    H   . . . . . . . . . . . . . . . . . . . . 205

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```