EC8ASAL1ps

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  --------------------------------x

3  ENRIQUE SALINAS, *et al.*,

4              Plaintiffs,

5         v.                              13-cv-2992 (AT)

6  STARJEM RESTAURANT CORP., *et al.*,

7              Defendant.

8  --------------------------------x

9                                    New York, N.Y.
                                     December 11, 2014
10                                   9:00 a.m.

11 Before:

12                    HON. ANALISA TORRES

13                                      District Judge

14

15                         APPEARANCES

16 MICHAEL FAILLACE & ASSOCIATES, P.C.
        Attorneys for Plaintiffs
17 BY:   JOSHUA S. ANDROPHY, ESQ.
         SHAWN R. CLARK, ESQ.
18
   LITTLER MENDELSON, P.C.
19      Attorneys for Defendants
   BY:   CRAIG R. BENSON, ESQ.
20       NAVEEN KABIR, ESQ.

21 ALSO PRESENT:   EUGENE ALVAREZ, Spanish interpreter

22

23

24

25

EC8ASAL1ps

```
 1              (Trial resumed)
 2              THE COURT:  Good morning.  Would you call your next
 3   witness, please?
 4              MR. CLARK:  Yes.  Good morning, your Honor.
 5              Plaintiffs call Mr. Luis Roballo to the stand.
 6    LUIS ROBALLO,
 7         called as a witness by the Plaintiffs,
 8         having been duly sworn, testified through the interpreter,
 9         as follows:
10              THE DEPUTY CLERK:  Please state your full name and
11   spell it for the record.
12              THE WITNESS:  My name is Luis Roballo.  L-U-I-S
13   R-O-B-A-L-L-O.
14   DIRECT EXAMINATION
15   BY MR. CLARK:
16   Q.  Good morning, Mr. Roballo.
17              Your Honor, may I approach the witness to give him a
18   copy of his declaration?
19              THE COURT:  You may.
20   Q.  Mr. Roballo, do you recognize the document that I just
21   handed you?
22   A.  Yes, sir.
23   Q.  And is this the declaration that you intend to use as your
24   direct testimony in this action?
25   A.  Yes, sir.
```

ECB5sal1                    Roballo - direct

1    Q.  Now, can you please turn to the last page of this document?

2    Is that your signature, Mr. Roballo?

3    A.  Yes, sir.

4            MR. CLARK:  At this point plaintiffs move to present

5    this into evidence as Plaintiff's Exhibit 110.

6            THE COURT:  Any objection?

7            MS. KABIR:  No objection.

8            THE COURT:  Admitted.

9            (Plaintiff's Exhibit 110 received in evidence)

10           MR. CLARK:  Your Honor, we also correspondingly seek

11   to move into evidence Plaintiff's Exhibits 56, 57, 58 and 59,

12   all of which are identified in the declaration.

13           THE COURT:  Any objection?

14           MS. KABIR:  No objection.

15           THE COURT:  They're admitted.

16           (Plaintiff's Exhibits 56, 57, 58 and 59 received in

17   evidence)

18           MR. CLARK:  Thank you, your Honor.  We have no further

19   questions on direct examination at this time.

20           THE COURT:  Cross-examination.

21   CROSS EXAMINATION

22   BY MS. KABIR:

23   Q.  Good morning, Mr. Roballo.

24   A.  Good morning, ma'am.

25   Q.  You worked as a busser at Fresco Restaurant, correct?

ECB5sal1                          Roballo - cross

 1    A.  Correct.

 2    Q.  And, as a busser, you were assigned certain shifts to work

 3    on different sections of the dining room floor, correct?

 4    A.  Yes, ma'am.

 5    Q.  And sometimes you were also assigned to work as a coffee

 6    preparer, isn't that right?

 7    A.  Yes.

 8    Q.  And sometimes you also worked as a stocker, is that

 9    correct?

10    A.  Yes.

11    Q.  You also previously testified that on some shifts you

12    worked as both the coffee preparer and the stocker, correct?

13    A.  Yes.

14    Q.  And these were on nights when the restaurant was typically

15    very slow; isn't that right?

16    A.  Yes.  It was lunches and sometimes dinner.

17    Q.  These were typically during the summer months, isn't that

18    right?

19    A.  Yes.

20    Q.  And when you were assigned as a busser on the dining room

21    floor there used to be five, six or seven stations in the

22    dining room, correct?

23    A.  Yes.

24    Q.  The number would change every shift; isn't that right?

25    A.  I do not understand you.

ECB5sal1                    Roballo – cross

1    Q.   The number of stations in the dining room would change from

2    shift to shift, isn't that right?

3    A.   Yes.

4    Q.   So, when you came to work at the beginning of your shift,

5    you had to check the station map posted at the host stand, did

6    you not?

7    A.   Yes.

8    Q.   And you did not work as a food runner at Fresco Restaurant,

9    correct?

10   A.   Correct.

11   Q.   During the shifts you worked as a stocker you ran food

12   every shift you worked, right?

13   A.   When I worked as a stocker I was obligated, forced to take

14   the food out by the chef.

15   Q.   So, did you run the food every shift you worked as a

16   stocker?

17   A.   When it was my turn to work as a stocker it was my –– the

18   chef told me that it was my obligation to take the food out.

19   And this would take me about 15 minutes, seven or eight times.

20          THE COURT:  What percentage of your time, when you

21   were working as a stocker, did you spend running food from the

22   kitchen to tables?

23          THE WITNESS:  90 percent as a stocker and 10 percent

24   of taking the food out.

25   BY MS. KABIR:

ECB5sal1                    Roballo - cross

1    Q.  And when the chef ordered you to take the food out, you

2    followed his instructions; isn't that right?

3    A.  Yes.  I didn't pay attention because he told me leave that,

4    you have to take the food out.

5    Q.  And this happened almost every shift; isn't that right?

6    A.  Well, when it was my turn to be a stocker, yes.

7    Q.  And when you ran food to the tables, you had to put the

8    plates at the right seat number on the table, correct?

9    A.  Correct.

10   Q.  So, before you left the kitchen you had to see where you

11   were going; isn't that right?

12   A.  Yes, because the chef had to tell me.

13   Q.  So, there was a station map posted near where you worked as

14   a stocker, correct?

15   A.  If you can repeat, please?

16   Q.  There was a map of all the stations with the table numbers

17   in the dining room posted near where you worked as a stocker,

18   correct?

19   A.  A number plan?  Are you telling me that for the table where

20   the food is supposed to go?  Is that what you are trying to

21   tell me?

22   Q.  Yes.  Was one of those station maps posted near where you

23   worked as a stocker?

24   A.  No.  No, because it was the chef who would tell me to take

25   it to this table, to table 23 and station 1, 2 or 4.  It was

1   not a station, it was a position.  It was a position within the

2   table.

3   Q.  And how did you know which table to go to?

4   A.  Because the chef would tell me go over, for example, to

5   table 15, position 2 and 4, and as one works one knows where

6   that table is.

7   Q.  So, you were familiar with the layout of the dining room,

8   correct?

9   A.  Yes, because one knows the name -- the numbers of the

10  tables and everything in there.

11  Q.  On the shifts that you worked as a busser, some of your

12  co-workers worked as a stocker; isn't that right?

13  A.  Yes.  We all would work as stockers but not -- with the

14  exception of one person who was, is from Europe.  I never did

15  see that gentleman working as a stocker, as a coffee maker

16  either, or as a barback.  I have never seen that gentleman, but

17  all of us do have to go or rotate through all of these other

18  jobs.

19         MS. KABIR:  Move to strike as non-responsive after

20  "but."

21         THE COURT:  I will allow it.  I overruled the

22  objection.

23  BY MS. KABIR:

24  Q.  You testified that some of your co-plaintiffs in this case

25  worked as a stocker specifically, correct?

ECB5sal1                          Roballo - cross

1    A.   Yes.

2    Q.   And you also testified that they performed the same duties

3    you performed when you were a stocker, isn't that right?

4    A.   Yes.

5    Q.   And you also saw them running food from the kitchen when

6    they worked as stockers; isn't that right?

7    A.   Yes, I did see that.

8    Q.   And that happened almost every shift you worked as a

9    busser, correct?

10   A.   Yes.

11   Q.   You also testified that when you worked as a stocker

12   sometimes you were required to do the job of a dishwasher;

13   isn't that right?

14   A.   Correct.

15   Q.   Approximately how often, when you worked as a stocker, did

16   you have to take the place of a dishwasher?

17   A.   30 or 40 minutes.

18           THE COURT:  When you were assigned to the stocker

19   position, what percentage of your time did you devote to

20   washing dishes?

21           THE WITNESS:  During the shift I did 90 percent as a

22   stocker, but after 2:30 p.m. or 3:00 p.m. that they would send

23   the dishwasher home, then it was my turn to do that job, to go

24   over and do the dish washing via a dishwasher.

25           THE COURT:  So, you said before that you spent about

ECB5sal1                      Roballo - cross

```
 1   10 percent of your time as a runner when you were working as a

 2   stocker, and so of your total time as a stocker, what

 3   percentage was devoted to washing dishes?

 4              THE WITNESS:  Well, as I explained to you, during my

 5   shift when I was a stocker, we started at 11:00 to 2:30 p.m.

 6   That was the busy time.  And then it would become slow

 7   afterwards so that when they would send the dishwasher home,

 8   then the chef told me that it was my obligation for me to go

 9   and wash the dishes.

10              THE COURT:  My question is what percent.  I want you

11   to give me a percent of the total time that you spent as a

12   stocker.  If you are assigned one day to be a stocker, what

13   percent of your time was devoted to dish washing?  Before you

14   told me that 10 percent of your time was devoted to running, so

15   what percent was devoted to washing dishes?

16              THE WITNESS:  Well, as I tell you, during the shift

17   that was during the busy time I was concentrating and doing my

18   job as a stocker, and when I was told that it was my

19   obligations, obligated, by the chef, to tell me to run the food

20   outside.  It was about seven to eight times during that shift.

21   But, afterwards, when they would send home --

22              INTERPRETER:  Added by the interpreter.

23              THE WITNESS:  -- the dishwasher was sent home, then

24   the chef would tell me that I had to go and wash the dishes.

25              THE COURT:  So, you told me now that seven or eight
```

ECB5sal1                         Roballo - cross

1   times you had to run the food.  Those seven or eight times you

2   say means 10 percent of the total time as a stocker that was

3   dedicated to running food.  Is that right?

4              THE WITNESS:  Yes.

5              THE COURT:  So, what percent of your total time was

6   dedicated to washing dishes?  What percent?

7              THE WITNESS:  It was 30 percent.

8              THE COURT:  Washing dishes?

9              THE WITNESS:  Yes.  After 2:30.

10             THE COURT:  No, I'm talking about your entire shift.

11             THE WITNESS:  Then it would lapse.  It would take more

12   like a hundred percent that I would be washing dishes and doing

13   my job as a stocker.

14   BY MS. KABIR:

15   Q.  Is it your testimony that you washed dishes every shift you

16   worked as a stocker?

17   A.  Yes.  When it was my turn to work as a stocker I was told

18   by the chef that it was my obligation to wash dishes.

19   Q.  And was this every shift you worked, throughout the year,

20   as a stocker?

21   A.  That was before 2011.  And then after 2011, very few times.

22   Very few times, maybe two or three times.

23   Q.  So, you worked as a stocker during the busy season,

24   correct, in the wintertime?

25   A.  Yes; as a stocker and as a busboy.

ECB5sal1                    Roballo - cross

1    Q.  And is it your testimony you spent 30 minutes washing

2    dishes?

3    A.  Yes.

4    Q.  When you worked as a stocker during the busy season?

5    A.  Yes.

6           THE COURT:  How many minutes did you spend running the

7    food?

8           THE WITNESS:  Two minutes.  For example, I would go

9    right now to leave that food.  Two minutes, one minute.

10          THE COURT:  In total, how many minutes?

11          THE WITNESS:  15 minutes.

12   BY MS. KABIR:

13   Q.  Did you also spend 30 minutes washing dishes as a stocker

14   during the slow season in the summertime?

15   A.  Yes.

16   Q.  Was this during the lunch shifts?

17   A.  Yes.

18   Q.  Did you ever work as a stocker during dinner shifts?

19   A.  Yes.

20   Q.  Did you spend any time washing dishes when you worked as a

21   stocker during dinner shifts?

22   A.  When I would start at 4:00 p.m. I would arrive and the chef

23   would tell me you have to wash those few dishes that are over

24   there in the machine.

25   Q.  So, is it your testimony that you washed dishes at 4:00

1    p.m. when you arrived for the dinner shift when you worked as a

2    stocker?

3    A.  Yes.

4    Q.  And how long did you wash dishes for during the dinner

5    shift?

6    A.  20, 30 minutes.

7    Q.  And this was every shift you worked as a stocker during

8    dinner, correct?

9    A.  Yes.

10   Q.  Mr. Roballo, did you sit for a deposition in this matter on

11   December 27, 2013?

12   A.  Yes.

13   Q.  Did you give sworn testimony under oath at that deposition?

14   A.  Yes.

15   Q.  I am going to show you a copy of your deposition from that

16   day.

17   A.  Okay.

18           INTERPRETER:  May the interpreter be heard?

19           THE COURT:  Yes.

20           INTERPRETER:  Counsel perhaps did not check this

21   binder.

22           THE COURT:  What are you looking at now?

23           MS. KABIR:  The deposition transcript of Luis Roballo.

24           THE COURT:  Which is in what binder?

25           MS. KABIR:  I believe we gave all the deposition

ECB5sal1                    Roballo – cross

1    transcripts in two volumes to the Court.  All of them should be

2    in the Min-U-Script version.

3              THE COURT:  So, what tab should I go to?

4              MS. KABIR:  I am not sure.  I can take a look?

5              THE WITNESS:  Can I have a glass of water, please?

6    BY MS. KABIR:

7    Q.  On page 64 of your deposition transcript on line 19, were

8    you asked the following questions and did you give the

9    following answers:

10   "Q  Now, when you were working as a stocker, did you wash

11   dishes?

12   "A  Yes.  Sometimes."

13   A.  Yes.

14   Q.  On page 65 of your deposition, line 11, were you asked the

15   following questions and did you give the following answers:

16   "Q  Okay.  So you claim that you washed dishes as a stocker?

17   "A  Yes.

18   "Q  How often did that happen?

19   "A  Very rarely, but I did wash dishes.

20   "Q  When you say very rarely, like once a month?

21   "A  Maybe five or six times, I'd say."

22             Were you asked those questions and did you give those

23   answers?

24   A.  Yes.

25   Q.  So, is it your testimony that you only washed dishes five

ECB5sal1                    Roballo – cross

1    or six times a month?

2    A.  Yes.

3    Q.  When you worked as a busser, what time did your lunch shift

4    start?

5    A.  10:00 a.m.

6    Q.  And from 10:00 until 10:30 a.m. you did your side work,

7    isn't that right?

8    A.  Yes.

9    Q.  And from 10:30 until 11:00 there was a family meal in the

10   Rose Room section of the dining room; isn't that right?

11   A.  Yes.

12   Q.  And after the family meal was finished the bussers assigned

13   to the dining room reset the tables in the Rose Room, correct?

14   A.  Correct.

15   Q.  And during this time the waiters and food runners would be

16   having a meeting in another section of the dining room,

17   correct?

18   A.  Correct.

19   Q.  And at 11:30 a.m. the restaurant opened for lunch

20   customers, correct?

21   A.  Correct.

22   Q.  And beginning at 11:30, as a busser, you would run bread to

23   tables, correct?

24   A.  Yes, when it was my turn at my station and I would get to

25   one of the tables and it was my turn to bring the bread and the

1   water.

2   Q.  And you would also clear and reset the table settings when

3   customers finished their food, correct?

4   A.  Correct.

5   Q.  And at some point during the lunch shift your section of

6   the dining room would start to empty out; isn't that right?

7   A.  Can you repeat, please?

8   Q.  The tables in your section of the dining room would start

9   to empty out during the lunch service, correct?

10  A.  Correct.

11  Q.  And the time this happened differed every day; isn't that

12  right?

13  A.  Correct.

14  Q.  And as the tables got up you had to reset them, correct?

15          INTERPRETER:  I'm sorry, your Honor.  I'm having a bit

16  of problem with the reception of my earphone.  This is --

17  unfortunately, I didn't hear the last part.

18  Q.  As the customers at the tables got up from your section you

19  had to reset them, correct?

20  A.  Correct.

21  Q.  And if all of your customers left early you can start your

22  closing side work at that time; isn't that right?

23  A.  I didn't understand.

24  Q.  You had closing side work as a busser; isn't that right?

25  A.  Correct.

ECB5sal1                    Roballo - cross

1   Q.  And it took you only -- I'm sorry -- strike that.

2           You previously testified it took you no more than 10

3   or 15 minutes to finish your closing side work as a busser;

4   isn't that right?

5   A.  About 10 minutes.  Around there.

6   Q.  And if the tables in your section were empty, you could

7   start this closing side work once the customers had left; isn't

8   that right?

9   A.  No, because I had to wait until the clients would leave so

10  that I could start my side work.

11  Q.  So, you would agree that once the clients had left your

12  section you could begin your side work, correct?

13  A.  When the clients would leave, clearly, so that, yes, I

14  could start my side work.

15  Q.  And if you finished your side work early you could also

16  leave; isn't that right?

17  A.  Well, before 2011 we were 10 and we did not have time to

18  leave like the 34 in the afternoon.  Then after 2011 we did

19  have a schedule that said, there it said you must close or you

20  must work as, from 10:00 to 2:30.

21  Q.  Mr. Roballo, I didn't ask you what time you left.  I am

22  just asking if you were permitted to leave once you finished

23  your closing side work.  You were, correct?

24  A.  Yes.

25  Q.  If you could turn to page 134 of your deposition?  Starting

1   on line 6, were you asked the following questions and did you

2   give the following answers at your deposition:

3   "Q   Now, whether you worked as a busser, was there any closing

4   side work?

5   "A   In the evenings and during the day.  Also for lunch.

6   "Q   Okay, what was the closing side work?

7   "A   You had to keep -- leave the stations clean.

8   "Q   Anything else?

9   "A   Just to leave the stations clean.

10  "Q   How long did that take?

11  "A   In the evening it was quick because you wanted to leave.

12  You can do it in five minutes or 10 minutes the latest, the

13  longest.

14  "Q   What about for lunch?

15  "A   The side work?

16  "Q   Yeah.  Closing side work for lunch?

17  "A   You could also do it in five or 10 minutes because you want

18  to leave quickly also."

19          Did you give those answers at your deposition?

20  A.   Correct.

21  Q.   And that's been true the entire time you worked at Fresco,

22  correct?

23  A.   Not all the time because before 2011 -- before 2011, as I

24  told you between 3:30 p.m. and 4:00 because we did not have

25  time to leave.  And then after 2011 it was different.  It was

ECB5sal1                    Roballo - cross

1    not all the time as the lady says.

2    Q.  You also previously testified that when you worked as a

3    busser you were required to do work that didn't involve

4    customer service, correct?

5    A.  If you can do a favor for me so that I --

6           INTERPRETER:  The witness is asking me directly to do

7    a certain type of interpretation so I will direct him to ask

8    that question, or somebody should direct him to ask that

9    question to the proper person, not to the interpreter.  I do

10   not believe I can make that decision, your Honor.

11          THE COURT:  Sir, what is the problem?

12          THE WITNESS:  The problem is that she is speaking and

13   then you're there, and so maybe when she finishes then so that

14   you can talk to me.

15          THE COURT:  Sir, I want you to listen exclusively to

16   the interpreter.

17          THE WITNESS:  Okay.

18          THE COURT:  I want you to concentrate on him and not

19   listen to her, then you won't get confused.

20          THE WITNESS:  Okay.

21   BY MS. KABIR:

22   Q.  If you could turn to page 4 of your trial declaration?  If

23   you look at paragraph 23 you previously testified:

24   Additionally, when I worked as a busser, I was required to do

25   work that did not involve customer service.  This work included

ECB5sal1                          Roballo - cross

1    cleaning walls, cleaning pictures and paintings.

2          Correct?

3    A.  I had to take care of the customers because I was a busboy.

4    And besides that, I also would do that job that the lady is

5    telling me.

6    Q.  And how often did you clean walls, clean pictures and clean

7    paintings when you worked as a busser?  During every shift?

8    A.  When Mr. Brent or Mr. Attilio would tell me that I had to

9    clean the walls and then the pictures and the stairway.  That

10   was before the lunch started.

11   Q.  And the lunch started at 11:30 a.m., correct?

12   A.  Yes.

13   Q.  And were you instructed to clean these items during every

14   lunch shift you worked as a busser?

15   A.  Can you repeat, please?

16   Q.  Were you instructed to clean walls, clean pictures and

17   clean the staircase during every lunch shift you worked as a

18   busser?

19   A.  Me?  Nobody gave me instructions to clean the pictures.

20          When I started to work I made an application to be a

21   busboy.  I did not make an application to clean pictures or

22   walls or glasses or windows or stairways.  When I was already

23   working, the managers would tell me that I had to do those

24   jobs; to clean the pictures, the walls, the windows, glasses,

25   and the stairway.

1          MS. KABIR:  Move to strike as non-responsive.

2          THE COURT:  Sustained.  The answer is stricken.

3          Would you read back the question, please?

4          (Record read)

5          THE WITNESS:  Yes.  Yes, when I was ordered to do so

6    by the managers.

7    BY MS. KABIR:

8    Q.  How much time did you spend cleaning these items during

9    your lunch shift?

10   A.  About 40 minutes, 30.

11   Q.  From what time period did you perform this work?

12   A.  Sometimes at 11:00, at 11:30.

13   Q.  And you previously testified that the bussers were setting

14   up the Rose Room between 11:00 and 11:30; isn't that right?

15   A.  Yes, but I had to do those things quickly so I could do

16   what the managers had told me; that I had to clean the pictures

17   and I had to go quickly and do that and hurry in order to do

18   what the manager was telling me to do.

19   Q.  And when the customers came in at 11:30, sometimes you

20   would be still cleaning these items, correct?

21   A.  Yes, because I would tell my fellow workers for them to

22   take care of my station in case a customer would arrive so that

23   he could start providing water or bringing the bread, whatever

24   the male or female waiter would tell them to do because I had

25   to finish my job.

ECB5sal1                      Roballo - cross

 1   Q.  So, is it your testimony that you were the only busser

 2   required to do this on your shift you worked during lunch?

 3   A.  No.  Not only to me.  I could see that the large majority

 4   of them were required to -- I would see my fellow workers doing

 5   the same thing.

 6   Q.  Is it your testimony that all the bussers were cleaning the

 7   dining room when customers started to come in at 11:30?

 8   A.  When it was my turn, for example, one day it was my turn to

 9   do it.  Then I had to do it.  Then, another day, it was done by

10   the other fellow workers because those pictures needed to be

11   really, really clean and shining.  The manager said that we had

12   to keep those things, the restaurant really clean.

13   Q.  Which pictures are you referring to?  Are you referring to

14   the oil paintings in the dining room?

15   A.  The pictures that are, when one is going to the bathroom,

16   there are many pictures.  There are way too many of those

17   pictures and the walls in the main dining room and the columns

18   there.  All of those things I had to clean them before the

19   customers would arrive.

20   Q.  Is it your testimony that these pictures were cleaned every

21   day during the lunch shift?

22   A.  I did not do it every day.  I would do it when the manager

23   would tell me, about two times per week, three times.

24   Q.  And was this also during the dinner shift?

25   A.  The greater majority of the times it was during lunch.

1    Q.  And how did you clean the pictures in the staircase?

2    A.  I would clean them with a sponge or with one of those

3    napkins that we use for the clients.

4    Q.  And how long did this take you?

5    A.  30, 40 minutes.

6    Q.  And this was during every lunch shift you worked as a

7    busser?

8    A.  Yes.  As I have told you, when I was given orders by the

9    manager, I would do it two, three times.

10   Q.  You also previously testified that you cleaned walls; is

11   that right?

12   A.  Yes.

13   Q.  Are you referring to the walls in the main dining room?

14   A.  Yes.

15   Q.  Did you clean those walls every shift you were assigned as

16   a busser?

17   A.  When I was told so by the manager.  Then it was my turn to

18   do it.

19   Q.  And how often did that happen when you worked as a busser?

20   A.  Two, three times per week.

21   Q.  Was this during the lunch shifts?

22   A.  A large majority was during the lunch, and at rare

23   occasions, during dinners.

24   Q.  How long did it take you to clean these walls?

25   A.  Some 10 minutes, 15.

ECB5sal1                          Roballo - cross

1   Q.  And what time during the lunch shift did you clean the

2   walls?

3   A.  I would do that between 11:15 to 11:30, approximately,

4   because I had to hurry up to do my side work in order to do

5   what the manager had told me to do.

6   Q.  How did you clean these walls?

7   A.  I would clean them with Windex.  And when the rags would

8   arrive they're dirty with blood.  With those rags we would

9   clean the walls, and even the silverware we would clean with

10  that.

11  Q.  You also testified you worked as a barback, correct?

12  A.  Yes.

13  Q.  And you worked as a barback during both lunch and dinner

14  shifts; isn't that right?

15  A.  Yes.

16  Q.  And as a barback you were responsible for being the busser

17  for all of the tables in the bar section of the restaurant,

18  correct?

19  A.  Yes.

20  Q.  And you were also responsible for assisting the bartender

21  and bussing the seats at the bar, correct?

22  A.  Correct.

23  Q.  And you estimated that you spend half of your shift doing

24  your busser duties at the bar and the other half performing

25  your barback duties, correct?

ECB5sal1                    Roballo - cross

```
 1    A.  Yes.
 2    Q.  Mr. Roballo, you testified that when you applied for a job
 3    at Fresco Restaurant you spoke with Attilio Vosilla, correct?
 4    A.  Yes.
 5    Q.  You told him you were looking for a job as a busser?
 6    A.  Yes.
 7    Q.  Did you give him a resume?
 8    A.  Yes.
 9    Q.  Do you recall whether this was during a lunch shift or a
10    dinner shift?
11    A.  I do not remember very well whether it was lunch or dinner.
12    I do not remember very well.
13    Q.  And Mr. Vosilla told you to come back to train at the
14    restaurant; isn't that right?
15    A.  Yes.
16    Q.  And you came back to train at the restaurant?
17    A.  Yes.
18    Q.  How many shifts did you train for?
19    A.  Two days.
20    Q.  Were these two shifts on the same day or two shifts on two
21    different days?
22              MR. CLARK:  Objection.  I don't believe that that was
23    his testimony.
24              THE COURT:  I don't understand the objection.
25              MR. CLARK:  I believe that his testimony was that he
```

ECB5sal1                    Roballo - cross

1   worked for two days and the question, I believe, spoke of two

2   shifts.

3             MS. KABIR:  I can ask the question again.

4             THE COURT:  Go ahead.

5             THE WITNESS:  Can you repeat, please?

6   BY MS. KABIR:

7   Q.  Did you come back to work during your training, did you

8   come back on two different days?

9   A.  Two days, one after the other.

10  Q.  Was one a lunch shift?

11  A.  There were two days, one after the other, that I trained.

12  Q.  One shift each day, correct?

13  A.  The day has two shifts:  Lunch and dinner.

14  Q.  And you only trained on one shift each day you came back to

15  train, correct?

16  A.  I received training during two shifts, lunch and dinner,

17  and I worked for two days, one after the other one.

18  Mr. Attilio told me you have to train for two days.

19  Q.  And while you were training, you were paired with another

20  busser, correct?

21  A.  Yes.

22  Q.  Do you recall if Mr. Anthony Scotto was present in the

23  restaurant during your training?

24  A.  I did not know that gentleman.

25  Q.  You don't remember if he was present in the restaurant at

ECB5sal1                    Roballo - cross

1    that time?

2    A.  I was focused on my job.  I do not know whether the

3    gentleman was there or he wasn't.  I was concentrating on my

4    job, training, doing as much as I could in order to start

5    working.

6    Q.  You also testified that your employment was terminated at

7    Fresco Restaurant, correct?

8    A.  I did not understand the question.

9    Q.  You testified that you were fired, correct?

10   A.  Yes.

11   Q.  When did this happen?

12   A.  I do not remember.  It was during the summer and I do not

13   remember the month nor the day nor the date, but Mr. Brent was

14   the one who fired me.

15         When I arrived, mister took my things out, my uniform

16   and everything that I used there for my job, and he had placed

17   it outside of the entrance door and he told me, Mr. Luis, there

18   is no more job.  We will call you as soon as we can, but for

19   right now thank you very much for everything.

20   Q.  And you worked at Fresco until April 2013; isn't that

21   right?

22   A.  I do not remember the month.  It was, yes, but 2013, yes.

23   I did work until that year but I cannot remember the month very

24   well.

25   Q.  Do you know if it was Mr. Brent Drill's decision to fire

ECB5sal1                          Roballo – cross

1    you?

2    A.   I do not know.  He was the manager.  He is the one who he

3    decides.  He says to you:  You stay back home or you come to

4    work.  He is the one that hires the person so that they will

5    start working.

6              MS. KABIR:  Move to strike as non-responsive.  The

7    witness testified I don't know so anything after that is not

8    responsive.

9              THE COURT:  Overruled.

10             MS. KABIR:  We have no further questions.

11             THE COURT:  Redirect?

12             MR. CLARK:  If I can have a moment to confer with

13   counsel?

14             THE COURT:  Yes.

15             (Counsel conferring)

16             MR. CLARK:  We have no further questions for this

17   witness.

18             THE COURT:  Thank you.

19             Thank you, sir.  You may step down.

20             THE WITNESS:  Thank you.

21             (Witness excused)

22             THE COURT:  You may call your next witness.

23             MR. ANDROPHY:  Plaintiffs call Nahun Flores.

24    NAHUN FLORES,

25        called as a witness by the Plaintiffs,

ECB5sal1                    Roballo - cross

1          having been duly sworn, through the interpreter,

2          testified as follows:

3               THE DEPUTY CLERK:  Please be seated.  Please state

4     your full name and spell them for the record.

5               THE WITNESS:  My name is Nahun Flores.  N-A-H-U-N,

6     F-L-O-R-E-S.

7               MR. ANDROPHY:  May I approach the witness to give him

8     his declaration?

9               THE COURT:  You may.

10    DIRECT EXAMINATION

11    BY MR. ANDROPHY:

12    Q.  Mr. Flores, is the document I just gave you your

13    declaration which you submit as your direct testimony in this

14    action?

15    A.  Yes, sir.

16               (continued on next page)

17

18

19

20

21

22

23

24

25

Ecb2sal2                        Flores - Direct

1   Q.  And if you could turn to the last page, please, is that

2   your signature on the last page?

3   A.  Yes.

4           MR. ANDROPHY:  We ask that this declaration be

5   admitted as Plaintiffs' Exhibit 111.

6           MR. BENSON:  No objection, your Honor.

7           THE COURT:  It is admitted.

8           (Plaintiffs' Exhibit 111 received in evidence)

9           MR. ANDROPHY:  We also ask that Plaintiffs' Exhibits

10  42, 43, 44, and 82 be admitted.

11          MR. BENSON:  No objection.

12          THE COURT:  They are admitted.

13          (Plaintiffs' Exhibits 42, 43, 44, and 82 received in

14  evidence)

15          MR. ANDROPHY:  Also, with respect to Plaintiffs'

16  Exhibit 82, I notice that there is one document on which we

17  inadvertently included bank account or failed to redact bank

18  account information from one page, so we would like to

19  substitute that page when we have an opportunity so that the

20  admitted exhibit does not include that information.

21          THE COURT:  That's fine.

22          MR. ANDROPHY:  Thank you.

23          I have no further questions at this time.

24          THE COURT:  Cross-examination.

25          MR. BENSON:  Thank you, your Honor.

Ecb2sal2                          Flores - Direct

 1   CROSS EXAMINATION

 2   BY MR. BENSON:

 3   Q.  Good morning, Mr. Flores.

 4   A.  Good morning.

 5   Q.  You were hired by Fresco Restaurant in 1998, correct?

 6   A.  That is so.

 7   Q.  And you worked until the end of April of 2013, correct?

 8   A.  Correct.

 9   Q.  Prior to working at Fresco Restaurant, did you have

10   experience in the restaurant industry?

11   A.  Yes.

12   Q.  That was at Lumi Restaurant?

13   A.  Yes.

14   Q.  What position?

15   A.  Busser.

16   Q.  Was that a tipped house at Lumi?

17   A.  Yes.

18           THE COURT:  Would you spell Lumi?

19           MR. BENSON:  L-U-M-I.

20   Q.  Is that correct?

21   A.  L-U-M-I.

22   Q.  When you first started working at Fresco Restaurant, it was

23   a very busy restaurant, correct?

24   A.  Yes.

25   Q.  And it stayed busy -- strike that.

Ecb2sal2                     Flores - Cross

1        It was busier when you were hired than it was when you

2   left employment, correct?

3   A.  Yes.

4   Q.  Do you remember what year it became less busy?

5   A.  No, I cannot recall.

6   Q.  Was it around 2008?

7   A.  No, more recently, more towards this, perhaps just during

8   the last four years perhaps.

9   Q.  So you think somewhere in 2009 or 2010?

10  A.  '10 or '11.

11  Q.  And when it was busy, would it stay open later?

12  A.  Yes, up until 11:30 at night.

13  Q.  And then when it was less busy, it would close earlier,

14  correct?

15  A.  At 11.

16  Q.  You were hired by Anthony Scotto, correct?

17  A.  He interviewed me during the first interview; and, after my

18  training, Mr. Jerry told me that I was going to start my

19  schedule the next week that I was hired.

20  Q.  Mr. Scotto is the boss of the restaurant, is he not?

21  A.  Yes.

22  Q.  And everybody who works there knows that, correct?

23  A.  Yes.

24  Q.  And he is very hands on, correct?

25  A.  Yes.

Ecb2sal2                    Flores - Cross

1   Q.  And, based on your observation, he was involved in every

2   facet of the operations at Fresco, correct?

3   A.  No, no, he delegates many things to his managers, to

4   Mr. Brent and to Mr. Attilo.

5   Q.  At some point you worked almost exclusively as a coffee

6   person, correct?

7   A.  Yes, a lot of time.

8   Q.  And almost all of your shifts were as a coffee person,

9   correct?

10  A.  About 90 percent.

11  Q.  At what year did you start working 90 percent as the coffee

12  person?

13  A.  I do not remember.  For the 15 years that I worked,

14  approximately ten of those I worked as a coffee maker.

15  Q.  So for the last ten years you were 90 percent assigned to

16  be the coffee person?

17  A.  Yes.

18  Q.  And on the other 10 percent of the time, you would work as

19  a busser?

20  A.  I was split between being as a stocker, a bar-back, a

21  busser, and sometimes as a runner.

22  Q.  So you didn't work as a stocker very often, correct?

23  A.  No; occasionally.

24  Q.  Once a month?

25  A.  Once a week perhaps.

Ecb2sal2                        Flores - Cross

1    Q.  Well, if you work 90 percent of your shifts as the coffee

2    person, how would you work once a week as the stocker?

3    A.  Yes, possibly six shifts as a coffee maker, one as a

4    bar-back and another one as a stocker or a busser, too.

5    Q.  Now, as a coffee person, your responsibility is to pour the

6    beverages and give the beverages to the customers, correct?

7    A.  No, not during the lunch shift.

8    Q.  Okay.  Is it your testimony that when you work as a coffee

9    person during the lunch shift, that you never run beverages to

10   the tables?

11   A.  Occasionally if there was not a helper.  But all of the

12   time, all of the time during lunch there was always a helper.

13   I would dedicate myself to make the coffees, and the helper was

14   the one who took the coffees.

15   Q.  But you didn't have a helper on every shift, did you?

16   A.  Yes.  There was rarely a day that there was not one.

17   Q.  So it is your testimony that there was rarely a day when

18   you worked the lunch shift that there wasn't a specific person

19   assigned as a coffee helper?

20   A.  Yes, there was always a coffee maker and a helper.

21   Q.  And was that true on dinner as well?

22   A.  No.

23   Q.  So if we look at the schedule for lunch shifts, we would

24   see somebody as a coffee person and a coffee helper, is that

25   true?

Ecb2sal2                      Flores - Cross

1    A.  Yes.  Not at that schedule, not at that time.  That would

2    appear --

3              THE COURT:  I disagree with the interpretation of the

4    interpreter.  My understanding of the witness's answer was "not

5    on the schedule."

6              THE INTERPRETER:  "Not on the schedule."

7              THE COURT:  Do you disagree?

8              THE INTERPRETER:  I would have to find -- I always

9    will accept what your Honor says, your Honor.

10             THE COURT:  I'm not the actual interpreter.

11             THE INTERPRETER:  I would have to then wait to find

12   out about the context of it because of the way it can be

13   interpreted in Spanish.  Yes, it could be "the schedule" or "at

14   that time," so I would have to find out.  Or perhaps counsel

15   could be a bit more precise.  Unfortunately the word in Spanish

16   could go two, ways and your Honor is right one of the meanings

17   can be just "schedule."

18   Q.  Isn't it true that it is in fact very rare for a coffee

19   helper to be assigned to the lunch shift?

20   A.  No, it is rare that there is not a helper.

21   Q.  And only when the restaurant is very busy in the latter

22   part of November and in December are there enough reservations

23   to justify a coffee helper.

24   A.  No, no, no, lunch, the great majority of the time during

25   the whole year, during lunch, it is busy.

Ecb2sal2                          Flores - Cross

1    Q.  Is it your testimony that on more than 40 shifts a year

2    there is a coffee person -- strike that.

3              Is it your testimony that on more than 40 shifts a

4    year there is a coffee helper?

5    A.  What is the question?  40 what?

6    Q.  40 shifts.

7    A.  So, on 40 shifts, how many times there is a helper?

8    Q.  No, in the whole year there is no more than 40 shifts where

9    there is a helper, correct?

10   A.  No, no, no, a lot more than 40 shifts.

11   Q.  By a "coffee helper," do you mean other bussers or the

12   stockers who help you run the coffee?

13   A.  No, no, that is why they make it -- assigned a helper that

14   could be any of the busboys.

15   Q.  None at dinner, correct?

16   A.  No.  I would do it me, myself.  I would make the coffees

17   and I would run them.

18   Q.  Isn't it true that on the majority of days there are as

19   many dinner reservations as there are lunch reservations and

20   that the volume of customers is no different?

21   A.  Yes, it is different.  Dinner is a little bit slower, and

22   it allows you time for you to run the coffees.  During lunch --

23   the lunch is during two hours -- everything is done in a hurry.

24   Q.  And it is your testimony that even when you had a helper

25   that you did not run the coffee to the dining room.

1   A.  No.  There wasn't enough time.

2   Q.  Never?

3   A.  No.

4   Q.  So not one time when you had a helper did you assist in

5   running coffee to the dining room?  Is that your testimony?

6   A.  Occasionally, towards the end of the shift, when things had

7   gotten done, I had one or two tickets, the orders for coffee, I

8   would only have one or two dubs or stubs, stubs, requesting

9   coffee.  Yes, toward the end of the shift.  It could have been

10  about 3 p.m.

11  Q.  So even where you had a helper, there were indeed some

12  times when you say that you ran beverages to the dining room,

13  correct?

14  A.  I already told you perhaps one time occasionally toward the

15  end of the shift.

16  Q.  And that would happen on every shift?

17  A.  Occasionally.

18  Q.  Would that happen when it was busy?

19  A.  Yes.

20  Q.  The coffee trays are very small, correct?

21  A.  No, they are a regular size, not very small.

22  Q.  How many cups of coffee can fit on a tray?

23  A.  About 10.

24  Q.  There is also milk and sugar on the trays, right?

25  A.  Everything is included, yes.

Ecb2sal2                    Flores - Cross

1    Q.  How many people come in on a lunch?

2    A.  Between 100 and 150 and as many as 200.

3    Q.  And they all order beverages at once, correct?

4    A.  Within two hours or three hours, as long as the lunch is

5    being served or lunch lasts.

6    Q.  And it is unacceptable for beverages to be served at the

7    wrong temperature, correct?

8    A.  No.

9    Q.  Meaning it is acceptable to serve them at the wrong

10   temperature?

11   A.  No, it is not acceptable.

12   Q.  Thank you.

13           So as a result, they need to be run immediately after

14   they are poured, correct?

15   A.  Correct.

16   Q.  And one person can't possibly run enough to serve the

17   dining room in a timely manner, correct?

18   A.  Yes, it is possible.  It is possible.  I did it for a long,

19   long time.

20   Q.  Don't you get help from the other positions?

21   A.  No.

22   Q.  No help?

23   A.  Occasionally if a waiter would arrive and if he wanted to

24   take his coffee over to his table, he would take -- his or her

25   table, he would take it.

Ecb2sal2                    Flores - Cross

1   Q.  You testified that you worked as a stocker 10 percent of

2   the time, is that right?

3   A.  Yes.

4   Q.  At paragraph 17 of your declaration, it is on page 3, you

5   state, "Sometimes when I worked as a stocker, I was required to

6   do the job of a dishwasher," is that correct?

7   A.  Yes.

8   Q.  So it wasn't all of the time, correct?

9   A.  I did it for -- during a couple of occasions.

10  Q.  So only a couple of occasions, when you were assigned to

11  work as a stocker, did you take the place of a dishwasher,

12  correct?

13  A.  I don't know if I took the place, but I had to wash the

14  dishes that were needed and the silverware that was needed and

15  the coffee cups that I needed.

16  Q.  Is it your testimony that that is something that is

17  normally done by the dishwasher?

18  A.  Yes.

19  Q.  Is it your testimony that on the occasions when you did

20  this, that the dishwasher was not there?

21  A.  Correct.

22  Q.  And you said by -- I apologize.  I don't mean to misquote

23  you.  I thought you said very rarely you did that.  Is that

24  accurate?

25  A.  In my case, yes.

Ecb2sal2                          Flores - Cross

1    Q.  Would that be true -- strike that.

2              In fact, it only happened, on the rare occasions when

3    it did, in the summer months, correct?

4    A.  Yes.

5    Q.  And on those occasions, when would you do it?  At what

6    hours?

7    A.  Between July and August, between 4 or 5, 5 to 6, during

8    those times the dishwasher, they did not call him to start

9    until 6 -- he would leave at 3 and they would not bring him

10   back until about 6 p.m.

11   Q.  So, it is your testimony -- strike that.

12             This didn't happen on every time that you were a

13   stocker during the summer, correct?

14   A.  Yes.

15   Q.  So it was only, even in the summer, a rare occasion,

16   correct?

17   A.  In my case, yes.

18   Q.  It is your testimony that you continued to be a stocker on

19   occasion all the way through the time that you no longer worked

20   at the restaurant, correct?

21   A.  That is correct.  At some occasions, I did the job of a

22   stocker and of a coffee maker for the same wage, that I believe

23   they are two jobs combined into one, and for the same wage.

24             MR. BENSON:  Move to strike, your Honor.  There is not

25   even a question pending.

Ecb2sal2                        Flores - Cross

1            THE COURT:  Sustained.  It is stricken.

2   Q.  When you were hired -- strike that.

3            At some point -- do you remember when Brent Drill was

4   hired in the restaurant?

5   A.  No, I do not remember.

6   Q.  Do you remember he was a waiter for many years?

7   A.  I do not know whether many years, but he did start working

8   as a waiter.

9   Q.  And at some point he became the floor captain, correct?

10  A.  Toward the beginning, yes.

11  Q.  Now, for many years, the waiters run the tip pool at

12  Fresco, correct?

13  A.  Yes.

14  Q.  And the waiters have been running the tip pool for the

15  entire time that you have worked at the restaurant, at Fresco,

16  correct?

17  A.  To take them or to do the closing at night or to distribute

18  the share for each one of the tip.

19  Q.  All of that, waiters have done all of that for the entire

20  time that you have worked at Fresco Restaurant, correct, per

21  shift?

22  A.  Yes, during the whole time there were always two waiters

23  who were in charge to do the closing for the lunch and for the

24  dinner.

25  Q.  Now, the tip pool has different shares depending upon what

Ecb2sal2                          Flores - Cross

1   job you have, correct?

2   A.  Yes.

3   Q.  And for as long as you can remember, the floor captain

4   always had a 1.5 share, correct?

5   A.  No, no.  During the beginning, he had one point.

6   Q.  One point.  At some point, the floor captain went to 1.5

7   points?

8   A.  1.5.

9   Q.  And the waiters made that choice, correct?

10  A.  No, the one who took that decision was Mr. Anthony.  He

11  said that the captain -- that the captain was doing a good job,

12  and that is why he was going to give him a point and a half.

13  Q.  He told that you personally?

14  A.  Yes, yes, he said it during a meeting.

15  Q.  Now, Mr. Drill worked as the party -- as the floor captain

16  during the lunch shift and for a part of the dinner shift,

17  correct?

18  A.  That happened way before, during the beginning.

19  Q.  But it is correct.

20  A.  Yes.  But then afterwards, it has been the manager from --

21  I don't know, 2005/2006, has been the manager from that time

22  toward nowadays.

23  Q.  He was the floor captain for the entire time that you

24  worked until January 1, 2013, correct?

25  A.  No.  He was manager.

Ecb2sal2                        Flores - Cross

1   Q.  Did his responsibilities change from the time that he was

2   the floor captain all throughout?

3   A.  I do not know whether his responsibilities changed because

4   there were other -- there was another -- there were other

5   captains, because there were some other captains.  Some of the

6   other waiters would rotate, and he was the -- he was always a

7   permanent manager during the last years.

8   Q.  At some point, the waiters decided to reduce Mr. Drill's

9   share of the tip pool on the dinner shift, correct?

10  A.  Yes, they decided to reduce what?

11  Q.  Mr. Drill's percentage of the tip pool that he received,

12  his points.

13  A.  I do not know.  I was not aware of this.

14  Q.  Isn't it true that at some point the waiters decided to

15  reduce Mr. Drill's points for the dinner shift?

16          MR. ANDROPHY:  Objection.  Asked and answered.

17          THE COURT:  Sustained.  Asked and answered.

18  Q.  Now, after January 1, 2013, Mr. Drill no longer

19  participated in the tip pool, correct?

20  A.  From what I can remember from January of 2013 until

21  nowadays.

22  Q.  Is that yes?

23  A.  Yes.  From 2013 until nowadays, not before.

24  Q.  And somebody else took his position as a party captain --

25  as a floor captain, correct?

1    A.  Yes, yes.  There always has been a captain.  Some of the

2    other waiters, they rotate.  Then they can wear the suit that

3    the captain wears.

4    Q.  So there has always been a floor captain who participated

5    in the service, correct?

6    A.  Yes.

7    Q.  And that person has always shared in the tip pool, correct?

8    A.  Yes.

9    Q.  In your declaration, you claim that during your years of

10   employment, you were disciplined on two occasions, correct?

11   A.  Yes, from what I can remember, that I can remember of.

12   Q.  In paragraph 56, you state, "In fact, Mr. Drill sent me

13   home twice," correct?

14   A.  Correct.

15   Q.  On one occasion, it was on a Monday, correct?

16   A.  Yes.

17   Q.  For an incident that had allegedly taken place the prior

18   Saturday.  Is that correct?

19   A.  Yes, correct.

20   Q.  And the incident that took place on Saturday was that you

21   failed to bring some cups either back -- was it back to the

22   kitchen?

23   A.  Yes.  It was a cupful (sic) of small espresso coffee cups

24   that he says that I forgot to take from the dishwasher's

25   position over to the station, to the coffee station.

Ecb2sal2                    Flores - Cross

1   Q.  This incident supposedly happened on a Saturday night?

2   A.  Yes.

3   Q.  Did Mr. Drill -- was Mr. Drill working on that Saturday

4   night?

5   A.  I cannot remember.

6   Q.  In fact, he wasn't working on that Saturday night, was he?

7   A.  Okay.  I cannot remember.

8   Q.  And nobody said anything to you that night, did they?

9   A.  No.

10  Q.  So you don't know who saw the incident, correct?

11  A.  No, I do not know.

12  Q.  And you don't know, then, who made the decision to send you

13  home for a day, correct?

14  A.  I do not know.

15  Q.  The other incident, where you allege Mr. Drill sent you

16  home -- by the way -- I withdraw that question.

17          What year did the first incident with the coffee cups

18  occur?

19  A.  I do not remember.

20  Q.  The second incident you allegedly called in sick?

21  A.  Yes.

22  Q.  What year was that?

23  A.  I cannot remember.  It could have been 2008, '9.

24  Q.  Do you recall what day of the week it was?

25  A.  It could have been like a Wednesday or Thursday.

Ecb2sal2                        Flores - Cross

1    Q.  I am asking you if you remember, sir.

2    A.  I told you, about Wednesday.

3    Q.  Are you sure it was a Wednesday?

4    A.  No.

5    Q.  When you called in, who did you speak with?

6    A.  I don't remember with whom it was.  With one of the

7    managers.  It was Attilo or -- I believe it was Attilo.

8              MR. BENSON:  Move to strike after "I don't remember."

9              THE COURT:  Overruled.

10   Q.  What time did you call?

11   A.  No, no, I cannot remember.  It was during the morning.

12   Q.  Mr. Attilo doesn't work in the mornings, does he?

13   A.  No, no.

14   Q.  Meaning you agree that he doesn't work in the morning.

15   A.  I agree.

16   Q.  So you didn't speak to Mr. Attilo, did you?

17   A.  I do not remember.  I do not recall.

18   Q.  So when you said previously that it was Mr. Attilo, that

19   was not accurate.

20   A.  No.  Possibly then I spoke to Brent.  I don't remember.

21   Possibly it could have been the host, James.  Because they are

22   all days, every day.

23   Q.  So you don't remember who you spoke with, correct?

24   A.  No, no, no.

25   Q.  You worked there a lot -- a long time, correct?

Ecb2sal2                          Flores - Cross

1   A.  Yes.

2   Q.  There were other times when you called in sick, correct?

3   A.  Like the -- what's the question?

4   Q.  When you called in sick, there were many times, during the

5   many years that you worked there that you called in sick.

6   A.  Well, there were a few times.

7   Q.  On those other occasions that you called in sick, you never

8   received any discipline as a result of that, correct?

9   A.  The time that I called sick when I spoke to Brent, the next

10  day he sent me back home.  In a sarcastic way he told me, Baby,

11  you need another day rest.  No.  He did not ask me whether I

12  could prove that I was sick or how I felt or how I was, none of

13  that.  As soon as I arrived to the restaurant, he sent me back

14  home.

15          MR. BENSON:  Move to strike, your Honor.  I asked him

16  about other occasions, not this occasion.  We will get to that.

17          THE COURT:  So you are saying that you were asking

18  about different occasions on which he called in sick?

19          MR. BENSON:  Yes, other occasions on which he called

20  in sick.

21          THE COURT:  So I will strike the answer.

22  BY MR. BENSON:

23  Q.  On any other occasion that you called in sick, were you

24  ever disciplined?

25  A.  Yes.

Ecb2sal2                         Flores - Cross

1    Q.  When was that?

2    A.  In July 2010.

3    Q.  This is the occasion that you are speaking about, correct,

4    where you allege that Mr. Drill disciplined you?

5    A.  No, that was another occasion in July 2010.  It was

6    Mr. Attilo.  I called.  I was sick and I called on a Saturday,

7    and the hostess told me that -- Mr. Attilo told me the hostess

8    said that no one can call in sick, and he sent me back home as

9    a penalty.  He sent me back home as a punishment for one week.

10   He sent me home.

11   Q.  So it is your testimony that you got sent home for a week

12   for calling in sick?

13   A.  Yes.

14   Q.  Did you speak with Mr. Vosilla directly in that situation?

15   A.  With whom?

16   Q.  Did you speak with Mr. Vosilla directly?

17   A.  Yes, after he sent me back home, that evening he called me

18   on the phone and he told me take the whole week off.

19   Q.  Was that because you were sick, you couldn't come to work?

20   A.  Yes.

21   Q.  Is that the only time in all of the years that you worked

22   at Fresco that you allege that Mr. Vosilla disciplined you?

23   A.  Yes.

24   Q.  And what sickness did you have on that occasion?

25   A.  Only I have a slight fever.

Ecb2sal2                        Flores - Cross

1   Q.  You deliver food to people, correct, sir, as part of your

2   job?

3   A.  Do you mean was I a runner?

4   Q.  No, strike that.

5         It is very important that you not perform your job

6   when you are sick, correct?

7   A.  I do not think so.

8   Q.  So is it your belief that if you are sick that you can

9   still come to the restaurant and serve food to people?

10  A.  No, but why is he going to send me back home for a week?

11  Q.  It is nonresponsive to my question, sir.

12        MR. BENSON:  Move to strike.

13        THE COURT:  I am striking that part that begins with

14  "why."

15  Q.  It is important for the restaurant to be careful, correct,

16  and make sure that you are healthy in order to serve food,

17  correct?

18  A.  Yes.

19  Q.  On other occasions you called in sick and had -- strike

20  that.

21        Other than the coffee situation and being told

22  allegedly to take one more day after you had called in sick,

23  are there any other incidents of discipline that you received

24  from Mr. Drill?

25  A.  Right at this moment I do not remember, I do not recall.

Ecb2sal2                          Flores - Cross

1   Q.  So is the answer -- strike that.

2           If you were ever suspended, would you remember that?

3   A.  I already told you the week that I was suspended because I

4   called in sick.

5   Q.  There were no other suspensions that you received at any

6   time you worked at Fresco, correct?

7   A.  No, I cannot remember now, no.

8   Q.  Other than -- strike that.

9           There is only one other incident -- strike that.

10          Other than the one situation where you claim that

11  Mr. Vosilla told you to take more time when you called in sick,

12  are there any other incidents of discipline that you observed

13  on the part of Mr. Vosilla?

14  A.  Yes, on some occasions.

15  Q.  When?

16  A.  It was around 2012 or '13, a fellow worker refused to work

17  as a bar-back, and he fired him -- and he dismissed him.

18  Q.  Who was that?

19  A.  The name is here.  I think his name is José Amezquita.

20  Q.  Do you have personal knowledge of the circumstances

21  surrounding that?

22  A.  Yes, it happened in front of me.

23              (Continued on next page)

24

25

ECB5sal3                        Flores - cross

1   BY MR. BENSON:

2   Q.  Was Mr. Scotto present?

3   A.  No.  Not at that time, no.

4   Q.  Do you know if he had consulted with Mr. Scotto?

5   A.  I do not think so because this man, this fellow worker

6   Jose, he spoke later on to Mr. Anthony and they were able to

7   settle the matter and so he did remain; he stayed there

8   working.

9   Q.  So, Mr. Anthony intervened and the person continued to

10  work, correct?

11  A.  Yes, for a certain time, but then he was also dismissed.

12  Q.  Are there any other incidents in your many years of

13  employment where you have observed Mr. Vosilla discipline

14  someone?

15  A.  Yes.  On another occasion he dismissed a stocker whose name

16  I cannot remember right now.  And there were some other ones

17  but I cannot remember them exactly.

18  Q.  Can you remember when this stocker was supposedly let go by

19  Mr. Vosilla?

20  A.  It wasn't Vosilla, it was Mr. Brent.

21  Q.  I am asking you questions about Mr. Vosilla.  Do you wish

22  to change your testimony that there was another stocker?

23  A.  No.  Mr. Vosilla -- Mr. Vosilla dismissed a fellow worker.

24  His name is Carlos -- Juan Carlos.

25  Q.  When did this situation take place?

1    A.  I cannot recall whether it was 2011 during the evening,

2    late evening, 11:30 or 12:00 midnight, toward the end of the

3    shift.

4    Q.  Were you present?

5    A.  Yes.

6    Q.  And what happened to lead to this individual being

7    disciplined?

8    A.  He, Juan Carlos, he only told me that there were too many

9    workers there and so that that was the reason.  That was the

10   only reason.

11          MR. BENSON:  Objection, your Honor.  Move to strike as

12   hearsay.

13          MR. ANDROPHY:  He asked for --

14          THE COURT:  Overruled.

15          INTERPRETER:  Your Honor, I need to take a very quick

16   bathroom break, please.

17          THE COURT:  We will take a bathroom break of a few

18   minutes.

19          (Recess)

20          THE COURT:  You may continue.

21          And remember that you are under oath, sir.

22          THE WITNESS:  Yes.

23   BY MR. BENSON:

24   Q.  Mr. Flores, in 2010 isn't it true that you arrived to work

25   for a shift in an intoxicated state and were sent home by

ECB5sal3                    Flores - cross

```
 1   Mr. Scotto and told to take a week off?

 2   A.  No.  That is not true.

 3   Q.  It is your testimony that that never happened?

 4   A.  Not intoxicated.

 5   Q.  Okay, but Mr. Scotto did send you home for a week, though?

 6           INTERPRETER:  May the interpreter be heard, please?

 7           THE COURT:  Yes.

 8           INTERPRETER:  The word "intoxicated" in Spanish has

 9   different meaning, one is intoxicated the other is ebrio,

10   perhaps --

11           MR. BENSON:  Inebriated.

12           THE COURT:  Do you mean drunk?

13           MR. BENSON:  Drunk.

14           INTERPRETER:  Thank you.

15           THE WITNESS:  No.  That was invented by the porter and

16   his name is Willy.  Me, I faced him.  I faced him and I said,

17   Why are you saying that I was drunk?  Did you see me or did you

18   give me things to drink?  Why are you saying that I am coming

19   here drunk?  When I called, the hostess said Mr. Attilio said,

20   no, and the hostess told me that Mr. Attilio said that no one

21   is to call in sick and she hung up on me.

22           So, then I started thinking about, well, I'm not --

23   I'm feeling a little bit indisposed or not well but I am still

24   going to work.  So then, when I arrived, Mr. Attilio was there

25   and Willy was also there, the porter, and they were laughing,
```

ECB5sal3                          Flores - cross

1   What are you doing here if you are sick?  Go home.

2           So, I went back home and then afterwards I know I

3   found out that Willy had said that I had -- I was drunk right

4   in front of Willy.  And Mr. Attilio and they saw that I was all

5   right.  So then, afterwards, I faced Willy and I asked him why

6   are you saying that I arrived here drunk?  Did you provide me

7   with my, with the drinks or did you see me drinking?  He didn't

8   reply anything, all he did is he lowered his head.  And then

9   during that evening Mr. Attilio, he called me and he told me

10  that I was to be -- to go home for a week.  I have a week off.

11  BY MR. BENSON:

12  Q.  Okay.  So, this is the incident that you previously

13  testified to where you allege that Mr. Vosilla sent you home

14  for a week, correct?

15  A.  Yes.

16  Q.  Now, on that night, sir, isn't it true that you sat in

17  Mr. Scotto's office with Willy interpreting for 45 minutes

18  discussing this situation?

19  A.  Never did I go to the gentleman's office.  Never was I

20  called there.  No.  No.

21  Q.  Is it your testimony that you did not see Mr. Scotto, with

22  Willy acting as the interpreter, on the day in question?

23  A.  No.

24  Q.  And it was Mr. Scotto who sent you home as a result of this

25  incident and told you to take a week off?

 1  A.  No.  No.  No.  No.

 2          That same night, that Saturday, it was Mr. Attilio who

 3  called me back home and he told me you are -- you are let off

 4  for a whole week because you called in sick.  He didn't tell me

 5  that because I was drunk.  Then, afterwards, I found out that

 6  Willy was saying that I had arrived drunk.

 7  Q.  Is it your testimony that you never saw Mr. Scotto in

 8  connection with that incident on the night in question?

 9  A.  No.  Never.  Never have I spoke to him.  Never.  No.

10  Q.  Is it your testimony that he wasn't at the restaurant on

11  the night in question?

12  A.  No.

13          THE COURT:  Well, are you saying that he was not in

14  the restaurant?  Are you saying that he was not in the

15  restaurant?

16          THE WITNESS:  No.  That Saturday he was not there.

17          MR. BENSON:  I have no further questions.

18          THE COURT:  Redirect?

19  REDIRECT EXAMINATION

20  BY MR. ANDROPHY:

21  Q.  Mr. Flores, this incident in 2010 that you testified that

22  you were told not to come in after calling in sick, were you --

23  A.  Can you speak louder?  Yes.  Can you start the question?

24  Q.  Yes.  I withdraw the previous question and I will start

25  again.

1              When you were told to stay home for a week in July

2    2010 because you had called in sick, did Attilio tell you to

3    check in the rest of the week and let him know if you were

4    still sick?

5              MR. BENSON:  Objection.  Leading, your Honor.

6              THE COURT:  Sustained.

7    BY MR. ANDROPHY:

8    Q.  When you called in sick, were you told right then not to

9    work for the whole week?

10             MR. BENSON:  Objection, your Honor.  Leading.

11             THE COURT:  Sustained.

12             Ask him what he was told.

13   BY MR. ANDROPHY:

14   Q.  When you called in sick in July 2010, what exactly were you

15   told?

16   A.  Take the rest of the week, the whole week off.  And because

17   you called in sick, call during the week to find out your new

18   schedule.

19             THE COURT:  And who told you that?

20             THE WITNESS:  Mr. Attilio.

21   BY MR. ANDROPHY:

22   Q.  Did you tell Attilio that you thought you were going to be

23   sick for the whole week?

24             MR. BENSON:  Objection, your Honor.  Leading.

25             THE COURT:  Overruled.  You can answer the question.

ECB5sal3                        Flores - redirect

1              THE WITNESS:  Can you repeat the question?

2   BY MR. ANDROPHY:

3   Q.  When you called in sick, did you know how long you were

4   going to be sick for?

5   A.  No.

6   Q.  Did you tell Attilio how long that you would be sick for?

7              MR. BENSON:  Objection.  Leading.

8              THE COURT:  Overruled.

9              INTERPRETER:  He said something so I can't hear, your

10  Honor.  I apologize, your Honor.  I didn't hear you.

11             THE COURT:  The question is did you tell Attilio how

12  long you would be sick for?

13             THE WITNESS:  No.

14  BY MR. ANDROPHY:

15  Q.  Did you ever work on the same shift as the coffee preparer

16  and as a stocker?

17  A.  Yes.

18  Q.  And when that happened were you paid out of the tip pool

19  for both positions or for only one?

20  A.  Only from one portion.  For one position.

21             THE COURT:  I don't understand your question.

22             MR. ANDROPHY:  Sure.

23             The question was when he served as both the stocker

24  and the coffee preparer, did he receive the share in the tip

25  pool for both positions or for only one.

1          THE COURT:  So are you asking him whether he received

2     a tip wage for one and not for the other?  Is that what you are

3     asking?

4          MR. ANDROPHY:  I apologize.  I am asking whether he

5     received both the stocker's points on the shift as well as the

6     coffee person's points on the shift, or whether he received one

7     position's tips.

8          THE COURT:  As finder of the fact I have no idea

9     whether they're the same points or different points.

10    BY MR. ANDROPHY:

11    Q.  Mr. Flores, are you familiar with the tip pool that was

12    used by Fresco by Scotto?

13    A.  Yes.

14    Q.  And were there different points for each position that

15    determined what share of the tips that position would receive?

16    A.  Yes.

17    Q.  Do you recall how many points were assigned for the stocker

18    position on the tip pool sheet?

19    A.  Half a point.

20    Q.  And do you recall how many points were assigned on the tip

21    pool sheet for the coffee preparer?

22    A.  .6.

23    Q.  When you worked as both the coffee preparer and the stocker

24    on the same shift, did you receive -- how many points did you

25    receive tips for?

ECB5sal3                         Flores - redirect

1   A.  .6.

2   Q.  You were asked previously about when it gets very busy

3   during the lunch period and there are a lot of coffee orders.

4   Do you remember that?

5   A.  Yes.

6   Q.  If you are the coffee preparer, do you prepare all of those

7   drinks?

8   A.  Yes.  That is so.

9   Q.  And did anyone ever tell you that it is important that

10  coffee drinks be prepared quickly?

11  A.  Yes.

12  Q.  Who has told you that?

13  A.  The manager.

14          MR. ANDROPHY:  I have no further questions.

15          MR. BENSON:  I would just like a minute, your Honor.

16          (Counsel conferring)

17          MR. BENSON:  No further questions, your Honor.

18          THE COURT:  Thank you, sir.  You may step down.

19          (Witness excused)

20          THE WITNESS:  Excuse me.

21          THE COURT:  Call your next witness.

22          MR. ANDROPHY:  Plaintiffs call Angel Cedeno.

23          THE COURT:  Is this your final witness for today?

24          MR. ANDROPHY:  Yes, your Honor.

25   ANGEL CEDENO,

ECB5sal3                        Flores - redirect

1              called as a witness by the Plaintiffs,

2           having been duly sworn, testified as follows:

3                THE DEPUTY CLERK:  Please state your name for the

4      record and spell them.

5                THE WITNESS:  Angel Cedeno.  A-N-G-E-L  C-E-D-E-N-O.

6                THE COURT:  You may inquire.

7                MR. ANDROPHY:  May I approach to hand the witness his

8      declaration?

9                THE COURT:  Yes.

10               THE WITNESS:  Thank you.

11     DIRECT EXAMINATION

12     BY MR. ANDROPHY:

13     Q.  Mr. Cedeno, is the document I have just placed before you

14     your declaration which you have submitted to serve as your

15     direct testimony in this action?

16     A.  Yes.

17     Q.  If you can turn to the last page, please?  Is that your

18     signature on the last page?

19     A.  Yes.

20               MR. ANDROPHY:  We ask that this be admitted as

21     Plaintiff's Exhibit 112.

22               THE COURT:  Any objection?

23               MR. BENSON:  No objection, your Honor.

24               THE COURT:  Admitted.

25               (Plaintiff's Exhibit 112 received in evidence)

ECB5sal3                        Cedeno - cross

1          MR. ANDROPHY:  We also ask that exhibits 39, 40 and

2     41, which Mr. Cedeno identifies in his declaration, also be

3     admitted into evidence.

4          MR. BENSON:  No objection, your Honor.

5          THE COURT:  They're admitted.

6          (Plaintiff's Exhibits 39, 40 and 41 received in

7     evidence)

8          MR. ANDROPHY:  We have no further direct examination.

9          THE COURT:  Cross-examination?

10         MR. BENSON:  Thank you very much, your Honor.

11    CROSS EXAMINATION

12    BY MR. BENSON:

13    Q.  Good morning, Mr. Cedeno.

14    A.  Good morning.

15    Q.  You were hired in 2011, correct, by Fresco?

16    A.  Yes.

17    Q.  And you were interviewed and hired by Anthony Scotto,

18    correct?

19    A.  Yes.

20    Q.  Now, prior to working at Fresco, did you have experience

21    working as a busser?

22    A.  Yes.

23    Q.  And where was that experience from?

24    A.  At Barbetta Restaurant?

25    Q.  And were you working at Barbetta at the time that you were

ECB5sal3                          Cedeno - cross

 1    hired at Fresco?

 2    A.  Yes.

 3    Q.  And did you continue working at Barbetta after you were

 4    hired by Fresco?

 5    A.  Yes.

 6    Q.  So you worked at both places at the same time, correct?

 7    A.  Yes.

 8    Q.  And is that true for the entire time that you have worked

 9    at Fresco?

10    A.  Yes.

11    Q.  Are you currently employed by Fresco?

12    A.  Yes.

13    Q.  Is it your testimony that you performed certain shifts as a

14    stocker?

15    A.  At Fresco?

16    Q.  Yes.

17    A.  Yes.

18    Q.  How often?

19    A.  During the beginning, two or three times.

20    Q.  Two or three times a week?

21    A.  Yes.

22    Q.  And has that continued throughout your employment at

23    Fresco?

24    A.  Until today?

25    Q.  Yes.

1    A.  No.  It has changed.

2    Q.  You work less shifts as a stocker now?

3    A.  No.  I just work on the floor and at the bar.

4    Q.  So you work no shifts a stocker?

5    A.  At the beginning when I started working at Fresco.

6    Q.  So I am asking currently you are no longer assigned to the

7    stocker role, correct?

8    A.  Correct.

9    Q.  And from approximately or -- strike that.

10        When did you no longer perform the stocker role,

11   assignment?  Assignment, role; whatever.

12   A.  I recall -- it has been a year.

13   Q.  So, in the last year you have not worked as a stocker?

14   A.  No.

15   Q.  Is that true of other senior bussers as well?

16        THE COURT:  By senior you mean the more experienced?

17   Q.  More experienced; yes.

18   A.  When you start to work at Fresco you must have experience,

19   all right?  You have to know how to set the plates and the

20   glasses.  What do you refer to by experience?

21   Q.  Experience at Fresco, the people with the more experience

22   as bussers are less likely to be assigned as stockers, correct?

23   A.  Correct.

24   Q.  Is it your testimony that you ever had to replace the

25   position of the dishwasher on any of the occasions where you

1    were assigned as a stocker?

2    A.  I remember just once but only just once.

3    Q.  So, only one time during the entire time that you had been

4    employed at Fresco, did you ever serve as a dishwasher when you

5    were assigned the stocker role, correct?

6    A.  Correct.

7    Q.  And for how long a period of time did you do it on that

8    occasion?

9    A.  15 to 20 minutes.  Only for the remainder dishes that were

10   left on the tables.

11   Q.  So, the entire time that you worked at Fresco Restaurant

12   you spent 15 to 20 minutes taking the place of a dishwasher,

13   correct?

14   A.  Correct.

15   Q.  Now, the lunch shift at Fresco starts at 10:00 a.m.,

16   correct?

17   A.  Correct.  That is correct.

18   Q.  That is for a late or closer, in which case it is 11:00,

19   correct?

20   A.  Correct.

21   Q.  Now, when your shift starts at 10:00 a.m. you are free to

22   leave when your section is clear and your closing side work is

23   completed, correct?

24   A.  Correct.  Yes.

25   Q.  And if you are not in a closing station that will be much

ECB5sal3                         Cedeno - cross

1   earlier, correct?

2   A.  When you are seeing -- saying -- when you are saying

3   station, the closer, is that something like that that you said?

4   Q.  I will withdraw the question.  That is a fair response.

5           The closers are put in a certain section of the

6   restaurant, correct?

7   A.  No.

8   Q.  No.

9           And the people who come in later at lunch aren't

10  placed in the section where the closers are working?

11  A.  Only for the person who works the lunches, the one that is

12  assigned to close, whether he or she arrives at 10:00 or 11:00

13  he is assigned for that lunch.  He is the one that closes.

14  Q.  And he has to stay until the last customer is done eating,

15  correct?

16  A.  Correct.

17  Q.  But if you are not the closer you do not have to wait until

18  the last customer leaves, correct?

19  A.  Correct.

20  Q.  And you are free to leave when your particular section is

21  clear and your closing side work is completed, correct?

22  A.  Correct.

23  Q.  So that if you are not the closer your shift will end much

24  earlier than if you are not the closer, correct?

25  A.  Correct.

ECB5sal3                          Cedeno - cross

1   Q.  And on most shifts where you are not the closer it usually

2   ends around 2:30, correct?

3   A.  2:30, 2:15.  Around there.  But, one always tells the

4   captain or the manager that is in charge or the one, the floor

5   captain whether one can leave.  And if they accept that one can

6   leave, then you can go.  If there are very many tables and

7   clients you cannot leave because they are too many.

8   Q.  So, sometimes you have to help others out because the

9   dining room is still full, correct?

10  A.  Correct.

11  Q.  But, generally speaking, when your section is clear and

12  your side work is completed you are free to leave, correct?

13  A.  Correct.

14  Q.  And that is usually somewhere between 2:15 and 2:30,

15  correct?

16  A.  Correct.

17  Q.  There was always a floor captain on the floor, correct?

18  A.  Correct.

19  Q.  And that floor captain wears a suit, correct?

20  A.  Correct.

21  Q.  And that floor captain is in charge of the service,

22  correct?

23  A.  Correct.

24  Q.  Until January 1st of 2013 Brent Drill was the floor

25  captain, correct?

ECB5sal3                    Cedeno - cross

1    A.  Well, manager.

2    Q.  He was also the floor captain, correct?

3    A.  That is the dilemma that we have because me, personally, I

4    did not know whether he was a captain and a manager at the same

5    time because Mr. Anthony once said that Mr. -- that that

6    gentleman was a manager.

7    Q.  But you saw him every day perform the role of the floor

8    captain, correct?

9    A.  Yes.

10   Q.  You testified that you observed Mr. Vosilla terminate

11   somebody; is that correct?

12   A.  Are you referring to Attilio?

13   Q.  Yes.

14   A.  Yes.

15   Q.  And who was that?

16   A.  Juan.

17   Q.  What is Juan's last name?

18   A.  I only knew him as Juan.  I do not know his last name.

19   Q.  What year did this take place?

20   A.  During this year.

21   Q.  Was Mr. Scotto present at the restaurant at the time?

22   A.  No.  I do not remember.

23           THE COURT:  Are you saying he was not there or you

24   cannot remember if he was there or not?

25           THE WITNESS:  I do not remember whether he was there.

ECB5sal3                          Cedeno - cross

1    BY MR. BENSON:

2    Q.  You have been provided with shirts by Fresco Restaurant,

3    correct?

4    A.  Yes.

5    Q.  And you have not paid for those shirts, correct?

6    A.  At the beginning I paid $25 for one.

7    Q.  You paid for one shirt?

8    A.  Yes.

9    Q.  And have others been provided to you for free?

10   A.  Oh, that?  I do not know.

11   Q.  Has the restaurant given you more than one shirt since you

12   have been employed?

13   A.  Yes; because I have asked for it from Attilio and from

14   Brent.

15   Q.  And on those occasions you have not been charged for those

16   shirts, correct?

17   A.  Only the first one.

18   Q.  And when you paid $25 for the first one, who did you pay

19   that to?

20   A.  To a lady that's in the office.  She is the one that makes

21   the checks.  I do not remember her name but she did not give me

22   a receipt or something, in other words, that --

23   Q.  And since that time you have been given many shirts by the

24   restaurant without paying for them, correct?

25   A.  About four of the yellow shirts.  We are now using a white

ECB5sal3                        Cedeno - cross

1   shirt, that is the new work uniform.  We have to buy our new

2   one -- well, the tie.

3   Q.  I'm sorry.  You have to buy what?

4   A.  The tie.

5   Q.  So you have to buy a tie on your own, is that your

6   testimony?

7   A.  Yeah.

8           MR. BENSON:  I have no further questions, your Honor.

9           THE COURT:  Redirect?

10          MR. ANDROPHY:  If I may just have one minute?

11          (Counsel conferring)

12          MR. ANDROPHY:  I have no redirect for this witness.

13          THE COURT:  Thank you, sir.  You may step down.

14          THE WITNESS:  Thank you.

15          (Witness excused)

16          THE COURT:  So, have the parties scheduled a

17   sufficient amount of witnesses for tomorrow so that we will go

18   through 3:30?

19          MR. ANDROPHY:  I believe we expect to complete all the

20   plaintiffs' witnesses but I'm not -- the only one I am

21   uncertain of is the one in Mexico, Mr. Lugo.  If I can turn

22   this over to Mr. Clark who has been handling more of those?

23          MR. CLARK:  Yes.

24          Mr. Lugo, I am going to be attempting to work out a

25   simulation later today here and make sure that there are no

ECB5sal3

1  technical issues.  If I do discover that there are any

2  technical issues that might delay his testimony -- but

3  otherwise I would anticipate that we would be able to have him

4  testify tomorrow.

5          THE COURT:  So, does the defense have witnesses lined

6  up then, to the extent that the plaintiffs do not take up the

7  full amount of time?

8          MR. BENSON:  We were always under the impression that

9  it was going to take all day tomorrow to finish and I don't see

10  why it wouldn't because we have, I believe, a total of four

11  witnesses.  So, the answer is we have not contemplated going

12  forward tomorrow.

13          THE COURT:  But you expect that Mr. Scotto is going to

14  be a witness, correct?

15          MR. BENSON:  I do.

16          THE COURT:  All right.  So, if they finish early you

17  are putting him on or someone else.

18          MR. BENSON:  Okay.

19          THE COURT:  Thank you very much.  See you tomorrow at

20  9:00.

21          MR. ANDROPHY:  Your Honor, may I raise one thing?

22          THE COURT:  Yes.

23          MR. ANDROPHY:  I note the defendants discussed

24  yesterday possibly having Mr. Scotto provide supplemental

25  direct testimony.  We would ask that if, aside from what has

ECB5sal3

1    been submitted in declaration, we would ask that that is done

2    soon, that rather than have additional testimony he provide

3    supplemental declaration.  The defendants have had the benefit

4    of having every plaintiff's complete direct testimony in

5    preparing their cross and we ask the same opportunity to have

6    the complete direct examination in writing to prepare our

7    cross-examination.

8         MR. BENSON:  If that's going to be the case then we

9    are obviously going to need more time before we put Mr. Scotto

10   on.  I have no problem with doing my questioning on redirect,

11   but I think that the additional questions that I am going to

12   ask him are more in the form of redirect.  And so, that wasn't

13   contemplated in the procedure, in the Court's procedures as

14   providing written redirect and that really is the nature.  It

15   is more a point of order than anything else that I am

16   requesting that we continue it.  I am more than happy to wait

17   until redirect to do that questioning.

18        MR. ANDROPHY:  We have no problem with defendants

19   asking Mr. Scotto questions on redirect but if they intend to

20   explore areas that are not covered by cross-examination and not

21   covered by Mr. Scotto's declaration that he submitted, we would

22   ask that those be provided ahead so that we can have the same

23   opportunity to prepare that defendants have had for any

24   witness.

25        THE COURT:  It is 12 noon.  You have hours and hours

ECB5sal3

1    and hours.  The night is young.  So, if you are going to go

2    into a new area, then you ought to prepare a redirect

3    affidavit.

4              MR. BENSON:  Well, we are also going to be preparing

5    for tomorrow's witnesses but that assumes that Mr. Scotto is

6    our first witness, which he may not be.

7              THE COURT:  Well then whomever it is that is going to

8    go.

9              MR. ANDROPHY:  If he is not the first witness we are

10   happy to get that additional redirect regardless of whether he

11   is the first witness or not.  If he is not the first witness,

12   obviously they'll have a lot more time to do that.

13             THE COURT:  All right, then.  Tomorrow at 9:00.  Thank

14   you.

15             MR. BENSON:  Your Honor, what will the schedule be

16   tomorrow in terms of are we going to have a lunch break?  Are

17   we going to --

18             THE COURT:  What about 11:15 to 12:00 as our break?

19             MR. BENSON:  Whatever your Honor --

20             THE COURT:  I am proposing that.

21             MR. ANDROPHY:  That works for us.  I just remind the

22   Court, I requested that we end by 3:30 and I just want to

23   remind everyone, make sure that is understood.

24             THE COURT:  All right.  So, we will break between

25   11:15 and 12:00.

ECB5sal3

1          MR. BENSON:  Thank you.

2          THE COURT:  Okay.

3          MR. ANDROPHY:  Thank you, your Honor.

4          (Adjourned to 9:00 a.m., December 12, 2014.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        INDEX OF EXAMINATION

 2     Examination of:                         Page

 3     LUIS ROBALLO

 4     Direct By Mr. Clark  . . . . . . . . . . . 332

 5     Cross By Ms. Kabir . . . . . . . . . . . . 333

 6     NAHUN FLORES

 7     Direct By Mr. Androphy . . . . . . . . . . 358

 8     Cross By Mr. Benson  . . . . . . . . . . . 360

 9     Redirect By Mr. Androphy . . . . . . . . . 384

10     ANGEL CEDENO

11     Direct By Mr. Androphy . . . . . . . . . . 389

12     Cross By Mr. Benson  . . . . . . . . . . . 390

13                        PLAINTIFF EXHIBITS

14     Exhibit No.                          Received

15      110  . . . . . . . . . . . . . . . . . . 333

16      56, 57, 58 and 59  . . . . . . . . . . . 333

17      111  . . . . . . . . . . . . . . . . . . 359

18      42, 43, 44, and 82 . . . . . . . . . . . 359

19      112  . . . . . . . . . . . . . . . . . . 389

20      39, 40 and 41  . . . . . . . . . . . . . 390

21

22

23

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300