Ecc2sal1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   ENRIQUE SALINAS, et al.,

 4                  Plaintiffs,

 5           v.                           13-cv-2992 (AT)

 6   STARJEM RESTAURANT CORP., et al.,

 7                  Defendant.

 8   ------------------------------x

 9                                        New York, N.Y.
                                          December 12, 2014
10                                        9:00 a.m.

11   Before:

12                       HON. ANALISA TORRES

13                                        District Judge

14

15                          APPEARANCES

16   MICHAEL FAILLACE & ASSOCIATES, P.C.
          Attorneys for Plaintiffs
17   BY:   JOSHUA S. ANDROPHY, ESQ.
           SHAWN R. CLARK, ESQ.
18
     LITTLER MENDELSON, P.C.
19        Attorneys for Defendants
     BY:   CRAIG R. BENSON, ESQ.
20         NAVEEN KABIR, ESQ.

21
     Also Present:  G. Eugene Alvarez
22                  Spanish Interpreter

23

24

25
```

Ecc2sal1

1          (Trial resumed)

2          THE COURT:  Good morning.

3          COUNSEL:  Good morning.

4          MR. BENSON:  Your Honor, as a few points of order,

5   last night we prepared a supplemental declaration for

6   Mr. Scotto and are prepared to go forward with him as a witness

7   today if time allows.

8          In conferring with counsel this morning, he informed

9   me that there are still two additional witnesses that he is

10  contemplating utilizing in this matter, and when will those

11  witnesses go?  Will they go in the middle of our defense case,

12  in which case Mr. Scotto, for example, will have testified

13  without having the benefit of hearing what they have to say?  I

14  want to know how it is going to work in terms of that and

15  whether or not I will be able to then recall him.  It seemed to

16  me at some point their case has to conclude and we are entitled

17  at that point to put our defense in.  I am just curious as to

18  how your Honor wants to approach that issue.

19         THE COURT:  The way that it would work if there are

20  plaintiffs' witnesses today and we have to go to one of your

21  witness I will hold their case open and to the extent that they

22  bring in a witness who testifies on a matter that your client

23  has not had an opportunity to testify on, you can recall your

24  client.

25         MR. BENSON:  Okay.

Ecc2sal1

1          Also, with respect to our rebuttal case, there are a

2     couple of additional, what should be reasonably short witnesses

3     that we intend to call.

4          THE COURT:  Exactly what is it that you mean by

5     rebuttal?  Because usually it is the plaintiffs' case the

6     defense case and then the plaintiff would get a rebuttal so I'm

7     not sure what you mean by defense rebuttal.

8          MR. BENSON:  Well, in this case or as defense

9     witnesses based upon what we heard in the testimony as opposed

10    to what we had heard before.  New things that came up that need

11    to be addressed as part of the defense's case, call it what you

12    may.  So in those situations, my question is do we need to

13    submit declarations for those individuals prior to their

14    testimony or can we just do direct and then allow plaintiff to

15    cross.

16         THE COURT:  As time permits.

17         MR. BENSON:  Okay.

18         THE COURT:  As time permits.  It's really a matter of

19    time.

20         MR. BENSON:  Okay.

21         THE COURT:  Anything further.

22         MR. BENSON:  No, your Honor.

23         MR. CLARK:  Nothing for plaintiffs.

24         THE COURT:  Call your next witness, please.

25         MR. CLARK:  Yes, plaintiffs call Mr. Miguel Cervantes

Ecc2sal1

1     to the stand.

2      MIGUEL CERVANTES,

3          called as a witness by the plaintiffs

4          having been duly sworn, testified as follows:

5     DIRECT EXAMINATION

6     BY MR. CLARK:

7     Q.  Good morning, Mr. Caravantes.

8     A.  Good morning.

9              MR. CLARK:  Your Honor, may I approach the witness?

10             THE COURT:  You may.

11    Q.  Mr. Caravantes, do you recognize the document that I just

12    presented you?

13    A.  Yes.

14    Q.  Do you intend for this declaration to serve as your direct

15    testimony in this matter?

16    A.  Yes.

17    Q.  Could you please turn to the last page.

18             Mr. Caravantes, is this your signature here on the

19    last page of this declaration?

20    A.  Yes.

21             MR. CLARK:  At this point plaintiffs would seek to

22    admit this declaration as Plaintiff's Exhibit 113.

23             THE COURT:  Any objection.

24             MR. BENSON:  No objection, your Honor.

25             THE COURT:  It is admitted.

1          (Plaintiff's Exhibit  Exhibit 113 received in

2     evidence)

3          MR. CLARK:  Your Honor he would also seek to admit

4     exhibits number 37 and 38 which are referenced in the

5     declaration.

6          MR. BENSON:  No objection, your Honor.

7          THE COURT:  They are admitted.

8          (Plaintiffs' Exhibits  37 and 38 received in evidence)

9     Clark lark plaintiffs have no further questions on direct for

10    this witness at this time.

11         THE COURT:  Cross-examination.

12         MR. BENSON:  Thank you, your Honor.

13    CROSS EXAMINATION

14    BY MR. BENSON:

15    Q.  Good morning, Mr. Caravantes.

16    A.  Good morning.

17    Q.  Mr. Caravantes, you worked at Fresco Restaurant from 1999

18    until 2013, correct?

19    A.  Correct.

20    Q.  Approximately 14 years.

21    A.  Yes.

22    Q.  Prior to working at Fresco Restaurant, did you have

23    experience in the restaurant industry?

24    A.  Yes.

25    Q.  What was that experience?

Ecc2sal1                    Caravantes – Cross

1   A.  Busboy.

2   Q.  What restaurant?

3   A.  The name of it is Remi.

4   Q.  How many years did you work at Remi?

5   A.  I do not remember.

6   Q.  Were you working at Remi at the time that you began working

7   at Fresco Restaurant?

8   A.  Again?  Say it again?

9   Q.  Were you working at Remi at the time that you began work at

10  Fresco Restaurant?

11  A.  Yes.

12  Q.  Did you continue working for Remi when you first started

13  working at Fresco Restaurant?

14  A.  No.

15  Q.  Was Remi what they call a tipped house?

16  A.  I do not recall.

17  Q.  So you were not distributed tips when you worked at Remi?

18  A.  Yes, but I do not recall at this moment.

19  Q.  You know Anthony Scotto, correct?

20  A.  Yes.

21  Q.  He runs Fresco Restaurant, does he not?

22  A.  Yes.

23  Q.  And that has always been the case for all of the years that

24  you worked there, correct?

25  A.  Yes.

Ecc2sal1                         Caravantes - Cross

1    Q.  Anthony is always at the restaurant, is he not?

2    A.  Yes.

3    Q.  And he is involved, based upon your observations, in all

4    major decisions involving the restaurant, correct?

5    A.  Yes.

6    Q.  And that would involve all decisions involving the terms

7    and conditions of employment of the service employees, correct?

8    A.  Yes.

9    Q.  At Fresco Restaurant you served in the position of busser

10   in the years that you were employed, correct?

11   A.  Yes.

12   Q.  And there were different assignments within the busser

13   category, correct?

14   A.  Yes.

15   Q.  Those assignments were stocker, correct?

16   A.  Yes.

17   Q.  Coffee person, correct?

18   A.  Yes.

19   Q.  What they call bar-back, correct?

20   A.  Yes.

21   Q.  Did you serve in all of those positions?

22   A.  Yes.

23   Q.  Were you assigned the stocker assignment for all of the

24   years that you worked at Fresco Restaurant?

25   A.  When I started to work, yes.

Ecc2sal1                          Caravantes – Cross

1    Q.  So it was just when you started to work?

2    A.  Yes, the first years when I started to work.

3    Q.  At some time you were no longer assigned as a stocker?

4    A.  During the last years, not anymore.

5    Q.  So when was the last time that you worked as a stocker?

6    A.  I cannot remember.

7    Q.  Approximately?

8    A.  I do not remember.

9    Q.  So is it true that the more experienced bussers worked

10   little or no shifts as a stocker?

11   A.  Well, they assigned us to different positions.

12   Q.  But you yourself haven't been assigned as a stocker for

13   years, correct?

14   A.  I do not remember.

15   Q.  Have you been assigned as a stocker since 2008?

16   A.  I do not remember.

17   Q.  How about since 2010?

18   A.  I do not remember.

19   Q.  The stocker helps the bussers by bringing materials that

20   they need to use to the dining room floor, correct?

21   A.  Yes.

22   Q.  And if the stockers didn't do it, the bussers themselves

23   would have to do it, correct?

24   A.  Correct.

25   Q.  And bringing clean materials to the service floor for the

1   customers to use is an important part of a busser's job, is it

2   not?

3   A.  Yes.

4   Q.  If somebody other than the busser does that, it makes the

5   busser's job easier, does it not?

6   A.  It was always done by the stocker.

7   Q.  My question is, does that make the busser's job easier?

8   A.  That was the job of the stocker.

9   Q.  Did it make -- if you were bussing tables on the service

10  floor, having the clean materials at the stations made your job

11  easier as a busser, correct?

12  A.  I had a number of activities to perform as a busboy.

13  Q.  One of them was to change the service material and turn

14  over the tables, correct, set the tables with clean utensils

15  and plates?  Correct?

16  A.  Correct.

17  Q.  Having those things close by enabled you to do that faster,

18  did it not?

19  A.  Yes.

20  Q.  And that was good for the customers, was it not?

21  A.  Yes.

22  Q.  So the stocker was an important part of the service team,

23  correct?

24  A.  Yes.

25  Q.  And it was very much a part of providing good customer

Ecc2sal1                          Caravantes - Cross

1    service, correct?

2    A.   Yes.

3    Q.   And that was true for the entire time that you worked at

4    Fresco Restaurant, correct?

5    A.   Yes.

6    Q.   All of the bussers -- and when I say that, I include all of

7    the assignments -- all worked together as a team, correct?

8    A.   Yes.

9    Q.   That includes the stocker, the coffee person, the bar-back,

10   and any of the bussers, correct?

11   A.   Yes.

12   Q.   You help each other out, correct?

13   A.   If we have the time, yes.

14   Q.   And you do that because it makes the service better,

15   correct?

16   A.   Yes.

17   Q.   And that means that everyone on the service team runs food

18   when necessary, correct?

19   A.   Sometimes.

20   Q.   Well, bussers run food, do they not?

21   A.   No.

22   Q.   Bussers never run food.

23   A.   Two, three times.

24   Q.   Okay.  So stockers or the stocker assignment runs food more

25   than the regular busser assignment?  Is that your testimony?

1   A.   Can you repeat?

2   Q.   Okay.  Stockers run food, correct?

3   A.   Two, three times.

4   Q.   Two, three times a meal?

5   A.   Yes.

6   Q.   That's all?

7   A.   Yes, because one had to bring the whole service out.

8   Q.   And if your other plaintiffs testified that it happened

9   more than that, is that contrary to your own experience and

10  observations?

11  A.   Well, I did my job and --

12          THE INTERPRETER:  Your Honor, sometimes the witness is

13  speaking a little bit to himself, and I have to hear him on top

14  of my own voice.  I requested him a number of times by making

15  signs for him to speak louder, and he must understand that I

16  have to hear him and my own voice on top of his sort of just

17  kind of very hushed voice.  Please, your Honor.

18          THE COURT:  Sir, would you speak up, please?

19          THE WITNESS:  Yes, of course.

20          MR. BENSON:  I'm not sure is if there is a question

21  pending.

22          THE COURT:  I will read it:  "And if your other

23  plaintiffs testified that it happened more than that, is that

24  contrary to your own experience and observations?"

25  A.   Well, I speak about my own, myself personally, and the jobs

1   that I was performing.

2   Q.  And you don't remember when the last time that you were a

3   stocker was, correct?

4   A.  Exactly.  I do not remember.

5   Q.  But it is true, is it not, that there are times when a lot

6   of food must be run out of the kitchen all at the same time.

7   A.  I do not understand the question.  Can you repeat?

8   Q.  So, for example, if there is a large party or a big table,

9   and there aren't enough runners because they are busy running

10  out food to the dining room, does anybody else help out during

11  that time?

12  A.  That would be one, two, or three times that we would help.

13  There were always sufficient enough runners.

14         THE COURT:  So based on your observations, sir, with

15  regard to the stockers, what percent of their time did they

16  dedicate to running food from the kitchen to the tables?

17         THE WITNESS:  The runners would perform by taking

18  their food.  I would suppose that the runner would do it all

19  the time.

20         THE COURT:  What about the stockers?  How much time

21  did the stockers devote?  What percentage of their time?

22         THE WITNESS:  3, 4 percent.

23  Q.  You never replaced the position of a dishwasher at any time

24  that you were assigned to be a stocker, correct?

25  A.  I cannot remember.

Ecc2sal1                          Caravantes – Cross

1    Q.  Meaning that you have no recollection of ever replacing the

2    dishwasher for any portion of any shift that you worked as a

3    stocker, correct?

4    A.  I cannot remember.

5    Q.  I'm not sure that you understood my question.  I am just

6    trying to understand your testimony.

7           It is your testimony that, as you sit here today, you

8    have no recollection of ever doing that, is that correct?

9    A.  Correct; I do not remember.

10   Q.  Isn't it true, as you sit here today, that you never

11   observed any other stockers taking the place of a dishwasher

12   for any portion of any shift which you worked at Fresco

13   Restaurant, correct?

14   A.  I would do my own job, and I wasn't overseeing or watching

15   the other fellow workers.

16   Q.  So the answer to my question is yes, correct?

17          MR. CLARK:  Objection.  I don't see how he can get

18   that from the testimony that the witness has given.

19          THE COURT:  Sustained.

20   Q.  You normally arrive at 10 a.m. for a lunch shift, correct?

21   A.  Correct.

22   Q.  And then you perform side work, correct?

23   A.  Yes, correct.

24   Q.  And you do that between 20 and 30 minutes, correct?

25   A.  Correct.

Ecc2sal1                    Caravantes - Cross

1   Q.  And then you have a family meal, correct?

2   A.  Correct.

3   Q.  And then after the family meal, you set up the Rose Room

4   and prepare the dining room for the arrival of the customers at

5   11:30, correct?

6   A.  The restaurant would open at 11:30, but the people would

7   arrive 11 -- 12:30, 12:30, 12:30.

8   Q.  No customers arrived at 11:30, is that your testimony?

9   A.  Yes.

10  Q.  Even though the restaurant was open from 11:30 to 12:30, it

11  is your testimony that no customers would arrive during that

12  time?

13  A.  Varies.  It was on a rare occasion.

14  Q.  You also spent some time working as a runner, correct?

15  A.  Yes.

16  Q.  Approximately how much time did you work as a runner?

17  A.  Towards the end -- what do you mean by "time"?

18  Q.  That's a fair question.

19          At what time during your employment at Fresco did you

20  start working as a runner?

21  A.  The runner would come in and start at 10 also.

22  Q.  I apologize then I am not being clear.  I am trying to

23  understand at what time during your employment --

24          THE COURT:  Do you mean what year?

25          MR. BENSON:  What year.

1   A.  Well, perhaps during the last two years that I worked

2   there.

3   Q.  Okay.  Now, in the kitchen, a chef or one of the chefs

4   stands in front of a microphone, correct?

5   A.  Sometimes.

6   Q.  And the person in front of the microphone is in charge of

7   getting the orders and communicating to the cooks, correct?

8              THE INTERPRETER:  "Post" you said, right.

9              MR. BENSON:  "Communicating to the cooks."

10  A.  Yes.

11  Q.  And that person sometimes has a person next to them,

12  correct?

13  A.  I do not understand what you mean by "next to that person."

14  Q.  Okay.  One person stays in front of the microphone and

15  communicates with the cooks, correct?

16  A.  Yes.

17  Q.  Another person may be next to that person to deal with the

18  plates after they are cooked and ready to go out to the dining

19  room, is that correct?

20  A.  Yes.

21  Q.  And that person communicates with the runners and whoever

22  else is running the food to the dining room to ensure that the

23  food goes to the right place, is that correct?

24  A.  Yes.

25  Q.  Sometimes there are two chefs -- one in front of the

1   microphone and the other communicating with the runners --

2   correct?

3   A.  Yes.

4   Q.  Other times, if the chefs go to the bathroom or are

5   otherwise occupied, a runner may fill in for the position that

6   communicates with the individuals who are running the food,

7   correct?

8   A.  Yes, that is so.

9   Q.  And in those situations, the runner who was assisting also

10  runs the food, correct?

11  A.  When the chef or sous chef were not there, then the runners

12  would take the food.  But when there was a runner by the side,

13  he would send them, he would send the runners.

14  Q.  And if a runner was doing that job, the runner would join

15  the other runners in delivering the food, correct?

16  A.  Yes, at some occasion.

17  Q.  And you, yourself, on a few occasions served in that

18  position, correct?

19  A.  Yes, on some occasions.

20  Q.  And when you served in that position, you ran food out to

21  the dining room, correct?

22  A.  Yes, because I was the only person in the kitchen.

23  Q.  And the food needed to be run out to the tables, correct?

24  A.  Correct.

25  Q.  It has always been true, has it not, that the end times of

Ecc2sal1                    Caravantes - Cross

1   any shift vary from day to day, correct?

2   A.  Yes.

3   Q.  And it is also different depending upon when a particular

4   section clears out, correct?

5   A.  Clearly so, yes.

6   Q.  So that if your section clears out earlier, you are able to

7   leave earlier than someone else's section who happens to be

8   busy, correct?

9   A.  If I was closing, I would have to stay until the dining

10  room was empty.

11  Q.  But that is true only if you were closing, correct?

12  A.  Clearly so.

13  Q.  And if you weren't closing, you could leave as soon as your

14  section was clear, correct?

15  A.  One had to ask the manager.

16  Q.  But you could leave, and often did leave, once your section

17  was clear, correct?

18  A.  The manager, the manager would decide at what time we could

19  leave.

20          THE COURT:  By "manager," what do you mean?

21          THE WITNESS:  The person that at that time was in

22  charge of us.

23          THE COURT:  So who were the managers?

24          THE WITNESS:  During the morning it was Brent, and

25  during the afternoon/evening, Attilo.

Ecc2sal1                    Caravantes - Cross

1    Q.  Are you talking about floor captains who would have to

2    release you, sir?

3    A.  No, the managers.

4    Q.  Well, there were times when Marco was serving in that role,

5    correct?

6              THE COURT:  What role are you referring to?

7              MR. BENSON:  The role that he is referring to, what he

8    calls the manager role.

9    A.  Marco was one, he was a waiter, only I only knew Brent and

10   Attilo as a person who would tell us that we could leave.

11   Q.  But if they weren't there on a shift?

12   A.  Usually they were always there.  They would always be

13   there.

14   Q.  What if they weren't?

15   A.  I always -- I always saw them.

16   Q.  Is it your testimony they were there on every shift?

17   A.  Yes.

18   Q.  You never remember a shift where either one of them wasn't

19   present?

20   A.  No, no, I cannot remember.

21   Q.  There weren't other individuals who wore suits during a

22   service and acted as floor captains?

23   A.  The captains were there, and those were -- I do not

24   remember, but the managers, they were the managers.

25             THE COURT:  So who were the floor captains?

Ecc2sal1                     Caravantes - Cross

1   A.  I do not remember.

2   BY MR. BENSON:

3   Q.  Isn't it true, sir, that Brent Drill was a floor captain?

4   A.  Well, he -- during the morning it was he who decided what

5   we were to do, and we had to tell him what we were going to do

6   and we would take a break.

7   Q.  Sir, you worked in restaurants for a long time, correct?

8   A.  Yes.

9   Q.  And you know what a captain does in the service, correct?

10  A.  Yes.

11  Q.  And the captain is in charge of the service, correct?

12  A.  Yes.

13  Q.  And the captain tells the waiters and the bussers and the

14  runners what to do during a shift, correct?

15  A.  Yes.

16  Q.  That is their job.

17  A.  Yes.

18  Q.  But you would agree with me that, on any shift, different

19  bussers leave at different times?

20  A.  Yes.

21  Q.  And that has been true for the entire time that you worked

22  at Fresco Restaurant, correct?

23  A.  Yes.

24  Q.  When you were on call, it is your responsibility to call

25  the restaurant at a specific time before the shift begins in

Ecc2sal1                         Caravantes - Cross

 1  order to determine whether you will be needed, correct?

 2  A.  Yes.

 3  Q.  At the time that you were employed at Fresco Restaurant,

 4  did Brent Drill work as a floor captain?

 5  A.  Well, Brent would always give orders to us.

 6  Q.  That's nonresponsive to my question, sir.

 7           My question to you is:  Did Brent Drill work as a

 8  floor captain?

 9  A.  Brent was a manager to the best of my knowledge.

10  Q.  Sir, did you take a deposition in this case?

11  A.  Yes.

12  Q.  Were you asked questions and did you give answers?

13  A.  Yes.

14  Q.  Were you sworn to tell the truth?

15  A.  Yes.

16  Q.  And did you tell the truth?

17  A.  Yes.

18  Q.  I am going to give you a copy of that deposition.

19           MR. BENSON:  Do you want a copy?

20           THE COURT:  I have.

21           MR. BENSON:  You have.

22  Q.  I direct your attention to page 168 of your deposition,

23  specifically line 19.  Were you asked the following -- were you

24  asked this question and did you give this answer:

25  "Q  Did Brent Drill work as a floor captain?

Ecc2sal1                          Caravantes – Cross

1   "A   Yes."

2            Were you asked that question and did you give that

3   answer?

4   A.   Yes.

5   Q.   Now, you worked at Fresco Restaurant for 14 years.  Did you

6   ever observe Brent Drill hire a single individual?

7   A.   Yes.

8   Q.   I direct your attention to page 120 of your deposition.

9   No, I'm sorry.  One moment, please.  Can't read my own

10  handwriting.

11           Page 170, specifically line 4, were you asked the

12  following question and did you give the following answer:

13  "Q   Did Brent hire anybody?

14  "A   I don't know."

15           Were you asked that question and did you give that

16  answer?

17  A.   Yes.

18  Q.   Did you observe Brent fire anybody?

19  A.   I do not remember.

20  Q.   And did you observe Brent discipline anybody?

21  A.   I do not remember.

22  Q.   Do you know who Attilo Vosilla is?

23  A.   Yes.

24  Q.   Did you observe Mr. Vosilla during the many years as you

25  were an employee of Fresco?

Ecc2sal1                       Caravantes – Cross

1   A.  Yes.

2   Q.  Did you ever observe Mr. Vosilla hire anyone?

3   A.  I do not remember.

4   Q.  Did you observe Mr. Vosilla fire anyone?

5   A.  I don't remember.

6   Q.  Did you observe Mr. Vosilla ever discipline anybody?

7   A.  I do not remember.

8   Q.  Is it your testimony that you never received shirts for

9   free from Fresco Restaurant?

10  A.  That is true; I never received them.

11  Q.  Is it your testimony that you had to pay for those shirts?

12  A.  Yes, we had to pay.

13  Q.  Who gave you the shirts?

14  A.  I do not remember.  I believe it was the manager.

15          THE COURT:  What manager?

16          THE WITNESS:  I think Brent.

17  Q.  Do you remember that it was Brent or are you speculating?

18  A.  I do not remember.

19  Q.  So you have no recollection of Brent giving you shirts,

20  correct?

21  A.  I do not remember.

22  Q.  Who did you pay for the shirts?

23  A.  To the secretary.

24  Q.  Who is that?

25  A.  Natasha.

Ecc2sal1                        Caravantes – Cross

1   Q.  How much did you pay for the shirts?

2   A.  $50.

3   Q.  And how did you pay that $50?

4   A.  Cash.

5   Q.  Did you ever ask for a receipt?

6   A.  No.

7   Q.  I direct your attention to page 178 of your testimony,

8   specifically line 5.  Were you asked the following questions

9   and did you give the following answers:

10  "Q  Okay.  Who did you have to buy the uniform from?

11  "A  From Fresco, the company.

12  "Q  And how did you pay for it?

13  "A  In cash.

14  "Q  Okay.  Who did you pay?

15  "A  The person that would give it to us at the moment.

16  "Q  And who was that?

17  "A  I don't remember at this moment."

18          Were you asked those questions and did you give those

19  answers?

20  A.  Yes.

21          MR. BENSON:  I have no further questions, your Honor.

22          THE COURT:  Redirect?

23          MR. CLARK:  Could I have a moment to confer with

24  counsel?

25          (Counsel confer)

Ecc2sal1                      Caravantes - Cross

1          MR. CLARK:  We have no redirect for this witness at

2     this time.

3               THE COURT:  Thank you, sir.  You may step down.

4               (Witness excused)

5               THE COURT:  Would you call your next witness, please.

6               MR. ANDROPHY:  Plaintiffs call José Julian Amazquita.

7      JOSE JULIAN AMAZQUITA AGUDELO,

8          called as a witness by the plaintiffs

9          having been duly sworn, testified as follows:

10              THE COURT:  You may inquire.

11              MR. ANDROPHY:  May I hand the witness his declaration?

12              THE COURT:  Yes.

13    DIRECT EXAMINATION

14    BY MR. ANDROPHY:

15    Q.  Good morning, Mr. Amazquita.

16    A.  Good morning.

17    Q.  Is the document I just handed you the declaration that you

18    submit as your direct testimony in this action?

19    A.  That is so.

20              (Continued on next page)

21

22

23

24

25

1   BY MR. ANDROPHY:

2   Q.  And, if you can turn to the last page?

3   A.  Yes.

4   Q.  Is that your signature on the last page?

5   A.  Yes.

6               MR. ANDROPHY:  At this time we ask that

7   Mr. Amazquita's declaration be admitted as Plaintiff's Exhibit

8   114.

9               THE COURT:  Any objection?

10              MR. BENSON:  No objection, your Honor.

11              THE COURT:  It is admitted.

12              (Plaintiff's Exhibit 114 received in evidence)

13              MR. ANDROPHY:  And we also ask that Plaintiff's

14  Exhibits 31, 32, 33, 34, 35 and 36 and 87 be admitted.  These

15  are documents identified in the witness' declaration.

16              MR. BENSON:  No objection.

17              THE COURT:  They are admitted.

18              (Plaintiff's Exhibits 31, 32, 33, 34, 35, 36 and 87

19  received in evidence)

20              MR. ANDROPHY:  Thank you.  We have no further direct

21  examination at this time.

22              THE COURT:  Cross-examination.

23              MR. BENSON:  Thank you, your Honor.

24  CROSS EXAMINATION

25  BY MR. BENSON:

1    Q.  Good morning, Mr. Amazquita.

2    A.  Good morning.

3    Q.  Mr. Amazquita, you were hired in January of 2012, correct?

4    A.  Yes.

5    Q.  And at the time of your hiring did you have any restaurant

6    experience?

7    A.  Yes.

8    Q.  Where had you worked previously?

9    A.  I had worked my previous job before Fresco, it was at

10   Tony's Roma Restaurant, and before that one, well, the Tony

11   Roma's at Queens, and that one at Docks.

12   Q.  And was that previous experience as a busser?

13   A.  Busser, runner, and as a host.

14   Q.  And, you interviewed with Anthony Scotto, correct?

15   A.  Yes.

16   Q.  And Mr. Scotto was the individual who hired you, correct?

17   A.  Yes.

18            INTERPRETER:  Your Honor, could the witness please be

19   instructed to wait until I have finished my simultaneous

20   interpretation before he provides an answer, please?

21            THE COURT:  So, sir, just wait for him to finish

22   speaking.

23            THE WITNESS:  Excuse me.

24   BY MR. BENSON:

25   Q.  When you were assigned as a busser --

ECC5sal2                    Amazquita - cross

1   A.  Yes.

2   Q.  -- were you ever assigned to the stocker assignment?

3   A.  When I worked, yes.

4   Q.  And were you also ever assigned as the coffee person?

5   A.  Yes.

6   Q.  And were you ever assigned as the barback?

7   A.  Yes.

8   Q.  When you worked as a stocker, was there ever any shift

9   where you took the place of a dishwasher for any portion of

10  that shift?

11  A.  Yes.  Several times.

12  Q.  And when did that happen?

13  A.  When I was a stocker, between 2:00 and 3:00 in the

14  afternoon, the dishwasher would go over to be the preparer or

15  to prepare things or do some other things so then I had to

16  clean my station and also do wash glasses, plates, silverware.

17  Q.  What time of year did this happen?

18  A.  During the two years that I worked at Fresco bar.  A year

19  and a half.  Some, around there.

20  Q.  Was that the case through the entire time that you worked

21  at Fresco Restaurant?

22  A.  Most of the shifts when I was working as a stocker.

23  Q.  And so that was throughout the year whether it was busy or

24  not?

25  A.  Yes.

ECC5sal2                        Amazquita - cross

1   Q.  And is that something that you did on your own or you were

2   directed to do it?

3   A.  What happens is it happens that what happened, there was a

4   lot of, lost time -- there was a lot of lost time, there was --

5   things were not kept in a proper order so -- okay.  So, things

6   were not kept in the proper order, plates and the dishwasher

7   wasn't there so I have to finish my own job and so I had to do

8   it.

9   Q.  Again, sir, maybe you didn't understand my question.

10              My question to you is, is that something that you did

11  on your own or were you directed to do it?

12  A.  Sometimes both things.  By my own, on my own account, or

13  because sometimes the manager would tell me to do so.

14  Q.  So sometimes you just started washing dishes on your own

15  without being told to do so?

16  A.  On the two times, both times.

17  Q.  Is it your testimony that you did this just twice?  I'm

18  confused.

19  A.  No.  He is asking me whether I did that on my own, okay,

20  and I'm telling him that it was because of my own, I did that

21  on my own and also because the manager would tell me that

22  sometimes.

23  Q.  So, you say that this is both shifts that you were a

24  stocker.  Is that a fair characterization of your testimony?

25              INTERPRETER:  You said both?

 1          MR. BENSON:  I said most.

 2   A.  Yes, on most of the shifts.

 3   Q.  And on the shifts that you say that you replaced the

 4   dishwasher,what percentage of those shifts did you do that on

 5   your own as opposed to being told to do it?

 6   A.  I do not understand what you mean by percentage.

 7   Q.  Okay.  I'm trying to get a sense of how often you get it on

 8   your own as opposed to being told to do it.  Do you understand

 9   that?

10   A.  Well, what happens is that when I was working as a stocker

11   I would work from -- from 12:00 to 4:00 in the afternoon and if

12   by 2:30 my station was dirty and the dishes, glasses are dirty,

13   I have to take some time as a stocker, from the stocker to

14   perform as a dishwasher during that time.

15   Q.  I understand that, sir.  And you have testified that you

16   did that on most shifts that you were a stocker, correct?

17   A.  Yes.

18   Q.  And you have also testified that some of the time you did

19   that on your own and on other occasions you were told to do it;

20   is that correct?

21   A.  Yes, because -- but you have already asked me that 20

22   times.

23   Q.  I am trying to understand how often you were told to do it

24   as opposed to how often you did it on your own.

25   A.  The same.  It was the same.

ECC5sal2                    Amazquita - cross

1   Q.  So, half the time you did it on your own and half the time

2   you were told to do it?  Is that your testimony?

3   A.  Yes.

4   Q.  And how long would you spend washing dishes on these

5   occasions?

6   A.  I just said it.  I said during the shift as a stocker

7   between 12:00 to 4:00 from 12:00 to 2:30 I was the stocker but

8   then afterwards, as I had to finish doing my things that I had

9   to clean, I had to wash my dishes and wash whatever I had to

10  wash.  I said that already.

11  Q.  How many minutes did you spend washing dishes?

12          THE COURT:  So, counsel, he has already answered this

13  question and I will testify on his behalf if you would like.

14  12:00 to 2:30 he is at his stations, 2:30 to 4:00 he washed the

15  dishes.  Now, do you want him to convert that into minutes?

16          MR. BENSON:  No.  If that is his testimony I am fine

17  with that, your Honor.  I respectfully did not understand that

18  to be his testimony.

19          THE WITNESS:  I said that already.

20          MR. BENSON:  Okay.

21          INTERPRETER:  Your Honor, I in turn, have some times,

22  if I may be heard, I, in turn, have sometimes much difficulty

23  also being here.  Something is happening to the system which

24  projects, because I went yesterday and asked the interpreter's

25  office, and they told me that sometimes the signal, which

ECC5sal2                    Amazquita - cross

1    apparently is coming, might not be very clear.  So I, myself,

2    sometimes lose the signal, too, as the lady court reporter is

3    saying.  I also sometimes lose the signal.

4              Thank you, your Honor.

5              I try to place myself where everybody will be as well

6    as possible.  I am trying my best, your Honor.

7              THE COURT:  I know.

8              INTERPRETER:  Thank you, your Honor.

9    BY MR. BENSON:

10   Q.  Did you ever wash dishes with another stocker at the same

11   time?

12   A.  No.

13   Q.  So, when you are at paragraph 15 of your declaration where

14   it says, and I quote in the third sentence, sometimes another

15   stocker would also have to wash dishes with me, that was not

16   correct?

17   A.  Can you repeat the question, please?

18   Q.  At paragraph 15, specifically the third sentence it reads,

19   and I quote, sometimes another stocker would also have to wash

20   dishes with me.  Unquote.

21             That's not accurate, is it?

22   A.  Well, I do not remember that I wrote that.  I cannot

23   remember that I said that because never, never, did I have help

24   from a stocker.

25   Q.  When it says:  This would often happen during times when

1    Fresco was less busy such as in the summer months; that wasn't

2    really accurate either, correct?

3    A.  Yeah, I wrote here.  It says there and he is reading in

4    English, this was often during the summertime.  Yeah.

5    Q.  So, is it your testimony that this happened during the

6    summertime?

7    A.  No.  During the whole time, no, sir, just during the

8    summer.

9           THE COURT:  What is it that you are saying happened

10   during the whole time?

11          THE WITNESS:  About washing, to be working as a

12   stocker and as a dishwasher.

13   BY MR. BENSON:

14   Q.  Paragraphs 17 says that you have other employees that were

15   assigned as stocker and that they had the same duties as you

16   when you were a stocker.  Is that correct?

17   A.  Yes.

18   Q.  So, based on your observations, is it your testimony that

19   the other individuals who you list here also would be washing

20   dishes from 2:30 to 4:00?

21   A.  No.  I saw them doing what I was doing but not necessarily

22   all of them had to be there between 2:30 to 4:00.

23   Q.  Is it safe to say that you observed all of them spending

24   some portion of their shift as a stocker washing dishes?

25   A.  Yes.  Yes.

ECC5sal2                    Amazquita - cross

1   Q.  Is that also true for Angel Cedeno?

2   A.  Yes.

3   Q.  Yes.

4   A.  Yes.

5   Q.  And would that also be true for Vicente Leon?

6   A.  All the names that appear here and that I said so, it is

7   because I saw them.

8   Q.  Okay.

9           So, when you say you saw them, you saw them spending

10  some portion of their shift as a stocker washing dishes,

11  correct?

12  A.  Yes, but not necessarily simultaneously at the same time

13  that I was doing it.

14  Q.  I understand.  That would be quite a feat.

15  A.  Exactly.

16  Q.  Now, there are paintings at Fresco, correct?  Oil

17  paintings?

18  A.  Yes.  Yes.  Oils.  Pictures.

19  Q.  They're very, very large paintings, correct?

20  A.  Yes.

21  Q.  You never spent any time cleaning those paintings, did you?

22  A.  Several times.  Several times.

23  Q.  Is it your testimony that you personally cleaned the oil

24  paintings?

25  A.  Yes.  Sometimes.

1    Q.   And how would you do that?

2    A.   When we were starting before any shift.

3    Q.   I'm asking you specifically what materials you used to

4    clean those oil paintings.

5    A.   Rags.

6    Q.   And would you put anything on those rags?

7    A.   It would depend whether it was -- it was a glass we would

8    use Windex or water.

9    Q.   Okay.  I'm asking you about the big oil paintings in the

10   restaurant's main floor.  Do you understand what I am asking

11   you?

12              THE COURT:  Counsel --

13              MR. BENSON:  Yes.

14              THE WITNESS:  Oh, what you are talking is about those

15   paintings.  Oh.

16              THE COURT:  Do you want to use the photograph,

17   counsel, so that the witness will understand the question?

18              THE WITNESS:  Because me, I would clean as well as the

19   other busboys, we would clean the photographs, those pictures,

20   also the mirrors -- in English.  No, no.  The other ones, not.

21              MR. BENSON:  Okay.  Thank you.

22              THE COURT:  Counsel, if it is a question of importance

23   to you, since I am the finder of fact, at this point I don't

24   know that you have distinguished between the various things

25   that were hanging on the wall.  And so, if you want, in your

ECC5sal2                    Amazquita - cross

1    post-trial filings to distinguish, then you need to ask this

2    witness a more specific question.

3            MR. BENSON:  I appreciate that, your Honor.  Thank

4    you.

5            So the record is clear, I will show you something that

6    I will mark as Defendant's Exhibit J.

7            INTERPRETER:  Counsel, could I be provided with one

8    also?  The techniques for an interpreter, we look at who is

9    speaking and we want to be in situ.  We prefer to be where

10   things happen.

11           THE COURT:  Are you going to seek to admit this as an

12   exhibit?

13           MR. BENSON:  Yes.

14   BY MR. BENSON:

15   Q.  Do you recognize that as a picture of the restaurant, of

16   the dining room floor of the restaurant?

17   A.  Yes.

18           MR. BENSON:  Move it into evidence, your Honor.

19           THE COURT:  Any objection?

20           MR. ANDROPHY:  No objection.

21           THE COURT:  This is admitted.

22           (Defendant's Exhibit  J received in evidence)

23   BY MR. BENSON:

24   Q.  Now, you see that there are paintings on the wall in this

25   picture, correct, specifically?

ECC5sal2                    Amazquita - cross

1   A.  Yes.  Me, already, I have already said just the pictures

2   and the photographs and the mirrors and the windows, the

3   glasses.

4   Q.  Okay, but not the paintings, correct?

5           THE COURT:  You are referring to the oil paintings?

6           MR. BENSON:  The oil paintings.

7   A.  Yes.  I said so.

8   Q.  You said that you were assigned to be a coffee person on

9   certain shifts, correct?

10  A.  Yes.

11  Q.  And on those shifts you would pour and deliver beverages to

12  the customers, correct?

13  A.  Yes.

14  Q.  And that would be on lunch shifts, correct?

15  A.  Lunch or dinner.

16  Q.  Prior to January 1st of 2013, did you ever observe Brent

17  Drill fire an employee?

18  A.  Yes.

19  Q.  Who?

20  A.  I do not remember.

21  Q.  When?

22  A.  Several times.

23  Q.  When, specifically, if you can recall?

24  A.  No, no.  I cannot remember what day and at what time.

25  Q.  And you can't remember the names of those individuals?

ECC5sal2                    Amazquita - cross

1   A.  No.

2   Q.  Not even one?

3   A.  No.  At this moment, no.

4   Q.  Prior to January 1, 2013, did you ever see Brent Drill

5   discipline anyone?

6   A.  Yes.

7   Q.  Who?

8   A.  He was the manager.

9   Q.  It is not responsive to my question, sir.  I asked you who

10  did you see Mr. Drill discipline?

11  A.  I'm going to continue speaking.  Several times, because he

12  was the manager.

13          MR. BENSON:  Move to strike as non-responsive, your

14  Honor.

15          THE COURT:  Sustained.

16          Who did you see him discipline?

17          THE WITNESS:  I already told him the several persons

18  but I do not remember who they were.

19  BY MR. BENSON:

20  Q.  What positions were they?

21  A.  Busboys, dishwashers, waiters.

22  Q.  So, it is your testimony that you saw him discipline

23  several busboys, dishwashers and waiters.  There weren't more

24  than 20 people in that entire category, correct?

25  A.  Category?  Category of what?

ECC5sal2                    Amazquita - cross

1    Q.  Of waiters, bussers and dishwashers that you mentioned?

2    A.  I do not understand your question.

3    Q.  There weren't many employees who worked as bussers at

4    Fresco, correct?

5    A.  There were several busboys, several waiters.

6    Q.  How many?

7    A.  I cannot remember.  We were several of us.

8    Q.  You knew everyone's name, did you not?

9    A.  Yes.

10   Q.  And now I'm asking you, who did Brent Drill discipline

11   prior to January 1st of 2013?

12   A.  What happens is that every day there are different busboys

13   and different waiters, and during the whole year he would

14   discipline someone.  The only persons that I can remember, it

15   was Washington and Wallington.  Yes.

16   Q.  And what do you say that Mr. Drill did to Washington?

17   A.  He disciplined, he -- well, he -- yeah.  He disciplined him

18   because he did something that he did not want him to do.

19   Q.  When did that take place?

20   A.  I do not remember.

21   Q.  Are you sure it was before January of 2013?

22   A.  Before and after.

23   Q.  I am specifically asking you now about Washington.

24   A.  Yes.

25   Q.  It was both before and after January 1st of 2013?

ECC5sal2                    Amazquita - cross

1    A.  Yes.

2    Q.  So he disciplined Washington on more than one occasion?

3    A.  Yes.

4    Q.  Tell me the first occasion that you remember him doing

5    that.

6    A.  This is what happened, that many times it happened, and I

7    do not specifically remember the day and the time and exactly

8    how it happened.

9    Q.  Is it your testimony that you don't recall the first time

10   it happened prior to January 1st of 2013?

11   A.  I'm telling you, I do not know exactly when it happened, at

12   what time and what day.  Simply, they just happened.

13   Q.  What happened, sir?

14   A.  He disciplined them.

15   Q.  How?

16   A.  Talking in English.  Talking in Spanish.

17            I mean, no, just by saying it to them.

18   Q.  What did he say?

19   A.  That's what I am telling him.  He -- he told me I saw

20   several times because he did not want to do something and Brent

21   disciplined him, them but I do not remember exactly which words

22   and what time, what day and at what moment.  I cannot remember

23   exactly that.

24   Q.  Do you remember what the subject was?

25   A.  There were different subjects the times that it happened.

ECC5sal2                    Amazquita - cross

1    Q.  Do you remember any of them?

2    A.  No.

3    Q.  How about Wellington?  Do you remember any incidents of

4    discipline prior to January 1st, 2013 where Brent Drill

5    allegedly -- I apologize.  Please let me finish the question.

6             Do you remember any incidents prior to January 1st of

7    2013 where Brent Drill disciplined Wellington?

8    A.  The same thing.

9    Q.  Meaning that you have no recollection of any of the details

10   or times or places of anything in connection with these alleged

11   incidents?  Is that correct?

12   A.  Once again, I repeat:  There were many times and I cannot

13   tell you exactly each time what it was that happened and I do

14   not remember what exactly the hour or what day it happened.

15   Just, simply, it did happen.

16   Q.  Can you give me the details of any incident of alleged

17   discipline on the part of Mr. Drill toward any employee at

18   Fresco Restaurant?

19   A.  With me, myself.

20   Q.  That was after January of 2013, correct?

21   A.  I do not remember.

22   Q.  Well you remember, sir, the incident --

23   A.  No, no.  I do not remember.

24   Q.  Let me finish my question, please.

25            You are speaking about the incident in connection with

ECC5sal2                    Amazquita - cross

1    your termination, correct?

2    A.  No.  No.

3    Q.  So, there were other incidents prior to your termination?

4    A.  Yes.

5    Q.  When did the first one take place?

6    A.  Well, because he -- he just lost it and he raised his voice

7    on me and he wanted just for me to go back home; leave and go

8    back home.

9    Q.  When did that take place?

10   A.  I do not remember.

11   Q.  Do you recall any incidents where Attilio Vosilla

12   disciplined anyone?

13   A.  Yes.

14   Q.  When did that take place?

15   A.  I do not remember the day.

16   Q.  What incident are you referring to?

17   A.  They are two specifically that I know, and I must repeat

18   regarding the same names, Washington and Wellington.

19   Q.  And are those the same incidents that you were referring to

20   in connection with your allegation that Mr. Drill was involved?

21   A.  No.

22   Q.  There were different incidents?

23   A.  They were totally different.  Different.

24   Q.  Let's talk about Wellington.  What was the first incident

25   with Wellington?

ECC5sal2                        Amazquita - cross

1    A.  He arrived late and he disciplined him and he wanted to

2    send him back home and he didn't want to.

3    Q.  Did he send him back home?

4    A.  Yes.

5    Q.  When did that take place?

6    A.  I do not remember.

7    Q.  Do you know the year?

8    A.  I do not remember.

9    Q.  Were you present for that incident?

10   A.  Yes.

11   Q.  Did you hear Mr. Vosilla say anything?

12   A.  For him to leave.

13   Q.  When, during the shift, did this take place?

14   A.  Okay.  During the morning the manager is Brent in the

15   evening --

16          MR. BENSON:  Objection.  Move to strike, your Honor.

17          THE COURT:  Sustained.  I will strike it.

18   BY MR. BENSON:

19   Q.  Would you like the question read back?

20   A.  Yes.  I was trying to say --

21          MR. BENSON:  I'm sorry.  Could the court reporter

22   please read back the question?

23          (Record read)

24   A.  In the evening.

25   Q.  What part of the evening?

ECC5sal2                    Amazquita - cross

1   A.  I don't know.

2   Q.  Was it in the beginning of the shift or the end of the

3   shift?

4   A.  I don't know.  I do not remember.  I do not remember.

5   Q.  You don't know whether this is 2012 or 2013?

6   A.  I do not remember.

7   Q.  Is that the only incident with Wellington that you remember

8   involving Mr. Vosilla?

9   A.  I believe there were two more, but I do not remember

10  specifically.

11  Q.  How about Washington?  Is it your testimony that

12  Mr. Vosilla allegedly disciplined Washington?

13  A.  Yes.  Several times.

14  Q.  And do you recall whether that was 2012 or 2013?

15  A.  No.  I do not remember.

16  Q.  Do you remember the specifics of any of those incidents

17  involving Washington?

18  A.  Well, what I remember now, two or three things.  The first

19  one he -- he started fighting with someone inside the kitchen.

20  Q.  Who?  Washington?

21  A.  Yes.

22  Q.  Were you there?

23          THE COURT:  A physical fight?

24          THE WITNESS:  Yes.  Yeah.  Yes.

25  BY MR. BENSON:

ECC5sal2                      Amazquita - cross

1    Q.  What is the other incident?

2    A.  He sent him to clean the glasses, the windows, the outside

3    windows; those were at the entrance of the restaurant and he

4    said that that was not his job to do.  So, then he said for him

5    to go back home.

6    Q.  And what year was that?

7    A.  I do not remember.

8    Q.  Morning shift or afternoon shift?

9    A.  Afternoon.  Afternoon.  Afternoon.

10   Q.  Early part of the shift or later part of the shift?

11   A.  At the beginning of the evening shift.

12              MR. BENSON:  I have no further questions.

13              THE COURT:  Were there managers at the restaurant?

14              THE WITNESS:  Yes.

15              THE COURT:  And who were they?

16              THE WITNESS:  As far as I know, when I was Brent was

17   the general manager and Attilio was the manager in the

18   evenings.

19              THE COURT:  Were there floor captains at the

20   restaurant?

21              THE WITNESS:  I only know about one who was the one

22   who came here, only one.  I only met one and he would perform

23   as a waiter and his name was Peter.  Peter.

24              THE COURT:  So, did he have responsibilities in

25   addition to being a waiter?

1          THE WITNESS:  Yes.

2          THE COURT:  Like what?

3          THE WITNESS:  When he was a captain he -- he was in

4    charge of the parties on the second floor and if, for any

5    reason, the manager was not there then he would be there.  What

6    I do know is that he didn't have a right to fire anybody or to

7    discipline.

8          THE COURT:  Redirect?

9    REDIRECT EXAMINATION

10   BY MR. ANDROPHY:

11   Q.  Mr. Amazquita, do you still have in front of you the photo

12   that was marked Defendant's Exhibit J?

13   A.  Yes.  Yes.  Yes.

14   Q.  And you testified you did not clean the large paintings

15   that are on the walls, correct?

16   A.  No.  No, no.  No.  That's logical.  On the walls, no.

17   Q.  Were there any other paintings at the restaurant?

18         THE COURT:  Are you asking about oil paintings?  I'm

19   asking you Mr. Androphy.

20         MR. ANDROPHY:  If the witness knows, yes, I'm asking

21   about oil paintings.

22         THE WITNESS:  No.  In other words what I did clean was

23   the pictures of the photographs.  Photographs.  I -- the

24   mirrors, the windows, the glasses.  The only thing about the

25   oil ones is to clean the dust.    (Continued on next page)

Ecc2sal3                          Amazquita Agudelo - Redirect

1    Q.  Do you see in this photograph there are two columns?

2    A.  Yes.

3    Q.  Do you know what is hanging on those columns?

4    A.  They are pictures.

5    Q.  I understand it might be difficult to tell from this

6    photograph.  Do you recall whether those pictures are

7    photographs or paintings or something else?

8    A.  Paintings.

9    Q.  Would you sometimes have to clean those?

10   A.  Yes.

11           MR. ANDROPHY:  I have no further questions.

12           THE COURT:  One moment, please.

13           THE WITNESS:  Could I say something?

14           THE COURT:  You are saying with respect to the last

15   question?

16           THE WITNESS:  No, but it is with regards to . . .

17           THE COURT:  No.

18           MR. BENSON:  Nothing further, your Honor.

19           THE COURT:  One moment, please.

20           He wants to make some commentary unrelated to the last

21   question, and I said no.

22           I am waiting for a Sharpie because I am going to ask

23   the witness to circle everything on the walls that he cleaned.

24           (Pause)

25           THE WITNESS:  But here, the whole restaurant is not

 1    here.

 2              THE COURT:  So this is only a part of the restaurant?

 3              THE WITNESS:  The photographs are not here, the second

 4    floor is not here.

 5              THE COURT:  So what part of the restaurant is this?

 6              THE WITNESS:  This is the main, central part, the

 7    floor, the main central floor.

 8              THE COURT:  So circle just what you cleaned in that

 9    section.

10              THE WITNESS:  Like here in the back part there is

11    also, and here, and here towards the background, look here, and

12    the bar on this side.

13              THE COURT:  May I see that, please?

14         I am now pointing to the right of the photograph to

15    what looks like a painting that has glass over it and I am

16    asking whether you also cleaned that.

17              THE WITNESS:  Yes.

18              THE COURT:  What about the painting that is on the far

19    right of the picture, against the wall on the far right?

20              THE WITNESS:  This one?

21              THE COURT:  Yes.

22              THE WITNESS:  Just the dust.

23              THE COURT:  So you would dust that picture.

24              THE WITNESS:  Yes, yes.

25              THE COURT:  Anything further?

1          MR. BENSON:  Nothing further, your Honor.

2          THE COURT:  Sir, what did you observe Brent Drill

3     doing while he was working?

4          THE WITNESS:  Manager.

5          THE COURT:  I am asking you what tasks did he perform

6     that you personally observed.

7          THE WITNESS:  Well, he was the person that was in

8     charge when we would all arrive, all of us employees of Fresco,

9     so that everything would be correctly in its place, clean, that

10    everything was ready and he was -- whatever a manager is in

11    charge of.

12         THE COURT:  And what about Anthony Scotto?  What did

13    you observe him do, if anything?

14         THE WITNESS:  Well, he is the owner and he would

15    direct or give instruction to the managers, but he would also

16    would instruct us or give orders to us.

17         THE COURT:  What about Mr. Vosilla?  What did he do?

18         THE WITNESS:  Exactly the same, but in the evenings.

19         THE COURT:  The same as what?

20         THE WITNESS:  Manager, that everything would be

21    properly in its -- the set-up would be -- that everything would

22    be clean.

23         THE COURT:  Any questions?  Any further questions?

24         MR. BENSON:  Yes, your Honor.

25    RECROSS EXAMINATION

Ecc2sal3                    Amazquita Agudelo - Recross

1   BY MR. BENSON:

2   Q.  Let's start with respect to Mr. Drill.  He was on the

3   service floor for the entire service, correct?

4   A.  Yes.

5   Q.  And he spent most of his time in the VIP section, correct?

6   A.  In the whole part of the restaurant.

7   Q.  He sold wine throughout the restaurant, correct?

8   A.  Well, when he would work during the mornings, yes.

9   Q.  He was an expert in wine, wasn't he?

10  A.  Yes.

11  Q.  And he would go around to the tables and explain the wine

12  and get the wine and pour the wine, correct?

13  A.  No, no, not necessarily so.

14  Q.  Which of that didn't he do?

15  A.  He was the manager.  He would give orders so that

16  everything would be proper and correct.

17          MR. BENSON:  Move to strike.  I asked him about the

18  wine.

19          THE COURT:  The answer is stricken.

20  Q.  I asked you previously -- you testified previously that he

21  went around the restaurant selling wine, correct?

22  A.  No, I did not say it.  I did not say that he was around --

23  going around the restaurant selling wine.

24  Q.  Was he conversing with the customers about the wine?

25  A.  Sometimes.

1   Q.   And he also spent a lot of time in the VIP section of the

2   restaurant, correct?

3   A.   He was all over the restaurant.

4   Q.   Where is the VIP section?

5   A.   Number one.

6   Q.   Did you observe him there?

7   A.   I saw him in one, two, three, at the bar.

8   Q.   Did you observe him taking drink orders from customers?

9   A.   The majority of times it was done by the waiters, but if it

10  was necessary and the waiter was not there, then he would do

11  it.

12  Q.   So he would take drink orders.

13       He would also explain specials to the customers,

14  correct?

15  A.   Sometimes.

16  Q.   And he would also pour wine at the tables once it was

17  delivered, correct?

18  A.   Sometimes.

19  Q.   And he would also assist in running food from the kitchen

20  to the tables, correct?

21  A.   Well, really?  No.

22  Q.   You never saw him running food to the tables?

23  A.   Well, not in my whole lifetime, no, but there were very few

24  times.

25  Q.   So you did see him doing that on occasion.

Ecc2sal3                        Amazquita Agudelo - Recross

1   A.  Yes.

2   Q.  And if a customer had a problem during the meal, it was

3   Mr. Drill who would address that problem, correct?

4   A.  If the waiter could not do it or solve it, then he would

5   go.

6   Q.  And he would interact directly with the customers when he

7   did that, correct?

8   A.  Yes.

9   Q.  And all of those thing that we have just talked about were

10  the same with Mr. Vosilla, correct?

11  A.  Yes.

12  Q.  And all of these things took place during the entire

13  service, did they not?

14  A.  Yes.

15          MR. BENSON:  No further questions, your Honor.

16          THE COURT:  You have no questions, right?

17          MR. ANDROPHY:  If I could have just brief redirect?

18          THE COURT:  All right.

19  REDIRECT EXAMINATION

20  BY MR. ANDROPHY:

21  Q.  Did Mr. Drill do anything in addition to all of the things

22  that Mr. Benson just asked you about -- serving wine,

23  explaining specials, pouring wine, interacting with customers,

24  addressing customer issues?  Did Mr. Drill do anything in

25  addition to all of those things?

Ecc2sal3                    Amazquita Agudelo - Redirect

1    A.  No.  Well, that practically was what he did.  He was

2    manager.

3              MR. ANDROPHY:  Okay.  I have no further questions.

4              THE COURT:  Thank you, sir.  You may step down.

5              (Witness excused)

6              THE COURT:  We will take our 45-minute break at this

7    time.

8              (Luncheon recess )

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ecc2sal3

```
 1                      A F T E R N O O N     S E S S I O N

 2                            12:00 p.m.

 3              MR. CLARK:  Good afternoon, your Honor.

 4              This is a preliminary issue.  We have Mr. Francisco

 5    Lugo available, and we intend to call him as the next witness.

 6    One thing I did want to mention, because of the fact this is

 7    going to be going over Skype, that perhaps for this witness we

 8    use consecutive interpretation instead of simultaneous

 9    interpretation, because I think it is difficult for him to be

10    able to hear more than one voice at any one time.

11              THE COURT:  That's fine.  The other thing is, you

12    should feel free to have whomever is doing the questioning in

13    front of the camera so that he can see that individual.

14              MR. CLARK:  Yes, your Honor.  My hope and intention

15    was that we would use these two chairs in front of the computer

16    so that he will always be able to see both the interpreter and

17    the questioner and also you can sort of see in the corner what

18    he is able to see and he will also be able to see you.

19              I think that the most difficult thing would

20    potentially be his ability to hear you.  Hopefully that's not

21    going to be a large issue, but it is something where the

22    questioner, whether that be me or opposing counsel, that we

23    will have to be aware visually, some sort of sign that you said

24    something.  I haven't checked the acoustics from your chair.

25              THE COURT:  Well, the interpreter is going to
```

Ecc2sal3

| | |
|---|---|
| 1 | interpret for me, so if he can hear the interpreter, he will be |
| 2 | hearing me. |
| 3 | MR. CLARK:  Hopefully that will work perfectly. |
| 4 | At this point plaintiffs would call Mr. Francisco Lugo |
| 5 | to testify. |
| 6 | FRANCISCO LUGO, |
| 7 | called as a witness by the plaintiffs |
| 8 | having been duly sworn, testified as follows: |
| 9 | THE INTERPRETER:  He said in Spanish "I cannot hear |
| 10 | you very well.  Would you please get closer to the microphone? |
| 11 | Excuse me." |
| 12 | THE WITNESS:  Yes, I state that it is the truth. |
| 13 | THE DEPUTY CLERK:  Please state your full name and |
| 14 | spell them slowly for the record. |
| 15 | THE WITNESS:  My names is Francisco Lugo.  I cannot |
| 16 | hear you. |
| 17 | MR. CLARK:  I think he didn't hear the part about |
| 18 | spelling his name. |
| 19 | THE WITNESS:  Excuse me.  Excuse me very much, |
| 20 | Mr. Attorney, but I cannot understand you. |
| 21 | MR. CLARK:  Please spell your name. |
| 22 | THE WITNESS:  My name is Francisco Lugo. |
| 23 | THE COURT:  That's fine.  His name is Francisco Lugo. |
| 24 | I have got that. |
| 25 | MR. CLARK:  Great. |

Ecc2sal3

1   DIRECT EXAMINATION

2   BY MR. CLARK:

3   Q.  Mr. Lugo, do you recognize this document?

4           THE INTERPRETER:  Can I participate a bit more, if I

5   am authorized, to lower his hand or to instruct the attorneys

6   to instruct him.  He still has had hand up.  Now he has --

7           THE COURT:  He is fine.

8   BY MR. CLARK:

9   Q.  Do you recognize this document?

10  A.  Yes, I have it.

11  Q.  Is this document the declaration that you intend to use as

12  your direct testimony in this matter?

13  A.  Yes, sir.

14  Q.  Now, I am going to turn to the last page.

15  A.  Yes.

16  Q.  Is this your signature?

17  A.  Yes, sir.  My name I signed.  I'm sorry.

18          MR. CLARK:  At this point we would move --

19          THE COURT:  There was a question, and the question is

20  was this your signature?

21  Q.  Again I ask, is this your signature?

22  A.  Yes; yes, sir.

23          MR. CLARK:  At this point we would like to move this

24  into evidence as Plaintiffs' Exhibit 115.

25          MR. BENSON:  No objection.

Ecc2sal3                          Lugo – Direct

 1                  THE COURT:  It is admitted.

 2                  (Plaintiff's Exhibit 115 received in evidence)

 3                  MR. CLARK:  Your Honor we, would also correspondingly

 4      seek to admit Exhibits 51, 52, 53, 54, and 55, all of which are

 5      identified in the declaration.

 6                  MR. BENSON:  No objection.

 7                  THE COURT:  They are admitted.

 8                  (Plaintiff's Exhibits 51, 52, 53, 54 and 55 received

 9      in evidence)

10                  MR. CLARK:  The plaintiffs have no further questions

11      for this witness at this time.

12      CROSS EXAMINATION

13      BY MR. BENSON:

14      Q.  Good afternoon, Mr. Lugo.

15      A.  (In English) Good morning, sir.

16      Q.  You worked at Fresco Restaurant from November 2011 to

17      February of 2014, is that correct?

18      A.  It is correct.

19      Q.  Prior to that time, did you have experience in the

20      restaurant industry?

21      A.  Yes, sir.

22      Q.  And what was that experience?

23      A.  What was my experience?

24      Q.  Yes.

25      A.  I worked a different Italian and French restaurant.

Ecc2sal3                    Lugo - Cross

1    Q.  As a busser?

2    A.  (In English) Busser, yes, like a busser.

3    Q.  Were you compensated in part by tips in those positions?

4    A.  I cannot understand.  Your voice is coming very choppy.

5         (Question repeated)

6    A.  Yes.

7    Q.  In Fresco Restaurant you were hired as a busser, correct?

8    A.  I cannot understand.  Your voice comes and goes.  It comes

9    and goes.

10   Q.  You were employed at Fresco Restaurant as a busser,

11   correct?

12   A.  Yes, sir.

13   Q.  And there were different busser assignments at the

14   restaurant, correct?

15   A.  Correct.

16   Q.  And those assignments included stocker, correct?

17   A.  Yes, sir.

18   Q.  And coffee person?

19   A.  Yes, sir.

20   Q.  And bar-back as well, correct?

21   A.  Yes, sir.

22   Q.  And did you serve in all of those roles when you worked at

23   Fresco Restaurant?

24   A.  Yes, sir.

25   Q.  On the lunch shift, you would arrive at 10 a.m., correct?

Ecc2sal3                    Lugo - Cross

1    A.  Yes, sir.

2    Q.  And you would do side work when you arrived at the

3    restaurant, correct?

4    A.  Correct, sir.

5    Q.  And that side work involved folding napkins, correct?

6    A.  Yes, sir, correct.

7    Q.  And folding napkins assisted you in the service, correct?

8    A.  Yes, sir.

9    Q.  And you also put glasses at the service stations, correct?

10   A.  Correct.

11   Q.  And that was part of your regular duties as a busser also,

12   correct?

13   A.  Yes, sir.

14   Q.  And you would spend between 20 and 30 minutes doing side

15   work, correct?

16   A.  Correct.

17   Q.  And then you would eat the family meal, correct?

18   A.  Correct, sir.

19   Q.  And that was for 30 minutes, correct?

20   A.  Correct.

21   Q.  And at 11 a.m., you would start to set up the dining room

22   for the customers, correct?

23   A.  (In English) That is correct.

24   Q.  And the customers would start arriving at 11:30 a.m.,

25   correct?

Ecc2sal3                        Lugo - Cross

1   A.  (In English) That is correct, sir.

2   Q.  And on the evening shift, you arrive at 4 p.m., correct?

3   A.  (In English) That is correct.

4   Q.  You would spend the same 20 or 30 minutes performing side

5   work, is that correct?

6   A.  Yes, sir.

7   Q.  And it's the same side work that you perform at lunch,

8   correct?

9   A.  Yes.

10  Q.  Folding napkins and placing glasses at the station,

11  correct?

12  A.  It is correct.

13  Q.  And at 4:30, you would have a 30-minute family meal,

14  correct?

15  A.  It is correct.

16  Q.  And you performed no work during that family meal, correct?

17  A.  It is correct.

18  Q.  And then at 5:00 you would prepare the dining room for the

19  customers to arrive at 5:30, correct?

20  A.  I lost the image.  Excuse me.

21          That is correct.

22  Q.  At times were you assigned to the stocker assignment?  At

23  times did you perform the assignment of stocker?

24  A.  Yes, sir.

25  Q.  Approximately how often?

1   A.   Two times per week.

2   Q.   And in that position, you brought clean supplies to the

3   dining room for use in service with the customers, correct?

4   A.   I am sorry, I cannot understand your voice very clearly.

5         MR. BENSON:   Would the court reporter read the

6   question, please.

7         (Record read)

8   A.   That is correct.

9   Q.   And those things that the stocker brought to the dining

10  room assisted the bussers in being able to do their job,

11  correct?

12  A.   Yes, sir.

13  Q.   It made it easier for them to have the supplies close by,

14  correct?

15  A.   It is correct.

16  Q.   And as a result of having those supplies in the dining

17  room, they were able to turn over the tables more quickly,

18  which helped the overall service, correct?

19  A.   It is correct, sir.

20  Q.   The bussers and runners, regardless of their assignments,

21  helped each other out during the service?

22  A.   It is correct, sir.

23  Q.   And many times, regardless of assignment, whomever was free

24  would assist in running food from the kitchen to the dining

25  room, correct?

Ecc2sal3                         Lugo – Cross

| | |
|---|---|
| 1 | THE INTERPRETER:  I lost it. |
| 2 | (Read record)? |
| 3 | A.  (In English) Correct, sir. |
| 4 | Q.  And that was because it was important to get the food from |
| 5 | the kitchen to the dining room floor in as fast a time as |
| 6 | possible? |
| 7 | A.  Correct. |
| 8 | Q.  Did you ever work as a coffee person? |
| 9 | A.  Only as a helper. |
| 10 | THE COURT:  What does the helper do? |
| 11 | THE WITNESS:  When the person that was assigned to |
| 12 | prepare coffee was very busy, they could not do it all by |
| 13 | himself in order to deliver the coffees over to the tables, and |
| 14 | one would assist him by taking the coffees to the tables. |
| 15 | Q.  And in those circumstances -- strike that. |
| 16 | And in those situations, both the coffee person and |
| 17 | the assistant would run the drinks from the coffee station to |
| 18 | the service floor, correct? |
| 19 | A.  Yes.  The bussers would assist.  That is correct. |
| 20 | THE COURT:  The question is whether or not the coffee |
| 21 | maker was delivering the coffee to the tables. |
| 22 | THE WITNESS:  Yes, sir. |
| 23 | Q.  When you were assigned as a stocker -- strike that. |
| 24 | Isn't it true that when you were assigned as a |
| 25 | stocker, you never took the place of a dishwasher for any |

Ecc2sal3                        Lugo - Cross

1    portion of a shift?

2    A.  No, sir.  That is not correct.

3    Q.  Is it your testimony that you replaced the dishwasher for

4    any portion of a shift when you were a stocker?

5    A.  Okay.  For certain occasions, for whatever reason, the

6    dishwasher was sent to go and bring back, and when we were very

7    busy, I had to wash the silverware and the plates for the main

8    dining room.

9    Q.  When did that happen?

10   A.  Very frequently.

11   Q.  At what time during the shift did it happen.

12   A.  It happened when it was fully busy during the lunch and the

13   dinner.

14   Q.  Okay.  At what time of day did it happen?

15   A.  Was the question at what true, real, exact time?  Was that

16   the question?

17   Q.  Yes.  I am trying to understand when during a shift you

18   alleged to have taken the place of a dishwasher.

19   A.  The hour is a nondefined hour because . . .

20   Q.  Were you through?

21   A.  Well, because I repeat one more time, there were occasions

22   when the dishwasher was very busy, and I could not wait until

23   he would provide me with flatware or plates, so then I would

24   get in there and do it there myself.

25   Q.  And when -- so would that happen throughout the shift?

Ecc2sal3                    Lugo - Cross

1   A.  I just mentioned, no, that only in certain occasions, not

2   every day.

3   Q.  And only those occasions where it was very busy, is that

4   correct?

5   A.  That is correct, sir.

6   Q.  And on those occasions, is it your testimony that there was

7   a dishwasher present next to you while you were washing those

8   dishes?

9   A.  Excuse me, yes.

10          I can listen to you, but I have lost the image of you.

11          THE COURT:  That is not a problem, if he can hear.

12          THE WITNESS:  Yes, I do hear you.

13          (Question read)

14  A.  Yes, sir.

15  Q.  And for how many minutes did you do the washing of the

16  dishes?

17          THE COURT:  The connection has been broken and we are

18  trying to reestablish the connection.

19          (Pause)

20          MR. CLARK:  Mr. Lugo?

21          THE WITNESS:  Yes, sir.  Please.  I don't know.

22          MR. CLARK:  Okay.  Just one moment.

23          MR. BENSON:  I believe there is a question pending.

24          (Record read)

25          THE WITNESS:  Mr. Interpreter, can I call on the

Ecc2sal3                         Lugo - Cross

1   phone?  I cannot hear very well.

2              THE COURT:  Would the parties consent to a telephone

3   testimony?

4              MR. CLARK:  Plaintiffs would consent.  My

5   understanding is that may potentially be an issue for

6   defendant.  I leave it to your determination.

7              MR. BENSON:  Defendants are interested in moving this

8   along, so we will agree.

9              THE COURT:  We will move the court telephone.  We will

10  turn on the speaker and speak into the court telephone.

11             MR. BENSON:  So he can remain on the screen?

12             THE COURT:  Is he able to call us?  I don't know that

13  I can make an international call on that line.

14             (Pause)

15             THE COURT:  I don't think he can hear.

16             (Question repeated)

17             THE WITNESS:  Yes, I can do that.  I have no problem,

18  that.  I will dial.

19             (Pause).

20             THE INTERPRETER:  The phone that you must dial after

21  your access code for dialing from Mexico to the United States

22  is the following, so then you must dial whichever way you need

23  to dial from Mexico to come to the United States and then you

24  will please dial the following numbers.

25             (Speaking Spanish).

Ecc2sal3                          Lugo - Cross

1          THE COURT:  We are going to take a bathroom break for

2     a couple of minutes.

3          (Recess)

4          THE COURT:  You may continue.

5          MR. BENSON:  I believe there is a question pending.

6          (Record read)?

7     A.  Ten, 15 minutes approximately.

8     Q.  And on those occasions where you allegedly took -- well,

9     you weren't replacing a dishwasher in those situations,

10    correct?  You were working side by side with a dishwasher.  Is

11    that your testimony?

12    A.  Yes.

13         Can I make a commentary?

14         THE COURT:  Go ahead.

15         THE WITNESS:  Okay.  When the shift was over, one

16    could not leave until the station had been left completely

17    clean, and one would have to do that as the dishwasher had to

18    do his extra jobs, too, so that everybody could leave after

19    their own shift.

20         THE COURT:  But the question, sir, was whether or not

21    the dishwasher was also washing dishes when you were washing

22    dishes.

23         THE WITNESS:  No.  A thousand apologies, no.

24    BY MR. BENSON:

25    Q.  So when you previously testified that you worked side by

Ecc2sal3                        Lugo - Cross

1  side with the dishwasher for the ten or 15 minutes, when you

2  did this, was that accurate?

3  A.  No, sir.

4  Q.  So the dishwasher was not present during the ten to 15

5  minutes that you were doing this?

6  A.  No, he was not present.

7  Q.  And this was on both the lunch shift and the dinner shift?

8  A.  That is correct, sir.

9  Q.  And it was at the end of both shifts?

10  A.  In part and also when we were very busy because I could not

11  wait until he could give me flatware, plates, and glasses.  I

12  would go in there and do them myself, wash the dishes.

13  Q.  On these occasions, were you directed by anyone to wash the

14  dishes or was this something that you did on your own?

15  A.  I did it on my own.

16  Q.  A lunch shift began at 10, correct?

17  A.  That is correct.

18  Q.  It ended at different times depending on whether there were

19  customers in the station to which you were assigned, correct?

20  A.  It is correct.

21  Q.  And the same would be true with respect to the dinner

22  shift, correct?

23  A.  It is correct, sir.

24  Q.  And when you were not assigned to be -- strike that.

25            When you were a closer, you had to wait until the last

Ecc2sal3                          Lugo - Cross

1   customer left, correct?

2   A.   That is correct.

3   Q.   And the closer would leave the dining room later than if

4   you were not assigned as a closer, correct?

5   A.   That is correct.

6   Q.   And if you were not the closer on the lunch shift, it

7   normally ended around 2:30.  Is that correct?

8   A.   That is correct.

9   Q.   And if you weren't the closer at dinner, it normally ended

10  at some time between 9:30 and 10:00, is that correct?

11  A.   Yes.

12  Q.   And even if you were the closer, it would be rare to work

13  past 10:30 at night, correct?

14  A.   No, we would leave later.

15  Q.   11:00?

16  A.   10:30, 11; that would be correct.

17  Q.   Brent Drill only received tips when he worked as a floor

18  captain, correct?

19  A.   Yes.

20              THE WITNESS:  Can I make an observation?

21              MR. BENSON:  He answered the question.

22              THE COURT:  No, sir, you cannot.

23              (Continued on next page)

24

25

ECC5sal4                    Lugo - cross

1    BY MR. BENSON:

2    Q.  And Attilio Vosilla only received tips when he served as a

3    party captain, correct?

4    A.  It is my understanding that he would receive a salary and

5    tips.

6    Q.  But the answer to my question -- strike that.

7           But isn't it true that he only received tips when he

8    served as a party captain?

9    A.  It is correct.

10   Q.  You never observed Brent Drill fire anyone, correct?

11   A.  No.  That is not correct.  I did see Brent Drill fire a

12   person.

13   Q.  Who was that?

14   A.  Julian.  I cannot remember his last name but it was Julian.

15   Q.  Was that Mr. Amazquita?

16   A.  Yes, sir.

17   Q.  Did that incident take place after January 1st of 2013?

18   A.  The day I cannot remember.

19   Q.  Do you know whether or not Mr. Drill or Anthony Scotto made

20   the decision to terminate his employment?

21   A.  Okay.  The first time he was fired by Brent Drill and the

22   second time he was fired by Mr. Anthony.

23   Q.  When was the first time that he was fired?

24   A.  Okay.  The date I do not know it, but they fired him when

25   he did not want to work at the bar.

ECC5sal4                          Lugo – cross

1    Q.  And on that occasion Mr. Scotto brought him back to the

2    restaurant; is that your testimony?

3    A.  On that occasion, yes, but later on he fired him some

4    months later.

5    Q.  All of that took place in 2013, correct?

6    A.  It is correct, sir.

7    Q.  Did you ever observe Brent Drill fire anyone prior to

8    January 1st of 2013?

9    A.  No.

10   Q.  Did you ever observe Brent Drill discipline anyone prior to

11   January 1st, 2013?

12   A.  No.

13           MR. BENSON:  I have no further questions at this time,

14   your Honor.

15           THE COURT:  Redirect?

16           MR. CLARK:  If I could have just one moment to confer

17   with co-counsel?

18           (Counsel conferring)

19           MR. CLARK:  We have no redirect at this time.

20           THE COURT:  I have some questions.

21           Were there any managers at the restaurant?

22           THE WITNESS:  Yes.

23           THE COURT:  And who were they?

24           THE WITNESS:  Brent Drill and what's his name?

25   Mr. Vosilla.  Attilio.

ECC5sal4                        Lugo - cross

1              THE COURT:  Were there any floor captains?

2              THE WITNESS:  They would also perform or act as

3    captains also.

4              THE COURT:  Do you have any questions?

5              MR. BENSON:  None, your Honor.

6              MR. CLARK:  I have none.

7              THE COURT:  Thank you, sir.

8              THE WITNESS:  Okay.

9              THE COURT:  We are finished.

10             MR. CLARK:  Your Honor, if I could have a moment to

11   just disconnect the call and the link?

12             THE COURT:  Yes.

13             THE WITNESS:  Okay.  Thank you very much.  Can I now

14   leave?

15             THE COURT:  Yes.

16             THE WITNESS:  Okay.

17             THE WITNESS:  (In English)  Thank you very much.

18             MR. ANDROPHY:  Plaintiffs call Vicente Leon.

19    VICENTE LEON,

20        called as a witness by the Plaintiffs,

21        having been duly sworn, testified as follows:

22             THE DEPUTY CLERK:  Please state your full name and

23   spell them slowly for the record.

24             THE WITNESS:  Vicente Leon.

25             THE COURT:  You may inquire.

ECC5sal4                    Lugo - cross

1              THE WITNESS:  V-I-C-E-N-T-E  L-E-O-N.

2    DIRECT EXAMINATION

3    BY MR. ANDROPHY:

4    Q.  Good afternoon, Mr. Leon.  Do you recognize the document I

5    have just put before you?

6    A.  Yes, sir.

7    Q.  Is this the written declaration you submit as your direct

8    testimony in this trial?

9    A.  Yes, sir.

10   Q.  And if you turn to the last page; is that your signature on

11   the last page?

12   A.  Yes, sir.

13              MR. ANDROPHY:  Your Honor, we ask that this

14   declaration be admitted as Plaintiff's Exhibit 116.

15              THE COURT:  Any objection?

16              MR. BENSON:  No objection, your Honor.

17              THE COURT:  116 is admitted.

18              (Plaintiff's Exhibit 116 received in evidence)

19              MR. ANDROPHY:  We also ask that exhibits 48, 49, 50

20   and 85 be admitted.

21              MR. BENSON:  No objection, your Honor.

22              THE COURT:  They are admitted.

23              (Plaintiff's Exhibits 48, 49, 50 and 85 received in

24   evidence)

25              MR. ANDROPHY:  We have no further direct examination

ECC5sal4                    Leon - direct

 1    at this time.

 2              THE COURT:  Cross-examination?

 3    CROSS EXAMINATION

 4    BY MR. BENSON:

 5    Q.  Good afternoon, Mr. Leon.

 6    A.  Good afternoon.

 7    Q.  You were hired by Fresco in January of 1999, correct?

 8    A.  Yes, sir.

 9    Q.  And you continue to work there to this very day, correct?

10    A.  Yes, sir.

11    Q.  During that time have you held any other jobs?

12    A.  Yes, sir.

13    Q.  Do you currently hold another job?

14    A.  Yes, sir.

15    Q.  What is your current job?

16    A.  Japanese restaurant.

17    Q.  How long have you held that job?

18    A.  A year, perhaps.

19    Q.  Prior to that did you have another job at another

20    restaurant other than Fresco?

21    A.  Before I started to work at Fresco?  Yes.

22    Q.  So, the only job that you held in addition to your job at

23    Fresco since January of 1999 has been the Japanese restaurant

24    job which you held approximately a year.  Is that accurate?

25    A.  Whether I have worked only at Fresco since I started there?

ECC5sal4                    Leon - cross

1    Q.   That is my question, yes.

2    A.   Weekends at some other places also.

3    Q.   So have you held jobs at other restaurants for most

4    weekends since you have been employed at Fresco?

5    A.   Yes, sir; because my schedule at Fresco has been very,

6    variable.

7    Q.   Has your schedule at Fresco allowed you to work at those

8    other jobs?

9    A.   Yes, sir.

10   Q.   You were hired by Anthony Scotto, correct?

11   A.   I do not recall exactly by whom, but I would think so, yes.

12   Q.   You don't recall that you were hired by Mr. Scotto?

13   A.   Well, I was working at another restaurant and the person

14   who invited me to work over there had spoken with the gentleman

15   who said for me to go over there for an interview and that the

16   person who interviewed me was Jerry who was the manager at that

17   time.

18   Q.   So it is your testimony that it wasn't Mr. Scotto, correct?

19   A.   Mr. Scotto, from what I can remember who just -- he just

20   told the person because -- he said whether I was a strong

21   person because the restaurant was very busy.

22   Q.   Did you take a deposition in this matter, sir?

23   A.   Yes, sir.

24   Q.   And were you asked questions and did you give answers?

25   A.   I do not remember.

ECC5sal4                      Leon – cross

1   Q.   Were you sworn to tell the truth during that deposition?

2   A.   Yes, sir.

3   Q.   And did you tell the truth, to the best of your ability,

4   during that deposition?

5   A.   More than the truth, only the truth.

6   Q.   I'm going to show you that deposition; specifically I

7   direct you to page 97, line 21.  Were you asked the following

8   questions and did you give the following answers:

9   "Q   And then Anthony gave you a job offer?

10  "A   Yes.

11  "Q   And he hired you as a busboy?

12  "A   Yes."

13          Were you asked those questions and did you give those

14  answers?

15  A.   Yes, Mr. Anthony, he provided us to fill out certain sheets

16  where to write things like address and the one phone number.

17  Q.   And he gave you a job offer, correct?

18  A.   He first -- I was on probation.  I was -- I was in

19  training.

20  Q.   And then he gave you a job offer, correct?

21  A.   Yes.

22  Q.   There were different assignments for bussers at Fresco,

23  correct?

24  A.   Yes, sir.

25  Q.   One of those assignments is stocker, correct?

ECC5sal4                    Leon – cross

1    A.   Yes.

2    Q.   And you, yourself, have been assigned to the stocker role

3    at times, correct?

4    A.   Yes, sir.

5    Q.   And has that been true throughout the entire time that you

6    have been employed at Fresco?

7    A.   I had shifts as a stocker, yes.

8    Q.   You continue to have shifts as a stocker?

9    A.   Until the beginning of this year, no, I have not worked as

10   a stocker.

11   Q.   So, from the beginning of this year on you haven't been

12   assigned as a stocker anymore?  Is that your testimony?

13   A.   I do not remember exactly.  Perhaps they have placed me as

14   such maybe once, but I do not remember exactly.

15   Q.   Now, I draw your attention to paragraph 16 of your

16   declaration.  It reads, and I quote:  Sometimes, when I worked

17   as a stocker, I was required to do the job of a dishwasher.

18   A.   Yes, sir.

19   Q.   When is the last time that you were required to do the job

20   of a dishwasher?

21   A.   I do not remember but it was during -- during the past

22   years before the machine started doing what -- oh, before they

23   put the machine, the clock for registering when we came in and

24   we left, the entrance, when we came in.

25   Q.   So, it is your testimony that you haven't been required to

ECC5sal4                        Leon - cross

1    do the job of a dishwasher since the time clock was put in in

2    2011?

3    A.   From 2011 towards nowadays where when things became

4    different.

5    Q.   Is it your testimony, sir, that since 2011 you have never

6    been required to perform the job of a dishwasher when you were

7    assigned to the stocker assignment?

8    A.   From 2011 towards nowadays?  No.

9    Q.   And, based on your observations, that is true with respect

10   to other bussers, correct, who have the stocker role?

11   A.   There have been stockers but I do not work many shifts at

12   the Fresco Restaurant presently.

13   Q.   I'm saying based on your observations, sir, since the time

14   clock was put in in 2011, you have not observed any other

15   busser who is assigned to the stocker role performing the

16   functions of a dishwasher.  Isn't that accurate?

17   A.   I -- I say to that question that I have been working just

18   not very much at Fresco Restaurant from 2011 to now.

19   Q.   So, I'm asking you what you observed from 2011 to the

20   present and on those occasions when you have been in Fresco

21   Restaurant have you observed any stocker washing dishes for any

22   portion of the shift?

23   A.   Me personally?  No.

24   Q.   Now, prior to the time when the time clock was put in is it

25   your testimony, sir, that you were required to do the job of a

1    dishwasher?

2    A.  Yes, sir.

3    Q.  Was that every time that you had -- strike that.

4           Was that every time you were assigned to the stocker

5    role?

6    A.  Not every time that I worked as a stocker but, yes, there

7    were a couple of times the chef would order us to go and to

8    wash dishes.

9    Q.  So it was a couple of times that you alleged that that

10   happened?

11   A.  It has to do with me personally?  Yes.

12   Q.  And, by a couple of times do you mean less than five?

13   A.  I have truly perhaps gone to or a maximum or most, at the

14   most three shifts as a stocker but not more than those.

15   Q.  Are you talking -- when you say that do you mean that you

16   had that many shifts per week?  Or that many shifts in total?

17   A.  The schedule changes.  They are different from week to

18   week.

19   Q.  I am trying to get a sense, sir, of when it is that you

20   allege that you were required to perform the job of a

21   dishwasher.

22   A.  During the shifts when I was a stocker.

23   Q.  Was that every shift that you were a stocker?

24   A.  Yes.  Well, there were two shifts per week, yes.

25   Q.  What years was that?

ECC5sal4                    Leon - cross

1   A.  I cannot remember the year.

2   Q.  It wasn't every year, correct?

3   A.  Not every year.  When it was my turn to wash the dishes it

4   was during one summer.

5   Q.  So it is your testimony that during one summer, from 1999

6   to the present, there were some occasions when you worked as a

7   stocker where you were required to do the job of a dishwasher?

8   Is that correct?

9   A.  I repeat:  For one summer, yes, I was sent over to wash the

10  dishes.

11  Q.  And you don't remember what year that was?

12  A.  No, sir.

13  Q.  And that was never for a full shift, correct?

14  A.  No.  Approximately 30 minutes, perhaps.

15  Q.  And that didn't happen every shift before that summer,

16  correct?

17  A.  I repeat:  The shifts when I was a stocker, yes.

18  Q.  And by summer do you mean the months of July and August?

19  A.  The slow months that are called summer, no.

20  Q.  Well, when you say that for one year you were required to

21  wash dishes for 30 minutes when you were a stocker, what months

22  did you mean by that?

23  A.  The months that are a little bit slow at the restaurant.

24  Q.  Which months are those?

25  A.  They can be July, August, May.

482

ECC5sal4                     Leon - cross

1   Q.   Do you recall when, during the shift, that was when you

2   were allegedly assigned to wash dishes in that one year in the

3   slow months?

4   A.   The year I cannot remember, sir.

5   Q.   I'm asking when, during the particular shift, you were

6   asked to do that.

7   A.   After one had finished eating at 5:00 Mr. Anthony would

8   tell the chefs to take -- not to give so many hours to the

9   dishwashers and take hours away from them so that they could

10  arrive at 6:00 and, meanwhile, we could wash those dishes, the

11  ones that the employees use for eating.  So that then,

12  afterwards, before Mr. Anthony was a little bit strict, he did

13  not want that there were any dirty dishes at the dishwasher

14  station.  He wanted the -- the stocker had to leave that

15  station very, very clean without any glasses or any glasses to

16  be there.

17  Q.   So, is it your testimony that that happened at 5:00?

18  A.   Yes.  When all, all the dishes that had been used by the

19  employees were there.

20  Q.   And when did the dishwasher return?  5:30?

21  A.   Not 5:00, 5:30, sometimes at 6:00 during the summer, during

22  the summer, during the slow time.

23  Q.   Now, did you ever work as a runner?

24  A.   Yes, sir.

25  Q.   Isn't it true that there is a position at the restaurant,

1    in the kitchen in front of a microphone, that is usually

2    performed by the chef or the sous chef that calls out the food

3    orders to the cooks?

4    A.  Yes, sir.

5    Q.  And there is another position, is there not, that stands

6    next to that person that helps coordinate the dishes so they

7    are taken to the proper positions in the dining room?  Is that

8    correct?

9    A.  Yes, sir; the expediters.

10   Q.  And, by expediter do you mean the person who stands next to

11   the person at the microphone?

12   A.  Mr. Raul is next to the microphone requesting the orders

13   from the cooks.

14        When Roberto Martinez was working he was an expediter

15   and he would send us with the food over to the runners.  And

16   then another one came around because he left and then another

17   one came, Pablo Alvarado came.  When Pablo left then Klever

18   stayed there for a longer time.  I do not know his last name.

19   Q.  These are runners who you are mentioning, correct?

20   A.  They are runners but they are the ones that stay for a long

21   time next to the chef sending the runners out with the food.

22   Q.  So, a runner, who has experience, stands next to the chef

23   with a microphone and assists, at times, with sending the food

24   out to the dining room, correct?

25   A.  Not correct.

1   Q.  The person who performs this function -- strike that.

2            Is the person who ever performs this function a

3   runner?

4   A.  Well, a uniform is a runner but he is the person that sends

5   the dishes out with the runners.

6   Q.  And that person also runs the food out with the runners,

7   correct?

8   A.  A couple of times, yes.  There was no one else when the

9   runners are very busy, for example, if they're at the Tuscan

10  Room with a lunch.

11  Q.  So, when the runners are busy, the runner who may be

12  serving in this role runs food to the dining room?  Is that

13  your testimony?

14  A.  Excuse me.  I did not understand.

15  Q.  Is it your testimony that only when the runners are busy

16  does the person who is assisting run food to the dining room?

17  A.  That is, therefore, I am making it clear:  That is the

18  person that is next to the sous chef is a runner who knows more

19  about the food in their organization so that the dishes come

20  out in the proper order.

21  Q.  And that person, when it is busy, also assists in running

22  the food out to the dining room, correct?

23  A.  If there is not another runner present, yes, he does do it.

24  Q.  Well, there is a constant need for extra hands to run food

25  out to the dining room, is there not?

ECC5sal4                    Leon - cross

1    A.  They will use a busboy if they see him and then they tell

2    him to take a dish out.  A runner can take three dishes out and

3    he can carry three dishes out in his hands, and if it is a

4    table of four persons then a runner can take only one dish.

5    Q.  And there are times when the runner, who assists in getting

6    the food out, fills in during his shift when the chef or the

7    sous chef is otherwise occupied; is that correct?

8    A.  During the mornings the sous chef, unless he has phone

9    calls that are made to him because he remains there present,

10   Klever.

11   Q.  So, Klever is the person who serves in this role?

12   A.  As an expediter, yes.

13   Q.  And so, Klever would be a good person to ask how often he

14   would run food to the dining room in order to get an idea of

15   how much food is run at this position?  Is that correct?

16   A.  There are many things that need to be made clear.

17          During this moment in time when it is busy, at this

18   time when it is busy, all years, they used four runners, yes.

19   Three runners are in charge of running appetizers, dessert.

20   When it is already now the time for dessert afterwards, or when

21   the clients or the main courses, then he is just ordering

22   direct next to the window at the kitchen so that the runner can

23   get there and quickly take the food out.

24   Q.  My question is:  Is Klever the right person to speak to to

25   find out how much food a person in this role runs during a

ECC5sal4                    Leon - cross

1   particular shift?

2   A.  Yes.  You can talk to him.  Yes.

3   Q.  And you, yourself, on occasion, have held this role,

4   correct?

5   A.  Yes.  As a busboy, yes, I have performed it.

6   Q.  No, I'm asking you if you have performed the role that you

7   call the expediter.

8   A.  No, sir.

9   Q.  You have never done it?

10  A.  No, sir.

11  Q.  Now, let's go through a typical day.  You arrived at 10:00

12  a.m., correct, for a lunch shift?

13  A.  Yes.  Before 2011, yes, we would all arrive at 10:00 in the

14  morning, yes.

15  Q.  Well, there were some opening people and closing people,

16  correct?

17  A.  Before 2011?  No.

18  Q.  So, it is your testimony that, prior to 2011, the

19  restaurant did not utilize closing people in its scheduling?

20  A.  Busboys?  No.

21  Q.  So it did with respect to waiters and runners?  Is that

22  correct?

23  A.  Runners all the time, there is always two closers, one for

24  the morning during lunch and another one during the evening for

25  the dinner so then there are two.

ECC5sal4                    Leon - cross

1    Q.  And it is your testimony that there were no closing bussers

2    scheduled prior to 2011?

3    A.  Busboys?  No.

4    Q.  Would that be true with respect to both the lunch shift and

5    the dinner shift?

6    A.  Yes, because every one of us, we all had to come in at 4:00

7    in the afternoon.

8    Q.  And so, it is your testimony that the restaurant put in

9    place a new practice when it instituted the time clock with

10   respect to the scheduling of bussers?

11   A.  Yes, sir.

12   Q.  And is it your testimony that you have no recollection of

13   there being closing bussers on the schedule prior to that time?

14   A.  I can remember that.  I do not remember the year but the

15   gentleman during this time, he was a busser during -- during

16   the previous years before 2011, during the times when it was

17   busy for these times during November and December, and the busy

18   time would start from September, perhaps.

19   Q.  So, is it your testimony that during busy times, prior to

20   2011, the company would schedule closing buzzers?

21   A.  No, sir; stockers.  It was one stocker would arrive early

22   to prepare the station and another stocker who would arrive

23   later would need to close the last thing by the clients.

24   Q.  And would those stockers be listed on the schedule?

25   A.  The schedules from 2011, back, it was always the stockers.

ECC5sal4                      Leon - cross

1    Stockers.

2    Q.  In your declaration at paragraph 23, page 4 you state, and

3    I quote:  Additionally, before 2011, when I worked as a busser,

4    I was required to do work that did not involve customer

5    service.

6              Do you see that, sir?

7    A.  Yes, sir.

8    Q.  So, is it your testimony that after 2011 you were not

9    required to do work that did not involve customer service?

10   A.  Excuse me?

11   Q.  You say here that before 2011, when you worked as a busser,

12   you were required to do work that did not involve service.  The

13   time was very specific, correct?

14   A.  As a busboy I did work.

15   Q.  So, is it your testimony that before and after 2011, when

16   you worked as a busser you were required to do work that did

17   not involve customer service?

18   A.  Before 2011?  Yes.

19   Q.  And after 2011, no, correct?

20   A.  I would do my job, the job that corresponded to me.

21   Q.  I don't think that is responsive to my question.  I

22   respectfully ask the court reporter to read it back again.

23             (Record read)

24   A.  Yes.  In other words, the job as a busboy.  In other words,

25   another thing such as a coffee maker, barback.

1   Q.  Are you through answering, sir?

2   A.  Yes.

3   Q.  So the record is clear and I understand your testimony, it

4   is that the things that you list here in paragraph 23 you only

5   did before 2011; is that accurate?

6   A.  Personally for me?  Yes.

7   Q.  And prior to 2011 -- strike that.

8          Bringing dishes and chairs and room dividers up and

9   down between the main dining area and the party room upstairs

10  were part of your normal responsibilities as a busser, correct?

11  A.  Yes, because the lady would always -- we do not know if

12  when she did -- I do not know whether she did not take her

13  reservations properly, because at every moment she would make

14  us to ask her four, five -- for us to go back to three.

15  Q.  So, the dining room had to be set up differently depending

16  on the number of reservations it had and whether or not it was

17  hosting parties, correct?

18  A.  Yes.  Supposedly the first sitting, it is the waiters, the

19  ones who are in charge for doing that.

20  Q.  The waiters are in charge of setting up the dining room?

21  A.  During the first sitting, yes.

22  Q.  So, would the waiters also bring dishes, chairs and room

23  dividers up and down between the main dining room and the party

24  room upstairs?

25  A.  No, sir.  Only the busboys.

1    Q.  Because it was your responsibility to set the dining room

2    up so that the customers could be served, correct?

3    A.  Yes, but sometimes we would be having to do something and

4    the waiters were just standing there.

5    Q.  Okay.  And this work that you say you did before 2011, it

6    would take approximately 30 minutes, correct?

7    A.  What job?  To bring chairs upstairs or what are you

8    referring to?

9    Q.  The jobs that are listed in paragraph 23 of your

10   declaration.

11   A.  Could you repeat it again?  I do not understand English.

12   Q.  My question is the jobs that you list in paragraph 23, they

13   would take approximately one half hour to perform, correct?

14              MR. ANDROPHY:  If someone could read those to the

15   witness?  He just said he can't read it and understand the

16   English.

17              MR. BENSON:  I apologize.

18              THE COURT:  So you are talking about what is in the

19   second sentence?

20              MR. BENSON:  Yes, what is in the second sentence;

21   that's correct, your Honor.

22              THE COURT:  Would the interpreter read the second

23   sentence to the witness?

24              INTERPRETER:  Yes, your Honor.  Let me get my glasses,

25   please.

1          THE WITNESS:  It would take me half an hour, yes, but

2     things were done during different times also.  For example, the

3     lady, the owner of the restaurant would always, when she saw

4     that there was dirt in the stairway, she would send us, order

5     us to go sweep the stairs and the gentlemen could never, just

6     standing, for example, before starting a lunch with the

7     napkins, with the sheets --

8          INTERPRETER:  As the one for beds, I asked him in

9     English and he said yes.  He said the sheets that arrive with

10    the delivery.

11         THE WITNESS:  The gentleman receives a bag with dirty

12    table clothes who are torn -- that are torn, and then cover bed

13    spreads or sheets they could be called.

14         INTERPRETER:  Verbatim.

15         THE COURT:  What did you use those materials for?

16         THE WITNESS:  The runner cuts them up with a knife

17    and -- cuts them up to the size of a standard napkin and with

18    those we would clean the walls, dust them.

19         At that time, on those previous times there were some

20    black chairs that, when there were parties for 40 or 50 persons

21    at the private party room, excuse me, but the chairs and the

22    back rest of those chairs would stain the walls with a black

23    stain.  And so, the gentleman wanted us, that with those rags,

24    we would clean the walls.

25         MR. BENSON:  Your Honor, I move to strike as

ECC5sal4                    Leon - cross

1  non-responsive.

2          MR. ANDROPHY:  I think he went on a necessary tangent

3  because there was some question as to what these rags were that

4  he described in responding to the question.

5          THE COURT:  I certainly am not going to strike that

6  portion that is responsive to my question, counsel.

7          MR. BENSON:  I understand that, your Honor, so I'm not

8  suggesting otherwise.

9          THE COURT:  So I am going to permit you to reask your

10  question.  Do you want your question read back?

11          MR. BENSON:  That would be helpful.

12          (Record read)

13          INTERPRETER:  Do you want the answer?

14          MR. BENSON:  Yes.

15          THE WITNESS:  Yes, sir.  20 minutes.

16  BY MR. BENSON:

17  Q.  And, is it your testimony that you were required to do the

18  things you list in paragraph 23 every day?

19  A.  When it was my turn to work those morning shifts.

20  Q.  And when is it your testimony, during this shift, that you

21  did this work?

22  A.  Before we started a lunch.

23  Q.  You also worked as a coffee person, correct?

24  A.  Yes, sir.

25  Q.  And you worked as a coffee person on both lunch shifts and

ECC5sal4                    Leon - cross

1    dinner shifts, correct?

2    A.  Yes, sir.

3    Q.  And your job in that role was to pour and deliver beverages

4    to the customers, correct?

5    A.  Yes, sir.

6    Q.  You worked at the restaurant a long time, correct, sir?

7    A.  Yes; from the year '99.

8    Q.  And the restaurant used to be busier than it has been in

9    recent years, correct?

10   A.  Yes; there was a difference.

11   Q.  And that difference goes back to 2008 approximately,

12   correct?

13   A.  From the time I started at the restaurant that they gave me

14   an opportunity for working it was very busy, the restaurant,

15   during the winter time.

16   Q.  And now it is less busy, correct?

17   A.  It has gone down a bit.  It has been a little bit less.

18   Q.  It was a lot less than it was in 2007 and 2008, correct?

19   A.  Yes, because truly, really, as we did not punch a clock

20   because then we would work more shifts, nine, ten, eight.

21              (Continued on next page)

22

23

24

25

Ecc2sal5                         Leon - Direct

1           THE INTERPRETER:  Your Honor, some time back when he

2   said that he was on trial, if it would be proper to correct the

3   record, I said probation.  A much better way of saying it, I

4   would have, instead of "on probation" I would have said "trial

5   basis," if it would be proper to correct the record.

6           THE COURT:  That's fine.

7   BY MR. BENSON:

8   Q.  In your declaration, at paragraph 63, you allege that Brent

9   Drill could and did send employees home or suspend if they

10  acted improperly or were not at the restaurant on time.

11          Isn't it true that you have no specific examples of

12  that prior to January of 2013?

13  A.  Yes.  He dismissed a person.  I cannot remember the year

14  exactly, but he did fire him.

15  Q.  And that person is, according to your declaration, at

16  paragraph 63 named Gelacio.  Is that correct?

17  A.  Yes.

18  Q.  Is that the only example that you can think of where

19  Mr. Drill disciplined or terminated somebody?

20  A.  That was the only person that I did see, yes.

21  Q.  And on that occasion, is it your testimony that Mr. Drill

22  was the individual who terminated his employment?

23  A.  Yes, sir.

24  Q.  Do you know what, if any, role Anthony Scotto played in

25  that?

Ecc2sal5                    Leon - Direct

1   A.  He was not present at that moment there.

2   Q.  So do you know what role he played?

3   A.  Who?  Brent or Gelacio.

4   Q.  Mr. Scotto.

5   A.  I do not know really.

6           THE COURT:  Well, what does he do?  My question is,

7   what does he do?  What does Mr. Scotto do?  I'm sorry.  I am

8   disagreeing with the interpreter.  I am saying "what does he

9   do" in the present tense.

10          THE WITNESS:  He is there on the dining room -- in the

11  dining room and he is there with the clients.  He greets them.

12  In other words, he welcomes them.

13          THE COURT:  Are there managers at the restaurant?

14          THE WITNESS:  Yes, sir.

15          THE COURT:  And who are they?

16          THE WITNESS:  During the evening, Mr. Attilo.

17          THE COURT:  During the day?

18          THE WITNESS:  Mr. Brent.

19  BY MR. BENSON:

20  Q.  Were there captains?

21  A.  Yes.

22  Q.  Isn't it true that prior to January of 2013, Mr. Drill's

23  job was floor captain?

24  A.  That I know of, he was a manager.

25  Q.  Do you know that he was also a floor captain?

Ecc2sal5                        Leon - Direct

1   A.  I know that he was a manager, because if any mistake was

2   made by a waiter it would go directly to him for him to go back

3   to the kitchen to find out where the mistake had been made.

4           THE COURT:  When a worker makes an error, who corrects

5   the worker?

6           THE WITNESS:  Mr. Brent, when he was there, during the

7   mornings.

8           THE COURT:  Anyone else correct the workers?

9           THE WITNESS:  Mr. Anthony, here present, also.

10  BY MR. BENSON:

11  Q.  Sir, you worked in restaurants for many years, correct?

12  A.  Yes, sir.

13  Q.  And you are familiar with the role of a captain in a

14  restaurant, are you not?

15  A.  Yes, sir.

16  Q.  And the role of a captain in a restaurant is to direct the

17  service, correct?

18  A.  The managers do that.

19  Q.  So is it your testimony that captains are not supposed to

20  direct -- sorry.

21          That captains are not supposed to direct employees in

22  the service?

23  A.  As captains?  They are not given much authorization for

24  them to tell a worker, look, here -- in other words, excuse me,

25  so that you can understand me, for example, a waiter, when he

Ecc2sal5                          Leon - Direct

1    makes a mistake, he cannot -- he does not go and see the

2    captains, because the captains say:  There is the manager.

3    That is for you to go and see him.  Go see the manager.

4             THE COURT:  So who are the captains at the

5    restaurants?

6             THE WITNESS:  A young man, a guy by the name Alex;

7    there was another one and his name is, was Julio; and some

8    others have done -- been through those positions, but I do not

9    remember their names.  Recently after 2013 it was

10   Mr. Christopher.

11   BY MR. BENSON:

12   Q.  So is it your testimony that Brent Drill was not a captain?

13   A.  No, Mr. Brent was a manager.

14   Q.  Look at paragraph 59 of your declaration, on page 9.  It

15   says, and I quote, "Brent Drill was a manager at Fresco and

16   also acted as a captain."

17             Is that correct?

18   A.  He started to work at Fresco Restaurant as a waiter.  From

19   being a waiter, then he was -- he became a captain.  And from

20   being a captain, he became a manager.

21             THE COURT:  When is it that he became a manager?

22             THE WITNESS:  I cannot remember exactly the years, but

23   he, for example, on Mondays that Mr. Attilo had a day off,

24   Mr. Brent was the one who would cover his shift.

25             THE COURT:  But is it recent that Mr. Drill became a

Ecc2sal5                          Leon - Direct

1    manager or are we talking about years ago that he became a

2    manager?

3              THE WITNESS:  No, no.  He was a captain, and from

4    captain he became a manager.

5              THE COURT:  But did that happen recently or did that

6    happen a number of years ago?

7              THE WITNESS:  No, not many years, just a few years.

8    Q.  January 1 of 2013, correct?

9    A.  That was the paper that the gentleman gave us, to us when

10   allegedly supposedly there it said that he was a manager, but

11   as a manager he had already -- he had already -- he already was

12   in charge of -- well, to tell the waiters what they had to do.

13             THE COURT:  Sir, what paper are you talking about?

14             THE WITNESS:  Yes, that Mr. Brent was a manager.

15             THE COURT:  Who gave you this paper?

16             THE WITNESS:  It was given to us by Mr. Anthony, but

17   just recently, about two years ago, I believe.

18   BY MR. BENSON:

19   Q.  Paragraph 57 of your declaration reads, and I quote, "Brent

20   Drill received tips when he served as a captain until January

21   2013."

22             Does that refresh your recollection that it was

23   January 2013?

24   A.  As a manager you might want to say.

25             THE COURT:  I want to go back to this piece of paper

1   that you were talking about.  You said you were given a paper

2   that Mr. Drill was a manager and then you said he already was

3   in charge.  What do you mean by that?

4           THE WITNESS:  He, for example, Mr. Brent, would give

5   the specials to the waiters during the mornings.  When one was

6   waiting on call to know whether one was going to be to work or

7   not, the host, James, in other words, his name is James, we

8   always had to ask Mr. Brent whether we were needed to go and

9   work or not.

10          THE COURT:  But what do you mean he already was in

11  charge?

12          THE WITNESS:  Yes, he -- yes, in other words, with

13  responsibilities as a manager.  He would tell us whether we

14  could work or not.

15          THE COURT:  And when was he exercising those

16  responsibilities?

17          THE WITNESS:  From -- I do not remember the years

18  before, but perhaps -- I do not remember, but perhaps from

19  since 2011, I do not remember exactly the year.

20          THE COURT:  So you are saying it was 2011 that he was

21  promoted from captain to manager?

22          THE WITNESS:  I would think so, yes.

23          MR. BENSON:  May I inquire, your Honor?

24          THE COURT:  You may.

25  BY MR. BENSON:

Ecc2sal5                    Leon - Direct

```
1    Q.  You testified, sir, that you believed that Mr. Drill was a

2    manager because he would tell James who was necessary?  Is that

3    your testimony?

4    A.  Yes, he would give the authorization for whether they would

5    need the person who was on call on the schedule.

6    Q.  Well, if you weren't there, how do you know that it was

7    Mr. Drill and not Mr. Scotto who told James whether on-call

8    people were needed or not?

9    A.  Because during the waiters' meeting -- the waiters' meeting

10   is done in the back part, near where you go into the kitchen,

11   and Mr. Hoster, when we would call him from the station, where

12   the gentleman performs his job, where we could hear him clearly

13   on the phone says is he going to be called to come here, and he

14   would say no.

15           THE COURT:  You are saying you would hear the voice of

16   Mr. Drill?

17           THE WITNESS:  Yes.

18   Q.  Isn't it true that only Mr. Scotto and no one else

19   determines the staffing that's necessary for every shift at

20   Fresco Restaurant?

21   A.  From our end, no.  Perhaps the gentleman reviews the

22   schedule.  I do not know.  Perhaps if he has enough busboys or

23   whether he has a private party or he needs more, I do not know.

24   But for taking decisions, we could see that it was Mr. Brent

25   who would also take decisions.
```

Ecc2sal5                       Leon - Direct

1    Q.  I am speaking specifically with respect to the number of

2    staff that is necessary on any particular shift.  Isn't it true

3    that Anthony Scotto was the only individual who made those

4    decisions?

5    A.  Mr. Anthony, when he arrives in the morning, perhaps he

6    goes to the liquor room or perhaps he remains in his office.

7    We do not know exactly very well.  Brent is the one who gives

8    the specials to the waiters.

9    Q.  Sir, Brent Drill didn't even arrive at the restaurant until

10   well after those decisions needed to be made, isn't that

11   correct?

12   A.  No, sir.  Mr. Brent would arrive between 10 in the morning

13   and 11 in the morning.

14   Q.  What time did Anthony Scotto arrive at?

15   A.  We would see him come in -- well, perhaps -- perhaps we

16   were not looking at a clock or a watch, but shortly before 10,

17   sometimes even perhaps before that sometimes.  When we would

18   arrive to start working, the gentleman was already present

19   there.

20   Q.  And when would you come in, sir?

21   A.  10 a.m.

22   Q.  And you just happened to be there when the discussions

23   regarding what staff is necessary were being made or were being

24   had?

25   A.  Possibly.

Ecc2sal5                     Leon - Direct

1  Q.  Other than saying that you believe that Mr. Drill made some

2  decisions in terms of what staff would be necessary and that he

3  spoke and told the specials to the waiters, there are no other

4  things that you can think of, correct, to establish that

5  Mr. Drill was a manager.

6  A.  Because they do not allow a waiter to give the specials.

7  It was always given by him in the morning or by Mr. Attilo

8  during the evening.

9  Q.  And both of those gentlemen spent their entire shift on the

10  service floor during a particular service, correct?

11  A.  Yes, when -- in other words, at their own shifts, yes.

12  Q.  And both of those gentlemen greet guests and take orders

13  and explain the specials and sell wine and deal with customer

14  complaints and do everything in connection with the service to

15  ensure that the customers at Fresco Restaurant have a great

16  experience.  Isn't that correct?

17  A.  Yes, that is correct at all restaurants.  There are people

18  who greet and deal with the questions and everything is all

19  right when they are eating, for example, then a manager can

20  come close to that table or the waiter and then they ask them

21  whether everything is all right when they are eating their

22  meals.

23  Q.  And that is what a good captain does, correct, sir?

24  A.  Yes.

25  Q.  Now, going back to Gelacio, why do you believe that

1    Mr. Drill was the one who fired Gelacio?

2    A.  On that occasion, Mr. Gelacio was working as a stocker.  I

3    cannot remember which station I was in exactly, but I was

4    taking dishes over to the kitchen when I heard some yelling.

5    Someone was yelling.  But my fellow worker Gelacio was coming

6    down the stairs.  Mr. Brent was at the stocker's station, and

7    he told him to leave, that he was not needed anymore because he

8    said a foul word.  But I do not know whether I can repeat it

9    here.

10            THE COURT:  You can quote him directly.

11   A.  He said that he looked -- or he was like a pig because this

12   guy Gelacio would sweat too much, perspire too much.

13   Q.  Isn't it true that Gelacio showed up an hour late for his

14   shift that night?

15   A.  No, sir.  Mr. Gelacio worked as a stocker in that location.

16   Q.  Do you testify from personal knowledge that he arrived at

17   work on time that day?

18   A.  Me, me, I was there.  When I came in with the dishes, they

19   are already arguing.

20   Q.  Isn't it true that Mr. Gelacio showed up late and

21   intoxicated on that occasion, drunk?

22   A.  I do not know whether he was drunk or not.  When I saw him,

23   he was already coming down the stairs in order to go and pick

24   up his things from the lockers.  The lockers, we have them at

25   the lower part in the basement, or I don't know what you call

Ecc2sal5                         Leon - Direct

```
 1   it.  So this gentleman had gone over to pick up his things in
 2   order to leave.
 3   Q.  So the first time you saw him on the day in question was
 4   after the incident had already happened when he was walking
 5   down the stairs to pick up his things to leave?  Is that your
 6   testimony?
 7   A.  All I only -- I just saw him when they were arguing.
 8   Sometimes one does not pay attention to the persons, at what
 9   time did they come in, to see what time they came in.
10   Q.  I thought you said that the first time you saw him was when
11   he was walking down the stairs to retrieve his things.  Perhaps
12   I misunderstood.
13   A.  The gentleman was already working with a busboy uniform.
14   Q.  Sir, isn't it true that on that occasion Gelacio threw
15   silverware at Mr. Drill?
16   A.  I did not see that part.
17   Q.  So you weren't observing the entire incident, is that
18   correct?
19   A.  I will repeat to you again, sir, I was coming in with
20   plates, and I was bringing dirty dishes, and I was bringing
21   them over to the dishwasher's station.  The dishwasher has a
22   big piece, a flat piece of -- like a large plate or a large
23   slate where all the dirty dishes are placed there on top -- a
24   counter where all the dirty dishes are placed there.
25   Q.  So is it your testimony you did not witness the entire
```

Ecc2sal5                    Leon - Direct

1    incident?

2    A.  I did not see everything, but I did see when he told him

3    for him to go back because he perspired too much.

4    Q.  And isn't it true that after this incident Gelacio met with

5    Mr. Scotto?

6    A.  I do not know so because I never saw him or that.

7    Q.  And that he told Mr. Scotto that he was drinking?

8    A.  Is that we do not look or watch -- see the persons when

9    they arrive.

10   Q.  And that it was Mr. Scotto who sent him home and terminated

11   his employment in connection with that incident after he

12   admitted drinking?

13          MR. ANDROPHY:  Objection.  The witness testified he

14   doesn't know if Gelacio admitted to drinking.

15          THE COURT:  Overruled.  You may answer.

16   A.  Sir, I did not see Mr. Gelacio arrive.  I did see the

17   argument between Mr. Brent only, and I did not see whether

18   Gelacio spoke with Mr. Anthony.

19          MR. BENSON:  Thank you.  I have no further questions.

20          THE COURT:  Redirect.

21   REDIRECT EXAMINATION

22   BY MR. ANDROPHY:

23   Q.  Mr. Leon, do you recall you were asked a few minutes ago

24   about when you were given the document that said Mr. Drill was

25   manager?

Ecc2sal5                          Leon - Redirect

1   A.  I do not remember the year, but they did give us a paper.

2              MR. ANDROPHY:  May I approach to give an exhibit?

3   Exhibit 49.

4   Q.  Do you recognize this document, Exhibit 49, that was put in

5   front of you?

6              THE COURT:  Is it Plaintiffs' 49?

7              MR. ANDROPHY:  Yes, Plaintiffs' Exhibit 49.

8              (Pause)

9              THE COURT:  Is there a question?

10             MR. ANDROPHY:  Sorry.  I was waiting for your Honor to

11  look at the exhibit.  I will proceed.

12  BY MR. ANDROPHY:

13  Q.  Do you recognize this document, Exhibit 49?

14  A.  Yes.

15  Q.  And do you recognize the signature on the document?

16  A.  Yes.

17  Q.  Do you know -- do you understand what this document says or

18  do you need it translated to understand what it means?

19  A.  I require a translation because I do not understand it

20  well.

21             MR. ANDROPHY:  I would just like to ask the

22  translator -- the interpreter to just translate the title and

23  the first paragraph to the witness.

24             (Pause)

25             THE INTERPRETER:  I read it to him in Spanish

Ecc2sal5                    Leon - Redirect

```
 1    according to your instructions, counsel.
 2            MR. ANDROPHY:  Thank you.
 3    BY MR. ANDROPHY:
 4    Q.  Does the interpreter's translation, does that assist in you
 5    understanding what this document is?
 6    A.  Sincerely, I did not understand it very well.
 7    Q.  Do you see the date on the document?
 8    A.  Yes.
 9    Q.  Does this document refresh your recollection of when you
10    received the document that was the managers of Fresco?
11            THE INTERPRETER:  What document did you say?
12            MR. BENSON:  Objection, your Honor.  He is leading the
13    witness.
14            THE COURT:  Sustained.
15    Q.  Do you recall you were asked previously what you did when
16    you were assigned as the coffee person?
17    A.  Yes.
18    Q.  Did you always both pour and deliver coffee when you served
19    as coffee person?
20    A.  Yes.
21            MR. ANDROPHY:  I have no further questions for this
22    witness.
23            MR. BENSON:  Nothing further, your Honor.
24            THE COURT:  Does that complete the testimony of all
25    the plaintiffs?
```

Ecc2sal5                              Leon - Redirect

1            MR. ANDROPHY:  Yes, that completes the testimony of

2    the plaintiffs.  We would reserve the right to recall them for

3    rebuttal if that is necessary after the defendants' witnesses

4    and there are also two individuals who we have been attempting

5    to serve with subpoenas, and so we may put them on as well.

6    Right now this is the testimony of all the plaintiffs.

7            THE COURT:  So you are not resting.

8            MR. ANDROPHY:  Well, we reserve the right to call

9    those two individuals who we are attempting to serve with

10    subpoenas, so we are not resting.

11            THE COURT:  Sir, you may step down.

12            (Witness excused)

13            THE COURT:  So even though plaintiffs have not rested,

14    we are now going to go to the defense case.

15            MR. BENSON:  We call Anthony Scotto, your Honor.

16            THE INTERPRETER:  Is the interpreter now excused, your

17    Honor.

18            THE COURT:  I assume you do not need the interpreter

19    any further.

20            MR. BENSON:  We do not.

21     ANTHONY SCOTTO,

22        called as a witness by the defendants,

23        having been duly sworn, testified as follows:

24            THE COURT:  You may inquire.

25    DIRECT EXAMINATION

Ecc2sal5                          A. Scotto - Direct

 1  BY MR. BENSON:

 2  Q.  Mr. Scotto, I would like to show you what have been marked

 3  for identification as Defendants' Exhibit K and L.

 4          MR. BENSON:  Your Honor, L is a supplemental trial

 5  declaration that we drew up last night.  This particular copy

 6  isn't signed, but it is identical to the one that Mr. Scotto

 7  has in front of him.

 8  Q.  Mr. Scotto, first, with respect to Exhibit K, can you

 9  identify that document?

10  A.  It is an affidavit I signed.

11  Q.  Does that represent your truthful and accurate testimony in

12  this matter?

13  A.  Yes, sir.

14          MR. BENSON:  Move it into evidence, your Honor.

15          THE COURT:  Any objection?

16          MR. ANDROPHY:  No objection.

17          THE COURT:  It is admitted.

18          (Defendant's Exhibit K received in evidence)

19          MR. BENSON:  In addition, I would like to move into

20  evidence Exhibits A through J, which are exhibits, move those

21  into evidence as well.

22          THE COURT:  Any objection?

23          MR. ANDROPHY:  If I may just have one moment.

24          Sorry.  I'm not entirely clear which exhibits

25  defendants are offering, if they are offering what they marked

Ecc2sal5                          A. Scotto - Direct

1   as Defendants' Exhibits A through J or if it is the exhibits

2   that are, I guess, annexed to the affidavit.

3          MR. BENSON:  Those annexed to the affidavit.

4          MR. ANDROPHY:  1A through 1J?

5          MR. BENSON:  That's correct.

6          MR. ANDROPHY:  No objection.

7          THE COURT:  They are admitted.

8          (Defendant's Exhibits 1A through 1J received in

9   evidence)

10  BY MR. BENSON:

11  Q.  Mr. Scotto, do you recognize what's been marked for

12  identification as Defendant's Exhibit L?

13  A.  Yes, sir.

14  Q.  Is that -- what is that?

15  A.  Supplemental declaration, sir.

16  Q.  Does that represent your truthful and accurate testimony?

17  A.  Yes, sir.

18         MR. BENSON:  Move it into evidence, your Honor.

19         THE COURT:  Any objection?

20         MR. ANDROPHY:  No objection.

21         THE COURT:  It is admitted.

22         (Defendant's Exhibit L received in evidence)

23         MR. BENSON:  We have nothing further at this time,

24  your Honor.

25         THE COURT:  Cross-examination.

Ecc2sal5                          A. Scotto - Direct

1    CROSS EXAMINATION

2    BY MR. ANDROPHY:

3    Q.  Good afternoon, Mr. Scotto.

4    A.  Sir.

5    Q.  Is it correct that you have been present in this courtroom

6    for all of the testimony so far in this trial?

7    A.  Yes, sir.

8    Q.  What is your position at Fresco by Scotto?

9    A.  Owner and manager, sir.

10   Q.  Do you have any official title?

11   A.  I would guess you would call me a general manager, sir.

12   Q.  Does Starjem Restaurant Corp. own and operate Fresco by

13   Scotto?

14   A.  Yes, sir.

15   Q.  Are you a shareholder of that company?

16   A.  Yes, sir.

17           THE COURT:  There are other shareholders?

18           THE WITNESS:  Yes, ma'am.

19           THE COURT:  Who are they.

20           THE WITNESS:  My mother, my sister, and -- sorry, my

21   two sisters.  I apologize.

22   Q.  Those two sisters being Elena and Rosanna?

23   A.  Yes, sir.

24   Q.  Is your mother the majority shareholder?

25   A.  Yes, sir.  She put up all the money.

Ecc2sal5                         A. Scotto - Cross

1    Q.  Do you know what her percentage share ownership is?

2    A.  It is in the 50 percent range, sir.

3    Q.  Do you have an official title as an officer of the

4    corporation?

5    A.  I believe it is secretary treasurer, sir.

6    Q.  Does anyone else have any official titles in the

7    corporation?

8    A.  Yes, sir.

9    Q.  And who has additional titles?

10   A.  I think the only remaining, then, would be my mom as

11   president and my sister Elena as vice president.

12   Q.  You testified at paragraph 4 of your affidavit that you are

13   typically at Fresco between 8:30 a.m. and 10 p.m. and on

14   Saturdays it varies, but usually you are there between 2 p.m.

15   and 9 p.m.  Is that correct?

16   A.  Saturdays also in the morning, at 7:00 in the morning,

17   doing maintenance with some people, leaving and coming back by

18   2, 2:30, yes, sir, on Saturday.

19   Q.  Do you recall that you gave a deposition in this case?

20   A.  Yes, sir.

21   Q.  And you took an oath to answer questions truthfully,

22   correct?

23   A.  Yes, sir.

24   Q.  And you were asked questions and you gave answers, correct?

25   A.  Yes, sir.

Ecc2sal5                          A. Scotto - Cross

1           MR. ANDROPHY:  If I may provide the witness and also

2      the court with Mr. Scotto's deposition transcript.

3           (Pause)

4           MR. ANDROPHY:  Your Honor, I have a binder.

5           THE COURT:  Thank you.

6      BY MR. ANDROPHY:

7      Q.  And that deposition took place January 9, 2014, correct?

8      A.  Yes, sir.

9           MR. ANDROPHY:  And for the court, that is at tab 3 in

10     the binder and for the witness as well.

11     Q.  I refer the witness to page 22 of his deposition.

12     A.  Yes, sir.

13     Q.  Did you give the following testimony beginning at line

14     16:  "Usual situation, I am there from 8:30 in the morning

15     until 9:30 at night.  By 9 to 9:30 at night you can shoot a

16     canon through my restaurant."

17           Did you give that testimony?

18     A.  Yes, sir.

19           (Continued on next page)

20

21

22

23

24

25

ECC5sal6                          A. Scotto - cross

1  BY MR. ANDROPHY:

2  Q.  Isn't it correct you're typically only at the restaurant

3  until 9:30 p.m.?

4  A.  That's being on the floor, sir.  I do some work downstairs

5  in the office.

6  Q.  Turn to page 37 of your deposition.  Directing your

7  attention to line 11 were you asked the following question and

8  did you give the following answer:

9  "Q  What time do you typically arrive on Saturday?

10 "A  5:00."

11 A.  Yes, sir.  I see that.

12 Q.  So, isn't it correct that typically on Saturday you arrive

13 around 5:00 p.m.?

14 A.  Again, there is a time when arriving on the floor and

15 arriving in the office.  As I said to you, I'm there early in

16 the morning on Saturdays also doing some work.

17 Q.  Is it true that you are often not at the restaurant on

18 Saturdays during the summer?

19 A.  I would like to take off on Saturdays during the summer,

20 yes.

21 Q.  So you are often away and away from New York City and in

22 the Hamptons on Saturdays in the summer?

23 A.  We do catering in the Hamptons on the weekends in the

24 summer.  We would like to be busy there in the summer also,

25 yes.

ECC5sal6                          A. Scotto - cross

1    Q.  Is it correct that Marion Scotto, your mother, is sometimes

2    involved in determining whether the restaurant will hire

3    additional employees?

4    A.  Never.

5    Q.  I direct your attention to page 50 of your deposition.

6    A.  Yes.

7    Q.  At line 7 were you asked the following questions and did

8    you give the fog answers:

9    "Q  How does Fresco by Scotto determine that it needs -- that

10   it may need to hire additional employees?

11   "A  I make the determination.

12   "Q  Is anyone else involved in that?

13   "A  Probably.  I mean, it could be anybody.  It could be my

14   mother, it could be James, it could be Attilio, it could be

15   Brent.  It could be anybody."

16           Did you give that answer?

17   A.  Yes, sir.

18   Q.  And was that answer correct and truthful?

19   A.  Absolutely, sir.

20   Q.  So, it is correct that your mother could be involved in the

21   decision to hire additional employees at Fresco?

22   A.  The only thing my mother was in charge of for Fresco

23   Restaurant, sir, was for private parties and me interviewing

24   hosts and hostesses that were involved with the front desk.

25   So, if it had to do with a host and hostess, I would run it by

ECC5sal6                          A. Scotto - cross

1  her because she was siting at that desk, so that she was sure

2  that she liked them prior to me hiring them.  I did the

3  interviewing, sir.

4  Q.  So, she would have some involvement in the hiring of a host

5  or hostess?

6  A.  James would also be involved in that hire.

7  Q.  She might be present at an interview for a host or a

8  hostess, is that correct?

9  A.  My mother, in 22 years, has never been involved in any type

10  of interview that I have been interviewing a potential person

11  being hired at the restaurant.

12  Q.  Can you turn to page 54 of your deposition?  I direct your

13  attention to line 4.  Were you asked the following questions

14  and did you give the following answers:

15  "Q  Was anyone else ever present at the interviews?

16  "A  Possibly.

17  "Q  Who might be present at an interview?

18  "A  My mother, James, Attilio, Brent, Peter, Marco."

19          Were those answers correct and truthful?

20  A.  Yes, sir.

21  Q.  So, your mother had been present at some interviews?

22  A.  Possibly I was taking things a little bit more

23  lackadaisical on this conversation with you, sir.

24  Q.  Referring to the conversation at the deposition?

25  A.  Yes, sir.  I think I was -- because I also mentioned people

ECC5sal6                        A. Scotto - cross

 1  that would never be in an interview also, sir.  I think I was

 2  just being a little silly with you, sir.

 3  Q.  Okay.

 4          And you were under oath at that time, correct?

 5  A.  Still possibly being silly, sir.

 6  Q.  So, of these individuals you listed at lines 9 and 10 on

 7  page 54, which ones might be present at an interview actually

 8  and which ones were you just being silly?

 9  A.  It is all depending on the interview, sir.

10  Q.  So, has James ever been present at an interview?

11  A.  He has been brought into interviews when I am interviewing

12  potential new hires.

13  Q.  Has Attilio been present in interviews?

14  A.  I would tell you no.

15  Q.  Has Brent been present in interviews?

16  A.  I think Brent, along with James, you know, maybe they have

17  walked into a situation where I have asked them questions

18  during an interview to maybe one of the potential new hires was

19  asking a question that I couldn't answer maybe about what

20  people were making and stuff like that.  So, they knew what was

21  going on.

22  Q.  Has Peter been present in interviews?

23  A.  I would probably tell you not.

24  Q.  And has Marco?

25  A.  Marco maybe had stopped in when I had asked him to, called

ECC5sal6                      A. Scotto - cross

1    him in.  For that type of question I would ask for Brent or

2    someone else in that situation.

3    Q.  Does Marion Scotto ever prepare documents to give to

4    employees?

5    A.  I don't see why she would have, sir.

6    Q.  I am giving you a document that's been marked and admitted

7    as Plaintiff's Exhibit 34.  Do you recall that you were shown

8    this document at your deposition?

9    A.  Sir, respectfully, I can't even read this document.

10   Q.  I apologize.  It is a somewhat poor quality copy.

11               If you could turn to page 143 of your deposition?

12   A.  Yes, sir.

13   Q.  And, directing your attention to line 23, do you recall the

14   following questions and answers:

15   "Q  I am giving you a copy of a document that was previously

16   marked Plaintiff's Exhibit 14."

17               Skipping ahead on page 144 to line 8:

18   "Q  Does this document show that Mr. Amazquita had an agreement

19   with Fresco by Scotto about employee uniforms and cleaning

20   reimbursement?

21   "A  I have no idea what this letter is.  Absolutely no idea

22   what this letter is.  None.

23   "Q  Do you recognize the signature next to the name Manager?

24   "A  I think the manager is Attilio Vosilla.

25   "Q  Have you seen this document before?

1    "A   Never.

2    "Q   Have you seen an unsigned copy version of this document?

3    "A   Never."

4              Were you asked those questions and did you give those

5    answers at your deposition?

6    A.   I see that here, sir.

7    Q.   And, does this refresh your recollection that you were

8    shown a document marked at trial as Plaintiff's Exhibit 34 and

9    asked those questions about that document?

10             MR. BENSON:   Objection, your Honor.   Weren't these

11   questions about Marion Scotto?

12             MR. ANDROPHY:   I am getting there, not that I need

13   to --

14             THE COURT:   I don't know.   I don't know.   Are you

15   asserting that they are?

16             MR. BENSON:   I believe that's --

17             MR. ANDROPHY:   I'm getting there.

18             THE COURT:   Okay.

19             THE WITNESS:   Sir?   I'm sorry.

20   BY MR. ANDROPHY:

21   Q.   Do you recall that those questions and answers referred to

22   the document that is marked here as Plaintiff's Exhibit 34?

23   A.   Respectfully, I can't read this document that you have got

24   in front of me, sir.   I apologize.

25   Q.   Okay.   Turn to page 145 of your deposition, were you asked

1  the following questions and did you give the following answers:

2  "Q   If Mr. Vosilla prepared this and gave it to the employee,

3  then he must have done that without your permission or

4  consultation.  Is that correct?"

5      Then after the objection, answer starting on page 146,

6  line 3:

7  "A   Maybe my mother gave this to him.  I don't know.  I don't

8  know.  The only thing I can figure this is and I don't know

9  what it is, I have never seen it before."

10      So, do you recall you testified that you thought maybe

11  your mother gave that document to Mr. Vosilla?

12  A.   Again, I was just probably talking out of school with you

13  again, sir.

14  Q.   You didn't say that because your mother would sometimes

15  provide documents to be given to employees?

16  A.   Again, I -- I can't recall the reason why my mother would

17  be giving employees documents.

18  Q.   And, again, that's testimony that you gave under oath,

19  correct?

20  A.   Absolutely, sir.

21  Q.   Does Marion Scotto help make sure that food is served

22  properly at Fresco?

23  A.   If it passes her in the bar area, yes.

24  Q.   And so, she's involved in making sure that service

25  employees are properly serving food on the restaurant floor?

ECC5sal6                        A. Scotto - cross

1    A.  Will she come to her son and say, *Anthony, the food that*

2    *was going out to table 202 didn't look right and why doesn't it*

3    *look right?*  Yes, there are times that she has done that, sir.

4    Q.  If you could turn, in the binder before you, to Exhibit 74?

5    A.  Yes, sir.

6    Q.  Do you recognize that document?

7    A.  I do, sir.

8    Q.  What is it?

9    A.  An employee handbook, sir.

10   Q.  And was Marion Scotto involved in creating the employee

11   handbook?

12   A.  I don't think so.

13           MR. ANDROPHY:  We ask that Plaintiff's Exhibit 74 be

14   admitted into evidence.

15           THE COURT:  Any objection?

16           MR. BENSON:  No objection.

17           THE COURT:  It is admitted.

18           (Plaintiff's Exhibit 74 received in evidence)

19   BY MR. ANDROPHY:

20   Q.  If you can turn to your deposition at page 159?

21   A.  Yes, sir.

22   Q.  And beginning at line 2 were you asked the following

23   questions and did you give the following answers?  Starting the

24   last two words of that line:

25   "Q  Do you recognize this document?

ECC5sal6                          A. Scotto - cross

1    "A  I see it is a Fresco employee document.  Yes."

2            And then moving down to line 17:

3    "Q  So, why is Brent Drill identified as a restaurant manager?

4    "A  Because I'm sure when Attilio and Brent put some of this

5    together and my mother and my father and my aunts and my

6    uncles, they all decided that everybody was going to be

7    categorized together and didn't -- who knows why."

8            Did you give that answer under oath at your

9    deposition?

10   A.  I now realize why Mr. Benson, when he told me to stop

11   kidding around with you about some of these things, why it is

12   coming back to haunt me.

13   Q.  So, was this another example of just being silly or talking

14   out of school at your deposition?

15   A.  Yes, sir.

16           THE COURT:  Are you being silly now?

17           THE WITNESS:  No, ma'am.

18   BY MR. ANDROPHY:

19   Q.  Isn't it correct that Marion Scotto also helps deliver food

20   to tables?

21   A.  I've never seen my mother deliver food to tables, sir.

22   Q.  If you can turn to page 48 of your deposition?

23   A.  Page 48?

24   Q.  Page 48.  At line 23 were you asked the following questions

25   and did you give the following answers.

1    "Q   So, how is it that food gets out in 45 minutes?

2    "A   Coffee men, stocker, me, Attilio, Brent, my mother, sous

3    chefs, waiters, James.  Do you want me to keep going?"

4            Did you give that answer?

5    A.  I did, sir.

6    Q.  And is it true that your mother sometimes helps see that

7    food gets out in 45 minutes?

8    A.  I guess my mother would grab a Fresco bread or something

9    when she is walking through the kitchen.  I guess that could

10   happen.  It hasn't happened recently, sir.

11   Q.  Was this another example of being silly in an answer?

12   A.  No.  I think that's truthful.

13   Q.  So, sometimes she might help bring food out?

14   A.  I guess it is possible, sir.

15   Q.  Your mother is at the restaurant every day usually?  Is

16   that correct?

17   A.  I would say yes.

18   Q.  Isn't it also correct that she signs employees' paychecks?

19   A.  If she's in the office because there needs to be two

20   signatures, sir.

21   Q.  She's one of the people who might sign checks; is that

22   correct?

23   A.  It is myself --

24            MR. BENSON:  Asked and answered.

25            THE WITNESS:  Sorry.

 1              THE COURT:  Sustained.

 2   BY MR. ANDROPHY:

 3   Q.  Who else signs checks for employees' paychecks?

 4   A.  Myself, my sister Elaina, and my mother.

 5   Q.  Your mother is also in charge of booking parties at Fresco,

 6   is that correct?

 7   A.  Yes, sir.

 8   Q.  And she would sign and send out contracts to clients; is

 9   that correct?

10   A.  Yes, sir.

11   Q.  And those contracts identified any service charges or any

12   mandatory gratuities that the restaurant charges; is that

13   correct?

14              MR. BENSON:  Objection as to the form of the question,

15   your Honor.

16              THE COURT:  What is wrong with the form of the

17   question?

18              MR. BENSON:  Compound question, your Honor.

19              THE COURT:  All right.  Break it down.

20              MR. BENSON:  And I only say that because there is a

21   difference with respect to the two issues.

22   BY MR. ANDROPHY:

23   Q.  Those contracts would identify any mandatory gratuities

24   that the restaurant charged for parties; is that correct?

25   A.  Is there a document in front of me that I could look at

ECC5sal6                         A. Scotto - cross

1    real quick?

2              MR. BENSON:  Which exhibit?

3              MR. ANDROPHY:  Tab 51 in defendant's binder.  It is an

4    exhibit, it is in Marion Scotto's declaration.

5              THE COURT:  Sorry.  Would you repeat that, please?

6              MR. ANDROPHY:  Yes.  This document I gave to the

7    witness is at tab 51 in defendant's binders and it is Marion

8    Scotto affidavit Exhibit 3A.

9              MR. BENSON:  Could the court reporter please read back

10   the question?

11             (Record read)

12   BY MR. ANDROPHY:

13   Q.  Does looking at that document assist you in answering that

14   question?

15             MR. BENSON:  Can I have a time frame, please?

16             MR. ANDROPHY:  I'm not sure what.

17             THE COURT:  Time frame for what?

18             MR. BENSON:  When he is asking the question.  The

19   first document, at least first one I am looking at, is dated

20   2013.

21             THE COURT:  Isn't the question as to whether or not

22   the contract indicates there is going to be a gratuity?  Was

23   that your question?

24             MR. ANDROPHY:  I believe that that is the question of

25   what the gratuity is, is that identified in these contracts.

ECC5sal6                         A. Scotto - cross

1          THE WITNESS:  I believe it says a 17 percent food and

2    beverage cost -- a 17 percent food and beverage cost will be

3    added to your account as a gratuity distributed to the members

4    of the service staff, sir.

5    BY MR. ANDROPHY:

6    Q.  Based on your recollection, has there ever been a time when

7    these contracts did not identify the mandatory gratuity that

8    would go -- that the restaurant would charge the clients for

9    the party?

10         MR. BENSON:  Objection.  Assumes facts not in

11   evidence.

12         THE COURT:  Was there a time?  You are asking was

13   there ever a time when the contract did not describe the

14   gratuity in the way that it is described in Exhibit 51?

15         MR. ANDROPHY:  I'm asking if the contract -- I'm not

16   asking if the contract was ever different, I am only asking if,

17   right now, if the contract always described any mandatory

18   gratuity.

19         THE COURT:  Are you saying over the course of their

20   business did all of their contracts describe the gratuity?

21         MR. ANDROPHY:  Yes.  Yes, your Honor.

22         THE WITNESS:  I couldn't remember right now, sir.  I'm

23   sorry.

24   BY MR. ANDROPHY:

25   Q.  Is it true that Marion Scotto is listed with the New York

1   Department of State as the Chief Executive Officer of Starjem

2   Restaurant Corp?

3   A.  I don't know.

4   Q.  Is it true that, until recently, Fresco by Scotto's website

5   described Mrs. Scotto as follows:  Known affectionately as 'the

6   boss 'Marion runs front of the house duties in the restaurant.

7           Do you know if that is correct?

8   A.  That is a website which was just corrected, I guess, about

9   nearly a month ago, was nearly 18 years old, and that boss

10  figure that you are discussing was something that was quoted

11  from the NBC today show, sir.

12  Q.  So, that's how Marion Scotto was described on the website,

13  up until, approximately, a month ago, correct?

14  A.  I think on-air personality she is the boss, sir.

15  Q.  Do you call her The Boss?

16  A.  As much as I can, sir.

17  Q.  Do customers call her The Boss?

18  A.  No.  They actually call her Mom.

19  Q.  Do employees, some employees call her The Boss?

20  A.  No.

21  Q.  What is your understanding of what term "front of the house

22  duties" means?

23  A.  In regards to who, sir?

24  Q.  Just your general understanding as someone who has been in

25  the restaurant business.

1    A.   Okay.  I have been in the restaurant business all of my

2    life.  There are so many aspects to the front of the house it

3    would be difficult for me to generically say what every

4    category does.  So, if you could just define it for me a little

5    bit?

6    Q.   Do you understand that front of the house duties would

7    include everything with having to do with service in the

8    restaurant?

9    A.   Absolutely.

10   Q.   And the appearance of the restaurant?

11   A.   So, ask the question before that again?  I'm sorry.  What

12   would the appearance have to do with the front of the house?

13   Q.   I'm asking if the appearance of the restaurant, if that's a

14   part of what you would consider front of the house as opposed

15   to back of the house.

16   A.   You are talking about maintenance of that?

17   Q.   Just the appearance of the restaurant and the places where

18   customers sit; is that part of front of the house duties, in

19   your understanding?

20   A.   A customer walks into Fresco Restaurant, they see the front

21   of the house; yes, sir, they do.

22           THE COURT:  All right.  We are going to stop here, it

23   is 3:30.  We will continue on Tuesday morning at 9:00 a.m.

24           Mr. Benson, please make sure that you have witnesses

25   that will fill the entire day until 5:00 p.m.

529

ECC5sal6                          A. Scotto - cross

1              MR. BENSON:  It will not be a problem, your Honor.

2              THE COURT:  Thank you.  You may step down.

3              MR. BENSON:  Have a nice weekend.

4              THE COURT:  Have a nice weekend.

5              THE WITNESS:  You too, ma'am.

6              (Adjourned to 9:00 a.m., December 16, 2014.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

MIGUEL CERVANTES

Direct By Mr. Clark . . . . . . . . . . . . . 407

Cross By Mr. Benson . . . . . . . . . . . . 408

JOSE JULIAN AMAZQUITA AGUDELO

Direct By Mr. Androphy . . . . . . . . . . 427

Cross By Mr. Benson . . . . . . . . . . . . 428

Redirect By Mr. Androphy . . . . . . . . . 448

Recross By Mr. Benson . . . . . . . . . . . 452

Redirect By Mr. Androphy . . . . . . . . . 454

FRANCISCO LUGO

Direct By Mr. Clark . . . . . . . . . . . . . 458

Cross By Mr. Benson . . . . . . . . . . . . 459

VICENTE LEON

Direct By Mr. Androphy . . . . . . . . . . 474

Cross By Mr. Benson . . . . . . . . . . . . 475

Redirect By Mr. Androphy . . . . . . . . . 505

ANTHONY SCOTTO

Direct By Mr. Benson . . . . . . . . . . . 509

Cross By Mr. Androphy . . . . . . . . . . . 511

```
 1                         PLAINTIFF EXHIBITS

 2    Exhibit No.                                       Received

 3      Exhibit 113   . . . . . . . . . . . . . . . 408

 4       37 and 38  . . . . . . . . . . . . . . . . 408

 5    114   . . . . . . . . . . . . . . . . . . . . 428

 6    31, 32, 33, 34, 35, 36 and 87  . . . . . . . 428

 7    31, 32, 33, 34, 35, 36 and 87  . . . . . . . 428

 8    115   . . . . . . . . . . . . . . . . . . . . 459

 9    51, 52, 53, 54 and 55   . . . . . . . . . . . 459

10    116   . . . . . . . . . . . . . . . . . . . . 474

11    48, 49, 50 and 85   . . . . . . . . . . . . . 474

12    74   . . . . . . . . . . . . . . . . . . . . . 521

13                         DEFENDANT EXHIBITS

14    Exhibit No.                                     Received

15      J   . . . . . . . . . . . . . . . . . . . . 438

16    K   . . . . . . . . . . . . . . . . . . . . . 509

17    1A through 1J   . . . . . . . . . . . . . . . 510

18    L   . . . . . . . . . . . . . . . . . . . . . 510

19

20

21

22

23

24

25
```