ECGASAL1ps

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ---------------------------------x

3    ENRIQUE SALINAS, *et al.*,

4                  Plaintiffs,

5              v.                          13-cv-2992 (AT)

6    STARJEM RESTAURANT CORP., *et al.*,

7                  Defendant.

8    ---------------------------------x

9                                         New York, N.Y.
                                          December 16, 2014
10                                        9:00 a.m.

11   Before:

12                      HON. ANALISA TORRES

13                                        District Judge

14

15                         APPEARANCES

16   MICHAEL FAILLACE & ASSOCIATES, P.C.
          Attorneys for Plaintiffs
17   BY:   JOSHUA S. ANDROPHY, ESQ.
           SHAWN R. CLARK, ESQ.
18
     LITTLER MENDELSON, P.C.
19        Attorneys for Defendants
     BY:   CRAIG R. BENSON, ESQ.
20         NAVEEN KABIR, ESQ.

21

22

23

24

25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

ECGASAL1ps

1              (Trial resumed; in open court)

2              THE COURT:  Good morning.

3              COUNSEL:  Good morning, your Honor.

4              THE COURT:  I want to the first address the

5    defendant's proposal with respect to Willie Baltadano.  On the

6    first day of trial, defendants for the first time disclosed

7    that the defendants intended to call Willie Baltadano as a

8    witness.  Three days later the defendants shared with the

9    plaintiffs the proposed trial declaration of Mr. Baltadano.

10   Mr. Baltadano was not identified in defendant's initials

11   disclosures, defendant's responses to plaintiffs'

12   interrogatories, or in the joint pretrial order.  Defendants

13   proposed that Mr. Baltadano testify about, A, whether bussers

14   have ever been assigned to clean the walls in the dining room

15   of the restaurant, including any artwork or photographs hanging

16   on those walls; B, whether bussers, including bussers assigned

17   to the stocker assignment, were ever required to perform the

18   role of a dishwasher, particularly under circumstances where a

19   dishwasher is "sent home early" -- I'm quoting from the

20   declaration of Naveen Kabir, defense counsel -- as plaintiffs

21   have alleged; C, whether of plaintiffs were ever required to

22   pay for any shirts and ties they received from Mr. Baltadano;

23   and, D, whether plaintiff Nahun Flores was suspended for

24   calling in sick by Mr. Vosilla, as he claims, or by Mr. Scotto

25   for showing up for his shift intoxicated.

ECGASAL1ps

1          I find that these matters were all explicitly

2     addressed in plaintiffs' trial declarations, and I have

3     reviewed the proposed declaration of Mr. Baltadano.  These

4     declarations have been in the possession of the defendant since

5     November 11, 2014.  Consistent with rules 26(a), 26(e), and

6     37(c) of the Federal Rules of Civil Procedure, and to avoid

7     prejudice to defendants, I find that the defendants are not

8     entitled to offer the testimony of Mr. Baltadano.  Accordingly,

9     plaintiffs' motion to preclude Mr. Baltadano from testifying at

10    trial is granted.

11         Who is the next witness?  We're going to continue with

12    Mr. Scotto?

13         MR. BENSON:  Mr. Scotto is on the stand, your Honor.

14         THE COURT:  OK.

15     ANTHONY SCOTTO, Resumed.

16         MR. BENSON:  If I may approach, I have signed copies

17    of his supplemental trial affidavit.  I believe I gave you an

18    unsigned copy.

19         THE COURT:  Thank you.

20         THE WITNESS:  May I sit, your Honor?

21         THE COURT:  You may.

22         I remind you, Mr. Scotto, that you are still under

23    oath.

24         THE WITNESS:  Yes, ma'am.

25    CROSS EXAMINATION

1    BY MR. ANDROPHY:

2    Q.  Good morning, Mr. Scotto.

3    A.  Good morning, sir.

4    Q.  When we left off on Friday, I had asked you about Fresco's

5    website and specifically where it says under the description

6    for Marion Scotto that she runs front-of-the-house duties in

7    the restaurant.

8            If I may direct your attention to Plaintiff's Exhibit

9    97, is that what the website, or what one of the pages on the

10   website, looked like until it was recently updated,

11   approximately a month ago?

12   A.  To be honest I'm not that sure.  I apologize.

13   Q.  Front-of-the-house duties, would that be in contrast to

14   back-of-the-house duties?

15   A.  In a word, yes, it would be.

16   Q.  And how would you describe what back-of-the-house duties

17   typically include?

18   A.  Well, back-of-the-house duties would include anything truly

19   in the kitchen.

20   Q.  And the recent updates to the Fresco by Scotto website, the

21   website still says Marion Scotto runs front-of-the-house duties

22   in the restaurant; is that correct?

23   A.  I'm not that sure, sir.  I know it's just been updated.

24   Q.  OK.  Are you aware of any changes to her description other

25   than changing it from "known affectionately as the boss" to

1    "known affectionately as mom"?

2    A.  I need to tell you sincerely, it's not -- I didn't do that

3    website revamp.  It was done by another family member.

4    Q.  Who did change -- who made any changes to the website

5    language?

6    A.  My sister Elena.

7    Q.  Friday we also discussed the Fresco employee policy guide.

8    Do you recall that?

9    A.  Sorry, sir.  Everything is a blur these days.  I'm sorry.

10   Q.  I'm going to give you Plaintiff's Exhibit 74.  This

11   document, which has been admitted into evidence, that's the

12   Fresco policy documents as updated October 2007, correct?

13   A.  It says that here, yes, sir.

14   Q.  If you could direct your attention to -- sorry.  I'll have

15   to give you another binder -- your deposition which was taken

16   February 17th, 2011 in the Gary Gillian matter.

17   A.  Do you want me to look at this?

18   Q.  Yes.  And if you could turn to the page that's

19   Bates-stamped on the bottom right as D006285.

20   A.  Yes, sir.

21   Q.  And if you look at the bottom of the page 6285, were you

22   asked the following questions and did you give the following

23   answers?  I'm starting at line 18 at the bottom:

24   "Q. Were you involved in the creation of this document?

25   "A. Part of it, yes.

1   "Q. Who else was?

2   "A. Attilio was.  This was done ten years ago.  My mother had a

3   little piece of this also."

4            Were you asked those questions and did you give those

5   answers?

6   A.  I did, sir.

7   Q.  And so was your mother involved in the preparation of that

8   Fresco policy document?

9   A.  I would tell you that, if there was any involvement, it was

10  for certain captions of the booklet itself.

11  Q.  Was she involved in the original Fresco policy document

12  that was prepared?

13  A.  I would tell you the involvement that she had with the book

14  was for, we had a bunch of different artists that were

15  displaying and loaning us artwork in the restaurant, and I

16  needed her input of who those artists were.

17  Q.  So you think that was the extent of her involvement?

18  A.  I think it was.  It's a very tight office, but I think

19  that's what her involvement was at the time.

20  Q.  And if you can direct your attention on the page that's

21  marked D006286, line 16, were you asked the following question

22  and did you give the following answer:

23  "Q. Who was involved in the updates?

24  "A. Me and Attilio basically, not my mother.  The original one

25  was my mom."

1          Is it correct that your mom was very much involved in

2    the original Fresco policy handbook?

3    A.  And I think that even comes more into play now with me

4    remembering.  The idea of getting the information I needed for

5    the policy book, I guess for basically the first page of the

6    artwork and stuff, that is what I needed.  Half of that was

7    already in the book.

8    Q.  So that was the extent of -- your testimony is, that was

9    the extent of her involvement?

10   A.  Yes, sir, it was, sir.

11   Q.  You would say you have a lot of responsibilities at the

12   restaurant, correct?

13   A.  Yes, sir, I do.

14   Q.  For example, you say in paragraph 4 of your testimony, "I

15   supervise all of the employees at the restaurant and manage the

16   kitchen, dining room, and administrative staff.  I personally

17   handle the relationships with Fresco's vendors, monitor the

18   restaurant's budget, and set all the personnel policies and pay

19   practices in the restaurant."  That's your testimony, correct?

20   A.  Sir, this restaurant has been operating for 22 years.  I

21   have a very strong hand in making sure that that is the only

22   way that that could be run.  I am very, very A-positive in

23   making sure that I work every day to make sure that it's the

24   best thing I could possibly do in my life.

25   Q.  So that's a lot of duties for one person to handle, isn't

ECGASAL1ps                    A. Scotto - cross

1    it?

2    A.  Growing up in the restaurant business and how I was trained

3    in the restaurant business, I don't know any restaurateur that

4    is my age that wouldn't have done the same thing.

5    Q.  Isn't it true that in order to handle all of these

6    responsibilities, you need to delegate some management of

7    employees to others?

8    A.  In a large corporation that would be the case, but in a

9    small restaurant, you're talking about a one-store restaurant,

10   the problem is, when their employees are hearing from other

11   voices a possible rendition of what you just said, it does not

12   work.  It comes from me directly.

13   Q.  During the period from 2007 to present, what's the typical

14   number of total employees that Fresco has had at any time?

15   A.  Look, I would tell you that we have been gloating in years

16   past to be very proud of having a lot of our employees stay for

17   a very long time.  I would tell you that 50 percent of our

18   employees are there for more than six or eight years,

19   currently, from front and back of house, which we're very proud

20   of.  We have a hundred and -- or 87 people in one location

21   right now.

22   Q.  So at any given time Fresco has had close to a hundred

23   employees?  Would that be --

24   A.  I would say that's the case.  I mean, it's all depending on

25   the economy and the year.  You know, we had a very bad dip in

1    the latter part of '7 and '8, '9.  '10 was another dip.  It's

2    not been good since then.

3    Q.  Isn't it true that sometimes Brent Drill would interview

4    employees?

5    A.  Let me explain about employees for a second, because

6    there's just something I need to clear up for you.  Fresco by

7    Scotto opens its doors at 8:30 in the morning, which I'm

8    basically there for.  Maybe 9 o'clock there are people that

9    could walk in and look -- and try to be employed by Fresco by

10   Scotto that walk in the door.  That could also be the same case

11   between 3 and 4.  Other than that, if it's not early in the

12   morning or that lag time between lunch and dinner, we don't

13   accept applications at that point only because we're just too

14   busy.

15          So in the morning, I am there to interview anybody,

16   see what's going on, try to pick up somebody new if we need

17   them.  In the afternoon, Monday, Wednesday, and Friday, I am

18   working out, or try to work out.  And there are people that

19   could possibly pop in the door.  They'll -- the first person

20   they'll see is James at the front desk.  Once they've seen

21   James, James will look at their résumé, see if it's a category

22   that we need to be hiring from, and they just call anybody in a

23   suit, just to say hello to that person.  Could that person be,

24   that's in a suit, Brent?  Or could it have been Brent?  Brent

25   no longer works for me, but yes, it could have been.  But it

1    also could have been six or eight other people that have to be

2    in that suit that day, that would grab that résumé at that

3    time, say hello to that person, ask them to come back the

4    following day.

5              That would only be in is the situation for a busboy,

6    not for a waiter.  The problem with busboys at the time, and

7    still is, is that if you're not hiring them or trying to hire

8    them immediately, they've moved on.  So we try to capture them,

9    keep their interest, and bring them in the following day where

10   I could see them in the morning where I see them when they come

11   in.  At that time they're interviewed, by me.  They're given an

12   application by me.  They're filling out an application with

13   their name and their address on it and the last place they've

14   worked.  And I'm calling that information to make sure that

15   they're not somebody they're not -- that really -- they're not

16   supposed to be.  Once I've verified that, we go on from there.

17   Q.  So it could be that a busboy would come in and meet

18   initially with Brent Drill -- in the past.  I understand he's

19   no longer there.

20   A.  Yes, sir.

21   Q.  -- and be told by Mr. Drill to come back for training the

22   next day.  Correct?

23   A.  Again, only in the situation as a busboy, sir.

24   Q.  OK.  And similarly with Attilio Vosilla, the same thing

25   could happen, correct?  Someone could come in, meet with

1   Mr. Vosilla, and Vosilla could say, come back, come back for

2   training; is that correct?

3   A.  I would tell you less with Attilio, only because he doesn't

4   show up until, um, 4, 4:30.  So basically after 4 o'clock we're

5   not taking any more applications, sir.  But there could be

6   other people.  It could be Peter, at the time, it could have

7   been Marco.  There were a lot of people in suits at that time,

8   sir.

9   Q.  OK.  So people could come and be told to come back for

10  training without having met with you.  Is that correct?

11  A.  Again, only with -- in the, in the busboy situation,

12  because we, we realized, in our own ways of doing things, if we

13  allowed me to wait to call them the following day, they

14  wouldn't receive the phone call, or it was very difficult for

15  me to find them.  So it was better to have them come and see me

16  personally, where I can get the ball moving if we wanted them.

17  Q.  Is it correct that Brent Drill used to also oversee

18  training of busboys?

19  A.  If he was in the station that, that a busboy trainee was

20  in, yeah, I guess he could have been.  Yes.

21  Q.  Could Attilio also oversee training?

22  A.  I would tell you no for Attilio only because we did most of

23  our training in the daytime.

24  Q.  Sometimes busboys train in both lunch and dinner?

25  A.  It's rare.

ECGASAL1ps                    A. Scotto - cross

1    Q.  If they were to train during dinner shifts, would they be

2    overseen by Mr. Vosilla?

3    A.  If it was the case and again that he was in the station,

4    possibly.

5    Q.  If Mr. Vosilla were to say that he oversees training and

6    scheduling of 42 employees, would that be correct?

7    A.  Sir, you have to understand.  We're on the floor.  The

8    floor is encompassed in a dining room that is open like this

9    with a couple of more pillars.  We're, we're all standing in

10   separate stations, looking at the sections that we're in.  I

11   usually take the front section.  Attilio could take the back

12   station.  Another captain could be in the middle station.  And

13   we're all responsible for the stations that we're in.  Do we

14   oversee each other and do we overlook what's going on?

15   Absolutely.  But are we involved in actually one part of that

16   person's, what their doing?  I would tell you no.

17   Q.  Is it correct that Mr. Vosilla or Mr. Drill would know more

18   about the particular busboys working at Fresco than you

19   yourself may know, just as far as who is a -- what their

20   strengths and weaknesses are?

21        MR. BENSON:  Objection as to form of the question,

22   your Honor.

23        THE COURT:  Sustained.

24        I just want to go back to the prior question.

25   Mr. Androphy asked, "If Mr. Vosilla were to say that he

1    oversees training and scheduling of 42 employees, would that be

2    correct?"  I don't see an answer to that question, and I'd like

3    to know whether you think that is correct or not correct.

4            THE WITNESS:  Your Honor, as far as -- I'm sorry.  I

5    probably should just answer the first part of that question,

6    not the second part.  I apologize.  For the first part of that,

7    as I said, we're on the dining room floor.  We're all in a

8    station.  We're all overseeing each other in a sense.  As far

9    as the scheduling goes, there is no question to that answer,

10   because I do the scheduling for Fresco by Scotto Restaurant.

11           THE COURT:  So then you were say -- you would say,

12   then, Mr. Vosilla does not do it.

13           THE WITNESS:  Again, we're a one-store restaurant.

14   It's not just about Attilio Vosilla or Brent Drill.  There are

15   four other captains that could possibly be on that floor at the

16   same time.  We're all overseeing each other at the same time.

17   We're all worrying about the customer, necessarily, not

18   worrying about server.  We're worrying about a customer.

19           THE COURT:  What about the scheduling?

20           THE WITNESS:  Yeah.  So the scheduling is -- may I ask

21   you what -- may I tell you in full?

22           THE COURT:  Yes.  Go right ahead.

23           THE WITNESS:  So the scheduling is basically, what

24   happens is, Monday and Tuesday are -- wait staff give captains,

25   possibly Attilio, at that time probably Brent, pieces of paper

1    that would say what they needed to be off the following week,

2    scheduled appointments or anything else that we need.  I would

3    gather all that information and keep it downstairs with me till

4    Wednesday, Wednesday afternoon.  I would sit down with my mom,

5    talk about parties for the following week, get those things

6    resolved, and then take a template that I had each week on my

7    computer and figure out what we need to move forward for the

8    following week, minus any problems, vacations, or anything else

9    that has to go on.

10           Could it have been Attilio, could it have been Brent,

11   could it have been one of my captains sitting in with me at the

12   meeting when I'm at my computer discussing things?  Yes.  I

13   mean, at the day that we had, years ago, your Honor, I was able

14   to take a busboy who was interested in cooking and put him in

15   the kitchen, let him spend a half a day with the chef.  I would

16   be able to take a cook and bring him outside to be a busboy.

17   That's all gone since these eight years of lawsuits.  I can't

18   do any of this anymore.  I don't know what I can do and not do

19   anymore.  There was a day that people wanted to do and move

20   forward, see what's going on, observe from what I know, my

21   knowledge of what goes on with that.  I don't know what to do

22   anymore.

23   Q.  Speaking about scheduling, is it correct that Attilio

24   Vosilla prepares the initial draft schedule?

25   A.  No.

1    Q.   Who prepares that initial draft?

2    A.   The initial draft is done from the week before.  So we're

3    taking, again, a template that we have from the week before and

4    moving on to the following week.  So there is no template.

5    It's on a computer that's kept live.  We're not printing and

6    reprinting drafts of that.  There's no reason to.  There could

7    be a situation, once it's printed and I bring that up on Friday

8    mornings, that by Friday afternoon I have to completely change

9    it.  So it's my responsibility, my doing, and my fixing.

10   Q.   Could you turn to the deposition in tab 3 -- that's just

11   the deposition you gave in this action -- and turn to page 29.

12   A.   Yes.

13   Q.   Were you asked the following questions and did you give the

14   following answers?  I'm at line 7 of page 29:

15   "Q. How are the employees' work shifts scheduled?

16   "A. Currently?

17   "Q. Let's start with currently.

18   "A. Currently Attilio Vosilla makes that schedule up weekly."

19   A.   Yes, sir.

20   Q.   Is that correct as -- when you testified to that in January

21   of 2014?

22   A.   Yes, sir.

23   Q.   So is it correct that Mr. Vosilla does schedule the -- does

24   make up the weekly schedule?

25   A.   As of 2013, sir, we moved certain people to a management

1    situation and allow them to take on a little bit more

2    responsibility, with me having to deal with these lawsuits.

3    Q.  So is it your testimony that Mr. Vosilla has made up the

4    schedule since approximately 2013?

5    A.  I would tell you, because of my mentoring with Attilio,

6    Brent, Peter, everybody that's worked for me, I have an idea

7    now that if I have to do something, I have someone that they

8    can cover for me.  At this point I feel positive, although

9    Attilio still does not have full rein on this schedule, I look

10   at the schedule before it's given up on Friday mornings, to

11   make sure it's done.  I make sure that the -- any requests or

12   anything that's special has to go -- each one of our employees

13   is done by me.  In fact I had four people yesterday talk to me

14   about vacations that they want to take in January, because

15   Attilio could not give them those approvals.  I am still fully

16   involved with what's going on.

17          It's not my personality not to be involved, and I

18   think my wait staff and -- all my staff depends on me to be

19   that way.

20   Q.  Is it your testimony that Mr. Vosilla's involvement in

21   preparing the schedule has changed over time?

22   A.  Can I give you another analogy?

23   Q.  If it answers the question.

24   A.  Everyone is able to come into the restaurant.  They come in

25   and work at the restaurant.  Busboy wants to be a busboy.

1   Waiter wants to be a bus -- a waiter.  Expediter wants to be an

2   expediter.  A -- the categories go on and on and on.  They come

3   in for that certain job.  A week or two later, they feel that

4   this is a great family.  They've been working with these people

5   for a bit.  They understand them.  They feel good about the

6   family.  And they want to feel like they could do something

7   else.  So they come to me.  And they talk to me about what they

8   want to do.  And I've had plenty of this, plenty of this going

9   on in my life, where, at the restaurant, people would come in

10  and say, you know, can we look at this or can we look at that.

11  This is a situation where, you know, Attilio, who maybe had

12  interest -- I can't even remember at this point -- but maybe he

13  might have had interest to try to do the schedule and be

14  involved in that schedule.  Would I have been mentoring to the

15  point him taking it over in 2013?  Yes.

16  Q.  So what was Mr. Vosilla's involvement in making the

17  schedule before 2013?

18  A.  Overseeing what I was doing.

19  Q.  Would he prepare the initial draft at that time?

20  A.  As I said to you, there is no initial draft.  We are using

21  the draft from the week before.

22          THE COURT:  Are you the only person who uses the

23  computer to input the new schedule?  Or do others also input?

24          THE WITNESS:  No.  There is no other inputter to the

25  schedule.  It's in my computer.  They would have to come into

1    my part of the office, which, by the way, is an office the size

2    of your desk, with my mother, my sister, and me myself at.  All

3    very tight in there.

4    Q.  So does Mr. Vosilla ever sit at your desk and access the

5    schedule and prepare any changes on the computer?

6    A.  He might be leaning over me to see what we're doing.  But

7    there is no actual seat for him to be sitting at.

8    Q.  So if he were to testify that he has always prepared the

9    first draft of the schedule, would that be incorrect?

10   A.  I would tell you it's -- it -- let's -- what's incorrect is

11   the word, the wording that's being used.  Again, the drafts

12   were coming on a weekly basis.  The draft is already there.

13   Would Attilio be sitting in or standing behind me or talking to

14   me about things or what I would do with it or how I would deal

15   with it?  Yes.

16   Q.  Isn't it true that he would prepare the initial draft and

17   you would let him know if there needed to be employees added or

18   taken away based on the number of reservations, but otherwise

19   he himself would prepare the schedule?

20   A.  Sir, again, the draft is used for the week before.  So I

21   just want to just clarify that.  So in that situation, then, we

22   look at the schedule, and I figure out what I have to do for

23   the following week.  In the middle of all of that, would I get

24   some input from Attilio, or would Attilio say to me, what would

25   I do in this situation?  Yes.  But is he actually physically

1    pulling it out of the computer, or making judgment calls on who

2    should be on and off?  No.

3    Q.  So it's your testimony that he would not decide which, say,

4    which busboys should be working which shifts?

5    A.  Look, I would tell you that when we're looking at the

6    schedule, we're not looking at a -- one busboy.  We're looking

7    at what we have for reservations.  We're looking at how many

8    parties we have to plug into those reservations.  And then we

9    follow in to the number of people that we need for that day.

10   Once we've figured out the day, I go through the entire week

11   and figure out how many shifts each person has worked, and then

12   figure out from there what needs to be fixed.  So it's not one

13   individual.  It's really just figuring out how many shifts we

14   need per shift.

15   Q.  Would Mr. Vosilla or would you determine what busboy should

16   work as a stocker on a particular shift, or which one should

17   work as a bar-back on a particular shift?

18   A.  There are sometimes better stockers, better bar-backs,

19   better party bussers than others.  When it comes to a VIP

20   situation or something where we need to make sure that we're

21   doing it right, we put a little bit more attention into that.

22   Otherwise, no.

23   Q.  And who would make that decision?  Would that be yourself,

24   or would that be Mr. Vosilla?

25   A.  No.  It might not be either one of us, to be honest with

ECGASAL1ps                    A. Scotto - cross

1    you.  Sometimes they are just marked as busboys.  And by

2    Monday -- I'm sorry.  The schedule will come up on Friday.  By

3    Monday the schedule is completely torn up because somebody who

4    had gotten sick, somebody left me.  I mean, there could have

5    been four or five disasters by Monday, so that we are changing

6    the schedule by Monday again.  And it's, every week it's the

7    same thing.  So by that time, once it's gone up to the floor,

8    the person that's making those changes is not me or, it could

9    have been Attilio, or Brent, or Peter, or Marco.  It could

10   have -- it's only James at that point.

11   Q.  So putting aside where there are changes mid week and

12   restaurant needs to maybe scramble to fill positions, in

13   preparing the initial schedule, does Mr. Vosilla decide which

14   busboys would be assigned to the stocker position or the

15   bar-back or coffee position?

16   A.  Not without my approval.

17   Q.  So are you involved in -- so you're involved in that

18   decision as well, then?

19   A.  We've known each other for a long time, sir.  You know my

20   personality.  I want to make sure that I am doing it right for

21   my employees.  It's me.

22   Q.  Do you know the busboys that work at Fresco by name?

23   A.  If not by name, sir, by sight.

24   Q.  So in making the schedule, isn't it correct that you don't

25   necessarily know which busboy is which when you're putting

ECGASAL1ps                    A. Scotto - cross

1   their names on the schedule?

2   A.  As I said to you earlier, as I said to you earlier, when

3   we're looking at a day that we have to fill shifts for, we're

4   not looking at an individual person.  We're looking at the

5   shifts that have to be -- that has to be inserted in that day.

6   We then follow the entire week out, making sure that we have

7   enough shifts for everybody.  And then we're plugging into the

8   individual situations.  We have to make sure that this person

9   is a station 9 or stocker that one day, that he's not that next

10  day.  We want to switch that around.  So there's some playing.

11          THE COURT:  Why is that?

12          THE WITNESS:  We like to make it -- they're all

13  busboys.  So if you're a busboy, you could be a coffee man one

14  day, you could be a station 9 one day, you could be upstairs in

15  the party room one day.  It's about moving around, just in case

16  somebody gets sick.  If you pigeonhole everybody into one

17  position, if someone gets sick, I'm dead.  So if I don't have

18  enough coffee men or if I don't have enough stockers that are

19  trained or if I don't have enough people in the party room, or

20  bar-backs, your Honor, I don't know how to move.

21          THE COURT:  You're talking about having versatile

22  skills.

23          THE WITNESS:  Everybody has to be sharing each other.

24  Q.  There are some busboys who did spend a majority of their

25  time in one position; is that correct?

1   A.  You'll have to remind me, sir.  I'm not sure.

2   Q.  For example, do you know if Enrique Salinas spent the

3   majority of his time as a stocker?

4   A.  I would tell you there was a good part of that.  But I

5   would tell you that he also became a coffee helper at times and

6   he was on the floor a couple of times too.  But Enri -- that

7   was Enrique's choice, if I remember that right.  It's a long

8   time ago.  But I think it was Enrique's choice to be in that

9   position.

10  Q.  And do you know if Nahun Flores spent a majority of his

11  time as the coffee person?

12  A.  There was no better coffee man than Nahun.

13  Q.  So he would spend a lot of time in the coffee man --

14  A.  But he liked it also, so it was part of his answer, you

15  know, thoughts to me of making sure that primarily he would be

16  doing that.  But, again, he was not only doing that.  Because I

17  always felt uncomfortable in not having somebody else train in

18  that position.  So he was out of that position.  If he worked

19  four days or five days in that position there would be two

20  other shifts in that position to make sure that somebody else

21  was filling that in.

22  Q.  Understood.  Is it true that busser Chris rarely served as

23  a stocker or a coffee man?

24  A.  That is a myth.

25  Q.  So you contend that that's not true?

1   A.  Absolutely not true.

2   Q.  How often does he serve as a stocker?

3   A.  No often than anyone else here that is presently holding

4   this action against me.

5          THE COURT:  I think there's more than one person by

6   the name of Chris.  Which Chris are you referring to?

7          MR. ANDROPHY:  I'm referring to Chris to have -- I

8   think his last name is Giletti.

9          THE COURT:  Is this the person that the plaintiffs

10   refer to as "the European"?

11          THE WITNESS:  Yes.

12          MR. ANDROPHY:  Yes.

13   Q.  Mr. Scotto, we've been referring to the same Chris,

14   correct?

15   A.  Yes, sir.

16   Q.  Isn't it correct that you often do not know the names of

17   the various busboys?

18          MR. BENSON:  Objection, your Honor.  Relevance.

19          THE COURT:  Wasn't this already asked, counsel?  I

20   believe you asked that question.

21          MR. ANDROPHY:  I wasn't certain that I got a full

22   answer.  But --

23          THE COURT:  I think he said he knows the name of some

24   of them, and some of them he knows by face.

25          MR. ANDROPHY:  OK.

ECGASAL1ps                    A. Scotto - cross

1    Q.  If you could turn to your deposition, page 170, tab 3.

2    A.  I'm sorry.  I have three books in front of me.  Just show

3    me which one it is?

4    Q.  It's the white binder, tab 3, page 170.

5    A.  Yes, sir.

6    Q.  Were you asked the following questions and did you give the

7    following answers at your deposition?

8    "Q. Do you know who Enrique Salinas is?

9    "A. No.

10   "Q. Do you know who Alfredo Rodriguez is?

11   "A. No.

12   "Q. Do you know who Angel Cedeno is?

13   "A. I'm getting the gist of this.  You're reading it.  I'm

14   seeing it here, yes, so obviously these must be my wonderful

15   employees.

16   "Q. You know them but you don't recognize the names offhand, do

17   you?

18   "A. I don't, sir.

19   "Q. Looking at the first page, is that Exhibit 21 you have in

20   front of you?

21   "A. 22, sir.

22   "Q. Exhibit 22.  Do you recognize any of these individuals who

23   are listed as plaintiffs in the caption?

24   "A. The names, you are saying?

25   "Q. Yes.

1    "A. No.

2    Q.  Did you give that testimony at your deposition?

3    A.  Yes, sir.

4    Q.  So you did not recognize the names of any of the

5    plaintiffs; is that correct?

6    A.  But you didn't quiz me on the 88 other people that worked

7    for me, sir.

8    Q.  So that was correct, yes?

9    A.  Yes, sir.

10   Q.  And at that time, Angel Cedeno still worked for Fresco,

11   correct?  He still works there today, correct?

12   A.  He does, sir.

13   Q.  And he was working there at that time as well, correct?

14   A.  Yes, sir.

15   Q.  Vicente Leon also still works for Fresco and was working

16   there then?

17   A.  He does, sir.

18   Q.  Alfredo Rodriguez still works for Fresco and was working

19   there at that time?

20   A.  Alfredo still works for me, sir.

21   Q.  And Francisco Lugo was working there at that time?

22   A.  No longer for me, sir.

23   Q.  I know he's not working now, but was he working, can you

24   recall if he was working there in January when you gave this

25   deposition?

1   A.  I don't know, sir.  I'm sorry.

2   Q.  So isn't it true, in making the schedule, that you didn't

3   really care which employees were assigned to which jobs because

4   you didn't know which employees were which?

5   A.  I don't know what you're changing around for me, sir.  I've

6   explained to you, when I'm doing the schedule and I'm looking

7   at a day and understanding what we have for parties and

8   reservations, I'm only concerned about the parties and

9   reservations.  I fill that in as I need them.  Once I've gone

10  through the week, I then go to the individual person to look at

11  what they have for shifts, to make sure that they're not going

12  any more or less than anybody else is, sir.  That's it.

13  Q.  And so would Mr. Vosilla decide which employees worked in

14  which positions and give them shifts?

15          MR. BENSON:  Objection, your Honor.  Asked and

16  answered several times, I believe.

17          THE COURT:  Sustained.

18  Q.  Do you know how many busboys Fresco employs today?

19  A.  I lost two yesterday, so it's around 22.

20  Q.  In January of 2014 when you gave your deposition, did you

21  know how many busboys Fresco employed at that time?

22  A.  Not sure, sir.

23  Q.  Isn't it correct that at your deposition you did not know

24  how many busboys Fresco employed?

25  A.  I don't know, sir.

1    Q.  If you turn to page 42 of your deposition, line 25, were

2    you asked the following question, did you give the following

3    answer:

4    "Q. Overall, how many busboys does Fresco by Scotto currently

5    employ?

6    "A. I'm not sure.  Sorry."

7            Does that refresh your recollection as to whether, in

8    January 2014, you knew how many busboys Fresco employed?

9    A.  No, sir.

10   Q.  It doesn't refresh your recollection as to whether you knew

11   or didn't know how many busboys Fresco employed?

12            MR. BENSON:  Objection, your Honor.

13            THE COURT:  Sustained.

14   Q.  Busboys at Fresco are paid currently on an hourly basis,

15   correct?

16   A.  Yes, sir.

17   Q.  And the number of shifts they work, or number of hours they

18   work would obviously, then, affect their pay, correct?

19            If they work more hours, they would be paid more,

20   correct?

21   A.  Sir, the check's a zero basically every week.

22   Q.  Was, or has Mr. Vosilla ever been involved in determining

23   employee compensation?

24   A.  Never.

25   Q.  Has he ever been involved in calculating the time worked by

1   employees?

2   A.  Not calculating the time, no.

3   Q.  If you would turn to Exhibit 102.  I believe it's in this

4   binder.

5   A.  This one here?

6   Q.  Yes.

7   A.  Yes, sir.

8   Q.  Do you recognize this document?

9   A.  Yes, sir, I do.

10  Q.  And if you turn to the last page, is that your signature,

11  on page 13?

12  A.  Yes, sir, it is.

13          MR. ANDROPHY:  We ask that Plaintiff's Exhibit 102 be

14  admitted.

15          MR. BENSON:  No objection.

16          THE COURT:  It is admitted.

17          (Plaintiff's Exhibit 102 received in evidence)

18  Q.  Turn to page 6, and the interrogatory no. 25, that

19  interrogatory asked the following: "Identify each person

20  responsible for managing employees at Starjem Restaurant Corp.,

21  d/b/a Fresco by Scotto, including each and every person

22  responsible for the following tasks: A, determining employees'

23  compensation; B, determining employees' work hours or work

24  schedules; C, determining employees' status as exempt or

25  non-exempt; D, calculating employees' time worked; E, preparing

1    the payroll; F, maintaining payroll records; and, G, paying

2    employees of Starjem Restaurant Corp., d/b/a Fresco by Scotto."

3    Do you see that?

4    A.  I do, sir.

5    Q.  And do you see then in the response, Starjem Restaurant

6    Corp. identified yourself, Anthony Scotto Jr., Attilio Vosilla,

7    and Brent Drill?

8    A.  I see that, sir.

9    Q.  So is it true that Attilio Vosilla did all of those -- was

10   responsible for all of those tasks listed in interrogatory

11   no. 25?

12   A.  I'm going to tell you no, but you're going to have the

13   opportunity of speaking to him very soon.

14   Q.  Did he do any of those?

15   A.  He had nothing to do with compensation.  He oversaw me

16   doing the schedule, so the day-to-work hours and work

17   schedules.  I'm not sure what C is.  I apologize.  He did not

18   calculate time worked.  He punches a report for Natasha.  That

19   is all he does with that.  He does not prepare payroll.  Can he

20   see or maintain payroll records?  He could see payroll records.

21   He is not physically paying anybody more employees.

22   Q.  Is it true that Mr. Vosilla had and has the authority to

23   hire and fire employees?

24          MR. BENSON:  Objection as to the form of the question,

25   "had and has."

1          MR. ANDROPHY:  I'll rephrase.

2    Q.  Is it true that Mr. Vosilla has the authority currently to

3    hire and fire employees?

4    A.  Yes.

5    Q.  And how long has he had that authority?

6    A.  He had the opportunity as of 2013.

7    Q.  Before January 2013 was he able to hire or fire employees?

8    A.  Sir, he hasn't hired and fired employees currently, as of

9    today.  It's just not his personality.  He doesn't like to hire

10   and he doesn't like to fire.

11   Q.  Did he have that authority to do so before?

12   A.  He did not have it before.

13   Q.  And does he currently have the authority to discipline

14   employees?

15   A.  I would not call it disciplining, sir.  He is more of a

16   person that is to calm the situation down if I'm not there.

17   Q.  Would he have authority, the authority currently to write

18   up a disciplinary communication?

19   A.  Um, yes and no.  We've had situations where it's late at

20   night, Attilio is by himself, and it's rare, but, you know, two

21   employees get into an argument, he calms it down by sending

22   those two home and to deal with me in the morning.  He then

23   writes up a piece of paper for me to look at in the morning,

24   for me to talk to those people when I see them the next day.

25   Q.  And would he do that also before January 2013?

1    A.  I would tell you that he, as a floor captain, service

2    manager, he was on the floor making sure a customer would not

3    see something crazy go on, because at the end of the day it's

4    about a 20 percent tip and people coming back to Fresco.  No

5    one wants to see something going crazy.  Times happens that

6    some things go crazy.  His job is to defuse, resolve, and let

7    me deal with it in the morning if I'm not there.

8    Q.  Has Mr. Vosilla always supervised the work done by bussers

9    and similar employees?

10   A.  If they're in his station.

11   Q.  When Mr. Vosilla is on the floor, is he only responsible

12   for one specific station or the entire service floor?

13   A.  Until 9:30, 10 o'clock, he's responsible for one station.

14   Q.  Is there a specific station that he's always assigned to,

15   or does it change?

16   A.  It could be the party room.  It could be -- they're all

17   switching each other up, sir.  Again, it's six of those guys.

18   It's not just Attilio and Brent.

19   Q.  And has he performed the role of supervising employees

20   throughout his employment, or is that something that's changed

21   recently?

22        MR. BENSON:  Objection as to the form of the question,

23   your Honor.

24        THE COURT:  Sustained.  Just break the question into a

25   couple parts.

1              MR. ANDROPHY:  Sure.

2    Q.  Mr. Vosilla plays a role in supervising employees, correct?

3    A.  Yes, sir.

4    Q.  And has he always done that, as long as he's worked at

5    Fresco?

6    A.  Different versions of it, sir.

7    Q.  So has his role changed over time, regarding supervising

8    employees?

9    A.  Sir, the word "supervisor" to me is a little strange,

10   because, I again, I need to say this to you -- a waiter

11   supervises a busboy.  A busboy supervises a stocker.  A waiter

12   supervises a coffee man.  A coffee man supervises somebody

13   else.  This word "supervisor" makes no sense to me.  We are

14   there simply to take care of a customer.  The person in a suit

15   is there for two jobs, one, to make sure the customer's

16   experience is one hundred percent, and two, to hopefully open

17   up the most expensive wine the customer can afford, because

18   without that suit they wouldn't deal with the waiter.

19   Q.  He also makes sure that busboys do their job correctly and

20   if they're not, he would correct them.

21   A.  So would a waiter.

22   Q.  So Mr. Vosilla would do that.

23   A.  And so would a waiter.

24   Q.  Would he do that more than a waiter?

25   A.  You have a station that you have seven tables, you have one

1   busboy that's separated there between those two stations.  So

2   we have for every -- if I have seven to nine stations on a

3   floor, that's one server per station.  In that situation, then

4   I have anywhere between four and five bussers.  So those

5   bussers are basically splitting up two stations per server.

6   There are a lot of times I have servers coming to me and

7   complaining about the busboys that are working in those

8   stations because they're not to be found.  I make those

9   adjustments.  I figure out what's going on with it.  I

10  understand if the station is too large or small for that one

11  busser.  That's when you were asking me if Nahun was a good

12  coffee man or if somebody else is a better stocker.  Those are

13  the situations we're evaluating every day to make sure

14  everybody is comfortable, because I cannot afford a single

15  employee leaving me.

16  Q.  Going back to the question I asked, does Mr. Vosilla play

17  more of a role in correcting a busboy than a waiter would?

18  A.  If it had to do with service on the floor, Attilio Vosilla

19  would be no more boisterous about an employee than a server

20  would be.

21      Your Honor, I need to say that again.  Just -- Attilio

22  Vosilla, if he's working in the back room, so there's three of

23  us, there's three captains on the floor.  It's myself in the

24  front station.  I usually have a second guy in the middle

25  station.  And we have somebody in the back.  Attilio usually

ECGASAL1ps                   A. Scotto - cross

1   takes the back.  And when Attilio is in the back room, he's got

2   one, two, three, almost five stations he has to operate.  So

3   I'm telling you in that --

4            THE COURT:  What do you mean by "stations"?

5            THE WITNESS:  Right now so -- do we have a station

6   chart here.

7            MR. ANDROPHY:  Plaintiff's Exhibit 92, which I believe

8   has been admitted, I think.

9            MR. BENSON:  I think there's one attached to your

10  trial declaration also.

11           THE COURT:  All right.  So I'm looking at 92.

12           THE WITNESS:  May I stand up for a second, ma'am?

13           THE COURT:  You may.  I have also 92 if you want to

14  look at it at the same time.

15           THE WITNESS:  I want to just show you a quick example.

16  This is when I'm considering breaking up the room.  The front

17  station here -- I'm sorry, ma'am.

18           THE COURT:  That's all right.

19           THE WITNESS:  The front station here is what I'm

20  considering the VIP station.  So it's the front part of the

21  restaurant.  Then there is the middle station and the back

22  station.  So when I'm talking about the back station for

23  Attilio, for instance, Attilio would be handling one, two,

24  three, four, four and a half different stations.  Of those four

25  and a half different stations, you have only two busboys.

1    So --

2              THE COURT:  Are there a certain amount of tables per

3    station?

4              THE WITNESS:  Yes, ma'am.  Six to seven.

5              So I can't -- I mean, as crazy as I think I can handle

6    the entire dining room and as busy sometimes as we are, I

7    can't.  So I relinquish some of my responsibilities to captains

8    as we go into those different stations so we have the full

9    coverage for our customers.  I always take this station.

10             So the answer to the question is, would a waiter have

11   more responsibility to talk about a busser in this station?

12   Yes is the answer, because Attilio is worrying about

13   everything, not two busboys or five waiters.  He's worrying

14   about all of these tables.

15   Q.  If a busboy arrives late, Attilio could write the busboy

16   up, correct?

17   A.  So there is a policy we have at Fresco by Scotto that in

18   the morning if you're not calling in by 10:30 for a 10 o'clock

19   Showtime, or in the afternoon if you've not called in by 4:30

20   for a 4 o'clock call time, James Rotundo, which is at the front

21   desk, is actually making those phone calls.  He is trying to

22   find you.  He is trying to see what's going on.  Because we

23   have a second problem with that, is the on-call.  The on-call

24   has to be -- is calling as I said at 10:30 or 4:30 in the

25   afternoon.  I hate -- hate -- to have the on-call come in and

1    then, at 10:35 or 4:35 the people show up and have reappeared.

2    So now I not only have the on-call coming in, which I told him

3    to come; I also have the person that has been a half an hour,

4    45 minutes late, coming in also.  So what do I do?  50 percent

5    of the time I take the situation where I am taking that other

6    person that's coming in and I'm paying for the person, just so

7    as not to aggravate the tip pool.  Or, if that person is really

8    crazed and he's done it two or three times to me in the past

9    month, I'm sending that person that was the half an hour, 45

10   minutes late home.  It still does not benefit me.  I hate it.

11   Because it's so volatile, the restaurant system now and the

12   restaurant business now, it's very difficult to find employees.

13   The last thing I want to do is aggravate anybody.

14          THE COURT:  Are you saying there's a shortage of

15   employees?

16          THE WITNESS:  It is, your Honor, it is horrible.  I

17   cannot find a busboy.  I cannot find a busboy.  I cannot find a

18   busboy.  I cannot find them.  I'm almost to the point, January

19   1st, of going busboyless.  And I'm trying to figure out a way

20   in my tip pool -- because, you know, no one realizes this, your

21   Honor.  I am up all night and day trying to figure out how much

22   money my employees can make on a given day, so that tomorrow --

23   today they spend it and tomorrow they come back happy.  Because

24   really that's all it's about.  If you're getting enough money

25   in your pocket each day, then you're happy with me, because

1    I've done my job.  We've all done a great job for Fresco by

2    Scotto for 22 years.  When I'm looking at a situation where I'm

3    looking at a busboy that's coming in and I see we only have 50

4    reservations and I've got to figure out how to figure out the

5    five that I already scheduled, coming in for a 4 o'clock

6    reservation, for a 4 o'clock shift -- it rains.  There's a

7    demonstration.  Two weeks of that.  No one realizes the other

8    side of demonstrations.  Everybody's rah-rah about

9    demonstrations.  But no one realizes small businesses get

10   pummeled with it, where you're in a situation where now, it is

11   now 5 o'clock in the afternoon.  My mother is at the desk, and

12   all she keeps going is, OK, thank you, OK, thank you, see you

13   next time, OK, thank you, see you next time -- because everyone

14   is canceling.  No one wants to come out and everyone is

15   canceling.  Now I'm talking with all these people.  Now I'm

16   looking at the tip pool going on.  Damn, these people aren't

17   going to make enough money.  They're going to be upset with me.

18   What am I going to do now?  There are times when I've sat down

19   to go, you know what, pay these guys out, just send them home

20   early, just pay them out and I'll take it out of my pocket and

21   leave the till pool alone so they're making enough money to get

22   through the night.  And it's all day.  Your Honor, there are so

23   many variables that -- they're banging outside with drill

24   hammers.  They shut down the street because something is going

25   on.  It's all day.  It's the life of a small business, and it's

1   hell.

2   Q.  So I understand, obviously, why you would be unhappy if

3   someone comes late.  But my question was --

4   A.  I'm disappointed more than I am unhappy.

5   Q.  My question was, Mr. Vosilla has the authority to write up

6   an employee for that, correct?

7   A.  Mr. Vosilla would only have written that up because I told

8   him to, because by the time that person was late for his shift,

9   he hadn't gotten in yet.

10  Q.  A waiter couldn't do that kind of write-up, correct?

11  A.  No, sir.

12  Q.  Would a waiter be able to do that?  That write-up?

13  A.  Sir, a waiter would tell me if a busboy would have left the

14  floor for 20 minutes, nobody knew where he was, and I wanted to

15  find the busboy and ask him, you know, so-and-so said you

16  disappeared for 20 minutes, what's going on.  Well, I was in

17  the bathroom.  So I go upstairs to the waiter and go, all

18  right, chill out, he was in the bathroom.  All right.  But this

19  is the third time he's been in the bathroom.  I go back to the

20  busboy and go, is there something wrong with you, are you

21  feeling OK?  I'm fine.  I said OK, relax, he says he's fine,

22  whatever is going on, it's fine.  Let's move on.  This is the

23  life of the restaurant business.

24  Q.  Again, my question is, would a waiter be able to do a

25  formal written communication, a written report, for a busboy

1    who comes in late?

2    A.  If a form was not sitting out for Attilio to write it up,

3    sir, Attilio wouldn't even know where the form was.

4              THE COURT:  So is that the system, that when there's a

5    failure to perform by an employee, a written report is done?

6              THE WITNESS:  Um, only as of 2013, when this is

7    just -- it's eight years of this, ma'am, and I don't know how

8    to stop it now, so we're trying to figure out a way of

9    protecting the company at this point.  So we're growing up into

10   understanding what we have to do in our lives.  It's not the

11   way my family does things.  We're a family.  We talk to people

12   like family.  We deal with family.  But we have to change our

13   ways now.

14   Q.  Mr. Vosilla has written up these communications because

15   employees have come in late, correct?

16   A.  Again, would Attilio actually fill out the forms?

17   Possibly, sir.  But it would not be a situation where he did

18   not have me knowing about it first or me sitting in the room

19   showing how to possibly write out the form.  You have to

20   understand, these guys had no idea what to do with these forms

21   to begin with.  They had to be trained to be doing that.  It

22   just doesn't come out of the air.  It's not something we were

23   doing, up until we started getting sued.

24   Q.  Understood.  So isn't it true that there have been times

25   that Attilio prepares the forms and he's the only person from

ECGASAL1ps                    A. Scotto - cross

1   the restaurant who signs the form?

2   A.  Yeah.  I mean, I would tell you there were times -- yes, is

3   the case.  Sir, it's a one-store restaurant.  I am not running

4   14 different locations.  I am at my restaurant from 8:30 in the

5   morning till 9:30, 10 o'clock at night.  Do you think somebody

6   is going to pass by something in my restaurant without me

7   knowing about it first?

8   Q.  In these circumstances where an employee is written up,

9   does Attilio also sometimes have a verbal discussion with the

10  employee?

11           MR. BENSON:  Objection.  I --

12           THE COURT:  Overruled.  You may answer.

13  A.  In the times that we have written people up, which is

14  probably a handful in the 22 years that we're open, sir, when

15  it was that problematic that we had to get it done, I was in

16  the room with Attilio having the conversation, along with

17  Attilio, so he can observe what's going on, so just in case I

18  get hit by a bus, he knows what to do going forward, sir.

19  Q.  So is it your testimony, then, that any verbal warning or

20  communication about improper conduct would be had with both

21  you -- sorry, strike that.

22           Is it your testimony that any time a verbal warning is

23  given by Fresco to an employee, you would be the one to give

24  that verbal warning?

25  A.  My employees, no.  But if by chance they've done something

1    wrong and they're going to be reprimanded, or they're going to

2    be talked to, or find out what's going on with them -- because

3    a lot of times it's not reprimanding, by the way.  A lot of

4    times it's finding out that his son is sick, his daughter --

5    his wife threw him out, he's been drinking for three days.

6    There are so many variables with different employees that it's

7    crazy.  In those situations I am talking to that person one on

8    one and having that conversation.

9          Once that conversation is finished, I am bringing

10   Attilio in, I'm bringing -- it could be anybody in, just to

11   understand that he's a human being, everything is fine, let's

12   move on.

13         You know, Attilio -- I don't want people -- if by

14   chance words were given to two employees or words were given to

15   Attilio against another employee and there's animosity between

16   the two of them, well, you know, at the end of the day, my

17   family loses with this, by the way, because somebody's not

18   selling right, they're talking to each other behind each

19   other's backs.  It's not moving the day along the way it should

20   be, and it's negative crap that has to go on and I don't like

21   it.  So what I do is I defuse the situation.  I bring everybody

22   in to give a kiss and hug and go, let's move on.

23   Q.  Can you turn to Exhibit 35.

24   A.  In this book, sir?

25   Q.  You might not have the correct book.  Sorry.  It's in this

ECGASAL1ps                    A. Scotto - cross

1   form.

2   A.  Yes, sir.  Can I just pull that up with you?

3   Q.  Yes.

4   A.  Thanks.  Thank you.

5   Q.  You're welcome.

6   A.  Yes, sir.

7   Q.  This is an employee communication for Julian Amazquita,

8   correct?

9   A.  Yes, sir.

10  Q.  And it's signed by Attilio Vosilla, correct?

11  A.  Reyes, sir.

12  Q.  And it indicate he was given a verbal warning, correct?

13  A.  Yes, sir.

14  Q.  And you did not sign this, did you?

15  A.  I did not, sir.

16  Q.  Do you know if Mr. Vosilla gave the verbal warning?

17  A.  I was with Mr. Vosilla, sir.

18          THE COURT:  Wait.  Are you talking about Plaintiff's

19  35?

20          MR. ANDROPHY:  Yes.

21          THE COURT:  OK.  Go ahead, please.

22          MR. ANDROPHY:  I'm sorry.  Could you read back the

23  last question and answer.

24          (Record read)

25  Q.  So you were there and you just didn't sign the document

1    yourself, correct?

2    A.  Sir, in the situation of Julian, this is -- was three

3    verbal conversations that I had with him prior to that, for

4    that week.  It seemed like something happened.  Julian was a

5    very nice person and terrific, and then snapped and I didn't

6    know what the snap was.  Well, I now know what the snap is

7    because he's suing me.  But I didn't know prior to that what

8    that situation was.

9            And if you've seen this write-up, by the way, he

10   showed up at 4:48 on a 4 o'clock show.  He called in and said

11   he was going to be 4:30 late, and he showed up at 4:48, just so

12   that you understand that.

13           MR. ANDROPHY:  I understand.

14   A.  OK, sir.

15   Q.  And the write-up says he was scheduled to work at 4:30,

16   correct.

17   A.  Because he actually called in at 4:30.  He called in at 4

18   o'clock and said he would be in at 4:30.  We let it go.

19   Q.  Now, it's correct that Mr. Vosilla would prepare and sign

20   some documents on behalf of the company, on behalf of Fresco by

21   Scotto; is that correct?

22   A.  Anything Attilio Vosilla prepared and had signed was for me

23   setting it up for him in the office, because he doesn't know

24   where the forms are to get any of those signed.

25   Q.  Mr. Vosilla would give the Fresco employee reference guides

1   to employees and sign those on behalf of the company; isn't

2   that correct?

3   A.  Again, he would know -- not know where they were until I

4   set up an envelope for him for each employee to make sure that

5   he knew what was going on.  Again, it's about the conversation

6   of talking about mentoring and showing people what they can do

7   so if they want to move on in life and do what I do for my

8   living, I have the opportunity of showing them something.  No

9   more than that.  Attilio Vosilla would not fill out a form

10  without me knowing about it first.

11  Q.  Understood.  But he would fill out a form, with you knowing

12  about it, and give it to an employee, and sign it on behalf of

13  the company, correct?

14  A.  Most of those times it was done in the office.  I was in

15  the office with him when it was getting signed.  He was getting

16  two forms of ID, just going through the motions of what was

17  going on, just in case, again, something would happen to me,

18  there was someone else there that we could have promoted into

19  that situation prior to 2013.

20  Q.  And he would sign documents as the, quote, company

21  representative; isn't that correct?

22  A.  It made him feel good, sir.

23  Q.  And that would include documents such as, if you look at

24  Plaintiff's Exhibit 39, employee -- employment eligibility

25  verification forms required to be maintained by the United

1    States government?

2    A.  Yes, sir.

3    Q.  And he would sign those as the employer or authorized

4    representative, correct?

5    A.  Sir, he was taking two forms of ID and filling it out and

6    signing the bottom of it.  He was not arranging anybody's

7    salaries or anything like else like that, sir.  That wasn't his

8    job.

9    Q.  And he would also sign notices of pay rates and payday for

10   employees as, for example, in Exhibit 38; is that correct?

11   A.  Let me get there, sir.  I'm sorry.

12           Sir, again, these are forms that are filled out by

13   myself and Natasha.  There is an envelope that's given to him

14   by the employee's name.  This stuff is already filled out by

15   us.  Most of the times it's done by Natasha, because she needs

16   to make sure that the person's got the information that needs

17   to be done, the package is done.  Attilio is just formally just

18   making sure that the customer -- or employee knows what's going

19   on with it.  That's all.

20   Q.  So he would be the one, he would give it to the employee

21   and make sure the employee signs?

22   A.  I would tell you that 80 percent of the times I was there

23   with him, sir.

24   Q.  And he would sign it on behalf of the company?

25   A.  It made him feel good, sir.

ECGASAL1ps                    A. Scotto – cross

1    Q.  And on the first page of page 38, Exhibit 38, he would be

2    listed as the preparer and the manager; is that correct?

3    A.  Yes, sir.

4    Q.  Is it also correct that Mr. Vosilla helped prepare the

5    employee reference guide, which we looked at before as

6    Plaintiff's Exhibit 74?

7    A.  I would tell you that, along with my mom's input of knowing

8    what was going on for the paintings and, you know, that type of

9    decor stuff, because my mom was really involved in that type of

10   stuff and helping us with the restaurant.  Attilio could give

11   me some information about some other part of the book.  The

12   rest of it was really done off the website.  I don't want to

13   boast that I really knew what I was doing with this thing.  I

14   need to tell you that.  I actually went on websites and just

15   found forms to download, and I downloaded those forms.  I got

16   to be honest with you.  I wasn't really that good at this.

17              (Continued on next page)

18

19

20

21

22

23

24

25

1   BY MR. ANDROPHY:

2   Q.  And was Attilio involved in any updates made to the

3   employee guide?

4   A.  I would tell you that I probably had five or six people

5   look at this guide to make sure that I wasn't missing

6   something; it could have been James, it could have been a coat

7   check person.  Whoever was there that day and knew I had to

8   deal with this and get it done, had somebody look at it and to

9   see that I was doing it right, what was I missing.  For the

10  most part, what would they give me?  The information was so

11  advanced that astronauts can't even know what it means.

12  Q.  In your trial affidavit you refer, at paragraph 30 on page

13  13 you say:  Attilio Vosilla is employed as a maître d'/service

14  manager.

15          Isn't it true that his position is just simply

16  manager?

17  A.  I'm not sure where that is, the white folder?

18  Q.  Page 13 of your declaration, it is not the binders.  So, do

19  you have your declaration up there?

20  A.  This here?  Supplemental?

21  Q.  The first one.

22  A.  Okay.  Sorry.  Page 13.

23  Q.  Page 13, paragraph 30.

24  A.  Yes, sir.

25  Q.  Isn't it true that Mr. Vosilla's position is simply

ECG5sal2                          A. Scotto - cross

1    manager, not maître d', not service manager?

2    A.  Have you read no. 30?

3    Q.  I'm referring to paragraph 30, the first sentence:  He is

4    employed as maître d'/service manager.

5    A.  Well, everything that is addressed there, which is what he

6    does on an everyday basis is what he does, so to me that is a

7    maître d'/service manager.

8    Q.  Other than your affidavit, is Mr. Vosilla described in any

9    documents as a maître d' or service manager?

10   A.  I don't know.

11   Q.  At your deposition do you ever refer to him as maître d'?

12   A.  Sir, if I wasn't getting sued would you really care what

13   his title was?  I'm telling you what his position was at the

14   restaurant.  His position was a person that was on the floor

15   worrying about a customer making sure they could get the best

16   sales we can to get at least 20 percent gratuity for everybody

17   to go home, spend it, and come back the next day.  Anything

18   else on top of that was me.

19   Q.  Isn't it true though that other than in this affidavit when

20   you have described Mr. Vosilla you have simply said that he is

21   a manager?  Isn't that true?

22   A.  I don't know, sir.

23   Q.  If you would turn to your deposition in the white binder,

24   page 70?

25   A.  Yes, sir.

ECG5sal2                          A. Scotto - cross

1    Q.  At line 16 were you asked the following questions and did

2    you give the following answers:

3    "Q  Does Fresco by Scotto currently have two managers besides

4    yourself?

5    "A  Yes.

6    "Q  Is that Brent Drill and Attilio Vosilla?

7    "A  Yes."

8    A.  When was this dated, sir?  I'm sorry.

9    Q.  This deposition was taken January 9, 2014.

10   A.  I don't even think Brent was there.  I think Brent had left

11   by then, didn't he?

12   Q.  I think he was still there until July.

13   A.  What I am saying, though, is at that time it could have

14   been Brent and Attilio, six months before that it could have

15   been Brent, Attilio and Marco.  If you asked me in 2011 who

16   else was involved it could have been Peter, Marco, Attilio,

17   Brent.

18           These are all what I consider managers but the job,

19   the name of it which you are so tied up on I'm not sure, more

20   than what they actually do at the restaurant which you really

21   should be more concerned about is what I am trying to explain

22   to you.

23           There are a lot more people at Fresco by Scotto that

24   are on the floor in a suit than Attilio and Brent.  You know

25   that, right?

1  Q.  If you turn back to Plaintiff's Exhibit 74?

2  A.  I'm sorry, where is that?  Black book?

3  Q.  Exhibit 74, one of the black binders.

4  A.  Here, sir?

5  Q.  Yes.

6  A.  74?

7  Q.  Yes.

8  A.  Yes, sir.

9  Q.  On the second page --

10  A.  Yes, sir.

11  Q.  -- this policy document identifies the restaurant managers

12  as Anthony Scotto, Jr., Attilio Vosilla, and Brent Drill; is

13  that correct?

14  A.  You said 74, right?

15          MR. BENSON:  Your Honor, the exhibit speaks for

16  itself.

17          MR. ANDROPHY:  Exhibit 74.

18          THE WITNESS:  Because mine doesn't have that here.

19          THE COURT:  Overruled.

20  BY MR. ANDROPHY:

21  Q.  Do you have the second page in about Fresco?

22  A.  Oh.  I'm sorry.

23          In that general information, that's what my mother

24  helped me with, by the way, to remind you here, so that you

25  know what I was talking about.

ECG5sal2                          A. Scotto - cross

1   Q.   Thank you.

2   A.   What are you saying after that?

3   Q.   Do you see after the first descriptive paragraph it says:

4   The kitchen is run by the Scotto family and Chef Steven Santoro

5   and then the restaurant managers are Anthony Scotto, Jr.,

6   Attilio Vosilla, and Brent Drill.

7   A.   I apologize.  I don't have what you have.

8   Q.   Let me make sure we are looking at the same document.

9   A.   Oh.  Sorry.  So small I couldn't even read it.

10          Yes, sir; I see that.

11  Q.   So, isn't it true that Attilio Vosilla and Brent Drill

12  were, along with you, the restaurant managers, as far back as

13  October 2007?

14  A.   Sir, as I discussed, service manager, manager, captain;

15  whatever makes everybody feel good, it is fine.

16          Again, if you weren't suing me, would it make a

17  difference?

18          THE COURT:  So, Mr. Scotto, his job is to ask the

19  questions.

20          THE WITNESS:  No, I know.  I know.  I know.

21          THE COURT:  Your job is to answer.

22          THE WITNESS:  I know.

23          No, sir.

24  BY MR. ANDROPHY:

25  Q.   Is that, no, they were not managers at that time?

 1   A.  No more managers than they are now, sir.

 2   Q.  Does that mean they were not managers at that time?

 3   A.  They were service managers/captains, sir.  I apologize.

 4   Q.  Is there a reason Fresco prepares this policy document and

 5   gives it to employees?

 6   A.  It is a good question, I need to tell you that.  I don't

 7   know why we did it.  I know I was instructed to do it but I

 8   cannot, for the life of me, remember why.

 9   Q.  Doesn't Fresco put information in here that it wants

10   employees to read to understand the policies of the company?

11   A.  I could see if we were going to be expanding and if we were

12   going to open up 14 restaurants and everybody needed to know

13   what was going on in each one of the restaurants, but I'm not

14   sure why we were told to do this in one store.

15              THE COURT:  Who told you to do it?

16              THE WITNESS:  I don't remember, ma'am, at all.  I

17   don't remember why we did this.  I have been asking all my

18   family members if anybody remembered why I had to get this done

19   and no one can remember.

20   BY MR. ANDROPHY:

21   Q.  It is correct, though, that you didn't just prepare this

22   and give it out but you also would have employees sign an

23   acknowledgment to confirm that they received it, correct?

24   A.  Yes, sir.  We did.

25   Q.  And, isn't it true that this document describes some roles

1   that are played by management?

2   A.  I don't know.

3   Q.  Staying on page 2 --

4   A.  Sir.

5   Q.  -- do you see the last two sentences:  All inquiries about

6   the room should be directed to either Mrs. Scotto or Elaina

7   Scotto.  If they're not available, get a manager to take the

8   pertinent information.

9   A.  Yes, sir.

10  Q.  So wasn't one of the reasons that this document was given

11  and why managers are identified are so employees would know who

12  to speak to when the document says speak to a manager?

13  A.  Right, but it neglected, because I really wasn't good at

14  this -- but it neglected to mention James who is a manager at

15  our front desk who, to be honest with you, 80 percent of the

16  people see and talk to before they even speak to anybody on the

17  floor.  So, I missed James in this also.  And, I don't know, my

18  mothers' work ethic is sometimes worse than mine so she's in at

19  9:00 in the morning.  My mother loves being at that front desk.

20  Q.  If you can turn to Exhibit 73?  It is in the same binder.

21  A.  Yes, sir.  Yes, sir.

22  Q.  Do you recognize this document?

23  A.  Yes, sir.

24  Q.  So that's, again, the policy document and this is, as

25  indicated on the first page, updated in December 2012, correct?

ECG5sal2                          A. Scotto - cross

1    A.  Yes, sir.

2    Q.  And this document also lists Attilio Vosilla and Brent

3    Drill as managers; isn't that correct?

4    A.  Yes, sir.

5    Q.  Were they managers at that time?

6    A.  As I said earlier, sir, they're service managers, captains,

7    but a name is just a name, sir.

8              MR. ANDROPHY:  We ask that Plaintiff's Exhibit 73 be

9    admitted.

10             THE COURT:  Any objection?

11             MR. BENSON:  No objection.

12             THE COURT:  It is admitted.

13             (Plaintiff's Exhibit 73 received in evidence)

14   BY MR. ANDROPHY:

15   Q.  We also ask that Plaintiff's Exhibit 71 and 72 be admitted.

16             THE COURT:  Has there been a foundation?  Have they

17   been authenticated?

18             MR. ANDROPHY:  I can go through them with the witness.

19   They're similar documents so I don't know if defendants will

20   just stipulate to their admission.

21             THE COURT:  Is the difference --

22             MR. ANDROPHY:  The difference is just -- they're

23   different versions; 71 is updated January 2013, 72 is updated

24   April 2013.

25             MR. BENSON:  We have no objection, your Honor.

1          THE COURT:  They are admitted.

2          (Plaintiff's Exhibits 71 and 72 received in evidence)

3   BY MR. ANDROPHY:

4   Q.  Is it correct that employees such as busboys would have to

5   get permission from Mr. Vosilla to leave the restaurant at the

6   end of their shift on the dinner shift?

7   A.  I don't understand that.

8   Q.  Would bussers have to speak with Mr. Vosilla to get

9   approval to leave at the end of the dinner shift?

10  A.  So you are saying the shift, the area that they're working

11  in is no longer busy and they want to go home?  Is that what

12  you are saying?

13  Q.  Yes; would they have to then speak with Mr. Vosilla to just

14  get the okay to go home for the evening?

15  A.  No.

16  Q.  Did they have to do that in the past?

17  A.  Possibly.  There were times in the past -- it wasn't just

18  Attilio, by the way; it was the captain on the floor.  So,

19  whoever was in that station, it could have been a captain, it

20  could have been Attilio, it could have been another -- Brent.

21  Another service manager.  It could have been another captain

22  sitting somewhere else and all they wanted to do was make sure

23  that if they were going to combine stations.  So, in other

24  words, a busboy who was taking on two stations because we

25  slowed down is going to take on four stations.  They just

ECG5sal2                      A. Scotto - cross

1   wanted to make sure that all of those servers knew who their

2   busboy was at that time.  That's all.  Not to say that you were

3   going to do it or not do it.  They've already made the decision

4   to do it.  It was more for flow function than it was for

5   anything else.

6   Q.  If you can turn to your deposition?  Again, that's the

7   white binder, page 40.

8   A.  Yup.

9   Q.  Were you asked these questions and did you give the

10  following answers, starting on line 7:

11  "Q  When you leave the restaurant on a typical night around

12  9:30, are there waiters and busboys and food runners still

13  working on the floor?

14  "A  Yes.  Yes.

15  "Q  And do they just decide on their own whether to leave for

16  the night or does someone direct them?

17  "A  For the 20 years that Fresco has worked, usually servers

18  and bussers come up to Brent or Peter and say there is nobody

19  at my station and can I go home.

20  "Q  So, they speak to someone to let them know they're going to

21  remember, correct?

22  "A  It is more like they, you know, yeah, you know, there is no

23  one here.

24  "Q  Do they need to speak to a manager to do that?

25  "A  Currently Attilio is doing it at night.  That's currently."

1              So, is it correct that they would speak with Attilio

2       before leaving?

3              MR. BENSON:  Objection, your Honor.  He didn't read

4       the whole answer, for the record.

5              THE COURT:  What page were you on?

6              MR. ANDROPHY:  Sorry, that finished on page 41.

7              THE COURT:  So why don't you read the whole answer.

8              MR. ANDROPHY:  Okay.

9       Q.   Where I left off currently continuing:

10      "A  Before that is" --

11             Sorry.

12             "Before that it was a little bit more lackadaisical

13      because I was a little bit more involved in the restaurant and

14      I didn't have anybody specifically doing that job.  Now I do.

15             So, is it correct that when you gave this deposition,

16      when you testified at this deposition in January 2014, part of

17      Attilio's job would be to approve employees leaving at the end

18      of the night or at the end of their shift?

19      A.   No one is approving anyone to be doing anything, sir.

20      Again, what is happening is it is a general conversation that

21      is happening on the floor where station five and six are empty

22      and those people that are in five and six are turning around to

23      the captain that is in that station and going, What should we

24      do?  And the captain goes, You know what?  It is empty?  Just

25      start packing up.

1          It is nothing formal.  It is about the customer.  It

2     is not you need to stay here to be punished.  It is about the

3     customer and no one being there.

4     Q.  In January 2014 they would have to speak with Attilio

5     specifically, correct?

6     A.  I would tell you that as of January 2014 I took a back seat

7     a little bit and gave people a little bit more things to do

8     only because of the situations that I am in with this, but

9     truly, at the end of the day, it didn't change any more than

10    2013, 2012 and 2011, sir.  It has always been the same way.

11    Q.  Mr. Vosilla is paid a weekly salary by Fresco that does not

12    vary according to the number of hours he works, correct?

13    A.  Yes.

14    Q.  Is he ever paid overtime if he works more than 40 hours in

15    a week?

16    A.  No.

17    Q.  Why is he not paid overtime if he works more than 40 hours?

18    A.  Because we took the amount of hours that he could possibly

19    work in a week which, by the way, is no more than 45.  We take

20    those number of hours, we put it into a salary.  I crunched

21    numbers with Natasha, our bookkeeper, to figure out what those

22    numbers were, and came up with a happy medium for him.  That is

23    all what happened.

24    Q.  Is that Natasha in the -- sitting there in the seat?

25    A.  I can't see.  There is somebody behind the pillar here, the

ECG5sal2                          A. Scotto - cross

1    podium.

2              MR. ANDROPHY:  I just ask that, under Federal Rule of

3    Evidence 615, that if there are any non-party witnesses that

4    they wait outside the courtroom while there is testimony.

5              THE COURT:  Mr. Benson?

6              MR. BENSON:  Well, it is a little late for that

7    application, I think, at this point.  Throughout the

8    proceedings all of the witnesses have been able to be present

9    while everyone he will was testifying.

10             THE COURT:  Are you talking about all of the

11   plaintiffs who are parties to the action and who have the right

12   to be present while it is being tried?

13             MR. BENSON:  I'm speaking about all the parties, your

14   Honor, all of the individuals who are participating in the

15   trial.  We have no objection if your Honor feels that

16   sequestration is necessary.

17             THE COURT:  It is appropriate that a non-party witness

18   be excluded until the testimony.

19             MR. BENSON:  Okay.

20   BY MR. ANDROPHY:

21   Q.  It is your testimony that Mr. Vosilla's job

22   responsibilities changed around January 1st, 2013; is that

23   correct?

24   A.  I know it was in 2013, sir.

25   Q.  Was that change documented anywhere?

ECG5sal2                           A. Scotto - cross

1    A.  No, sir.

2    Q.  Was there any announcement to employees about any change

3    made to his job responsibilities?

4    A.  Not only his, sir.  Yes, sir.

5    Q.  So there was an announcement?

6    A.  Yes, sir; there was.

7    Q.  You also testified that Brent Drill, that his job changed

8    in January 2013; is that correct?

9    A.  Yes, sir.

10   Q.  And is that documented anywhere?

11   A.  I don't know, sir.  I know I had made a couple of

12   announcements and also notified everybody of the new captains

13   and service managers that was moving into that position.

14   Q.  So, how was that done?  How was that announced?

15   A.  During pre-meal, sir.

16   Q.  And how, exactly, did Mr. Drill's job change?

17   A.  It didn't.

18   Q.  Mr. Drill's job did not change in January 2013?

19   A.  His title changed, sir, so that I wouldn't be getting in

20   trouble every five minutes, but the otherwise what he did every

21   day did not change at all.

22   Q.  So, your testimony is that Mr. Drill became a manager in

23   January of 2013; is that correct?

24   A.  I think somewhere in 2012 I would tell you that I had a

25   meeting with both Attilio and Brent.  Beth of them were looking

1    leave us -- I mean us Fresco by Scotto.  Brent was looking to

2    move to Florida, Attilio said he had enough doing in the

3    position that he was in.  I sat long and hard trying to figure

4    out how to afford all of this and to bring them on as

5    management because that is what they wanted to do, they wanted

6    to open up their own restaurants and move to the next step.  I

7    thought long and hard about it, spoke to Elaina my sister about

8    it, I might have mentioned it to my mom but I don't think she

9    was in the meeting, and said, if we lose these two guys, we

10   kind of lose the heart of Fresco because they have been on the

11   floor so long taking care of customers everybody knows who they

12   are.  I think it is only right to move them along.  So, that's

13   what we did.

14   Q.  So, for Mr. Drill was it simply just the change in title

15   and salary?

16   A.  Yeah.  For Brent -- Brent and Attilio it was both the

17   change in title and salary.  In fact, Brent, once he took the

18   title and salary, six months later he left and moved to Florida

19   anyway, so.

20   Q.  Mr. Drill has written up employees for discipline --

21   disciplinary communications; is that correct?

22   A.  If it was, again, it was me being right there with him.  I

23   need to tell you honestly, he is dyslexic and never resolved

24   the problem so it is very difficult for him to write things

25   down.

ECG5sal2                          A. Scotto - cross

1   Q.  And Mr. Drill has also written up employees for

2   termination; that true?

3   A.  Again, if he did, sir, it was me being there with him.

4   Q.  If you could turn to Exhibit 59?

5   A.  In the white book, sir?

6   Q.  Sorry.  Not in the white binder, in the exhibit binder, it

7   is in the same binder as 74.

8   A.  What number again?

9   Q.  59.

10  A.  Yes, sir.

11  Q.  This is an employee write-up for termination of Luis

12  Roballo, correct?

13  A.  Yes, sir.

14  Q.  And it is signed only by Brent Drill, correct?

15  A.  It is, sir.

16  Q.  Who, at Fresco, decided to include floor captains and party

17  captains in tip pools?

18  A.  Me.

19  Q.  And so, in your trial affidavit --

20  A.  Yes, sir.

21  Q.   -- when you say on page 4, paragraph 8 --

22  A.  Page 4?

23  Q.  Page 4.

24  A.  Yes, sir.

25  Q.  Paragraph 8, second to last sentence --

ECG5sal2                          A. Scotto - cross

1   A.  Yes?  The system was set by implementing the waiter.

2   Management has never played any role in the operation of the

3   tip.

4   Q.  That's not entirely correct, is it?  Management would

5   decide who participates in the tip pool, correct?

6   A.  We can go over many times where the tip pool has changed

7   the people that are in the pool and out of the pool, sir.

8   Q.  So, management would make those decisions as to who was

9   within the tip pool, correct?

10  A.  No.  I would tell you that there have been many situations

11  where captains that were paid in the tip pool that at times

12  were as high as 1.5 percent have gone down to .5 percent by

13  different arguments that was presented by the tip-pooled

14  employees telling me about what was going on with that.

15  Q.  So those decisions about, say, moving captains from 1.5

16  points to 0.5 points, did you have to personally approve those

17  decisions?

18  A.  I wanted to know about it, by the way, because, you know,

19  you are talking about captains that are -- I guess if you want

20  to throw Brent in there for a second, Brent on the floor, I

21  know I did research on this, I don't know if I have it here

22  somewhere but I know Brent on the floor has more sales than any

23  server in Fresco history.  So, all he is serving is wine so why

24  shouldn't he be involved in reaping the benefit of what he is

25  selling?  I mean, his sales are better than anybody else at

1    Fresco.

2    Q.  My question, again, is the decision to change the points to

3    a captain from 1.5 to 0.5 points in the tip pool, is that a

4    decision that you approved?

5    A.  I would tell you it would have to be brought to me before I

6    would even think about it.  You know, there are people in the

7    tip pool that had to be coming to me and telling me something

8    is going on.  You had to listen to their conversation.

9    Q.  So it would be brought up by people in the tip pool but

10   ultimately you would have to approve that?

11   A.  Sir, I have to change the form.

12   Q.  So you would have to approve that?

13   A.  As long as everybody is voting on it, everybody feels it is

14   the case; it is not my money, it is their money.  So, if they

15   feel that should be the case and they all vote on it and are

16   not positive about it, I'm not fighting it.

17   Q.  And the decision for Brent to stop receiving tips?

18   A.  He wasn't happy.

19   Q.  That was your decision, correct?

20   A.  That was their decision and they brought up a very good

21   decision, by the way.  They brought up a very good point that

22   lunch, where he was able to get a bigger point, at dinner

23   because he was selling so much and the revenue was so great

24   that he was doing better than a lot of people were doing and

25   they didn't like that so they wanted to bring it down.

ECG5sal2                        A. Scotto - cross

1   Q.  So --

2   A.  And, again, he wasn't still until close.

3   Q.  Just so we are clear, my last question, I wasn't referring

4   to changing from 1.5 points to 0.5 points --

5   A.  Yes.

6   Q.   -- I was referring to Mr. Drill not receiving any tips.

7            Let me go back.  Is it your -- did Mr. Drill, at some

8   point, stop receiving tips from the tip pool?

9   A.  Yes, sir.

10  Q.  And when was that?

11  A.  When I promoted him to manager, sir.

12  Q.  And so, was that then your decision, that he would stop

13  receiving tips?

14  A.  Well, he couldn't receive tips.

15  Q.  Because he was a manager?

16  A.  Well he was -- he was doing a different service for the

17  restaurant, sir, he was doing something that is more involved

18  than just worrying about the customer.  If you are not touching

19  the customer you are not in the tip pool.

20  Q.  And that was your decision to exclude him at that point,

21  from the tip pool?

22  A.  Yes, sir; that was my decision.

23  Q.  Thank you.

24           Before customers begin to come on the shift, Fresco by

25  Scotto holds a staff meeting, correct?

1   A.  Yes; before lunch and dinner.  Yes.

2   Q.  And isn't it true that Mr. Vosilla would sometimes run

3   those meetings?

4   A.  No more than telling specials at times and changing the

5   wine lists.

6   Q.  And would Mr. Drill also sometimes lead those meetings?

7   A.  I think you just said the two same persons, so Attilio?

8   Q.  I think before was Mr. Vosilla.

9   A.  I apologize.

10          Yes, it could be a captain also.  It could be the

11  chef.  It was not set in stone who was doing it.  It could have

12  been me.

13  Q.  Did Mr. Drill and Mr. Vosilla sometimes lead those meetings

14  before January 2013?

15  A.  I don't know.  Again, it could have been a handful of

16  people.  The chef liked to do it at night, by the way.

17  Q.  Okay.

18          There was a time when Fresco by Scotto paid busboys

19  and food runners without keeping track, exactly, of the time

20  that they started their shift and ended their shifts; is that

21  correct?

22  A.  We had shift pays for our employees for a while, yes.

23  Q.  That was before approximately June 2011?  Is that correct?

24  A.  Yes, sir.

25  Q.  So, during the shift pay period did all busboys leave the

ECG5sal2                          A. Scotto - cross

1    restaurant at the same time or would they leave at different

2    times?

3    A.  All scattered times, sir.

4    Q.  Can you turn to, in the white binder, your deposition tab

5    3, page 84?

6    A.  Yes.  Yes, sir.

7    Q.  Were you asked the following question and did you give the

8    following answer?  I'm at line 13:

9    "Q  So, the way that the number of hours an employee worked

10   to -- for a given week would be determined simply by looking at

11   tip sheet, seeing if the employee's name is -- seeing which

12   shifts that employee's name is on and then figure out what time

13   that employee likely would have been there?  Is that --

14   "A  Well, not likely, because everybody comes in at 10:00 or

15   comes in at 11:00 and everybody leaves at 3:00 and now it is

16   really 2:15 and 2:30 by the time clock and we left the waiter

17   there until 4:00 which basically leaves at 3:00.  So, I paid

18   for the changeover computer for a year with just getting a

19   computer system."

20           Isn't it true that everybody left at 3:00 at that

21   time?

22   A.  No.  That would be the latest point would be 3:00 and I

23   think it kind of explains that.

24   Q.  In your trial affidavit at paragraph 13 on page 6.

25   A.  Do it again?

ECG5sal2                          A. Scotto - cross

1   Q.  Page 6 in your affidavit?

2   A.  Yes, page 6.  Yes, sir.

3   Q.  Paragraph 13.

4   A.  Yes, sir.

5   Q.  You testified, and I am in the middle of the paragraph, the

6   fourth sentence:  I also control the number of shifts that each

7   individual works so that new one spent more than 32 or 35 hours

8   in the restaurant per week.

9          Is it your testimony that no bussers ever worked more

10  than 32 or 35 hours in the restaurant in a week?

11  A.  I would tell you, unless it was just the two weeks in

12  December I would tell you.  Yes, sir.

13  Q.  Is it also your testimony that the restaurant would, in

14  paragraph 14 you testified that the restaurant would pay five

15  hours for each lunch shift; is that correct?

16  A.  Well, at that time it was -- I don't know what time this

17  was, but there was a time it was five hours and there was a

18  time where it was six and seven hours depending what the

19  business was.

20  Q.  It was never less than six or seven -- sorry.

21         It was never less than five, was it?

22  A.  Yeah.  I don't think it was anything more than seven.  I

23  think the five period was when we -- we lost, in one year,

24  close to $2.5 million in revenue.  Late 2007 to 2008 and all

25  the way through that we have been losing since then, so it was

ECG5sal2                          A. Scotto - cross

1  about $2.5 million we lost in that one year.

2  Q.  I am looking at the document, excerpts from two of the

3  larger exhibits, 76 and 77, and for the convenience of the

4  witness and the Court I have excerpted a couple pages of those.

5  I will give a copy to counsel as well.

6          So, for the record, the documents that I have given

7  up, the first page is marked Fresco by Scotto 005178 and this

8  is taken from Plaintiff's Exhibit 77.  The next three pages are

9  Fresco by Scotto 005170 through 5172 and these are taken from

10 Plaintiff's Exhibit 76.

11          Looking at the first page, do you recognize what this

12 document is?

13 A.  It says payroll busser sheet.

14 Q.  Is this a document that you are personally familiar with?

15 A.  I know it is one of the tools Natasha uses, yes.

16 Q.  And looking at the next three pages, are you familiar with

17 that type of document?

18 A.  It is an ADP payroll sheet; yes, sir.

19 Q.  Looking at the first page here, this indicates the tips

20 that each employee received for the week, correct?

21 A.  The category on the left you are saying?

22          THE COURT:  If you would identify the week that you

23 are referring to?

24          MR. ANDROPHY:  Sure.

25 BY MR. ANDROPHY:

ECG5sal2                        A. Scotto - cross

1   Q.  The first page is for the week ending February 12th, 2011;

2   is that correct?  Do you see that?

3   A.  Yes.  I see that, sir.

4   Q.  Is it correct that this document identifies how much each

5   employee listed here received in tips on each shift that he

6   worked?

7   A.  I guess it does, sir.  Yes, sir.

8   Q.  And so, this also indicates which shifts employees worked,

9   correct?  Because they wouldn't receive tips if they didn't

10  work.

11  A.  I agree with that, sir.

12  Q.  If you look at Miguel Caravantes?

13  A.  Yes, sir.

14  Q.  Isn't it true that he worked 10 shifts; five lunches and

15  five dinners?

16  A.  It shows that, sir.

17          That was $888?  Is that what that was?

18  Q.  Yes.

19  A.  Yes, sir.  Okay.

20  Q.  Turning to the second page --

21  A.  Yes, sir.

22  Q.  -- does this document show how many hours each employee is

23  going to be paid for for that week?

24  A.  Yes, sir.

25  Q.  And it also shows how many tips they earn that week,

ECG5sal2                          A. Scotto - cross

 1   correct?

 2   A.  Yes, sir.

 3   Q.  So, this document also shows Miguel Caravantes earned $888

 4   in tips?

 5   A.  Yes, sir; it does.

 6   Q.  And this document also shows that Mr. Caravantes was only

 7   paid for 40 hours in that week; isn't that correct?

 8   A.  Yes, it does, sir.  Can we go through the rest of the

 9   people on that sheet?

10   Q.  Yes.  I will go through some of them.

11   A.  Okay.  Let's go through all of them because they're all

12   listed here, right?

13   Q.  I will be asking questions.

14   A.  Okay, sir.

15   Q.  Nahun Flores; he worked eight shifts that week, correct?

16   A.  Give me a second, sir.  I'm sorry.

17   Q.  Sure.

18   A.  Yes, sir.  He did.

19   Q.  And that was four lunches and four dinners with one of

20   those being a Saturday dinner?

21   A.  Yes, sir.

22   Q.  And then turning to the third page, Mr. Flores was also

23   paid 40 hours that week; is that correct?

24   A.  That is correct, sir.

25   Q.  And Luis Roballo --

ECG5sal2                          A. Scotto - cross

1    A.  Yes, sir.

2    Q.   -- on the first page I think it is actually misspelled

3    R-A-B-A-L-L-O --

4    A.  Yes, sir.

5    Q.   -- he worked eight shifts, correct?

6    A.  Yes, sir.

7    Q.  Three lunches, five dinners, including a Saturday dinner?

8    A.  Yes, sir.

9    Q.  And then, turning to the fourth page of this document, he

10   was also paid for 40 hours that week?

11   A.  Yes, sir.

12   Q.  And Mr. Salinas, he also worked eight shifts that week,

13   correct?

14   A.  Give me a second, sir.

15   Q.  Sure.

16   A.  Sorry.

17   Q.  Mr. Salinas?

18   A.  Yes, sir; that's correct.

19   Q.  And that's three lunches and five dinners including a

20   Saturday dinner?

21   A.  Yes, sir.

22   Q.  And turning to the last page he was also paid for 40 hours

23   that week?

24   A.  Yes, sir.

25   Q.  So, Mr. Caravantes who worked 10 shifts was paid for 40

ECG5sal2                         A. Scotto - cross

1    hours and employees who worked eight shifts were also paid for

2    40 hours; is that correct?

3    A.  I would tell you to look -- I mean, listen to me.  No one

4    is perfect.  I would tell you, do we have the payroll period

5    for the week after this?

6               THE COURT:  So, why don't we first focus on the

7    question at hand and that is --

8               THE WITNESS:  Okay.

9               THE COURT:   -- this payroll period.

10              THE WITNESS:  Yes, ma'am.

11              At this point, yes, you are saying that -- yes is the

12   answer.  Yes.

13              But your Honor, just to let you know, there are times

14   that we miss things and we go to the next week and pay the

15   difference in the next week, just so that you know that.

16   BY MR. ANDROPHY:

17   Q.  I ask that this excerpt be marked admitted as Plaintiff's

18   Exhibit 117.

19              THE COURT:  Any objection?

20              MR. BENSON:  I think it is part of a larger exhibit.

21              THE COURT:  Right, but it is helpful, for effect, to

22   have an excerpt than having 3,000 pages of documents.

23              MR. BENSON:  I was inquiring whether it was and I have

24   no objection.

25              THE COURT:  Good.  So, if you would just mark that

1    with an Exhibit label as 117 it is admitted.

2              MR. ANDROPHY:  Thank you, your Honor.

3              (Plaintiff's Exhibit 117 received in evidence)

4    BY MR. ANDROPHY:

5    Q.  I am going to hand you another excerpt.  The first page of

6    this excerpt, this is again the summary of the tips received by

7    each employee for this one is for the week ending June 1st,

8    2010; is that correct?

9              THE COURT:  Is it May 1st, 2010?

10             MR. ANDROPHY:  I think it incorrectly says 5/1/2010

11   above but looking at the dates for each day of the week it

12   looks like that is actually for June 1st.

13             THE COURT:  Mr. Scotto, is that right?

14             THE WITNESS:  Ma'am, I don't know.  It seems to me a

15   mistake.  I am not sure what the mistake is.  I don't know what

16   it is.  I'm sorry.

17             THE COURT:  At the top it says:  Payroll Busboys.  And

18   then there is 5/1/2010.

19             THE WITNESS:  I would go, your Honor, with the bottom

20   part of it, not the top, so I would go with the actual days.

21             THE COURT:  So it is the week ending June 1st, 2010?

22             THE WITNESS:  I would say that is the case, ma'am.

23   BY MR. ANDROPHY:

24   Q.  Then Pablo Alvarado that week, he worked seven shifts,

25   correct?

606

ECG5sal2                          A. Scotto - cross

1    A.  Yes, sir.

2    Q.  Four lunches and three dinners?

3    A.  Yes, sir.

4    Q.  And Miguel Caravantes also worked seven shifts that week,

5    correct?

6    A.  Yes.

7    Q.  Five lunches and two dinners?

8    A.  Okay.

9    Q.  Nahun Flores worked eight shifts, is that correct?

10   A.  Yes, sir.

11   Q.  Three lunches and five dinners including the Saturday

12   dinner?

13   A.  Yes.

14   Q.  And Pablo Francisco worked nine shifts, correct?

15   A.  Yes, sir.

16   Q.  And that includes four lunches and five dinners including a

17   Saturday dinner?

18   A.  Yes, sir.

19   Q.  And Vicente Leon worked eight shifts, correct?

20   A.  Yes.

21   Q.  Which include three lunches and five dinners including a

22   Saturday dinner?

23   A.  Yes, sir.

24   Q.  And Enrique Salinas worked 10 shifts, correct?

25   A.  Yes, sir.

ECG5sal2                        A. Scotto - cross

1   Q.   And that included four lunches and six dinners including

2   the Saturday dinner?

3   A.   Yes, sir.

4   Q.   And Luis Roballo worked nine shifts, correct?

5   A.   Yes, sir.

6   Q.   And that includes five lunches, four dinners including the

7   Saturday dinner, correct?

8   A.   Yes, sir.

9   Q.   Turning to the second page, Pablo Alvarado and Miguel

10   Caravantes each were paid for 35 hours; is that correct?

11   A.   I see that, sir.  Yes.

12   Q.   And Nahun Flores, who we just saw worked eight shifts, he

13   was paid for 40 hours, correct?

14   A.   Yes, sir.

15   Q.   And Pablo Francisco, who worked nine shifts, he was also

16   paid for 40 hours, correct?

17   A.   Yes, sir.

18   Q.   And Vicente Leon, he worked for eight shifts, he was paid

19   for 40 hours, correct?

20   A.   Yes, sir.

21   Q.   And Enrique Salinas, who worked 10 shifts, was also paid

22   for 40 hours, correct?

23   A.   Yes, sir.

24   Q.   And Luis Roballo, who worked nine shifts, also was paid for

25   40 hours; is that correct?

ECG5sal2                         A. Scotto - cross

1    A.  Yes, sir.

2            Can I just explain that for a second?

3    Q.  Yes.  Please.

4    A.  Because at this time we were on a shift pay-type situation,

5    as I said to you, when I put up the schedule on Fridays, to

6    submit to the staff so they all had their job for the following

7    week.  By Mondays I told you the job schedule itself would be a

8    complete disaster because everybody had changes.  In this

9    instance, on May 26, you will see that two employees are not

10   here, mostly the entire week, which probably set that off in

11   knowing what happened there.  And in that situation we really

12   need to look at the week after to see if those hours were made

13   up in a situation because we are on a shift pay-type situation.

14           Do you understand that?

15   Q.  Yes, sir.

16   A.  Okay.  Just throwing that out there.  Thank you.

17   Q.  Now, when you say that the hours would be made up the

18   following week how, exactly, would that be done?

19   A.  So far you have shown me two examples, one year and another

20   year.  If you showed me an entire year for an employee you

21   would readily see that they're usually working between five and

22   seven shifts because more than that, I had a belief they would

23   be aggravated being there and possibly being nasty to the

24   customers.  So, you took two snippets after a situation where I

25   had a disaster and you are making that as gospel and that is

 1    not the way it was.

 2              THE COURT:  So you are saying in each of these cases

 3    the proper compensation would be reflected the following week?

 4              THE WITNESS:  Yes, ma'am.

 5              In the situations that these little blips that you are

 6    talking about, yes.  And realize also, your Honor, that since

 7    they were only working five to seven shifts they weren't even

 8    coming near the 40 hours in the first place.  So, there might

 9    be give and take in all of this and it could have been

10    mistakes -- I'm not saying there weren't -- but I only see two

11    right now.

12              THE COURT:  Do you have the figures for each week

13    following these weeks?

14              MR. ANDROPHY:  Not at my fingertips.  I know they are

15    in our Exhibits 76 and 77.

16              THE COURT:  This is a good time, then, to take a break

17    and we will take a quick bathroom break.

18              MR. ANDROPHY:  Thank you.

19              THE WITNESS:  Your Honor.

20              THE COURT:  And remember that you are still under

21    oath.

22              THE WITNESS:  Yes, ma'am.

23              (Recess)

24              MR. ANDROPHY:  Your Honor, we are still trying to find

25    the appropriate --

ECG5sal2                          A. Scotto – cross

1          THE COURT:  You can go on to other questions while

2     your associate looks for those records.

3          MR. ANDROPHY:  Okay.  Thank you.

4     BY MR. ANDROPHY:

5     Q.  Around June 2011 the restaurant began having employees

6     enter their time on the time clock, correct?

7     A.  It was in 2011, sir.  Yes.

8     Q.  Before that was there already a system in place that the

9     restaurant used for kitchen employees to keep track of their

10    time electronically?

11    A.  I believe so.  Yes.

12    Q.  But it wasn't used until sometime in 2011 for busboys and

13    food runners and those positions, correct?

14    A.  That is correct, sir.

15    Q.  And the employees would enter their time when they came in

16    and had they left at the end of their shift, correct?

17    A.  The front of the house employees?

18    Q.  Yes.  Yes.  After 2011.

19    A.  Yes, sir.  Yes, sir.

20               (Continued on next page)

21

22

23

24

25

1    Q.  Would the employees be paid for all the time in between

2    when they entered and when they left?

3    A.  They had a half-an-hour break in between, sir.

4    Q.  So were they not paid for that half hour?

5    A.  I believe they were able to leave the restaurant and do

6    what they wanted to do, and most of them did at that point.  I

7    don't remember, but I don't think we did.  I'm not sure.  I

8    don't know.

9    Q.  And so the restaurant would deduct some time from what

10   would otherwise be the total from the start time to the end

11   time.  Isn't it true that the restaurant would deduct some time

12   in determining how much to pay the employees?

13   A.  If I remember right, it was a half-an-hour meal break, or

14   recess, and I was, if I remember right, deducting 20 minutes of

15   that 30 minutes, sir.

16   Q.  And why was that 20 minutes deducted?

17   A.  When we installed the computer system at Fresco by Scotto,

18   the system was brought in through a Squirrel manufacturer.

19   That Squirrel manufacturer did its per mill -- sorry -- the

20   start of this function that he was planning on doing for us.

21   And they did this in California.  And I guess it was inset in

22   their hardware.

23   Q.  So was this something the restaurant requested, or is it

24   your testimony that it was automatically set up to deduct

25   approximately 20 minutes?

1    A.  I would tell you we did not realize the deduction was

2    happening until you notified us of that, sir.

3    Q.  So the restaurant did not request from the operator of the

4    time clock that it be set up to subtract some time from the

5    total.

6    A.  Absolutely not, and was after that corrected, sir.

7    Q.  OK.  At Fresco, on every shift, or just about every shift,

8    there's a busboy who's assigned to a stocker position, correct?

9    A.  Station 9 stocker, yes, sir.

10   Q.  And the stocker's main duties are to receive silverware and

11   dishes from the dishwasher, and then bring those to the

12   stocking stations on the floor, correct?

13   A.  Wipes them off, makes sure that there's no lip marks or

14   something on them, and brings them out to the floor, sir.

15   Q.  And then it's also your testimony that stockers would

16   sometimes run food to tables?

17   A.  Absolutely.

18   Q.  And you testified in your supplemental affidavit, at page

19   4, paragraph 11, you say, "A stocker spends approximately half

20   of his shift restocking the dining room with the plate settings

21   necessary to serve customers in a timely manner and

22   approximately half of his shift assisting the other service

23   employees by running food, serving coffee, clearing dishes, and

24   assisting other bussers in resetting tables."  Correct?

25   A.  I would say that's very close, sir.  Yes, sir.

1    Q.  Now, at your deposition, do you recall that you were asked

2    for an estimate of what percentage of the time a stocker is

3    bringing food to other tables?

4    A.  I don't, sir.

5    Q.  If you turn to page 49 of your deposition -- again, that's

6    the white binder.

7    A.  Yes, sir.

8    Q.  Or actually before that, page 48.

9    A.  Yes, sir.

10   Q.  Starting at line 6.  Were you asked the following question

11   and did you give the following answer:

12   "Q. Are you able to give an estimate of how much of the

13   stocker's time is spent making sure the stocking station has

14   everything it needs and doing that sort of work, and how much

15   time is spent running food to tables or bussing tables?

16   "A. The only way I can tell you is, tell you commonly if you

17   understand this for a second, so there are anywhere between two

18   and three runners on a shift, so that's six hands, who serve

19   anywhere between 100 and 180 people for lunch on a regular day.

20   There is no possibility that those six hands can get out all

21   that food in 45 minutes."

22           Then moving forward to page 49 at line 12:

23   "Q. Would you be able to estimate percentage-wise how much time

24   a stocker is bringing food to tables and how much time they are

25   spending otherwise tending to the stocking station?

1   "A. Again, if you were looking at it commonly for a second, I

2   will tell you that when we get busy all of the calamaris,

3   Fresco bread, and primarily pizzas are being taken out by the

4   stocker or the coffee man.  Dessert-wise, because we are still

5   too busy, as the six hands can only handle the entrées.  Same

6   thing goes for desserts and stuff like that happens.  So they

7   are in the dining room right often.

8   "Q. Are you able to give an estimate of how much percentage of

9   their time are not?

10  "A. It's all day.

11  Q.  So at that time you really weren't able to give a

12  percentage estimate, were you?

13  A.  No, sir.

14  Q.  OK.  But now it's your testimony that's approximately

15  50/50, 50 percent doing, attending to the stocking station, and

16  about 50 percent running food and bussing tables?

17  A.  Yes, sir.

18  Q.  Now, what time typically would a stocker begin his shift?

19  A.  11 or 12 o'clock.

20  Q.  Would the stocker have to come in before that and perform

21  side work?

22  A.  No.  I mean, it might be five minutes of setup.

23  Q.  Fresco also sometimes will have a food runner who spends

24  the shift in the kitchen and expedites the food so that the

25  food runners know which tables to take the food to; is that

1    correct?

2    A.  No, sir.

3    Q.  Is there ever a food runner who spends most of his shift in

4    the kitchen next to the chef and helps arrange the plates so

5    that they go out to the tables?

6    A.  And you said never leaves the kitchen?

7    Q.  Well, let's put aside "never leaves the kitchen," then, for

8    now.  Is there sometimes a food runner who's assigned to spend

9    at least part of his time in the kitchen making sure that the

10   plates go to the correct tables?

11   A.  There is the most senior runner at Fresco by Scotto that

12   stands next to the chef, who arranges for the exit of the food

13   out of the kitchen.

14   Q.  And does that food runner leave the kitchen himself to run

15   food?

16   A.  Absolutely.

17   Q.  Turn to your deposition, page 153.

18   A.  Is that the white booklet again?

19   Q.  White, yes.

20   A.  Yes, sir.

21   Q.  At line 23, were you asked the following question and did

22   you give the following answer:

23   "Q. Does the expediter expedite, bring the order for the

24   kitchen staff, or bring it from the kitchen to the waiter, to

25   bring it to the customers, or both?

1   "A. No.  He is not doing any of that.  All he's doing is

2   expediting the actual food orders for the line for them to

3   prepare that food.  He is not moving from that station."

4          Was it your testimony that the food runner in that

5   position was not moving from that station?

6   A.  No, sir.

7          Do you want to ask me why?

8   Q.  Not right now.

9          The restaurant gives employees the shirts,

10  specifically bussers, the shirts and ties that they're expected

11  to wear on the floor; is that correct?

12  A.  It hasn't happened in a while, but, yes, sir.

13  Q.  Since 2007, the restaurant has done that, has given shirts

14  and ties for employees to wear?

15  A.  I guess that prior to 2011, yes, that was the case, sir.

16  Q.  And is it true that employees would be required to purchase

17  those items from the restaurant?

18  A.  It was my intention at one time to have the employees

19  purchase the initial one shirt, one tie, and for a waiter one

20  shirt, one tie, and vest, sir.

21  Q.  And they would have to purchase those from the restaurant?

22  A.  It was my intention for that to happen, yes, sir.

23  Q.  Did that actually happen?

24  A.  I realize it hasn't happened, sir.

25  Q.  And how do you realize that hasn't happened?

ECGASAL3ps                    A. Scotto - cross

1    A.  When this all started, I went back to find this supposed

2    money and receipts that I was handing out to people, and

3    realized there were no receipts and no money generated for any

4    of this, sir.

5    Q.  Is it possible that employees paid in cash and did not

6    receive receipts?

7    A.  In 22 years, I have not had a receipt as a documentation

8    whatsoever of anyone taking and buying a shirt from me, sir.

9    And also, a lot of these shirts were given to me.  So I think

10   the intention in the beginning was, when I got the first round

11   of shirts that were coming in, which I thought we had to pay

12   for, we probably did not pay for them.  We were probably given

13   them too as a gratis.  So that kind of went away and no one did

14   anything with it and let it go.  It was very...

15   Q.  Was there a time that the restaurant's policy was that bus

16   staff and wait staff were supposed to purchase these items from

17   the restaurant?

18   A.  I, I would tell you sincerely there was an intention of

19   mine to make sure that they were going to do that.

20   Unfortunately it didn't happen.

21   Q.  I'm going to turn back now to the pay and shift records

22   that we were looking at before.

23   A.  Yes, sir.

24   Q.  The first sheet that we, the first excerpts that we looked

25   at were for the week of February 12, 2011 or so, and bring you

1  the worksheets for the week of February 19, 2011.

2  A.  Yes, sir.

3  Q.  This is in Plaintiff's Exhibit 76.  The page number, it's

4  Bates-stamped Fresco by Scotto 5130.

5           MR. ANDROPHY:  For your Honor I think we have three

6  binders that include Exhibit 76.  I think it's in one that's

7  marked as 76-B, I think.  It might be C.  I apologize.

8           THE COURT:  And where in 76-B?

9           MR. ANDROPHY:  It's 5130.

10           THE COURT:  I'm at 5130.  I don't see a date.

11           MR. ANDROPHY:  I believe it's written on the first

12  page.

13           THE COURT:  Where?  Are you saying 2/19/11?

14           MR. ANDROPHY:  Right.  And the corresponding document

15  in Exhibit 77 is at Fresco by Scotto 5143.  That's also the

16  week ending 2/19/2011.

17           THE COURT:  In Exhibit 77 it's at what page?

18           MR. ANDROPHY:  5143.

19  Q.  Do you have that as well?

20  A.  So you showed me this.

21           THE COURT:  I have it.

22           MR. ANDROPHY:  I need to find it for the witness.  I

23  apologize.  (Pause)

24  Q.  OK.  So if you recall, when we looked at Plaintiff's

25  Exhibit 117, that showed that Mr. Caravantes worked ten shifts

ECGASAL3ps                    A. Scotto - cross

1   that week, correct?

2   A.  Give me one second.  Sorry.  We're back with February,

3   right?

4   Q.  Yes.  When we looked at the week of February 12th, 2011,

5   which --

6   A.  Yes.

7   Q.  -- Mr. Caravantes worked ten shifts that week.

8   A.  Yes.

9   Q.  And was paid for 40 hours.

10  A.  Yes.

11  Q.  So the week of February 19, 2011, looking at page 5143 of

12  Plaintiff's Exhibit 77, he worked seven shifts; is that

13  correct?

14  A.  Yes, sir.

15  Q.  And on the right side, what does the notation "plus 3H," do

16  you know what that notation means?

17  A.  Plus three hours, sir.

18  Q.  And do you know why that says "plus three hours"?

19  A.  It was making up for the week before, sir.

20  Q.  OK.  So then in Exhibit 76, at page 5130, that's the

21  payroll worksheet for the week of February 19th, now?

22  A.  I'm confused now.  I apologize.  This is the booklet that

23  you're making me look at now?  This one.  Go ahead.

24  Q.  At page 5130, that begins the payroll worksheet for the

25  corresponding week, the week ending February 19, 2011, correct?

1   A.  I think that's what it says, sir.  Yes, sir.

2   Q.  Can you turn to page 5136.

3   A.  5136, sir.  Yes, sir.

4   Q.  So that shows Mr. Caravantes' number of hours he was paid

5   for that week, correct?

6   A.  I don't see his name.  Give me one sec?

7   Q.  Sure.

8   A.  5138, 7.  Yes, sir.  38 hours.

9   Q.  38 hours.  Do you recall in February 2011 how many

10  shifts -- or, sorry -- how many hours restaurant was paying per

11  shift?

12  A.  Prior to the time clock, I think it was five or six for

13  dinner, and I don't remember for lunch.  I apologize.

14  Q.  Would you agree that, based on reviewing these two

15  documents, it appears that the restaurant was paying 5 hours

16  per shift, whether it was lunch or dinner?

17  A.  To be honest with you, I don't remember.  I apologize.

18  Q.  And the restaurant never paid less than five hours per

19  shift, correct?

20  A.  We didn't like to.  What we, you know, what we always liked

21  to do was to make sure that everybody tried to get 40 unless we

22  had a day off or there was a snowstorm or something crazy, but

23  we tried to make sure everybody got the 40.

24  Q.  The week of February 12, 2011, or the first of these sheets

25  we looked at, Mr. Caravantes worked 10 shifts, correct?

1    A.  Yes, sir.

2    Q.  So shouldn't Mr. Caravantes have been paid at least for 50

3    hours?

4    A.  See, the confusion starts with the amount of hours they're

5    actually working in the time period that we're paying them for.

6    If we're looking at current punches in and punches out, which I

7    think would help the Court, if you looked at what we're doing

8    now and -- to see how many people or how many hours each shift

9    works, you would realize that, within eight shifts, they're

10   still allotted 48 hours -- I'm sorry, within eight shifts

11   they're still allotted 40 hours.  So, you know, it's all

12   depending on how many shifts, what the shifts are and how many

13   hours they're working, is what we're discussing.  You know,

14   sometimes these guys took early outs, way early outs, if it

15   wasn't busy.  And what period was this?

16   Q.  This is February 2011.

17   A.  I think 2 thousand -- I don't know, 2010, 2011, it really

18   got slower than it was in 2008.  We had a very bad time there

19   at one point.  We dropped a figure close to 7 or 8 hundred

20   thousand dollars in that year, from losing the already 2 and a

21   half million dollars we lost in 2007.  So there were so many

22   things going on, people leaving early, early shifts out, half

23   shares.  There was a lot of stuff going on at that time, just

24   to try to make everybody happy.

25   Q.  So it's your testimony, then, that sometimes employees

ECGASAL3ps                A. Scotto - cross

1    would be paid for less than five hours per shift?

2    A.  Again, only if the situation was that they earlied

3    themselves out or they had a situation where -- snowstorm.

4    You're talking about very few -- well, there might not have

5    been few, but there were situations where they took early outs

6    and stuff like that.

7    Q.  Isn't it true that the plus three hours for February 19,

8    2011 was not to make up for the previous week but, rather, was

9    to pay what's called spread of hours pay for Mr. Caravantes for

10   that week?

11   A.  I don't know, but you can ask Natasha that.

12   Q.  That week Mr. Caravantes worked, there were three days --

13   and again I'm talking about February 19th now -- there were

14   three days he worked a lunch and a dinner shift, correct.

15   A.  I see four.

16   Q.  The week of February 19th, on Tuesday, Wednesday, and

17   Thursday?

18   A.  But aren't we talking about February 12th, getting paid for

19   February 19th?

20   Q.  I'm talking right now -- I'm confused, moving back and

21   forth between these.

22   A.  OK, I'm sorry.

23   Q.  I'm talking now about the payroll for the week ending

24   February 19th, so I'm specifically looking at the tip summary

25   sheet, at page 5143.

1    A.   Yep.

2    Q.   So it's correct, Mr. Caravantes worked double shifts on

3    Tuesday, Wednesday, and Thursday, correct?

4    A.   On the 19th?

5    Q.   Yes, the week of the 19th.

6    A.   But these are the hours for the week before.  We discussed

7    that.  Correct?

8    Q.   Are you saying the plus three hours are the hours for the

9    week before?

10   A.   That's what I'm saying, yes.

11   Q.   OK.  But that's what I may be correcting you on.  Let's

12   look at -- or we'll see if we can figure this out.

13   Mr. Caravantes worked three days where he worked double shifts

14   the week of February 19th, correct?

15   A.   Instead of guessing, why don't we just ask Natasha?

16   Q.   I'll do that, but I'm asking you right now.

17            THE COURT:  Mr. Scotto, refrain from asking him

18   questions, please.

19            THE WITNESS:  Sorry.

20   Q.   So is that correct that Mr. Caravantes, the week of

21   February 19th, had three days where he worked double shifts,

22   Tuesday, Wednesday, and Thursday?

23   A.   One second, sir.  I see four, sir.  Monday -- oh, you're

24   right.  Monday, Wednesday, Thursday.

25   Q.   I'm talking about February 19th.

624

ECGASAL3ps                    A. Scotto - cross

1  A.  Yes, sir.

2  Q.  Tuesday, Wednesday, and Thursday.  Correct?  For

3  Mr. Caravantes?

4  A.  Monday, Wednesday, and Thursday, sir.

5  Q.  Are we looking at 5143, for Mr. Caravantes?

6  A.  Yeah.  I see --

7  Q.  Monday is only a lunch, correct?

8  A.  Right.  You said three lunches, right?

9  Q.  Sorry.  I said three doubles.

10  A.  Oh, I apologize.  OK.  Sorry.

11  Q.  Three for each lunch and dinners.

12  A.  So it's Tuesday, Wednesday, and Thursday.  Yes, sir.

13  Q.  And Mr. Alvarado, if you go, Mr. Alvarado, he had, he

14  worked double lunch and dinner Monday and Wednesday, correct?

15  A.  Yes, sir.

16  Q.  And for Mr. Alvarado, it says "plus 2H," correct, on 5143.

17  A.  Yes, sir.

18  Q.  And the week before, February -- the week ending February

19  12th, 2011, Mr. Alvarado worked five shifts.  Is that correct?

20  A.  Yes, sir.

21  Q.  And he didn't have any time that needed to be added based

22  on the previous week, did he?

23  A.  I don't know, sir.

24        MR. ANDROPHY:  Your Honor, I think I neglected to move

25  into evidence the second set of excerpts, which is the document

ECGASAL3ps                    A. Scotto - cross

```
 1    marked Fresco by Scotto 3360 and then 3354 through 3356.  I ask

 2    that that be admitted as Exhibit 118.

 3              THE COURT:  No objection?

 4              MR. BENSON:  No objection.

 5              THE COURT:  It is admitted as 118.

 6              (Plaintiff's Exhibit 118 received in evidence)

 7              MR. ANDROPHY:  If I may hand the witness and your

 8    Honor some photographs.

 9    Q.  Do you recognize the photographs I've given you?

10    A.  I'm sorry.  I didn't go through them, sir.  I saw -- do you

11    want me to look at all of them?

12    Q.  Yes.  Do you recognize what's pictured in these

13    photographs?

14    A.  Yes, sir.

15    Q.  And what is that?

16    A.  The employee rights, payroll, hourly wages, sick pay, sick

17    day, everything that's informing the employee about their

18    rights.

19    Q.  And have these posters always been posted where they're

20    shown in this photograph?

21    A.  Right there.

22              MR. ANDROPHY:  We ask that that set of photographs be

23    admitted as Exhibit 119.

24              MR. BENSON:  No objection.

25              THE COURT:  They are admitted.
```

1      (Plaintiff's Exhibit 119 received in evidence)

2      MR. ANDROPHY:  Your Honor, I have an additional

3  photograph.

4  Q.  Mr. Scotto, do you recognize what's shown in the photograph

5  I have placed before you?

6  A.  Yes, sir.

7  Q.  And what is that?

8  A.  Coffee station, sir.

9  Q.  Does this depict where the coffee station has always been

10  at Fresco, as long as -- as long as it's been in operation?

11  A.  Yes, sir.

12      MR. ANDROPHY:  We ask that this be admitted as

13  Plaintiff's Exhibit 120.

14      MR. BENSON:  No objection, your Honor.

15      THE COURT:  Admitted.

16      (Plaintiff's Exhibit 120 received in evidence)

17      MR. ANDROPHY:  If I may hand another photograph to the

18  witness, your Honor.

19      THE COURT:  You may.

20  Q.  Mr. Scotto, I've handed you a group of three photographs.

21  Do you recognize what's shown in those photographs?

22  A.  Yes, sir.

23  Q.  And what is it?

24  A.  The foyer at Fresco by Scotto, going to the bathrooms.

25      MR. ANDROPHY:  We ask that these photographs be

ECGASAL3ps                       A. Scotto - cross

1   admitted as Plaintiff's Exhibit 121.

2              MR. BENSON:  No objection, your Honor.

3              THE COURT:  They are admitted.

4              (Plaintiff's Exhibit 121 received in evidence)

5              MR. ANDROPHY:  May I approach and hand up another set

6   of photographs?

7              THE COURT:  You may.

8   Q.  Looking at the first photograph in this group, do you

9   recognize what's shown in that photograph?

10  A.  I'm sorry.  I pulled them apart.  I apologize.

11  Q.  OK.  So the first one, which -- I'll show you.

12  A.  Yeah.

13  Q.  Do you recognize what's shown in that photograph?

14  A.  It's the back half of the restaurant.  Yes.

15  Q.  And on the side wall, are there framed paintings?

16  A.  Two of them.

17  Q.  And on the second page, which is a somewhat dark

18  photograph, are there framed paintings on the wall?

19  A.  Is this the party room stairs?  I can barely see it.

20  Q.  It's a party room upstairs?

21  A.  Hold on.  Yeah, I believe this is the party room upstairs.

22  Q.  OK.  And are there framed paintings on the wall?

23  A.  Three of them.

24  Q.  The third page, which is the bar area -- correct?

25  A.  Yes.

1    Q.  So that's the bar area in Fresco, correct?

2    A.  It is, sir.

3    Q.  And is there a framed photo on the column on the left --

4    sorry, a framed painting on the column to the left?

5    A.  One of them.

6    Q.  OK.  And the tables that are shown in this photograph, are

7    these the tables, the type of tables that are typically in the

8    bar area?

9    A.  Yes.  We could use them in the dining room to add, to

10   increase or something, but they're normally kept in the bar

11   area.

12          MR. ANDROPHY:  I ask that this group of photographs be

13   admitted as Exhibit 122.

14          MR. BENSON:  No objection, your Honor.

15          THE COURT:  They are admitted.

16          (Plaintiff's Exhibit 122 are received in evidence)

17          THE COURT:  I do have a question.  These framed

18   photographs that you remarked to, or rather framed paintings,

19   are these frames that have glass?

20          THE WITNESS:  Right.  So this painting, they all

21   have -- this has glass in front of it, but this is an oil

22   painting.  These are all oil paintings, are up on top in the

23   party room.  And these are not oil paintings, but they are not,

24   they're not pictures.  These are actual drawings.

25          THE COURT:  So the oil paintings do not have glass on

ECGASAL3ps                     A. Scotto - cross

1    top, but the other ones do, correct?

2              THE WITNESS:  Yes, ma'am, they do.

3              MR. ANDROPHY:  If I may hand up one more photograph.

4    Q.  Do you recognize what's shown in this photograph?

5    A.  It's the dish area.  Yes.

6    Q.  Would the stocker also be in this area?

7    A.  Yeah, but you're missing the stocker on the right-hand side

8    that's going further into the wall.  So you're looking at the

9    dish area.

10   Q.  OK.  So this is looking at the dish area from approximately

11   where the stocker would be?  Is that --

12   A.  I guess.  I mean, a little bit, I don't know.  I think the

13   stocker is a little bit more into the right-hand side.

14             MR. ANDROPHY:  OK.  We ask that this be admitted as

15   Plaintiff's Exhibit 123.

16             MR. BENSON:  No objection, your Honor.

17             THE COURT:  It is admitted.

18             (Plaintiff's Exhibit 123 received in evidence)

19   Q.  What if anything did you do to determine that Mr. Drill

20   could participate in the tip pool?

21   A.  Brent Drill started at Fresco by Scotto as a waiter, so he

22   was always part of the tip pool.  He eventually went to school

23   to better himself, get in wine programs and understand wine and

24   selling.  I did have a captain on the floor prior to that that

25   was doing the same job.  He had left.  Brent took over that

1   position.  It's a position that's been held at Fresco by Scotto

2   since day one.  And the only reason that person is on the tip

3   pool is because that person is taking care of the customer in

4   its entirety.

5   Q.  Is there any specific research you did to determine whether

6   he can legally receive tips from the tip pool?

7   A.  The research I did prior to this is finding out -- and,

8   again, it's Internet.  There's no one walking into Fresco by

9   Scotto and telling us what the new laws are, sir.  So it's, you

10  know, it's Internet.  It's going to different functions, seeing

11  what's going on.  But, you know, my experience in the

12  restaurant business has always been a captain being able to be

13  on the floor if he is involved in the floor.  And that's the

14  way I've gone from there.

15  Q.  So would you say it was mostly relying on your experience

16  in the restaurant industry?

17  A.  No.  I'm constantly looking at the new laws and what's

18  popping up because it's constant now.  So I'm trying to stay

19  ahead of it.

20  Q.  Similarly for Mr. Vosilla's receiving tips when he serves

21  as a party captain, was there any specific research you did to

22  determine if that was legal?

23  A.  Again, it's the same thing.  If Attilio Vosilla is coming

24  in in the daytime, or coming in at 4 o'clock or 4:30, going

25  upstairs, and solely worrying about the party, waiting for that

1   party to finish because parties are always the earliest of the

2   dining room -- they're the earliest to finish because the

3   parties come in early.  Make sure that room is reset, take care

4   of the entire party, make the customer pay their bill.  It's

5   party captain.

6   Q.  Did you seek any advice on Mr. Drill and Mr. Vosilla's

7   participation in the tip pool?

8   A.  I'm sure I did, sir.

9   Q.  Do you recall any specific advice?

10  A.  Not offhand.  I apologize.

11  Q.  And did you make any changes after the restaurant was first

12  sued by a group of waiters?

13          MR. BENSON:  Objection as to the open-ended question.

14          THE COURT:  I think you need to be more specific.

15          MR. ANDROPHY:  OK.

16  Q.  Do you recall that the restaurant was sued by Gary Gillian

17  and -- a group of waiters, including Gary Gillian?

18  A.  Was this the first lawsuit?

19  Q.  Yes.  Yes.

20  A.  Yes.

21  Q.  And do you recall that there was a decision in that lawsuit

22  which held that if Mr. Drill and Mr. Vosilla worked in a

23  management capacity, they could not legally participate in the

24  tip pool?

25          MR. BENSON:  I'm going to object to the

1    characterization of the decision.  The decision speaks for

2    itself.  He's specifically referring to the decision in his

3    question, and without the decision in front of Mr. Scotto, I

4    think that's an unfair question.

5              THE COURT:  Are you challenging the court's -- his

6    summary of the court's holding?  Is it an inaccurate summary of

7    the court's holding?

8              MR. BENSON:  I'm not exactly sure that that accurately

9    characterizes it.  I think that the court's holding was as to

10   the specific nature of the individuals, not necessarily the use

11   of the word "management," is what I have an objection to, and

12   that within the predicate of the question, if I am correct.

13             THE COURT:  Do you want to rephrase your question?

14   Q.  Do you recall a decision in the lawsuit, the first lawsuit,

15   which was brought by Gary Gillian, which held that, depending

16   on the exact duties and responsibilities of Mr. Drill and

17   Mr. Vosilla, it may not be legal for them to participate in the

18   tip pool?

19             MR. BENSON:  Objection.

20             THE COURT:  There was a decision that was issued in

21   which the court made a holding with respect to the legality of

22   those individuals' participating in the tip pool.  Is that

23   correct?

24             MR. ANDROPHY:  Well, it denied a motion by defendants

25   for summary judgment, basically because there were questions of

ECGASAL3ps                          A. Scotto - cross

1    fact as to what their actual duties and responsibilities and

2    what they actually did was a factual issue.

3           THE COURT:  So are you asking him whether there was

4    such a decision on the motion for summary judgment?

5           MR. ANDROPHY:  I'm asking if he's familiar with that

6    decision.

7           THE COURT:  OK.  You can ask that question.

8    Q.  Do you understand the question now?

9    A.  I am completely confused.

10   Q.  Do you recall that in the first lawsuit, there was a

11   decision which held that, depending on the actual duties and

12   responsibilities of Mr. Drill and Mr. Vosilla, their

13   participation in the tip pool may be unlawful?

14          MR. BENSON:  Objection, your Honor.

15          THE COURT:  Was the decision that determining whether

16   they could participate in the tip pool was dependent on their

17   duties and responsibilities?  Was that the holding?

18          MR. ANDROPHY:  I believe so.  I believe the court

19   found there was a factual question as to what exactly Mr. Drill

20   and Mr. Vosilla did and whether they would be -- whether it was

21   lawful for them to participate in the tip pool.

22          THE COURT:  So are you familiar with that decision?

23          THE WITNESS:  No, ma'am.

24   Q.  Do you recall that one of the issues raised in the first

25   lawsuit brought by Gary Gillian was whether stockers were

 1   permitted to participate in the Fresco tip pool?

 2   A.  No, sir.

 3   Q.  Have you done any specific research to ensure that all

 4   employees at Fresco who are paid at the tip credit rate are

 5   doing work which qualifies them to be paid at that tip credit

 6   rate?

 7   A.  Yes.  I am -- that's my largest pet peeve, by the way.

 8   It's not really the minimum because if it's the minimum they

 9   wouldn't be working for me, sir.  It's really to try to

10   maximize the amount of money that they can make at any given

11   day.  So I'm more the opposite than the minimum.  Because the

12   minimums are not staying with me.

13           THE COURT:  All right.  I'm going to stop for now.

14   We're going to take hour one-hour lunch break at this time.

15   And then we will continue with the witness.

16           You may step down.

17           THE WITNESS:  Yes, ma'am.

18           (Witness excused)

19           (Luncheon recess)

20           (Continued on next page)

21

22

23

24

25

ECG5sal4

```
 1                    A F T E R N O O N   S E S S I O N

 2                             1:35 p.m.

 3             THE COURT:  Mr. Androphy?

 4             MR. ANDROPHY:  Counsel for both sides have conferred

 5   and we would like to jointly offer the following exhibits into

 6   evidence Plaintiff's Exhibit 1 through 26 and Plaintiff's

 7   Exhibit 76 through 80 and Defendant's Exhibit A.

 8             THE COURT:  They are admitted.

 9             (Plaintiff's Exhibits 1 - 26 received in evidence)

10             (Plaintiff's Exhibits 76 - 80 received in evidence)

11             (Defendant's Exhibit  80 received in evidence)

12             THE COURT:  Mr. Scotto?

13             THE WITNESS:  May I?

14             THE COURT:  Remember that you are still under oath.

15             THE WITNESS:  Yes, your Honor.

16   BY MR. ANDROPHY:

17   Q.  Mr. Scotto, you are familiar with overtime laws, correct?

18   A.  Yes, sir.

19   Q.  And you are aware that, generally, they require an employer

20   to pay employees who work above 40 hours per week at one and a

21   half times their regular rate for all hours above 40 in the

22   week?

23   A.  Yes, sir.

24   Q.  At Fresco what time do bussers typically work on a Saturday

25   shift?
```

ECG5sal4

```
 1   A.  3:30 to 4:00, I think.

 2            What time do they come in at?

 3   Q.  Yeah.  Let's start with what time they come in at.

 4   A.  I think it is 3:30, 4:00.

 5   Q.  And what time do they typically leave at the end of their

 6   shift?

 7   A.  Depending.  And again, it is all scattered.  I would tell

 8   you that some could be leaving at 9:00, 9:15, 9:30 as it goes

 9   from there type of situation.

10   Q.  Speaking specifically before 2011, was a Saturday shift

11   typically longer than a weeknight dinner shift?

12   A.  With the exception of Friday I would tell you that during

13   the week is definitely busier than Saturdays.

14   Q.  Not just specifically busier but -- strike that.

15            A Saturday dinner shift would start earlier than a

16   weeknight dinner shift, is that correct?

17   A.  I think it's 5:00 or 5:30.  I think it is the same.

18   Q.  As far as the time the employees would come in?

19   A.  For the customers to come in?

20   Q.  I am sorry.  I wasn't clear.

21            As far as the time the employees would come in?

22   A.  I don't think they would come in earlier because it is a

23   Saturday.  I don't think that is the case.  It is about the

24   opening time, it is about -- I think it is the same time as our

25   regular day.
```

ECG5sal4

```
1    Q.  And would the restaurant typically close later on Saturdays
2    compared to the rest of the week?
3    A.  No.  Again, I would tell you that Saturdays, as you call
4    it, are -- because we're a midtown restaurant it is a
5    destination, no one is working around, no one is coming in -- I
6    mean, after 9:30 no one is there.  So, I will tell you during
7    the week is busier than on the weekends.
8              MR. ANDROPHY:  I have no further questions.
9              THE COURT:  Redirect?
10   REDIRECT EXAMINATION
11   BY MR. BENSON:
12   Q.  Good afternoon, Mr. Scotto.
13   A.  Sir.
14   Q.  There were some questions on cross-examination regarding
15   your mother Marion Scotto.  Putting aside maternal
16   considerations, is Marion Scotto the boss at Fresco?
17   A.  No, sir.
18   Q.  Who is the boss at Fresco?
19   A.  Me.
20   Q.  Is Marion Scotto involved in the decision making concerning
21   the terms and conditions of employment of the plaintiffs?
22   A.  No, sir.
23   Q.  Do you discuss scheduling with her?
24   A.  No, sir.
25   Q.  Pay raise?
```

1   A.  No, sir.

2   Q.  Discipline?

3   A.  No, sir.

4   Q.  Hiring and firing?

5   A.  No, sir.

6   Q.  Are you familiar with a concept of working what are

7   referred to as doubles?

8   A.  Yes, sir.

9   Q.  And what is that?

10  A.  Working lunch and dinner shift, sir.

11  Q.  Is that on the same day?

12  A.  Yes, sir.

13  Q.  Does whether one is working a double have any impact on the

14  shift lengths of lunch and/or dinner?

15  A.  Sir, if you are asking me if somebody works lunch and

16  dinner compared to just a lunch?

17  Q.  Yes?

18  A.  Yes.  Tremendous impact, actually.

19  Q.  How is that?

20  A.  Well, the start times are -- well, if everybody would come

21  in at 10:00 still if they worked lunch or dinner -- I'm sorry.

22          If you worked a lunch double or a lunch single, so no

23  dinner, I would tell you that everybody would still come in at

24  10:00.  But, the person that's working the double would get out

25  earlier, much earlier than the closer.  So, for example, if

Miguel, who we have talked about a couple of times here just as

an example, would work lunch and dinner today, Miguel would

have come in at 10:00, he would have left at 2:00, 2:10, 2:15,

as soon as we started slowing down, and then wouldn't come back

until 5:00 and then would still get out earlier that night

anyway because he has worked that double.

Q.  So, is it true that the shift times would be less when one

works a double?

A.  Yes.

Q.  Now, there was also some questions with respect to the,

quote unquote, expediter.  Would you please explain to the

Court what an expediter is and what an expediter does?

A.  Yes.

At the restaurant there is a microphone when you walk

into the restaurant -- I'm sorry, into the kitchen of the

restaurant.  When you walk into the kitchen there is a

microphone and there is usually a chef or a sous chef at that

position.  That position is called the expediter position.

There is no other expediter in the restaurant.

Your Honor, when you walk in and the tickets are

coming into the kitchen, there is only one person calling those

tickets into the line to let them know what has to be cooked.

If there are two people doing that it is nothing but confusion

because who said that, who said this, who is doing this and who

was doing that, that is never the case.  In every restaurant,

1    in any restaurant I have ever worked in there is only one

2    person calling the tickets in and then one person helping

3    expedite those tickets out.

4            So, what happens is the expediter calls in the

5    tickets, or usually a chef or a sous chef or someone if they're

6    not there I pay to be in that position.  Next to him is a

7    person that is a senior runner for that position, for that

8    shift.  And we have mentioned Klever and a bunch of other

9    people in that position.  Pablo, I think, was in that position

10   at one time also.

11           What their job was then is to get those tickets

12   together, not the deuces and the four-tops because you had

13   other runners that can get that done but you are talking about,

14   your Honor, close to 19 tables that could be 12 to 14-tops,

15   plus a party upstairs could be 35 or 40, plus the bar area that

16   is seating a la carte in one seating.  At Fresco by Scotto we

17   serve lunch from 12:15 to 12:30 until 1:15 to 1:30 until they

18   have coffee about 2:00.  Dinner, as soon as we open the door at

19   5:00, 5:30, we are busy up until 8:30, quarter to 9, and then

20   all of a sudden everybody, by 9:30, is gone from my location

21   because no one lives in the area, they come to me.

22           So, when you look at the expediter, the expediter

23   calls the ticket and the head runner puts those tickets

24   together, that head -- the head person, the one sitting next to

25   the expediter is the one that is getting all those tickets

ECG5sal4                      A. Scotto – redirect

together, allowing for those big tables to be finished and

making sure they're not going to make a mistake.  It is not

just one table, it could be seven of all those tables together.

So, he is lining those tables up to make sure they're getting

done and he is grabbing not the expediter, by the way, he is

grabbing the coffee man, the stocker, he is grabbing a busboy

that happens to run through, me, any of the captains, some of

the managers.  Anybody that happens to be in there:  Table 14,

position 3; table 15, position 1.  And this is what that person

is doing.  When he knows that ticket is complete and there is

two or three dishes left, he finishes the table.  He goes to

the next.

          THE COURT:  What do you mean he finishes the table?

          THE WITNESS:  So, he has to be the one to finish the

table because he has the ticket.

          THE COURT:  Do you mean he delivers the food?

          THE WITNESS:  Yeah.  He has to finish the ticket, it

is in his hand.  So, he is calling out all the orders, table 14

now, table 15, 16, could be 20 tops that he is making sure

everybody is running all of that food and he is the one that is

last out with the ticket in his hand because he has to check

that table to make sure that all the people are at the table

and they've gotten fed and we haven't messed it up.  Cheese and

pepper, making sure everybody is happy, going back into the

kitchen.

1          There is also side dishes that no one talks about that

2     we have to make sure that we have to gather together all side

3     dishes to go out to the entree that is going out there.  You

4     have pastas going on upstairs, appetizers going on at the bar.

5     It is a free-for-all.

6          The person that is in the kitchen that stays in the

7     kitchen is the person at the microphone.  Everyone else:

8     Stockers, runners, busboys, anybody that is in a suit, anybody

9     that is in uniform is out of the kitchen making sure they're

10    getting the food delivered at all times.

11    BY MR. BENSON:

12    Q.  Now, are there ever occasions when you assign a runner to

13    handle the responsibilities at the microphone?

14    A.  If I have hired a runner to be an expediter, the person

15    that is staying at the microphone, it is paid by me.  And, yes,

16    I have done that.

17    Q.  And do they participate in the tip pool in that situation?

18    A.  No.

19    Q.  So, the runner who is given the, quote unquote, expediter

20    assignment, is the person that stands next to what you have

21    described as the expediter, correct?

22    A.  We have talked earlier about me having to mentor certain

23    people just in case somebody should get sick or something

24    should happen.  What we always did is we took the head runner

25    that was working with the person that is with the expediter to

1   make sure if something should happen to the expediter that

2   someone else can take that position over.

3              So, it is just –– but by them staying next to him is

4   understanding what is going on with the mic and all of that,

5   but his position that he does to do everything else, he is

6   running food constantly.

7   Q.  Now, you gave some testimony regarding when Brent Drill got

8   promoted in January of 2013.  Did Mr. Drill's service

9   responsibilities change as a result of the promotion?

10  A.  No, sir.

11  Q.  Did he have any additional responsibilities as a part of

12  the promotion?

13  A.  Yes.

14  Q.  What were those?

15  A.  I allowed him to start doing some of the writeups.  I

16  allowed him to do some of the items in the scroll computer.  I

17  allowed him to do a little bit more ordering so back of the

18  house stuff I allowed him to do a little bit more.

19  Q.  Prior to that time, was Mr. Drill involved in writing up

20  any discipline?

21  A.  No, sir.

22  Q.  Prior to that time was Mr. Drill involved in any hiring and

23  firing?

24  A.  No, sir.

25              MR. BENSON:  I have no further questions, your Honor.

1            THE COURT:  Recross?

2    RECROSS EXAMINATION

3    BY MR. ANDROPHY:

4    Q.  Before January 2013, if someone came in to apply for a

5    position for busboy and you weren't available at the time,

6    would Mr. Drill meet with the busboy and take his information?

7    A.  He might shake his hand and, again, if it was a busboy?

8    Because there are two clarifications.  If it was a busboy he

9    would probably shake his hand, talk to him for a second, come

10   back tomorrow because, as I discussed earlier, a busboy is a

11   little bit more fickle when we are having to hire them so we

12   want to make sure we are grabbing them and holding them.  If

13   they understand that we are just going to call them again

14   sometime again it doesn't work, they've already found another

15   job.  So, we kind of force them into coming back and seeing us

16   in the morning and they usually see me.

17   Q.  So, before January 2013 Mr. Drill could meet with a busboy

18   applicant and tell them come back for training; is that

19   correct?

20   A.  It is not come back for training, it is just come back in

21   the morning.  He is grabbing the resume, come back in the

22   morning, we will see you in the morning.  Absolutely.

23            And that was James, too, by the way.  Sorry.

24            MR. ANDROPHY:  No further questions.

25            MR. BENSON:  Nothing, your Honor.  Thank you.

ECG5sal4                        A. Scotto – recross

1          THE COURT:  Thank you, sir, you may step down.

2          THE WITNESS:  Thank you, ma'am.

3          (Witness excused)

4          THE COURT:  You may call your next witness.

5          MR. BENSON:  Thank you, your Honor.

6          MS. KABIR:  Defendants call Natasha Gelman.

7          MR. BENSON:  Your Honor, before we call Ms. Gelman may

8    we approach the bench?

9          THE COURT:  All right.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ECG5sal4

```
 1              (At side bar)
 2              MR. BENSON:  Ms. Gelman recently had brain surgery,
 3    and while she is fully capable of testifying and has recovered,
 4    I just want the Court to be mindful of if she needs a break or
 5    anything like that, if she appears to be physically struggling.
 6              THE COURT:  Of course.
 7              MR. BENSON:  Okay.
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

ECG5sal4

```
 1              (In open court)

 2      NATALYIA GELMAN,

 3          called as a witness by the Defendants,

 4          having been duly sworn, testified as follows:

 5              THE DEPUTY CLERK:  Please state your full nail and

 6      spell it slowly for the record.

 7              THE WITNESS:  My full name is Natalyia Gelman.

 8      N-A-T-A-L-Y-I-A, and last name:  G-E-L-M-A-N.

 9              MS. KABIR:  Your Honor, may I approach the witness to

10      hand her a copy of her exhibits?

11              THE COURT:  You may.

12      DIRECT EXAMINATION

13      BY MS. KABIR:

14      Q.  Ms. Gelman, before you marked as Exhibit M is a copy of the

15      original affidavit you signed on October 7th, 2014.  Can you

16      please review the last page of your affidavit?

17      A.  The last page?

18      Q.  The last page of the affidavit itself, not the attachment.

19      A.  Okay.  I look at this.

20      Q.  Is that your signature on that page?

21      A.  Yes.

22              MS. KABIR:  We move for the affidavit and the exhibits

23      to be moved into evidence as Exhibit M.

24              THE COURT:  Any objection?

25              MR. ANDROPHY:  No objection.
```

1          THE COURT:  They're admitted.

2          (Defendant's Exhibit M received in evidence)

3          MS. KABIR:  We have no further direct examination for

4    this witness.

5          THE COURT:  Cross-examination?

6    CROSS EXAMINATION

7    BY MR. ANDROPHY:

8    Q.  Good afternoon, Ms. Gelman.

9    A.  Good afternoon.

10   Q.  You have worked for Fresco by Scotto since it opened in

11   1993; is that correct?

12   A.  Yes.

13   Q.  Do you consider yourself close to the Scotto family?

14   A.  You know, I working for anyone years of course it is like,

15   you know, I spent on the book more time than I spend at home.

16   Q.  Do you consider the members of the Scotto family personal

17   friends?

18   A.  No.  No.

19   Q.  Did you know any of the members of the Scotto family before

20   you began working for them in 1993?

21   A.  No.  I met Anthony Scotto before I start working with them

22   but it was in another place that I working at, Cafe Iguana on

23   Park Avenue.

24   Q.  Had you worked as a bookkeeper for anyone else before

25   working at Fresco by Scotto?

ECG5sal4                          Gelman - cross

1    A.   Yes.

2    Q.   And where was that?

3    A.   Cafe Iguana.

4    Q.   During the time that you have worked at Fresco, have you

5    also worked anywhere else?  Or has Fresco been your full-time

6    job?

7    A.   No.  Fresco was my full-time job.

8    Q.   It is correct that before June 2011 Fresco would pay

9    employees, such as busboys, based on the number of shifts that

10   they worked, correct?

11   A.   Yes.  This is correct.

12   Q.   Who decided how many hours each shift would be paid?

13   A.   It was always my boss Anthony Scotto.  He used to -- I mean

14   he is like general manager in the place.

15   Q.   Did the number of hours per shift that would be paid, did

16   that change week to week?  Or was that a set amount?

17   A.   No.  No, it doesn't change week to week.  You know, it was

18   a period of time, you know, in years when we have less business

19   and we were closed earlier, you know, and this is what it start

20   change, with the hours.

21   Q.   So is it then correct that each week --

22   A.   No, it is not each week.

23   Q.   Hold on, let me finish -- that each week you would

24   determine how much or how many hours each employee should be

25   paid for?  That's correct?

ECG5sal4                    Gelman - cross

1    A.  Yes.  That's right.  Yes.

2    Q.  And so you would have instructions from Anthony Scotto as

3    to how many hours to pay for each shift?

4    A.  Yes.

5    Q.  Okay.  And those would be the same instructions for each

6    busser, correct?

7    A.  Yes.

8    Q.  And would anyone tell you, on a weekly basis, that a

9    particular busser worked a longer shift and therefore should be

10   paid a different amount?

11   A.  No.

12   Q.  Now, do you know if during this time before June 2011 if

13   all bussers worked the same number of hours on each shift?

14   A.  It's not necessary but I didn't know about this and, you

15   know, it could be some of them working five hours, some of them

16   working three hours.  So, and we start to do the scroll system,

17   you know, punch-in and out, and you can see from this how many

18   hours they really work.

19   Q.  Right.  Okay.

20        Now, in paragraph 31 of your affidavit, on page 7 --

21   A.  31?

22   Q.  Yes, paragraph 31 you say:  For example, the longest lunch

23   shift for a busser or runner typically lasted from 10:00 a.m.

24   until 3:00 p.m.

25        Do you personally know if the lunch shift ever lasted

ECG5sal4                          Gelman - cross

1   longer than that?

2   A.  No.  It's never last longer.

3   Q.  Is that your personal knowledge and observation that --

4   A.  We open from 11:00 so, you know, from 11:00 until 2:30

5   basically to 2:00 all lunch crowd were gone.

6   Q.  Would you be on the floor during a lunch shift?

7   A.  No.  You know, I just going to the bathroom during the

8   lunch shit or dinner shift.  You know, this is all the time

9   when I'm going upstairs.

10  Q.  Okay.  Otherwise you would be in your office?

11  A.  Yes; downstairs in the basement.

12  Q.  And so, if a busboy would work until 3:30 or 4:00 p.m. on

13  the lunch shift, you wouldn't know that, would you?

14  A.  I didn't see this, you know?

15  Q.  On paragraph 32 you say:  When the restaurant is at its

16  busiest, the dinner shift typically lasts from 4:00 p.m. until

17  11:00 p.m. including a 30-minute family meal break between 4:30

18  and 5:00 p.m.

19          Do you have any personal knowledge of what time

20  employees would leave at the end of the shift?

21  A.  No.  I never stay later than 8:00 p.m. so I don't know what

22  really time they left but, again, from the punch report and

23  payroll report I know they don't leave so late, you know?

24  Because we usually have close waiter and close busboy and they

25  leave -- they come in late and they leave later, you know?  So.

ECG5sal4                      Gelman - cross

1    Q.  Okay.  And before the restaurant started using the punch

2    system you wouldn't know that if an employee worked until

3    midnight, would you?

4    A.  No.  You know, but we kitchen close at 11:00 and it wasn't

5    even -- you know, we never have late crowd in the restaurant,

6    you know?  So, I know for sure that they never stay late.

7    Maybe during December, you know, when we have Christmas party

8    or whatever, but during the regular time it's never.

9    Q.  Also in paragraph 32 you say:  During these busy periods

10   the restaurant would pay seven hours of minimum wage for dinner

11   for a maximum of six and a half hours spent on compensable

12   work.

13         By "during these busy periods," does that mean

14   seasonally?

15   A.  No.  I mean just Christmastime, and it is usually start in

16   the end of November and it's finished before Christmas.

17   Q.  So, during November/December the restaurant would pay

18   these -- pay, as you say, seven hours of --

19   A.  Yes, exactly.  But, you know, sometimes even for the

20   Christmas we weren't busy because it was, you know, like,

21   economically it wasn't good time.

22   Q.  Paragraph 34 on the next page, page 8, you say that:  In or

23   around July 2008, coincidental with the downturn in the economy

24   the volume of business in the restaurant had declined, the last

25   lunch customer would be gone by 2:00 p.m. and the last dinner

1  customer would be gone by 9:00 p.m. or 9:15 p.m.

2          Did you personally observe when the last dinner or

3  last lunch customer would leave?

4  A.  No.  I personally didn't observe, but whatever I can say

5  you because we have, every day we have report punch -- not

6  punch report, I mean sales report and sales report, it's

7  usually, it says what time it was run and I know it was usually

8  very early.  And usually this report runs when everybody gone

9  already.

10 Q.  Do you know if bussers would have to do anything at the end

11 of their shift after the last customer would leave?

12 A.  You know what?  I don't know their responsibility, you

13 know?  I'm honest with you, I don't know.  I never observed

14 this and I just know by name and everybody but not whatever

15 they're doing, what their job supposed to be done.

16 Q.  If you could take a look at document that's been marked as

17 Plaintiff's Exhibit 118?  Do you recognize the first page of

18 this document?

19 A.  Yes.  It is represent the tips for the week.

20 Q.  Do you recognize the second, third and fourth pages of this

21 document?

22 A.  Yes.

23 Q.  And what are they?

24 A.  These are actually hours they were working, the tips, and

25 the meal factor.

1             THE COURT:  Is this an already admitted exhibit?

2             MR. ANDROPHY:  Yes.

3             THE COURT:  Which one?

4             MR. ANDROPHY:  This is 118, the first page is Fresco

5    3360 -- Fresco by Scotto 3360.

6             THE WITNESS:  And it is actually, you know, start with

7    dishwasher too.

8    BY MR. ANDROPHY:

9    Q.  I'm sorry.  Are you referring to the second page?

10   A.  Yes.  Oh no, on first page -- on second page, right, after

11   this.  Payroll worksheet.

12   Q.  Okay.

13   A.  It starts with Alvarado Pablo.  This is a busser and runner

14   but before it was dishwasher.

15   Q.  Thank you.

16   A.  You're welcome.

17   Q.  And it is your testimony that this time, May 2010, the

18   restaurant was paying five hours per shift, is that correct,

19   for both lunch and dinner?

20   A.  Yes.

21   Q.  Looking at the first page is it correct that Pablo

22   Francisco, this week, worked nine shifts?

23   A.  I'm very --

24   Q.  I'm referring to the first page of the document.  Sorry.

25   Let me withdraw that question.

ECG5sal4                              Gelman - cross

1              This first page of the document --

2    A.  Yes, it is just seven shifts for Pablo.  I just counted.

3    Q.  Sorry.  I asked about Pablo Francisco.  I think you might

4    be looking at Pablo Alvarado.

5    A.  Yes, Pablo Francisco.  Yes, I see this.

6    Q.  So, he worked nine shifts, correct?

7    A.  Uh-huh.

8    Q.  And if you look at the third page of this document --

9    A.  Yeah, 40 hours.

10   Q.  Right.

11             So you are saying that Pablo Francisco was paid for 40

12   hours of work?

13   A.  Yes.

14   Q.  When he worked nine shifts?

15   A.  Yes.

16   Q.  And is nine shifts by five hours, shouldn't that have been

17   45 hours?

18   A.  But, you know, if you look at another stop because in this

19   time we usually paid him 40 hours, but if you look at another

20   week, another week he probably work five shifts or four shifts

21   but I still pay him 40 hours.  And this was our practice, we

22   usually pay 40 hours.

23   Q.  So, is the practice that even if someone worked nine shifts

24   or 10 shifts they would be paid for 40 hours?

25   A.  But, you know, they're really rare working so many shifts.

ECG5sal4                          Gelman - cross

1    Q.  Can you look at the first page again?  Enrique Salinas.

2    A.  Okay.

3    Q.  He worked 10 shifts, correct?

4    A.  Okay.  Yes.

5    Q.  And then looking at the last page he was paid for 40 hours,

6    correct?

7    A.  Yes.  Again, this is what I told you.  Usually I pay them

8    40 hours weekly.

9    Q.  And then same thing for Luis Roballo, correct?  He worked

10   nine shifts?

11   A.  Roballo?

12   Q.  Roballo.

13   A.  Yes.  Probably somebody was sick or somebody was out and

14   this is how it's come, but usually he didn't work so many

15   shifts.

16   Q.  But this week he worked nine shifts, correct?

17   A.  Yes.

18   Q.  And he was paid for 40 hours?

19   A.  Yes.

20   Q.  Nahun Flores; he worked eight shifts, correct?

21   A.  Yes, but Nahun Flores, he usually does the coffee job and

22   this I know he never even was working five hours.

23   Q.  Okay.  This week he worked eight shifts, correct?

24   A.  Okay.

25   Q.  And he was also paid for 40 hours?

ECG5sal4                          Gelman - cross

1    A.   Yes.

2    Q.   Now, did you decide, yourself, that if an employee worked

3    nine shifts or 10 shifts that they would only be paid for 40

4    hours?

5    A.   No.  I would usually ask Anthony Scotto.

6    Q.   So you would ask Anthony?

7    A.   Yes.

8    Q.   And he would instruct you if they worked more than --

9    A.   Yes.

10   Q.   -- eight shifts to pay them for 40 hours?

11   A.   Yes.

12   Q.   Looking again at your affidavit, paragraph 32, so you

13   testified that when the restaurant was at its busiest the

14   dinner shift typically lasts from 4:00p.m. until 11:00 p.m.

15   including a 30-minute family meal break between 4:30 and 5:00

16   p.m., and during these periods the restaurant would pay seven

17   hours of minimum wage for dinner for a maximum of six and a

18   half hours spent on compensable work.

19   A.   Yes.

20   Q.   So, it is your understanding that during that time

21   employees were paid for the time of the meal break even though

22   they --

23   A.   You know what?  I cannot tell you if it was meal break or

24   when they come or they come later or they finish earlier.  I

25   cannot tell you but this is what the policy, seven hours.

ECG5sal4                     Gelman - cross

1   Q.   Okay.

2            Now, around June 2011 the restaurant started keeping

3   track of the time worked by bussers and waiters and food

4   runners on the time clock, correct?

5   A.   Yes.

6   Q.   And you testified in paragraph 46 on page 10:  After the

7   restaurant started using the POS system to track time, the

8   amount of unpaid time was reduced to 20 minutes per each lunch

9   and dinner shift even though the time and duration of the

10  family meal periods did not change.

11           So, does that mean that there would be 20 minutes

12  subtracted from the amount of time that -- between when an

13  employee clocked in and when an employee clocked out?

14  A.   You know what?  I never look at this this way because I use

15  payroll report total hours and I never divide this, what it was

16  for break for the food or it was break for something else.  But

17  whatever was on the payroll report, whatever I paid them.  And

18  on this time I don't even use this exists but I know this

19  should be by law or whatever but I don't even know about this.

20  Q.   So, each week, once the time system was installed, is it

21  correct that you would look at that -- look at reports and see,

22  determine how many hours employees should be paid for?

23  A.   Yes.  Exactly right.

24  Q.   Ms. Gelman, do you have in front of you the exhibits to

25  your affidavit?

ECG5sal4                        Gelman - cross

1   A.   Yes, I think so I have.  I have here.

2   Q.   The first exhibit, Exhibit 2A, is this an example of

3   document you would review to determine how much -- how many

4   hours employees worked once the time clock was used?

5   A.   It's payroll report, right?

6   Q.   Yes.

7   A.   Yes.  This is what I use.

8   Q.   And would you just look at the total for the week generated

9   by this to determine how much each employee should be paid?

10  A.   Yes.  You mean this 1,111?

11  Q.   Well, I meant for each employee.

12  A.   For each employee, yes, and this is what I pay on the

13  paycheck.

14  Q.   And were you aware at any time that the total would be

15  approximately 20 minutes less than --

16  A.   No.  I never look at this.  I take the total numbers.

17  Q.   Okay.

18  A.   I didn't do the math, you know, every day.

19           MR. ANDROPHY:  I have no further questions.

20           THE COURT:  Redirect?

21  REDIRECT EXAMINATION

22  BY MS. KABIR:

23  Q.   Ms. Gelman, you testified on cross-examination that

24  Mr. Scotto instructed you to pay certain bussers 40 hours per

25  week during the shift, correct?

ECG5sal4                    Gelman - redirect

1   A.  Yes.

2   Q.  And you mentioned that sometimes you paid 40 hours when

3   bussers worked only four or five shifts per week?

4   A.  Yes.

5   Q.  Can you please explain what you meant by that?

6   A.  Because, you know what?  It was 40 hours every week but

7   sometimes they're working less, sometimes they're working more

8   shifts and this is how we determine it, I determinated it.

9   Q.  And, on average, how many shifts per week did bussers work?

10  A.  You know, it is probably around seven shifts.

11  Q.  How often would you say --

12          THE COURT:  So, the custom was to estimate?

13          THE WITNESS:  No, it wasn't estimate but, you know,

14  whatever it was 40 hours per week it was 40 hours per week.

15          THE COURT:  No matter how many shifts you work?

16          THE WITNESS:  Yes.

17          THE COURT:  It always comes out to 40 hours a week.

18          THE WITNESS:  Yes.  Yes.  Exactly right.

19  BY MS. KABIR:

20  Q.  Do you know before the restaurant started using a time

21  clock if the bussers, on a particular shift, would all leave at

22  the same time?

23  A.  No.  They never leave in the same time because, you know,

24  sometimes when they're going upstairs I see we have still

25  customer in the dining room but bussers already gone.  It is

ECG5sal4                    Gelman - redirect

1    one to two bussers on the floor.

2    Q.  Did that change after the restaurant started using a time

3    clock?

4    A.  No, it's not change, because if you look at the punch

5    report now and payroll report, you know, for the lunch?

6    They're sometimes just working two hours, two hours 30 minutes.

7    That's it.

8    Q.  You also mentioned in your cross-examination testimony that

9    there is a different report that is not a time punch report

10   that prints out every night.  Can you please explain what

11   report you are referring to?

12   A.  Whatever I have sales report every night; sales report,

13   credit card report, words report, promo report, item report.

14   Just name it, it is like 20, 25 pages.

15   Q.  Did that report run before the restaurant started using a

16   time clock?

17   A.  It is always run, this report.

18   Q.  When did you review those reports?

19   A.  Every morning when I come I do the sales number.

20   Q.  You also mentioned that since the restaurant started using

21   a time clock you reviewed these weekly time punch reports for

22   the totals in terms of the number of hours worked per week,

23   correct?

24   A.  You know?  I do this because I still using tip sheets, you

25   know, and sometimes special bussers and runners, they don't

ECG5sal4                    Gelman - redirect

1    punch-in and out.  And so, if I see that I have the tips on the

2    report, I know they were working this time because they signed

3    for those tips.  So, I added the time for this.  If it is not

4    on the payroll report I added the hours whatever they were

5    working because they got the tips.  And I usually determinate

6    this but the guy who is working on the floor on the same time

7    for lunch and dinner, how many hours that they on the floor and

8    I basically got paid for those hours, whatever, they never

9    punch-in or out.  And this is happen basically very often.

10          MS. KABIR:  We have no further questions for this

11   witness.

12          THE COURT:  All right.  Thank you, ma'am.  You may

13   step down.

14          (Witness excused)

15          THE WITNESS:  I am done?

16          THE COURT:  You are done.

17          THE WITNESS:  Thank you very much.

18          THE COURT:  Your next witness, Mr. Benson?

19          MR. BENSON:  Attilio Vosilla.

20    ATTILIO VOSILLA, JR.,

21        called as a witness by the Defendants,

22        having been duly sworn, testified as follows:

23          THE DEPUTY CLERK:  Please state your full name for the

24   record.

25          THE WITNESS:  Attilio Vosilla, Jr.  A-T-T-I-L-I-O

ECG5sal4

1   V-O-S-I-L-L-A, Jr.

2          MR. BENSON:  Your Honor, may I approach the witness?

3          THE COURT:  You may.

4   DIRECT EXAMINATION

5   BY MR. BENSON:

6   Q.  Mr. Vosilla, I am going to show you what's been marked

7   Defendant's Exhibit N and ask you if you recognize that.

8   A.  I do.

9   Q.  Will you turn to the last page?  Is that your signature?

10  A.  It is.

11  Q.  Does that represent your true, full and accurate testimony

12  in this proceeding?

13  A.  It does.

14          MR. BENSON:  Move into evidence, your Honor.

15          THE COURT:  Any objection?

16          MR. ANDROPHY:  No objection.

17          THE COURT:  It is admitted.

18          (Defendant's Exhibit N received in evidence)

19          MR. BENSON:  No further questions.

20          THE COURT:  Cross-examination.

21  CROSS EXAMINATION

22  BY MR. ANDROPHY:

23  Q.  Good afternoon, Mr. Vosilla.

24          In your affidavit at paragraph 4 you say, quote:  I

25  don't have an official title.

1              Correct?

2     A.  Yes.

3     Q.  Isn't it true that since at least 2007 your title at Fresco

4     has been and still is manager?

5     A.  I take care of the service so service manager, I guess.

6     Q.  If you can turn to, in this binder Plaintiff's Exhibit 74?

7     It is tabbed, it is towards the end.

8              At page 2 of that document in the first paragraph --

9     sorry, in the first section do you see where it says:  The

10    restaurant managers are Anthony Scotto, Jr., Attilio Vosilla,

11    and Brent Drill?

12    A.  I do.

13    Q.  So were you in fact a restaurant manager at that time?

14    A.  Service manager.  Same thing as restaurant manager.

15             THE COURT:  I'm sorry, sir, but I need for you to

16    speak up.

17             THE WITNESS:  Okay.

18             (Record read)

19    Q.  So, to you that means the same thing; service manager and

20    restaurant manager?

21    A.  Yes.

22    Q.  And, during your time at Fresco you've signed documents as

23    a manager; is that correct?

24    A.  Per Anthony's instruction, yes.

25    Q.  And you were hired to work as a manager, correct?

ECG5sal4                    Vosilla - cross

1    A.   Correct.

2    Q.   And when were you hired by Fresco?

3    A.   19 -- 15 years ago, 1999.

4    Q.   And, is it true that over those approximately 15 years your

5    duties have not changed much?

6    A.   Not too much.

7    Q.   And as part of those duties you can discipline employees,

8    correct?

9    A.   Not without Anthony's approval.

10   Q.   Is it your testimony you can discipline employees with

11   Anthony's approval?

12   A.   No.  I will bring any issues up with Anthony who will

13   direct me as to what to do.

14   Q.   And you can write up an employee on employee

15   communications, is that correct?

16   A.   Correct; after speaking with Anthony, yes.

17   Q.   If someone comes late to work you can write them up?  Is

18   that correct?

19   A.   If it becomes excessive, correct.  But, again, bringing it

20   up with Anthony.

21   Q.   Does it ever happen that you bring something up to Anthony

22   and he tells you don't write this person up?

23   A.   I don't remember.

24   Q.   So you can't recall that ever happening, can you?

25   A.   No.

1          THE COURT:  So you are saying it never happened?  Or

2     you cannot recall whether it happened?

3          THE WITNESS:  Whether it happened.

4     BY MR. ANDROPHY:

5     Q.  So you can't remember a single example where you came to

6     Anthony and said we should discipline this employee or write

7     them up and he said don't do that?

8          MR. BENSON:  Asked and answered, your Honor.

9          THE COURT:  Sustained.

10    Q.  Is it correct that you prepared the weekly schedule for

11    Fresco's service employees?

12    A.  I -- yes.  I update the schedule and then leave it for

13    Anthony for approval, and he makes any changes afterwards.

14    Q.  So, each week you create the initial schedule, correct?

15    A.  It is a template that we go over, yes.

16    Q.  And have you done that since 1999?

17    A.  No.  I don't remember when I started doing that, but it

18    wasn't at the beginning.

19    Q.  Was it in the past three years that you started that?  Or

20    earlier.

21    A.  Probably a little earlier than that.

22    Q.  Have you done that since at least 2007, if you can recall?

23    A.  Yeah.  I guess.

24    Q.  Now, when you bring the schedule to Mr. Scotto for

25    approval, what types -- does he ever -- sorry.  Withdrawn.

1          When you bring the schedule to Mr. Scotto for

2     approval, does he ever make changes?

3     A.  He has.

4     Q.  And are those changes always either to add or reduce staff

5     for given shifts?

6     A.  Depending on the business.

7     Q.  Does he ever make changes that involve swapping out

8     employees for a shift?  So, for example, if you have Enrique

9     scheduled for a shift does Anthony ever say don't schedule

10    Enrique, schedule Pablo for the shift?

11    A.  Not to me.

12    Q.  And does Anthony ever direct you to change the job

13    assignments for a shift?  So, for example, if someone is not a

14    stocker, does Anthony ever tell you make someone else the

15    stocker?

16    A.  What he does with the schedule after I give it to him,

17    that's his discretion.

18    Q.  Are you aware of him ever making that sort of change?

19    A.  Well, I leave it for him and then he takes care of it the

20    next morning, so I'm not there.

21    Q.  So you're not aware of any changes like that?

22    A.  I don't know.

23    Q.  You're usually at the restaurant during the dinner shift

24    from Tuesdays through Saturdays, is that correct?

25    A.  Correct.

ECG5sal4                    Vosilla - cross

1    Q.  And on those nights you're the last person at the

2    restaurant and you close it up, is that correct?

3    A.  Correct.

4    Q.  And do bussers need to check in with you before they leave

5    for the end of their shift?

6    A.  Well, their schedule times are staggered so the earlier

7    ones will leave earlier and then there is usually a closer or

8    two who will finish up the side work.

9    Q.  Do they need to check with you to make sure it is okay for

10   them to leave?

11   A.  They usually will.

12   Q.  Bussers at Fresco are paid on an hourly basis currently; is

13   that correct?

14   A.  I'm not sure.

15   Q.  If a busser has an issue with his schedule would you be

16   able to make a schedule change?

17   A.  I'm not sure of the question.

18   Q.  If an employee who, let's say, is scheduled to work a lunch

19   shift on Thursday and for whatever reason they're not able to,

20   are you able to change the schedule so that someone else would

21   fill in?

22   A.  Before or after the schedule is posted?

23   Q.  Before.

24   A.  They'll usually hand in, you know, they'll write down a

25   request.

ECG5sal4                    Vosilla - cross

1   Q.  And how about after the schedule is posted?  Would you be

2   able to make a schedule change?

3   A.  Those are usually even swaps with another employee.

4   Q.  Would you be the one to authorize that?

5   A.  I could be.

6   Q.  And a captain, somebody who is just a captain and not a

7   manager wouldn't be able to make that change, would he?

8   A.  No.

9           THE COURT:  Who are the captains?

10           THE WITNESS:  In terms the people, what their job is?

11           THE COURT:  No.  I'm saying who -- what are the names

12   of the captains at the restaurant?

13           THE WITNESS:  There is a few.  There is -- it is

14   usually waiters that have been there for a while and we use

15   them as captains.  There is several.

16           THE COURT:  So, for example, who are the captains?

17           THE WITNESS:  Peter Bretts, Dennis Ryan, Darden Hodi,

18   Michelle Reyes.  But they're also waiters and bartenders, too,

19   when they're not being used as a captain.

20   BY MR. ANDROPHY:

21   Q.  Do you run the pre-shift meeting with service employees

22   before the dinner shift?

23   A.  The pre-shift meeting is with myself, the chef, and usually

24   Anthony.

25   Q.  You are familiar with the work that's done by the person

1   assigned to the stocker position, correct?

2   A.  Correct.

3   Q.  And is it true that the stocker's main responsibilities are

4   to polish the silverware and make sure that the stocking

5   stations on the floor are properly stocked with silverware and

6   glasses and plates?

7   A.  Correct.

8   Q.  Sometimes you have served as a party captain; is that

9   correct?

10  A.  Correct.

11  Q.  And would you serve as the party captain for all the

12  parties that would take place on dinner shifts between Tuesdays

13  and Saturdays?

14  A.  Yes.

15  Q.  And you would receive a portion -- strike that.

16       Was there a time that you received a portion of the

17  gratuities from the parties?

18  A.  With what is in place now?

19  Q.  I'm not asking about what is in place now, I'm asking about

20  previously, was there a time that you would receive a portion

21  of the gratuities?

22  A.  There is a party captain.  There was 20 percent of -- the

23  gratuity is 20 percent and 15 percent of that 20 percent went

24  to the party captain.

25  Q.  And, currently, the mandatory gratuity is 17 percent and

ECG5sal4                        Vosilla – cross

1   there is 3 percent administrative fee and that goes to the

2   party captain?  Is that correct?

3   A.  Well, it is still 20 percent but 17 percent goes to the tip

4   pool, 3 percent goes to administrative fees.

5   Q.  Sometimes there would be multiple parties at the same time,

6   correct?

7   A.  Correct.

8   Q.  Would you serve as the party captain at all of those

9   parties?

10  A.  Correct.

11  Q.  Isn't it true that sometimes if there were two parties or

12  three parties at once you wouldn't spend any time at one of the

13  parties?

14          MR. BENSON:  Objection to the form of the question.

15  Compound.

16          THE WITNESS:  No.  That just means that --

17          THE COURT:  Overruled.  I don't agree, but the witness

18  says he doesn't understand the question.

19          He just said he doesn't understand the question; is

20  that correct?

21          THE WITNESS:  Correct.

22          THE COURT:  So, rephrase it.

23  BY MR. ANDROPHY:

24  Q.  There were some times where there would be two parties at

25  once or three parties at once; is that correct?

1    A.  Correct.

2    Q.  And when that happens would there sometimes be one party

3    that you have nothing to do with?

4    A.  No.  I have something to do with all of them.

5    Q.  Is it correct that sometimes you've interviewed bussers and

6    other employees to work at Fresco?

7    A.  I will accept resumes but then I pass them on to Anthony.

8    Q.  When you accept a resume do you ever also tell the

9    prospective employee to come back for training?

10   A.  No.  I would tell them someone would get in touch with

11   them.

12   Q.  Do you ever help interview employees together with Anthony?

13   A.  Not often.

14   Q.  But there have been some times that you have done that?

15   A.  Few.

16   Q.  And do you sometimes make suggestions about whether an

17   employee should or should not be hired?

18   A.  I may have.

19   Q.  Do you recall ever suggesting that -- suggesting to Anthony

20   that an employee be hired and having Anthony disagree with you?

21   A.  No.

22   Q.  You have signed some employment papers on behalf of the

23   restaurant, correct?

24   A.  Correct; with Anthony's direction.

25   Q.  Would you need to get Anthony's direction or approval for

1   each document that you signed?

2   A.   Yes.

3   Q.   Isn't it true that once an employee is going to be hired

4   you, yourself, have the authority to sign any papers that are

5   part of that process without having to ask Anthony for approval

6   for each document?

7   A.   If they've been approved to be hired they've been approved

8   by Anthony.

9   Q.   So, the employee might be approved to be hired and then

10  you, yourself, can determine, without further confirm with

11  Anthony, what papers need to be signed by you and by the

12  employee, correct?

13  A.   Nobody is getting any papers without Anthony telling me to.

14  Q.   Does Anthony tell you with each hire specifically what

15  papers to give the employee?

16  A.   It's usually a packet.

17  Q.   If you could turn to Exhibit 34?  I believe that is in the

18  binder in front of you.

19  A.   Okay.

20  Q.   I apologize, it is a very poor copy.  Are you able to make

21  out what this document is?

22  A.   Barely.

23  Q.   What are you able to see on the document?

24  A.   Employee uniform and cleaning reimbursement.

25  Q.   And did you sign this document, as manager?

ECG5sal4                    Vosilla - cross

1   A.  It looks like.

2   Q.  Do you know if this is a document that Anthony gave you to

3   give to the employee?

4   A.  Correct.

5   Q.  Is it correct that one of the documents you would give

6   newly hired employees would be a copy of the Fresco policy

7   document?

8   A.  Yes.

9   Q.  And you would obtain the signature from them confirming

10  that they received that, correct?

11  A.  Correct.

12  Q.  And you would also sign that receipt on behalf of the

13  company, correct?

14  A.  Correct.

15  Q.  Do you have any understanding of why the restaurant would

16  provide the Fresco policy document to employees?

17  A.  To inform them about the restaurant.

18  Q.  And so, the restaurant would want to give accurate

19  information, correct?

20  A.  I guess so.

21  Q.  If you can turn to Plaintiff's Exhibit 73?  This is the

22  Fresco policy document as updated December 2012, correct?

23  A.  Yes.

24  Q.  Did you play any part in preparing this document?

25  A.  Did I write this document?

ECG5sal4                        Vosilla - cross

1   Q.  Did you play any part in the writing it?  I'm not asking if

2   you wrote the whole thing yourself.

3   A.  No.

4   Q.  Did you play any role in updating it from time to time?

5   A.  I might have updated the date there saying updated, but.

6   Q.  Aside from the date, did you update any of the content,

7   ever?

8   A.  No.

9   Q.  And on page 3 of this document it lists yourself and Brent

10  Drill as managers, correct?

11  A.  Correct.

12  Q.  If you turn to page 4 look at the fifth paragraph it says:

13  Management will go over our daily additions to the menu.

14          Is that something that you would do as a manager, go

15  over the additions to the menu?

16  A.  That's the pre-meal meeting with myself, the chef and

17  Anthony.

18  Q.  I have given you a document that's been marked Plaintiff's

19  Exhibit 96.  Do you recognize this document?

20          MR. BENSON:  Can you just give us a second, counsel?

21          MR. ANDROPHY:  I'm sorry.

22  Q.  Do you recognize this document?

23  A.  Yes.

24  Q.  What is it?

25  A.  My LinkedIn page.

ECG5sal4                      Vosilla – cross

1   Q.  And did you write the content yourself?

2   A.  Yes.

3   Q.  Did you write anything in your profile that's incorrect or

4   not true?

5   A.  Everybody embellishes on their resumes.

6            THE COURT:  Are you embellishing now?

7            THE WITNESS:  On that?

8            THE COURT:  As you testify.

9            THE WITNESS:  No.

10  BY MR. ANDROPHY:

11  Q.  You wrote in your LinkedIn profile that, as a manager at

12  Fresco by Scotto, you interview and hire new employees.

13           Do you see that?

14  A.  Yes.

15  Q.  So you do, in fact, interview and hire employees, correct?

16  A.  That was part of the embellishment.

17  Q.  You also write that you oversee training and scheduling of

18  42 employees.  Do you in fact oversee training of employees?

19  A.  Training usually happens at lunch, so no.

20  Q.  Do you oversee scheduling of employees?

21  A.  I will do the schedule and give it to Anthony.

22  Q.  Have your job responsibilities been the same over the past

23  six years?

24  A.  Pretty much so, yes.

25           THE COURT:  Counsel, did you attach a date to the

ECG5sal4                        Vosilla - cross

1    Facebook page or LinkedIn page?  I don't remember which one it

2    was.

3              MR. ANDROPHY:  The linked in page, I do not have a

4    date for it.  I can -- I can make a representation that the top

5    left corner of Exhibit the 96 is dated December 26, 2013.

6              THE COURT:  And so, is that the way that the page

7    looked on that date?

8              I am asking the witness.

9              THE WITNESS:  Yes.  I guess so.

10             MR. ANDROPHY:  We ask that Exhibit 96 be admitted.

11             MR. BENSON:  No objection, your Honor.

12             THE COURT:  It is admitted.

13             (Plaintiff's Exhibit 96 received in evidence)

14             MR. ANDROPHY:  I have no further questions at this

15   time.

16             MR. BENSON:  Your Honor, I need a few minutes, and may

17   we coincide that with a bathroom break?

18             THE COURT:  Yeah.  Sure.

19             MR. BENSON:  Thank you.

20             (Recess)

21

22

23

24

25

1          THE COURT:  Mr. Vosilla, you are still under oath.

2          THE WITNESS:  Yes, your Honor.

3          MR. BENSON:  May I proceed?

4          THE COURT:  You may.

5          MR. BENSON:  Thank you, your Honor.

6    REDIRECT EXAMINATION

7    BY MR. BENSON:

8    Q.  In January of 2013 you got a promotion.  Is that correct?

9    A.  Yes.

10          MR. ANDROPHY:  Objection.  Leading.

11          THE COURT:  The objection is sustained.

12          Did something happen in January 2013?

13          MR. BENSON:  Something big happened in January 2013.

14   Q.  Mr. Vosilla?

15   A.  Yes.

16   Q.  And what was that?

17   A.  I guess it was being manager.

18   Q.  Did your service responsibilities stay essentially the same

19   as a result of that?

20   A.  Essentially.

21   Q.  But did you get any additional responsibilities?

22   A.  A little bit.

23   Q.  And what were those?

24   A.  Maybe having a little more with the disciplinary and doing

25   the write-ups, but -- and being able to order some things for

ECGASAL5ps                    Vosilla – redirect

1   the restaurant.

2   Q.  Prior to that time, were you involved in write-ups and

3   discipline?

4   A.  Just at Anthony's direction.

5   Q.  Now, there was some testimony regarding paperwork that you

6   filled out.  Did you ever get involved with that paperwork on

7   your own initiative?

8   A.  No.

9   Q.  Was it always, were you always instructed to do so by

10  Anthony?

11  A.  Correct.

12  Q.  As soon as you've been at Fresco Restaurant, who hires and

13  fires all the employees?

14  A.  Anthony Scotto.

15  Q.  Anyone else?

16  A.  No.

17  Q.  Has there ever been any deviation from that for as long as

18  you've been employed?

19  A.  No.

20          MR. BENSON:  No further questions, your Honor.

21          THE COURT:  Recross?

22  RECROSS EXAMINATION

23  BY MR. ANDROPHY:

24  Q.  I previously asked you if there had been any changes in

25  your job responsibilities over the past six years, and you said

1     something along the lines of, no, not really.  Had you

2     forgotten at that time the promotion that you supposedly

3     received in January 2013?

4              MR. BENSON:  Objection, your Honor.  I'm not sure that

5     accurately characterizes the testimony.

6              THE COURT:  Overruled.  You may answer.

7     A.  Um, it's just in title only.  Otherwise it's the same job.

8              MR. ANDROPHY:  I have no further questions.

9              THE COURT:  Thank you, sir.  You may step back.

10             THE WITNESS:  Thank you.

11             (Witness excused)

12             THE COURT:  And you may call your next witness.

13             MR. BENSON:  Marion Scotto.

14      MARION SCOTTO,

15         called as a witness by the defendant,

16         having been duly sworn, testified as follows:

17             MR. BENSON:  May I approach the witness, your Honor?

18             THE COURT:  You may.

19     DIRECT EXAMINATION

20     BY MR. BENSON:

21     Q.  Ms. Scotto, I'm going to give you what's been marked as

22     Defendant's Exhibit O and ask you if you recognize that.

23             THE CLERK:  State your full name.

24             THE WITNESS:  Marion Scotto.

25     Q.  I apologize.  I handed you what's been marked as

1   Defendant's Exhibit O and ask if you recognize that document

2   and your signature on the last page.

3   A.  Yes.  Yes, I do.

4   Q.  And does that represent your truthful and accurate

5   testimony in this matter?

6   A.  Yes.

7          MR. BENSON:  I move it into evidence, your Honor,

8   along with the accompanying exhibit.

9          THE COURT:  Any objection?

10          MR. ANDROPHY:  No objection.

11          THE COURT:  They are admitted.

12          (Defendant's Exhibit O received in evidence)

13          MR. BENSON:  Thank you.  We have nothing further.

14          THE COURT:  Cross-examination.

15   CROSS EXAMINATION

16   BY MR. ANDROPHY:

17   Q.  Good afternoon, Mrs. Scotto.

18   A.  Hi.

19   Q.  You are the majority shareholder of Starjem Restaurant

20   Corp., correct?

21   A.  Yes.  Yes.

22   Q.  Do you know what percentage share ownership you have?

23   A.  Well, you don't divide a restaurant.  I had to put a

24   mortgage on my house in Brooklyn.  And -- because my kids

25   didn't have any money.  So I came in with the mortgage money,

1  and I got 51 percent of the mortgage -- of the restaurant,

2  sorry.

3  Q.  If you were so inclined, would you have the authority to

4  decide to shut down the restaurant by yourself?

5  A.  You know, the restaurant is our life.  Um, it's brought my

6  children and I closer together.  And for a mom, this is the

7  best thing that could happen in anyone's life, to work side by

8  side with her kids.  I never have to say they didn't call me.

9  Q.  If you --

10  A.  Did I answer?

11  Q.  If you were so inclined, would you have the ability to

12  decide on your own to close the restaurant?

13  A.  No.

14  Q.  You are the CEO and the president of Starjem restaurant

15  Corp., correct?

16  A.  Yes.

17  Q.  And is it correct that until recently Fresco's website had

18  the following description for you: "known affectionately as the

19  boss, Marion runs front-of-the-house duties in the restaurant"?

20  A.  I do run front-of-the-house duties in the restaurant.  But

21  "the boss" label got to me through our shows, because I do all

22  the shows, and when we get there, when we get to NBC I'll say

23  Anthony, you do this, Elena, you've got to talk about the

24  sauce.  So I'm just pushing everybody around and all their

25  back-of-the-house people call me "here comes the boss."  That's

1   how I got it.  No one calls me "the boss" in the restaurant.

2   Q.  Do any employees call you "the boss"?

3   A.  They call me "mom."  Everybody calls me "mom."

4   Q.  Do any customers call you "the boss"?

5   A.  You know what gets me now is when the people that are older

6   than me call me "mom."

7   Q.  When you say that you run front-of-the-house duties, what

8   does that mean?

9   A.  Well, I sit by the book.  I'm the only one that sits down.

10  I have a bad leg and I sit, help with the reservations, greet

11  the people as they come in the door, and that's so important.

12  You know, a restaurant starts from the beginning.  As soon as

13  you walk in the door, there's got to be a happy face.  And then

14  there's got to be great food, great service.  And that's what

15  we try to give our customers.

16  Q.  What do you personally do to make sure that there's great

17  service for the customers?

18  A.  Well, I give -- my customers, as they walk out, say, thank

19  you, Marion, I'm coming back.  And that's my gift.  I feel

20  great when that happens.  So I know service was great and food

21  was terrific.

22  Q.  Do you ever give direction to employees to make sure that

23  the service will be as great as you want it to be?

24  A.  You know, the only directions I give are if my tables

25  should change, you know, the reservations -- Mayor Giuliani,

1   let's go with him.  They'll call me.  He's six.  We set up the

2   table for six.  They call me 20 minutes before the reservation,

3   they're 12.  So the table has got to be changed.  That's the

4   only directions I give.

5   Q.  Do you personally interview potential hosts or hostesses?

6   A.  Well, usually they go through Anthony.  Anthony will then

7   give them to me.  And then we all work together.

8   Q.  So you do have a role in interviewing and hiring hosts and

9   hostesses?

10  A.  You know what, I'm downstairs a lot of time because I'm

11  doing my parties for the party room.  So Anthony is upstairs.

12  So he sees them first, usually.

13  Q.  Are you involved in deciding how many employees Fresco is

14  going to have at a certain time?

15  A.  No.  No.

16          They'll ask me how many people are in my parties.  But

17  other than that, no.

18  Q.  Would you have involvement in deciding to reduce the number

19  of employees overall if employees are costing too much for

20  Fresco?  Has that ever happened?

21  A.  No.  Usually Anthony takes care of that.

22  Q.  Have you ever been involved in that discussion?

23  A.  I could have been siting there when they were talking about

24  it, but I don't think I, I said anything about it.

25  Q.  And how about discussions about whether Fresco should hire

ECGASAL5ps                    M. Scotto - cross

1   additional employees?

2   A.  No.

3   Q.  Did you help put together any version of the Fresco

4   employee handbook?

5   A.  No.

6   Q.  Even the original version?  Did you have any --

7   A.  No.  I don't get involved with that.

8   Q.  You're usually at Fresco just about every day, correct?

9   A.  I'm there every day, and I don't really leave the

10  restaurant, because I have a bad leg that has to be operated on

11  soon, and so this person has to -- I sit around constantly.

12  I'm there every day.

13  Q.  You sign checks, including payroll checks, correct?

14  A.  Yes, I do.

15  Q.  And is it also correct that you've always been in charge of

16  booking private parties at Fresco?

17  A.  Yes.  Yes.

18  Q.  And would you send the contracts to the clients?

19  A.  Yes, I do.

20  Q.  Do you know if those contracts always identified a

21  mandatory gratuity?

22  A.  Well, not -- no.  It was a suggested gratuity.  You can't

23  do mandatory, because some -- you know, we deal with the

24  corporate area.  So some will give 20 percent.  Some will give

25  15 percent.  And some will give more than 25 percent.  So it

1    varies.

2    Q.  Is there currently a mandatory minimum gratuity of 17

3    percent?

4    A.  Yes.  We were told to do that by our lawyer.  So we put it

5    on my contracts.

6    Q.  And is it correct that before there was the current minimum

7    gratuity of 17 percent, there was a minimum gratuity of 20

8    percent?

9    A.  Say it again.

10   Q.  Before -- the forms currently say there is a mandatory

11   gratuity of 17 percent.  Correct?

12   A.  Yes.

13   Q.  Previously, before the restaurant made the change, was

14   there a mandatory gratuity of 20 percent?

15   A.  No, there was never a mandatory.  It was suggested 20

16   percent would be the gratuity.  But like I told you, some

17   people would call me and say, Marion, we can only give you 15

18   percent.  And that would be fine too.  Listen, we work with

19   nice people.  We're in the corporate area.  We're an early

20   restaurant.  They come in early.  They leave early.

21   Q.  Was there anything listed on the form previously that

22   identified a suggested gratuity?  I'm talking about the form,

23   the contract for a private party.

24   A.  You mean before this one?

25   Q.  Before it changed to the current form.

1   A.   Yeah.  It would say 20 percent.  But it was only a

2   suggestion.  And it varied with different people.

3   Q.   Thank you.

4              MR. ANDROPHY:  I have no further questions.

5              MR. BENSON:  We have nothing, your Honor.

6              THE COURT:  All right.  Thank you.  You may step down.

7              THE WITNESS:  Thank you so much.

8              (Witness excused)

9              MR. BENSON:  Your Honor, defendants rest.

10             THE COURT:  Do the plaintiffs rest at this time?

11             MR. ANDROPHY:   There is one matter we wish to raise.

12  As I think we discussed at the pretrial conference, there is

13  one individual, Milena Cesarka, who we had subpoenaed, and we

14  have learned that she is eight months pregnant and because of

15  that not able to testify.  We would request that therefore she

16  be considered an unavailable witness and that way we would be

17  able to put in her deposition testimony in lieu of live

18  testimony here pursuant to Rule 32, 32(a)(4) of the Federal

19  Rules of Civil Procedure, as well as Rule 804 of the Rules of

20  Evidence, which addresses when a declarant is unavailable, that

21  their former testimony under certain circumstances may be

22  admissible as non-hearsay.

23             THE COURT:  Mr. Benson?

24             MR. BENSON:  Yes, your Honor.  We previously discussed

25  this at pretrial.  Ms. Cesarka gave testimony in conjunction

ECGASAL5ps

1   with a different proceeding involving different issues, and we

2   were not given an opportunity to question her with respect to

3   all of the issues that are germane in this proceeding.  And

4   counsel has had plenty of time to secure her cooperation.  And

5   I appreciate that he's making a representation that she's not

6   physically capable of being here.  But, again, even if she, if

7   that's true, we have not been given an opportunity to

8   cross-examine her, and introducing her testimony in another

9   proceeding without giving us that opportunity, we think, is

10  prejudicial.  And the prejudice clearly, the probativeness is

11  outweighed by the prejudice to the defendants.

12         THE COURT:  I agree with the defense, it would not be

13  fair to introduce testimony, because they would not be

14  adequately able to cross-examine her.  So the application is

15  denied.

16         MR. ANDROPHY:  Thank you, your Honor.  In that case,

17  the plaintiffs rest.  I do also, I want to put on the record

18  that both sides have given your Honor deposition designations

19  for Brent Drill, but I'm not sure if that's on the trial

20  record, but I believe both sides would want that testimony to

21  be included in the record before your Honor.

22         THE COURT:  Anything that has not yet been moved into

23  evidence you should do so now.

24         MR. BENSON:  We jointly move the depositions for Brent

25  Drill into evidence.

ECGASAL5ps

1          THE COURT:  Anything else?

2          MR. ANDROPHY:  Corresponding with that, plaintiffs

3     would request admission of Plaintiff's Exhibits 89, 90, 91, 93,

4     94, and 95 into evidence.  These are documents that are

5     identified in the portions of Mr. Drill's deposition which have

6     been designated, and so we would seek admission of those

7     documents into evidence.

8          THE COURT:  No objection?

9          MR. BENSON:  No objection.

10          THE COURT:  Anything else?

11          MR. BENSON:  Yes, your Honor.  In light of the

12     upcoming holidays, I'm personally going to go see my mom for a

13     bit of time in Florida.  I know your Honor had talked about two

14     weeks as a briefing schedule.  That basically encompasses smack

15     everything from Christmas to New Year's.  And we have conferred

16     and would jointly request that our briefing be due the Friday,

17     I think it's the 8th or the 9th of January, if that's OK with

18     the Court.

19          THE COURT:  OK.  So with respect to all of these

20     exhibits that the parties have just sought to admit, they are

21     all admitted.

22          (Plaintiff's Exhibits 89, 90, 91, 93, 94, and 95

23     received in evidence)

24          THE COURT:  So let's talk about the briefing.  With

25     respect to each and every point, I expect the parties to be

ECGASAL5ps

1    making detailed references to the transcript and the other

2    evidence.  No broad assertions.  Everything has to be

3    supported, with specific references.

4            So I will have, then, both post trial briefs due on

5    January 9th, with opposition papers by the 23rd,

6    simultaneously.

7            Anything else?

8            MR. ANDROPHY:  In the post trial submissions, is there

9    any page limit?  We'll obviously try and be brief, but also, as

10   your Honor just instructed, complete and detailed.

11           THE COURT:  Well, are you requesting a particular page

12   limit?

13           MR. ANDROPHY:  No, your Honor.

14           MR. BENSON:  And defense plans on providing your Honor

15   with demonstrative charts utilizing the underlying evidence

16   that's been placed into evidence.  I think your Honor has

17   previously indicated that that would be acceptable.  I just

18   want to confirm that.

19           THE COURT:  That's fine.  I usually have a 25-page

20   limit on there.  But I am willing, however, to entertain

21   requests for an enlargement of that amount.

22           MR. BENSON:  I would make such a request, your Honor.

23   I believe that, given the number of issues and the number of

24   plaintiffs -- there are 13 plaintiffs here, each with their own

25   case and testimony, and just the findings of fact on each --

ECGASAL5ps

1    I've been thinking about this, how it's going to play, and I

2    have an idea.  I don't think that 25 pages would be nearly

3    enough, given the 13 plaintiffs and the number of issues that

4    we have to deal with.  We have to deal with, there are many

5    causes of actions and even subdivisions within those causes of

6    action.  I don't think that -- you know, I've learned a long

7    time ago to not be long for the sake of being long.  But given

8    that, I don't see how we -- I don't think it would be to your

9    Honor's advantage to have a 25-page limit because we would be

10   constrained in what we could put before you.

11             THE COURT:  All right.  50 pages.

12             Anything else?

13             MR. BENSON:  Thank you, your Honor.

14             THE COURT:  I wish you all a wonderful holiday season.

15   Thank you.

16             MR. ANDROPHY:  Thank you, your Honor.

17                           o0o

18

19

20

21

22

23

24

25

692

INDEX OF EXAMINATION

Examination of:                                    Page

ANTHONY SCOTTO

Cross By Mr. Androphy . . . . . . . . . . . 535

Redirect By Mr. Benson . . . . . . . . . . . 637

Recross By Mr. Androphy . . . . . . . . . . . 644

NATALYIA GELMAN

Direct By Ms. Kabir . . . . . . . . . . . . . 647

Cross By Mr. Androphy . . . . . . . . . . . 648

Redirect By Ms. Kabir . . . . . . . . . . . 659

ATTILIO VOSILLA

Direct By Mr. Benson . . . . . . . . . . . . 663

Cross By Mr. Androphy . . . . . . . . . . . 663

Redirect By Mr. Benson . . . . . . . . . . . 678

Recross By Mr. Androphy . . . . . . . . . . . 679

MARION SCOTTO

Direct By Mr. Benson . . . . . . . . . . . . 680

Cross By Mr. Androphy . . . . . . . . . . . 681

```
 1                        PLAINTIFF EXHIBITS

 2    Exhibit No.                                    Received

 3    102   . . . . . . . . . . . . . . . . . . 559

 4    73    . . . . . . . . . . . . . . . . . . 585

 5    71 and 72  . . . . . . . . . . . . . . . 586

 6    117   . . . . . . . . . . . . . . . . . . 605

 7    118   . . . . . . . . . . . . . . . . . . 625

 8    119   . . . . . . . . . . . . . . . . . . 626

 9    120   . . . . . . . . . . . . . . . . . . 626

10    121   . . . . . . . . . . . . . . . . . . 627

11    122 are  . . . . . . . . . . . . . . . . 628

12    123   . . . . . . . . . . . . . . . . . . 629

13    1 – 26  . . . . . . . . . . . . . . . . . 635

14    76 – 80  . . . . . . . . . . . . . . . . 635

15    96    . . . . . . . . . . . . . . . . . . 677

16    89, 90, 91, 93, 94, and 95  . . . . . . . 689

17                        DEFENDANT EXHIBITS

18    Exhibit No.                                    Received

19     80   . . . . . . . . . . . . . . . . . . 635

20    M   . . . . . . . . . . . . . . . . . . . 648

21    N   . . . . . . . . . . . . . . . . . . . 663

22    O   . . . . . . . . . . . . . . . . . . . 681

23

24

25
```