**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------X

ENRIQUE SALINAS , ALFREDO
RODRIGUEZ,ANGEL CEDENO,
CHRISTIAN URGILES,FRANCISCO LUGO,
JOSE AMEZQUITA, LUIS ROBALLO,
MIGUEL CERVANTES, NAHUN FLORES,
PABLO ALVARADO, PABLO
FRANCISCO-LOPEZ, VALENTIN
XOCHIPILTECATL and VICENTE LEON,
individually and on behalf of others similarly
situated,

                  *Plaintiffs*,

          -against-

STARJEM RESTAURANT CORP (d/b/a
FRESCO BY SCOTTO) MARION SCOTTO
and ANTHONY SCOTTO,

                *Defendants.*
-------------------------------------------------------X

Index No. 13-cv-2992 (AT)

## PLAINTIFFS' POST-TRIAL MEMORANDUM OF LAW

MICHAEL FAILLACE & ASSOCIATES, P.C.
Joshua S. Androphy
Shawn Clark
60 East 42nd Street, Suite 2020
New York, New York 10165
(212) 317-1200
*Attorneys for Plaintiffs*

Table of Contents

**Preliminary Statement**...................................................................................................1

**Argument** ...........................................................................................................................3

   I.    DEFENDANTS WERE REQUIRED TO PAY PLAINTIFFS AT THE MINIMUM
        WAGE RATE RATHER THAN THE LOWER TIP-CREDIT RATE ...........................3

     A. FLSA Tip-Credit Requirements ...............................................................3

     B. New York State Law Tip-Credit Requirements ...........................................5

     C. The Stocker, Coffee Preparer, Bar Back, and Expeditor Positions Were Non-Service
        Positions and Therefore Ineligible to be Paid at the Tip-Credit Rate...........................7

          a.  Stockers .........................................................................................7

          b.  Coffee Preparers ..........................................................................10

          c.  Barbacks ......................................................................................11

          d.  Bussers.........................................................................................12

     D. Fresco Did Not Provide Notice that Plaintiffs Would be Paid the Tip-Credit
        Minimum Wage................................................................................15

     E. Fresco Improperly Included Ineligible Participants in the Tip Pool .........................19

          a.  Non-Service Employees .................................................................20

          b.  Managers Brent Drill and Attilio Vasilla ......................................20

              i.  Brent Drill.............................................................22

             ii.  Attilio Vosilla ......................................................25

            iii.  Anthony Scotto's Testimony that he Singlehandedly Made All
                  Employment Decisions at Fresco is not Credible..............................29

  II.   DEFENDANTS MISAPPROPRIATED PLAINTIFFS' TIPS IN VIOLATION OF
        NYLL §196-d ..............................................................................................31

 III.  PLAINTIFFS WERE NOT COMPENSATED FOR ALL HOURS WORKED, IN
        VIOLATION OF THE MINIMUM WAGE AND OVERTIME PROVISIONS OF
        THE FLSA AND NYLL ...............................................................................32

     A. Before June 2011 .........................................................................33

     B. After June 2011 ...........................................................................36

  IV.  PLAINTIFFS ARE ENTITLED TO COMPENSATION FOR UNIFORM AND
        EQUIPMENT COSTS ..................................................................................38

   V.   DEFENDANTS VIOLATED THE WAGE NOTICE AND WAGE STATEMENTS
        PROVISIONS OF THE NYLL ...................................................................40

  VI.  MARION SCOTTO IS AN EMPLOYER OF PLAINTIFFS .......................................42

VII.  PLAINTIFFS ARE ENTITLED TO LIQUIDATED DAMAGES UNDER THE FLSA
      AND NYLL, AND A THREE YEAR STATUTE OF LIMITATIONS UNDER THE
      FLSA ..................................................................................................................45

      A.  Liquidated Damages  ...............................................................................45

      B.  Statute of Limitations  .............................................................................47

**Conclusion** ..........................................................................................................**48**

## Table of Authorities

**Cases**

*Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946) .......................................... 36
*Barenboim v. Starbuck Corp.*, 21 N.Y.2d 460 (2013) ................................................................. 31
*Barfield v. NYC Health & Hosps. Corp.*, 537 F.3d 132 (2d Cir. 2008)................................. 43, 46
*Carter v. Dutchess Community College*, 735 F.2d 8 (2d Cir. 1984)........................................... 42
*Chhab v. Darden Rests., Inc.*, 2013 U.S. Dist. LEXIS 135926
    (S.D.N.Y. Sept. 20, 2013)................................................................... 3, 4, 5, 9, 12
*Copantitla v. Fiskardo Estiatorio, Inc.*, 788 F. Supp. 2d 253
    (S.D.N.Y. 2011) ...................................................................... 6, 16, 17, 18, 19, 42
*Cuzco v. F & J Steaks 37th St, LLC*, 2014 U.S. Dist. LEXIS 72984 (S.D.N.Y. May 28, 2014)... 41
*Encalada v. SDNY 19 Mad Park*, Index No. 13-cv-1926 (PAC) (S.D.N.Y. Nov. 6, 2014) ........ 32
*Fonseca v. Dircksen & Talleyrand Inc.*, 2014 U.S. Dist. LEXIS 52744, 2014 WL 1487279
    (S.D.N.Y. April 10, 2014)................................................................................... 3, 19
*Gillian v. Starjem Rest. Corp.*, 2011 U.S. Dist. LEXIS 115833, 2011 WL 4639842
    (S.D.N.Y. Oct. 4, 2011) ............................................................................... 4, 21, 48
*Hai Ming Lu v. Jing Fong Restaurant, Inc.*, 503 F. Supp. 2d 706 (S.D.N.Y. 2007) ............... 6, 20
*Hart v. Rick's Cabaret Int'l, Inc.*, 967 F.Supp.2d 901 (S.D.N.Y. 2013) ..................................... 45
*Herman v. RSR Sec. Services Ltd.*, 172 F.3d 132 (2d Cir. 1999)................................................ 46
*Ho v. Sim Enters.*, 2014 U.S. Dist. LEXIS 66408 (S.D.N.Y. May 14, 2014) ............ 45, 46, 47, 48
*Irizarry v. Catsimatidis*, 722 F.3d 99 (2d Cir. 2013) ...................................................... 42, 43, 45
*Kuebel v. Black & Decker, Inc.*, 643 F.3d 352, 362 (2d Cir. 2011)............................................ 36
*Martin v. Tango's Rest., Inc.*, 969 F.2d 1319 (1st Cir. 1992) .................................................... 16
*McLaughlin v. Richland Shoe Co.*, 486 U.S. 128 (1988)). .......................................................... 48
*McLean v. Garage Mgmt. Corp.*, 2012 U.S. Dist. LEXIS 55425, 2012 WL 1358739
    (S.D.N.Y. April 19, 2012)................................................................................ 46, 47
*Merino v. Beverage Plus Am. Corp.*, 2012 U.S. Dist. LEXIS 140679
    (S.D.N.Y. Sept. 25, 2012)..................................................................................... 47
*Moon v. Kwon*, 248 F.Supp.2d 201 (S.D.N.Y. 2002) ................................................................. 46
*Padilla v. Manlapaz*, 643 F.Supp.2d 302 (E.D.N.Y.2009)........................................... 7, 17, 18
*Schear v. Food Scope Am., Inc.*, 2014 U.S. Dist. LEXIS 3454, 2014 WL 123305
    (Jan. 10, 2014)..................................................................................................... 6, 20
*Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234 (2d Cir. 2011) .............. 3, 4, 19, 31
*Solis v. Cindy's Total Care, Inc.*, 2012 U.S. Dist. LEXIS 1808, 2012 WL 28141
    (S.D.N.Y. Jan. 5, 2012)........................................................................................ 46
*Tony & Susan Alamo Found v. Sec'y of Labor*, 471 U.S. 290 (1985) ........................................ 42
*Widjaja v. Kang Yue USA Corp.*, 2011 U.S. Dist. LEXIS 109007, 2011 WL 4460642
    (E.D.N.Y. Sept. 26, 2011);................................................................................. 4, 21

**Statutes**

29 U.S.C. §203................................................................................... 2, 3, 18, 19, 42

29 U.S.C. §207............................................................................................... 11

29 U.S.C. §255............................................................................................... 23

N.Y.L.L. §195 ............................................................................................... 17

N.Y.L.L. §196. .................................................................................................................... 8

N.Y.L.L. §198. .................................................................................................................... 17

N.Y.L.L. §663 ..................................................................................................................... 22

**Other Authorities**

U.S. Department of Labor, Wage and Hour Division Fact Sheet #15: Tipped Employees Under
the Fair Labor Standards Act (FLSA) (rev. July 2013) ("DOL Fact Sheet #15"), available at
http://www.dol.gov/whd/regs/compliance/whdfs15.pdf ................................................ 5

U.S. Department of Labor, Wage and Hour Division Fact Sheet #15: Tipped Employees Under
the Fair Labor Standards Act (FLSA) (rev. Mar. 2011) ("DOL Fact Sheet #15"), available at
http://www.dol.gov/whd/regs/compliance/whdfsl5.pdf ................................................ 6

**Regulations**

12 N.Y.C.R.R. § 137-3.1.8 ................................................................................................. 2

12 N.Y.C.R.R. § 146-1.8 .................................................................................................... 2

12 N.Y.C.R.R. §137 ....................................................................................................... 6, 17

12 NYCRR §137-1.3 .......................................................................................................... 32

12 NYCRR §137-1.8 .......................................................................................................... 40

12 NYCRR §146-1.3(b). ...................................................................................................... 5

12 NYCRR §146-1.8 ........................................................................................................... 40

12 NYCRR §146-2.2 ...................................................................................................... 5, 16

12 NYCRR §146-2.9 ........................................................................................................ 6, 9

12 NYCRR §146-3.10(a). .................................................................................................. 40

12 NYCRR §146-3.10(b). .................................................................................................. 40

12 NYCRR §146-3.4 ................................................................................................... 6, 9, 12

12 NYCRR 146-1.4 ............................................................................................................ 32

29 C.F.R. §§531.50, *et seq.* ............................................................................................. 16

29 C.F.R. §531.35 .............................................................................................................. 39

29 C.F.R. §531.51 ..................................................................................................... 5, 9, 12

NYLL §195(1)(a) ............................................................................................................... 40

NYLL §195(3)/ .................................................................................................................. 41

NYLL §198(1-b). ............................................................................................................... 40

NYLL §198(1-d). ............................................................................................................... 41

Plaintiffs Enrique Salinas, Alfredo Rodriguez, Angel Cedeno, Christian Urgiles, Francisco Lugo, Jose Amezquita, Luis Roballo, Miguel Ceravantes, Nahun Flores, Pablo Alvarado, Pablo Francisco-Lopez, Valentin Xochipiltecatl, and Vicente Leon, by their attorneys Michael Faillace & Associates, P.C., submit this post-trial memorandum of law.

## PRELIMINARY STATEMENT

Based on the testimony and evidence at trial, the Court should reach the following conclusions:

- Plaintiffs assigned to the stocker position, coffee preparer position, and barback position were not eligible to be paid at the lower tip-credit minimum wage rate, under the Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL").

- Plaintiffs assigned as bussers and runners at Fresco by Scotto ("Fresco") were not eligible to be paid at the lower tip-credit minimum wage rate, under the FLSA and NYLL.

- Fresco did not provide adequate notice to employees of its intention to pay them at a tip-credit minimum wage rate, and therefore it was unlawful under the FLSA and NYLL to pay Plaintiffs at the tip-credit minimum wage rate.

- Fresco unlawfully included non-service employees, and specifically the stocker, coffee preparer (on shifts where there was a coffee helper), bar back, and expediter, in its tip pool, in violation of the FLSA and NYLL.

- Fresco unlawfully allowed manager Brent Drill to participate in its tip pool until January 1, 2013, in violation of the FLSA and NYLL.

- Fresco unlawfully allowed manager Attilio Vosilla to participate in its tip pool when he served as a "party captain," until June 2011, in violation of the FLSA and NYLL.

- Fresco failed to pay Plaintiffs for all hours worked during the period when it paid employees by "shift pay," and therefore failed to pay Plaintiffs at the minimum wage rate and, in weeks where Plaintiffs worked more than 40 hours, at the overtime rate, in violation of the FLSA and NYLL.

- After Fresco recorded Plaintiffs' time worked by having them enter their start time and end time on a time clock, Fresco unlawfully deducted times from Plaintiffs' shifts, until February 2014, resulting in Plaintiffs not being paid for all hours worked, and therefore not receiving minimum wage, and not receiving overtime wages in weeks when Plaintiffs worked above 40 hours per week, in violation of the FLSA and NYLL.

- Prior to February 14, 2011, Fresco failed to pay Plaintiffs Salinas, Rodriguez, Cedeno, Urgiles, Roballo, Cervantes, Flores, Alvarado, Francisco-Lopez, Xochipiltecatl and Leon spread of hours pay on days when their spread of hours worked exceeded 10 hours, in violation of the NYLL.

- Fresco did not provide Plaintiffs with adequate wage notices, in violation of NYLL §195(1).

- Fresco did not provide Plaintiffs with accurate wage statements, in violation of NYLL §195(3).

- Plaintiffs were required by Fresco to purchase clothing from Fresco to wear as a uniform, and are entitled to recover the costs of those uniforms, under 12 N.Y.C.R.R. § 137-3.1.8 (prior to January 1, 2011) or 12 N.Y.C.R.R. § 146-1.8 (after January 1, 2011).

- Marion Scotto is an employer of Plaintiffs under the FLSA and NYLL.

- Defendants acted willfully under the meaning of 29 U.S.C. §255, and as a result, a three-year statute of limitations applies to Plaintiffs claims.

2

- Defendants' actions were willful within the meaning of the NYLL prior to November 24, 2009, entitled Plaintiffs to liquidated damages under the NYLL.

- Defendants' actions were not in good faith, and therefore Plaintiffs are entitled to liquidated damages under the FLSA and NYLL (after November 24, 2009).

## ARGUMENT

### I.   DEFENDANTS WERE REQUIRED TO PAY PLAINTIFFS AT THE MINIMUM WAGE RATE RATHER THAN AT THE LOWER TIP-CREDIT RATE

Both the FLSA and New York Labor Law require an employer to pay an employee a minimum wage. Both laws allow an employer to pay an employee at a lower "tip-credit" rate if certain conditions are met.

### A.   FLSA Tip-Credit Requirements

Under the FLSA, an employer may pay food service employees at a lower tip credit rate if the employee regularly receives more than $30 a month in tips. 29 U.S.C. §§ 203 (m), 203(t). Such employees may be paid at a rate of $2.13 per hour, provided that when their tips are accounted for, they receive the minimum wage of $7.25 per hour. 29 U.S.C. §203(m); *Chhab v. Darden Rests., Inc.*, 2013 U.S. Dist. LEXIS 135926, *9 n. 4, 2013 WL 5308004 (S.D.N.Y. Sept. 20, 2013).

"An employer may not avail itself of the tip credit if it requires employees to share their tips with employees who do not regularly and customarily receive tips." *Fonseca v. Dircksen & Talleyrand Inc*., 2014 U.S. Dist. LEXIS 52744, *5, 2014 WL 1487279 (S.D.N.Y. April 10, 2014) (citing 29 U.S.C. §203(m)). Therefore, "an employer loses its entitlement to the tip credit where it requires tipped employees to share tips with (1) employees who do not provide direct customer service or (2) managers." *Shahriar v. Smith & Wollensky Rest. Grp., Inc*., 659 F.3d 234, 240 (2d

Cir. 2011); *see also Chhab*, 2013 U.S. Dist. LEXIS 135926, at *17 ("The inclusion of an employee who does not customarily and regularly receive tips will invalidate the tip credit applied to participating employees' wages").

In determining whether an employee is one who customarily and regularly receives tips, the court must determine "whether the employee's job is historically a tipped occupation and whether he has more than 'de minimis' interaction with customers as a part of his employment." *Chhab*, 2013 U.S. Dist. LEXIS 135926, at *18.  Courts in this district have generally drawn a line between back-of-the-house restaurant staff who cannot participate in tip pools because they do not interact with customers, and employees who provide direct service to customers such as servers, hosts, and bussers.  *Id.*, 2013 U.S. Dist. LEXIS 135926, at *18-19.

Fresco also was not permitted to pay Plaintiffs at the tip-credit rate because managers regularly participated in the tip pool.  To determine whether a tip pool participant is a manager under the FLSA, courts consider multiple factors, including "[1] [the] authority to suspend or terminate employees . . . ; (2) supervision of the wait staff and [making] hiring decisions; (3) [taking] responsibility for the restaurant's budget, including analyzing payroll and food costs; and (4) receipt of a salary . . . regardless of the number of hours . . .worked."   *Widjaja v. Kang Yue USA Corp.*, 2011 U.S. Dist. LEXIS 109007, *15-16, 2011 WL 4460642 (E.D.N.Y. Sept. 26, 2011); *see also Gillian v. Starjem Rest. Corp.,* 2011 U.S. Dist. LEXIS 115833, *11-12, 2011 WL 4639842 (S.D.N.Y. Oct. 4, 2011) (courts consider whether individual "(1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records").

4

Additionally, when an employee performs both tipped and non-tipped work, Department of Labor regulations "permit the employer to utilize the tip credit only for hours spent by the employee in the tipped occupation." *Chhab*, 2013 U.S. Dist. LEXIS 135926, at *9 (citing 29 C.F.R. §531.51).   Furthermore, the Department of Labor has issued an opinion that "tipped employees who spend a substantial amount of time, or more than twenty percent of their workweeks, engaged in related but non-tip-producing work must be paid the full minimum wage for the time spent performing the non-tipped work." *Id.*, 2013 U.S. Dist. LEXIS 135926, at *10-11 (citing U.S. Department of Labor, Wage and Hour Division Fact Sheet #15: Tipped Employees Under the Fair Labor Standards Act (FLSA) (rev. Mar. 2011) ("DOL Fact Sheet #15"), available at http://www.dol.gov/whd/regs/compliance/whdfsl5.pdf).   The evidence will show that when Plaintiffs worked as stockers, coffee preparers, bar backs, or expediters, they spent over 20 percent of their time doing non-tipped work, and could not be paid at the tip-credit rate.   The evidence at trial will also show that all busser and food runners performed non-tipped work for at least 20 percent of their shifts, and were unlawfully paid at the tip-credit rate for all the hours they worked.

### B.  New York State Law Tip-Credit Requirement

New York law also allows an employer to pay an employee at a tip-credit rate.   The employee must receive a wage of at least $5.00 per hour, and the total of tips and wages must equal or exceed $8.00 per hour.  12 NYCRR §146-1.3(b).

The employer must provide the employee written notice of the employee's hourly rate, overtime rate, and tip credit.  12 NYCRR §146-2.2.  The notice must be in both English and in any other language spoken by the employee as his primary language.  12 NYCRR §146-2.2(a).

If an employee is not notified as required by 12 N.Y.C.R.R. §146-2.2, the employer is not allowed to pay employees at the lower tip credit rate.

Under the NYLL, a restaurant employee is not a "food service worker" and may not be paid at the lower tip credit rate if the employee is assigned to do work for which tips are not received for 2 hours or more or for more than 20 percent of her shift, whichever is less.  12 NYCRR §146-3.4; *see also* 12 NYCRR §146-2.9.

The NYLL, like the FLSA, also prohibits tipped employees to be required to share tips with non-service staff, and with managers.  NYLL §196-d.  Courts in this Circuit have repeatedly held that where an employer required tipped employees to share tips with non-service staff and with managers, the tipped employees are entitled to both the difference between the full minimum wage and the tipped minimum wage, and the misappropriated tips.  *See*, *e.g.*, *Copantitla*, 788 F. Supp. 2d at 290 (S.D.N.Y. 2011) ("defendants' violation of N.Y. Lab. Law §196-d itself constitutes an independent and sufficient reason to find that defendants are not entitled to a tip credit"); *Hai Ming Lu v. Jing Fong Restaurant, Inc.*, 503 F. Supp. 2d 706, 711 (S.D.N.Y. 2007) ("this separate violation of §196-d would render [employer] ineligible to receive a tip credit under New York law").[1]

Prior to January 1, 2011, the tip credit eligibility of Plaintiffs was governed by 12 N.Y.C.R.R. §137.  Under those regulations, in order to pay employees at a tip-credit rate, employer were required to (1) "furnish to each employee a statement with every payment of wages listing ... allowances ... claimed as part of the minimum wage...," and (2) "maintain and preserve for not less than six years weekly payroll records which shall show for each employee...

---

[1] We are aware that this Court reached an opposite conclusion in *Schear v. Food Scope Am., Inc.*, 2014 U.S. Dist. LEXIS 3454, *51, 2014 WL 123305 (S.D.N.Y. Jan. 10, 2014).  We respectfully disagree and ask the Court to reconsider.

allowances ... claimed as part of the minimum wage...."  *Copantitla*, 788 F.Supp.2d at 290

(quoting *Padilla v. Manlapaz*, 643 F.Supp.2d 302, 309 (E.D.N.Y. 2009)).

###### C. The Stocker, Coffee Preparer, Bar Back, and Expeditor Positions Were Non-Service Positions and Therefore Ineligible to be Paid at the Tip-Credit Rate

The evidence at trial established that employees who worked as stockers, coffee

preparers, bar backs, and expeditors were not working in service positions, and therefore were

not eligible to be paid at the lower tip-credit rate.

###### a. Stockers

The stocker position was a non-service position.  The stocker's primary responsibility at

Fresco was to take dishes from the kitchen dish pit, clean, polish, dry, and restock glasses,

silverware, and plates, and takes these items to the floor at Fresco.  (Salinas Dec. ¶15; Rodriguez

Dec. ¶15; Cedeno Dec. ¶14; Urgiles Dec. ¶15; Lugo Dec. ¶15; Amezquita Dec. ¶13; Roballo

Dec. ¶16; Caravantes Dec. ¶14;  Flores Dec. ¶15; Alvarado Dec. ¶24;  Francisco-Lopez Dec.

¶16; Xochipiltecatl Dec. ¶14; Leon Dec. ¶14; Trial Tr. at 16:1-3, 17:5-12, 38:23-39:16, 462:22-

463:8)  Stockers would also lay down small carpets, clean the stocker stations, cut rags to use to

polish the silverware, dishes, and glasses, and sweep the sidewalk in front of the restaurant.  The

stocker primarily spent his time in the kitchen next to the dishwasher, carrying items between the

kitchen and the restaurant floor, and restocking items at stocker stations at the restaurant.

(Salinas Dec. ¶16; Rodriguez Dec. ¶16; Cedeno Dec. ¶16; Urgiles Dec. ¶16; Lugo Dec. ¶16;

Amezquita Dec. ¶14; Roballo Dec. ¶17; Caravantes Dec. ¶15;  Flores Dec. ¶16;  Francisco-

Lopez Dec. ¶17; Xochipiltecatl Dec. ¶15;  Leon Dec. ¶15)

Additionally, stockers sometimes had to do the work of the dishwasher.  (Salinas Dec.

¶17; Rodriguez Dec. ¶17; Cedeno Dec. ¶17; Urgiles Dec. ¶17; Lugo Dec. ¶17; Amezquita Dec.

¶15; Roballo Dec. ¶18; Flores Dec. ¶17; Francisco-Lopez Dec. ¶18; Xochipiltecatl Dec. ¶16;

Leon Dec. ¶16; Trial Tr. 107:7-108:13, 179:25-180:16, 191:21-192:1, 268:15-270:14, 315:24-318:18, 319:12-323:21, 338:11-339:24, 340:5-341:5, 341:13-342:9, 368:1-369:17, 392:24-393:14, 430:8-433:19, 435:14-25, 464:24-466:16, 468:7-469:15, 479:24-482:22)

Stockers spend only a *de minimis* portion of their shifts providing customer service. Plaintiffs testified that when they worked as stockers they spent, at most 15 minutes per shift running food from the kitchen to customers, or setting tables.  This was, if at all, as a minimal portion of their job.   (Tr. 42:22-43:9, 43:16-44:10, 116:16-117:5, 335:15-24, 339:25-340:4, 341:6-11, 414:2-7, 415:14-22)  Stockers did not run food at all on every shift.  Enrique Salinas, who spent most of his shifts as a stocker, testified that usually he only ran food on Friday or Saturday dinner shifts, when Fresco would be very busy, and on other shifts usually did not run food at all.  (Trial Tr. 33:24– 36:9)  Salinas testified that he would only spend approximately 3 or 4 percent of a shift taking food out to customers, and less than one percent of shifts setting tables. (*Id.* 116:16-117:5, 117:16-118:20)  Salinas further testified that he only would run food as a stocker when he was specifically forced to do so by the chef or sous chef, but otherwise he needed to focus on his stocker job.  (*Id.* 21:20-23:25, 32:25-33:22)  Another employee, Valentin Xochipiltecatl, testified that he never had to serve food or reset tables when he worked as a stocker.  (*Id.* 267:14-24)

Defendants did not put forward any credible testimony that stockers performed more than a minimal portion of their shifts running food to tables.  Anthony Scotto testified in his supplemental declaration that "[a] stocker spend approximately half of his shift restocking the dining room with the plat settings necessary to serve customers in a timely manner and approximately half of his shift assisting the other service employees by running food, serving coffee, clearing dishes, and assisting other bussers in resetting tables."  (Scotto Supp. Dec. at

¶11)  However, at his deposition, Scotto admitted that he was not able to give an estimate of what percentage of a stocker's time was spent running food to tables.  (Tr. 613:10-614:13)  Additionally, Attilio Vosilla testified that a stocker's main responsibilities are to polish the silverware and make sure that stocking stations on the restaurant floor are properly stocked with silverware, glasses, and plates.  (Tr. 669:25-670:7)

The evidence at trial establishes that stockers were not eligible to be paid at the tip-credit rate, and rather had to be paid at the minimum wage rate.  Under the NYLL, a restaurant employee is not a "food service worker" and may not be paid at the lower tip credit rate if the employee is assigned to do work for which tips are not received for 2 hours or more or for more than 20 percent of her shift, whichever is less.  12 NYCRR §146-3.4; *see also* 12 NYCRR §146-2.9.  Similarly, the previous wage order stated than an employee is not a "food service worker" "on any day in such week in which he has been assigned to work in an occupation in which tips are not customarily received."  The stockers spent the vast majority of their shifts doing tasks that were preparatory and did not involve customer contact, and which do not customarily receive tips.  Under the NYLL, Plaintiffs were required to be paid the regular minimum wage rate when employed as stockers.

Similarly, under the FLSA, Department of Labor regulations "permit the employer to utilize the tip credit only for hours spent by the employee in the tipped occupation."  *Chhab*, 2013 U.S. Dist. LEXIS 135926, at *9 (citing 29 C.F.R. §531.51).  Furthermore, the Department of Labor has issued an opinion that "tipped employees who spend a substantial amount of time, or more than twenty percent of their workweeks, engaged in related but non-tip-producing work must be paid the full minimum wage for the time spent performing the non-tipped work."  *Id.*, 2013 U.S. Dist. LEXIS 135926, at *10-11 (citing U.S. Department of Labor, Wage and Hour

Division Fact Sheet #15: Tipped Employees Under the Fair Labor Standards Act (FLSA) (rev. Mar. 2011) ("DOL Fact Sheet #15"), available at http://www.dol.gov/whd/regs/compliance/whdfsl5.pdf).  Plaintiffs' unrebutted testimony is that when they were assigned to the stocker position, they spent nearly their entire shift doing work such as polishing dishes and bringing them to the stocker station, which did not involve customer service and does not customarily receive tips.  Therefore, Plaintiffs could not be paid at the lower tip-credit rate, and were required to be paid at the minimum wage rate, under the FLSA.

### b. Coffee Preparers

The overwhelming testimony at trial established that on many shifts, and particularly on most lunch shifts, the coffee preparer was assisted by a coffee helper.  On such shifts, the coffee helper did not personally run any coffee to tables, and spent the entire shift at the coffee station preparing coffee, teas, and other like beverages.[2]  On dinner shifts, the coffee preparer would himself run drinks to customers tables.  (Salinas Dec. ¶¶26-28; Rodriguez Dec. ¶¶26-27; Cedeno Dec. ¶26; Urgiles Dec. ¶¶26-27; Lugo Dec. ¶¶26-27; Amezquita Dec. ¶¶23-24; Roballo Dec. ¶¶27-28; Caravantes Dec. ¶26; Flores Dec. ¶¶28-29; Alvarado Dec. ¶29; Francisco-Lopez Dec. ¶¶26-27; Xochipiltecatl Dec. ¶24;  Leon Dec. ¶¶27-28; Tr. 48:22-49:3, 50:15-51:1, 52:24-54:9, 54:17-55:1, 118:24-120:8, 141:7-143:5, 144:14-146:22, 222:5-13)

Nahun Flores's testimony on the duties of the coffee maker are particularly relevant, as he spent about 90 percent of his shifts working as a coffee maker.  (362:5-10)  Flores testified that when he worked as a coffee preparer during lunch shifts, there was almost always a coffee helper whose job it was to run drinks, while Flores would prepare the drinks.  (*Id.* 363:5-20, 364:18-365:15)  Flores testified unequivocally that when there was a coffee helper, he would not

---

[2] The coffee station is located in Fresco's kitchen.  (P. Ex. 120; Tr. 626:4-11)

run drinks to customers (except for perhaps one or two drinks at the end of a shift), because he did not have time.  (*Id.* 365:24-366:18)

If the coffee person ever ran food, it was a minimal portion of their shift — less than five percent.  (*Id.* 117:6-14, 221:21-222:3)  On most shifts they did not run food at all.  For example, Christian Urgiles testified that of all the shifts he worked as a coffee preparer, he ran food on approximately 5 or 10 percent of those shifts.  (*Id.* 188:19-25)  The coffee preparer was not regularly required to run food to the tables, and only did so when specifically forced to do so by the chef or sous chef.  (*Id.* 21:3-18, 32:22-24)

Defendants contend that the coffee preparer had to run drinks when there were many orders in a short period of time during lunch.  However, no one other than the coffee preparer would prepare these drinks.  (Tr. 189:1-3, 388:2-13)  It was important to prepare drinks quickly.  (*Id.* 388:9-13)  Therefore, when it was busy, the coffee preparer could not leave the coffee station to run drinks, but rather he had to stay there and prepare the many drink orders received.

On shifts where the coffee preparer was assisted by a coffee helper, which was most lunch shifts, the coffee preparer spent, at most, a minimal portion of his time delivering drinks to customer.  The rest of the time he was performing work that is not customarily tipped, preparing coffee and other drinks for customers, to be delivered by the coffee helper.  Under both the FLSA and NYLL, the coffee preparer was required to be paid the regular minimum wage rate for lunch shifts, where a coffee helper delivered the drinks.

### c. Barbacks

Fresco also assigned bussers to work as barbacks.  The busser who worked as a barback would spend part of his time washing glasses, cleaning bottles, cleaning the bar area, cleaning mirrors, and sweeping around the bar.  The barback also would perform regular busser functions

for the tables in the bar area.  (Rodriguez Dec. ¶ 28; Cedeno Dec. ¶27; Urgiles Dec. ¶28; Lugo Dec. ¶28; Amezquita Dec. ¶25; Roballo Dec. ¶30; Flores Dec. ¶31; Francisco-Lopez Dec. ¶28; Leon Dec. ¶29; Tr. 147:17-149:8)

The bussers who worked as barbacks spent half or less their time performing regular busser functions.  (Urgiles Dec. ¶28; Roballo Dec. ¶30; Tr. 189:14-190:2, 192:21-193:20, 195:4-13, 195:25-196:10, 353:11-354:1)

When Plaintiffs worked as barbacks, the portions of their shifts when they were not performing regular busser functions involved work that is not customarily tipped.  Because barbacks spent at least 20 percent or 2 hours of their shift performing non-tipped work, they were required to be compensated at the full minimum wage rate under the NYLL.  2 NYCRR §146-3.4; *see also* 12 NYCRR §146-2.9.  Under the FLSA, Fresco was required to pay barbacks at the full minimum wage rate for the portions of their shift that they did work such as cleaning bottles, washing glasses, and cleaning the bar area.  *Chhab*, 2013 U.S. Dist. LEXIS 135926, at *9 (citing 29 C.F.R. §531.51) (Department of Labor regulations "permit the employer to utilize the tip credit only for hours spent by the employee in the tipped occupation").

### d. Bussers

There is no dispute that bussers' core duties of clearing and setting tables are tipped duties.  However, because bussers regularly spent more than 20 percent of their shift doing non-tipped duties, they were not eligible to be paid at the tip-credit rate under the NYLL.  They were required to be paid at the full minimum wage rate for their shifts under the NYLL, and under the FLSA for the portions of their shifts that they performed non-tipped duties.

Plaintiffs testified that they were required to perform sidework before their shifts as bussers.  Plaintiffs testified that their sidework at the beginning of shifts included tasks such as

"polishing bread baskets, cleaning the sugar bowls, cleaning the coffee pots and tea pots, cleaning the candleholders, cleaning the mirrors, cleaning walls inside the kitchen, folding napkins, putting glasses at their proper stations, sweeping the restaurant or kitchen, and filling and bringing ice buckets to their proper stations." (Flores Dec. ¶25; *see also* Salinas Dec. ¶24: Rodriguez Dec. ¶24; Cedeno Dec. ¶24; Urgiles Dec. ¶24; Lugo Dec. ¶24; Amezquita Dec. ¶21; Roballo Dec. ¶25; Caravantes Dec. ¶21; Francisco-Lopez Dec. ¶24; Xochipiltecatl Dec. ¶22; Leon Dec. ¶24)  This sidework would take 30 minutes, and sometimes as long as 45 minutes. (Salinas Dec. ¶24; Rodriguez Dec. ¶24; Cedeno Dec. ¶24; Urgiles Dec. ¶24; Lugo Dec.¶24; Amezquita Dec. ¶21; Roballo Dec. ¶25; Flores Dec. ¶25; Francisco-Lopez Dec. ¶24; Xochipiltecatl Dec. ¶22;  Leon Dec. ¶24; Tr. 461:2-16, 462:2-6).

Bussers also had to perform sidework at the end of their shifts.  This sidework would include tasks including "sweeping, collecting the candleholders, move the tables against the wall, dumping the ice buckets at the stations, clean the area where they make bread in the kitchen, and cleaning [bussers] stations."  (Flores Dec. ¶26; *see also* Salinas Dec. ¶25: Rodriguez Dec. ¶25; Cedeno Dec. ¶25; Urgiles Dec. ¶25; Lugo Dec. ¶25; Amezquita Dec. ¶22; Roballo Dec. ¶26; Caravantes Dec. ¶22; Francisco-Lopez Dec. ¶25; Xochipiltecatl Dec. ¶23;  Leon Dec. ¶25)  End of shift sidework could also take 30 to 40 minutes, though sometimes it took shorter. (Flores Dec. ¶26 (30 to 40 minutes); Salinas Dec. ¶25 (15 to 20 minutes): Rodriguez Dec. ¶25 (20 to 30 minutes); Cedeno Dec. ¶25 (5 to 10 minutes); Urgiles Dec. ¶25 (30 minutes); Lugo Dec. ¶25 (20 to 30 minutes); Amezquita Dec. ¶22 (20 to 30 minutes); Roballo Dec. ¶26 (5 to 10 minutes); Caravantes Dec. ¶22 (10 minutes); Francisco-Lopez Dec. ¶25 (30 minutes); Xochipiltecatl Dec. ¶23 (15 to 25 minutes);  Leon Dec. ¶25 (20 to 30 minutes).

13

In addition to the sidework, bussers often had to perform non-service work during approximately a half-hour of their shifts, including work like "cleaning walls, cleaning pictures and paintings, taking deliveries of linens from vendors and stocking them, bring in boxes of wines to the wine room from outside, bring dishes, chairs, and room dividers up and down between the main dining area and the party rooms upstairs." (Flores Dec. ¶24; *see also* Salinas Dec. ¶23: Rodriguez Dec. ¶23; Cedeno Dec. ¶23; Urgiles Dec. ¶23; Lugo Dec. ¶23; Amezquita Dec. ¶20; Roballo Dec. ¶23; Caravantes Dec. ¶20;; Francisco-Lopez Dec. ¶23; Xochipiltecatl Dec. ¶21;  Leon Dec. ¶¶22-23; Tr. 297:8-15, 298:19-305:22)  Fresco had many paintings and framed photographs in the restaurant that required cleaning. (P. Exs. 121-122)

Bussers sidework and other non-service work would regularly exceed 20 percent of their shifts.  Although the exact time of each shift varied, and is a disputed issue in this action, many Plaintiffs testified that a typical lunch shift before Fresco utilized a time clock was approximately from 10:00 a.m. to approximately 3:30 p.m., with a half-hour break for family meal.  In a five-hour shift, if a Plaintiff spent more than one hour doing sidework and other non-service work, the Plaintiff is entitled to be paid at the full minimum wage rate under the NYLL.  Plaintiffs' testimony shows that they in fact regularly spent more than 20 percent of their busser shifts doing non-tipped work, and therefore were required to be paid at the minimum wage rate, rather than the lower tip-credit rate.

### e. Food Runners

Pablo Alvarado worked as a food runner at Fresco, and Miguel Caravantes worked as a food runner during approximately his last two years at Fresco.  Like bussers, food runners regularly spent twenty percent or more of their work time doing non-tipped work.  Food runners would have to perform sidework at the beginning and end of shifts, such as weighing pasta,

removing leaves from basil, cleaning bread baskets, preparing artichokes for calamari, separating doilies that are placed on plates, and preparing artichokes and penne gratin.  This would regularly take 15 to 20 minutes at the beginning of a shift, and 5 to 10 minutes at the end of a shift.  (Alvarado Dec. ¶¶13-15; Caravantes Dec. ¶24)

Alvarado also would be required to spend approximately 30 minutes per shift doing work that did not involve service to customers.  This would include work like cleaning mirrors, cleaning the doors at the restaurant, cutting rags that were used for polishing silverware, and making cookies.  (Alvarado Dec. ¶11)  Similarly, Caravantes testified that when he worked as a runner he spent approximately two hours per lunch shift and four hours per dinner shift running food, and the rest of his shift would be spent doing preparatory work which did not involve customer service.  (Caravantes Dec. ¶25)

Alvarado and Caravantes regularly spent more than twenty percent of their shifts doing non-tipped work, and therefore Fresco was required to pay them at the full minimum wage rate. Alvarado testified that his lunch shift typically was from 10:00 a.m. to 2:30 p.m., which included a 30 minute family meal.  (Alvarado Dec. ¶31; Stipulation of Fact No. 15; *see also* P. Ex. 13)  Of his approximately four hour shift, Alvarado spent 50 minutes to one hour doing non-tipped work. (Alvarado Dec. ¶¶ 11, 13, 15)  This is more than 20 percent of his shift.  Likewise, Caravantes' unrebutted testimony is that when he worked as a food runner, only two hours of his lunch shift and four hour of his dinner shift was spent delivering food to customers.  (Caravantes Dec. ¶25) The remainder of his shift was spent doing non-tipped work.  That portion exceeded twenty percent of his shift.  (P. Ex. 15, showing hours worked by Caravantes each shift).  Accordingly, Alvarado, and Caravantes when he worked as a food runner, should have been paid at the full minimum-wage rate, rather than the tipped minimum wage rate.

15

D.  Fresco Did Not Provide Notice that Plaintiffs
Would be Paid the Tip-Credit Minimum Wage

Defendants did not provide Plaintiffs with notice, as required by the FLSA and NYLL, that they would be paid at the lower tip-credit minimum wage rate.  Nor did Defendants properly indicate the tip allowance claimed in the wage statements they provided Plaintiffs.  Therefore, it was unlawful for Defendants to pay Plaintiffs at the lower tip-credit minimum wage rate.

The FLSA includes strict notice requirements before an employee can be paid at the tip-credit rate.  Proper notice requires "at the very least[,] notice to employees of the employer's intention to treat tips as satisfying part of the employer's minimum wage obligations." *Copantitla v. Fiskardo Estiatorio, Inc.*, 788 F. Supp. 2d 253, 287-288 (S.D.N.Y. 2011) (quoting *Martin v. Tango's Rest., Inc.,* 969 F.2d 1319, 1322 (1st Cir. 1992)).   Before using the tip credit, an employer must inform the employee of (1) the amount of cash wage the employer is paying the employee, (2) the amount they claim as a tip credit, (3) that the tip credit cannot exceed the amount if tips actually received by the employee, (4) the tips received by the employee are to be retained by the employee except for a valid tip pooling arrangement limited to employees who customarily and regularly receive tips; and (5) that the tip credit will not apply to a tipped employee unless he she has been informed of these tip credit provisions.  U.S. Department of Labor, Wage and Hour Division Fact Sheet #15: Tipped Employees Under the Fair Labor Standards Act (FLSA) (rev. July 2013) ("DOL Fact Sheet #15"), available at http://www.dol.gov/whd/regs/compliance/whdfs15.pdf. *See also* 29 C.F.R. §§531.50, *et seq.*

Likewise, under the NYLL, an employer must provide the employee written notice of the employee's hourly rate, overtime rate, and tip credit.  12 NYCRR §146-2.2.  The notice must be in both English and in any other language spoken by the employee as his primary language.  12

NYCRR §146-2.2(a).  If an employee is not notified as required by 12 N.Y.C.R.R. §146-2.2, the employer is not allowed to pay employees at the lower tip credit rate.

Prior to January 1, 2011, the tip credit eligibility of Plaintiffs under the NYLL was governed by 12 N.Y.C.R.R. §137.  Under those regulations, in order to pay employees at a tip-credit rate, employer were required to (1) "furnish to each employee a statement with every payment of wages listing ... allowances ... claimed as part of the minimum wage...," and (2) "maintain and preserve for not less than six years weekly payroll records which shall show for each employee... allowances ... claimed as part of the minimum wage...." *Copantitla*, 788 F.Supp.2d at 290 (quoting *Padilla v. Manlapaz*, 643 F.Supp.2d 302, 309 (E.D.N.Y.2009)).

The evidence at trial showed that, before 2011, Plaintiffs did not receive any notice that Fresco would include tips to satisfy their obligation to pay Plaintiffs at the minimum wage rate. Rather, Plaintiffs (with the exception of Amezquita, who was hired in 2012) testified that no one discussed wages with them when they were hired by Fresco.  (Salinas Dec. ¶5; Rodriguez Dec. ¶5; Cedeno Dec. ¶5; Urgiles Dec. ¶5; Lugo Dec. ¶5; Roballo Dec. ¶6; Caravantes Dec. ¶5; Flores Dec. ¶5; Alvarado Dec. ¶4; Francisco Dec. ¶6; Xochipiltecatl Dec. ¶5; Leon Dec. ¶4)

In 2011 and in February 2012, Fresco had the Plaintiffs sign a wage notice, written only in English, which stated they would be paid at the rate of $5.00 per hour, and that Fresco would take a $2.25 per hour tip credit.  However, this notice was in English only, and Plaintiffs' primary language is Spanish.  Fresco only first provided notices in both English and Spanish in July 2012. (P. Exs. 30, 38, 40, 44, 46, 50, 54, 58, 61, 65, 68)  Most of the Plaintiffs testified that they signed the notice and returned it to Fresco, and were not given a copy to keep.  (Salinas Dec. ¶106; Rodriguez Dec. ¶104; Urgiles Dec. ¶109; Roballo Dec. ¶101; Caravantes Dec. ¶95; Flores Dec. ¶107; Alvarado Dec. ¶100; Francisco Dec. ¶95; Leon Dec. ¶102)

17

Plaintiffs did receive wage statements, which listed the tips they received each week. However, this did not satisfy the pre-2011 NYLL requirement that, in order to pay employees at the tip-credit rate, an employer must "furnish to each employee a statement with every payment of wages listing ... allowances ... claimed as part of the minimum wage...." *Copantitla*, 788 F.Supp.2d at 290 (quoting *Padilla v. Manlapaz*, 643 F.Supp.2d 302, 309 (E.D.N.Y.2009)).  The wage statements simply listed the tips the employee received, but did not identify that the employer was claiming an allowance for tips.  (P Exs. 82-86)  Here, as in *Copantitla*, "although defendants provided plaintiffs with a pay statement listing hourly pay, deductions, and tip income, the pay statements do not show 'allowances... claimed as part of the minimum wage.'" *Copantitla*, 788 F.Supp.2d at 290.  The pay statements the Plaintiffs received "show only that plaintiffs earned tip-related income; they do not record that any of the tip income was claimed as part of the minimum wage." *Id.*  This did not satisfy the requirement of the NYLL, and Plaintiffs were required to be paid at the regular minimum wage rate.

The notices Fresco made Plaintiffs signed starting in 2011 and in February 2012 also did not provide proper notice, for several reasons.  *First*, they were in English only, and Plaintiffs' primary language is Spanish.  12 NYCRR §146-2.2(a).  *Second*, Plaintiffs were not provided with copies of the notices to keep.  *Third*, the notices were inaccurate.  As set out below (Part III), Defendants regularly undercounted the number of hours Plaintiffs worked.  Therefore, Plaintiffs were not actually paid $5.00 per hour, but rather were paid at a lower rate.  Although Fresco had Plaintiffs sign notices which were in English and Spanish beginning in July 2012, the additional deficiencies persisted.

Because Defendants did not provide Plaintiffs with proper notice under the FLSA and NYLL that Plaintiffs' tips would be used as a credit allowing Fresco to pay them below

minimum wage, it was unlawful for Fresco to pay Plaintiffs below the regular minimum wage rate.

E.   Fresco Improperly Included Ineligible Participants in the Tip-Pool

Fresco improperly included non-service employees — specifically stockers and coffee preparers on lunch shifts — in its tip pool.  Fresco also included managers Brent Drill and Attilio Vosilla in its tip pool.  Under both the FLSA and NYLL, it was unlawful for Fresco to pay service employees at the lower tip-credit rate when they were required to share tips with non-service employees and managers.

Under the FLSA, "an employer may not avail itself of the tip credit if it requires employees to share their tips with employees who do not regularly and customarily receive tips." *Fonseca v. Dircksen & Talleyrand Inc*., 2014 U.S. Dist. LEXIS 52744, *5, 2014 WL 1487279 (S.D.N.Y. April 10, 2014) (citing 29 U.S.C. §203(m)).  Therefore, "an employer loses its entitlement to the tip credit where it requires tipped employees to share tips with (1) employees who do not provide direct customer service or (2) managers." *Shahriar v. Smith & Wollensky Rest. Grp., Inc*., 659 F.3d 234, 240 (2d Cir. 2011); *see also Chhab*, 2013 U.S. Dist. LEXIS 135926, at *17 ("The inclusion of an employee who does not customarily and regularly receive tips will invalidate the tip credit applied to participating employees' wages").

The NYLL, like the FLSA, also prohibits tipped employees to be required to share tips with non-service staff, and with managers.  NYLL §196-d.  Courts in this Circuit have repeatedly held that where an employer required tipped employees to share tips with non-service staff and with managers, the tipped employees are entitled to both the difference between the full minimum wage and the tipped minimum wage, and the misappropriated tips.  *See*, *e.g.*, *Copantitla*, 788 F. Supp. 2d at 290 (S.D.N.Y. 2011) ("defendants' violation of N.Y. Lab. Law

§196-d itself constitutes an independent and sufficient reason to find that defendants are not entitled to a tip credit"); *Hai Ming Lu v. Jing Fong Restaurant, Inc.*, 503 F. Supp. 2d 706, 711 (S.D.N.Y. 2007) ("this separate violation of §196-d would render [employer] ineligible to receive a tip credit under New York law").[3]

> a. Non-Service Employees

In determining whether an employee is one who customarily and regularly receives tips, the court must determine "whether the employee's job is historically a tipped occupation and whether he has more than 'de minimis' interaction with customers as a part of his employment." *Chhab*, 2013 U.S. Dist. LEXIS 135926, at *18.

As set out above in Part I(C)(a), stockers' primary duties were to polish silverware, plates, and glasses, and restock those items at the stocking stations on the Fresco restaurant floor. Any direct service to customers, such as running food to customers or bussing tables, was *de minimis*. Similarly, the coffee preparers on lunch shifts only prepared beverages in Fresco's kitchen, which were served by other employees to the customers. *Supra*, Part I(C)(b). These *de minimis* interactions with customers are not sufficient to include the stocker and the coffee preparer (on lunch shifts) in the tip pool. *See Chhab*, 2013 U.S. Dist. LEXIS 135926, at *40 (silverware polishers and dishwashers tip-ineligible because did not interact with customers, "as their primary responsibility was to clean flatware and glasses in the kitchen area, away from table service"). For this additional reason, Plaintiffs were required to be paid at the full minimum wage rate.

> b. Managers Brent Drill and Attillio Vosilla

---

[3] We are aware that this Court reached an opposite conclusion in *Schear v. Food Scope Am., Inc.*, 2014 U.S. Dist. LEXIS 3454, *51, 2014 WL 123305 (S.D.N.Y. Jan. 10, 2014). We respectfully disagree and ask the Court to reconsider.

It is undisputed that Brent Drill received tips from Fresco's tip pool on every shift he worked until January 1, 2013, and that Attilio Vosilla received tips on shifts he worked as a party captain until June 2011. (Scotto Dec. ¶¶34, 36-37) This was unlawful, because Drill and Vosilla were managers with authority over the terms and conditions of Plaintiffs' employment.

To determine whether a tip pool participant is a manager under the FLSA, courts consider multiple factors, including "[1] [the] authority to suspend or terminate employees . . . ; (2) supervision of the wait staff and [making] hiring decisions; (3) [taking] responsibility for the restaurant's budget, including analyzing payroll and food costs; and (4) receipt of a salary . . . regardless of the number of hours . . .worked." *Widjaja v. Kang Yue USA Corp.*, 2011 U.S. Dist. LEXIS 109007, *15-16, 2011 WL 4460642 (E.D.N.Y. Sept. 26, 2011); *see also Gillian v. Starjem Rest. Corp.,* 2011 U.S. Dist. LEXIS 115833, *11-12, 2011 WL 4639842 (S.D.N.Y. Oct. 4, 2011) (courts consider whether individual "(1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records").

Under the NYLL, Section 196-d of the New York Labor Law provides:

> No employer or his agent or an officer or agent of any corporation, or any other person shall demand or accept, directly or indirectly, any part of the gratuities, received by an employee, or retain any part of a gratuity or of any charge purported to be a gratuity for an employee. . . . Nothing in this subdivision shall be construed as affecting the allowances from the minimum wage for gratuities in the amount determined in accordance with the provisions of article nineteen of this chapter nor as affecting practices in connection with banquets and other special functions where a fixed percentage of the patron's bill is added for gratuities which are distributed to employees, nor to the sharing of tips by a waiter with a busboy or similar employee.

An individual is not a "similar employee" to waiters and bussers if the individual exercises "meaningful or significant authority or control over subordinates." *Barenboim*, 21 N.Y.2d at 473.  The New York Court of Appeals further explained:

> Meaningful authority might include the ability to discipline subordinates, assist in performance evaluations or participate in the process of hiring or terminating employees, as well as having input in the creation of employee work schedules, thereby directly influencing the number and timing of hours worked by staff as well as their compensation.  In other words . . . the power to hire and fire is not the exclusive test . . . .  Meaningful authority, not final authority, should be the standard.

*Id.*  Therefore, "an employee granted meaningful authority or control over subordinates can no[t] be considered similar to waiters and busboys within the meaning of section 196-d and, consequently, is not eligible to participate in a tip pool."  *Id.*

> i.   Brent Drill

Brent Drill worked as a manager, and had meaningful authority over employees.  Specifically, Drill could and did interview and hire Fresco employees, fire and impose lesser discipline on employees, supervise employees in the performance of their work, and create employee records.

At trial, Plaintiffs provided specific testimony of actions Drill took that demonstrate his meaningful authority over employees:

- Enrique Salinas was introduced to Drill when he came to Fresco to look for a job.  He was told Drill was a manager, spoke with Drill, and told to come back the next day to begin training.  The following day, Drill told Salinas he was hired and Salinas began his employment at Fresco.  Salinas did not see or speak to Anthony Scotto at the restaurant when he first met with Drill or when he returned to start working.  (Salinas Dec. ¶4; Tr. 97:21-99:23,  121:21-122:13)

- Salinas observed Drill suspend Nahun Flores and Luis Roballo.  (Salinas Dec. ¶66)

- Alfredo Rodriguez observed Drill send Julian Amezquita home without consulting Anthony Scotto first, because Julian refused to work as a bar back, and Anthony Scotto later asked Julian to return to work.  (Rodriguez Dec. ¶63; Tr. 323:22-324:12)

- When Christian Urgiles arrived to begin his training, James, the host, told him to speak with Drill, who would oversee his training.  After three days of training, Drill told Urgiles he was hired.  (Urgiles Dec. ¶4; Tr. 154:2-12)

- Drill sent Urgiles home for arriving late to work, and Urgiles did not see Drill speak with Anthony Scotto before sending him home.  (Urgiles Dec. ¶68; Tr. 164:6-165:18)

- Urgiles saw Drill send another employee, Abel Reyes, home because he arrived late, and Urgiles did not see Drill speak with Anthony Scotto first.  (Urgiles Dec. ¶68; Tr. 166:10-168:9)

- Drill terminated Jose Julian Amezquita's employment.  (Amezquita Dec. ¶53; P. Ex. 36)

- Amezquita observed Drill fire and discipline other employees.  (Tr. 439:16-443:15)

- Drill terminated Luis Roballo.  (Roballo Dec. ¶62; Tr. 356:9-357:5)

- When Miguel Caravantes asked Drill if he can take a day off, Drill told Caravantes if he took the day off he should also not come in for the rest of the week, and Drill did so without conferring with Anthony Scotto.  (Caravantes Dec. ¶63)

- Drill sent Nahun Flores home twice: once because he didn't take a cup from the dishwashing station to the coffee station, and a second time when he came in a day after calling in sick.  (Flores Dec. ¶66; Tr. 373:12-375:24)

- Dill interviewed Pablo Francisco-Lopez, and told him to come back for training, without first conferring with Anthony Scotto.  Drill then oversaw Francisco-Lopez's training, and told him at the end of his training that he was hired.  (Francisco-Lopez Dec. ¶¶4-5)

- Drill interviewed Valentin Xochipiltecatl, told him to return for training, and told him at the end of training that he was hired.  Xochipiltecatl never met Anthony Scotto during this interview and training period.  (Xochipiltecatl Dec. ¶4; 272:9-274:6)

- Vicente Leon observed Drill fire an employee named Gelacio, and did not see Drill first speak with Anthony Scotto.  (Leon Dec. ¶63; Tr. 494:11-495:5, 502:25-505:18)

Defendants have not put forth evidence or testimony disputing that Drill performed these actions.  In fact, Anthony Scotto confirmed that Drill would sometimes meet with bussers who applied to work at Fresco, and could tell the bussers to return for training.  (Tr. 540:3-541:23, 542:9-16)  Anthony Scotto also admitted that Drill would oversee bussers' training.  (Tr. 542:17-20)

In addition to Plaintiffs' testimony about these specific incidents of Drill exercising management authority over employees, additional evidence and testimony shows that Drill was in fact a manager at Fresco.  Fresco's own employee policy handbook listed Drill as a manager.  (P. Ex. 71-74)  Drill was listed as a manager as early as October 2007.  (P. Ex. 74)  The same policy handbooks identified specific matters that employees were required to address to managers such as Drill.  (P. Exs. 71-74)  These employee policy documents were given to all employees, and the employees were required to sign acknowledgements of receipt.  (P. Exs. 29, 33, 37, 41, 43, 47, 49, 52, 57, 62, 67, 69)  Additionally, Drill described himself as a manager on his Linked-In profile.  (P. Ex. 95; Drill Dep. Tr. 142:21-144:7)  Plaintiffs knew Drill as a manager, and Drill was referred to as a manager at Fresco.  (Salinas Dec. ¶59; Rodriguez Dec.

24

¶55; Cedeno Dec. ¶54; Urgiles Dec. ¶59; Lugo Dec. ¶54; Amezquita Dec. ¶47; Roballo Dec. ¶56; Caravantes Dec. ¶58; Flores Dec. ¶58; Alvarado Dec. ¶¶58, 61; Francisco Lopez Dec. ¶56; Xochipiltecatl Dec. ¶50; Leon Dec. ¶59; Tr. 395:24-396:6, 495:13-18, 495:22-496:7)

Brent Drill was in charge of service for the entire restaurant.   (Salinas Dec. ¶62; Rodriguez Dec. ¶58; Cedeno Dec. ¶54; Urgiles Dec. ¶63; Lugo Dec. ¶57; Amezquita Dec. ¶50; Roballo Dec. ¶59; Caravantes Dec. ¶60; Flores Dec. ¶61; Alvarado Dec. ¶62; Francisco Lopez Dec. ¶59; Xochipiltecatl Dec. ¶53) He regularly supervised the service employees such as Plaintiffs, and made sure they performed their jobs correctly.   (Salinas Dec. ¶¶ 63, 66; Rodriguez Dec. ¶¶59-60, 63;Cedeno Dec. ¶55; Urgiles Dec. ¶64-65, 68; Lugo Dec. ¶58, 62; Amezquita Dec. ¶¶51-53; Roballo Dec. ¶¶60-63; Caravantes Dec. ¶¶61, 63; Flores Dec. ¶¶ 62, 65-66; Alvarado Dec. ¶¶64, 66; Francisco-Lopez Dec. ¶60, 62; Xochipiltecatl Dec. ¶¶54, 56; Leon Dec. ¶¶62-63; Tr. 495:22-496:7)  Drill would lead pre-shift staff meetings, either together with Anthony Scotto or by himself.   (Salinas Dec. ¶68; Rodriguez Dec. ¶66; Cedeno Dec. ¶59; Urgiles Dec. ¶71; Lugo Dec. ¶65; Amezquita Dec. ¶55; Roballo Dec. ¶68; Caravantes Dec. ¶66; Flores Dec. ¶69; Alvarado Dec. ¶68; Francisco-Lopez Dec. ¶64; Xochipiltecatl Dec. ¶59; Leon Dec. ¶66)  Drill was authorized to address customer complaints, and could void items.   (Salinas Dec. ¶70; Rodriguez Dec. ¶68; Cedeno Dec. ¶62; Urgiles Dec. ¶73; Lugo Dec. ¶68; Amezquita Dec. ¶58; Roballo Dec. ¶70; Caravantes Dec. ¶68; Flores Dec. ¶71; Alvarado Dec. ¶70; Francisco-Lopez Dec. ¶65; Xochipiltecatl Dec. ¶61; Leon Dec. ¶69)

## ii.   Attilio Vosilla

The trial testimony and evidence also established that Attilio Vosilla was a manager at Fresco, who was not eligible to participate in Fresco's tip pool.  Plaintiffs trial testimony gave numerous specific examples of Vosilla exercising authority over Fresco employees, including:

- When Luis Roballo walked into Fresco to look for a job, he was introduced to Vosilla, who interviewed him and told him to return for training.  Vosilla did not speak to anyone else before inviting Roballo to return for training.  Vosilla supervised Roballo's training, and at the end of his training told Roballo he was hired.  Roballo did not meet Anthony Scotto at all before he was hired.  (Roballo Dec. ¶¶4-5; Tr. 354:2-355:5)

- Enrique Salinas and Christian Urgiles witnessed Vosilla fire an employee Patricio, without consulting with Anthony Scotto beforehand.  (Salinas Dec. ¶79; Urgiles Dec. ¶82; Tr. 105:18-106:14, 172:21-178:10)

- Vosilla wrote up a disciplinary communication which went into Alfredo Rodriguez's personnel file for arriving late to Fresco.  (Rodriguez Dec. ¶76; P. Ex. 63; Tr. 324:13-17)

- Alfredo Rodriguez witnessed Vosilla terminate an employee named Nazario.  (Rodriguez Dec. ¶77; Tr. 324:18-22)

- Angel Cedeno witnessed Vosilla fire an employee named Juan.  (Cedeno Dec. ¶69; 396:10-25)

- Vosilla wrote up a disciplinary communication which went into Jose Julian Amezquita's personnel file for arriving late to Fresco.  (Amezquita Dec. ¶66; P. Ex. 35;

- Jose Julian Amezquita witnessed Vosilla send home bussers Washington and Wellington, without conferring with Anthony Scotto.  (Amezquita Dec. ¶65; Tr.444:24-447:11)

- Once when Nahun Flores called in sick, the hostess told him that Vosilla told her that  if he missed work because he was sick, he would be suspended for one week.  (Flores Dec. ¶79; Tr. 376:23-377:25)

- Flores witnessed Vosilla fire an employee, Juan Carlos, when Anthony Scotto was not at the restaurant.  (Flores Dec. ¶80; 380:23-381:10).

- Flores witnessed Vosilla interview and hire employees.  Specifically, Flores witnessed Vosilla hire a busser named Wellington.  (Flores Dec. ¶83)

-  Vosilla met with Valentin Xochipiltecatl at the beginning of his training.  (Xochipiltecatl Dec. ¶4)

While Vosilla testified that he would only accept prospective employees' resumes and pass them along to Anthony Scotto, he admitted that would sometimes interview employees with Scotto, and make suggestions about whether an employee should be hired.  (Tr. 672:5-18)  Vosilla further admitted that he could not recall Scotto ever disagreeing with his suggestion that an employee be hired.  (*Id.* 672:19-21)

In addition to these specific examples of Vosilla's involvement in the hiring, training, disciplining, and firing of employees, Vosilla regularly carried out management functions at Fresco.  All Plaintiffs — who all have experience working in restaurants — understood that Vosilla was a manager in charge of overseeing employees, and that he had the authority to discipline employees.  (Salinas Dec. ¶¶78-79; Rodriguez Dec. ¶¶75-77; Cedeno Dec. ¶¶68-69; Urgiles Dec. ¶¶81-82; Lugo Dec. ¶75; Amezquita Dec. ¶¶65-67; Roballo Dec. ¶¶76-77; Caravantes Dec. ¶75; Flores Dec. ¶¶78-80; Alvarado Dec. ¶76; Francisco-Lopez Dec. ¶73; Xochipiltecatl Dec. ¶68; Leon Dec. ¶76; Tr. 495:13-18)  Vosilla regularly ran pre-shift meetings before the dinner shift, either with or without Anthony Scotto's participation.  (Salinas Dec. ¶83; Rodriguez Dec. ¶82; Cedeno Dec. ¶72;  Urgiles Dec. ¶87; Lugo Dec. ¶80; Amezquita Dec. ¶72; Roballo Dec. ¶82; Caravantes Dec. ¶79; Flores Dec. ¶85; Alvarado Dec. ¶80; Francisco-Lopez Dec. ¶76; Xochipiltecatl Dec. ¶72; Leon Dec. ¶81; Tr. 669:21-24)

Fresco itself identified Vosilla as a manager, along with Anthony Scotto and Brent Drill in its employee handbook, as early as 2007 and continuing thereafter.  (P. Exs. 71-74)  Vosilla

himself describes his position on his LinkedIn profile as "Responsible for hands-on management of a high volume, 180 seat high profile restaurant.  Duties include all front of house and banquet functions. . . . Interview and hire new employees.  Oversee training and scheduling of 42 employees."  (P. Ex. 96)

Anthony Scotto admitted that Vosilla has the authority to hire and fire employees, but claims that he only has had that authority since January 2013.  (Tr. 561:2-24)  However, Vosilla testified that his job responsibilities have been the same for at least the past six years.  (Tr. 676:22-24)  While Vosilla then said on redirect examination that he received "a little bit" of additional responsibilities in January 2013 (Tr. 678:8-679:4), he admitted on recross examination that the only change was in title, "[o]therwise it's the same job."  (Tr. 679:24-680:7).

Vosilla was responsible for scheduling at Fresco.  Vosilla testified on cross-examination that, at least since 2007, he would prepare the initial weekly schedule for Fresco.  (Tr. 666:10-23).  Anthony Scotto may have made changes to add or reduce staff, but would not direct Vosilla to have certain employees work certain shifts, or in certain positions.  (*Id.* 667:1-21)  Vosilla was able to authorize employees to swap shifts.  (*Id.* 668:15-669:8)

Vosilla testified that he could discipline or write up employees, but could only do with Anthony Scotto's approval.  However, Vosilla admitted that he could not recall any time when he brought an employee issue to Scotto's attention and Scotto told him not to write up the employee.  (Tr. 665:7-666:3)

Vosilla would be the last person at the restaurant on dinner shifts from Tuesday through Saturday, and would close up the restaurant.  (Tr. 667:23-668:3; Salinas Dec. ¶87; Rodriguez Dec. ¶86; Cedeno Dec. ¶75;  Urgiles Dec. ¶91; Lugo Dec. ¶84; Amezquita Dec. ¶75; Roballo Dec. ¶85; Caravantes Dec. ¶82; Flores Dec. ¶88; Alvarado Dec. ¶83; Francisco-Lopez Dec. ¶80;

Xochipiltecatl Dec. ¶77; Leon Dec. ¶84)   Employees would obtain Vosilla's approval before leaving the restaurant at the end of dinner shifts.  (Tr. 668:4-11; Salinas Dec. ¶85; Rodriguez Dec. ¶85; Cedeno Dec. ¶74;  Urgiles Dec. ¶90; Lugo Dec. ¶83; Amezquita Dec. ¶74; Roballo Dec. ¶84; Caravantes Dec. ¶81; Flores Dec. ¶87; Alvarado Dec. ¶82; Francisco-Lopez Dec. ¶79; Xochipiltecatl Dec. ¶74; Leon Dec. ¶83).

Additionally, Vosilla signed numerous forms on behalf of Fresco, including employment eligibility verifications, acknowledgements of receipt of the employee handbook, and wage notices.  (P. Exs. 27, 29-35, 37-54, 56-58, 60-70).

### iii.   Anthony Scotto's Testimony that he Singlehandedly Made All Employment Decisions at Fresco is not Credible

 In an attempt to justify Brent Drill and Attilio Vosilla's participation in Fresco's tip pool, Anthony Scotto testified that he is the sole person who hires and fires employees, that he interviews all candidates including bussers, and that he is the sole person who can take any meaningful authority of the terms and conditions of employment.   (Scotto Dec. ¶5)   This testimony is not credible.

As set out above, Plaintiffs identify both specific incidents of Drill and Vosilla exercising meaningful authority over terms and conditions of employment, including hiring, firing, disciplining, and setting schedules, and general management authority that Drill and Vosilla exercised on a regular basis, such as overseeing performance and giving permission to leave at the end of shifts. (*supra*, Parts I(E)(b)(i) and I(E)(b)(ii))

Moreover, it is simply not credible that Anthony Scotto can perform all the functions he claims to perform without delegating some management of employees to others.  From 2007 to the present Fresco has had close to one hundred total employees at any given time.  (Tr. 539:13-540:2)  Scotto does not only oversee service employees.  He also is "responsible for making sure

that the Restaurant runs smoothly at all times," "manage[s] the kitchen, dining room and administrative staff[,] personally handle[s] the relationships with Fresco's vendors, [and] monitor[s] the Restaurant's budget." (Scotto Dec. ¶4)  It is not fathomable that Scotto personally performed all of these functions without delegating some management of employees to others.

Additionally, Scotto admitted that sometimes potential bussers would meet with Brent Drill initially when they came to Fresco looking for a job, and be told to return for training without first meeting with Scotto.  (Tr. 540:3-542:16)

Scotto's testimony that he personally was fully responsible for scheduling service employees is contradicted by Vosilla's own testimony that he would prepare the initial draft of schedules, and could make changes among employees on his own.  (Tr. 666:10-669:8)

It is not surprising that Vosilla could make changes to the schedule on his own, considering that Scotto did not know Fresco's bussers by name, or know how many bussers Fresco employed.  (Tr. 551:22-23, 555:8-557:1, 557:20-558:9)  At his deposition, Scotto could not even recognize the names of four Plaintiffs who were working for Fresco at the time.  (*Id.* 555:8-557:1)

Additionally, in response to interrogatories, Starjem Restaurant Corp. identified Anthony Scotto, Dill and Vosilla as persons who were responsible for (A) determining employee's compensation, (B) determining employees' work hours or work schedules, (C) determining employees' status as exempt or non-exempt, (D) calculating employees' time worked, (E) preparing the payroll, (F) maintaining payroll records, and (G) paying employees of Starjem Restaurant Corp.  (P. Ex. 102; Tr. 559:18-560:21)  Scotto's attempt to back away from that identification should not be credited.

Anthony Scotto's credibility is also damaged because he openly acknowledged that he testified falsely under oath at his deposition. Repeatedly, when questioned about his mother, Marion Scotto's, involvement in Fresco, he testified that testimony he gave at his deposition was not accurate. (Tr. 516:7-517:5, 519:25-520:20, 521:10-522:15)

## II. DEFENDANTS MISAPPROPRIATED PLAINTIFFS' TIPS IN VIOLATION OF NYLL §196-d

Defendants unlawfully misappropriated tips from the Plaintiffs by requiring them to share portions of their tips with managers and with non-service employees such as stockers, coffee preparers, bar backs, and expediters.

Section 196-d of the New York Labor Law provides:

> No employer or his agent or an officer or agent of any corporation, or any other person shall demand or accept, directly or indirectly, any part of the gratuities, received by an employee, or retain any part of a gratuity or of any charge purported to be a gratuity for an employee. . . . Nothing in this subdivision shall be construed as affecting the allowances from the minimum wage for gratuities in the amount determined in accordance with the provisions of article nineteen of this chapter nor as affecting practices in connection with banquets and other special functions where a fixed percentage of the patron's bill is added for gratuities which are distributed to employees, nor to the sharing of tips by a waiter with a busboy or similar employee.

The New York Court of Appeals has defined "similar employee" to mean employees who are "ordinarily engaged in personal customer service." *Barenboim v. Starbuck Corp.*, 21 N.Y.2d 460, 471-72 (2013); *see also Shahirar*, 659 F.3d at 240 (Section 196-d prohibits employers from requiring employees to share tips with non-service employees and managers).

As set out in Parts I(C) and I(E) above, Defendants required Fresco's service employees to share tips with non-service employees (specifically stockers and, on some shifts, coffee preparers) and with managers (Brent Drill and Attilio Vosilla). Under NYLL §196-d, Plaintiffs

are entitled to their pro-rate shares of tips that were misappropriated and given to non-service employees and managers.

A recent decision by District Judge Crotty is directly on point. In *Encalada v. SDNY 19 Mad Park*, Index No. 13-cv-1926 (PAC) (S.D.N.Y. Nov. 6, 2014),[4] Judge Crotty determined after a bench trial that a maître d' named Mr. Lombardozzi possessed the meaningful authority that rendered him ineligible to participate in a tip pool. Mr. Lombardozzi frequently interviewed potential hires, disciplined employees, and created the initial employees' schedule each week. *Id.* at 9. Judge Crotty held that even if other individuals held "ultimate authority" over those actions, and even if 90 percent of Mr. Lombardozzi's actions related to customer service, the remaining 10 percent constitutes 'meaningful authority' under *Starbucks.*" *Id.* at 9-10  Therefore, Mr. Lombardozzi was not allowed to participate in the tip pool. *Id.*

Likewise, Drill and Vosilla had meaningful authority over employees. Even if they spent part of their work engaged in customer service, and if Anthony Scotto maintained ultimate authority over Fresco's employees, the authority Drill and Vosilla exercised meaningful authority over Fresco's employees. Defendants are liable to Plaintiffs under Section 196-d.

### III. PLAINTIFFS WERE NOT COMPENSATED FOR ALL HOUR WORKED, IN VIOLATION OF THE MINIMUM WAGE AND OVERTIME PROVSIONS OF THE FLSA AND NYLL

Under both the FLSA and NYLL, an employee must be paid a minimum wage for all hours worked. 29 U.S.C. §206; N.Y. Lab. Law §652. Also under both the FLSA and NYLL, an employee must be paid at the rate of one and one-half times the employee's regular hourly rate for each hour the employee works in excess of 40 hours in a given workweek. 29 U.S.C. § 207(2)(C); 12 NYCRR 146-1.4; 12 NYCRR §137-1.3.

---

[4] A copy of the transcript containing the decision after trial in this action was annexed to Plaintiffs' pre-trial brief. (Doc. No. 62-1)

The evidence at trial showed that Plaintiffs were not paid for all of the hours worked, and therefore were paid below the minimum and overtime wage rate.  This occurred both before June 2011, when the Defendants did not track the number of hours Plaintiffs worked, and after June 2011, when the Defendants implemented a time clock system that automatically subtracted approximately 19 minutes of each shift Plaintiffs worked.

### A.  Before June 2011

Defendants admit that before June 2011, they paid Plaintiffs on a shift pay basis, and did not track the exact hours Plaintiffs worked.  (Scotto Aff. ¶¶13-14; Tr. 597:18-598:3, 649:8-650:11)   According to Defendants, from January 2007 until July 2008, Defendants paid Plaintiffs for 5.5 hours worked for lunch shifts, and 7 hours worked for dinner shifts.  (Gelman Aff. ¶33)  Around July 2008, Defendants claim that they reduced the number of hours paid per shift, and paid Plaintiffs for 5 hours per shift.  (*Id.* ¶34)  In December 2010, Defendants state that they paid six hours per dinner shift.  (*Id* ¶35)

Defendants' documents show that Gelman's testimony was not accurate.  According to Gelman, by November 2008, Fresco was paying bussers 5 hours per shift for all shifts.  (*Id.* ¶34)  However, for example, the week ending November 1, 2008, Defendants continued to pay Plaintiffs at the rate of 5.5 hours per lunch shift, and 7 hours per dinner shift.  (P. Ex. 76 at 1327-1339, P. Ex. 77 at 1340) Thus, that week, Pablo Alvarado worked two lunch shifts and three dinner shifts, and was paid for 32 hours.  Miguel Caravantes worked a single lunch shift, and was paid for 5.5 hours.  (*Id.*)

Defendants' records show that on or around November 2008, Fresco changed to paying 5 hours per lunch shift, and 6 hours per dinner shift.  For example, the records for the week ending November 22, 2008, Pablo Alvarado worked 3 lunch shifts and 4 dinner shifts, and was paid for

39 hours.  (P. Ex. 77 at 2485)  Luis Arizaga worked 3 lunch shifts and 3 dinner shifts and was paid for 33 hours.  (*Id.*)  On or about January 17, 2009, Fresco changed to paying all shifts at 5 hours per shift, according to their records.  (P. Ex. 76 at 2282-2293, 2254-2265, 77 at 2268, 2280)  The records show that starting on or about December 10, 2010, Fresco paid bussers 5 hours per lunch shift and 6 hours per dinner shift.  (P. Ex. 76 at 5408-5419, P. Ex. 77 at 5420)

However, Plaintiffs were not paid these number of hours for their shifts.  Particularly, during this period Defendants never paid Plaintiffs for more than 40 hours per week, even when Defendants' own documents show that some Plaintiffs worked more than 40 hours, according to Defendants' calculations.  (P. Ex. 117, 118; Tr. 600:2-608:1)  At trial, Gelman testified that she was instructed by Anthony Scotto to pay employees for only 40 hours, even when they worked more than eight shifts per week.  (Tr. 657:2-11, 660:5-18)  Anthony Scotto admitted that the week ending February 12, 2011, Miguel Caravantes worked ten shifts and was only paid for 40 hours, while other Plaintiffs who worked only 8 shifts were also paid for 40 hours.  (P. Ex. 117; Tr. 600:2-604:15).  Scotto and Natasha Gelman also admitted that the week ending May 1, 2010[5], Pablo Francisco and Luis Roballo worked nine shifts and was paid for 40 hours, and Enrique Salinas worked ten shifts and was paid for 40 hours, while Nahun Flores and Vicente Leon only worked eight shifts and also were paid for 40 hours.  (P. Ex. 118; Tr. 605:5-608:1, 653:16-657:1)

At trial, Scotto attempted to justify this practice by claiming that any hours that were not paid would be made up the following week.  (Tr. 604:13-15; 608:17-609:11)  Fresco's own

---

[5] Plaintiffs' Exhibit 118 states that it is for the week ending May 1, 2010, but the dates on the document end with June 1, 2010.  At trial, the parties assumed that P. Ex. 118 reflected the week ending June 1, 2010.  (Tr. 605:5-22)  Upon review, it appears that the document was for the week ending May 1, 2010.  We ask the Court to take judicial notice that May 1, 2010 was a Saturday, while June 1, 2010 was a Tuesday.

records proved that to be false.[6]   At trial, Scotto was shown the records for the week following February 12, 2011.   Those records did not show any additional hours being added to Miguel Caravantes's pay, even though the previous week he had worked ten shifts and been paid for only 40 hours.   (Tr. 617:24-624:18; P. Ex. 76 at 5130-5142; P. Ex. 77 at 5143)[7]   Likewise, the records for the week ending May 8, 2010 do not evidence any additional hours paid for Francisco, Roballo, or Salinas.   (P. Ex. 76 at 3321-3332; P. Ex. 77 at 3333).   That week, Francisco and Salinas worked seven shifts and were paid for 35 hours, and Roballo worked eight shifts and was paid for 40 hours.   (P Ex. 76 at 3327-28; P. Ex. 77 at 3333).

The two weeks reviewed at trial were not the only weeks where Plaintiffs were paid for 40 hours though they worked nine or more shifts at Fresco.   Additional examples of such weeks are summarized at Appendix A, annexed hereto.

In addition to violating the overtime laws, Fresco's shift pay was flawed because it undercounted the hours Plaintiffs worked.   Plaintiffs' testimony is that they typically worked more hours per shift that Fresco paid them for.   The exact hours typically worked on a shift varied by Plaintiff.   Plaintiffs' testimony of their typical hours, prior to June 2011, is summarized at Appendix B.

Defendants contend that the hours Plaintiffs worked after June 2011, when the time clock was implemented, are reflective of the hours Plaintiffs typically worked before the time clock was used.   That is not the case.   Before the time clock was used, all bussers would typically remain at the restaurant until all customers left.   After Fresco began using the time clock,

---

[6] Even if Fresco had paid employees for any unpaid hours in a following week, there still would be a violation of the overtime law.   Overtime wages must be paid the week they are owed.   Moreover, if Fresco had paid those missing hours in a following week, but at the straight time rate rather than the overtime rate, Plaintiffs would have been deprived of the overtime premium.
[7] While these records did show hours being added to Caravantes and other employees' totals, these additions were for spread of hours pay, which Fresco began paying this week.   Caravantes worked three days of double shifts, and received an additional three hours' pay.   Likewise, Pablo Alvarado worked two days of double shifts and was paid an additional two hours' pay.   (Tr. 622:7-624:23; P. Ex. 76 at 5130-5142; P. Ex. 77 at 5143)

Plaintiffs would be sent home earlier, as their section closed.  (Tr. 59:2-61:7, 62:3-66:17, 67:19-75:5, 136:24-137:20, 254:6-15)   This is hardly surprising.   Before June 2011, Fresco paid employees the same amount per shift regardless of the number of hours actually worked, and had not reason to send employees home until all customers left.   Once Fresco paid employees according the time they were at the restaurant, Fresco had a strong incentive to send employees home gradually through the end of the shift as the restaurant became less busy, so Fresco would not have to pay employees who were not necessary to servicing the remaining customers.

Plaintiffs' recollections of the hours they worked should be accepted.  Before June 2011, Fresco did not keep records of the hours Plaintiffs worked each shift.  Where an employer does not maintain records of the hours employees worked, a plaintiff may meet his burden of proving the number of hours he worked "through estimates based on his own recollection."  *Kuebel v. Black & Decker, Inc.*, 643 F.3d 352, 362 (2d Cir. 2011).  "The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negat[e] the reasonableness of the inference to be drawn from the employee's evidence."  *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946).  (*See* Joint Pretrial Order, Stip. of Law No. 13)  Plaintiffs met their burden to prove the number of hours they typically worked during the period when Fresco did not keep records, and Defendants have not met their burden of proving that Plaintiffs worked different hours, or negating the reasonableness of the Plaintiffs' testimony

B.  After June 2011

On or about June 13, 2011, Fresco by Scotto implemented a time clock system, whereby Plaintiffs were required to enter their start time and stop time in a computer when they began and finished each shift.  The time clock system would calculate a total number of hours each Plaintiff

worked on each shift.  However, the total was not the full number of hours between a Plaintiff's start time and end time.  Rather, Fresco by Scotto intentionally manipulated the time clock system so that the system would calculate the total hours worked as approximately nineteen minutes less than the time between an employee's recorded start time and end time.  (P. Exs. 13-24, 78)

As one typical example, on July 17, 2012, Pablo Alvarado was recorded as "In" at 10:01 AM and "Out" at 2:35 PM.  His total time worked should have been recorded as 4 hours and 34 minutes, or 4.56 hours.  Instead, his "Total" was recorded as 4.25 hours, or 4 hours and 15 minutes.  Later the same day, he was recorded as "In" at 4:10 PM and "Out" at 10:16 PM.  His total time should have been recorded as 6 hours and 6 minutes, or 6.10 hours.  Instead, the "Total" for that shift is 5.78 hours, or 5 hours and 47 minutes.   (P. Ex. 13)

This undercounting of the number of hours worked resulted in Plaintiffs being paid less than they were due under the minimum wage laws.  Independent of the issue of whether Plaintiffs could be paid the tip-credit, Plaintiffs were not paid at the minimum wage rate because Fresco by Scotto did not account for all the hours they worked.

In some cases, this also caused Plaintiffs not to receive overtime pay for hours worked above 40, since Plaintiffs worked above 40 hours in a week but their total hours were undercounted so that they worked below 40 hours.  For example, in the week from December 10 through December 15, Plaintiff Nahun Flores's hours worked were calculated as 38.77 hours.  However, his time was undercalculated by approximately 2 hours and 13 minutes (7 shifts of 19 minutes undercounted each).  Flores actually worked approximately 41 hours that week, yet he did not receive any overtime pay because his hours were undercounted.  (P. Exs. 12, 17)

In pretrial filings, Defendants argued that Fresco subtracted the time from shifts to account for employees' approximately 30 minute meal breaks.  (*See* Dkt. No. 68, D Pretrial Opp. Br. at 7-8)  At trial, however, Defendants' testimony revealed that the time was not subtracted to account for the meal break.  Rather, Scotto and Gelman testified that the deduction was due to how the software was installed, and that they were not aware of the deduction until this action. (Tr 611:9-612:6, 658:6-19, 659:14-18)  Crediting Scotto and Gelman's testimony, Plaintiffs are entitled to be paid for the time that was automatically deducted from their shifts.

Additionally, Plaintiffs Leon, Urgiles, and Roballo testify that they were directed by Brent Drill not to punch in for several shifts they worked, specifically in December when the restaurant was busy.  (Urgiles Dec. ¶45; Roballo Dec. ¶44; Leon Dec. ¶43)  This is supported by Defendants' records.  Defendants recorded Christian Urgiles as receiving tips on December 24, 2012, but not punching in and out.  (P. Ex. 77 at 9009; P. Ex. 24; P. Ex. 78 at 9043)    These Plaintiffs were entirely unpaid for these shifts, in clear violation of the FLSA and NYLL.

## IV.    PLAINTIFFS ARE ENTITLED TO COMPENSATIONFOR UNIFORM AND EQUIPMENT COSTS

Throughout their employment at Fresco by Scotto, Plaintiffs were required to purchase specific clothing that they were required to wear at work.  Fresco by Scotto has a strict dress code which required Plaintiffs to wear specific shirts and ties that they were required to purchase from Fresco by Scotto itself.  (Salinas Dec. ¶¶95-96; Rodriguez Dec. ¶¶94-95; Cedeno Dec. ¶¶83-84; Urgiles Dec. ¶¶99-100; Lugo Dec. ¶¶92-93; Amezquita Dec. ¶¶83-84; Roballo Dec.¶¶90-91; Caravantes Dec. ¶ 87;  Flores Dec. ¶¶97-98; Alvarado Dec. ¶¶90-91; Francisco-Lopez Dec. ¶¶86-87; Xochipiltecatl Dec. ¶¶79-80; Leon Dec. ¶¶92-93; Tr. 111:7-114:13; 243:6-245:4, 246:18-247:9; 425:8-426:20)   Plaintiffs paid for these items in cash, and were not reimbursed for them, nor were they given a receipt. (Salinas Dec. ¶¶98, 100; Rodriguez Dec.

¶¶97, 99; Cedeno Dec. ¶¶86-87; Urgiles Dec. ¶¶102, 104; Lugo Dec. ¶¶95-96; Amezquita Dec. ¶¶85, 87; Roballo Dec.¶¶93, 95; Caravantes Dec. ¶ 87-89;  Flores Dec. ¶¶100, 102; Alvarado Dec. ¶¶93, 95; Francisco-Lopez Dec. ¶¶89, 91; Xochipiltecatl Dec. ¶¶81, 83; Leon Dec. ¶¶95, 97)

While Defendants deny that they required Plaintiffs to purchase clothing to wear as uniforms at Fresco, Anthony Scotto admitted that it was in fact Fresco's policy and intention to have employees purchase a shirt and tie from the restaurant.  (Tr. 616:16-617:20)  This policy was also reflected in Fresco's employee handbook, which stated "All Wait Staff are required to purchase a vest ($40), a tie ($10) and a shirt ($15) from the restaurant.  Bus Staff must purchase a tie and a shirt."  (P. Ex. 74 at D007998)  Defendants also signed statements for at least two Plaintiffs, Julian Amezquita and Francisco Lugo, stating that they would be reimbursed $9 for uniform purchases.  (P. Exs. 34, 53)

Defendants violated both the FLSA and NYLL by requiring Plaintiffs to purchase items from Fresco by Scotto for use in their jobs.  Federal law requires that wages be paid "free and clear" of all "'kick-backs' directly or indirectly to the employer or to another person for the employer's benefit."  29 C.F.R. §531.35.  This prohibition includes any "kick-back," whether or not in cash:

> For example, if it is a requirement of the employer that the employee must provide tools of the trade which will be used in or are specifically required for the performance of the employer's particular work, there would be a violation of the Act in any workweek when the cost of such tools purchased by the employee cuts into the minimum or overtime wages required to be paid him under the Act.

*Id.*  Here, Plaintiffs were required by Fresco to purchase clothing — shirts, ties, and collar stays — directly from Fresco.  Plaintiffs are entitled to recover these expenses under the FLSA.  *See, e.g., He*, 2014 U.S. Dist. LEXIS 114605, at *28-*30.

Plaintiffs are also entitled to recover these expenses under the NYLL and regulations.  12 NYCRR §137-1.8, in effect until January 1, 2011, provided that "[w]here an employee purchases a required uniform he shall be reimbursed by the employer for the cost thereof not later than the time of the next payment of wages."  Likewise, 12 NYCRR §146-1.8, in effect starting January 1, 2011, provides that "[w]hen an employee purchases a required uniform, he or she shall be reimbursed by the employer for the total cost of the uniform no later than the next payday."  A "required uniform" is "that clothing required to be worn while working at the request of an employer . . ., *except* clothing that may be work as part of any employee's ordinary wardrobe."  12 NYCRR §146-3.10(a).  "Ordinary wardrobe" means "ordinary basic street clothing selected by the employee-where the employer permits variations in details of dress."  12 NYCRR §146-3.10(b).  Plaintiffs are entitled to recover these expenses.

## V. DEFENDANTS VIOLATED THE WAGE NOTICE AND WAGE STATEMENT PROVISIONS OF THE NYLL

Under the NYLL, employers must provide employees with wage and hour notices.  NYLL §195(1)(a).  Specifically, the notices must inform the employee, in both English and the employee's primary language, of the rate of pay.  Employees must be provided such notices at the time of hiring and on or before February first of each subsequent year of employment.  *Id.*  An employee who does not receive such notices can recover damages of $50 per week, up to a statutory maximum of $2,500.  NYLL §198(1-b).  These requirements went into effect on April 9, 2011.

Similarly, employers are also required to provide wage statements with each payment of wages, which must include, among other things, the rate of pay and basis thereof, and "allowances, if any, claimed as part of the minimum wage." NYLL §195(3). An employee who does not receive such statements can recover $100 per week of violation, up to a maximum of $2,500. NYLL §198(1-d).

Plaintiffs are entitled to damages for violation of the notice provision. Plaintiffs were directed to sign notices in April 2011 and February 2012. However, the notices were defective. Plaintiffs' primary language is Spanish, as Defendants knew. (Salinas Dec. ¶103; Rodriguez Dec. ¶101; Cedeno Dec. ¶89; Urgiles Dec. ¶106; Amezquita Dec. ¶90; Roballo Dec. ¶98; Caravantes Dec. ¶91; Flores Dec. ¶104; Alvarado Dec. ¶97; Francisco-Lopez Dec. ¶93; Leon Dec. ¶99) However, Defendants did not provide Plaintiffs notices in both English and Spanish until July 2012. (P. Exs. 30, 32, 38, 40, 44, 46, 50, 54, 58, 61, 65, 68) Moreover, at all times, Plaintiffs were not given copies of the notices to keep. They only signed the notices and returned them to Fresco, but did not receive copies for themselves. Additionally, the notices were defective because they falsely stated that Plaintiffs would be paid at the regular rate of $5.00 per hour. In fact, Plaintiffs were paid at a lower rate because Fresco by Scotto automatically and deducted approximately nineteen minutes from Plaintiffs' shifts, resulting in Plaintiffs being paid at a lower rate. *See* Part III, *supra*. Accordingly, Plaintiffs should be awarded damages for violations of the wage notice provision *See Cuzco v. F & J Steaks 37th St, LLC*, 2014 U.S. Dist. LEXIS 72984, *10-*12 (S.D.N.Y. May 28, 2014) (existing employees have private right of action for failure to provide wage notices annually).

Plaintiffs also have claims for violation of the wage statement provisions. Though Plaintiffs were provided with wage statements, they were not accurate, because, as stated above,

Plaintiffs were actually paid below $5.00 per hour, since they were not compensated for all hours worked.   Moreover, while the statements Plaintiffs received did identify the tips Plaintiffs received each week, the tips were not identified as "allowances . . . claimed as part of the minimum wage."   Rather, they were simply listed as "Other."   (P. Exs. 82-87)   Therefore, Defendants violated the wage statement provisions of the NYLL.  *See Copantitla*, 788 F.Supp.2d at 290 (wage statements that list tip income but do not show that the tip income was an allowance claimed as part of minimum wage do not satisfy employer's obligation to provide wage statement).

## VI.     MARION SCOTTO IS AN EMPLOYER OF PLAINTIFFS

Marion Scotto is an individual employers of the Plaintiffs, and are individually liable to Plaintiffs for any violations of the FLSA and NYLL.

Under the FLSA, employer is defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee."  29 U.S.C. §203(d).  "The Supreme Court has recognized that `broad coverage [under the FLSA] is essential to accomplish the [statute's] goal of outlawing from interstate commerce goods produced under conditions that fall below minimum standards of decency."  *Irizarry v. Catsimatidis*, 722 F.3d 99, 103 (2d Cir. 2013) (citing *Tony & Susan Alamo Found v. Sec'y of Labor*, 471 U.S. 290, 296 (1985)).  Accordingly, the Supreme Court has "consistently construed the Act liberally to apply to the furthest reaches consistent with congressional direction."  *Id.*  The determination of whether an employer-employee relationship exists under FLSA is based on an "economic reality" test taking account of the totality of the circumstances.  *Id.* at 104.

In *Carter v. Dutchess Community College*, 735 F.2d 8 (2d Cir. 1984), the Second Circuit identified  four  factors  for  determining  the  `economic reality'  of  a  putative employment

relationship: "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Barfield v. NYC Health & Hosps. Corp.*, 537 F.3d, 132, 142 (2d Cir. 2008) (quoting *Carter*, 735 F.2d at 12). These factors do not constitute "a rigid rule for the identification of a FLSA employer," but rather "provide a nonexclusive and overlapping set of factors to ensure that the economic realities test mandated by the Supreme Court is sufficiently comprehensive and flexible to give proper effect to the broad language of the FLSA." *Id.* at 143.

In addition to these four factors, courts must also consider "other factors bearing upon the overarching concern of whether the alleged employer possessed the power to control the workers in question." *Irizarry* 722 F.3d at 105 (citing *RSR Sec. Servs.*, 172 F.3d at 139). Most importantly, the court must consider whether the individual possessed "operational control." *Id.* at 109. "A person exercises operational control over employees if his or her role within the company, and the decisions it entails, directly affect the nature or conditions of the employees' employment." *Id.* at 110.

Marion Scotto is an individual employer under the FLSA. The testimony and evidence at trial proved that Marion Scotto, among other things, (1) interviewed hostesses to work at Fresco (Salinas Dec. ¶52; Rodriguez Dec. ¶48; Cedeno Dec. ¶45; Urgiles Dec. ¶52; Lugo Dec. ¶47; Amezquita Dec. ¶40; Caravantes Dec. ¶51; Flores Dec. ¶52; Alvarado Dec. ¶48; Francisco-Lopez Dec. ¶49; Xochipiltecatl Dec. ¶43; Leon Dec. ¶51; Tr. 97:11-16, 123:12-13, 254:16-18, 515:22:-516:6, 684:5-12), (2) gives directions to employees, including the Plaintiffs and other bussers, on a regular basis (Tr. 122:20-123:5; Salinas Dec. ¶48; Rodriguez Dec. ¶44; Cedeno Dec. ¶41; Urgiles Dec. ¶48; Lugo Dec. ¶43; Amezquita Dec. 36; Caravantes Dec. ¶47; Flores

Dec. ¶48;   Francisco-Lopez Dec. ¶45; Xochipiltecatl Dec. ¶39;   Leon Dec. ¶47), (3) was physically at Fresco by Scotto every day it is open (Tr. 123:6-11, 523:15-17, 685:8-12), (4) is involved in deciding when and whether Fresco by Scotto will hire additional employees (Tr. 515:5-19), (5) was involved in drafting Fresco by Scotto's employee policy guide (Tr. 536:10-538:10), (6) signs employees' checks (Tr. 238:11-13, 523:18-20, 685:13-14; Salinas Dec. ¶49; Rodriguez Dec. ¶45; Cedeno Dec. ¶42; Urgiles Dec. ¶49; Lugo Dec. ¶44; Amezquita Dec. 37; Caravantes Dec. ¶48 ; Roballo Dec. ¶46; Alvarado Dec. ¶45 ; Flores Dec. ¶49;  Francisco-Lopez Dec. ¶46; Xochipiltecatl Dec. ¶40; Leon Dec. ¶48; P. Ex. 88), (7) runs front of the house duties at Fresco (Tr. 682:20)  (9) is viewed by employees as a boss (Salinas Dec. ¶46; Rodriguez Dec. ¶43; Cedeno Dec. ¶39; Urgiles Dec. ¶46; Lugo Dec. ¶41; Amezquita Dec. 34; Caravantes Dec. ¶46; Roballo Dec. ¶45; Alvarado Dec. ¶44; Flores Dec. ¶46;   Francisco-Lopez Dec. ¶43; Xochipiltecatl Dec. ¶37;  Leon Dec. ¶45), (10) was described on Fresco by Scotto's website as "[k]nown affectionately as 'The Boss,'" and "runs front-of-the-house duties in the restaurant," (Tr. 527:4-14, 682:17-683:1) and (11) is the president, chief executive officer, and majority shareholder of Starjem Restaurant Corp., the corporation that operates Fresco by Scotto (Tr. 511:24-512:11, 681:19-682:2, 682:14-16).

These factors taken together show that the economic reality is that Marion Scotto is an individual employer under the FLSA.  She was deeply involved in the business and its operations.  As Fresco's website says, Marion Scotto "runs front-of-the-house duties in the restaurant.  (*Id.* 527:4-11)  According to Anthony Scotto, front-of-the-house duties include everything having to do with service, in contrast to back-of-the-house duties, which would include anything having to do with the kitchen. (*Id.* 527:21-528:21, 535:13-19)  Marion Scotto was actually involved in the hiring and firing of employees, and had the authority to hire and fire

employees.   She supervised or controlled employee schedules, in that she would assign employees to work at parties, and gave employees directions to perform specific tasks.   She determined the rate and method of payment, as she personally signed employees' paychecks. *See Irizarry*, 722 F.3d at 115 (fact that individual's signature appeared on paychecks is important factor in determining he was an employer).   She also, from a practical standpoint as the majority shareholder, controls the company financially.  *Id.*

While the question of whether the same test for employer status applies under the NYLL was left open by the 2nd Circuit in *Irizarry*, *id.* at 117-118, "district courts in this Circuit have consistently interpreted the definition of `employer' under the New York Labor Law coextensively with the definition used by the FLSA."  *Ho v. Sim Enters*., 2014 U.S. Dist. LEXIS 66608, *26 (S.D.N.Y. May 14, 2014); *see also Hart v. Rick's Cabaret Int'l, Inc.*, 967 F.Supp.2d 901, 940 (S.D.N.Y. 2013).

### VII.   PLAINTIFFS ARE ENTITLED TO LIQUIDATED DAMAGES UNDER BOTH FEDERAL AND NEW YORK LAW, AND A THREE YEAR STATUTE OF LIMITATIONS UNDER THE FLSA

#### A.   Liquidated Damages

Plaintiff are entitled to recover liquidated damages under both federal and New York law. Both the FLSA and New York Labor Law provide for an award of liquidated damages unless the Defendants prove their violations were made in good faith.  Because Defendants did not prove their violations were in good faith, Plaintiffs are entitled to liquidated damages.

Under the FLSA, once liability is established the employee is entitled to recover all unpaid minimum and overtime wages, as well as "an additional equal amount as liquidated damages." 29 U.S.C. § 216(b).  "Liquidated damages are not a penalty exacted by the law, but rather compensation to the employee occasioned by the delay in receiving wages due caused by the employer's violation of the FLSA."  *McLean v. Garage Mgmt. Corp.*, 2012 U.S. Dist. LEXIS

55425, *12, 2012 WL 1358739 (S.D.N.Y. April 19, 2012) (quoting *Herman v. RSR Sec. Services Ltd.*, 172 F.3d 132, 142 (2d Cir. 1999)). The employer may escape liability for liquidated damages, if it can demonstrate that "it acted in subjective 'good faith' with objectively 'reasonable grounds' for believing that its acts or omissions did not violate the FLSA." *Barfield v. New York City Health and Hospitals Corp.,* 537 F.3d 132, 150 (2d Cir. 2008). The employer must make establish its subject good faith and objective reasonableness by "plain and substantial evidence." *Solis v. Cindy's Total Care, Inc.,* 2012 U.S. Dist. LEXIS 1808, *74, 2012 WL 28141 (S.D.N.Y. Jan. 5, 2012) (quoting *Moon v. Kwon*, 248 F.Supp.2d 201, 234 (S.D.N.Y. 2002). "The employer bears the burden of proving good faith and reasonableness, but the burden is a difficult one, with double damages being the norm and single damages the exception." *McLean*, 2012 U.S. Dist. LEXIS 55425, *13 (quoting *Herman*, 172 F.3d at 142). "To establish the requisite subjective good faith, an employer must show that it took active steps to ascertain the dictates of the FLSA and then act to comply with them." *Id.* (quoting *Barfield*, 537 F.3d at 150).

Similarly, under the New York Labor Law, an employee is entitled to recover liquidated damages unless the employer proves a good faith basis for having failed to pay the required wages. N.Y.L.L. §663(1); *Hart*, 967 F.Supp.2d at 936-37. For the period prior to November 24, 2009, an employee can recover liquidated damages if he proves that the Defendants' violations were willful. *Id.* For periods prior to April 9, 2011 liquidated damages under the NYLL are awarded at 25%; from April 9, 2011 forward, 100%. N.Y.L.L. §663(1).

A plaintiff may recover both FLSA and NYLL liquidated damages for overlapping periods of time. *See, e.g.*, *Ho*, 2014 U.S. Dist. LEXIS 66408 at *47-*51 ("This Court adopts the rationale followed by the majority of district courts in this Circuit and concludes that plaintiffs may recover liquidated damages under both FLSA and the NYLL"); *Merino v. Beverage Plus*

46

*Am. Corp.*, 2012 U.S. Dist. LEXIS 140679, *8, 2012 WL 4468182 (S.D.N.Y. Sept. 25, 2012) ("Most courts in this Circuit hold that a plaintiff may recover both forms of liquidated damages because the FLSA's damages are meant to be compensatory, while the state damages are meant to be punitive;" following majority of courts and awarding recovery of liquidated damages under both FLSA and NYLL); *McLean*, 2012 U.S. Dist. LEXIS 55425 at *25-26 ("FLSA liquidated damages and NYLL liquidated damages serve fundamentally different purposes, and the plaintiffs are entitled to both FLSA and NYLL liquidated damages for unpaid wage").

In order to establish a good faith defense, under both the FLSA and NYLL, "the employer bears the burden of establishing, by plain and substantial evidence, subject good faith and objective reasonableness . . . . The burden, under 29 U.S.C. §260, is a difficult one to meet, however, and double damages are the norm, single damages the exception." *Ho*, 2014 U.S. Dist. LEXIS 66408 at *45 (quoting *Reich*, 121 F.3d at 71).

Here, Defendants did not demonstrate that they has a good faith basis for believing their employment practices did not violate the law. Upon questioning at trial, Anthony Scotto did not identify any specific basis for why he believed it was legal to include Brent Drill and Attilio Vosilla in the Fresco tip pool, or to pay Plaintiffs and similar employees at the tip credit rate. (Tr. 629:19-631:10, 634:3-12) Nor did Anthony Scotto set forth any good faith basis in his direct testimony for the violations Defendants committed. Defendants failed to establish a good faith basis for their violations.

B.  Statute of Limitations

The statute of limitations under the FLSA is two years from the filing the Complaint, except that an action based on a willful violation may be commenced within three years of the violation. 29 U.S.C. §255(a). "An employer has willfully violated FLSA if it either acted

knowingly or 'showed reckless disregard for the matter of whether its conduct was prohibited by the statute . . . '" *Ho*, 2014 U.S. Dist. LEXIS 66408, at *35 (quoting *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 133 (1988)).

Here, Defendants knew at the very least that there was a high likelihood that their pay practices violated the law. Many of the claims that are the subject of this action were the basis for a previous lawsuit against Fresco by Scotto filed on August 12, 2010, in which Defendants' moved for and were denied summary judgment on several of these same claims, including the improper participation of managers and non-service employees in the tip pool. *See Gillian v. Starjem Rest. Corp.,* 2011 U.S. Dist. LEXIS 11583, 2011 WL 4639842 (S.D.N.Y. Oct. 3, 2011). Defendants therefore were aware that they were likely violating the FLSA, and still continued the illegal practices. Additionally, Fresco systematically paid employees for less than their full number of hours worked. Defendants admitted that when they paid employees by the shift pay method, they systematically never paid Plaintiffs for more than 40 hours per week when they worked above 40 hours. (Part III, *supra*) Defendants intentionally and willfully violated the FLSA, and a three year statute of limitations should apply for the FLSA.

## CONCLUSION

Wherefore, it is respectfully requested that Plaintiffs be granted judgment against Defendants, in an amount to be determined in the subsequent liability phase.

Dated:          January 12, 2015

By: ___/s/ Joshua S. Androphy____
Joshua S. Androphy
Shawn R. Clark
Michael Faillace & Associates, P.C.
60 East 42nd Street, Suite 2020
New York, New York 10022
(212) 317-1200
jandrophy@faillacelaw.com

*Attorneys for Plaintiffs*