UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ENRIQUE SALINAS, ALFREDO RODRIGUEZ,
ANGEL CEDENO, CHRISTIAN URGILES,
FRANCISCO LUGO, JOSE AMEZQUITA, LUIS
ROBALLO, MIGUEL CERVANTES, NAHUN
FLORES, PABLO ALVARADO, PABLO
FRANCISCO-LOPEZ, VALENTIN
XOCHIPILTECATL, and VICENTE LEON,
individually and on behalf of others similarly
situated,

Index No. 13-cv-2992 (AT)

Plaintiffs,

-against-

STARJEM RESTAURANT CORP., (d/b/a FRESCO
BY SCOTTO), MARION SCOTTO and
ANTHONY SCOTTO,

Defendants.

---

## DEFENDANTS' POST-TRIAL MEMORANDUM

---

LITTLER MENDELSON, P.C.
Attorneys for Defendants
900 Third Avenue
New York, New York 10022-4834
(212) 583-9600

Of Counsel:
    Craig R. Benson, Esq.
    Naveen Kabir, Esq.

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ................................................................... 1

I.     PLAINTIFFS LACK OVERALL CREDIBILITY ........................................ 2

       A.     Plaintiffs' Shifting, Implausible Testimony Cannot be Credited .......... 2

              1.     "Replacing the Dishwasher" During Stocker Shifts ................. 3

              2.     Cleaning Pictures and Walls During Busser Shifts ................... 8

       B.     The False Assertion That Fresco Radically Changed Its Front-of-House
              Practices Once It Implemented a Time Clock in June 2011 ................ 12

              1.     End-of-Shift Times Have Always Varied ............................... 13

              2.     The Number of Scheduled Shifts Per Week Did Not Change as the
                     Result of the Implementation of the Time Clock .................... 16

LEGAL ARGUMENT .............................................................................. 17

II.    PLAINTIFFS WERE PROPERLY COMPENSATED AS TIPPED EMPLOYEES ...... 17

       A.     The Trial Evidence Established that the Stocker, Coffee Person, Barback
              and Lead Runner Assignments are All Properly Included in the Tip Pool ......... 17

              1.     The Stocker Assignment ................................................... 18

              2.     The Coffee Person Assignment ........................................... 21

              3.     The Bar Back Assignment ................................................. 23

              4.     The Lead or Senior Runner v. the "Expediter" ...................... 24

       B.     Plaintiffs Were Not Required to Share Tips with Any Employer-Managers
              During the Relevant Time Periods ........................................... 26

              1.     The Role of Anthony Scotto, Jr ........................................ 28

              2.     The Role of Brent Drill and Attilio Vosilla ......................... 29

              3.     There is No Evidence that Brent Drill or Attilio Vosilla Frequently
                     "Participated" in the Hiring Process at Fresco ..................... 31

# TABLE OF CONTENTS
### (CONTINUED)

PAGE

4.    There is No Evidence that Brent Drill or Attilio Vosilla Played a Role in Suspensions or Terminations Prior to January 2013 .................. 33

5.    There is No Evidence that Brent Drill or Attilio Vosilla Influenced the Number of Shifts Worked by Plaintiffs, or their Compensation from the Restaurant ................................................................................... 37

III.    PLAINTIFFS WERE PROPERLY COMPENSATED FOR ALL HOURS WORKED ...................................................................................................... 38

    A.    Plaintiffs Did Not Perform Any Work During the Family Meal Period ............. 38

    B.    Plaintiffs Are Not Entitled to Any Additional Pay During the Weeks They Worked Fewer Than Nine Shifts ......................................................... 39

    C.    Plaintiffs' 80-20 Claim Fails as a Matter of Law ................................. 42

IV.    PLAINTIFFS HAVE NO LEGAL OR EVIDENTIARY BASIS FOR TIP CREDIT DAMAGES BASED ON LACK OF NOTICE ................................................ 45

V.    PLAINTIFFS HAVE FAILED TO PROVE THEIR UNIFORM PURCHASE CLAIMS ....................................................................................................... 46

VI.    MARION SCOTTO IS NOT AN "EMPLOYER" ........................................ 48

CONCLUSION ....................................................................................................... 50

# TABLE OF AUTHORITIES

**PAGE**

**Cases**

*Alvarado v. Five Towns Car Wash, Inc.*, 2014 WL 4678258 (E.D.N.Y Sept. 19, 2014) ....... 27, 46

*Arencibia v. 2401 Rest. Corp.*, 831 F. Supp. 2d 164  (D.D.C. 2011) .................................... 34, 46

*Barenboim v. Starbucks Corp.*, 21 N.Y.3d 460, 927 N.Y.S.2d 191 (2013)..................... 18, 27, 32

*Barenboim v. Starbucks Corp.*, 549 F. App'x 1 (2d Cir. 2013) (summary order)........... 28, 33, 38

*Baystate Alternative Staffing v. Herman*, 163 F.3d 668, 678 (1st Cir. 1998).............................. 49

*Carter v. Dutchess Cmty. Coll.*, 735 F. 2d 8, 12 (2d Cir. 1984) ..................................................... 27

*Daniels v. 1710 Realty LLC*, 2011 WL 3648245 (E.D.N.Y. Aug. 17, 2011) *aff'd*, 497 F. App'x
    137 (2d Cir. 2012)......................................................................................................................... 39

*Encalada v. SDNY 19 Mac Park, LLC*, 13-cv-01926-PAC ("*Encalada*").................. 28, 32, 37, 39

*Garcia v. La Revise Assoc. LLC*, 2011 WL 135009 (S.D.N.Y. Jan. 13, 2011) ............... 21, 27, 29

*Grochowski v. Phoenix Constr.*, 318 F.3d 80 (2d Cir. 2003) ........................................................ 41

*Hosking v. New World Mortgage, Inc.*, 570 F. App'x 28 (2d Cir. 2014) (summary order) ......... 40

*Irizarry v. Catsimatidis*, 722 F.3d 99, 109-10 (2d Cir. 2013)....................................................... 50

*Kalloo v. Unlimited Mech. Co. of NY, Inc.¸* 977 F. Supp. 2d 187 (E.D.N.Y. 2013).................... 49

*Mendez v. Int'l Food House Inc.*, 2014 WL 4276418 (S.D.N.Y. Aug. 28, 2014) ................. 43, 46

*Roach v. T.L. Cannon Mgmt. Corp.*, 889 F. Supp. 2d 364 (N.D.N.Y. 2012) .............................. 47

*Santana v. RCSH Ops., LLC*, 2012 WL 463822 (S.D. Fla. Feb. 13, 2012)................................... 21

*Schear v. Food Scope Am., Inc.*, 297 F.R.D. 114 (S.D.N.Y. 2014)........................... 17, 18, 25, 49

*In re Starbucks Emple. Gratuity Litig.*, 264 F.R.D. 67 (S.D.N.Y. 2009) *aff'd by Barenboim v.*
    *Starbucks Corp.*, 549 F. App'x 1 (2d Cir. 2013) ........................................................................ 33

*See Giuffre v. Marys Lake Lodge, LLC*, 2012 WL 4478806 (D. Colo. Sept. 28, 2012).............. 26

*Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234 (2d Cir. 2011) ...................... 18, 26

*Turner v. Millennium Park Joint Venture, LLC*, 767 F. Supp. 2d 951 (N.D. Ill. 2011) 19

**Statutes**

29 U.S.C. § 203(m)............................................................................................................... 17, 46

NYLL § 195 (1) .......................................................................................................................... 47

NYLL § 196-d.............................................................................................................................. 18

NYLL § 198 (1-d).......................................................................................................................... 47

**Regulations**

12 N.Y.C.R.R. § 146-1.3 .............................................................................................................. 46

12 N.Y.C.R.R. § 146-2.14(e)........................................................................................ 21, 25, 32 , 33

12 N.Y.C.R.R. § 146–3.4 .............................................................................................................. 43

29 C.F.R. § 541.56(e).................................................................................................................... 20

## PRELIMINARY STATEMENT

In their main claim in this lawsuit, Plaintiffs seek the difference between the tipped minimum wage and the regular minimum wage for each hour worked, not because they were not properly compensated for what they did (as they exceeded the minimum wage as much as by $45 per hour), but because they allege that certain positions were not properly included in the tip pool.   As was clear at trial, these assertions are not based on the reality of the day to day service at Fresco Restaurant and the functions of the positions.   The evidence established that every position at issue plays a vital role in the overall service and had just as much right to share in the tips as the Plaintiffs did.

In another claim — that appears to be limited to the time period when the restaurant paid shift pay instead of using a time clock — the Plaintiffs assert that they were somehow not compensated for all hours worked.  Once again, this claim, which involves exaggerated accounts of shift times and the number of shifts worked each week, is not supported by the record evidence.   That evidence instead establishes that except in exceedingly rare circumstances, the Plaintiffs were properly compensated.   Plaintiffs' assertions to the contrary are simply not credible and against the weight of the relevant evidence in this regard.

In the end, this case is all about service and understanding what that means at Fresco Restaurant.  As bussers and food runners, who all worked at the Restaurant during various time periods dating back to 1998, the Plaintiffs all played (or continue to play) a key role providing direct service to guests.  In fact, service drives every aspect of the practices underpinning their claims: from their role in the front-of-house service hierarchy and the duties performed in various assignments, to their weekly schedules and the length of each shift, to whether the individuals that they claim were "employers," Brent Drill and Attilio Vosilla, had service management authority (which by law does not render them ineligible to participate in a tip pool)

or the kind of authority with respect to terms and conditions of employment that would make them an "employer," for purposes of the wage and hour law.  As will be demonstrated herein, the logical leaps required in order to conclude that the positions at issue were non-service positions; Messrs. Drill and Vosilla were otherwise ineligible to participate in the tip pool; that Plaintiffs routinely worked past closing time; or that they worked more than 40 hours at Fresco, are insurmountable.  Plainly stated, their claims make no sense, find no support in the evidence, and cannot support the global recovery that they seek.  Defendants submit this post-trial memorandum pursuant to the Court's direction at the conclusion of trial.  (Tr. 689:24-691:11.[1])

## I.  PLAINTIFFS LACK OVERALL CREDIBILITY

The assessment of overall credibility will play a particularly vital role in the disposition of the instant case.  That is because the testimony that is being proffered by both sides is, in many cases, diametrically opposed to one another.  There is not a lot of grey in this case.  One side or the other is not being truthful.

The testimony and evidence presented at trial established that the Plaintiffs, both collectively and individually, are not credible.  Although Plaintiffs' trial declarations painted what appeared to be a consistent picture of their allegedly unlawful experiences at Fresco, their live testimony revealed numerous and consequential inconsistencies among and between their accounts of what transpired with respect to every issue that is germane to this proceeding.  We focus on some of the most egregious examples below.

### A.  Plaintiffs' Shifting, Implausible Testimony Cannot be Credited

#### 1.  "Replacing the Dishwasher" During Stocker Shifts

---

[1] "Tr." refers to citations to the trial transcript in this matter.  "Pl. Ex." And "Def. Ex." refers to the numbered and lettered exhibits proffered by the Plaintiffs and Defendants, respectively, and admitted into evidence at trial.  Citations to exhibits that were not pre-marked in Defendants' pretrial submissions are referenced by the volume and tab number of the courtesy copy binders submitted to chambers on November 11, 2014 and supplemented on December 8, 2014.

In the context of their attempt to downplay the extent that stockers performed their core duties of re-stocking the dining room and assisting the other bussers and runners serve customers (and/or in support of an 80-20 claim for those individuals assigned as stockers), Plaintiffs asserted that on some shifts — *i.e.*, when the Restaurant was slow during the summer months — the stocker was also required to replace the dishwasher.[2]  The trial testimony with regard to this contention — which took up a lot of time at trial — is perhaps the most glaring example of consistently *in*credible testimony from the Plaintiffs.  Not only did Plaintiffs utterly fail to corroborate their own declarations on this issue at trial, but their varying accounts of if, when, how often, and how much time they allegedly spent performing the duties of a dishwasher themselves (or witnessed others doing the same) is emblematic of their overall lack of credibility in the entire case.

The declarations of eleven Plaintiffs alluded to "sometimes" being required to replace the dishwasher for an unspecified amount of time, after lunch shifts, on afternoons "the dishwasher was sent home early" or told to come in late, which would "often" happen "when Fresco was less busy, such as in the summer months."[3]  Although vague and non-specific as to times and dates, it is a very specific assertion with respect to time of day (the end of the lunch shift) and time of year (when the Restaurant was slow, usually during the summer months).  It is also false.

---

[2] Pl. Ex. 104 (Salinas Dec.) ¶¶ 16-20; Pl. Ex. 109 (Rodriguez Dec.) ¶¶ 16-20; Pl. Ex. 112 (Cedeno Dec.) ¶¶ 16-20; Pl. Ex. 105 (Urgiles Dec.) ¶¶ 16-20; Pl. Ex. 114 (Amezquita Dec.) ¶¶ 14-17; Pl. Ex. 115 (Lugo Dec.) ¶¶ 16-17; Pl. Ex. 110 (Roballo Dec.) ¶¶ 17-20; Pl. Ex. 113 (Caravantes Dec.) ¶¶ 15-17; Pl. Ex. 111 (Flores Dec.) ¶¶ 16-20; Pl. Ex. 106 (Alvarado Dec.) ¶ 25; Pl. Ex. 108 (Francisco Dec.) ¶¶ 17-20; Pl. Ex. 107 (Xochipiltecatl Dec.) ¶¶ 15-18; Pl. Ex. 116 (Leon Dec.) ¶¶ 15-19.

[3] Pl. Ex. 104 ¶ 17; Pl. Ex. 109 ¶ 17; Pl. Ex. 112 ¶ 17; Pl. Ex. 105 ¶ 17; Pl. Ex. 115 ¶ 17; Pl. Ex. 114 ¶ 15; Pl. Ex. 110 ¶ 18; Pl. Ex. 111 ¶ 17; Pl. Ex. 108 ¶ 18; Pl. Ex. 107 ¶ 16; Pl. Ex. 116 ¶ 16. The declarations of Plaintiffs Rodriguez, Lugo, Amezquita, Francisco-Lopez and Xochipiltecatl also offered contradictory assertions of sometimes washing dishes with another busser on shifts there was a second stocker, *i.e.*, when the Restaurant was very busy.  Pl. Ex. 109 ¶¶ 12, 17; Pl. Ex. 115 ¶¶ 12, 17; Pl. Ex. 114 ¶¶ 11, 17; Pl. Ex. 108 ¶¶ 13, 18; Pl. Ex. 107 ¶¶ 12, 16.

The same individuals who provided the above referenced testimony in their declarations, told eleven completely different stories at trial.  Four Plaintiffs, contrary their declarations and the assertions of their fellow Plaintiffs, testified that they washed dishes very rarely, if ever, when assigned to the stocker role.  Miguel Caravantes — who worked at Fresco for 13 years — testified that he could not remember ever having to replace a dishwasher himself, and disclaimed having any memory of witnessing others doing the same.  (Tr. 415:23-416:15.)  This testimony, standing alone, is enough to discredit the entire allegation—as it is specifically alleged that all individuals, including Mr. Caravantes, who were assigned to the stocker role, replaced the dishwasher.

Angel Cedeno, a current employee, testified that, since starting at Fresco in March 2011, he spent 15 to 20 minutes washing dishes exactly once.  (Tr. 392:24-393:14.)

Christian Urgiles testified that, during his seven (7) years at Fresco, he "could have been" asked to wash dishes one or two times when he worked shifts as a stocker over the summer months, but provided no details  (Tr. 180:8-12.)

Nahun Flores testified his personal experience as a stocker involved having to replace the dishwasher only on "a couple of occasions," which happened very rarely, even during the summer.[4]  (Tr. 368:4-369:17.)

Vicente Leon —another current employee, who has been working at Fresco since 1999 — testified that he has not washed dishes (*or observed others washing dishes*) since June 2011, *i.e.*, when the Restaurant started using a time clock.  Before June 2011, he testified that he only had to do it a "couple of times," before changing his testimony entirely to claim he washed

---

[4] Mr. Flores also incredibly claimed that on those occasions when the dishwasher was sent home, he would not return until 6 PM or 7 PM, *i.e.*, during the busiest time of the dinner shift.  (Pl. Ex. 111 ¶ 17.)  No other Plaintiff even made this assertion.

dishes for 30 minutes *every* shift he worked as a stocker — during one unspecified summer, sometime between 1999 and 2011.  (Tr. 478:15-482:19.)

In direct contravention of the above referenced testimony provided by Mr. Leon,  Enrique Salinas testified that he did not have to wash dishes until 2008, but that he continued to do it until he left Fresco in April 2013  (*i.e.*, nearly two years after the time clock was rolled out). This was during the two year time period that Mr. Leon testified that he didn't observe any other bussers washing dishes.  (Tr. 107:1-110:23.)

Others, even more incredibly, purported to wash dishes more regularly, albeit under different circumstances, and at different times, during the day.  Six Plaintiffs contradicted their own trial declarations and the declarations of their fellow Plaintiffs, by testifying that they replaced the dishwasher during the middle of a shift (*i.e.*, while they were supposed to be setting up the dining room after family meal, or performing their stocker duties while customers were in the Restaurant).

Francisco Lugo testified that he would wash dishes *on his own initiative* for 10 or 15 minutes during the middle of service on very busy shifts,  when he "could not wait [for the dishwasher to] provide me with flatware or plates."  (Tr. 464:23-469:15.)  On such occasions, Mr. Lugo conceded that he could not have been replacing the dishwasher if they were washing dishes side-by-side, before changing his testimony to say that the dishwasher (who was not able to keep up with the demand for clean items) was not in the station whenever he washed dishes.[5] (*Id.*)

---

[5] Although Mr. Lugo gave conflicting testimony as to whether he also had to wash dishes at the end of his shift, *i.e.*, on occasions when "the dishwasher was sent [someplace unspecified]," he also testified that his lunch shift typically ended at 2:30 PM for lunch and between 9:30 PM and 10 PM for dinner, unless he was scheduled to be the closing busser.  (Tr. 465:6, 468:15-19, 470:3-11.)

Alfredo Rodriguez testified that he also washed dishes on his own, but that he did so before any customers arrived, so that the bussers could use the 20 or so plates used during family meal to set up the dining room.[6]   (Tr. 315:24-323:21.)   Like Mr. Lugo, Mr. Rodriguez, in contravention of his trial declaration, conceded he did not "replace" the dishwasher at the end, or the beginning, of the shift, but instead stated that he occupied the dishwasher's station for 15 to 20 minutes when that individual was sent "downstairs to peel potatoes or [] sent somewhere to clean" — *i.e.*, when there were no dishes to wash.  (Tr. 322:8-323:21.)

Like Mr. Rodriguez, Pablo Francisco-Lopez ("Mr. Francisco") also acknowledged that there was a dishwasher on duty at all times.  (Tr. 281:4-290:14.)   Despite this fact, he also (uniquely) claimed that the chef ordered him to wash dishes prior to service because the *cooks* needed the plates used for the family meal.  (Tr. 285:8-286:9.)   Mr. Francisco then apparently resumed his usual stocker duties in the dining room, despite allegedly having washed dishes for 30 minutes in his busser uniform.  (Tr. 285:8-286:9.)

Valentin Xochipiltecatl also testified that he was allegedly ordered to wash dishes after the family meal, but only on shifts the dishwasher was late for his scheduled shift, because the machine was somehow already full of dirty dishes and the chef wanted them cleaned *before* the dishwasher arrived at 5:30 PM (*i.e.*, when the dining room opened for dinner).  (Tr. 268:1-271:21.[7])

In direct contravention of all of the other Plaintiffs, two Plaintiffs, Luis Roballo and Jose

---

[6] Only six (6) out of 44 tables in the main dining room are used for the family meal and need to be re-set prior to service.  *See* Def. Ex. K ¶ 20 (attaching station maps showing Tables 52, 53, 62, 63, 72 & 73); *see also* Pls. Ex. 92 (Station Map for Jan. 21, 2012 dinner shift).

[7] Mr. Xochipiltecatl had previously testified that he only had to replace the dishwasher when the dishwasher was either sent home earlier in the afternoon, or was scheduled to arrive later during the dinner shift.  (Pl. Ex. 106 ¶ 16.)  Although he also testified that he sometimes washed dishes with another stocker (*id.*), during cross-examination, he admitted that this part of his declaration testimony was, in fact, incorrect.  (Tr. 270:12-271:21.)

Amezquita, attempted to claim that they replaced the dishwasher <u>every</u> shift they were assigned to work as a stocker, regardless of how busy the Restaurant was, before changing major aspects of their testimony.  Mr. Roballo testified he replaced the dishwasher at the end of every lunch shift and the beginning of every dinner shift he worked as a stocker.  When confronted with his declaration to the contrary, he changed is testimony and said he only did this "rarely," *i.e.*, a few times a month.  (Tr. 338:11-344:2.)  He then proceeded to change his testimony (again) to state that he only replaced the dishwasher regularly before 2011.  (*Id.*)  When asked by the Court to estimate what percentage of any given shift was devoted to replacing the dishwasher, Mr. Roballo faltered. (*Id.*)  Despite previously estimating that he spent only 10% of his shift running food, he testified that "[i]t was 30 percent – after 2:30" that he washed dishes, then "[a] hundred percent that I would be washing dishes and doing my job as a stocker."  (Tr. 338:15-340:13.)

Mr. Amezquita testified to spending the greatest amount of time replacing the dishwasher, *i.e.*, between 2:30 and 4:00 PM at the end of "most" of the lunch shifts he worked as a stocker.  (Tr. 430:8-434:13.[8])  Contrary to his declaration, he claimed, at trial, that he replaced the dishwasher all year round (regardless of how busy the Restaurant was), either because a "manager" ordered him to wash dishes or because he chose to do so on his own initiative.  (*Id.*)  Mr. Amezquita did not stop there.  Not only did he testify that he allegedly replaced the dishwasher, all year long on a regular basis when assigned as a stocker, but he claimed that his trial declaration was accurate with respect to his assertion that he observed all of the other plaintiffs doing the same thing:

> Q. Is it safe to say that you observed all of them spending some portion of their shift as a stocker washing dishes?

---

[8] A review of Mr. Amezquita's time punches shows that, out of the 69 lunch shifts reflected on Pls. Ex. 14, he punched after 4:00 PM exactly once (on January 4, 2013) and that he punched out *before* 2:30 PM on 20 other shifts.

A. Yes. Yes.
Q. Is that also true for Angel Cedeno?
A. Yes.
***
Q. And would that also be true for Vicente Leon?
A. All the names that appear here and that I said so, it is because I saw them.
Q. Okay.
So, when you say you saw them, you saw them spending some portion of their shift as a stocker washing dishes, correct?
A. Yes, but not necessarily simultaneously at the same time that I was doing it.
Q. I understand. That would be quite a feat.
A. Exactly.

(Tr. 435:23-436:15.)  In this regard, Mr. Amezquita's testimony was especially incredible given that by the time he testified at trial, Messrs. Caravantes, Cedeno and Leon had already testified during their cross-examinations that they had only replaced the dishwasher once (if ever), and/or had not spent any time washing dishes by the time Mr. Amezquita started working at Fresco (in January 2012).  (Fact. Stip. 6.[9])

Together, all of these disparate and wholly irreconcilable accounts of what transpired in this respect suggest that Plaintiffs rarely, if ever, replaced a dishwasher and certainly did not serve in this capacity as part of their regular job responsibilities.

More importantly, the inconsistent and implausible trial testimony with respect to this issue established an overall lack of credibility amongst the Plaintiffs.  They all testified in their declarations not only that there were times where they replaced the dishwasher, but that they observed the other Plaintiffs when they were assigned to the stocker role and that they all did the same thing.  It was their choice to testify so boldly in this regard and they must be held accountable for this choice.  The above referenced trial testimony presented glaring and irreconcilable inconsistencies amongst all of the Plaintiffs and compels the conclusion that they

---

[9] "Fact Stip." refers to the stipulated facts set forth in the Parties' Joint Pretrial Order ("JPTO") § VII.B.  (Dkt. 56 at 6-9.)

were simply not credible on this, or any, subject.

### 2.    Cleaning Pictures and Walls During Busser Shifts

In additional support for their alleged contention that they somehow spent more than 20% of their busser shifts on non-service duties, Plaintiffs also attempted to characterize a number of tasks in their trial declarations as "work that did not involve customer service," *i.e.*, moving tables and chairs and also "cleaning walls, cleaning pictures, and paintings."[10]   While their declarations varied as to whether they did these things "often," "sometimes," "always," "most times" or "a couple times a week," all of the Plaintiffs, in their declarations, estimated that they spent an average of 30 minutes performing alleged "non-service" work without specifying how much time they spent on each task.  (*Id.*)

At trial, the Plaintiffs testimony with  respect to when, how often, for how long, and what materials they used to "clean" walls — and/or any paintings or photographs on those walls — took on the same shifting, contradictory and implausible qualities as their tales of the stocker who supposedly replaced the dishwasher.

For example, Mr. Francisco initially testified that he had to "wash" or "clean" walls, pictures and photographs with a "moist or wet rag" or "sometimes Windex" before changing his testimony to state that the rags he used were only "damp, so that the picture would not get stained."  (Tr. 298:19-299:24.)  Although he never kept track of how often he did this, he said that he was "ordered by Mr. Willie" to do so on "several occasions," which he estimated meant less than once a month, once a week, or twice a week at various points in his testimony.  (Tr. 300:1-305:22.)  He also claimed that he spent 10 to 15 minutes cleaning while the Restaurant

---

[10] Pl. Ex. 104 ¶ 23; Pl. Ex. 109 ¶ 23; Pl. Ex. 112 ¶ 23; Pl. Ex. 105 ¶ 23; Pl. Ex. 114 ¶ 20; Pl. Ex. 110 ¶ 23; Pl. Ex. 113 ¶ 20; Pl. Ex. 111 ¶ 24; Pl. Ex. 108 ¶ 23; Pl. Ex. 107 ¶ 21; Pl. Ex. 116 ¶ 23. Plaintiff Pablo Alvarado also testified that he had to clean walls when he worked as a runner.  Pl. Ex. 106 ¶ 11.

was open, but only on shifts where there were no customers seated his section; then changed his testimony to say that there were no patrons seated in the dining room at all whenever he cleaned. (*Id.*)  Wiping down surfaces with ammonia-scented rags just as customers are about to sit down to eat is implausible and conflicts with basic notions of hospitality and good service. Notwithstanding this problem, Mr. Francisco also repeatedly flip-flopped between <u>what</u> it was exactly that he claimed to have cleaned.  Although he initially denied cleaning any of the large-scale original oil paintings in the main dining room, he changed his testimony to say he did clean these paintings when confronted with his prior declaration testimony — even though this would have required him to either climb on top of the banquettes or prop up a ladder (in full view of customers, who were either already there or just about to arrive), and take more than 10 or 15 minutes to accomplish.  (Tr. 301:16-303:23; *see also* Pl. Ex. 108, ¶ 23.)  Upon seeing a photograph that illustrated these challenges, Mr. Francisco promptly disclaimed having cleaned any oil paintings at all; only the framed "pictures that had been taken with a camera" and "the paint that is used for painting the walls."[11]

Mr. Amezquita, on the other hand, testified that he personally cleaned these same large-format oil paintings with rags soaked in Windex or water, before clarifying that he only cleaned the small glass-framed photographs hanging on columns and the mirrored trim above the banquettes in the main dining room (both before and after he was shown the photo of the dining room admitted as Def. Ex. J).  (Tr. 436:16-439:7.)  Although Mr. Amezquita initially confirmed that he did <u>not,</u> in fact, clean oil paintings after being shown a photo of the dining room, and then testified on re-direct that it was "not logical" for him to have ever cleaned those paintings — he

---

[11] *See*, *e.g.*, the Photo attached as Ex. 1-C to ¶ 20 of Def. Ex. K; Def. Ex. J; *see also* Pl. Ex. 122. Electronic copies of the photos in Def. Ex. J and Pl. Ex. 122 were enclosed on the CD-ROM pre-marked as a joint exhibit and submitted in Vol. II, Tab 53 of Defendants' Pretrial Filings.

nonetheless proceeded to change his testimony *again* to claim, for the first time, that he actually *dusted* those paintings. (Tr. 448:8-450:17; Def. Ex. J.) After the Court instructed him to circle what he actually cleaned in the photograph with a Sharpie, Mr. Amezquita doubled down on this implausible story, just as he did with respect to washing dishes:

> THE COURT: What about the painting that is on the far right of the picture, against the wall on the far right?
> THE WITNESS: This one?
> THE COURT: Yes.
> THE WITNESS: Just the dust.
> THE COURT: So you would dust that picture.
> THE WITNESS: Yes, yes.

By contrast, Mr. Roballo explained that the "walls, pictures and paintings" he testified to cleaning in his declaration, referred to the stairway leading to the Tuscan Room, which he would do "when the lady" (*i.e.*, Marion Scotto) told him to, before changing his testimony to say that "Mr. Brent or Mr. Attilio" instructed him to clean during lunch shifts (despite the fact that Attilio Vosilla only worked dinners). (Tr. 348:2-350:6, 351:24-352:9.) Mr. Roballo estimated that it would take him 30 or 40 minutes to clean the framed photos hanging in the stairway "with a sponge or one of those napkins that we used for the clients." (Tr. 350:7-352:9.) Not only is such an assertion implausible on its face, but photos of the stairwell demonstrate why this would be the most ineffective method for wiping the glass frames (many of which could not be reached with a napkin or sponge, even standing on a chair). (*See* Pl. Ex. 121.) This is especially true given the timeframes estimated by Mr. Roballo. Indeed, he testified that if he did not start until (or finish by) 11:30 AM, *he asked other bussers to do his job of serving bread and pouring water* for the customers in his section — before changing his testimony to say that he finished cleaning before any customers arrived. (Tr. 350:7-352:9.) He also purported seeing his "fellow workers" wipe picture frames with napkins or sponges when it was not his "turn" to clean — an assertion his co-Plaintiffs failed to corroborate. (Tr. 350:7-352:9.)

It makes no sense that the walls, paintings, or framed photos anywhere in the Restaurant would need to be cleaned (a) by a busser, (b) in the middle of the day, (c) on even a semi-regular basis when the same areas of the Restaurant are cleaned by porters at 7 AM and 4 PM <u>every</u> day. (Def. Ex. K ¶ 45.)  If there were even a shred of truth to this allegation, Plaintiffs would not have had such difficulty corroborating one another's live testimony.  Yet each Plaintiff's explanation was more incredible than the last.  After Mr. Francisco testified to cleaning not the paintings, but the paint on the walls (which had no paint on them, as they were wallpapered), Mr. Roballo testified the following day that he also did this "with Windex" and "rags [that] would arrive [at the Restaurant] dirty with blood" — which he also purportedly used to clean silverware, without any apparent regard to the obvious sanitation implications of either practice.  (Tr. 352:10-353:10.)  The day after that, Mr. Leon testified that he used <u>bed sheets</u> to "dust" the same walls. (Tr. 494:8-502:24.)  Plaintiffs' entire proof on this point resembles a game of telephone gone wrong, and is further proof of their overall lack of credibility.

### B.    The False Assertion That Fresco Radically Changed Its Front-of-House Practices Once It Implemented a Time Clock in June 2011

In an effort to bolster their claim that they were not paid for all hours worked, Plaintiffs grossly exaggerated both the general length of each shift that they worked, as well as the number of shifts they worked each week.  Plaintiffs' trial declarations proffered that, on average, they typically worked from 10 AM to 3:30 PM (for lunch shifts) and from 4 PM to 11:30 PM or midnight (for dinner shifts).[12]  Significantly, these declarations did not differentiate between the time periods before and after the time clock.  (*Id.*)  Because such fabrications were easily exposed by looking at tip records (*see* Pl. Ex. 77), schedules (*see* Def. Ex. A) and, once the time

---

[12] Pl. Ex. 104 ¶¶ 31-33; Pl. Ex. 109 ¶ 32 ; Pl. Ex. 112 ¶ 30; Pl. Ex. 105 ¶¶ 31-32, 34; Pl. Ex. 115 ¶¶ 32-34; Pl. Ex. 113 ¶¶ 30-31; Pl. Ex. 111 ¶ 35; Pl. Ex. 106 ¶¶ 31-32 ; Pl. Ex. 108 ¶¶ 32-33; Pl. Ex. 107 ¶¶ 28-29; Pl. Ex. 116 ¶¶ 33-34.

clock was implemented, their time punch records (*see* Pl. Exs. 13-24), Plaintiffs were faced with a problem.  At trial, they attempted to solve this dilemma by arguing that a number of practices of the Restaurant (affecting both the length of their shifts, as well as the number of shifts they worked) somehow radically changed after the time clock was implemented.  As will be demonstrated below, this argument has no merit whatsoever, is not supported by either the documentary evidence or the testimony in the record, and presents yet another glaring example of their overall lack of credibility.

### 1.    End-of-Shift Times Have Always Varied

First, Plaintiffs consistently attributed the exaggerated, and allegedly uniform, shift ending times contained in their declarations (*i.e.*, 3:30 PM for lunch and 11:30 PM or 12 AM for dinner), to Fresco's supposed practice of always requiring that they all stay until the last customer left the Restaurant — regardless of whether their individual sections were empty.[13] Significantly, Plaintiffs testified that this was the practice both before, and after, the time clock was implemented.  Neither assertion is correct.

As an initial matter, it makes absolutely no sense to require individuals to stay and do nothing (which is what the Plaintiffs claimed) but stand around and watch others work.  This goes against every notion of common sense and good service.  Moreover, if this was the practice, we could expect to see that all of the individuals who worked on a particular shift would leave on or about the same time.  A review of the time punches in evidence establishes that this never happened.  (*See* **Table 1**.[14])

---

[13] Pl. Ex. 104 ¶¶ 31-33; Pl. Ex. 109 ¶ 32 ; Pl. Ex. 112 ¶ 30; Pl. Ex. 105 ¶¶ 31-32, 34; Pl. Ex. 115 ¶¶ 32-34; Pl. Ex. 113 ¶¶ 30-31; Pl. Ex. 111 ¶ 35; Pl. Ex. 106 ¶¶ 31-32 ; Pl. Ex. 108 ¶¶ 32-33; Pl. Ex. 107 ¶¶ 28-29; Pl. Ex. 116 ¶¶ 33-34.

[14] "**Table 1**" refers to the table summarizing the time punches admitted into evidence as Pl. Exs. 13-24 and is attached hereto as <u>Exhibit A</u> to the accompanying Declaration of Craig R. Benson dated January 12, 2014 ("Benson Dec.").

The shifting testimony from various Plaintiffs on this key issue is telling.  At trial, Mr. Salinas testified that it was the Restaurant's policy to require all bussers and runners to stay until the last customer left, only before June 2011, and conceded that his declaration (which did not make this distinction) was inaccurate in this regard.  (Tr. 56:5-75:19; Pl. Ex. ¶¶ 31-33.)  Mr. Salinas further undermined himself by testifying that, before the time clock, all members of the front-of-house staff (i.e., the bussers, runners and even the waiters) had to stay until the dining room was empty (even if they had nothing to do) because the Restaurant did not designate anyone as a "late" or "closing" person on the weekly schedule (i.e., to come in later and stay until all the customers left).  (Tr. 56:5-75:19.)  According to Mr. Salinas, the utilization of "late" or "closing" service staff was new to the era of the time clock.  But this is patently false, as demonstrated by the schedules pre-dating the time clock, which clearly evidence the use of "late" or closing" positions prior to June 2011.[15]  (Def. Ex. A at A-1–A-78.)

---

[15] Mr. Salinas's testimony was so riddled with obvious falsehoods that he was hardly credible on any issue.  For example, when the Court asked Mr. Salinas to explain what he meant by employees who were "on call," he falsely stated that they "had to stay at home and wait" for a phone call from the Restaurant summoning them to work the lunch shift (and if not, the dinner shift later that day), which prevented him from working another job, or "even … just go[ing] to the movies."  (Tr. 26:6-27:11.)  After defense counsel clarified the actual call-in procedure utilized at Fresco for the Court, Mr. Salinas admitted that if he was scheduled to be "on call," that it only meant he had to telephone the Restaurant at a certain time to confirm whether or not he was needed for that shift — and that he did not, in fact, have to "wait[] all day long" to find out if he had to work, as he had previously testified.  (Tr. 27:12-31:20.)  Mr. Salinas also testified to a number of practices implemented in June 2011, that no other Plaintiff even attempted to corroborate.  For example, Mr. Salinas testified that the Restaurant eliminated double shifts after June 2011, even though his punch records show that he himself worked 120 double shifts, or _25% of the days he worked_ after the time clock was implemented.  (Tr. 67:11-12; Pl. Ex. 23; see also **Table 1**.)  He also testified that once Fresco started tracking time, employees who arrived 7 or 8 minutes late for their shift were sent home and individuals scheduled to be "on call" were summoned by the Restaurant to replace them — contradicting his prior admission that that on-call employees actually call in to the Restaurant (not vice versa), as well as his own time records, which show that he clocked in between 10:08 AM and 11:00 AM _42% of the tim_e during lunch, and between 4:07 PM and 5:00 PM _33% of the time_ during dinner.  (Compare Tr. 59:22-60:10 with 26:6-27:11 and Pl. Ex. 23; see also **Table 1**.)

Additional proof of the false nature of Plaintiffs' assertion that things were markedly different before and after the time clock can be found in Pablo Alvarado's trial testimony.  (Pl. Ex. 106 ¶¶ 31-32; Def. Ex. H ¶ 11.)  Mr. Alvarado undermined Plaintiffs' sweeping assertion of uniform end times when he testified that his lunch shifts typically ended not at 3:30 PM, but by 2:30 PM when he was not scheduled to close, and that the whole purpose of having a "closer" is so that that individual could wait on the remaining customers and the "early" runners (or bussers) could leave.  (Tr. 228:17-236:8; Def. Ex. G ¶ 11; *accord* Def. Ex. L ¶¶ 4-5.)

Miguel Caravantes — who worked at Fresco for nearly 12 years before the time clock was implemented — credibly testified that it was always the case that he was free to leave whenever his section was empty, unless he was scheduled to close.  (Tr. 419:25-420:19; Def. Ex. K ¶¶ 40-41; Def. Ex. L ¶¶ 4-5; Def. Ex. N ¶ 24; Drill Dep. 37:19-38:19, 55:9-56:25, 80:18-81:2.)

Despite other Plaintiffs' efforts to uphold the fallacy of the radical changes allegedly implemented after the time clock, their story continued to unravel at trial.  Mr. Roballo, for example, testified that the Restaurant began scheduling "closers" and also printed shift end times starting in 2011 — despite the varying end times reflected in time records, and despite his conflicting deposition testimony about making a point to complete his side work in 5 or 10 minutes so that he could leave as quickly as possible.  (Tr. 346:1-348:1; *see also* Pl. Ex. 21; **Table 1**.)  He cannot have it both ways.

After first testifying that there were never any "closers" when he worked at Fresco (i.e., prior to November 2010), Mr. Xochipiltecatl had to concede otherwise upon being shown schedules where he was the "late" busser during certain shifts; and admitted that all of the "opening" bussers were free to leave when their sections cleared out.  (Tr. 261:16-265:14.)

Mr. Urgiles also conceded this point upon being shown copies of Restaurant schedules,

but then proceeded to change his testimony twice: first to claim that the "early" bussers only ever left prior to closing during the summer, then to claim that only waiters or runners were scheduled to close — and that all the bussers had wait for the customers to leave, even if that meant they had to stand around with nothing to do for hours.  (Tr. 130:7-137:20.)

Plaintiffs testimony with respect to this important issue was literally all over the place and it presents yet another example of a willingness to say anything to allegedly support their claims, whether it is truthful or not.

### 2.    The Number of Scheduled Shifts Per Week Did Not Change as the Result of the Implementation of the Time Clock

Plaintiffs also insinuated that the Restaurant drastically cut back on the number of shifts per week, after June 2011, ostensibly to avoid incurring overtime costs.[16]  Unfortunately for the Plaintiffs, a review of both the tip records and the schedules also shows that nothing changed after June 2011 with respect to Mr. Scotto's general practice of assigning six or seven shifts per week.  (*See* Def. Ex. A; Def. Ex. K ¶ 49, Def. Ex. L ¶¶ 5-6.)  Indeed, this was corroborated by Mr. Alvarado, who testified that he was consistently scheduled for (and worked) seven shifts a week — from 1998 until the end of his employment 2012.  (Tr. 223:8-15.)

Once again, the record evidence is completely contrary to a theory of recovery articulated by the Plaintiffs.  As a practical matter, the Restaurant was open for the same number of hours and had the same staffing requirements both before, and after, the time clock.  If hours and shift numbers were drastically cut simply to avoid overtime or reduce hours, who was going to do the work?  This makes absolutely no sense, and is debunked by a comparison of the Restaurant's schedules, both before, and after, the implementation of the time clock.  (*Compare* Def. Ex. A at A-1–A-78 *with id.* at A-79–A-192.)

---

[16] Pl. Ex. 104 ¶ 30 ; Pl. Ex. 109 ¶ 31; Pl. Ex. 112 ¶ 29; Pl. Ex. 105 ¶ 30; Pl. Ex. 110 ¶ 32; Pl. Ex. 111 ¶ 33; Pl. Ex. 106 ¶ 30; Pl. Ex. 108 ¶ 30; Pl. Ex. 116 ¶ 31.

In light of the above, it is not surprising that there is no evidentiary support for Plaintiffs'

claim that, regardless of however many shifts they were scheduled for, they "usually" ended up

working eight (or more) shifts — especially prior to June 2011.[17]  But the weekly tip calculation

records also confirm that this testimony was false, both before and after June 2011.  (*See* Pl. Ex.

77; *see also* **Table 2** and **Table 3**.[18])  In reality, Plaintiffs only ever worked eight of more shifts

per week less than 10% of the time; even then, most Plaintiffs never worked more than seven

shifts, and only some (*i.e.*, Messrs. Salinas, Caravantes, Robollo, Flores and Francisco-Lopez)

ever worked more than eight shifts (even then, it was only on rare occasions).  (*See* **Table 3**.)   In

fact, of the **2,091** shifts worked by the 13 Plaintiffs reflected by the tip records, they only worked

9 shifts per week only **71** times; 10 shifts per week only **10** times, and 11 shifts per week only

**once**.  (*Id.*)  Plaintiffs claims of "usually" working more than shifts cannot be credited.

## LEGAL ARGUMENT

**II.**    **PLAINTIFFS WERE PROPERLY COMPENSATED AS TIPPED EMPLOYEES**

   **A.**    **The Trial Evidence Established that the Stocker, Coffee Person, Barback and Lead Runner Assignments are All Properly Included in the Tip Pool**

If Plaintiffs "had more than a *de minimis* interaction with customers as a part of their

employment and/or whether they were ordinarily engaged in personal customer service," then

they were properly compensated as tipped employees under the FLSA and NYLL.  *See Schear v.*

*Food Scope Am., Inc.*, 297 F.R.D. 114, 132 (S.D.N.Y. 2014) (Torres, J.) (internal citations

omitted).  The FLSA only prohibits the sharing of tips with (1) managers who qualify as an

"employer" or agents thereof or (2) non-service employees.  *See* 29 U.S.C. § 203(m); *Shahriar v.*

---

[17] Pl. Ex. 104 ¶ 30 ; Pl. Ex. 109 ¶ 31; Pl. Ex. 112 ¶ 29; Pl. Ex. 105 ¶ 30; Pl. Ex. 110 ¶ 32; Pl. Ex. 111 ¶ 33; Pl. Ex. 106 ¶ 30; Pl. Ex. 108 ¶ 30; Pl. Ex. 116 ¶ 31.
[18] "**Table 2**" refers to the table summarizing the number of shifts worked per week on Pl. Ex. 77 and is attached hereto as Benson Dec., Exhibit B.   **"Table 3"** refers to the table listing the number and percentage of instances Plaintiffs worked between 0 and 11 shifts per week as reflected in Pl. Ex. 77 and is attached hereto as Benson Dec., Exhibit C.

*Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 240 (2d Cir. 2011).[19]

Similarly, under the New York Labor Law (NYLL), gratuities may not be distributed to an "employer or his agent" or with employees who do not constitute "a waiter … [or] busser or similar employee."  NYLL § 196-d; *see also Barenboim v. Starbucks Corp.*, 21 N.Y.3d 460, 471-72, 927 N.Y.S.2d 191, 195 (2013) (defining "similarly employee" as employees who are "ordinarily engaged in personal customer service.").

Like runners and bussers at other fine dining establishments, the Plaintiffs collectively performed a suite of typical duties that are integral to the front-of-house service experience at Fresco.  This included those individuals who functioned as the lead or senior runner, and also those bussers assigned to work in the bar back, Coffee Person and stocker assignments.  To get around the everyday realities of the service at Fresco, and the integral role that each of these positions plays in that service, Plaintiffs attempted to portray their duties in these roles as wholly segregated from those of the other runners and bussers.  Plaintiffs thus claimed  that there was little, or no, service orientation in connection with the responsibilities of these positions.  These claims were false.

### 1.     The Stocker Assignment

The testimony at trial established that the stocker plays a key role in the service at Fresco. Many of the Plaintiffs testified that replenishing the four stocking stations located throughout the Restaurant was a core busser duty that made the difference in terms of their ability to clear and re-set service items (by hand) in a timely manner over the course of their shift.  (Tr. 411:19-415:16, 462:22-464:7, 181:24-182:3, 14:24-17:4.[20])  If there was no stocker to re-fill these

---

[19] But "[u]nlike the FLSA, New York's Minimum Wage Act … does not prohibit employers from availing themselves of a tip credit" even where tip sharing practices are found to violate Section 196-d.  *Schear*, 297 F.R.D. at 132.
[20] *See also* Def. Ex. K ¶ 28, Drill Dep. 96:7-97:15; Def. Ex. N ¶ 15

stations, then the bussers assigned to each specific section of the Restaurant would have to perform this duty themselves.  (*See id*.)  Enabling the bussers to spend more time providing the same sort of direct service often performed by waiters helped to generate more tips "and sweeten the pot for everyone."  *Turner v. Millennium Park Joint Venture, LLC*, 767 F. Supp. 2d 951, 954–55 (N.D. Ill. 2011) (when a "busboy performs a task that would have to be carried out by the waitperson if there [was] no busboy," it helps cut down on the time and effort the waitperson would have spent on indirect customer service duties and helps them earn more tips).

In addition to the position's own inherent service obligations, it was also established that the busser assigned to the stocker station assists the other bussers in all of their busser functions. This consisted of, *inter alia*, running Fresco bread, appetizers, and calamari, along with iced tea and other beverages, and also other food.  (Tr. 208:3-213:14; Def. Ex. K ¶ 25; Def. Ex. N ¶ 15; Drill Dep. 96:7-97:15.)  Pablo Alvarado testified that when orders come in very quickly to the kitchen, and also when there are large tables of customers seated in the dining room, it is necessary for other individuals — *i.e.*, "whichever person was nearby … bussers, stockers, or whomever might be free," to help bring the food to the tables.  (Tr. 208:3-213:14.)  Mr. Lugo also testified that all the bussers —including the stocker — helped run food.  (Tr. 462:22.)  And several Plaintiffs testified that they ran food and cleared tables every shift they were a stocker, contradicting their declarations (which claimed that they did not "usually" bring food or clear tables, and that they only ran food on a handful of occasions when "ordered" to do so by the

chef).[21]   (Tr. 315:21-23.)  Plaintiff Salinas testified that he performed all of the busser duties while assigned to the stocker  assignment, even the resetting of tables.  (Tr. 42:4-18.)

Not surprisingly, Plaintiffs attempted to minimize the amount of time spent on running food and performing the other busser functions.[22]   But their estimates should not be credited given the overall credibility problems that have been established and the propensity to say whatever they believe assisted their case, regardless of its truth or falsity.  Plainly stated, given the functions of the stocker assignment, as well as the team approach at the Restaurant — which is absolutely necessary in a fine dining establishment like Fresco — it makes perfect sense that the stocker would spend at least 50% of their time on the service floor.  (Def. Ex. L ¶ 11.)  This is exactly what Anthony Scotto, Jr. testified to in this regard and that testimony should be credited.[23]

As demonstrated, in reality, Plaintiffs spent approximately half their shift re-stocking and half their shift assisting other service employees.  (Def. Ex. L ¶ 11.)  All of the bussers — not just the busser-stocker — spent time going back and forth between the kitchen and the dining

---

[21] Pl. Ex. 104 ¶¶ 11, 18; Pl. Ex. 109 ¶¶ 11,18; Pl. Ex. 112 ¶ 11; Pl. Ex. 105 ¶¶ 11, 18; Pl. Ex. 115 ¶¶ 11, 17; Pl. Ex. 114 ¶ 10; Pl. Ex. 110 ¶ 12; Pl. Ex. 113 ¶ 11; Pl. Ex. 111 ¶ 11; Pl. Ex. 106 ¶ 21; Pl. Ex. 108 ¶ 12; Pl. Ex. 107 ¶ 11; Pl. Ex. 116 ¶ 12, 17.  Although these declarations contained the identical allegation that the stocker never split his shift with another position, the declarations of Messrs. Salinas, Roballo and Flores contradictorily stated that on some shifts, they were assigned to work as both as a the stocker and the Coffee Person.  Pl. Ex. 104 ¶ 27; Pl. Ex. 110 ¶ 29; Pl. Ex. 111 ¶ 29.

[22] Pl. Ex. 104 ¶¶ 11, 18; Pl. Ex. 109 ¶¶ 11, 18; Pl. Ex. 112 ¶ 11; Pl. Ex. 105 ¶¶ 11, 18; Pl. Ex. 115 ¶¶ 11, 17; Pl. Ex. 114 ¶ 10; Pl. Ex. 110 ¶ 12; Pl. Ex. 113 ¶ 11; Pl. Ex. 111 ¶ 11; Pl. Ex. 106 ¶ 21; Pl. Ex. 108 ¶ 12; Pl. Ex. 107 ¶ 11; Pl. Ex. 116 ¶ 12, 17.

[23] Even assuming *arguendo* that Plaintiffs' wildly disparate accounts about washing dishes could be credited, Plaintiffs spent so little time on washing dishes (which, at best, occurred so infrequently) that they would still qualify as tipped employees.  *See* 29 C.F.R. § 541.56(e) (explaining that time spent performing duties "related" to a tipped occupation "need not by themselves be directed toward producing tips" in order to qualify for the tip credit, *i.e.*, such as a "waitress who spends part of her time cleaning and setting tables, toasting bread, making coffee and occasionally washing dishes or glasses.").

room floor because they had to bring dirty service items back by hand each time they cleared a table, instead of bringing them to a service station or using bus tubs to carry items from more than one table at a time.  Given the locations of the stocking stations throughout the Restaurant, it would not be possible to perform the busser-stocker role by being confined, as they claim, to the kitchen.  Therefore, Plaintiffs were eligible to participate in the tip pool during those shifts they were assigned to the stocking assignment.  *See Santana v. RCSH Ops., LLC*, 2012 WL 463822, at *3 (S.D. Fla. Feb. 13, 2012) (runners "[who] evenly split their time in the kitchen and the dining room" and assisted waiters by delivering bread and appetizers had more than "de minimis" interaction with customers).

### 2.    The Coffee Person Assignment

Plaintiffs do not claim that the Coffee Person assignment is not properly included in the tip pool.  That job entails pouring, and delivering, iced teas and various hot beverages throughout the meal.  Indeed, given the skill and coordination required of such a position, this individual receives a 0.6-point share in the tip pool (as opposed to the 0.5 point share for all of the other bussers, including those in the stocker and bar back assignments).[24]  All of these duties make the bussers assigned to the Coffee Person role eligible to receive tips.  *See Garcia v. La Revise Assoc. LLC*, 2011 WL 135009, at *2, 7 (S.D.N.Y. Jan. 13, 2011) (bartenders who "made and delivered drinks for patrons, including mixed drinks, coffee, tea, and wine" for customers seated at in the dining room and at the bar); *see also* 12 N.Y.C.R.R. §§ 146-2.14(e)(3), (5), (6) (listing "bus persons," "service bartenders" and "barbacks" as tip-eligible occupations).

Obviously recognizing that this is a properly tipped position, Plaintiffs do not even assert that, in the ordinary course of things, the Coffee Person is improperly included in the tip

---

[24] Indeed, on redirect Mr. Flores testified that he received a 0.6-point share in the tip pool even during shifts he was assigned to work as both the Coffee Preparer and the stocker simultaneously.  (Tr. 387:11-388:1.)

pool.  Rather, they argue that the position somehow radically changes during especially busy

lunch shifts, and loses its tip eligibility, in instances where another busser is assigned to assist

them.   According to this argument, the Coffee Person (not the Coffee Assistant who allegedly

runs all of the beverages into the dining room) is not properly in the tip pool because the busser

assigned as the Coffee Person allegedly stays in the kitchen the entire shift and has no customer

interaction whatsoever.   This assertion is false and is belied by the testimony of several of the

Plaintiffs.

As an initial matter, it makes absolutely no sense that if the Restaurant is busy enough

that an individual is needed to assist the Coffee Person, that only one person could possibly

deliver all of the beverages in a timely manner.[25]  This is especially true given the nature of the

beverages, which, in large part, need to be served quickly to maintain the proper

temperature.  No one likes cold coffee or tea.  Plaintiffs would have the Court believe that one

individual stays in the kitchen and exclusively pours the coffee, tea, and other drinks, while the

other individual delivers all of them.  Once again, this self-serving assertion makes no sense

whatsoever and is another example of patently incredible testimony.  As a practical matter, the

coffee and other hot beverages would be sitting there, getting cold, waiting for the individual

who was allegedly serving the customers to return to the kitchen to pick them up.  This protocol

also makes no sense given the number of tables and the size of the tables in the Restaurant.  The

---

[25] Mr. Flores — who testified that he worked as the Coffee Person on 90% of his shifts — also
testified that the Restaurant was so busy that there was a Coffee Assistant on almost every shift
he worked.   (Tr. 362:5-367:25.)   Elsewhere, he contradicted himself by claiming that the
Restaurant was not so busy that the dining room would have 100-150 guests at the same time,
undermining his claim that a Coffee Assistant was necessary on most shifts at all.

coffee trays are not that large.[26]  One person could not possibly serve a single large table, much less all of the tables, without getting assistance.  It is, quite frankly, absurd to suggest that the Coffee Person would rather risk having drinks pile up and get cold (to the point of having to re-make them) instead of serving the drinks himself.  (*See* Tr. 145:5-146:13, 362:5-367:25.)

Fortunately, we can rely not just on common sense in debunking this contention, but the cross examination testimony of the Plaintiffs themselves in this regard.  Several Plaintiffs testified that both the Coffee Person, and the Assistant (when there was one), both ran coffee to the dining room.  Mr. Leon testified that he always poured and delivered beverages during shifts he was assigned as the Coffee Person.   (Tr. 507:15-20.)   Mr. Lugo testified that when he worked as the Coffee Assistant, he prepared <u>and</u> ran beverages, and that all the bussers helped deliver drinks each shift.  (Tr. 464:8-11.)  Similarly, Mr. Amezquita testified that he always prepared and ran beverages when working as the Coffee Preparer.  (Tr. 439:7-15.)  Mr. Alvarado testified that during lunch shifts, the Coffee Person is busy both making and running iced teas.  (Tr. 209:23-210:19.)  In addition, Mr. Alvarado testified that the Coffee Person would help the runners run food during every shift, and during the shifts there was a coffee helper on duty, the helper was more active but that both of individuals helped run food.  (Tr. 253:18-254:5.)

Because the evidence establishes that the Coffee Person job was the same whether and Assistant was present, or not, this was a position that was integral to the overall service, involved significant customer interaction, and was properly included in the tip pool.

### 3.      The Bar Back Assignment

As part of their kitchen sink approach, Plaintiffs alternatively claimed that the busser assigned as a bar back was not properly included in the tip pool.  According to this claim, the

---

[26] The trays seen in the photo attached as Ex. 1-5 to Def. Ex. K (*see* Vol. II, Tab 35 of Defs.' Pretrial Filings) undermines Mr. Flores's testimony that he could fit up to <u>10 beverages</u> and their accompaniments on one tray.  (Tr. 362:5-367:25.)

position is limited to performing non-service duties such as washing glasses and cleaning bottles.[27]   In fact their declarations neglect to even mention bussing or resetting tables as a responsibility in connection with this assignment.   (*Id.*)   Once again, this is an example of Plaintiffs providing the Court with false and misleading testimony.

Tellingly, several Plaintiffs admitted that, in addition to assisting the bartender by pouring beverages and restocking the bar, the busser assigned to the bar back role was actually responsible for, and spent the majority of their time, bussing the 12 tables in the bar area near the front of the Restaurant (*i.e.*, where all the walk-in guests are seated during lunch and dinner), as well as the service items used by patrons dining at the bar.  (Tr. 312:19-314:22, 353:11-354:1.)

Indeed, Mr. Rodriguez testified that the bar back assignment consisted mostly of bussing the tables, which turned over very quickly and made the bar one of the more demanding sections in the Restaurant; he had to "move himself faster" in order to bring dirty service items back to the kitchen and re-set the tables in a timely manner.  (Tr. 312:19-314:22.)  It simply makes no sense that the busser assigned to the bar back role would be occupied with washing barware (or with otherwise assisting the bartender — particularly during lunch shifts) during service when the tables are full and requiring constant attention.

It cannot be seriously disputed that the busser assigned to the bar back assignment has just as much right as any other busser to participate in the tip pool and this is just another example of the incredible claims Plaintiffs are willing to make.  In fact, it is well-established that both bussers and bar backs are tip-eligible employees; given that the bar back assignment at Fresco is a hybrid of these two roles, it follows that this assignment is also eligible to participate

---

[27] Pl. Ex. 109 ¶ 28; Pl. Ex. 112 ¶ 27; Pl. Ex. 105 ¶ 28; Pl. Ex. 115 ¶ 28; Pl. Ex. 114 ¶ 25; Pl. Ex. 110 ¶ 30; Pl. Ex. 111 ¶ 31; Pl. Ex. 108 ¶ 28; Pl. Ex. 116 ¶ 29.

in the tip pool.[28]   *See* 12 N.Y.C.R.R. §§ 146-2.14(e)(3), (6) (listing "bus persons," and "barbacks" as tip-eligible occupations); *see also* USDOL Op. Ltr. FLSA2009-12, 2009 WL 649014 (Jan. 15, 2009) (explaining that a "barback" whose primary duty was to support the bartender by restocking the bar and bussing the service counter was eligible to receive tips).

### 4.      The Lead or Senior Runner v. the "Expediter"

Plaintiffs also challenge the inclusion of the runner position (or at least one person assigned to that position) in the tip pool, but only on  shifts where it is alleged that the individual stays in the kitchen and does not run food at all.[29]   As was demonstrated at trial, this alleged position has never been included in the tip pool and Plaintiffs have failed to establish any viable claim in this regard.

Three Plaintiffs who worked as runners — Messrs. Alvarado, Caravantes, and Leon — all corroborated Defendants' explanation that the *expediter* is actually the chef or sous chef who calls in orders from each ticket into a microphone to the line cooks.  (Tr. 213:16-220:20, 417:13-418:24, 482:23-486:10.)  By contrast, the individual who stands *next* to the expediter helps coordinate dishes as they are prepared by the cooks to ensure that all the runners (and bussers, like the stocker or Coffee Person) know to which table and to which seat position each plate should go to.[30]  (*Id*.)  This is an important function of the runners and the overall service at Fresco, as it helps ensure that all the food is brought out to customers at the same time, at the

---

[28] Indeed, as Mr. Rodriguez continues to work in the bar back and stocker roles (*see* Tr. 312:14-318:22) he appears to be arguing against his own interest by taking the position that neither one is eligible to participate in Fresco's tip pool.  *Schear*, 297 F.R.D. at 122 (explaining that current employee-plaintiffs who rotated through challenged positions "have an interest in their [own] participation in the tip pool (when serving as stockers and expediters, respectively) being validated.").

[29] Pl. Ex. 109 ¶ 30; Pl. Ex. 112 ¶ 28; Pl. Ex. 105 ¶ 29; Pl. Ex. 115 ¶ 30; Pl. Ex. 114 ¶ 26; Pl. Ex. 108 ¶ 29; Pl. Ex. 107 ¶ 25; Pl. Ex. 116 ¶ 30.

[30] The "EXPEDITE" notation reflected on certain schedules simply indicates whether an individual would be designated as the runner who stood next to the expediter during that shift to help coordinate the service of plates as they left the kitchen.  (*See* Def. Ex. A at A-1 to A-56.)

correct temperature, and taken to the proper spot on any particular table.  (*Id.*)  There are times, when this individual is a senior runner.  However, it bears repeating, that this is not the position at the microphone, and in those situations where a runner takes on this role, that individual never loses their core running responsibilities and continues to run food to the dining room.  *See Giuffre v. Marys Lake Lodge, LLC*, 2012 WL 4478806, at *2 (D. Colo. Sept. 28, 2012) (describing "expeditor" as a "front of house" position responsible for checking plates to match the tickets, organizing plates before delivering them to tables, exchanging food if a customer complains, and "assisting the wait staff in any other way necessary," *i.e.*, "very similar to [] a waiter").

There are situations, where a very experienced runner might be assigned to take over the true expediter (at the microphone) role.  In those situations, they do not leave the kitchen.  However, neither do they participate in the tip pool.  Instead, they are paid by the house.  (Def. Ex. K ¶ 33.)

Mr. Alvarado corroborated testimony from the defense witnesses regarding the true nature of this position.  He admitted that the "expediter" is actually the sous chef (who stands in the kitchen and calls out the orders printed on each ticket to the line cooks), and that typically the most experienced runner on duty helps coordinate orders as they go out into the dining room, but always runs food on those shifts.  (Tr. 213:16-220:20.)

**B.    Plaintiffs Were Not Required to Share Tips with Any Employer-Managers During the Relevant Time Periods**

Both the FLSA and NYLL prohibit sharing tips with "managers," but only when they qualify as "employers" or agents thereof.  *Shahriar*, 659 F.3d at 240.  "To determine whether a person acts as an 'employer' under the FLSA and the NYLL so as to preclude tip sharing … courts [in the Second Circuit] apply the 'economic reality' test … to determine whether the

alleged employer possessed the power to supervise and control the workers in question." *Garcia*, 2011 WL 135009, at *6 (internal citations and quotations omitted). Under the FLSA, four factors are used to assess the totality of the circumstances in this regard; however, no one factor is dispositive: (1) the power to hire and fire, (2) supervising and controlling employee work schedules or conditions of employment, (3) determining employees' rate and method of pay and (4) maintaining employment records. *Id.* (citing *Carter v. Dutchess Cmty. Coll.*, 735 F. 2d 8, 12 (2d Cir. 1984)).

These same factors bear on the "meaningful or significant authority or control over subordinates" standard articulated by the Court of Appeals as the dividing line between service employees with limited supervisory authorities — like captains or individuals who exercise such authority during the service itself — and agents of the employer disqualified from receiving tips under NYLL § 196-d. *Barenboim*, 21 N.Y.3d at 473; *see also Alvarado v. Five Towns Car Wash, Inc.*, 2014 WL 4678258, at *3 (E.D.N.Y Sept. 19, 2014) (explaining that the "meaningful authority" standard "resembles the economic reality test [under the FLSA], hinging as it does on various factors indicating managerial power"). This is consistent with the New York State Department of Labor's ("NYSDOL") "long-standing" position "that employees who regularly provide direct service to patrons remain tip-pool eligible even if they exercise a limited degree of supervisory responsibility." *Barenboim*, 21 N.Y.3d at 472 (emphasis added); see also 12 N.Y.C.R.R. § 146-2.14(e)(8) (identifying "captains who provide direct food service to customers" as tip-eligible employees). The proper test is whether their "supervisory duties, considered together with [their] 'principal' responsibilities to provide 'personal service to patrons,' can[] [support] a finding of the 'meaningful or significant authority or control over subordinates' contemplated by § 196-d." *Barenboim v. Starbucks Corp.*, 549 F. App'x 1, at *3

(2d Cir. 2013) (summary order) (applying Court of Appeals standard following answer to certified question) (emphasis added).[31]

In *Encalada,* Judge Crotty found that the restaurant's maître d' "frequently" (1) interviewed candidates, (2) disciplined and/or (3) fired existing employees. (Dkt. 62-1 at 9:23-25) (emphasis added). In addition, the maître d' was also regularly involved with the restaurant's scheduling process. (Dkt. 62-1 at 9:25-10:1.) Because the court found that the maître d played "a large part in each process," he wielded "'meaningful authority' within the meaning of Starbucks" even though he did not possess final or ultimate authority over any of these processes. (Dkt. 62-1 at 9:22-23, 10:5-6) (emphasis added).

### 1.    The Role of Anthony Scotto, Jr.

One member of the Scotto family, and only one member of that family, runs Fresco restaurant — Anthony Scotto Jr. Anthony is the General Manager. (Def. Ex. K ¶ 3.) He is there, literally every day. (*Id.* ¶¶ 3-5.) He is there early in the morning. (*Id.*) He is there for lunch. (*Id.*) He is there for dinner. (*Id.*) On the rare occasions when he is not at the Restaurant, he is still there in a managerial sense as no significant decision is ever made by anyone other than Anthony. (*Id.*; Def. Ex. L ¶¶ 9, 12; Drill Dep. 40:9-19; Def. Ex. N ¶¶ 43-45.) He will be called. (Def. Ex. N ¶ 44; Drill Dep. 26:5-29:25.) He will be tracked down. (*Id.*) He will be found. And he will make the decision that needs to be made. There is hands on, and then there is Anthony.[32] He makes the hiring decisions.[33] (Def. Ex. K ¶ 5, 18, 35; Def. Ex. L ¶ 9; Drill

---

[31] Judge Crotty recently applied this standard in a post-bench trial decision cited in Plaintiffs' pretrial briefing. (*See* Dkt. 62, Pls. Pretrial Br. at 10; *see also* Dkt. 62-1, Nov. 6, 2014 Transcript from *Encalada v. SDNY 19 Mac Park, LLC,* 13-cv-01926-PAC ("*Encalada*").)

[32] Mr. Alvarado testified that Anthony Scotto is so hands on, he once personally took Mr. Alvarado's neck measurements so he could purchase a shirt from a department store, because the Restaurant had no shirts in his size in stock. (Tr. 236:24-237:1; *accord* Def. Ex. K ¶ 9.)

Dep. 40:9-19, 43:2-45:17; Def. Ex. N ¶¶ 43, 45; Def. Ex. O ¶ 5.)  He makes the firing decisions.  (*Id.*)  He determines rates of pay.  (*Id.*)  He determines what personnel is necessary on a given shift.  (*Id.*)  He maintains the employment records.  (*Id.*)  He is responsible for every term and condition of employment at the Restaurant.  (*Id.*)  This may be frustrating to certain people, like the people who work for him, or even his family, but that is Anthony.  (*Id.*)  That is his way.  And that is how Fresco Restaurant is run.  All of the Plaintiffs acknowledged that Anthony runs Fresco.[34]  That is not in dispute.

Notwithstanding Anthony's clear role at Fresco with respect to the factors that are germane to the issue of who is an "employer" for purposes of participating in a tip pool, Plaintiffs tried to argue that Brent Drill and Attilio Vosilla, given their given their otherwise clearly distinguishable service management roles, are also somehow  "employers."  They are wrong.  As will be demonstrated below, while Mr. Drill and Mr. Vosilla had meaningful management responsibilities in connection with the service that was provided on a day to day basis at Fresco, that is not enough to render them "employers" and therefore ineligible to participate in the tip pool.  This is a particularly important issue because there is no dispute that these individuals regularly and meaningfully participated in the service at the Restaurant, and customers would absolutely expect that they would otherwise receive a share of the tips.

### 2.    The Role of Brent Drill and Attilio Vosilla

As an initial matter, it is important to understand the proper time frame when considering the roles of Mr. Drill and Mr. Vosilla.  Starting in June 2011, the restaurant starting utilizing an

---

[33]  As several Plaintiffs acknowledged during trial, Mr. Scotto personally observes busser candidates during training shifts to assess their performance in deciding whether to offer them a job.  (Tr. 152:17-21, 154:23-155:5, 207:6-16, 311:23-312:6.)  Indeed, on redirect Mr. Urgiles admitted that Mr. Scotto followed him around while he trained.  (Tr. 190:15-21.)

[34] Tr. 99:9-12; 152:14-21, 153:22-154:1; 236:9-237:1; 409:19-410:8.
*See also* Def. Ex. K ¶¶ 5, 35, 36, 44; Drill Dep. 59:6-61:2; Def. Ex. N ¶¶ 4, 45; Def. Ex. O ¶ 5.

administrative fee and therefore Mr. Vosilla no longer participated in the tip pool.  (Stip. Fact 16.)  As a result, when evaluating his responsibilities, only the time period prior to that date is germane.  Similarly, Mr. Drill ceased participating in the tip pool, as a floor captain, when he was promoted in January of 2013.  (Stip. Fact 17.)  As a result, only the time period prior to that date is germane when evaluating his particular responsibilities.[35]

### a.    Brent Drill

Everyone who provided testimony in this case, on both sides, acknowledged that service was the primary aspect of Mr. Drill's job responsibilities. In fact, several Plaintiffs confirmed that Brent Drill effectively functioned as a second waiter in the VIP area of the Restaurant (*i.e.*, Sections 1 and 2, located in the front of the dining room).  (Tr. 100:16-103:4, 159:19-161:24, 452:2-454:8, 502:9-24.)  He spent the entirety of any shift that he worked, in the dining room, providing service. (*Id.*)  Just like the waiters, he greeted guests, reviewed the specials, took food orders, and helped deliver food and bus tables as necessary. (*Id.*)  He also fielded special menu requests from patrons, advise them on the wine list and made recommendations, retrieved bottles and opened and pour wine at the table. (*Id.*)  In fact, Brent Drill was an expert in wine, and had the highest wine sales in the Restaurant.  (*Id.*)  As several Plaintiffs acknowledged, this benefitted the entire tip pool, given that customers typically left at least 20% of the entire bill as a gratuity.  (*Id.*)  The more wine he sold, the more he benefitted the entire service staff.  (*Id.*; *see also* Def. Ex. K ¶ 36; Drill Dep. 18:10-23, 33:2-34:10, 100:11-102:23.)

### b.    Attilio Vosilla

Many Plaintiffs also admitted that they observed Mr. Vosilla performing the exact same service functions in the main dining room on a regular basis, *i.e.*, even when he was not serving as a party captain.  When asked what the difference was between the duties performed by Mr.

---

[35] Accordingly, Pls. Exs. 34, 35, 36, 53 & 55 are not relevant to the Court's inquiry.

Drill and Mr. Vosilla and other captains, Plaintiffs were unable to distinguish between them.  Mr. Lugo (who did not start working at Fresco until November 2011, *i.e.*, 5 months after Attilio Vosilla had stopped receiving tips) testified that Brent Drill and Attilio Vosilla were known as both managers <u>and</u> captains.  Mr. Cedeno (who started at Fresco only 3 months prior to the administrative fee) explained that they both wore a suit; the only difference was their title.  (Tr. 395:17-396:9.)

In any event, Mr. Vosilla only participated in the tip pool when he worked as a party captain.[36]  As a party captain, it is undisputed that he greeted and interacted with the host of the party; answered questions about the menu and wine list; opened and poured wine for guests; compiled the food and drink orders for the kitchen; plated the pasta course; coordinated all the dishes before they were served to guests; helped serve food to guests; checked in with guests to monitor their satisfaction throughout the meal; and presented the check at the end of the party. (Tr. 103:5-105:13, 185:2-186:25; Def. Ex. N ¶ 22.)

Notwithstanding their overall service responsibilities, Plaintiffs attempted to cast Mr. Drill and Mr. Vosilla as managers.  They did this by  parroting this label as early and often as possible during the trial.  Some Plaintiffs testified that they were "introduced" to them as managers and they offered copies of the employee manual where they were listed as "managers." (*See* Tr. 161:2-5, 190:10-14.)  All of this is irrelevant.  Defendants have never contested the fact that they served in a managerial capacity with respect to the service at Fresco.  However, to quote the New York State tip pooling regulation: "Eligibility of employees to receive shared tips, or to receive distributions from a tip pool, shall be based upon duties and to titles."   12

---

[36] Pl. Ex. 104 ¶ 81, Pl. Ex. 109 ¶ 79, Pl. Ex. 112 ¶ 71, Pl. Ex. 105 ¶ 84, Pl. Ex. 115 ¶ 77, Pl. Ex. 114 ¶ 69, Pl. Ex. 110 ¶ 79, Pl. Ex. 113 ¶ 76, Pl. Ex. 111 ¶ 82, Pl. Ex. 106 ¶ 78, Pl. Ex. 108 ¶ 75, Pl. Ex. 107 ¶ 69, Pl. Ex. 116 ¶ 78.

N.Y.C.R.R. § 146-2.14(e).

At trial, Plaintiffs failed to establish that either Mr. Drill or Mr. Vosilla had any "meaningful" input with respect to any of the factors that would otherwise render them ineligible to participate in the tip pool.

### 3.   There is No Evidence that Brent Drill or Attilio Vosilla Frequently "Participated" in the Hiring Process at Fresco

Neither Mr. Drill nor Mr. Vosilla have ever "participate[d]" in Fresco's hiring process in any "meaningful" way. *Barenboim*, 21 N.Y.3d at 473; *see also Encalada,* Dkt. 62-1 at 9:23-25 (discussing maître d' who "frequently" interviewed candidates).  (Def. Ex. N ¶ 43; Drill Dep. 40:9-19.)

Messrs. Salinas, Francisco-Lopez and Xochipiltecatl all claimed in their declarations that they were hired by Brent Drill.[37]  However, it became clear during trial that by "hire" they were referring to only dropping off a resume.  (Tr. 157:23-159:18.)  As several Plaintiffs testified, they were all advised to return to the Restaurant and train so that Anthony Scotto could evaluate their performance and decide whether or not they were suitable for a permanent position.  (Tr. 154:23-155:5, 208:17-208:2, 311:22-312:6.)  This was the only real job interview.  This was the protocol at Fresco for getting hired.  Furthermore, Mr. Drill testified that he was not even authorized to call a candidate's references until after he was promoted in 2013; this has always been Mr. Scotto's domain.  (Drill Dep. 43:2-45:17; *see also* Def. Ex. L ¶ 9.).

Although Plaintiffs attempted to make much of Mr. Vosilla's signature on various forms, the testimony from the defense witnesses credibly established that Mr. Scotto assembled those forms for Mr. Vosilla only <u>after</u> he had already made the decision to hire an individual. (Tr. 673:9-16; Def. Ex. K ¶ 5, 35; Def. Ex. N ¶¶ 9, 35, 39.)  This was nothing more than a ministerial

---

[37] Pl. Ex. 104 ¶ 4; Pl. Ex. 108 ¶ 4; Pl. Ex. 107 ¶ 4.

act and certainly does not provide evidence of hiring authority, as it involved no discretion whatsoever.  Accordingly, the paperwork relied upon by the Plaintiffs is not evidence of Mr. Vosilla's role in creating an employment relationship between Fresco and each Plaintiff.

The act of passing along a resume — or asking a candidate to return when Mr. Scotto would be at the Restaurant, or completing the ministerial chore of having paperwork filled out — is not the sort of input into the hiring process contemplated by the Court of Appeals in *Barenboim*, or by Judge Crotty's decision in *Encalada*.  *See also In re Starbucks Emple. Gratuity Litig.*, 264 F.R.D. 67, 72 (S.D.N.Y. 2009) *aff'd by Barenboim v. Starbucks Corp.*, 549 F. App'x 1 (2d Cir. 2013) (explaining that "senior floor captains . . . accorded supervisory responsibilities, are not agents for the purposes of [NYLL] § 196-d, presumably because" they "are not exercising powers relevant to the creation or maintenance of the employment relationship").

### 4. There is No Evidence that Brent Drill or Attilio Vosilla Played a Role in Suspensions or Terminations Prior to January 2013

Several Plaintiffs testified that the only supervisory authority Mr. Drill or Mr. Vosilla wielded over them was directing them in the service — just like with captains at all fine dining Restaurants.  (Tr. 100:16-103:4, 422:7-15, 502:12-24.)  *See* 12 N.Y.C.R.R. § 146-2.14(e)(8) (listing "captains who provide direct service to customers" as eligible to receive tips).

These generic descriptions of being "corrected" or "warned" in connection with the performance of their service duties is no different from the sort of "coaching" or "performance feedback" the Second Circuit ultimately upheld as permissible supervisory authority under NYLL § 196-d.  *See Barenboim*, 549 F. App'x 1 at *3 (explaining that shift supervisors' coaching baristas on their job performance, "verbally correcting mistakes," and  advising managers regarding their job performance constituted only "limited" supervisory authority, especially since they lacked the authority to formally discipline their subordinates).

Although Plaintiffs claimed to have witnessed either Mr. Drill or Mr. Vosilla suspending or dismissing an employee, their testimony at trial revealed either these incidents were not disciplinary in nature, or Plaintiffs had no personal knowledge of the Restaurant's decision-making process. *See Arencibia v. 2401 Rest. Corp.,* 831 F. Supp. 2d 164, 176 (D.D.C. 2011) (rejecting plaintiffs' testimony as to their perception of maître d's hiring authority because it was not based upon personal knowledge and did not constitute admissible evidence).

The shifting, contradictory nature of the other Plaintiffs' testimony shows that all of the incidents during relevant time period were manufactured. Mr. Urgiles testified that, during more than seven years at Fresco, he personally witnessed Mr. Vosilla fire only <u>one</u> employee, a busser named Patricio (which Mr. Vosilla denies) — although he was unable to recall what year this occurred. (Tr. 172:21-178:6; Pl. Ex. 105 ¶ 82; Def. Ex. N ¶ 45.) However, a review of the Restaurant's schedules and weekly tip records reveals that Mr. Urgiles could not have been present during the incident as he claimed, because he did not work the dinner shift on May 16, 2009 — *i.e.*, the night he claimed to have seen Patricio get fired — and when he also had a standing request to have Saturdays off. (Tr. 133:25-133:14, 172:21-178:6; *see also* Def. Ex. A & Pl. Ex. 77.[38]) Mr. Salinas also claimed to have witnessed this incident, but admitted that he did not actually have any personal knowledge as to whether Mr. Vosilla consulted Mr. Scotto, or even whether Mr. Vosilla even fired Patricio at all. (Tr. 105:14-106:22.)

Mr. Flores testified that Mr. Vosilla suspended him for a week in July 2010 because he

---

[38] Relevant excerpts from the schedules and tip records for the weeks of May 11, 2009 and May 23, 2009 are attached as Benson Dec., Exhibit H.

called in sick, which Mr .Vosilla also denied.  (Pl. Ex. 111 ¶ 79; Def. Ex. N ¶ 45.[39])  But at trial

his story changed several times.  First, he said that when he called in sick (with a slight fever)

and spoke with the hostess, she purportedly told him that Mr. Vosilla said not to come in for that

shift.  (Tr. 374:20-376:6.)  Later that evening Mr. Vosilla allegedly called him to tell him that he

would be suspended for a week.  (*Id.*)  Later, he testified that, after he initially called in sick, he

actually went to the Restaurant (because he was only feeling "indisposed"), where he spoke with

Mr. Vosilla in person, and was sent back home by Mr. Vosilla before speaking to him on the

phone later regarding his supposed one-week suspension.  (*Id.*)  When asked if he was actually

suspended by Mr. Scotto for coming in for his shift drunk, Mr. Flores then testified that, on the

evening in question, when he arrived at the Restaurant, Mr. Vosilla and "Willy, the porter"

laughed at him for showing up after calling in sick, and that Mr. Baltodano (*i.e.*, "Willy") had

made up a rumor that he was drunk.  (*Id.*)  Mr. Flores denied seeing Mr. Scotto on the evening in

question, going so far as denying that Mr. Scotto was even at the Restaurant at all — even

though he testified that he was only there for a short time.  (Tr. 376:23-379:7, 381:23.)  In

reality, Mr. Scotto actually suspended Mr. Flores for showing up for his shift drunk with a black

eye.[40]  (Ex. L, ¶ 13.)

Vicente Leon — who worked with Mr. Drill for *eleven years* prior to his promotion to

---

[39] By contrast, Mr. Salinas testified that he was never suspended for calling in sick.  (Tr. 108:15-19.)  And although Mr .Salinas testified in his declaration that he once observed Mr. Flores being suspended by Mr. Drill for failing to contribute money to a staff holiday party, Mr. Flores declined to corroborate this in his declaration or at trial, proof certain that it was fabricated.  (Pl. Ex. 104 ¶ 66.)

[40] Mr. Flores also testified that he purportedly observed Mr. Vosilla firing a stocker named Juan Carlos at the end of a dinner shift  in 2011, but Mr. Flores admitted that the only support for his belief that Mr. Vosilla had made the decision to terminate this individual was based solely on his own (hearsay) conversation with Juan Carlos.  (Tr. 380:21-381:10.)  Mr. Cedeno also testified that Mr. Vosilla fired an individual named Juan, but conceded that it happened in 2014.  (Tr. 396:10-24.)

manager — testified that the <u>only</u> termination he witnessed was when he reportedly saw Mr. Drill "fire an employee named Gelacio because he sweated too much." (Pl. Ex. 116 ¶ 63.) As an initial matter, the notion that Mr. Drill (or anyone) would fire an employee simply for looking "like a pig because … [he] sweat too much" makes no sense. (Tr. 502:25-505:19.) But as made clear during the trial, Mr. Leon did not actually witness the entire altercation between Mr. Drill and Gelacio firsthand. After initially testifying that, by the time he walked into the kitchen, this individual was already on his way down the stairs to clear out his locker, Mr. Leon admitted that he did not see Gelacio show up for his shift drunk, throw silverware at Mr. Drill, or meet with Mr. Scotto regarding his termination. (Tr. 502:25-505:19.) He clearly lacked firsthand knowledge of what transpired.

The rest of the examples offered by the Plaintiffs all took place outside the relevant time period. Multiple Plaintiffs testified that they observed Mr. Drill terminate Mr. Amezquita's employment sometime in 2013 — but also admitted that Mr. Scotto overrode Mr. Drill and reinstated Mr. Amezquita (before terminating him once and for all shortly thereafter). (Tr. 379:9-380:11 (Flores), 323:22-325:3 (Rodriguez[41]), 470:17-472:12 (Lugo).) Tellingly, when Mr. Amezquita was asked to identify specific examples of Messrs. Drill or Vosilla exercising any disciplinary authority, *he neglected to bring up the incident(s) involving his own termination*, and instead repeatedly claimed to have witnessed both of them disciplining individuals named Washington and Wellington, without supplying any details whatsoever regarding these purported

---

[41] Mr. Rodriguez also testified that he observed Mr. Vosilla fire an individual named "Nazario" or "Nosario," but that the incident occurred in 2014. (Pl. Ex. 109 ¶ 77; Tr. at 323:22-325:3.)

incidents.  (Tr. 439:16-444:10, 444:11-447:11, 447:13-448:7.[42])  In any event, all of this took

place after Mr. Drill had been promoted and was no longer participating in the tip pool.

It is also telling that, in all of their collective years working at Fresco, Plaintiffs were

unable to come up with anything other than a handful of examples of Messrs. Drill or Vosilla

exercising any sort of authority as their employer — all of which are deficient in some regard.

Indeed, Mr. Caravantes testified that in his 14 years at Fresco, he never once observed Mr. Drill

or Mr. Vosilla hire, fire or discipline anyone.  (Tr. 424:5-425:7.)  This is perfect corroboration

for the Defendants' contention that the managerial authority of Messrs. Drill and Vosilla was

strictly limited to service throughout the relevant time period.   The handful of examples

Plaintiffs managed to cobble together fall short of the "frequent" disciplinary action taken by the

maître d' in *Encalada*, and do not act to disqualify them for the receipt of tips given their

undisputed service responsibilities.   (*See* Dkt. 62-1 at 9:24.)   Even if Plaintiffs' one-sided

accounts of these isolated incidents could be credited (which they cannot), the only individual

who could, and did, exercise any decision-making authority in this regard was Mr. Scotto — not

Mr. Drill, and not Mr. Vosilla.  *See* Section II.B.1, *supra*.

> **5.     There is No Evidence that Brent Drill or Attilio Vosilla Influenced the
> Number of Shifts Worked by Plaintiffs, or their Compensation from
> the Restaurant**

Finally, Plaintiffs failed to establish that either Mr. Drill or Mr. Vosilla played any

meaningful role in controlling Plaintiffs' schedules or compensation.

First, although Plaintiffs testified in their declarations that they need to obtain approval

from either Mr. Drill or Mr. Vosilla before they could leave at the end of their shift, "send[ing] a

---

[42] By contrast, Mr. Roballo did manage to bring up his own 2013 termination as an example of
Mr. Drill exercising managerial authority, but admitted that he had no facts other than his own
belief to support his contention that Mr. Drill was the one who actually made the decision to
terminate his employment.  (Tr. 356:6-357:5.)  In any event, this was after Mr. Drill had been
promoted and is thus completely irrelevant.

[subordinate] home from a shift [after] he or she is no[ longer] needed" is not indicative of the "substantial degree of" managerial authority necessary for disqualifying a supervisor who also participates in the service from receiving tips. [43]  *Barenboim*, 549 F. App'x at *3.  In any event, this would not affect the amount of tips they received from the tip pool (or amount of hours they were paid for working that shift, prior to June 2011).

Mr. Vosilla's role in drafting the schedule, based solely on Mr. Scotto's directions, does not alter this analysis.  Plaintiffs uniformly testified in their declarations that Mr. Vosilla was "in charge" of employee schedules at the Restaurant.[44]  But like many of their allegations, this did not hold up at trial.  Mr. Urgiles candidly admitted that Mr. Vosilla advised them that any scheduling requests they communicated to him were subject to Mr. Scotto's approval.  (Tr. 168:10-172:20.)  This was consistent with the testimony from both Mr. Scotto and Mr. Vosilla, who testified that the only individual who could decide how many shifts each Plaintiff could work every week was Mr. Scotto.  (Def. Ex. K ¶ 10; Def. Ex. L ¶¶ 5-6; Def. Ex. N ¶ 36; *see also* Drill Dep. 50:2-9.)  It is exactly this sort of "direct[] influenc[e] over the number and timing of hours worked by staff as well as their compensation" that is considered "meaningful" under the Barenboim standard.  21 N.Y.3d at 473.  The evidence presented at trial established that Mr. Vosilla's role in drafting the weekly schedule is purely ministerial in nature, as Mr. Scotto instructed him on how many individuals to schedule for each position based on expected business volume.  (*See* Tr. 547:3-550:2.)  Similarly, Mr. Vosilla could not even make any changes without first getting approval from Mr. Scotto.  (*Id*.)  Thus, Mr. Vosilla cannot be found

---

[43] Pl. Ex. 104 ¶¶ 65, 86; Pl. Ex. 109 ¶¶ 62, 85; Pl. Ex. 112 ¶¶ 56, 74; Pl. Ex. 105 ¶¶ 67, 90; Pl. Ex. 115 ¶¶ 61, 83; Pl. Ex. 110 ¶¶ 65, 84; Pl. Ex. 111 ¶¶ 64, 87; Pl. Ex. 107 ¶¶ 55, 74; Pl. Ex. 113 ¶¶ 62, 81; Pl. Ex. 114 ¶ 74; Pl. Ex. 116 ¶ 83.
[44] Pl. Ex. 105 ¶ 80; Pl. Ex. 115 ¶ 74; Pl. Ex. 110 ¶ 75; Pl. Ex. 111 ¶ 77; Pl. Ex. 108 ¶ 72; Pl. Ex. 107 ¶ 67; Pl. Ex. 116 ¶ 75.

to play a "large part" in the scheduling process in the same manner Judge Crotty found to be significant in *Encalada*.  *See also Garcia*, 2011 WL 135009, at *7 (evidence that general manager who had the sole authority to hire and fire and make all decisions related to "the restaurant's staffing needs, including how to schedule shifts, how many staff members were needed per shift," defeated any claim that captains were ineligible to receive tips).

## III.   PLAINTIFFS WERE PROPERLY COMPENSATED FOR ALL HOURS WORKED

Plaintiffs also claim that they were not compensated for time worked during the 30-minute family meal period (Fact Stip. 15.), or for certain hours allegedly worked during each shift in the weeks prior to the week of June 20, 2011, *i.e.*, the first payroll period the Restaurant utilized an electronic timekeeping system.[45]  (*See* Law Stip. 3.[46])

### A.   Plaintiffs Did Not Perform Any Work During the Family Meal Period

As an initial matter, Plaintiffs are not entitled to recover for the 30-minute family meal period, as there is no credible evidence in the record that suggests they performed compensable work during those times.  *See Daniels v. 1710 Realty LLC*, 2011 WL 3648245, at *6 (E.D.N.Y. Aug. 17, 2011) *aff'd*, 497 F. App'x 137 (2d Cir. 2012) (summary order) (rejecting plaintiff's self-serving testimony and finding that plaintiff's time during his meal breaks were completely his own and therefore not compensable meal periods under the FLSA).

It is undisputed that the Restaurant provides a family meal during every shift (10:30 AM to 11 AM for lunch and 4:30 PM to 5:30 PM for dinner).  (Fact Stip. 15.)  Mr. Salinas testified that during the family meal, employees performed no work and were free to leave if they wanted to.  (Tr. 87:18-23.)  Although Mr. Alvarado seemingly contradicted Mr. Salinas when he testified in his trial declaration that he was not permitted to leave during the family meal (even though he

---

[45] *See* JPTO § V.A.1(e)-(g) (listing Plaintiffs' issues to be tried).  (Dkt. 56 at 3.)

[46] "Law Stip." refers to the undisputed legal standards set forth in JPTO § VII.C.

had testified to the contrary in his February 2011 declaration), at trial he conceded that his declaration in this regard was not accurate.  (Tr. 223:16-227:2; *see also* Def. Ex. H ¶ 10.)  Mr. Lugo also corroborated testimony from the defense witnesses on this point.  (Tr. 462:16-17.) There being no evidence in the record to the contrary, the Court must find that there was a 30-minute period where no work was performed and that the Plaintiffs were free to leave the restaurant during this time.  As a result, the Plaintiffs are not required to be compensated for this 30 minutes time period and this must be properly factored in when assessing whether the Plaintiffs were compensated for all hours worked.

### B.   Plaintiffs Are Not Entitled to Any Additional Pay During the Weeks They Worked Fewer Than Nine Shifts

With respect to their claim that they were allegedly not paid for all wages due, Plaintiffs may proffer recollection testimony regarding the amount of uncompensated work that they performed to meet their burden, so long as their estimates show that the amount <u>and</u> extent of such work can be inferred as a matter of just and reasonable inference.  (Law Stip. 13.)  This evidentiary burden must be met with <u>credible</u> evidence that enables the Court to quantify the number of violations ultimately proved.  *See Hosking v. New World Mortgage, Inc.*, 570 F. App'x 28, 32 (2d Cir. 2014) (summary order) (internal citation omitted).  Here, the factual issues before the Court necessary for making this determination include: (1)  whether Plaintiffs performed any work compensable work during the family meal; and (2) for the weeks prior to June 20, 2011, how many hours Plaintiffs worked during each shift (and whether they ever worked more than 40 hours a week). Defendants may rebut Plaintiffs' proof on these issues with evidence of the actual amount of work performed, <u>or</u> evidence that negates the reasonableness of the employees' evidence.  (Law Stip. 13.)  The Court, sitting as finder-of-fact, must resolve any disputes regarding the precise amount of uncompensated work performed by the Plaintiffs.  (*Id.*)

Plaintiffs rely principally on their own fanciful recollections in support of all their claims. But their shifting, speculative accounts of what duties they regularly performed, how often they were assigned to certain roles, or how much time they spent working — whether on discrete tasks, over the course of a single shift, or for a certain number of shifts each week — do not support their claimed violations by any stretch of the imagination.  *See Grochowski v. Phoenix Constr.,* 318 F.3d 80, 88–89 (2d Cir. 2003) (testimony that plaintiffs who "usually worked" certain hours but did not know if they regularly worked certain days was "only speculation" insufficient for the finder-of-fact "to make a reasonable inference as to the number of hours worked").   Plaintiffs' incredible and implausible testimony cannot support a "just and reasonable" inference that any of them worked the number of hours they claim — especially in light of the reliable, consistent evidence proffered by Defendants.

The time punches for every single one of the twelve[47] Plaintiffs who have such records flatly contradict their inflated recollections regarding the average length of their shifts, and also how many shifts per week they supposedly worked.[48]  (*See* **Tables 3 & 5**.)  These time records

---

[47] Mr. Xochipiltecatl left Fresco in November 2010, *i.e.*, prior to the implementation of the time clock.  (Fact Stip. 12.)

[48] In an effort to escape the reality of their actual shift times, Plaintiffs tried to discredit their time records by testifying that sometimes the time clock was broken when they punched in for their shift.  (Pl. Ex. 104 ¶ 43; Pl. Ex. 109 ¶ 42; Pl. Ex. 112 ¶ 38; Pl. Ex. 105 ¶ 44; Pl. Ex. 114 ¶ 33; Pl. Ex. 110 ¶ 43; Pl. Ex. 111 ¶ 45; Pl. Ex. 106 ¶ 43; Pl. Ex. 116 ¶ 44.)  However, a review of the 6,723 time punch records in **Table 1** shows that there are only **41** instances where one time punch is missing, or the interval between the punch in and out times is less than two hours — — or 0.6% likelihood the clock *may* have been broken.  In reality, the clock was not broken so much as a Plaintiff would forget to punch in.  Indeed, there are <u>no</u> examples to suggest that the clock was broken, as on each of these 41 occasions, one or more of the *other* Plaintiff(s) managed to punch in at an earlier time for the same shift.  (*See* **Table 4**, attached as Benson Dec., <u>Exhibit D</u>.)  *See U.S. v. Shyne*, 2007 WL 1075035, at *24 (S.D.N.Y. Apr. 5, 2007) (explaining the principle of Occam's razor, *i.e.*, "all things being equal, the simplest solution [or explanation] tends to be the best one.").

show that the average length of each shift worked was under five hours.  (*See* **Table 5**.[49])
Indeed, the average amount of time recorded for each shift shows that working seven shifts per
week resulted in an average of a 37.48-hour week — which, after discounting the 30-minute
family meal, results in a 33.98-hour workweek.  (*See* **Table 6**; *see also* Def. Ex. K ¶ 39.[50])
Likewise, the average amount of time recorded for each shift shows that working eight shifts per
week resulted in a 40.79-hour week — which, after discounting the 30-minute meal period,
results in a 36.79-hour week.  (*See* **Table 6**.)

A review of the 2,091 combined weeks that all of the Plaintiffs worked shows that they
exceeded eight shifts per week less than 5% of the time, and more than nine shifts less than 1%
of the time.  (*See* **Table 3**.)  Time records indicate that only Messrs. Salinas, Leon, Rodriguez
and Lugo ever worked more than 40 hours per week; even then, this only ever occurred very
rarely, *i.e.*, only in 18 weeks for all of them combined (10 of those weeks occurring in
December).[51]  (*See* **Table 7**.[52])  On average, Plaintiffs had to work more than eight shifts a week
in order to exceed 40 hours.  (*See* **Table 6 & 7**.)  Indeed, Messrs. Urgiles, Amezquita, Roballo,
Flores, Alvarado, and Francisco never worked more than 40 hours.[53]  (*See* **Tables 5, 6 & 7**.)
Plaintiffs Cedeno, Urgiles and Xochipiltecatl also all testified that they had other jobs while they

---

[49] "**Table 5**" refers to weekly totals for the number of shifts worked, number of hours recorded,
and number of hours worked (less the 30-minute meal break) calculated from the time punches
listed in **Table 1**, and is attached hereto as Benson Dec., Exhibit E.

[50] "**Table 6**" refers to the number and percentage of shifts exceeding 40 hours worked based on
the time punches listed in **Table 1**, and is attached hereto as Benson Dec., Exhibit F.

[51] Mr. Lugo does not have any overtime claims stemming from the Restaurant's practice of
paying shift pay, whereas Mr. Rodriguez only has shift pay claims for the week between March
2011 until approximately June 20, 2011.  (*See* Fact Stips. 2 & 7.)

[52] "**Table 7**" refers to the list of weeks in which Plaintiffs worked more than 40 hours per week
(*i.e.*, the number of hours recorded less the 30-minute family meal break) and is attached hereto
as Benson Dec., Exhibit G.

[53] Although Messrs. Alvarado and Caravantes have no overtime claims accruing after June 2011,
(*see* JPTO at § V.A.2.b), they both worked seven shifts per week after the time clock was
installed.  (*See* **Tables 3 & 5**.)

worked at Fresco, further undermining any contention that they could have ever worked more than 40 hours a week if they only worked five (5) or six (6) shifts.

The above evidence, and the summary charts created therefrom, establish that Fresco was, in fact, overly generous — except in extraordinarily rare circumstances — during the shift pay era.  Only those individuals who worked more than eight shifts are eligible for a recovery.  Plaintiffs' claims of a more global recovery, are greatly exaggerated and unsupported by the record evidence.

**C.     Plaintiffs' 80-20 Claim Fails as a Matter of Law**

Plaintiffs also claim that they did not spend a sufficient amount of time performing tipped duties to allow Fresco to take a "tip credit."   (JPTO § V.A.1.a.)   Under the FLSA, "tipped employees who spend a substantial amount of time, or more than twenty percent of their workweeks, engaged in related but non-tip-producing work must be paid the full minimum wage for the time spent performing the non-tipped work."  *Mendez v. Int'l Food House Inc.*, 2014 WL 4276418, at *3 (S.D.N.Y. Aug. 28, 2014) (internal citations and quotations omitted).  Under the NYLL, the time period is "2 hours or more or for more than 20 percent of her or his shift, whichever is less."  12 N.Y.C.R.R. § 146–3.4 (eff. Jan. 1, 2011).

Plaintiffs appear to contend that their side work, coupled with their sporadic performance of random (and wholly incredible) cleaning duties, somehow supports their 80-20 claim.  They are wrong.

First, it is undisputed how the runners and bussers spend their time during the first hour and a half before the Restaurant opens for either a lunch or dinner service.  The first-30 minute period of every shift (*i.e.*, 10 AM to 10:30 AM for lunch and 4 PM to 4:30 PM for dinner) is allocated towards opening side work.  Plaintiffs uniformly testified at trial that they always finished their side work within this time period; oftentimes they were able to finish this work

within 20 minutes (*i.e.*, confirming that the 40-60 minute estimates in their declarations were neither credible nor plausible, given the nature of their tasks).  (Tr. 292:9-16, 460:25-462:17, 417:3-7.)

Plaintiffs also testified that their "side work" was limited to setup directly related to the service, and did not appreciably differ from the "regular work" duties that they performed during their shift, *i.e.*, bussers setting up tables and preparing the dining room to be ready for service. (*Id.*)  In fact, this work is directly tip-producing in nature and should not even count towards any 80-20 type claim.

The second 30-minute period during every shift (10:30 AM to 11 AM for lunch and 4:30 PM to 5 PM for dinner) consist of the family meal break.  This time is non-compensable and does not count towards an 80-20 claim.  *See* Section III.A, *infra*.

The third 30-minute period (11-11:30 AM for lunch and 5-5:30 PM for dinner) consists of the pre-shift meeting attended by the waiters and runners, where the chef goes over the food specials and the service manager goes over changes to the wine list.  During this time, the bussers are re-setting six tables across the room in the section of the Restaurant where the family meal is served.  (Tr. 292:9-16, 460:25-462:17, 417:3-7.)  The bussers re-set these tables using items in the stocking stations re-filled during the last shift, just as they do during service.  (*See* Drill Dep. 71:9-72:4.)  This also includes re-configuring any of the large tables in the main dining room before guests arrive.  Once again, this responsibility is directly related to the core performance of their service responsibilities and should not count towards any 80-20 claim.

The Restaurant opens for customers at 11:30 AM for lunch and 5:30 PM for dinner. Although Plaintiffs dispute what time their shift ended, it is not seriously disputed that Plaintiffs spent the time from when the Restaurant opened until the end of their shift performing the core

duties in their assigned role for that shift.  Once again, none of this counts towards any 80-20 claim.

Finally, the "closing side work" also directly involves their core responsibilities as it is limited to making sure that the station is ready for the next customers.  In any event, these responsibilities involve an inconsequential amount of time and certainly don't provide support for an 80-20 claim.

Putting aside whether it is "related" or actually "tip-producing" (both for opening and closing side work), Plaintiffs do not seriously contend that this work forms the basis of their 80-20 claim.  The Plaintiffs who were bussers testified that, at most, they spent 45 minutes performing such duties.  (Tr. 91:15-93:18, 290:15-291:5, 295:14-15, 344:6-8, 345:21-345:20, 416:20-25, 461:2-16.)  By definition, this always falls short of 20% of a five-hour shift. Similarly, the Plaintiffs who worked as runners, arranged their station to prepare for service by stocking the necessary plates and garnishes and re-filling any condiments they would serve to guests.[54]  Although the Restaurant set aside 30 minutes at the beginning of each shift for setup, the evidence establishes that it often took much less time to complete these tasks.  (*Id.*; Def. Ex. K ¶¶ 40-41.)  To the extent Plaintiffs had to wrap up their stations to prepare for the next shift, they have similarly failed to establish that this took more than 10 or 15 minutes.  (*Id.*; *see also* Drill Dep. 77:15-78:20, 79:10-12, 79:13-80:2.)

Plaintiffs have also failed to establish that they regularly spent any significant time doing any cleaning unrelated to the service during a particular shift.  As explained in Section I.A.1, *supra*, Plaintiffs have no credible evidence that they ever replaced the dishwasher for any portion of their shift.  Likewise, their claims of cleaning walls or paintings for as much as 30 minutes,

---

[54] Pl. Ex. 106 ¶ 13.

also finds no support.  *See* Section I.A.2, *supra*.  To the extent any of the Plaintiffs had to set up tables in the private dining room or wipe down surfaces while bussing tables (the other duties listed in their declarations in connection with the assertion that they spent 30 minutes in this regard), these were directly related to their customer service duties and did not take longer than 5 or 10 minutes to complete.

All told, Plaintiffs have failed to establish that they spent more than 2 hours or 20% of their workday performing non-tipped duties.  *See Mendez*, 2014 WL 4276418, at *4 (declining to credit plaintiffs' inflated estimates regarding the amount of time they spent moving tables or cleaning, particularly when the restaurant employed a porter to mop and clean every morning). This claim thus finds no support and should be rejected in its entirety.

## IV.  PLAINTIFFS HAVE NO LEGAL OR EVIDENTIARY BASIS FOR TIP CREDIT DAMAGES BASED ON LACK OF NOTICE

The FLSA requires employers to inform their employees of the requirements of the tipped minimum wage and tip pooling requirements as a condition of paying the tipped minimum wage.  *See* 29 U.S.C. § 203(m).  Although this requirement may be satisfied by providing notice via postings and orally under the FLSA, beginning January 1, 2011 such notice was required to be provided in writing under the NYLL.  *See* U.S. Department of Labor ("USDOL") Wage and Hour Division ("WHD") Fact Sheet #15; 12 N.Y.C.R.R. § 146-1.3 (2011).  Here, it is not seriously disputed that Anthony Scotto posted the wage-and-hour notices shown in Pl. Ex. 119.

The posting is sufficient to meet the requirements of FLSA § 203(m) because "[e]mployers do not have to 'explain' the tip credit to employees … it is enough to 'inform' them of it."  *Alvarado*, 2014 WL 4678258, at *3.  Furthermore, Plaintiffs all had notice of the tip pool, and received their distributions from the tip pool directly from the waiters in cash after every shift.  *See Arencibia*, 831 F. Supp. 2d at 180 (finding no violation of FLSA's notice

requirements where "[employees] commonly understood that there was a tip pool" that was explained to them "at the time of hire and from time to time during [their] employment.").

Although Plaintiffs complain that they were provided with no notice whatsoever, it is also undisputed that the Plaintiffs who were employed at Fresco in 2011 received English-language notices that year and dual-language notices in English and Spanish in 2012 and 2013. [55]  (Fact Stip. 14.)

## V.   PLAINTIFFS HAVE FAILED TO PROVE THEIR UNIFORM PURCHASE CLAIMS

As an initial matter, the dress code for the bussers and runners — consisting of black pants, black shoes, a yellow button-down shirt, and a tie — has never constituted a "uniform" as a matter of law.  *See Roach v. T.L. Cannon Mgmt. Corp.*, 889 F. Supp. 2d 364, 373 (N.D.N.Y. 2012) (black pants, black shoes and black button-down shirt did not constitute a uniform, as all are items that "from an objective perspective, … are within the category of clothes 'that may be worn as part of an employee's ordinary wardrobe.'").  The fact that Plaintiffs testified in their declarations that they chose not to wear these clothing items outside of work is of absolutely no

---

[55] Even assuming, arguendo, that Defendants failed to comply with the written requirements of NYLL § 195 (1), there is no evidence that they ever received less than the tipped minimum wage and, therefore, Defendants are entitled to the benefit of the affirmative defense and Plaintiffs are not entitled to any statutory penalties.  NYLL § 198 (1-b).  The Legislature never intended to punish employers for paperwork violations pursuant to NYLL § 195.  This was recently confirmed with the passage of an amendment to the Wage Theft Prevention Act on December 29, 2014, which reaffirmed the affirmative defense available if an employer pays all wages due and eliminates the yearly wage notice requirement altogether.  It is also undisputed that the Plaintiffs who were employed at Fresco from 2011 to the present received pay stubs with all of the information required by NYLL § 195(3).  Plaintiffs only take issue with the number of hours listed on their pay stubs, as they claim they were not compensated for off-the-clock work. By definition, off-the-clock work is not reflected on employer records.  Assuming that any errors on Plaintiffs' paystubs attributable to incorrect time records actually presents a cognizable injury under NYLL § 195(3), Plaintiffs are still not entitled to any statutory damages because there is no evidence in the record of any underpayment of wages and therefore, Defendants are entitled to the benefit of the affirmative defense.  *See* NYLL § 198 (1-d).

consequence.[56]  (*Id.*)

Plaintiffs uniformly testified in their declarations that they paid $50 to the Restaurant's book keeper every six months to purchase two (2) shirts and a tie.[57]  But this allegation was also exposed to be an obvious falsehood at trial.  As an initial matter, we point out that the allegations in the complaint with respect to this issue were completely different than what was contained in the declarations.  According to the Complaint, and this is alleged with respect to each individual Plaintiff, they had to pay $30 for each shirt and $15 for each tie.[58]  This would add up to $70 for two shirts and a tie, not $50 as they claim in their declarations.  These two important documents thus contain differing testimony with respect to this issue, and like the rest of their testimony, establishes that they are simply not credible.  Rather, the truth is that they never were required to pay for the shirts and their claim in this regard should be dismissed.

Consistent with testimony from the defense witnesses,  some Plaintiffs admitted that they did not actually ever purchase shirts from Fresco.  Mr. Alvarado testified that when he needed a shirt, he "would ask Mr. Willy for it.  Sometimes Willy would give them to me and I wouldn't pay.  And sometimes he would tell me do not have any more shirts your size."  (Tr. 243:19-25; Def. Ex. K ¶ 9, *see also* Drill Dep. 74:2-5, 75:18-25, Def. Ex. M ¶ 56.)  He also testified that Mr. Scotto personally measured his neck and purchased a shirt for him from a department store when they did not have his size.  (Tr. 246:5-17; Def. Ex. K ¶ 9.)  Mr. Cedeno claimed he paid $25 for one shirt (not $50 for two shirts and a tie, as alleged in all of the Plaintiffs' declarations) exactly once; he got four or five other shirts for free.  (Tr. 397:2-398:7.)

---

[56] Pl. Ex. 104 ¶ 97; Pl. Ex. 109 ¶ 96; Pl. Ex. 105 ¶ 101; Pl. Ex. 115 ¶ 94; Pl. Ex. 110 ¶ 92; Pl. Ex. 111 ¶ 99; Pl. Ex. 106 ¶ 92; Pl. Ex. 108 ¶ 88.

[57] Pl. Ex. 104 ¶¶98, 104; Pl. Ex. 109 ¶¶ 97, 99; Pl. Ex. 112 ¶¶ 86-87 ; Pl. Ex. 105 ¶¶ 102, 104; Pl. Ex. 114 ¶ 95 ; Pl. Ex. 110 ¶¶ 93, 95; Pl. Ex. 113 ¶¶ 88-89; Pl. Ex. 111 ¶¶ 100, 102; Pl. Ex. 106 ¶¶ 93, 95; Pl. Ex. 108 ¶¶ 89, 91; Pl. Ex. 107 ¶¶ 81, 83; Pl. Ex. 116 ¶¶ 95, 97.

[58] Compl. ¶¶ 77, 98, 118, 142, 161, 181, 205, 229, 253, 276, 300, 322, 347.

Other Plaintiffs testified inconsistently as to who distributed the shirts.  Mr. Caravantes initially testified that "managers," distributed them, but when asked to name them, he changed his testimony to say that he did not remember.  (Tr. .425:8-426:20.)  Mr. Salinas initially testified that he received shirts from Brent Drill, before admitting that he "sometimes" also received shirts from "Willy," then vacillated between whether he had to pay $30 or $17.50 for one shirt.  (Tr. 110:24-114:13.)  He also incredibly testified that the Restaurant's bookkeeper, Natasha Gelman, charged $15 for additional ties, but allowed paying for it in (cash) installments.  (*Id.*)  In her declaration, Ms. Gelman denied ever taking any money, for any shirts, from any of the Plaintiffs or anyone else at Fresco for that matter.  Given this categorical denial, either Ms. Gelman or several of the Plaintiffs are lying.  It is one or the other.  Unlike the Plaintiffs, who presented inconsistent and irreconcilable testimony in this regard, there is no reason to question the credibility of Ms. Gelman and the weight of the evidence supports a finding against the Plaintiffs with respect to this claim.

**VI.     MARION SCOTTO IS NOT AN "EMPLOYER"**

Plaintiffs have also sued Mr. Scotto's mother, Marion Scotto, as an individual defendant with respect to the wage-and-hour claims in this litigation.  Individual liability under the FLSA is premised upon "personal responsibility for making decisions about the conduct of the business that contributed to the violations of the Act."  *Baystate Alternative Staffing v. Herman*, 163 F.3d 668, 678 (1st Cir. 1998).[59]  The Second Circuit has opined that this requires that "an individual defendant must possess control over a company's actual 'operations' in a manner that relates to a plaintiff's employment . . . A person exercises operational control over employees if his or her

---

[59]     Courts have applied the same "employer" standard for the purposes of determining individual liability under the FLSA and NYLL.  *See Schear*, 297 F.R.D. at 134 (*citing Kalloo v. Unlimited Mech. Co. of NY, Inc.*, 977 F. Supp. 2d 187, 200 (E.D.N.Y. 2013) (explaining that "any difference [between the FLSA and NYLL] would be immaterial to the facts of this case").

role within the company, and the decisions it entails, directly affect the nature or conditions of the employees' employment . . . the relationship between the individual's operational function and the plaintiffs' employment must be closer in degree than simple but-for causation." *Irizarry v. Catsimatidis*, 722 F.3d 99, 109-10 (2d Cir. 2013). "The *Carter* factors [] provide guidance for courts when an individual's actions rise to this level," *i.e.*, (1) the power to hire and fire, (2) supervising and controlling employee work schedules or conditions of employment, (3) determining employees' rate and method of pay and (4) maintaining employment records. *Id.* at 110.

Mrs. Scotto did not play any role at the Restaurant that would render her personally liable in this matter. At trail, not a single Plaintiff testified that she had any involvement with respect to any of the *Carter* factors. As has been demonstrated, only Anthony Scotto Jr. has responsibility in this regard. *See supra* at II.B.1. Mrs. Scotto credibly testified that she has no role in these type of decisions. (Tr. at 683:22-685:7.)

The only evidence remotely tying Mrs. Scotto to Plaintiffs' employment is (1) the fact that she is the majority shareholder of Starjem Restaurant Corp., (2) holds the title of CEO and, (3) was one of two signatories listed on their paychecks. Although Plaintiffs appear to rely on the fact that the Restaurant's website "affectionately" describes Marion Scotto as "the boss" of Fresco Restaurant, both Anthony and Marion Scotto testified at trial that this was in reference to Marion Scotto's "on-air personality," and that Anthony Scotto is the boss as far as all the employees are concerned. (Tr. 526:4-18, 682:17-683:13.) It is undisputed that Mrs. Scotto's primary role at the Restaurant is to sit at the host stand and greets guests. (*Id.*) Having played no part whatsoever in any of the decisions or practices that are at issue herein, she cannot be personally liable.

## **CONCLUSION**

For the reasons set forth above, Plaintiffs' minimum wage, overtime, misdirected tip claims, and uniform purchase claims should be dismissed, and Marion Scotto should be dismissed as a Defendant to this action.

Date:   January12, 2015
        New York, New York                    Respectfully submitted,


                                              /s/ Craig R. Benson
                                              _____
                                              Craig R. Benson
                                              Naveen Kabir
                                              LITTLER MENDELSON, P.C.
                                              900 Third Avenue
                                              New York, NY  10022.3298
                                              212.583.9600

                                              Attorneys for Defendants