**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------X

ENRIQUE SALINAS , ALFREDO
RODRIGUEZ,ANGEL CEDENO,
CHRISTIAN URGILES,FRANCISCO LUGO,
JOSE AMEZQUITA, LUIS ROBALLO,
MIGUEL CERVANTES, NAHUN FLORES,
PABLO ALVARADO, PABLO
FRANCISCO-LOPEZ, VALENTIN
XOCHIPILTECATL and VICENTE LEON,
individually and on behalf of others similarly
situated,

                    *Plaintiffs*,

           -against-

STARJEM RESTAURANT CORP (d/b/a
FRESCO BY SCOTTO) MARION SCOTTO
and ANTHONY SCOTTO,

                    *Defendants.*

-------------------------------------------------------X

**Index No. 13-cv-2992 (AT)**


## PLAINTIFFS' MEMORANDUM IN RESPONSE TO

## DEFENDANTS' POST-TRIAL MEMORANDUM


        MICHAEL FAILLACE & ASSOCIATES, P.C.
        Joshua S. Androphy
        Shawn Clark
        60 East 42nd Street, Suite 2020
        New York, New York 10165
        (212) 317-1200
        *Attorneys for Plaintiffs*

Table of Contents

**PRELIMINARY STATEMENT** ................................................................................................**1**

**Argument** ..........................................................................................................................**1**

    I.      FRESCO'S TIP POOL ILLEGALLY INCLUDED THE STOCKER,
          COFFEE PERSON, BRENT DRILL, AND ATTILIO VOSILLA .........................1

    A. The Stocker and Coffee Person Were Improperly Included in the Tip Pool ..............2

        1.  The Stocker Position........................................................................2

        2.  Coffee Persons.............................................................................7

    B. Defendants Unlawfully Required Plaintiffs to Share Tips with Managers Brent Drill
       and Attilio Vosilla ...................................................................................8

        1.  Anthony Scotto's Role .................................................................9

        2.  Brent Drill...................................................................................10

        3.  Attilio Vosilla .............................................................................12

    II.     PLAINTIFFS WERE IMPROPERLY PAID AT THE TIP-CREDIT RATE
          BECAUSE (A) THEY SPENT OVER 20 PERCENT OF WORK TIME
          PERFORMING NON-TIPPED WORK, AND (B) BECAUSE THEY DID NOT
          RECEIVE NOTICE OF THE TIP-CREDIT ......................................................15

    A. Plaintiffs Performed Non-Tipped Work for at least 20 Percent of Their Shifts .......15

        1.  Bussers........................................................................................15

        2.  Bar Backs....................................................................................17

         3.  Food Runners...............................................................................17

    B. Defendants Did Not Provide Plaintiffs Notice They Would be Paid at the Tip-Credit
       Minimum Wage Rate ...............................................................................18

    III.    PLAINTIFFS WERE NOT PAID FOR ALL HOURS WORKED ....................19

    A. Defendants May Not Deduct the Meal Period From Plaintiffs' Hours ...................19

    B. Plaintiffs' Entitlement to Addition Pay in the Shift-Pay Period ..............................20

    C. Plaintiffs' Entitlement to Addition Pay in the Time Clock Period ...........................23

    IV.    PLAINTIFFS ARE ENTITLED TO DAMAGES ON THEIR UNIFORM CLAIMS
          .........................................................................................................24

    V.     MARION SCOTTO IS AN EMPLOYER OF PLAINTIFFS .....................................26

**Conclusion** .......................................................................................................................**29**

**Table of Authorities**

**Cases**

*Alvarado v. Five Town Car Wash, Inc.*, 2014 U.S. Dist. LEXIS 132023 (E.D.N.Y. Sept. 19, 2014) .................................................................................................................................. 18

*Arencibia v. 2401 Rest. Corp.*, 831 F. Supp. 2d 164 (D.D.C. 2011) ........................................... 19

*Chhab v. Darden Rests., Inc.,* 2013 U.S. Dist. LEXIS 135926, 2013 WL 5308004  (S.D.N.Y. Sept. 20, 2013) ................................................................................................................ 3, 4, 15

*Copantitla v. Fiskardo Estiatorio, Inc.*, 788 F.Supp.2d 253 (S.D.N.Y. 2011) ............................ 18

*Irizarry v. Catsimatidis*, 722 F.3d 99 (2d Cir. 2013) ................................................................... 28

*Marquez v. Erenler, Inc.*, Index No. 12-cv-8580(GHW), Dkt. No. 85 (S.D.N.Y. Oct. 22, 2014) 18

*Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554 (2d Cir. 2012) ......................................... 14

*Reich v. S. New England Telecomms. Corp.*, 121 F.3d 58 (2d Cir. 1997) .................................... 21

*Roach v. T.L. Cannon Mgmt. Corp.*, 889 F. Supp. 2d 364 (N.D.N.Y. 2012) .............................. 25

*Schear v. Food Scope Am., Inc.*, 297 F.R.D. 114 (S.D.N.Y. 2014) ............................................... 4

*Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234 (2d Cir. 2011) ............................. 1

*Turner v. Millennium Park Joint Venture, LLC*, 767 F. Supp. 2d 951 (N.D. Ill. 2011) ................ 3

**Rules**

29 C.F.R. §531.35 ......................................................................................................................... 24

29 C.F.R. §541.100(a); .................................................................................................................. 14

Fed. R. Civ. P. 15(b)(2) .................................................................................................................. 25

**Other Authorities**

U.S. Department of Labor, Wage and Hour Division Fact Sheet #15: Tipped Employees Under the Fair Labor Standards Act (FLSA) (rev. Mar. 2011) ......................................................... 15

**PRELIMINARY STATEMENT**

Defendants' post-trial memorandum necessarily relies on false characterizations of the trial record.  A fair review of the evidence and testimony presented at trial makes clear that Defendants willfully engaged in multiple violations of the Fair Labor Standards Act ("FLSA") and New York Labor Law and associated regulations ("NYLL").

**ARGUMENT**

I.      FRESCO'S TIP POOL ILLEGALLY INCLUDED THE STOCKER,
        COFFEE PERSON, BRENT DRILL, AND ATTILIO VOSILLA

Defendants concede, as they must, that the FLSA prohibits the sharing of tips with managers and non-service employees.  (D. Mem. at 17-18)  Similarly, they acknowledge that gratuities may not be distributed to an "employer or his agent" or with employees who are not waiters, bussers, or similar employees.  (*Id.* at 18*)  The records established at trial conclusively establishes that (1) Plaintiffs, when working as bussers or food runners unlawfully had to share tips with non-service employees such as the stocker and  coffee preparer (on some shifts); and (2) Plaintiffs were required to share tips with managers Brent Drill and Attilio Vosilla.

There are several consequences to Fresco's illegal tip-pool.  Under the FLSA, where there are unlawful participants in a tip pool, the employed may not pay employees at the tip-credit rate.  *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 240 (2d Cir. 2011).  Plaintiffs contend that New York law similarly requires that employees who participated in a tip pool which included non-service employees or managers also are entitled to the full minimum wage.  (P. Mem. at 6)  New York law also requires that tips that were given to ineligible participants must be distributed to the eligible tip recipients.  NYLL §196-d.

A.  <u>The Stocker and Coffee Person Were Improperly Included in the Tip Pool</u>

Defendants contend that the stocker and coffee person were properly included in Fresco's tip pool.  However, the testimony at trial established that the stocker was not engaged in service, and that the coffee person was not engaged in service on shifts where there was a coffee helper.[1]

1.  <u>The Stocker Position</u>

The unequivocal testimony by Plaintiffs at trial was that the stockers completely or predominantly performed non-service work.  While Defendants claim that some Plaintiffs admitted that they ran food, the testimony Defendants cite does not identify how often, or what amount or percentage of time, stockers spent bringing food to customers.  (D. Mem. at 19-20) Plaintiffs unanimously testified that this was, at most, a sporadic and minimal portion of their job.  (Tr. 42:22-43:9, 43:16-44:10, 116:16-117:5, 335:15-24, 339:25-340:4, 341:6-11, 414:2-7, 415:14-22)

Defendants argue that Anthony Scotto's testimony that stockers spent at least 50% of their time on the service floor should be believed over the testimony of the Plaintiffs who actually worked as stockers.  (D. Mem. at 20, citing D. Ex. L ¶11)  Unlike Plaintiffs, Anthony Scotto did not work as a stocker, and had many other responsibilities at Fresco that kept him from observing how much time stockers spent engaged in service.  More importantly, Anthony Scotto was asked at his deposition what percentage of a stocker's time is bringing food to tables and bussing tables, and what percentage is spent tending to the stocker station.  Scotto admitted at trial that at his deposition he was unable to give any percentage estimate of how stockers spent their time.  (Tr. 612:18-614:17)  He also admitted that the stocker's main duties were receiving dishes and silverware from the dishwasher, wiping them off to make sure there were no marks on them, and bringing them to the floor.  (Tr. 612:10-14)  Defendants do not cite any other evidence

---

[1] Plaintiffs concede that the bar back and "lead runner" were permissibly included in the tip pool.

or testimony supporting Scotto's claim.  Scotto's affidavit testimony eleven months later that stockers spent half their time running food, clearing and resetting tables, and serving coffee should not be credited.

The credible testimony is that stockers spent the vast majority of their time doing the core stocker responsibilities, which Scotto admitted are receiving silverware and dishes from the dishwasher, cleaning those dishes, and bringing them to the floor.  (Tr. 612:7-14)   It is undisputed that the stocker station was in Fresco's kitchen.  (P. Ex. 123; Tr. 629:4-15)

Perhaps recognizing the futility of arguing that stockers were actually engaged in service for more than a minimal portion of their shifts, Defendants argue that it is sufficient that the stocker's duties helped bussers engaged in customer service.  (D. Mem. at 18-19)  Of course, the same could be said for any non-service employee — the work done by dishwashers, porters, and cooks also undoubtedly helped the bussers perform their jobs.

Defendants reliance on *Turner v. Millennium Park Joint Venture, LLC*, 767 F. Supp. 2d 951, 954–55 (N.D. Ill. 2011) for the contention that employees whose work helped bussers are properly included in a tip pool is ineffective, as *Turner* relied on the fact that the tipped employees voluntarily agreed to include silverware rollers to participate in the tip pool.  *Id.* at 954; *see also Chhab v. Darden Rests., Inc.,* 2013 U.S. Dist. LEXIS 135926, *42 n. 9, 2013 WL 5308004  (S.D.N.Y. Sept. 20, 2013).   The Fresco tip pool's participants were determined by Anthony Scotto.  (Salinas Dec. ¶58; Rodriguez Dec. ¶54; Cedeno Dec. ¶51; Urgiles Dec. ¶58; Lugo Dec. ¶53; Amezquita Dec. ¶46; Roballo Dec. ¶54; Caravantes Dec. ¶57; Flores Dec. ¶57; Alvarado Dec. ¶56; Francisco Lopez Dec. ¶55; Xochipiltecatl Dec. ¶49; Leon Dec. ¶58; *see also* Tr. 594:4-596:22)  And the law is clear that workers who have only *de minimis* interaction with customers are not eligible to participate in a tip pool.  *Schear v. Food Scope Am., Inc.*, 297

3

F.R.D. 114, 131 (S.D.N.Y. 2014) (quoting *Chhab*, 2013 WL 5308004, at *6). Stockers had only minimal, if any, contact with customers, and were not eligible to participate in the tip pool.

At trial and in their post-trial brief, Defendants spent an inordinate amount of time focused on Plaintiffs' time they spent washing dishes at Fresco. Plaintiffs' dishwashing activities are not necessary to Plaintiffs' claim that the stocker was improperly included in the tip pool and unlawfully paid the tip-credit wage. Even if Plaintiffs had never had to take the place of Fresco's dishwasher when they worked as stockers, the regular job functions of the stocker did not involve tip-producing work, and the stockers were ineligible to be paid at the tip-credit minimum wage and to receive tips from the tip pool. Nevertheless, given Defendants' obsessive focus on the dishwashing issue, a response to their claim that Plaintiffs' testimony on this issue is not credible is necessary.

First, it is unsurprising that eleven Plaintiffs who worked at Fresco at varying times, and worked as stockers with varying regularities, had slightly different experiences of when and how often they had to wash dishes.

Second, Defendants mischaracterized Plaintiffs' declaration testimony in order to set up a false conflict between their declaration and live trial testimony. Christian Urgiles' testimony is typical of the Plaintiffs who testified on this issue:

> Additionally, sometimes when I worked as a stocker I was required to do the job of a dishwasher. On some days the dishwasher for the dinner shift would be told to come late, and I would be required to wash dishes instead of him until he arrived. This would often happen during times when Fresco was less busy, mostly in the summer months.

(Urgiles Dec. ¶17; *see also* Salinas Dec. ¶17; Rodriguez Dec. ¶17; Cedeno Dec. ¶17; Lugo Dec. ¶17; Amezquita Dec. ¶15; Roballo Dec. ¶18; Flores Dec. ¶17; Francisco-Lopez Dec. ¶18; Xochipiltecatl Dec. ¶16; Leon Dec. ¶16) The first sentence of the paragraph states that

sometimes Urgiles would be required to do the job of a dishwasher.  The second and third sentences describe when this most often happened: when the dinner dishwasher was told to come late, most often when Fresco was less busy, which was mostly in the summer.  This does not mean that Urgiles (or any other stocker) washed dishes on *every* shift during the summer months. It also does not mean that Urgiles (or any other stocker) *only* washed dishes during the summer months, *only* when Fresco was less busy, or *only* when the dinner dishwasher was told to come late.  It simply described the situation when stockers most often replaced dishwashers.

Defendants argue that the fact that Miguel Caravantes testified that he could not remember replacing a dishwasher himself is proof that no stocker ever replaced the dishwasher. This is absurd.  Caravantes did not claim in his declaration that he ever replaced the dishwasher, and his trial testimony is entirely consistent with his declaration.  When asked whether other stockers replaced the dishwasher, Caravantes testified: "I would do my own job, and I wasn't overseeing or watching the other fellow workers."  (Tr. 416:10-15)  Defendants' argument that this "is enough to discredit the entire allegation" (D. Mem. at 4) is laughable.

Angel Cedeno testified in his declaration that he personally observed other stockers be ordered to replace the dishwasher.  Cedeno did not testify that he himself took the place of the dishwasher.  (Cedeno Dec. ¶17)  His testimony at trial that he personally washed dished only once is consistent with his declaration.  (Tr. 392:24-393:14)

Christian Urgiles's trial testimony was likewise consistent with his declaration testimony. At trial, he testified that he sometimes washed dishes during the summer.  (Tr. 179:12-180:16) Though Defendants claim Urgiles testified he only washed dishes one or two times, the record is not clear whether his testimony meant one or two times during his entire employment, or one or two times a week.  Just before Urgiles was asked how often he washed dishes, he was asked how

often he worked as a stocker, and answered "It would depend on the week, it would depend on the days. We would have one shift, two shifts. It would depend." (Tr. 179:12-15) Just afterwards, Urgiles was asked "can you estimate whether or now you were asked to wash dishes more than three times when you were assigned to work as a stocker?" He answered "Those times that I would work as a stocker it could have been two times, one time when I was a stocker." (Tr. 180:8-12) In context it appears Urgiles was answering how many times per week he washed dishes. Defendants' attorney did not attempt to clarify or obtain additional details.

Nahun Flores' testimony that he only replaced the dishwasher rarely is consistent with his testimony that he usually served as a coffee preparer, and only served as a stocker approximately once a week. (Tr. 362:5-363:4, 368:4-369:17) His testimony that the dishwasher would return at 6 PM or 7 PM is also consistent with testimony of other Plaintiffs who more generally stated that the dishwasher would return late during the dinner shift. (Flores Dec. ¶17; Tr. 369:5-11)

Vicente Leon consistent testimony was that he sometimes had to wash dishes when he worked as a stocker. (Leon Dec. ¶16; Tr. 478:15-482:19) He did not change his testimony, as Defendants charge.

Leon's testimony that he did not wash dishes since 2011 in no way contradicts Enrique Salinas's testimony that he washed dishes until he left Fresco in April 2014. (Tr. 107:1-110:23) Salinas and Leon are two different people. Salinas worked as a stocker nearly 90% of the time. (Salinas Dec. ¶11) It is little surprise that he served as a dishwasher more frequently than Leon when he worked as a stocker more often.

The testimony by several Plaintiffs that, in addition to replacing the dishwashers when they was sent home early from the lunch shift or arrived late to the dinner shift, they washed dishes at other times during shifts, is no contradiction to the Plaintiffs' declaration testimony. As

set out above, Plaintiffs never stated in their declarations that the only time they washed dishes was at the end of the lunch shift or beginning of the dinner shift.

Defendants also mischaracterize the testimony of Francisco Lugo, Alfredo Rodriguez, Pablo Francisco, and Valentin Xochipiltecatl.  Lugo testified, consistent with his declaration, that sometimes he would wash dishes at the end of a lunch shift because the dishwasher was sent away.  (Tr.468:15-19)    Rodriguez, Francisco, and Xochipiltecatl testified that, among other times, they washed dishes at the end of the lunch shift.  (Tr. 268:15-270:8, 287:15-288:25, 321:4-17)

Luis Roballo testified that he was required to wash dishes on every shift he worked as a stocker before 2011, and after 2011 only a few times.  (Tr. 340:15-22)  He did not, as Defendants charge, change his testimony at all.  At his deposition he testified that he sometimes washed dishes.  (Tr. 343:7-13)  This is fully consistent with his trial testimony.  Likewise, Julian Amezquita testified, consistent with his declaration testimony, that he often replaced the dishwasher at the end of lunch shifts.  (Tr. 430:8-433:19)

In sum, the Plaintiffs' testimony concerning stockers working as dishwasher is consistent and credible.  Defendants' inordinate emphasis on this issue, and failed attempts to draw out inconsistencies in Plaintiffs' testimony, underscores the weakness of Defendants' defense in this action.

## 2. Coffee Persons

Plaintiffs' claim that coffee persons being ineligible to participate in the tip-pool is confined to shifts where the coffee person was assisted by a coffee helper.  This happened on most lunch shifts.  (Tr. 363:8-365:10)  On such shifts, the coffee person prepared, but did not deliver, coffee and like beverages.  (Salinas Dec. ¶¶26-28; Rodriguez Dec. ¶¶26-27; Cedeno

Dec. ¶26; Urgiles Dec. ¶¶26-27; Lugo Dec. ¶¶26-27; Amezquita Dec. ¶¶23-24; Roballo Dec. ¶¶27-28; Caravantes Dec. ¶26; Flores Dec. ¶¶28-29; Alvarado Dec. ¶29; Francisco-Lopez Dec. ¶¶26-27; Xochipiltecatl Dec. ¶24;  Leon Dec. ¶¶27-28; Tr. 48:22-49:3, 50:15-51:1, 52:24-54:9, 54:17-55:1, 118:24-120:8, 141:7-143:5, 144:14-146:22, 222:5-13, 306:1-12, 363:5-366:19)

Defendants argue that it is practically impossible that on busy shifts the coffee person would not deliver coffee, because otherwise the coffee would get cold while waiting to be delivered.  (D. Mem. at 22-23)  This is certainly more plausible than what Defendants would have the Court believe: that when Fresco received many coffee orders, the coffee preparer would leave his post while orders piled up and waited to be prepared.  It is certainly plausible that Fresco utilized the same division of labor to efficiently deliver coffee that it used for serving other items.  There was not time for the coffee person to deliver coffee when many orders came in, because the drinks had to be prepared quickly.  (Tr. 365:24-366:3, 388:2-13)  The coffee helper would not prepare drinks, only deliver drinks.  (Tr. 141:23-143:5)

Because the coffee person did not engage in customer service on shifts when there was a coffee helper, he was not permitted to participate in the tip pool on those shifts.

### B.  Defendants Unlawfully Required Plaintiffs to Share Tips with Managers Brent Drill and Attilio Vosilla

Defendants acknowledge, as they must, that both the FLSA and NYLL prohibit employers from requiring sharing of tips with managers.  (D. Mem. at 26-28)  They contend that Brent Drill and Attilio Vosilla did not serve as managers, and were permitted to receive tips. This is contrary to the records established at trial.

8

### 1.  Anthony Scotto's Role

Defendants contend that Anthony Scotto alone is in charge of every single decision at Fresco, and that it is therefore impossible that Drill and Vosilla served as managers.  The trial record shows that Defendants are wrong.

If Anthony Scotto was as hands-on as he claims, surely he would recognize the names of Fresco's bussers and food runners.  Yet at his deposition, Scotto could not identify the Plaintiffs as employees of Fresco, even though four Plaintiffs worked for Fresco at the time.  (Tr. 551:22-23, 555:8-557:1, 557:20-558:9)  Nor did he know how many busboys Fresco employed at that time.  (Tr. 557:23-558:9)  It is unsurprising that Scotto could not identify the Plaintiffs, since Fresco has had close to 100 employees throughout the relevant time period.  (Tr. 539:13-540:2)

Scotto's claim that he makes Fresco's schedules, and denial that Vosilla prepares the first draft (Tr. 545:23-546:9, 548:16-552:10 ) is contradicted by his own deposition testimony (Tr. 546:10-19), and Vosilla's trial testimony that he prepared the schedule since at least 2007.  (Tr. 666:10-667:22).

Moreover, Scotto is not at Fresco every minute it is open.  Scotto testified that he normally is at Fresco from 8:30 a.m. to 10 p.m., Monday through Friday, and from 2:00 p.m. to 9:00 p.m on Saturdays.  (Scotto Aff. ¶4)  This contradicts his deposition testimony that he is usually at Fresco until 9:30 p.m. and on Saturday usually arrives at 5:00 p.m.  (Tr. 512:19-514:16)  Because Scotto was not always at Fresco, he delegated the authority to interview bussers and invite them to begin training to others, including Drill and Vosilla.  (Tr. Tr. 540:3-542:16)  Just as Scotto exaggerated the time he regularly is at the restaurant, his claim that he personally makes all decisions related to employment is also greatly exaggerated.  As set out in

Plaintiffs' post-trial memorandum, Scotto delegated many functions to Drill and Vosilla. (P. Mem. 22-31)

### 2. Brent Drill

As summarized in Plaintiffs' post-trial memorandum, Drill exercised significant authority over Plaintiffs and other Fresco employees, including the power to interview, hire, train, and discipline employees. (P. Mem. 22-25)

Defendants attempt to explain away the undisputed testimony of Salinas, Francisco-Lopez, and Xochipiltecatl that they were hired by Drill (Salinas Dec. ¶4; Tr. 97:21-99:23, 121:21-122:13; Francisco-Lopez Dec. ¶¶4-5; Xochipiltecatl Dec. ¶4; 272:9-274:6) by contending that they were not really hired by Drill, even though Drill was the only person they met with before beginning to work at Fresco.   According to Defendants, Scotto evaluated their performance and decided whether they would be permanently hired. (D. Mem. at 32)   Notably, Scotto did not testify that he observed any of these three Plaintiffs hired by Drill during their training.   Moreover, Salinas testified that Drill told him he was hired for regular employment at Fresco without training, and Salinas did not meet with Scotto before beginning his employment. (Salinas Dec. ¶4; Tr. 97:21-99:23, 121:21-122:13)   Similarly, Francisco-Lopez and Xochipiltecatl testified that Drill oversaw their training and that they never met Scotto during their training period. (Francisco-Lopez Dec. ¶¶4-5 Xochipiltecatl Dec. ¶4; 272:9-274:6)   The testimony Defendants cite of other Plaintiffs does not support Defendants' claim that Fresco's protocol was for employees to return and be supervised by Scotto. (D. Mem. at 32, citing 154:23-155:5, 208:17-208:2, 311:22-312:6)   Urgiles, Alvarado,  Rodriguez all initially met with Scotto, not Drill. (153:22-24, 206:17-19, 311:3-5)   Their experience is not probative of the

experiences of Salinas, Francisco-Lopez, and Xochiplitecatl, who all testified that they did not meet Scotto during their initial interview or during training.

Anthony Scotto's testimony confirms that Drill would frequently conduct an initial interview with bussers, and invite them to return to Fresco for training and, subsequently, employment.   Scotto testified that if potential bussers came looking for a job during the afternoon, they could meet with Drill, and Drill could invite them to start training at Fresco.  (Tr. 540:3-541:23)

Contrary to Defendants' contention, Drill actually disciplined and suspended employees before his purported promotion in January 2013.  Flores testified that he was sent home by Drill in 2008 or 2009 when he returned to work a day after calling in sick.  (Flores Dec. ¶66; Tr. 374:20-23)  Leon observed Drill terminate Gelacio before 2013.  (Leon Dec. ¶63; Tr. 494:8-495:5)  Other Plaintiffs testified about discipline imposed by Drill, and were not specifically asked at trial whether the events occurred before or after January 2013.[2]  (Salinas Dec. ¶66; Urgiles Dec. ¶68; Tr. 166:10-168:9; Caravantes Dec. ¶63)  Additionally, the reason Drill (and Vosilla) did not prepare written disciplinary communications before 2013 is that Fresco did not use written reports before 2013.  (Tr. 569:24-570:13)

Moreover, Scotto himself testified that Drill's job did not change at all when he was supposedly promoted in January 2013.  Scotto testified that only "[Drill's] title changed, sir, so that I wouldn't be getting in trouble every five minutes, but the otherwise what he did every day did not change at all."  (Tr. 591:19-21; *see generally* Tr. 591:16-592:18)  Even Scotto's claim that Drill title changed is false; Drill title at Fresco was manager from at least October 2007.  (Pl. Ex. 74)  Drill also called himself a manager on his LinkedIn profile before January 2013.  (Drill

---

[2] Urgiles testified that Drill sent an employee named Abel Reyes home when he showed up late for work.  Fresco's records list Abel Reyes as an employee but not after January 2013.  (P. Ex. 77)  Clearly, the incident Urgiles testified about occurred before January 2013.

Dep. 143:21-144:7)  Defendants' claim that Drill's job changed in January 2013, and that therefore his actions after January 2013 are irrelevant, is contradicted by their own testimony.

### 3.  Attilio Vosilla

Defendants claim that Attilio Vosilla had no meaningful authority over Fresco's employees simply cannot be squared with the facts presented at trial.

Vosilla singlehandedly interviewed Plaintiff Luis Roballo supervised his training, and told him he was hired, with Roballo never meeting Scotto before being permanently hired. (Roballo Dec. ¶¶4-5; Tr. 354:2-355:5)  Defendants ignore this undisputed fact.

Plaintiffs also provided compelling testimony that Vosilla terminated and suspended employees.  Defendants' attempts to poke holes in Plaintiffs' testimony fails.  For example, Defendant claim Salinas did not have knowledge of whether "Vosilla even fired Patricio at all." (D. Mem. at 34)  Not so.  Salinas testified that when Patricio refused to wash dishes, the sous chef got Vosilla, the manager [Vosilla] asked Patricio if he would wash the dishes, and when Patricio refused "he [Vosilla] said, Okay.  Get out from here, we do not need you anymore.  I did not see that the manager spoke to some or someone else further.  (Tr. 105:21-106:6)  This all took place "within three or four minutes."  (Tr. 106:12)  While Salinas acknowledged that Vosilla or the sous chef could have spoken to Scotto (Tr. 106:7-14), the time in which the events took place makes that unlikely.  Urgiles witnessed the same events, and likewise testified that while he did not know whether Vosilla spoke with Scotto first, it happened too quickly to think anyone spoke with Scotto first.[3]  (Tr. 172:21-178:1)

---

[3] Defendants contend that this incident occurred on May 16, 2009, a date Urgiles did not work.  There is no evidence of that.  The excerpts annexed at Benson Dec. Ex. H show that Patricio was listed on the schedule for the week ending May 16, 2009.  No one named Patricio is listed on the tip sheets.  Moreover, everyone who received tips on May 16, 2009 also received tips the following week.

Review of the tip sheets and schedules suggest that Patricio is listed as Julio P. Remache on the tip summary sheets. Julio P. Remache last received tips on Friday May 15, 2009, and received tips for all days Patricio was scheduled except May 16, 2009.  On May 15, 2009, Urgiles was scheduled to work the lunch shift as the closer, and Salinas

Defendants' attack on the credibility of Flores's account of his suspension by Vosilla in 2010 also falls flat.  Defendants conflate two separate occasions when Flores was suspended — once by Drill and once by Vosilla — to argue that Flores contradicted himself.  (D. Mem. at 35)

Additionally, it is beyond dispute that Vosilla wrote up and signed employee disciplinary communications documenting verbal warnings, which were not signed by Anthony Scotto.  (Pl. Ex. 35, 63)  These warnings are not the merely "coaching" or "performance feedback" of the kind discussed in *Barenboim*, 546 Fed. Appx. 1, 3 (2d Cir. 2013).  Rather, these were disciplinary communications placed in plaintiffs' employment files.  While these communications were signed after 2013, when Vosilla no longer received gratuities, Vosilla testified that his job duties have been the same since at least 2007.  (Tr. 676:22-23, 679:24-680:7)  This is consistent with the fact that he (and Brent Drill) had been listed as managers in Fresco's employee policy guide since at least October 2007.  (Pl. Exs. 71-74)

Scotto's argument that Vosilla did not take part in determining Plaintiffs' schedules at Fresco cannot be taken seriously.  Vosilla himself testified that he created the initial schedule each week, since at least 2007, and the only changes Scotto ever makes are to add or reduce staff.  (Tr. 666:10-667:24)  This contrasts with Scotto's self-serving testimony that Vosilla does not prepare the initial schedule. (Tr. 545:23-25)  Scotto was forced to backtrack from that denial, changing his testimony to claim that Vosilla has only prepared the initial schedule since 2013. (Tr. 546:10-548:21)  This still conflicts with Vosilla's testimony that he prepared the initial schedule since at least 2007.  (Tr. 666:10-666:24)  Scotto further contradicted Vosilla's unambiguous testimony that he prepares the schedule, testifying that Vosilla never sat at a

---

was scheduled to work the dinner shift as stocker.  It is consistent with the records and the testimony that the incident where Patricio was fired occurred between the lunch and dinner shifts on Friday May 15, 2009.  This is also consistent with Plaintiffs' testimony that bussers would often have to wash dishes during the time between lunch and dinner shifts.

computer to create an initial draft of the schedule, and only observed Scotto preparing the schedule. (Tr. 548:22-550:2) Aside from the initial schedule, Vosilla was authorized to make changes to the schedule to accommodate if an employee would be unavailable. (Tr. 668:18-669:8) Vosilla's and Plaintiffs' testimony confirms that Scotto lied about Vosilla's role in preparing the schedule, and that Vosilla in fact prepared Fresco's schedules. (Salinas Dec. ¶77; Rodriguez Dec. ¶74; Cedeno Dec. ¶67; Urgiles Dec. ¶80; Lugo Dec. ¶74; Amezquita Dec. ¶64; Roballo Dec. ¶75; Caravantes Dec. ¶74; Flores Dec. ¶77; Alvarado Dec. ¶75; Francisco-Lopez Dec. ¶72; Xochipiltecatl Dec. ¶67; Leon Dec. ¶75; Tr. 102:14:19, 168:25-169:4, 172:11-20, 191:7-16)

It is also noteworthy that Vosilla at all times has been paid a salary, and has not been paid overtime. (Tr. 589:11-23) Presuming that Fresco is not intentionally violating the FLSA and NYLL by not paying Vosilla overtime, Fresco must be relying on the executive exemption so as not to pay Vosilla overtime when he work above 40 hours in a workweek. The executive exemption covers employees paid a sufficient salary:

> "(2) whose primary duty is management of the enterprise in which the employee is employed or of a . . . department thereof ; (3) Who customarily and regularly directs the work of two or more other employees; and (4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight."

29 C.F.R. §541.100(a); *see also Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 569-570 (2d Cir. 2012). If Vosilla's primary duty is management of service employees, and Vosilla's suggestions and recommendations of changes of status of employees are given particular weight — as Fresco has apparently determined — he undoubtedly had meaningful authority over employees rendering him a manager under the FLSA and NYLL.

14

II.   PLAINTIFFS WERE IMPROPERLY PAID AT THE TIP-CREDIT RATE BECAUSE (A) THEY SPENT OVER 20 PERCENT OF WORK TIME PERFORMING NON-TIPPED WORK, AND (B) BECAUSE THEY DID NOT RECEIVE NOTICE OF THE TIP-CREDIT

In addition to Fresco's paying Plaintiffs at the tip-credit rate being unlawful because of the illegal tip pool, Fresco's payment of Plaintiffs at the tip-credit rate was illegal because (a) Plaintiffs in all positions performed non-tipped work for at least 20 percent of their shifts, and (b) Fresco did not provide the required notice of the tip-credit to Plaintiffs before July 2012.

A.   Plaintiffs Performed Non-Tipped Work for at Least 20 Percent of Their Shifts

Defendants concede that if an employee spends more than 20 percent of his shift, he must be paid at the regular minimum wage rate under the FLSA and NYLL.  (D. Mem. at 43) As set out above (Part I.A), stockers, and coffee persons on shifts with a coffee helper, performed non-tipped work for their entire shifts.  Defendants apparently concede this point, as they only contend that bussers and runners did not spend twenty percent of their shifts doing non-tip-producing work.  (D. Mem. at 43-46)  Plaintiffs typically spent more than twenty percent of their shifts doing non-tip-producing work when they worked as bussers, bar backs, and food runners.

1.   Bussers

Defendants contend that the time Plaintiffs spent performing preparatory side work, over an hour before customers arrive, should be considered "tip-producing" work.  (D. Mem. at 44) This is wrong as a matter of law.  The Department of Labor has stated that employers may not apply the tip credit for work that is related to tip-producing work, but itself is not tip-producing work.  *See Chhab*, 2013 U.S. Dist. LEXIS 135926, at \*10-11 (citing U.S. Department of Labor, Wage and Hour Division Fact Sheet #15: Tipped Employees Under the Fair Labor Standards Act (FLSA) (rev. Mar. 2011)).  The side work that bussers performed, which included duties like cleaning and polishing bread baskets, cleaning candle holders, cleaning mirrors, filling up and

15

dumping ice buckets, and generally cleaning the restaurant, well before customers arrived at Fresco or after customers left, is not tip-producing work, and Plaintiffs cannot be compensated at the tip-credit rate for such work.  (Salinas Dec. ¶¶24-25: Rodriguez Dec. ¶¶24-25; Cedeno Dec. ¶¶24-25; Urgiles Dec. ¶¶24-25; Lugo Dec. ¶¶24-25; Flores Dec. ¶¶25-26; Amezquita Dec. ¶¶21-22; Roballo Dec. ¶¶25-26; Caravantes Dec. ¶¶21-22; Francisco-Lopez Dec. ¶¶24-25; Xochipiltecatl Dec. ¶¶22-23; Leon Dec. ¶¶24-25)

Plaintiffs also regularly had to perform non-tip-producing work during their shift in addition to side work.  This includes not only cleaning pictures and setting up tables that Defendants discuss in their brief (D. Mem. at 45-46), but also tasks Defendants ignore which had no connection to tip-producing work: taking deliveries of linens and stocking them, taking in deliveries of wine, and moving room dividers upstairs or downstairs.  (Salinas Dec. ¶23: Rodriguez Dec. ¶23; Cedeno Dec. ¶23; Urgiles Dec. ¶23; Lugo Dec. ¶23; Flores Dec. ¶24; Amezquita Dec. ¶20; Roballo Dec. ¶23; Caravantes Dec. ¶20;; Francisco-Lopez Dec. ¶23; Xochipiltecatl Dec. ¶21;  Leon Dec. ¶¶22-23; Tr. 297:8-15)

Defendants attack on the credibility of Plaintiffs' testimony that they spent time cleaning pictures and paintings fails.  At trial, Defendants attempted and failed to impeach Plaintiffs' claim that they cleaned any paintings, by suggesting repeatedly that the only paintings at Fresco were large, unframed oil paintings which Plaintiffs could not have possibly cleaned.  (Tr. 301:16-304:13, 351:13-19, 436:16-439:7)  Defendants' attempt failed because photographs of Fresco showed clearly that there were other framed paintings which would logically be cleaned in the way Plaintiffs described.  (P. Ex. 122,: D. Ex. J; Tr. 448:11-449:10, 449:22-450:24, 627:8-629:2)

16

According to Anthony Scotto, the longest a lunch shift would ever last was from 10:00 a.m. to 3:00 p.m. — five hours including the family meal. (Scotto Aff. ¶14) Dinner shifts would last from 4:00 p.m. to 11:00 p.m., but sometimes would end as early as 9:00 p.m. (*Id.*) According to Defendants' own testimony, Plaintiffs need only have spent one hour on lunch shifts (or approximately 45 minutes if the family meal is excluded) to have spent twenty percent of their work doing non-tipped work. The trial record establishes that Plaintiffs regularly did so.

### 2.      Bar Backs

The bar backs testified that they split their time performing typical busser duties and performing work such as washing glasses, cleaning bottles, cleaning the bar area, bringing liquor up from the basement, and sweeping the sidewalk in front of the restaurant. (Rodriguez Dec. ¶ 28; Cedeno Dec. ¶27; Urgiles Dec. ¶28; Lugo Dec. ¶28; Amezquita Dec. ¶25; Roballo Dec. ¶30; Flores Dec. ¶31; Francisco-Lopez Dec. ¶28; Leon Dec. ¶29; Tr. 147:17-149:8) Defendants' statement that Plaintiffs' declarations failed to mention bussing or resetting tables as part of their responsibilities as bar backs is a lie. (D. Mem. at 24; Urgiles Dec. ¶28; Roballo Dec. ¶30) Plaintiffs consistently testified that they spent approximately half their time when assigned as bar backs doing typical busser work, and half doing work specific to the bar back position. (Tr. 189:14-190:2, 192:21-193:20, 195:4-13, 195:25-196:10, 353:11-354:1) Bar backs consistently had to spend at least half their time performing non-tip-producing work, and were not eligible to be paid at the tip-credit rate.

### 3.      Food Runners

As explained in Plaintiffs' post-trial brief, Alvarado and Caravantes spent more than 20 percent of their time when working as food runners performing non-tip-producing work. (P. Mem. at 14-15) They were not permitted to be paid at the lower tip-credit rate.

      B.      Defendants Did Not Provide Plaintiffs Notice They
              <u>Would be Paid at the Tip-Credit Minimum Wage Rate</u>

Defendants concede that the FLSA, and since January 1, 2011 the NYLL, require that employers provide notice to employees if they intend to pay employees at the lower tip-credit rate. (D. Mem. at 45)  Defendants also concede that Plaintiffs were not provided written notices of their wages until 2011, and until July 2012 these notices were provided only in English. (D. Mem. 47; Fact. Stip. 14)

Defendants contend that they satisfied their notice obligation by posting posters in the restaurant which contain information about the minimum wage laws. Defendants are wrong. Posting Department of Labor posters with general information about wage and hour laws does not inform employees that they will be paid at the tip-credit rate. "At most, these 'generic government poster[s]' could 'inform employees that minimum wage obligations exist, but could not possible inform employees that their employer[] intend[ed] to take the tip credit with respect to their salary." *Marquez v. Erenler, Inc.*, Index No. 12-cv-8580(GHW), Dkt. No. 85 at 14 (S.D.N.Y. Oct. 22, 2014) [4] (quoting *Copantitla v. Fiskardo Estiatorio, Inc.*, 788 F.Supp.2d 253, 289 (S.D.N.Y. 2011).  The posters "simply sketch the general rule; they do not communicate concretely [Fresco]'s intentions." *Id.* Moreover, Fresco's posters were practically impossible to read.  They were placed at a staircase, and one would have to climb over a handrail and stand in a small space above the stairs in order to actually read the posters. (Pl. Ex. 119; Tr. 625:9-21)

The two cases Defendant cite do not help their cause.  In *Alvarado v. Five Town Car Wash, Inc.*, 2014 U.S. Dist. LEXIS 132023 (E.D.N.Y. Sept. 19, 2014), the court denied summary judgment to plaintiff because defendant testified that he informed the plaintiffs that they were being paid at the tip credit rate.  In *Arencibia v. 2401 Rest. Corp.*, 831 F. Supp. 2d 164, 180

---

[4] A true and correct copy of the decision in *Marquez v. Erenler, Inc.* is annexed hereto as Appendix A.

(D.D.C. 2011) the issued raised by plaintiffs was apparently the "failure to disclose the use of a tip pool in the tip credit notices," not, as here, the failure to provide any tip credit notice at all.

### III.   PLAINTIFFS WERE NOT PAID FOR ALL HOURS WORKED

Plaintiffs proved at trial that they were not paid for all hours worked, both before and after June 2011, when Fresco instituted a time clock system for Plaintiffs to use.  (P. Mem. at 32-38)  Defendants' submissions in opposition are unavailing.

#### A.   Defendants May Not Deduct the Meal Period from Plaintiffs' Hours

According to the testimony of Anthony Scotto and Natasha Gelman, Fresco at all times compensated Plaintiffs for the meal periods.  Anthony Scotto testified that during the shift pay period, Fresco paid employees five hours per shift for lunch shifts, based on a shift lasting from 10:00 a.m. to 3:00 p.m., and seven hours per shift for dinner shifts based on shifts typically lasting from 4:00 p.m. to 11:00 p.m.  (A Scotto Aff. ¶14)  Likewise, Gelman testified that Fresco would pay employees for all hours worked, including the meal period.  (Gelman Aff. ¶¶ 31-32)  This contradicts Gelman's testimony that the meal breaks were unpaid.  (*Id.* ¶45)

Once Fresco began using a time clock, Fresco automatically deducted 20 minutes from Plaintiffs' shifts.  Although Gelman testified that this deduction was to account for meal breaks (*Id.* ¶46), Scotto and Gelman admitted at trial that this deduction was unintentional and simply how the time clock was set up Fresco's vendor.  (Tr. 611:9-612:6, 658:6-19, 659:14-18)

Thus, according to Fresco, the restaurant policy was to pay employees for their meal breaks.  Whether Fresco *could have* decided not to pay Plaintiffs for the meal break periods is irrelevant.  There is not legal support for Defendants' contention that the meal periods which Plaintiffs were compensated for "must be properly factored in when assessing whether the Plaintiffs were compensated for all hours worked."  (D. Mem. 40)   Defendants cannot

retroactively convert a paid meal period to unpaid break time in order to offset hours that Plaintiffs worked and were not compensated for.

B. <u>Plaintiffs' Entitlement to Additional Pay in the Shift Pay Period</u>

Defendants apparently concede that Plaintiffs are entitled to recover some unpaid overtime pay from the shift pay period, when Fresco's policy was to never pay employees for more than 40 hours, regardless of the number of hours actually worked. However, Defendants argue incorrectly that this should be limited to weeks when Plaintiffs worked more than nine shifts. Even according to Defendants' own testimony, this is wrong. Defendants' own records and testimony show that Defendants calculated the number of hours worked per shift changed over time, as follows:

- From January 2007 until November 2008, 5.5 hours per lunch shift and 7 hours per dinner shift. (Gelman Aff. ¶ 33; P. Ex. 76 at 1327-1339)
- From November 2008 to January 17, 2009, 5 hours per lunch shift and 6 hours per dinner shift. (P. Ex. 76 at 2282-2293; P. Ex. 77 at 2485)
- From January 17, 2009 until December 2010, 5 hours per lunch shift and 5 hours per dinner shift. (Gelman Aff. ¶34)
- On or about December 10, 2010 until implementation of time clock, 5 hours per lunch shift and 6 hours per dinner shift. (Gelman Aff. ¶35; P. Ex. 76 at 5408-5419, P. Ex. 77 at 5420)

(P. Mem. at 33-34; P. Mem. Appendix A) Therefore, sometimes Plaintiffs were entitled to overtime pay, according to Defendants' own calculations, if they worked as few as six shifts, if five or more were dinner shifts. (P. Mem. Appendix A) At a minimum, Plaintiffs are entitled to recover overtime pay for each shift that Defendants' own pay methods demonstrate that they worked above 40 hours per week.

Moreover, the Court should credit Plaintiffs' testimony regarding the typical number of hours they worked per shift during the shift pay period. Where, as here, the Defendants kept no records of the time actually worked, Plaintiffs' recollections of the hours they regularly worked

20

are "sufficient evidence from which violations of the [FLSA] and the amount of an award may be reasonably inferred." *Reich v. S. New England Telecomms. Corp.*, 121 F.3d 58, 66 (2d Cir. 1997).

Defendants' argument that the hours Plaintiffs worked before Fresco used a time clock can be derived from the hours Plaintiffs worked after the time clock was installed defies logic, and the Defendants' own testimony.  Anthony Scotto testified that the length of typical shifts at Fresco changed over time, as business slowed or grew at Fresco.   (A. Scotto Aff. ¶14) According to Scotto, Fresco used to be busier and open at dinner through 11:00 p.m.  (*Id.*)  Later, business decline "and the dining room was empty by 8:30 PM or 9 PM."  (*Id.*)  The downturn continued and "[b]etween 2007 and 2011, the Restaurant experienced an approximately 25% drop in food and beverage sales, which has not recovered since."  (A. Scotto Supp. Aff. at ¶8) Given the acknowledged fluctuations in Fresco's business, there is no basis to use recorded times worked after June 2011 to extrapolate shift lengths for shifts before the time clock.

The Defendants' claim that nothing changed in the length of shifts after the time clock was implemented is not believable.  Before Fresco used the time clock, Fresco had no reason to send employees home before all customers had left for the shift.  Since Fresco was not paying employees according to the number of hours they actually worked, they unsurprisingly would keep more staff on hand for longer than once Fresco started actually keeping track of the time employees worked.

Defendants' blunderbuss attack on the credibility of Plaintiffs' testimony on the hours they worked misses the mark.  Defendants falsely claim that Plaintiffs' declarations did not distinguish between the shifts they worked before and after the time clock.  Not so.  For the Plaintiffs who worked both before and after June 2011, Plaintiffs' declarations provided

Plaintiffs' recollections of the hours they worked before June 2011, and stated that after June 2011 their exact times were recorded in a time clock. For example, Christian Urgiles's declaration stated the approximate times of his shifts before June 13, 2011, and then stated that after June 13, 2011 the times he started and finished work have been recorded in the time clock system. (Urgiles Dec. ¶¶30-35, 42; *see also* Salinas Dec. ¶¶ 30-34, 41; Rodriguez Dec. ¶¶31-34, 40; Cedeno Dec. ¶¶29-31, 36; Roballo Dec. ¶¶32-36; Caravantes Dec. ¶¶28-33, 32; Flores Dec. ¶¶ 33-36, 43; Alvarado Dec. ¶¶30-34, 41; Francisco-Lopez Dec. ¶¶30-34, 41; Leon Dec. ¶¶31-34, 41) Since the times Plaintiffs began and finished work after the time clock was installed was not in dispute, the Plaintiffs gave testimony in their declaration only about the pre-June 2011 shift durations. Clearly, the testimony about the typical hours worked was intended to apply only to the time before the time clock. Any possible confusion on this point was dispelled early on at trial by Enrique Salinas, who confirmed that the times recounted in the declaration were specifically referring to before June 2011. (Tr. 58:8-11, 59:2-60:10, 66:6-69:3)

Defendants' attempt to show a conflict between the testimony of Plaintiffs Alvarado and Caravantes, who testified that they could leave once their sections were finished, ignores that Alvarado and Caravantes were testifying about work as food runners, and not work as bussers. (Tr. 228:17-236:8, 417:14-420:19; Alvarado Dec. ¶9)

Any minor inconsistencies in the thirteen Plaintiffs' testimony about the regular length and number of shifts pale in comparison with Anthony Scotto's false testimony that he "controlled the number of shifts that each individual works so that no one spent more than 32 or 35 hours in the Restaurant per week." (A. Scotto Aff. ¶13) Defendants' own records show that Plaintiffs worked seven shifts or more approximately one-third of their weeks worked in the shift-pay period, which according to Defendants' own pay practices meant at least 35 hours of

work.  (Benson Dec. Ex. C)  In addition, Fresco's undisputed willful practice of recording and paying for a maximum of 40 hours per week, even when employees worked above 40 hours, deprives Fresco of any credibility whatsoever on the number of hours Plaintiffs worked per week before Defendants instituted the time clock.  (P. Exs. 76, 77, 117, 118; Tr. 600:2-608:1; 657:2-11, 660:5-18)

Furthermore, Defendants' attack on Plaintiffs' claim that bussers regularly left at the same time before June 2011 makes no sense because Fresco paid Plaintiffs by the exact assumption that bussers all left at the same time.  Fresco paid bussers for a set number of hours per shift.  It did not pay different bussers for more or less time before June 2011, accounting for different times they started.  The reason is clear, and consistent with plaintiffs' testimony: all bussers regularly stayed until the end of shifts before June 2011, and therefore Plaintiffs were paid accordingly.

Contrary to Defendants' argument, their records and analyses of the shifts Plaintiffs worked confirms Plaintiffs' testimony that Fresco reduced the number of shifts per week after installation of the time clock.  Defendants' Table 3 shows that before the time clock was implemented for Plaintiffs, Plaintiffs collectively worked 8 shifts or more approximately 15% of their weeks.  (Benson Dec. Ex. C)  After Fresco implemented the time clock, and began to pay overtime if employees were recorded as working above 40 hours in a week, Plaintiffs collectively worked eight shifts or more for only approximately 3.5% of their shifts.  (*Id.*)

C.  Plaintiffs' Entitlement to Additional Pay in the Time Clock Period

Defendants appear to concede that Plaintiffs are owed compensation for the approximately 20 minutes that were subtracted automatically by the time clock.  However, Defendants appear to contend that they are entitled to retroactively deduct 30 minutes from

employees' clocked time worked to account for a meal period, which Defendants claim could have been unpaid.  (*See*, *e.g.*, Benson Dec. Ex E (deducting 30 minutes for family meal period) However, the undisputed record shows that Defendants treated the meal period as compensable time throughout Plaintiffs employment.  Defendants did not direct Plaintiffs to punch in and out for their meal breaks.  There is no basis to retroactively treat this meal period as time for which Plaintiffs are not entitled to compensation when in practice Fresco paid Plaintiffs for this period.

IV.   PLAINTIFFS ARE ENTITLED TO
      <u>DAMAGES ON THEIR UNIFORM CLAIMS</u>

Plaintiffs conclusively established their claims that they were required to pay for shirts and ties which served as uniforms at Fresco.

As an initial matter, the shirts and ties Plaintiffs were required to purchase are uniforms under the NYLL.  Under the NYLL, a uniform is "clothing required to be worn while working at the request of an employer . . . except clothing that may be worn as part of an employee's ordinary wardrobe."  12 NYCRR 146-3.10(a).  "Ordinary wardrobe" is "ordinary basic street clothing selected by the employee where the employer permits variations in details of dress."  12 NYCRR 146-3.10(b)  Here, there is no question that the shirts and ties Plaintiffs wore were chosen by their employer, not by the employee.  Hence, they are not "ordinary wardrobe," and are a "required uniform."

Under the FLSA, it is not necessary that the shirts and ties (and collar stays and crumbers) Plaintiffs purchased from Fresco were uniforms.  Under the FLSA, wages must be paid "free and clear" of all "'kick-backs' directly or indirectly to the employer or to another person for the employer's benefit." 29 C.F.R. §531.35.  Requiring employees to purchase tools of the trade from the employer is unlawful when it cuts into the employees minimum wages.  *Id.*

*Roach v. T.L. Cannon Mgmt. Corp.*, 889 F. Supp. 2d 364, 373 (N.D.N.Y. 2012), cited by Defendants, is inapposite. *Roach* involved the employees' purchase of items on their own, whereas here Fresco required Plaintiffs to purchase specific shirts and ties directly from Fresco itself.

The fact that the Complaint alleged that the shirts and tie cost more than Plaintiffs testified at trial is irrelevant. The allegations of the Complaint were not sworn statements of the Plaintiffs, and the minor inconsistency between the Complaint allegations and the trial testimony were simply a result of miscommunication between Plaintiffs and their attorneys at the outset of the litigation. To the extent necessary, the Complaint can be amended after trial to conform to the evidence. Fed. R. Civ. P. 15(b)(2).

Plaintiffs consistently testified that they had to pay $50 for a pair of shirts and a tie, and had to do so repeatedly. The sole exception was Angel Cedeno, who testified he only had to purchase one shirt for $25. (Tr. 397:2-398:7) Cedeno's testimony does not call the other Plaintiffs' testimony into question, as he only worked at Fresco since 2011, while other Plaintiffs began working at Fresco much earlier. The other supposed inconsistencies identified by the Defendants are in no way inconsistencies. There is no inconsistency in the fact that Alvarado testified that sometimes Willy would give him the shirts. Alvarado testified that all employees had to pay $50 for the shirts and tie when Fresco periodically changed the uniform, and that some other times he would request additional shirts because the shirts he had purchased were wearing out. On some of those occasions he would have to pay, and on others he would not have to pay. (Tr. 243:6-245:7, 246:18-247:7) Caravantes' uncertainty as to who gave him the shirts does not call his testimony into question. (Tr. 425:8-426:20) As Salinas testified, sometimes it was Brent Drill, and other times it was Willy who gave the shirt. (Tr. 110:24-114:13)

Moreover, Scotto himself testified that it was his intention to have bussers purchase shirts and ties from the restaurant, but that he realized this was not done because he could not find any receipts for purchasing clothing.   (Tr. 616:9-617:20)   Scotto's tepid denial that Plaintiffs purchased shirts and ties from Fresco is not based on personal knowledge, but rather on the absence of any receipts, and corroborates Plaintiffs' testimony that they were never provided receipts.   Also, Fresco's written policy required bussers and runners to purchase shirts from Fresco.  (P. Ex. 74)  The only reasonable conclusion is to credit Plaintiffs' testimony that Fresco actually carried out its policies, and required Plaintiffs to purchase shirts and a tie from Fresco.

## V.   MARION SCOTTO IS LIABLE AS AN EMPLOYER

Contrary to Defendants' representation, the evidence at trial established that Marion Scotto is an employer, as the term is defined by the FLSA and NYLL.  Marion Scotto does have the power to make hiring decisions.   At a minimum, Marion Scotto was often involved in interviewing and hiring hosts and hostesses.   (Salinas Dec. ¶52; Rodriguez Dec. ¶48; Cedeno Dec. ¶45; Urgiles Dec. ¶52; Lugo Dec. ¶47; Amezquita Dec. ¶40; Caravantes Dec. ¶51; Flores Dec. ¶52; Alvarado Dec. ¶48; Francisco-Lopez Dec. ¶49; Xochipiltecatl Dec. ¶43; Leon Dec. ¶51; Tr. 97:11-16, 123:12-13, 254:16-18, 515:22:-516:6, 684:5-12)

Anthony Scotto gave contradictory testimony at his deposition at trial as to Marion Scotto's involvement in determining how many employees to hire, or interviewing employees. At his deposition he testified that Marion Scotto was involved in those decision, but at trial he backed away from that testimony, and admitted he did not answer truthfully at his deposition. (Tr. 515:1-517:5)

Anthony Scotto similarly sought at trial to retract deposition testimony that Marion Scotto may have prepared a document (specifically, a receipt for an employee's payment for a uniform) and given in to Vosilla to give to an employee.  (Tr. 518:3-520:20)  At deposition,

when questioned about the document, Anthony Scotto volunteered "Maybe my mother gave this to him."  (Tr. 520:7)  At trial, Anthony Scotto changed his story and said that he mother would not prepare documents for employees, and that when he testified under oath at his deposition he "was probably just talking out of school with you again."  (Tr. 520:12-13)

Anthony Scotto also changed his testimony at trial on whether Marion Scotto helped prepare Fresco's employee policy document.  At deposition, Anthony Scotto said that his mother helped put the document together; at trial he again claimed that he was "just being silly or talking out off school at [his] deposition," and that Marion Scotto had no role in preparing the employee policy document.   (Tr. 521:4-522:17)   However, in another deposition in a prior lawsuit, Anthony Scotto testified that his mother had a role in preparing the employee policy document. (Tr. 536:14-538:10)  Anthony Scotto attempted at trial to limit Marion Scotto's involvement to giving input on descriptions in the document of the artwork at Fresco, but his testimony cannot be credited giving his shifting stories.

Anthony Scotto continued to give shifting testimony about Marion Scotto's role at Fresco.  At trial, Anthony Scotto said "I've never seen my mother deliver food to tables, sir." (Tr. 522:21)  He was then confronted with his deposition testimony that she would help deliver food to tables when the restaurant is very busy, and then changed his testimony to say "I guess my mother would grab a Fresco bread or something when she is walking through the kitchen.  I guess that could happen.  It hasn't happened recently, sir."  (Tr. 522:22-523:14)  Given Anthony Scotto's changing stories on Marion Scotto's role at Fresco, his testimony on the issue is not credible.

Defendants' claim that the only evidence tying Marion Scotto to Plaintiffs' employment is the fact that she is majority shareholder and CEO of Fresco, and signs checks, is wrong.  (D.

Mem. at 50)  Marion Scotto also gave Plaintiffs directions in connection with their employment, was at Fresco every day, was seen by all employees as one of the bosses, was identified on Fresco's website as "the Boss," and according to Fresco's own website "runs front-of-the-house duties in the restaurant."  (P. Mem. at 43-44)  These roles are more than sufficient to show that Marion Scotto is an employer under the FLSA.

Comparison with the role John Catsimatidis held in *Irizarry v. Catsimatidis*, 722 F.3d 99 (2d Cir. 2013) is instructive.  There, Catsimatidis was held to be an employer of employees at Gristede's supermarkets, even though he did not directly oversee the employees, but rather did so through layers of corporate organization, whereby subordinate managers reported to a vice president who reported to a chief operating officer who reported to Catsimatidis.  *Id.* at 111-112. Catsimatidis would make suggestions about specific stores, but would not directly exercise control over stores on a day-to-day level.  *Id.* at 113-114.  He did not involve himself in hiring or firing, though he had authority to do so.  *Id.* at 114-115.  He was not involved in individuals' salaries or scheduled.  *Id.* at 115.  And Catsimatidis did not personally maintain employment records.  *Id.* at 116.  Nevertheless, the totality of the circumstances, and especially his overall control over Gristede's, rendered him an employer under the FLSA.  *Id.* at 116-117.

Unlike Catsimatidis, Marion Scotto does not work at Fresco in a corporate office, receiving reports through layers of bureaucracy.  Fresco is "a small restaurant . . . a one-store restaurant."  (Tr. 539:8-9)   Marion Scotto is at Fresco "during the week from noon until around 8 PM or 8:30 PM, although it varies," and runs front of the house duties in the restaurant.  (M. Scotto Aff. ¶11; 682:20)  Marion Scotto directly and personally observes the work performed by employees, and personally tries to give her customers great service.  (Tr. 683:7-684:4)  Like Catsimatidis with Gristede's, Marion Scotto is the majority shareholder and CEO of Fresco, and

thus possesses ultimate authority over the company.  (Tr. 681:19-682:2, 682:14-16)  Also, like Catsimatidis, Marion Scotto signs employees' checks.  (*Irizarry*, 722 F.3d at 115; Scotto Aff. ¶9; Tr. 683:13-14; P. Ex. 82 at P-50; P. Ex. 88)  Given the totality of circumstances, Marion Scotto possessed operational control over Plaintiffs' employment and is liable as an employer.

## CONCLUSION

Wherefore, it is respectfully requested that Plaintiffs be granted judgment against Defendants, in an amount to be determined in the subsequent liability phase.

Dated:          January 26, 2015

By:   ___/s/ Joshua S. Androphy____
Joshua S. Androphy
Shawn R. Clark
Michael Faillace & Associates, P.C.
60 East 42nd Street, Suite 2020
New York, New York 10022
(212) 317-1200
jandrophy@faillacelaw.com
*Attorneys for Plaintiffs*