UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ENRIQUE SALINAS, ALFREDO RODRIGUEZ, ANGEL CEDENO, CHRISTIAN URGILES, FRANCISCO LUGO, JOSE AMEZQUITA, LUIS ROBALLO, MIGUEL CERVANTES, NAHUN FLORES, PABLO ALVARADO, PABLO FRANCISCO-LOPEZ, VALENTIN XOCHIPILTECATL, and VICENTE LEON, individually and on behalf of others similarly situated,

                       Plaintiffs,

            -against-

STARJEM RESTAURANT CORP., (d/b/a FRESCO BY SCOTTO), MARION SCOTTO and ANTHONY SCOTTO,

                     Defendants.

Index No. 13-cv-2992 (AT)

---

**DEFENDANTS' POST-TRIAL REPLY MEMORANDUM OF LAW**

---

                             LITTLER MENDELSON, P.C.
                             Attorneys for Defendants
                             900 Third Avenue
                             New York, New York 10022-4834
                             (212) 583-9600

Of Counsel:
    Craig R. Benson, Esq.
    Naveen Kabir, Esq.

# TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ................................................................................. 1

ARGUMENT ......................................................................................................... 2

I.   PLAINTIFFS' FLAWED TESTIMONY CANNOT SUPPORT THEIR CLAIMS ......... 2

    A.   Plaintiffs' Own Admissions Undermine their 80-20 Claims ................................. 3

        1.   Bussers Always Spent More Than 80% of their Shift on Tip-Producing Work ................................................................................. 3

        2.   There Is No Evidence that Runners Spent Any Time On Non-Tip-Producing Duties ................................................................................. 7

        3.   The Coffee Person Served Beverages, Even When There Was a Coffee Assistant ................................................................................. 9

        4.   The Bar Back Role Actually Consists of Two Tip-eligible Occupations ................................................................................. 12

        5.   The Stocker Performed a Suite of Tip-Producing Duties, In Addition to Running Food ................................................................................. 13

    B.   Plaintiffs Admitted that Mr. Drill and Mr. Vosilla's Managerial Authority Was Strictly Limited to the Service at All Relevant Times ................................. 16

        1.   Plaintiffs Admitted that Anthony Scotto is the Only Person Who Wielded Any Authority Over Their Employment ................................. 18

        2.   Brent Drill and Attilio Vosilla Did Not Have Meaningful Authority Over Hiring, Firing, Discipline or Scheduling ................................. 20

        3.   Mr. Drill's and Mr. Vosilla's Service Responsibilities Do Not Disqualify Them From Participating In the Tip Pool ................................. 28

    C.   Plaintiffs Admitted That They Actually Worked Fewer Hours Than They Were Paid For — Not More ................................................................................. 29

        1.   Plaintiffs Are Not Entitled to Recover Any Wages for the 30-Minute Family Meal, Either Before or After the Time Clock ................. 29

        2.   Plaintiffs Have No Credible Evidence to Support their Estimated Shift Times ................................................................................. 31

II.   THERE IS NO COMPETENT EVIDENCE TO SUPPORT PLAINTIFFS' UNIFORM PURCHASE CLAIMS ................................................................................. 33

**TABLE OF CONTENTS**

**(CONTINUED)**

**PAGE**

III.    PLAINTIFFS HAVE FAILED TO PROVE ANY NOTICE VIOLATIONS ................. 36

IV.    PLAINTIFFS ARE NOT ENTITLED TO A THREE-YEAR STATUTE OF LIMITATIONS PERIOD UNDER THE FLSA ................................................................. 40

V.    PLAINTIFFS HAVE NO PROOF THAT MARION SCOTTO IS AN EMPLOYER ................................................................................................................. 42

CONCLUSION ................................................................................................................. 43

**TABLE OF AUTHORITIES**

**Cases**

*Barenboim v. Starbucks Corp.*, 21 N.Y.3d 460, 972 N.Y.S.2d 191, 197 (2013) ........................ 28

*Barenboim v. Starbucks Corp.*, 698 F.3d 104 (2d Cir. 2012) ......................................................... 9

*Carter v. Dutchess Community College*, 735 F.2d 8 (2d Cir. 1984) ............................................ 43

*Celle v. Filipino Reporter Enters.*, 209 F.3d 163 (2d Cir. 2000) .................................................. 40

*Copantitla v. Fiskardo Estiatorio, Inc.*, 788 F. Supp. 2d 253 (S.D.N.Y. 2011) ......................... 38

*ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.,* 553 F.3d 187 (2d Cir.2009) ..................................................................................................................................... 40

*Gillian v. Starjem Rest. Corp.*, 2011 WL 4639842 (S.D.N.Y. Oct. 4, 2011) .............................. 41

*Hoodho v. Holder*, 558 F.3d 184, 191 (2d Cir. 2009) .................................................................... 30

*Hosking v. New World Mortg., Inc.*, 570 F. App'x 28 (2d Cir. 2014) .......................................... 32

*Kuebel v. Black & Decker Inc.,* 643 F.3d 352 (2d Cir.2011) ........................................................ 40

*Lentz v. Spanky's Rest. II, Inc.*, 491 F. Supp. 2d 663 (N.D. Tex. 2007) ........................................ 8

*McLaughlin v. Richland Shoe Co.,* 486 U.S. 128 (1988) ............................................................... 40

*McLean v. Garage Mgmt. Corp.*, 2012 WL 1358739 (S.D.N.Y. Apr. 19, 2012) ................... 41, 42

*McLean*, 2012 WL 1358739 at *8 ................................................................................................. 42

*Mendez v. Int'l Food House Inc.*, 2014 WL 4276418 (S.D.N.Y. Aug. 28, 2014) ................... 4, 39

*Reich v. Waldbaum*, 52 F.3d 35, 41 (2d Cir. 1995) ....................................................................... 42

*Santana v. RCSH Ops., LLC*, 2012 WL 463822 (S.D. Fla. Feb. 13, 2012) .................................... 9

*Hart v. Rick's Cabaret Intern'l., Inc.*, 967 F.Supp. 2d 901 (S.D.N.Y. 2013) ............................. 41

*Upadhyay v. Sethi*, 2012 WL 3100601 (S.D.N.Y. July 31, 2012) ................................ 2, 3, 12, 39,

## TABLE OF AUTHORITIES

### (CONTINUED)

PAGE

*Yan Yan v. 520 Asian Rest. Corp.*, 2014 WL 7177259 (S.D.N.Y. Dec. 17, 2014) ................ 35, 36

*Young v. Cooper Cameron Corp.,* 586 F.3d 201, 207 (2d Cir.2009) ........................... 40

*Zivali v. AT & T Mobility, LLC,* 784 F. Supp. 2d 456, 461 (S.D.N.Y. 2011) .............................. 30

**Statutes**

FLSA § 203(m) ........................................................................................... 36

**Regulations**

12 N.Y.C.R.R. § 146-1.7(a)(1) ................................................................ 35

12 N.Y.C.R.R. § 146-2.14(e)(8) ............................................................. 28

12 N.Y.C.R.R. § 146-2.2(c) ..................................................................... 39

12 N.Y.R.C.R. § 146-2.2(a)(2) ................................................................ 39

12 N.Y.R.C.R. § 146-2.2(d) ...................................................................... 39

29 C.F.R. § 531.55 .................................................................................. 34

Defendants submit this reply to Plaintiffs' Post-Trial Memorandum of Law ("Post-Trial Brief").[1]

## PRELIMINARY STATEMENT

One thing is clear from reviewing the post hearing briefs of both Parties: credibility is the paramount issue to be decided in the adjudication of this matter.  Whether it is the length and number of shifts worked, the job responsibilities of the positions at issue (*e.g.*, dishwashing), the role of Anthony Scotto, or the nature of the managerial responsibilities of Brent Drill and Attilio Vosilla, one side is not being truthful.  This is not a case where the evidence can be reconciled.  The differences in the testimony proffered by the Parties are simply too great.  As was established in Defendants' Post-Trial Brief, and is now even more apparent after reviewing the Plaintiffs' Post-Trial Brief, Plaintiffs' story simply does not hold up.

Plaintiffs' Post-Trial submissions are most significant for what they fail to address.  Plaintiffs virtually ignore their testimony at trial.  Plaintiffs' submissions read as if they are in response to a motion to dismiss — as if the eight-day trial never happened at all.  Their arguments rely almost exclusively on their declarations — testimony that was crafted by their attorneys, prior to cross examination, that was exposed as unreliable and/or outright false at trial.  And not surprisingly, where the trial record is cited, Plaintiffs managed to include testimony that actually supports Defendants' arguments.  Repeating a lie a thousand times does not make it true, and ignoring the record evidence does not make it go away.  The Court was very clear at the close of trial that the Parties' briefs should include complete citations to the record.  (Tr. 689:24-

---

[1] "Pl. Br." refers to citations to Plaintiffs' Post-Trial Brief (Dkt. 92) and "Def. Br." refers to citations to Defendants' Post-Trial Brief (Dkt. 93).  Citations to the materials submitted with the Parties' Pre- and/or Post-Trial filings are referenced by their docket number as "Dkt. _-_."

690:3.[2])   While Defendants provided example after example establishing that the Plaintiffs' declaration testimony was not to be credited, Plaintiffs did not respond in kind.   As will be demonstrated below, the arguments set forth by the Plaintiffs are not based on the full and complete record and provide no support for the recovery that they seek.

## ARGUMENT

## I.   PLAINTIFFS' FLAWED TESTIMONY CANNOT SUPPORT THEIR CLAIMS

In their Post-Trial Brief, Plaintiffs cite to their declarations, early and often, as proof of what they allegedly saw and what they allegedly did (and how often, and for how long that they did it).   Unfortunately for the Plaintiffs, their testimony at trial thoroughly "undermined much of the … presentation [of direct examination testimony] drafted by [their] counsel." *Upadhyay v. Sethi*, 2012 WL 3100601, at *6 (S.D.N.Y. July 31, 2012) (finding plaintiff who testified during evidentiary hearing on whether her wage-and-hour claims should be equitably tolled was not credible overall).   This is not without consequence.   Plaintiffs cannot back away from their declaration testimony in such spectacular fashion at trial and then expect to rely on the same self-serving statements that they disavowed. This is exactly what they are attempting to do.

Judge Buchwald's decision in *Upadhyay* is instructive.   Like the plaintiff in that case, the 13 Plaintiffs here:

- "seriously damage[d]" their declaration testimony when they disavowed specific representations, contradicted themselves, and also one another (*see* Def. Br. at 2-12; *see also* Sections I.A-I.C, II, *infra*);

- testified that they had no recollection (or personal knowledge) of certain key facts essential to their claims, contradicting their declarations, and also the Complaint (Def. Br. at 32-39; *see also* Sections I.A-I.C, II, *infra*);

---

[2] "Tr." refers to citations to the trial transcript in this matter.   "Pl. Ex." And "Def. Ex." refers to the numbered and lettered exhibits proffered by the Plaintiffs and Defendants, respectively, and admitted into evidence at trial.

2

- went to preposterous lengths to uphold exaggerated depictions of themselves that ultimately unraveled at trial (*see* Def. Br. at 2-12; *see also* Sections I.A-I.C, *infra*); and

- lied just as much about matters with <u>no</u> bearing on their claims as they lied about the issues central to the case. (Def. Br. 12-17, n.15 at 14; *see also* Sections I.A-I.C, II, *infra*.[3])

*Upadhyay*, 2012 WL 3100601 at *6-9. When viewing the trial record as a whole, "it is clear that [P[laintiff[s] purposefully constructed [their] web of falsehoods in an effort to achieve the most favorable litigation outcome possible." *Id.* at *8. By ignoring the evidence adduced at trial, Plaintiffs all but concede that the record does not support their claims.

A.    <u>Plaintiffs' Own Admissions Undermine their 80-20 Claims</u>

Plaintiffs argue that the "evidence at trial" established that bussers and runners, along with the Coffee Person, bar back and stocker assignments, were all non-service positions (their so-called 80-20 claim). (Pl. Br. at 7.[4]) Not surprisingly, the proof of this claim is largely contained in their conclusory declarations. But virtually all of the declaration testimony cited in support of Plaintiffs' 80-20 claims was exposed to be nothing more than boilerplate assertions with no real record support.

---

[3] By way of further example of how far Plaintiffs' counsel were willing to go to embellish their client's declarations, Plaintiff Pablo Alvarado claimed that "a couple times when a waiter lost a check" Anthony Scotto would "then take out the money from the tip pool." (Pl. Ex. 106 ¶ 57.) Mr. Alvarado's convoluted explanation of this allegation at trial prompted the Court to ask him if he was "saying that the waiter would keep that particular sale a secret?" (Tr. 248:1-249:9.) He had no choice but to acknowledge that he was referring to the bill presented to guests for payment at the end of the meal — which, in the case of credit card transactions, need to be signed in order for the Restaurant to collect any payment (and ergo, the tips) for that meal. (Tr. 249:10-251:22.)    Mr. Alvarado attributed the incomplete (and misleading) nature of his declaration by testifying that his attorneys "would not allow us to explain the things properly. We would start to say something and then immediately, immediately we were cut off." (Tr. 250:9-251:6.)

[4] Although Plaintiffs also list the "expeditor" assignment as an alleged non-service position, they failed to address this position anywhere in their Post-Trial Brief. (*See* Pl. Br. at 7-15.)

### 1. Bussers Always Spent More Than 80% of their Shift on Tip-Producing Work

Plaintiffs, as they must, concede that bussers at Fresco primarily perform tipped duties. (Pl. Br. at 12.) Nevertheless, they argue that bussers spend too much time performing allegedly non-tipped opening and closing side work on each shift, as well as other random chores. (*Id.* at 12-13.) Unfortunately for the Plaintiffs, they rely almost exclusively on their declarations in support of this contention. (*See id.*) This alone dooms Plaintiffs' 80-20 claim, because their declarations literally do not add up to a violation.

First, Plaintiffs admitted that their opening "side work" was really just setting up the dining room for service, *i.e.*, "folding napkins, putting glasses at their proper stations … and filling and bringing ice buckets to their proper stations." (Pl. Br. at 13 (citations omitted); *see also* Tr. 292:9-16, 460:25-462:17, 417:3-7, 91:15-93:18, 290:15-291:5, 295:14-15, 344:6-8, 345:21-346:5, 416:20-25, 461:2-16.) As explained in Defendants' Post-Trial Brief, this regular work is directly tip-producing in nature and should not even count in any calculation in this regard. (Def. Br. at 43-44.) Plaintiffs have failed to advance any argument as to why these setup tasks should be deemed non-tipped in nature. (Pl. Br. at 12.) Nor can they, given that both Plaintiffs Salinas and Lugo admitted that these duties directly affected their ability to serve customers, and were part of their regular busser duties throughout their shift. (Tr. 91:15-92:22, 461:2-462:21.) Therefore, any time spent on these opening side work duties does not count towards their 80-20 claim. *See Mendez v. Int'l Food House Inc.*, 2014 WL 4276418, at *3 (S.D.N.Y. Aug. 28, 2014) (explaining that only time spent on non-tip-producing work counts against an 80-20 claim under the FLSA and NYLL).

The same logic applies to any time spent on end-of-shift side work. Plaintiffs admitted that this work primarily consisted of dumping the ice from the wine buckets and tidying up their

stations — *i.e.*, preparing the dining room for service during the next shift.  (Tr. 91:15-93:18, 290:15-291:5, 295:14-16, 344:6-8, 345:21-346:5, 416:20-25, 461:2-16; Drill Dep. 71:9-72:4.[5]) Indeed, as Mr. Roballo confirmed at trial, there is not much else for them to do, because all of the tables are re-set as each seating leaves, so that all of the tables are set by the time the station is empty.  (Tr. 345:18-20.)

Even if this time is counted (which it shouldn't be), Plaintiffs still don't spend enough time performing non-tip producing work to establish their claim.  Their obvious failing in this regard is evidenced by their blatant attempt in their Post-Trial Brief to exaggerate the amount of time they spent on side work.  They claim that they spent up to 45 minutes for opening side work and 30-45 minutes for closing side work.  (Pl. Br. at 13.)  Once again, this is false.  As explained in Defendants' Post-Trial Brief, Messrs. Salinas, Francisco, Roballo, Caravantes and Lugo all admitted at trial that they spent, at most, a total of 45 minutes on both opening and closing side work <u>combined</u> per shift.  (Def. Br. at 45.)  Plaintiffs gloss over their trial testimony entirely, and even go so far as to rely on Mr. Flores's declaration for the proposition that they spent up to 45 minutes on closing side work — even though he was the <u>*only*</u> Plaintiff whose estimate was so inflated in this regard.  (Pl. Br. at 13; Tr. at 91:15-93:18, 290:15-291:5, 295:14-15, 344:6-8, 345:21-346:5, 416:20-25, 461:2-16.)   By contrast, the declarations of Messrs. Roballo, Caravantes and Cedeno corroborate testimony from the defense witnesses that closing side work took no more than 5-15 minutes.  (Pl. Ex. 110 ¶ 16; Pl. Ex. 113 ¶ 22; Pl. Ex. 112 ¶ 25; Def. Ex. K ¶¶ 40-41; Drill Dep. 77:15-78:20, 79:10-12, 79:13-80:2.)  And overall, side work took no more than 45 minutes in total.  (Tr. 91:15-93:18, 290:15-291:5, 295:14-15, 344:6-8, 345:21-345:20,

---

[5] *See also* Pl. Ex. 116 ¶ 25, Pl. Ex. 109 ¶ 25, Pl. Ex. 110 ¶ 26, Pl. Ex. 104 ¶ 25, Pl. Ex. 111 ¶ 26, Pl. Ex. 113 ¶ 22, Pl. Ex. 112 ¶ 25, Pl. Ex. 115 ¶ 25, Pl. Ex. 105 ¶ 25, Pl. Ex. 107 ¶ 23, Pl. Ex. 108 ¶ 25, Pl. Ex. 114 ¶ 22.  The "ice buckets" described in Plaintiffs' declarations are visible in the photos admitted as Pl. Ex. 122.

416:20-25, 461:2-16.[6])

This creates a problem for the Plaintiffs, as it quite literally fails to add up to an 80-20 violation.  As explained in Defendants' Post-Trial Brief, even 45 minutes spent on purely non-service duties is, by definition, always less than 20% of a 5-hour shift.  (Def. Br. at 14.)  Although Plaintiffs dispute the end time of the shifts (which, in fact, cuts against their 80-20 claim as they allege, albeit unsuccessfully, that the shifts were longer than 5 hours), they conceded that there were certain constant elements of each shift.  When they first arrived, they spent up to the first 30 minutes performing "side work."  (Tr. 292:9-16 (Francisco), 460:25-462:17 (Lugo), 417:3-7 (Caravantes)[7].)  They then perform no work during the 30-minute family meal break.  (Pl. Br. at 14; *see also* Def. Br. at 38-39.)  Thereafter, they spend the next 30 minutes re-setting tables and performing their normal busser duties until the customers arrive.  (Tr. 292:9-16 (Francisco), 460:25-462:17 (Lugo), 417:3-7 (Caravantes), Drill Dep. 71:9-72:4.)  Accordingly, Plaintiffs need to find more non-service time in the course of every shift order to establish this claim.

In order to find the additional minutes, they have resorted to completely fabricated testimony regarding an additional 30 minutes they "often" spent on other tasks, which again, included a mix of service duties — like moving and re-setting tables for large parties[8] — as well as random chores like cleaning "walls, pictures and paintings."  (Pl. Br. at 14 (citations omitted).)  As amply demonstrated in Defendants' Post-Trial Brief, during the trial, Plaintiffs thoroughly undermined themselves with their shifting, incredible testimony about these phantom cleaning

---

[6] *See also* Pl. Ex. 111 ¶ 25, Pl. Ex. 107 ¶ 22, Pl. Ex. 109 ¶ 24, Pl. Ex. 115 ¶ 24, Pl. Ex. 114 ¶ 21, Pl. Ex. 104 ¶ 24, Pl. Ex. 108 ¶ 24, Pl. Ex. 105 ¶ 24.
[7] *See also* Pl. Ex. 116 ¶ 24, Pl. Ex. 113 ¶ 21, Pl. Ex. 110 ¶ 25, Pl. Ex. 111 ¶ 25, Pl. Ex. 112 ¶ 24.
[8] Mr. Francisco admitted that taking apart and re-setting the tables (some unspecified part of the alleged phantom 30 minutes) was part of his main busser duties.  (Tr. 298:12-18.)

duties.  (Def. Br. at 8-12.)   The fact that Plaintiffs are willing to gloss over this testimony altogether, when it took up so much time at trial, underscores the inherent weaknesses of their claim in this regard.

Moreover, it is not even clear when they allegedly performed this additional 30 minutes of work.  As was established at trial and set forth above, all time is otherwise accounted for during a shift.  (Tr. 292:9-16 (Francisco), 460:25-462:17 (Lugo), 417:3-7 (Caravantes); Drill Dep. 71:9-72:4; *see* Def. Br. at 43-46.)  Unless they performed these duties at the same time that customers were present in the Restaurant—an implausible assertion that goes against every notion of good service—there is literally no time when this work could have been performed. Plaintiffs didn't even claim that they did this work at the *end* of their shift, *i.e.*, when they allegedly stood around and watched others work even after their section had emptied out.  (Tr. 62:25-63:13 (Salinas), 137:13-20 (Urgiles).)  Given the incredible testimony from the Plaintiffs in this regard, there is no basis to credit the claim that they spent 30 minutes each shift performing this additional work.  As a result, the bussers' 80-20 claim finds no support in the record and should be rejected in its entirety.

## 2.   There Is No Evidence that Runners Spent <u>Any</u> Time On Non-Tip-Producing Duties

Messrs. Alvarado and Caravantes assert two theories in support of their 80-20 claim for the shifts they worked as food runners: (1) excessive side work and (2) excessive non-tipped work performed during their shift.[9]  (Pl. Br. at 14-15.)  Again, Plaintiffs rely solely on their declarations, and ignore their trial testimony altogether.  But even if their declarations were credited, they do not logically support an 80-20 claim.

With respect to their side work, Plaintiffs admit that their duties included work that

---

[9] Although Mr. Leon also testified that he worked as a food runner (*see* Tr. 482:23-24) Plaintiffs have failed to cite any evidence in support of his 80-20 claim.  (Pl. Br. at 14-15.)

runners at Fresco perform to facilitate their service duties, *i.e.*, folding napkins, and preparing plates used to serve food to guests.  (Pl. Ex. 106 ¶ 13, Pl. Ex. 113 ¶ 24.)  These tasks are properly considered tip-producing duties.  *See Lentz v. Spanky's Rest. II, Inc.*, 491 F. Supp. 2d 663, n.3 at 667 (N.D. Tex. 2007) (explaining that "garnish[ing] plates … [and] organiz[ing] the plates[] for easy, organized and quick service to the tables" to ensure the timely delivery of food at the correct temperature "assist the waitstaff in providing efficient and prompt customer service").  Moreover, it is undisputed that they only spent 15 to 20 minutes performing these duties; and that if they were scheduled to be the late runner, they didn't perform any side work duties at all.  (Pl. Ex. 106 ¶¶ 13-14, Pl. Ex. 113 ¶ 24.)  As with the bussers, Plaintiffs attempted to bolster the minimal time spent on side work by alleging that they somehow performed an additional 30  of work doing phantom cleaning tasks.  (*See* Pl. Br. at 15.)  But, like the bussers, they fail to explain when it is they would have performed such work, given that it is *also* undisputed that (a) they performed no work during the 30-minute family meal period, and (b) attended the pre-shift meeting with the waiters during the 30-minute period before the Restaurant opened to customers.  (*Id.*; Tr. 87:18-23, 223:16-227:2,462:16-17.)

Plaintiffs weakly try to bolster their claim by contending that they "regularly" spent only half of their shift delivering food; the rest of the time they spent performing non-tipped work (although they decline to specify what this work was, or cite to any evidence in support of this contention).  (Pl. Br. at 15.)  Runners deliver food.  Time is inevitably spent in the kitchen waiting for the food to be prepared and arranging it for proper delivery to guests.  This time in the kitchen is part of their job and does not count as non-tip-producing work.[10]

---

[10] It also makes no sense that Mr. Alvarado had to "cut dirty hospital … linens" or clean mirrors, walls or doors <u>for up to an hour</u> on any given shift.  (Pl. Ex. 106 ¶¶ 11, 13, 15.)  Tellingly, Mr. Caravantes did not corroborate this allegation in his declaration at all.  (Pl. Ex. 113 ¶¶ 23-25.)  In

Mr. Caravantes purportedly spent only two hours during lunch and four hours during dinner shifts actually running food.  But this does not imply that the rest of his time was spent on non-tipped duties (especially given the fact that he declined to specify what he was doing the rest of his shift).  (*See* Pl. Br. at 15.)  The fact that the runners at Fresco divide their time between the dining room and kitchen does nothing to diminish their status as true "front-of-the-house" employees.  *Santana v. RCSH Ops., LLC*, 2012 WL 463822, at *3 (S.D. Fla. Feb. 13, 2012) (food runners "who evenly split their time in the kitchen and the dining room" to assist waiters serve food at high-end steakhouse had more than "*de minimis*" interaction with customers).

In sum, even if the grand total of 20 to 30 minutes Messrs. Alvarado and Caravantes spent on opening and closing side work could be considered non-tipped work (which it cannot), there is no arguable basis for the runners' 80-20 violation and the Court should reject this claim as well.

### 3.  The Coffee Person Served Beverages, Even When There Was a Coffee Assistant

It is undisputed that the Coffee Person assignment is a tip-eligible position during all dinner shifts, and on lunch shifts where there is no Coffee Assistant (or "helper") on duty.  *See Barenboim v. Starbucks Corp.*, 698 F.3d 104, 105 (2d Cir. 2012) (explaining that baristas who prepared and served  "coffee- and tea-based drinks" occupied the main rung of the store's service hierarchy and were eligible to receive tips).  Plaintiffs argue instead that the "overwhelming

---

addition to the litany of reasons it made no sense for bussers to perform random cleaning tasks, Mr. Alvarado's allegation begs the question when, exactly, did the runners have time to perform such work? Certainly not in the middle of service, *i.e.*, when they were handling plates of food and delivering them to guests.  And it couldn't have been at the end of their shift either, as both Messrs. Alvarado and Caravantes admitted that they were free to leave whenever the dining room started to empty out, unless they were scheduled to close.  (Tr. 228:17-236:8, 419:25-420:19; Pl. Ex. 106 ¶ 15; *see also* Drill Dep. 37:19-38:19, 55:9-56:25, 80:18-81:2.)  In reality, there was no time for them to devote to any extracurricular chores.  Mr. Alvarado's unsupported assertion is yet another example of how far Plaintiffs are willing to go to bolster their claims.

testimony at trial established that … on most lunch shifts" there was a Coffee Assistant and that the Coffee Person <u>never</u> had to serve any beverages.  (Pl. Br. at 10[11]) (emphasis added).  As explained in Defendants' Post-Trial Brief, this position was undermined by the testimony of several of the Plaintiffs.  In addition, the practical implications of such an arrangement strains all notions of common sense and good service.  (Def. Br. at 21-23.)   Furthermore, Plaintiffs principally rely on the trial testimony of Messrs. Flores and Urgiles — who were not credible on this issue, or on any other for that matter.  (Pl. Br. at 10-11; *see* Def. Br. at 23, 34-35.)

As an initial matter, we draw the Court's attention to Section II.A.2  of Defendants' Post-Trial Brief, where it was pointed out that Plaintiffs Lugo, Amezquita and Alvarado, directly contradicted the assertion that the Coffee Person <u>never</u> ran beverages when two individuals where assigned to the coffee station due to the high volume of business on certain lunch shifts. This alone, calls any of their fellow Plaintiffs' testimony to the contrary into serious question. (Def. Br. at 23.)

Mr. Flores testified that he worked as the Coffee Person on 90% of his shifts, and that there was a Coffee Assistant "all of the time during lunch shifts" — contradicting his own declaration, as well as those of Messrs. Francisco, Roballo, Salinas, Urgiles, Amezquita, Leon, Lugo and Rodriguez (which identically alleged the presence of a Coffee Assistant on "many"

---

[11] The declarations of Messrs. Flores, Lugo, Rodriguez, Francisco, Amezquita, Roballo, Urgiles and Salinas conspicuously omit serving beverages to customers from the list of the duties they performed in the Coffee Person role.  (Pl. Ex. 111 ¶ 28, Pl. Ex. 115 ¶ 27, Pl. Ex. 109 ¶ 27, Pl. Ex. 112 ¶ 26, Pl. Ex. 115 ¶ 26, Pl. Ex. 109 ¶ 26, Pl. Ex. 108 ¶ 26, Pl. Ex. 114 ¶ 23, Pl. Ex. 110 ¶ 27, Pl. Ex. 116 ¶ 27, Pl. Ex. 105 ¶ 26, Pl. Ex. 104 ¶ 26.)  Mr. Leon, however, did include "check[ing] the plates to make sure there were no cockroaches" and "mak[ing] sure the cups were clean and did not have any lipstick marks."  (Pl. Ex. 110 ¶ 27.)  Although no other Plaintiff corroborated this "duty," it should go without saying that upholding basic sanitation standards before serving beverages to guests is tip-producing work. *See Mendez*, 2014 WL 4276418, n.2 at *3 (explaining that carrying hookahs to tables at a nightclub was no different than serving food and drinks).

lunch shifts).[12]  (Tr. 362:5-363:22.)  Mr. Flores testified that a busser was assigned to the Coffee Assistant role irrespective of how busy the Restaurant was, *i.e.*, regardless of whether beverages needed to be served to 100 or 200 reservations within the *same* two-to-three hour time span.  (Tr. 364:18-25, 367:1-8.[13])  Even though he claimed that he was too busy to pour and serve drinks himself during lunch, he also testified that he was able to singlehandedly pour and immediately run beverages to the entire dining room without *any* help whatsoever from any other individuals during dinner[14] — even though he admitted that on most days, the number of reservations (and volume of customers) at lunch and dinner would be the same.  (Tr. 365:18-363:3, 367:3-25.)  None of this makes any sense whatsoever.

Mr. Flores — contrary to the assertion in Plaintiffs' Brief that the person in this position "never" ran beverages — also admitted that he ran beverages on occasion towards the end of lunch shifts.  (Tr. 365:24-366:19.)  Mr. Urgiles, on the other hand, steadfastly denied ever running beverages during shifts there was a Coffee Assistant — even if it meant beverages would pile up and get cold, and he would have to re-make them.  (Tr. 145:5-146:13.[15])  If that were true, then he would have singlehandedly delayed the turnover of virtually all of the tables in the Restaurant.   The more logical explanation is also the most obvious one (and the one advanced by the Defendants and supported by at least four of the Plaintiffs): both the Coffee Person and Coffee Assistant prepared and served beverages so that customers would receive

---

[12] Pl. Ex. 108 ¶ 27, Pl. Ex. 110 ¶ 28, Pl. Ex. 111 ¶ 29, Pl. Ex. 104 ¶ 28, Pl. Ex. 105 ¶ 27, Pl. Ex. 114 ¶ 24, Pl. Ex. 116 ¶ 28, Pl. Ex. 115 ¶ 27, Pl. Ex. 109 ¶ 27.

[13] However, Mr. Francisco admitted that the Coffee Assistant was only on duty during especially busy shifts, *i.e.*, like during the holiday season in November and December.  (Tr. 306:13-15.)

[14] Indeed, Mr. Scotto testified that "there was no better" Coffee Person than Mr. Flores.  (Tr. 553:10-12.)  Given Mr. Flores's undisputed talents, it strains credulity that he was completely paralyzed from serving *any* beverages during the lunch shift but not during dinner.

[15] Mr. Urgiles also admitted that during shifts he worked as a busser assigned to the private party room upstairs, he was responsible for preparing and serving beverages ordered by the guests — not the Coffee Person or the Coffee Assistant.  (Tr. 184:2-8.)

11

their beverages at the right temperature in a timely manner.  Without any credible evidence to support Plaintiffs' illogical and unsubstantiated theory to the contrary, this claim should be rejected as well.

### 4.    The Bar Back Role Actually Consists of Two Tip-eligible Occupations

Although Plaintiffs concede that the bar back assignment entailed performing regular busser duties for the tables in the bar area, they argue that they are entitled to full minimum wage for only the portion of their shift spent performing bar back tasks.  (Pl. Br. at 11-12.)  But as explained in Defendants' Post-Trial Brief, both bussers (who assist wait staff) and bar backs (who assist bartenders) are recognized as tip-eligible occupations under state and federal law. (Def. Br. at 24-25.)

Plaintiffs tried to get around this conundrum by arguing that their bar back duties consisted solely of cleaning tasks, and also took up the majority of their shift.[16]  (Pl. Br. at 11-12.)  Once again, this is an example of saying anything, regardless of its truth or falsity, in order to advance a claim.  Unfortunately for the Plaintiffs, the record evidence exposes their blatant fabrication in this regard.

Significantly, Plaintiffs ignore the trial testimony of Mr. Rodriguez, who admitted that the bar back assignment was one of the most demanding sections in the Restaurant and required more time on busser duties than bar back duties.  (*Id.*; *see* Tr. 312:19-314:22.)  Instead, Plaintiffs

---

[16] This, too, is objectively unreasonable. The declaration testimony cited for Messrs. Francisco, Amezquita, Rodriguez, Lugo, Roballo and Leon neglect to mention any service duties at all.  (Pl. Ex. 108 ¶ 28; Pl. Ex. 114 ¶ 25, Pl. Ex. 109 ¶ 28, Pl. Ex. 115 ¶ 28, Pl. Ex. 110 ¶ 30, Pl. Ex. 116 ¶ 29.)  When asked to explain this glaring omission at trial, Mr. Rodriguez explained that it was because when he applied to work as a busser at Fresco, no one explained to him that he would also have to perform bar back tasks.  (Tr. 314:23-315:20.)  Mr. Francisco explained that he simply could not recall everything he did as a bar back.  (Tr. 307:24-308:15.)  Neither of these explanations make sense or adequately address the omission — especially in light of the identical allegations in each of the aforementioned Plaintiffs' declarations.  *See Upadhyay*, 2012 WL 3100601, at n.12 at *6 (concluding that the credibility of a witness was "severely compromised" for failing to "provide any coherent explanation" for key facts omitted from her affidavit).

principally rely on their declarations (which remarkably omitted, in many cases, the fact that the station included bussing 12 tables as part of the responsibilities) and the trial testimony of Messrs. Roballo and Urgiles.  (Pl. Br. at 12.)

Despite their attempt to downplay the amount of time spent on busser duties, Mr. Roballo actually testified that he split his time evenly between the two roles.  (Pl. Ex. 110 ¶ 30; Tr. 353:23-354:1.)

Mr. Urgiles tried to uphold the fictional account in Plaintiffs' declarations, but failed. Mr. Urgiles testified that he spent the vast majority of his shift washing barware — even during lunch, when he insisted there was the same demand for wine and other alcoholic beverages as there was at dinner.  (Tr. 194:16-24, 195:25-196:4.)   In addition to contradicting his own declaration, this also contradicted the declarations of Messrs. Cedeno, Roballo, and Flores.[17]  Mr. Urgiles also admitted that the tables in the bar area were always full, but when asked who bussed the tables if he was washing barware, he equivocated between the waiter assigned to the bar area and the bussers assigned to sections 1 and 2 (*i.e.*, the VIP sections) of the dining room.  (Tr. 101:12-15, 565:4-566:4; *see also* Pl. Ex. 92.)  Plaintiffs' claim that the bar back assignment is not tip eligible is neither credible nor supported by the evidence.  Accordingly, the Court should also reject this claim.

### 5.    The Stocker Performed a Suite of Tip-Producing Duties, In Addition to Running Food

Plaintiffs went to great lengths in their declarations to portray the stocker assignment as a non-service position.   Their attempts to banish the stocker from the front-of-the-house to the kitchen must all be rejected, as they are inherently contradictory, implausible on their face, and

---

[17] In their declarations, Mr. Urgiles admitted to spending an hour bussing tables, while Messrs. Cedeno and Roballo admitted to performing regular busser duties, and Mr. Flores admitted to assisting the bartender by pouring drinks.  (Pl. Ex. 105 ¶ 28, Pl. Ex. 112 ¶ 27, Pl. Ex. 110 ¶ 23, Pl. Ex. 111 ¶ 31.)

undermined by Plaintiffs' testimony at trial.

First, even though Plaintiffs admit that the stocker was responsible for replenishing the service stations (which are on the service floor), they misleadingly claim the stocker spent the majority of each shift in the kitchen.[18]  (Pl. Br. at 7.)  If these stations are located in the dining By doubling down on the ridiculous notion that the stocker "primarily spent his time in the kitchen next to the dishwasher," Plaintiffs act as if the trial never happened.  (*Id.*)  In reality, Messrs. Salinas, Caravantes, Lugo, and Urgiles all admitted that replenishing these stations was a core busser duty, essential to their ability to clear and re-set tables in a timely manner —which supports Defendants' position, not Plaintiffs'.  (Tr. 411:19-415:16, 462:22-464:7, 181:24-182:3, 14:24-17:4.)  In their Brief, they failed to address (or even acknowledge) that restocking the dining room on a constant basis is, in and of itself, a service function that directly generates more tips for the entire service staff.[19]  (Pl. Br. at 7-10.)  Indeed, they did not advance any argument whatsoever as to why this function should not be considered an integral part of customer service. (*Id.*)  As explained in Defendants' Brief, time spent re-filling the stocking stations is as much of a tip-producing function, as any other busser duty.  (Def. Br. at 18-20.)  It is all part, and parcel, of their main responsibility of setting, bussing, and resetting tables.  (*Id.*)

For this reason, Plaintiffs' argument that only the time spent delivering food counts as customer service should also be rejected.  (Pl. Br. at 8.)  Moreover, their claim that the stocker only spent a *de minimis* portion of each shift (*i.e.*, from 0 to 15 minutes) running food is not

---

[18] Pl. Ex. 113 ¶ 15, Pl. Ex. 104 ¶ 16, Pl. Ex. 107 ¶ 15, Pl. Ex. 116 ¶ 15, Pl. Ex. 109 ¶ 16, Pl. Ex. 110 ¶ 17, Pl. Ex. 111 ¶ 16, Pl. Ex. 105 ¶ 16, Pl. Ex. 112 ¶ 16, Pl. Ex. 114 ¶ 14, Pl. Ex. 108 ¶ 17, Pl. Ex. 115 ¶ 16.

[19] As Mr. Urgiles admitted at trial, customers at Fresco typically leave a 20% gratuity on their bill.  (Tr. 161:19-21.)  Should the Court wish to take judicial notice of the prices charged by the Restaurant, copies of the lunch and dinner menus are accessible at: http://www.frescobyscotto.com/content/pdfs/fresco-lunch-menu-09.25.14.pdf                    and http://www.frescobyscotto.com/content/pdfs/fresco-dinner-menu-09.25.14.pdf.

supported by the record.  (*Id.*)  Although Plaintiffs cite to the trial testimony of Messrs. Salinas, Roballo and Caravantes, they mischaracterize and/or completely ignore evidence that contradict or otherwise undermine the trial record citations in their brief.

For starters, Mr. Caravantes testified that he did not even recall the last time he worked as a stocker —undermining the (cookie-cutter) allegations in his declaration about what duties he did, or did not, perform in this role.  (Tr. 414:2-415:22; Pl. Ex. 113 ¶¶ 14-15.)

Messrs. Salinas and Roballo also tried to downplay the amount of time they spent running food.  (Tr. 35:13-36:9, 335:13-19, 341:6-11.)  Although Plaintiffs tried to characterize this as an unusual occurrence, (*i.e.*, when they were "ordered to do so" by the chef), Mr. Salinas admitted that no one actually "forced" him to help his fellow workers.[20]  (Tr. 21:6-18, 33:1-19.) It does not make sense that Plaintiffs were "forced" to serve food by the chef so much as asked to do so as part of their job as front-of-house employees.  And while it is not seriously disputed that runners and bussers — including the stocker — spend time explaining dishes and offering cheese and pepper to guests when running food, Plaintiffs estimated that it only took them one or two minutes to run each dish before they resumed their other duties.  (Tr. 35:13-36:9, 335:13-19, 341:6-11.)  In addition to being wholly implausible, these time estimates further unraveled when the Court pressed Messrs. Salinas and Roballo to estimate the percentage of time they spent running food each shift.[21]  (Tr. 35:13-36:9, 335:13-19, 341:6-11.)

---

[20] Mr. Roballo also admitted that he knew the table numbers and seat positions so that when he was asked to run food as a stocker, he knew where to serve the dish handed to him by the chef. (Tr. 336:1-337:10.)  Mr. Alvarado corroborated the testimony of the defense witnesses by admitting that the stocker, along with any other busser wearing a yellow shirt, helped run food every shift.  (Tr. 208:3-213:14; *see also* Def. Ex. K ¶ 25.)

[21] It should also be noted that Plaintiffs attempt to mischaracterize Mr. Scotto's testimony as inconsistent.  His trial declaration estimates that the stocker spends half of his shift performing stocker duties and half his shift assisting the runners and other bussers (including those individuals assigned as the Coffee Person, bar back, and to the party room) performing their

Plaintiffs also misleadingly try to claim that one of their duties was to "clean" the service items they were responsible for restocking.[22]  This is false.  As Mr. Salinas, testified he merely <u>dried</u> clean service items before bringing them to the dining room to re-fill the stocking stations.  (Tr. 21:24-22:2, 44:2-6, *see also* 612:13-14.)  The only individual responsible for "cleaning" the *dirty* service items that the bussers brought back to the kitchen were the dishwashers.  As explained in detail in Defendants' Post-Trial Brief, there is not one shred of credible evidence in the record to suggest that "cleaning" dishes was a stocker duty.  (*See* Def. Br. at 2-9.)  Plaintiffs can parrot the boilerplate allegations from their declarations all they want, but it does not make them any more true.  (*See* Pl. Br. at 7-8.)  Indeed, Judge Crotty recently rejected a similar attempt by plaintiffs who tried to claim that a "special [silver] polisher role" that was "completely separate from the dining services" existed at a restaurant, as this role was performed by bussers who were assigned on a rotating basis.  *Encalada*, Dkt. 63-1 at 10:19-17.[23]  This Court should also reject Plaintiffs' claim with respect to the stocker role here.

### B.    Plaintiffs Admitted that Mr. Drill and Mr. Vosilla's Managerial Authority Was Strictly Limited to the Service at All Relevant Times

Plaintiffs' challenge to Brent Drill's and Attilio Vosilla's participation in the tip pool also fell apart at trial.  Although they tried to erase the real and legally significant responsibilities of Anthony Scotto from their depiction of how things operate at his own Restaurant in their declarations, each Plaintiff wound up corroborating the day-to-day management realities

---

duties.  (Def. Ex. K ¶¶ 25, 27, Def. Ex. L ¶ 11.)  Accordingly, the fact that Mr. Scotto did not provide an estimate of the amount of time spent running food each shift (a wholly different question) during his deposition is of no import — especially in light of the fatally flawed and illogical time estimates given by the Plaintiffs themselves.  (Pl. Br. at 9.)

[22] Pl. Ex. 106 ¶ 24, Pl. Ex. 114 ¶ 13, Pl. Ex. 111 ¶ 15, Pl. Ex. 116 ¶ 14, Pl. Ex. 109 ¶ 15, Pl. Ex. 107 ¶ 14, Pl. Ex. 113 ¶ 14, Pl. Ex. 104 ¶ 15, Pl. Ex. 110 ¶ 16, Pl. Ex. 108 ¶ 16, Pl. Ex. 112 ¶ 14, Pl. Ex. 105 ¶ 15, Pl. Ex. 115 ¶ 15.

[23] *See* Dkt. 62, Pls. Pretrial Br. at 10; *see also* Dkt. 62-1, Nov. 6, 2014 Transcript from *Encalada v. SDNY 19 Mac Park, LLC*, 13-cv-01926-PAC ("*Encalada*").

described by Messrs. Scotto, Drill and Vosilla at trial. To get around the fact that it is Mr. Scotto, and only Mr. Scotto, who has meaningful input into the employment decisions that matter with respect to participation in a tip pool, Plaintiffs attempted to divert the Court's attention away from the factors that matter, by invoking the "manager" label to describe Mr. Drill and Mr. Vosilla at every opportunity. (Tr. 161:2-5 (Salinas), 190:10-14 (Urgiles), 376:2-9 (Cedeno), 421:6-422:23 (Caravantes), 447:13-18, 451:2-22 (Amezquita), 496:4-498:17 (Leon).) But this was revealed to be more form than substance, as they never could explain exactly how their authority differed from other captains at the Restaurant in any meaningful sense.

The law does not require that all "managers" be automatically excluded from participating in a tip pool. If the management roles are limited to the service, as they were shown to be at trial, titles are not controlling. Waiters manage bussers. Captains manage waiters and bussers. Maître d's manage the entire service staff. There are thus inherent management responsibilities in any fine dining establishment, but the positions are properly included in the tip pool because of the overall service orientation of the position. It is thus the nature of the responsibilities, not titles, which are dispositive. In the case of Mr. Drill and Mr. Vosilla, the proof at trial established that their management responsibilities were service oriented in nature and did not render them ineligible to participate in the Fresco tip pool. Plaintiffs failed to offer any meaningful proof to the contrary.

Indeed, the few meager examples that Plaintiffs managed to conjure up for their declarations in alleged support of their claims that Mr. Drill and Mr. Vosilla were not eligible to participate, notwithstanding their admitted service responsibilities, were ultimately exposed as nothing more than unsupported assertions and/or irrelevant to the time periods relevant to their claims. (*See* Def. Br. at 31-32.) This, however, did not deter Plaintiffs from recycling these

discredited recitations to argue that Mr. Drill and Mr. Vosilla *always* had the authority to make decisions about hiring, firing, discipline and schedule in their Post-Trial Brief.  (Def. Br. at 32-39.) But this is false, and mischaracterizes the record.  As will be demonstrated below, Plaintiffs failed to rebut the mountain of evidence to the contrary.

> 1.  **Plaintiffs Admitted that Anthony Scotto is the <u>Only</u> Person Who Wielded Any Authority Over Their Employment**

First, Plaintiffs ignore their own admissions with respect to Mr. Scotto's role at the Restaurant.  Messrs. Salinas, Alvarado, Flores and Caravantes — who worked at Fresco for a *combined total of nearly 50 years* among them — all testified that Mr. Scotto (i) is the boss, (ii) is always there, and (iii) is very hands-on with all the decisions made at the Restaurant, including those affecting their employment.  (Tr. 94:3-22, 99:9-12, 152:11-21, 153:22-155:5, 236:9-237:1, 361:16-25, 409:19-410:8.)  Plaintiffs argue that given Mr. Scotto's overall responsibilities, it is unlikely that he could have "singlehandedly" wielded authority over all of the decisions pertaining to bussers and runners at the Restaurant, and also the kitchen and maintenance staff, "without delegating some management of employees to others."  (Pl. Br. at 29.)  But they are wrong.  Plaintiffs cannot simply ignore their admissions and argue that, as a matter of logic, it would be "impossible" for Mr. Scotto to run a single family-owned Restaurant — particularly when they had a front-row seat to Mr. Scotto's involvement *while they worked alongside him in the dining room* during every lunch and dinner shift.  (Tr. 190:15-24 (Urgiles), 538:11-540:2, 542:17-544:18, 564:23-566:9; *see also* Pl. Ex. 92.)  As Mr. Scotto credibly testified, he knows no other way.  (Tr. 538:11-539:12)

Plaintiffs weakly argue that Mr. Scotto "did not know Fresco's bussers by name, or know how many bussers Fresco employed," but this is a blatant mischaracterization of his testimony.  (Pl. Br. at 29.)  As the Court reminded Plaintiffs' counsel during trial, Mr. Scotto actually

18

testified that he knows some bussers by name, and others by their faces.  (Tr. 551:22-23, 554:16-558:9.)  Furthermore, Mr. Scotto credibly testified on December 16th, 2014, that out of his 87 current employees, approximately 22 of them were bussers (having lost two bussers the previous day).  (Tr. 538:25-539:21, 557:18-19.)  This is consistent with the ample evidence in the record of Mr. Scotto's hands-on approach to managing (or some might say micromanaging) the Restaurant.  (Tr. 547:17-19, 551:17-21;  *see also id.*  94:3-22, 99:9-12 (Salinas), 152:11-21, 153:22-155:5 (Urgiles), 236:9-237:1 (Alvarado), 361:16-25 (Flores), 409:19-410:8 (Caravantes).)

Plaintiffs also attempt to argue that Mr. Scotto somehow admitted that "potential bussers would meet with Brent Drill … when they came … looking for a job."  (Pl. Br. at 30.)  As was evident at trial, and explained in Defendants' Post-Trial Brief (and further below), this interaction is hardly a "meaningful" interview; even then, it was the exception rather than the rule.  (Def. Br. at 32-33; Tr. 538:11-540:2, 543:5-544:18.)  Moreover, Plaintiffs Urgiles, Alvarado, Rodriguez, Flores, Cedeno, Amezquita and Leon all admitted at trial that when they came to Fresco to look for a job, their initial interaction was *with Mr. Scotto* (not Mr. Drill), and that Mr. Scotto subsequently met with them to ask about their previous experience, and watched them train so he could evaluate their skills.  (Tr. 152:11-21, 154:23-155:5, 190:15-24, 207:6-16, 311:23-312:6.)  In fact, when Mr. Urgiles was asked during re-direct whether Mr. Scotto followed him around during training, he admitted that was, in fact, true — because Mr. Scotto is *always* working in the VIP sections of the Restaurant.  (Tr. 190:15-24.)  Plaintiffs cannot seriously argue that it is "unfathomable that [Mr.] Scotto personally performed" all the personnel management duties pertaining to the bussers when they themselves admitted this to be true at trial.  (Pl. Br. at 30.)

19

Plaintiffs attempt to discredit Mr. Scotto's testimony concerning his very hands on approach, by arguing that he "testified falsely under oath at his deposition" regarding Marion Scotto's involvement with creating the Restaurant's original handbook. (*Id.* at 31.) Putting aside the inflammatory nature of such an accusation given the mountain of lies the Plaintiffs told this Court over the course of the eight-day trial: what Mr. Scotto actually testified to was that, to the best of his recollection, Marion Scotto's input was solely limited to information about the Restaurant's artwork. (Tr. 537:7-19; *see also* 685:3-7.) At his previous deposition, Mr. Scotto did not testify to any specific recollection in this regard. (Tr. 536:14-538:10.) And there is <u>no</u> evidence in the record to suggest Mrs. Scotto was involved in any aspect of the handbook (or any other aspect of their employment) that could be deemed even tangentially related to Plaintiffs' claims. (*See* Tr. 515:20-516:11, 684:5-12, 682:17-683:6; *see also* Section V, *infra*.)

As Mr. Scotto candidly testified at trial, he is frustrated about being sued. (Tr. 566:14-569:4.) That frustration manifested itself during his deposition where he admitted that he acted "silly" in connection with his answers to a few very benign questions. (Tr. 516:12-517:5, 521:20-522:17.) With that said, Mr. Scotto testified credibly on the stand and there is nothing that Plaintiffs can point to in order to claim otherwise. As compared to the Plaintiffs, his testimony was clear, consistent with the record evidence, and overall credible.

### 2. Brent Drill and Attilio Vosilla Did Not Have Meaningful Authority Over Hiring, Firing, Discipline or Scheduling[24]

Plaintiffs argue that the limited list of incidents allegedly involving Mr. Drill and Mr. Vosilla that are cited in their Brief constitute evidence of "meaningful" managerial authority. (Pl. Br. at 22-24, 26-27.) Again, they rely principally on their declarations (*see id.*), and completely ignore their admissions that revealed these incidents to either be blatantly false, or

---

[24] Plaintiffs do not argue that Mr. Drill played any role in the Restaurant's scheduling process. (*See* Pl. Br. at 22-25.)

based entirely on speculation and belief, instead of Plaintiffs' personal knowledge. (*See* Def. Br. at 33-37.)  As demonstrated below, there is no credible evidence to support Plaintiffs' claims with respect to either Mr. Drill or Mr. Vosilla.

Plaintiffs also conspicuously omit any mention of when any of these incidents allegedly occurred, presumably because those that occurred *after* Messrs. Drill and Vosilla stopped receiving tips do nothing to further their claims. (*See* Def. Br. at 36-37.)  To get around this, they argue that Messrs. Drill and Vosilla had essentially the same authority before their promotion as they did afterwards. (*See* Pl. Br. at 24, 28.)  But this is not true.  As Mr. Scotto credibly testified at trial, neither Mr. Drill nor Mr. Vosilla had the authority to issue written discipline or make decisions with respect to terminations prior to January 1, 2013. (Tr. 582:11-589:10, 590:21-593:15;678:12-679:19; Drill Dep. at 22:25-23:22.)  Indeed, Plaintiffs have no evidence to the contrary.[25]

### a.   Brent Drill

#### (1)   Hiring

As explained in Defendants' Post-Trial Brief, Anthony Scotto make every hiring decision at Fresco, and the only meaningful interview was with Mr. Scotto. (Def. Br. at 32.)  Mr. Drill testified that he only sat in on, at most, one or two busser interviews conducted by Mr. Scotto — and these took place after he was promoted in 2013.   While he was a floor captain, his involvement was strictly limited to accepting resumes and passing them along to Mr. Scotto. (Drill Dep. at 41:20-42:24, 43:2-45:17.)  While Plaintiffs argue that Mr. Drill "could and did interview and hire Fresco employees" while he was a floor captain, they have cited no credible

---

[25] In fact, all of the documentary evidence in the record regarding disciplinary action taken by Messrs. Drill or Vosilla are dated after January 1, 2013, *i.e.*, after both of stopped receiving tips. (*See* Pl. Exs. 35, 36, 59.)  Although Plaintiffs cite a disciplinary communication form issued to Mr. Rodriguez pre-marked Pl. Ex. 63 (Pl. Br. at 26), this document was never admitted into evidence at trial. (*See* Tr. 309:18-310:5, 688:22-689:23.)

record evidence in support of this contention.  (*See* Pl. Br. at 22-24.)

Plaintiffs' claim that Mr. Drill "oversaw" the training of bussers is misleading, as it mischaracterizes the record and also overstates his input with respect to the decision-making process.  Mr. Scotto credibly explained at trial that, captains (including Brent Drill) were jointly responsible for overseeing service in certain sections of the dining room, including the section the busser candidate was assigned to train.  (Tr. 542:17-543:16.)  But Plaintiffs describe this testimony as if Mr. Drill actually oversaw the training component of the Restaurant's interview process.  This could not have been farther from the truth.  For example, Plaintiffs claim "James [Rotonno], the host, told [Mr. Urgiles] to speak with Drill, who would oversee his training."  (Pl. Br. at  23.)  At trial, Mr. Urgiles testified that Mr. Drill merely introduced him to the busser that he would be training with — and that Mr. Scotto actually observed him during his training.  (Tr. at 153:22-155:5.)  Mr. Urgiles also disclaimed his declaration testimony purporting to have observed Mr. Drill interview two busser candidates.  (Pl. Ex. 105 ¶ 51.)  At trial, he admitted that these interactions amounted nothing more than to Mr. Drill's acceptance of resumes in Mr. Scotto's absence.  (Tr. 156:10-159:4.)  When the Court asked him to clarify what he meant by the word "hire," Mr. Urgiles admitted that he was merely referring to the act of inviting the candidate back to the Restaurant to train — so that "if the owner did not like the way" the candidate worked, he (Mr. Scotto) could decide whether or not to "give him the job."  (Tr. 159:5-14.)  This testimony corroborates the Defendants' version of hiring at Fresco and supports the assertion that Mr. Drill played no meaningful role.[26]

---

[26] These admissions similarly undermine the allegations set forth in Mr. Francisco's trial declaration regarding being "interviewed" by Mr. Drill and "being hired on the spot" when he was invited back to train.  (*See* Pl. Br. at 24, Pl. Ex. 108 ¶ 4.)  Furthermore, Mr. Francisco's overall lack of credibility is established in Defendants' Post-Trial Brief.  (*See* Def. Br. at 6, 9-10.)

In addition to ignoring these admissions, Plaintiffs mischaracterize the other testimony in the record.  Mr. Salinas testified that he did not  remember seeing Mr. Scotto  in the Restaurant during the shifts he trained, before admitting that he actually did not know if Mr. Scotto observed him at all.  (Pl. Br. 22, Tr. 97:19-100:15, 121:21-122:13.)  Mr. Xochipiltecatl similarly testified that he did not remember if Mr. Scotto was in the Restaurant during his training period, and admitted that when he said he was "hired" by Mr. Drill in his declaration, he only meant that Mr. Drill was the person who communicated the job offer to him  — hardly evidence of his authority to hire, his input in the hiring process.  (Tr. 272:17-274:6.)

### (2)    Discipline and Terminations

Significantly, all together, Plaintiffs spent almost 94 years, or more than 34,000 collective days working at Fresco.  (*See* Fact Stips. 1-13.)  Yet, they were only able to come up with thirteen (**13**) alleged disciplinary incidents involving Mr. Drill.  (Pl. Br. at 22-24.)  Of these incidents, Plaintiffs only describe three (3) terminations: the dismissals of Plaintiffs Amezquita and Roballo (which both occurred in 2013 and are thus totally irrelevant as he was not participating in the tip pool at that time), as well as the hearsay assertions of Mr. Leon (whose lack of credibility is established in Defendants' Post-Trial Brief) regarding the dismissal of "Gelacio" (*i.e.*, the busser who allegedly perspired too much).[27]  (Def. Br. at 4-5, 10-11, 35-36; *see also* Tr. 502:25-505:19.)  Gelacio never testified.  Mr. Drill, on the other hand, testified that he never even recommended formal discipline before his promotion.  (Drill. Dep. at 22:25-23:22, 29:21-

---

[27] Even after his promotion, Mr. Drill's termination authority was far from absolute, as Mr. Scotto overrode his decision to terminate Mr. Amezquita (only to terminate him again a short time thereafter).  (Tr. 573:23-574:18.)  While Plaintiffs Rodriguez, Lugo, Roballo and Flores all corroborated this at trial, Mr. Amezquita did not.  (Tr. 379:9-380:11, 323:22-325:3, 470:17-472:12; *see also* Dkt. 92, Pl. Br. at 23.)  With respect to Mr. Roballo, Mr. Scotto testified at trial that he made the decision to terminate his employment, and that Mr. Drill's involvement was solely limited to filling out the form memorializing his termination.  (Tr. 592:20-593:15; Pl. Ex. 59.)

31:20, 36:11-17.)   Accordingly, there is <u>no</u> credible proof that Mr. Drill (even in the single instance alleged) terminated any busser prior to January 2013.

Plaintiffs' other incidents of alleged discipline fare no better.  Unbelievably, Plaintiffs cite to Mr. Caravantes's declaration as support for the allegation that Mr. Drill somehow had authority to discipline.  (Pl. Br. at 23.)  But they fail to address his damning admission at trial that undermines *all* of the Plaintiffs' testimony to the contrary: *i.e.*, that, in 14 years, he never saw Mr. Drill discipline or fire anyone at all.  (Tr. 424:5-425:7.)

Mr. Salinas — one of the *least* credible Plaintiffs overall (*see* Def. Br. at 14) — claims that he saw Mr. Drill suspend Mr. Flores for allegedly refusing to pay money for a Fresco Christmas party.  (Pl. Ex. 104 ¶ 64.)  But Mr. Flores neglected to mention any such incident, either in his declaration or at trial, despite being asked to describe all alleged incidents of discipline.  (*See, e.g.*, Pl. Ex. 111.)  Surely had such an incident actually happened, he would have remembered.  It is not every day that one gets suspended for a week for not attending a Christmas party.

Mr. Flores, himself, lacked overall credibility and his description of other alleged incidents involving discipline were exposed as falsehoods at trial.  He admitted that he had no firsthand knowledge of whether Mr. Drill made the decision to suspend him on a Monday for failing to put away a few espresso cups on a Saturday — an especially unlikely scenario, given that Mr. Drill never worked Saturdays.  (Pl. Ex. 111 ¶ 55, Tr. 373:12-374:13.)  He also admitted — after testifying he could not remember what year Mr. Drill allegedly suspended him for calling in sick — that he was not sure *who* he spoke with on the phone in connection with that incident, and that it could have just as easily been the Restaurant's host, James Rotonno.  (Tr. 374:15-376:6.)  His incredible testimony about being suspended by Mr. Vosilla in connection

with the same incident (*i.e.*, when Mr. Scotto actually was the one who suspended him for coming to work drunk with a black eye, *see* Def. Br. at 34-35), undermines his credibility on this subject, and also overall.

While Plaintiffs argue that Mr. Drill sent Mr. Urgiles and another employee, Abel Reyes, home as punishment for arriving late, this was not what Mr. Urgiles testified to at trial.  (Pl. Br. at 23.)  Rather, he admitted that he was sent home merely because the Restaurant was fully staffed by the time he arrived — not for disciplinary reasons — which is consistent with the on-call procedure at the Restaurant that Mr. Scotto testified to at trial.  (Tr. 164:6-168:9, 556:15-567:13.)   This does not serve as evidence that Mr. Drill had meaningful disciplinary responsibilities.

Plaintiffs' omission of any testimony from Plaintiffs Alvarado (*who worked at Fresco for 14 years*) Francisco and Xochipiltecatl on Mr. Drill's disciplinary authority is also telling.  (Pl. Br. at 22-24.)  Surely if Mr. Drill had any disciplinary authority during the relevant time period, these long time employees would have witnessed same.  In this instance, silence speaks volumes.

### b.    Attilio Vosilla

### (1)    Hiring

Plaintiffs argue that Mr. Vosilla "admitted that [he] would sometimes interview employees with [Mr.] Scotto, and make suggestions about whether an employee should be hired." (Pl. Br. at 32.)  But the testimony cited by Plaintiffs, once again, misses the mark and actually supports Defendants' position.  Mr. Vosilla credibly, and consistently, testified at trial that his only involvement with the hiring of bussers has been accepting resumes to pass them on to Mr. Scotto — he does not interview these individuals, or even tell them to come back to the Restaurant to train.  (Tr. 672:5-11; Def. Ex. N ¶ 43.)  When asked if he ever helped interview *other* employees — *i.e.*, not bussers — he testified "Not often." (Tr. at 672:12-

15.)  Significantly, there was no time frame attached to this question.  As the trier of fact, the Court is left to guess whether it was before, or after, he participated in the tip pool—hardly the type of evidence that can support any real finding in this respect.  In any event, this is not even arguably evidence of "frequent" participation in interviews to support a finding of "meaningful authority or control" over the Plaintiffs under the *Barenboim* standard.  *See* Dkt. 93-1, *Encalada* at 9:8-24.  Plaintiffs' unsupported, discredited assertions from their declaration testimony regarding being interviewed by Mr. Vosilla (or observing him hire others) cannot rebut Mr. Vosilla's clear, consistent testimony on this issue.  Nor the testimony of Mr. Scotto that only he had meaningful authority in this regard.  (*See* Pl. Ex. 110 ¶¶ 4-5, Pl. Ex. 111 ¶ 83, Pl. Ex. 107 ¶ 3.)

Plaintiffs' citation to the trial testimony of Mr. Roballo concerning Mr. Vosilla's role in hiring is also misleading in this regard.  (Pl. Br. at 26.)  As was established in Defendants' Brief, Mr. Roballo was not a credible witness.  (Def. Br. at 6-7, 11-12.)  In any event, he actually testified that he did not remember whether Mr. Scotto was in the Restaurant during his training.  (Tr. 355:22-356:5.)  Although he purportedly gave his resume to Mr. Vosilla and was told to come back to train, Mr. Roballo also admitted that he "did not remember very well" whether he came by during the lunch shift or the dinner shift.  (Tr. 354:2-12.)  Both Mr. Scotto and Mr. Vosilla testified at trial that it would have been unusual for Mr. Vosilla to accept any busser resumes, because he only worked dinner shifts, *i.e.*, when there were fewer candidates dropping by, or the Restaurant was too busy to accept applicants.  (Tr. 540:3-542:16, 672:5-11.)

### (2)    Discipline and Terminations

Plaintiffs' showing with respect to Mr. Vosilla's role in discipline and terminations is even thinner than their showing for Mr. Drill, as they were only able to muster up to seven (**7**) example of disciplinary incidents from 1998 until the present, including three alleged

26

terminations. (Pl. Br. at 26-27.) All of these examples are addressed in Defendants' Post-Trial Brief.[28] (*See* Def. Br. at 33-37.) They provide no support for the assertion that he had a meaningful role in this area. In fact, they establish the exact opposite. Surely, Plaintiffs would have come forward with better examples of meaningful authority in this regard had Mr. Vosilla actually possessed such authority.

The fact that Plaintiffs resort to arguing that Mr. Vosilla supposedly admitted that he could not recall a time Mr. Scotto instructed him not to issue a write-up shows exactly how weak Plaintiffs' claim is in this regard — especially given that the only such write-up in the record specifically denotes that Mr. Vosilla did not recommend any disciplinary action be taken. (Dk. 92, Pl. Br. at 28; Pl. Ex. 35.)

### (3)   Scheduling

Plaintiffs also argue that Mr. "Vosilla was responsible for scheduling at Fresco." (Pl. Br. at 28.) But both Mr. Scotto and Mr. Vosilla credibly and consistently testified that Mr. Vosilla's role with respect to scheduling was purely ministerial in nature, *i.e.*, updating a template containing the previous week's schedule per Mr. Scotto's direction and leaving it for his review and approval. (Tr. at 547:3-548:15, 548:16-552:23, 666:10-667:22; Def. Ex. N ¶ 36.) Mr. Scotto was the only person who made any decisions about how many shifts each individual could work per week. (*Id.*) Plaintiffs cite no record evidence that suggests Mr. Vosilla was anything more than a passive observer in this regard. (Pl. Br. at 28.)

Plaintiffs mischaracterize Mr. Vosilla's trial testimony with respect to his ability to "authorize" shift changes arranged by employees. (Pl. Br. at 28.) Mr. Vosilla actually testified that the only changes he supposedly "authorized" were shift swaps arranged by employees

---

[28] With respect to the disciplinary communication form issued to Mr. Rodriguez pre-marked as Pl. Ex. 63 (*see* Pl. Br. at 26), this document was never admitted into evidence at trial. (*See* Tr. 309:18-310:5, 688:22-689:23.)

themselves <u>after</u> the weekly schedule was finalized and posted by Mr. Scotto.  (Tr. 668:18-25.)

It is beyond dispute that Mr. Vosilla lacked the authority to approve requests made <u>before</u> the

weekly scheduled was finalized, as Mr. Urgiles admitted that Mr. Vosilla would advise him and

other bussers that the only person who could approve such requests was Mr. Scotto.  (*See* Def.

Br. at 38; *see also* Tr. 546:23-547:19, 666:10-667:22.)

### 3. Mr. Drill's and Mr. Vosilla's Service Responsibilities Do Not Disqualify Them From Participating In the Tip Pool

Given the obvious failings in terms of credible examples of meaningful authority in

connection with hiring, firing, and discipline, Plaintiffs fall back on the mantras from their

declarations regarding Mr. Drill's and Mr. Vosilla's supervision of the Plaintiffs in connection

with the service.  (Pl. Br. at 25, 27.)   This is irrelevant.  In fact, it is one of the few things that is

not seriously in dispute, as Plaintiffs Caravantes, Cedeno, Amezquita and Leon all corroborated

Mr. Scotto's testimony regarding the role of Mr. Drill, Mr. Vosilla and other captains at Fresco

providing direction to bussers and other members of the service staff at Fresco.  (Tr. 421:6-

422:23, 396:2-9, 447:13-18, 451:2-22, 496:4-498:16.)  Plaintiffs' argument is of no force in this

respect, as "supervisory employees who regularly provide direct service to patrons remain tip-

pool eligible <u>even if</u> they exercise a limited degree of supervisory responsibility."  *Barenboim v.

Starbucks Corp.*, 21 N.Y.3d 460, 472, 972 N.Y.S.2d 191, 197 (2013); *see also* 12 N.Y.C.R.R. §

146-2.14(e)(8) (identifying "captains who provide direct food service to customers" as tip-

eligible employees).[29]

---

[29] This has long been the state of the law under the NYLL.  *See* Dkt. 65-4, N.Y. DOL Op. RO-08-0049 (Feb. 13, 2009) ("[T]he sole criteria in determining whether [a supervisory] employee may be included" in a tip pool is "the extent of direct service provided to patrons," regardless of how that individual is compensated or classified); Dkt. 65-1, NYSDOL Inter-Office Memorandum, Sept. 5, 1972 (explaining that under § 196-d, "[a]n employer's agent is a person who stands in the shoes of the employer, including a[] general manger of the business, but does not include a mere supervisory employee who does not have the authority to hire or fire.").

All told, Plaintiffs have corroborated the testimony from Messrs. Scotto, Drill and Vosilla, instead of rebutting it.   Mr. Drill and Mr. Vosilla were service managers and their management authority was strictly limited to the service.   Based on the complete lack of proof regarding "meaningful" managerial authority in the record, the Court should reject Plaintiffs' tip-pooling claims with respect to Mr. Drill and Mr. Vosilla.

### C. Plaintiffs Admitted That They Actually Worked *Fewer* Hours Than They Were Paid For — Not More

Plaintiffs had to establish two basic premises in order to prevail on their shift pay and time-shaving claims: (1) that they performed work during the 30-minute family meal period (*i.e.*, time that could be considered compensable during both the shift pay and time clock eras) and (2) that their end-of-shift times were fixed (not variable) prior to the rollout of the time clock (*i.e.*, when the Restaurant paid a fixed number of hours per shift).[30]   Although their declarations alleged the (grossly exaggerated) practices argued in Plaintiffs' Post-Trial Brief, they not only failed to produce proof of same at trial, but provided testimony to the contrary.   As a consequence, there is no evidentiary support for the Court to infer that they actually worked the inflated number of hours that they seek relief for.

### 1. Plaintiffs Are Not Entitled to Recover Any Wages for the 30-Minute Family Meal, Either Before or After the Time Clock

Significantly, Plaintiffs conceded in their Post-Trial Brief that no work is performed during the 30-minute family meal break.   They describe a typical 5-hour lunch shift worked by bussers (*i.e.*, "from 10:00 a.m. to approximately 3:30 p.m., with a half-hour break for family meal") and a typical 4-hour lunch shift worked by runners (*i.e.*, "from 10:00 a.m. to 2:30 p.m., which included a 30 minute family meal.").   (Pl. Br. at 14-15.)   In both cases, they specifically

---

[30] The payroll period beginning Monday June 20, 2011 is the first payroll period the Restaurant started paying wages based on the time clock.   *See* Pl. Ex. 77, at FRESCO BY SCOTTO – 004617; *see also* Def. Ex. M ¶ 45.

excluded the 30-minute meal period from the calculation.  If Plaintiffs recognize that these 30 minutes should not count towards the shift time, this is tantamount to an admission that no work is performed during this time period.  Accordingly, it is beyond dispute that Defendants are not liable for any wages for these meal breaks.  *See* Def. Br. at 39-40; *see also Hoodho v. Holder*, 558 F.3d 184, 191 (2d Cir. 2009) (explaining that "[j]udicial admissions … are formal concessions … or stipulations" that are binding on a party and operate to withdraw factual disputes from scrutiny).  This is true for all relevant times at issue in this case.

Plaintiffs claim that they are somehow entitled to receive some form of compensation for the 20 minute time period that was automatically deducted from their paychecks after the implementation of the time clock.  (Pl. Br. at 37-38.)  Again, this claim ignores the fact that they performed no work during this time period. The Restaurant was thus fully entitled to deduct a full 30 minutes from the number of hours recorded by the time clock.  *See Zivali v. AT&T Mobility, LLC,* 784 F. Supp. 2d 456, 461 (S.D.N.Y. 2011) (explaining that under the FLSA, an employer's timekeeping policies are lawful as long as they "allow[] for the complete and accurate recording of all time worked."); *see also* Dkt. 65-4, NYSDOL Op. Ltr., RO–08–0049 (Feb. 13, 2009) (explaining that meal breaks automatically deducted by timekeeping software is not unlawful under the NYLL so long as employees are paid for all time worked).  As Plaintiffs themselves point out, Mr. Scotto and Ms. Gelman both testified that the timekeeping software was set up to deduct 20 minutes, instead of 30 minutes.[31]  (Pl. Br. at 38.)  This error actually

---

[31] The fact that Plaintiffs concede that this was an error undermines their argument that "Fresco by Scotto intentionally manipulated the time clock system so that the system would calculate the total hours worked as approximately nineteen minutes less than the time between an employee's recorded start time and end time."  (Pl. Br. at 37.)  For the Court's reference, the 19-20 minute deductions reflected in Plaintiffs' time punch records are reflected in the "Paper Total" column of Table 1.  (Dkt. 94-1.)  As explained in Defendants' Post-trial Brief, Plaintiffs' argument that the time records contain pervasive errors is also unsupported by any evidence.  (*See* Def. Br.,

inured to Plaintiffs' benefit in that they were compensated for an extra 10 minutes per shift when they actually performed no work.  Accordingly, to the extent that any claim is based on alleged uncompensated time during the 30-minute meal period, they are not entitled to recover for any alleged "undercounting" of hours.[32]  (Pl. Br. at 37.)

### 2.   Plaintiffs Have No Credible Evidence to Support their Estimated Shift Times

Plaintiffs principally rely on their discredited declaration testimony as evidence that prior to the time clock, "all bussers would remain at the restaurant until all customers left.  (Pl. Br. at 35; *see also* Dkt. 92-2, Pl. Appendix B.)  But the stubborn adherence to this position utterly ignores their clear admissions to the contrary at trial.  Messrs. Alvarado, Caravantes and Xochipiltecatl all admitted that runners and bussers could *always* leave once their section was empty, unless they were scheduled to be a "closing" or "late" runner or busser.  (*See* Def. Br. at 14-16.)  Mr. Alvarado's testimony is especially devastating in this regard.  At trial, he admitted his February 2011 declaration (submitted in conjunction with another case) — which is dated *prior* to the rollout of the time clock — was accurate.  (Tr. at 228:17-236:8, Def. Ex. H ¶ 11; *see also* Pl. Ex. 106 ¶¶ 31-32.)  Why would the Restaurant allow runners to end their shift as the customers were leaving the Restaurant, but detain the bussers to stay around with nothing to do?

---

n.48 at 41.)

[32] Plaintiffs also grossly mischaracterize the records cited in support of their claim that they were occasionally instructed to work off-the-clock, *i.e.*, around Christmas time.  (*See* Dkt. 92 at 38.)  With respect to Christian Urgiles, weekly tip records show that he earned $181 in tips that week for Monday dinner (December 24, 2012) and $40 in tips for Friday lunch (December 28, 2012).  (Pl. Ex. 77 at FRESCO BY SCOTTO – 009009.)  Although his time records show that he only recorded approximately four hours that week for the Friday lunch shift only (*see* Dkt. 94-1, **Table 1** at p. 76), payroll records show that he was paid for a total of 12.54 hours for that week.  (Pl. Ex. 76 at FRESCO BY SCOTTO – 009004.)  **Table 1** also shows that Mr. Rodriguez did clock in for the December 24, 2012 shift, and recorded approximately 8.5 hours — corroborating Ms. Gelman's testimony that, when in doubt — like when an employee forgot to punch in for their shift, which she caught while processing the waiters' tip-out worksheets — her practice was to pay them for the maximum amount of time they could have worked for that shift.  (Def. Ex. M. ¶ 28; Tr. 661:20-662:9.)

This makes absolutely no sense.  Even Mr. Salinas acknowledged that the logical conclusion of such a practice would be "too man hands" for too few customers — a tacit admission that such a practice never, in fact, occurred.  (Tr. 60:20-61:3.)  But we do not need to rely solely on the fact that this assertion makes no sense.  We have the testimony of the Plaintiffs.  In fact, any notion that such a practice applied to bussers is dispelled by the trial testimony of Mr. Caravantes (who only worked as a runner in his two last years at Fresco, *i.e.*, after the time clock was implemented, *see* Fact Stip. 8) and Mr. Xochipiltecatl (who only worked as a busser during the shift pay era, *see* Fact Stip. 12).   Given the force of these admissions, the Court cannot reasonably infer that their shifts lasted until the exaggerated times reflected on Plaintiffs' Appendix B. [33] (Dkt. 92-2.)  *See Hosking v. New World Mortg., Inc.*, 570 F. App'x 28, 32 (2d Cir. 2014) (summary order) (internal citation omitted) (explaining that plaintiffs must meet their burden under *Mt. St. Clemens* framework with credible evidence).  To the contrary, this is yet another example of the incredible and self-serving testimony provided by the Plaintiffs.

The record evidence actually establishes that the shift pay model also inured to Plaintiffs' benefit, as it provided a guaranteed amount of compensation for more time than they actually worked.  Plaintiffs mischaracterize the Restaurant's bookkeeping records to argue that because they were paid for a certain number of hours per shift, they actually worked those hours.  (Pl. Br. at 34.)  But that is not true.  The Restaurant's payroll records are only evidence of how much Plaintiffs were actually *paid*.  This distinction is critical.  As Mr. Scotto and Mr. Gelman credibly testified, under the shift pay system, Plaintiffs were paid for a guaranteed number of hours each

---

[33] As another example of the misleading nature of the boilerplate representations set forth in Plaintiffs' declarations, Appendix B — which is titled "Summary of Plaintiffs' Hours Worked During Shift Pay Period" — cites the testimony of Mr. Lugo, *who has no shift pay claims*.  Mr. Lugo started working at the Restaurant in November 2011, *i.e.*, five months <u>after</u> the time clock was rolled out.  (Fact Stip. 5.)

shift *regardless* of whether they left early (because their section, or the Restaurant, was empty) or showed up late.  (Tr. 597:18-600:1, 649:8-652:8; 660:20-661:1-14; Def. Ex. K ¶¶ 13-14; Def. Ex. M ¶¶ 28, 31, 39.)  Their testimony is further corroborated by the Plaintiffs' time records, which prove that the aggregate number of hours worked in any given week can vary even if two Plaintiffs work the same number of shifts during the same week.  (*See* Dkt. 94-5, **Table 5**.)  So even though all of the Plaintiffs worked an average of 4.81 hours per shift (*id.* at 12), it is undisputed that they were paid for at least five hours at all times during the shift pay era — meaning no underpayment actually occurred.

Plaintiffs essentially argue that an overtime violation must exist any time the *number of shifts* worked per week multiplied by the number of hours *paid per shift* is greater than 40.  (Pl. Br. at 33-36, Dkt. 95-1, Appendix A.)  By that logic, that would mean if a Plaintiff worked six dinner shifts during a week the Restaurant paid seven hours for dinner, then that is evidence they worked 42 hours.  But this has never been the case.  As Mr. Scotto and Ms. Gelman credibly testified, overtime has always been rare at Fresco.  (Tr. 655:16-25.)  The seven-shift-per-week schedule was designed with that in mind.  (Tr. 597:18-600:1, 660:2-10; Def. Ex. K ¶¶ 13-14.)  Plaintiffs' time records also corroborate this fact.  On average, Plaintiffs who worked exactly <u>seven shifts</u> worked fewer than 40 hours more than <u>95%</u> of the time, and those who worked exactly <u>eight shifts</u> worked fewer than 40 hours more than <u>76%</u> of the time.  (*See* Dkt. 94-6, **Table 6**.)  Thus, Plaintiffs' own time records make the scenarios set forth in Appendix A highly improbable.  (*See* Dkt. 95-1, Pl. Appendix A.)

## II.   THERE IS NO COMPETENT EVIDENCE TO SUPPORT PLAINTIFFS' UNIFORM PURCHASE CLAIMS

As part of their overall kitchen-sink approach in this case, Plaintiffs also argue that they are entitled to recover for alleged payments they made for purchasing shirts, ties and collar stays

from the Restaurant.[34]  (Pl. Br. at 40.)  As an initial matter, Plaintiffs failed to explain <u>why</u> these shirts and ties should be considered a "uniform" under the NYLL.  (*See id.*)  For the reasons stated in Defendants' Post-Trial Brief, these items fail to meet the requisite definitions as a matter of law.  (Def. Br. at 47-48.)  But even if they did, Plaintiffs utterly failed to put forth any evidence (aside from their unreliable and discredited declarations) that proves that they actually <u>purchased</u> these items from Fresco.  (Pl. Br. at 38-39 (citations omitted).)

Messrs. Alvarado and Cedeno admitted during cross-examination that they received shirts and ties for free.  (*See* Def. Br. at 48-49.)

Messrs. Salinas and Cedeno also gave testimony regarding how much they paid for shirts that conflicted with the amounts specified in all of the Plaintiffs' declarations, the Complaint, and also one another.  (*Id.*)  They also both purported to pay money to Ms. Gelman in this respect.  (*See* Tr. 110:24-114:13, 397:2-398:7.)  Ms. Gelman credibly denied ever receiving any payments.  (Def. Ex. M ¶¶ 55-56.)  One side or the other is not being credible in this regard.  It cannot be both ways.  Given the overwhelming examples of incredible testimony on the part of the Plaintiffs, there is no basis to conclude that the incredible testimony came from Ms. Gelman.

Plaintiffs attempt to sidestep these gaping evidentiary deficiencies by arguing that at one

---

[34] Plaintiffs' attempt to characterize the collar stays as "uniforms" or "equipment" should be rejected outright, as the notion that they needed collar stays in order to do their jobs as bussers or runners makes no sense.  *See* 29 C.F.R. § 531.55 (explaining that only when employees are required to purchase "tools of the trade which will be used in or are specifically required for the performance of the employer's particular work" can give rise to a minimum wage violation under the FLSA).  Tellingly, only <u>7</u> of the 13 Plaintiffs (*i.e.*, Messrs. Rodriguez, Roballo, Flores, Alvarado, Francisco, Xochipiltecatl and Leon) even bothered alleging that they had to purchase collar stays — although their testimony as to how many they purchased per year all varied.  Pl. Ex. 109 ¶ 98 (2 collar stays for $2 each); Pl. Ex. 110 ¶ 94 (4 collar stays for $2 each); Pl. Ex. 111 ¶ 101 (1 collar stay for $2); Pl. Ex. 106 ¶ 94 (4 collar stays for $2); Pl. Ex. 108 ¶ 90 (2 or 3 collar stays for $2 or $3); Pl. Ex. 107 ¶ 82 (1 collar stay for $2); Pl. Ex. 116 ¶ 96 (1 collar stay for $2 each year).  It should also be noted that there are no allegations or claims pleaded in support of these supposed collar-stay purchases anywhere in Plaintiffs' Complaint.  *See generally* Compl. ¶¶ 42-421.

point in time, the Restaurant had intended to start charging for shirts and ties — *even though there is no proof that the Restaurant actually ever followed through.* (*See* Pl. Br. at 39.[35]) While Mr. Scotto did testify that, at one time, he intended to charge for the shirts, this is of no consequence. It never happened. This does nothing to relieve Plaintiffs from proffering actual proof of the uniform purchases they purportedly made — proof that is clearly missing here.

A recent post-bench trial decision by Mag. Judge Fox on a similar claim is instructive on this point. In *Yan Yan v. 520 Asian Rest. Corp.*, 2014 WL 7177259 (S.D.N.Y. Dec. 17, 2014), the plaintiff testified in his affidavit that he purchased "eight motor scooters, for an average cost of $800 each." *Id.* at *1. However, when asked to explain why he previously had testified during his deposition that he purchased *bicycles* (*i.e.*, as opposed to "motor bikes" or scooters), the plaintiff "became evasive" and gave contradictory and inconsistent explanations. *Id.* at *1-3. Among other things, he testified that "electric bikes" and "bicycles" were basically "the same" thing; and that he used a scooter to commute to work (despite previously testifying he never used it for personal purposes) before backtracking and testifying that he commuted via subway. *Id.* Given this incredible testimony (and the three conflicting sets of calculations he proffered as to how much he spent on purchasing these items), Judge Fox concluded that the plaintiff "failed to present any credible evidence to support his request for bicycle purchase…damages" and denied

---

[35] To the extent Plaintiffs attempt to rely on the uniform reimbursement forms issued to Messrs. Amezquita and Lugo (*see* Pl. Exs. 34 & 53) as proof that the Restaurant required Plaintiffs to actually purchase certain clothing items from the Restaurant, it should be noted that these forms indicate that they would be reimbursed only $9 — which is consistent with the uniform maintenance amounts routinely reimbursed by the Restaurant on each paycheck. *See* Def. Ex. M ¶ 22, P 441; *see also* 12 N.Y.C.R.R. § 146-1.7(a)(1) (listing $9.00 as the uniform maintenance reimbursement rate for employees who worked over 30 hours per week on or after January 1, 2011). Despite initially mistaking these amounts as deductions on their paychecks (*see* Compl. ¶¶ 78, 99, 119, 143, 162, 182, 206, 230, 254, 277, 301, 323, 348) Plaintiffs agreed to drop their uniform reimbursement claim prior to trial. (*See* JPTO § V.A.2.c.) Accordingly, these reimbursement forms are not probative of (or relevant to) Plaintiffs' uniform purchase claims.

recovery on this claim.  *Id.* at *10.  In light of Plaintiffs' flawed and thoroughly inconsistent testimony regarding their "uniform" purchases in this case, the same conclusion is warranted here.

## III.   PLAINTIFFS HAVE FAILED TO PROVE ANY NOTICE VIOLATIONS

Plaintiffs essentially assert three (3) separate notice violations, stemming from Defendants' supposed failure to (i) adequately notify them of the tipped minimum wage (under both state and federal law); (ii) provide paystubs reflecting the number of hours they argue as having actually worked for the purposes of this litigation; and (iii) furnish Spanish-language annual notices.  (Pl. Br. at 16-19, 40-42.)  Plaintiffs' legal theories underpinning each of these violations should be rejected, as they fail to support a claim for recovering the tip credit — especially in light of the overwhelming proof in the record establishing that Plaintiffs did, in fact, have adequate notice of the requisite legal requirements and that they suffered no damages whatsoever as the result of the alleged lack of notice.[36]

First, Plaintiffs appear to argue that notice of the tip credit for the entire six-year limitations period applicable to their NYLL claims.  (Pl. Br. at 17-18; *see also* Law Stip. 5.)  But this is misleading, as the notice requirement under the NYLL did not take effect until January 1, 2011.  (*See* Law Stip. 6; *see also* Dkt. 65-6, Order of the Comm'r of Labor M. Patricia Smith on the Rep. & Recs. of 2009 Wage Board (Nov. 5, 2009).)  This is because — unlike FLSA § 203(m) — "New York's [previous] Minimum Wage Order in effect … did not require an employer to give an employee notice, as a condition for taking a tip credit."  *Yan Yan*, 2014 WL 7177259, at *10 (citing 12 N.Y.C.R.R. § 137-1.4 (repealed)).

---

[36] As explained in Defendants' Post-Trial Brief, Plaintiffs' claim for statutory damages (capped at $2,500 per year) for the paperwork violations they assert under NYLL §§ 195(1), (3) should also be rejected.  (Dkt. 93, n.55 at 47.)

Furthermore, as explained in Defendants' Post-Trial Brief, the FLSA's notice requirement may be satisfied via posting.  (Def. Br. at 46-47.)  Significantly, Plaintiffs do not contend that the wage-and-hour notices posted in English and Spanish at the Restaurant (*see* Pl. Ex. 119; Def. Ex. K ¶ 38[37]) are somehow deficient.  (*See* Pl. Br. at 16-19.)  Indeed, they completely ignore the existence of these posters altogether, and instead, rely on their own self-serving declarations as proof that prior to 2011, "no one discussed their wages with them when they were hired by Fresco."[38]  (*Id.* at 17) (citations omitted).  But it is undisputed that, during all the time period(s) relevant to this case, (1) these notices were conspicuously posted (*i.e.*, at the top of the stairwell leading to the employee locker room, *see* Tr. 625:12-25) ; (2) Plaintiffs were paid their tips in cash directly by the waiters, who distributed pooled tips after each shift (Def. Ex. K ¶¶ 8, 43-44; Def. Ex. N ¶ 25; Def. Ex. M ¶ 19; Drill Dep. 94:5-95:11[39]); (3) the Restaurant kept contemporaneous weekly records of tips earned each shift for tax reporting purposes (Def. Ex. M ¶¶ 18-20; *see also* Pl. Ex. 77); and (4) that the amount of tips were reflected along with the amount of hourly wages paid on Plaintiffs' weekly paychecks (*see* Def. Ex. M ¶¶ 7-8, 18-21, 23[40]).  The overwhelming evidence at trial also established that Plaintiffs — who are all

---

[37] Copies of the photographs Bates stamped D002723-24 and admitted into evidence as attachments to Def. Ex. K are enclosed in Tab 40 of Vol. II of Defs.' Pretrial Filings.  The Court may take judicial notice of the fact that the posters visible in these photographs are from Labor Law Compliance Center (*see* http://laborlawcc.com/New-York-Labor-Posters-51.html).  Copies of relevant USDOL and NYSDOL publications visible in these posters are accessible at http://www.dol.gov/whd/regs/compliance/posters/flsa.htm                                    and http://labor.ny.gov/formsdocs/wp/LS204.PDF, respectively.

[38] However, at trial Mr. Salinas admitted that the individual in charge of maintenance at Fresco, Mr. Willie Baltodano, spoke Spanish and distributed clothing to bussers — corroborating Mr. Scotto's testimony regarding Mr. Baltodano's role at the Restaurant.  Def. Ex. K ¶ 9; *see also* Def. Ex. L ¶ 13.

[39] *See also* Pl. Ex. 104 ¶ 55, Pl. Ex. 109 ¶ 51, Pl. Ex. 112 ¶ 48, Pl. Ex. 105 ¶ 55, Pl. Ex. 115 ¶ 50, Pl. Ex. 114 ¶ 43, Pl. Ex. 110 ¶ 51, Pl. Ex. 111 ¶ 54, Pl. Ex. 106 ¶ 52, Pl. Ex. 108 ¶ 52, Pl. Ex. 107 ¶ 46, Pl. Ex. 116 ¶ 55.

[40] *See* Tabs 45-49 of Vol. II of Defendants' Pretrial Filings for copies of the sample waiter tip out

admittedly veterans of the Restaurant industry (Pl. Br. at 27) — understood that Fresco was a pooled house[41], and had sufficient understanding of the number of *hours* reflected on their pay stubs.[42]  It is simply unbelievable that any of the Plaintiffs were clueless that Fresco was paying them a tipped minimum wage.  *See Upadhyay v. Sethi*, 2012 WL 3100601, at *7 (S.D.N.Y. July 31, 2012) (rejecting testimony of plaintiff who "dramatically undersold her facility with numbers" in an attempt to gain an advantage in the litigation).

For this reason, Plaintiffs argue that Defendants' supposed failure to strictly comply with regulatory requirements pertaining to their pay stubs and annual wage notices also entitle them to the same recovery.  But Plaintiffs are wrong on both counts.

First, Plaintiffs misleadingly argue that their paystubs did not satisfy the "pre-2011 NYLL requirement" of listing "allowances" as a pre-requisite for paying the tipped minimum wage.  (Pl. Br. at 18.)  As explained above, no such requirement was in effect prior to January 1, 2011.  Plaintiffs' reliance on *Copantitla v. Fiskardo Estiatorio, Inc.*, 788 F. Supp. 2d 253 (S.D.N.Y. 2011) is therefore misplaced, especially in light of the fact that — unlike Fresco — the defendants in *Copantitla* failed to offer <u>any</u> evidence that they informed employees that they intended to take a tip credit, or that they posted the required notices about the minimum wage laws.  *Id.* at 288-89.

Second, with respect to the annual notices, it is undisputed that (a) Plaintiffs received and signed these notices in 2011, 2012 and 2013, and (b) the notices contained all of the information

---

worksheets, weekly tip calculation records, and paystubs attached to Def. Ex. M.

[41] Pl. Ex. 104 ¶ 55, Pl. Ex. 109 ¶ 51, Pl. Ex. 112 ¶ 48, Pl. Ex. 105 ¶ 55, Pl. Ex. 115 ¶ 50, Pl. Ex. 114 ¶ 43, Pl. Ex. 110 ¶ 51, Pl. Ex. 111 ¶ 54, Pl. Ex. 106 ¶ 52, Pl. Ex. 108 ¶ 52, Pl. Ex. 107 ¶ 46, Pl. Ex. 116 ¶ 55.

[42] Pl. Ex. 104 ¶¶ 108-09, Pl. Ex. 109 ¶¶ 106-07, Pl. Ex. 112 ¶¶ 93-94, Pl. Ex. 105 ¶¶ 111-12, Pl. Ex. 115 ¶¶ 101-02, Pl. Ex. 114 ¶¶ 93-95, Pl. Ex. 110 ¶¶ 103-05, Pl. Ex. 113 ¶¶ 96-97, Pl. Ex. 111 ¶¶ 109-10, Pl. Ex. 106 ¶¶ 102-03, Pl. Ex. 108 ¶¶ 97-98, Pl. Ex. 107 ¶¶ 85-86, Pl. Ex. 116 ¶¶ 104-05.

required under 12 N.Y.C.R.R. § 146-2.2(d).[43]   (Fact Stip. 14; Pl. Exs. 30, 32, 38, 40, 44, 46, 50,

54, 58, 61, 65, 68.)   The only real dispute is whether Defendants were obligated to provide

Spanish-language notices in 2011.   (*See* Pl. Br. at 18; *see also* 12 N.Y.C.R.R. § 146-2.2(a)(2)

(requiring that a notice also be provided in an employee's "primary language").)   But Plaintiffs'

argument that they did not know what they were signing (or did not understand enough English

to comprehend the 2011 notices) is undermined by their own testimony.   In addition to testifying

that they understood information contained on their weekly paystubs, during the trial Plaintiffs

repeatedly demonstrated that they were sufficiently familiar with English to review their

declarations (and/or prior deposition testimony), as well as other documentation furnished by the

Restaurant, like their weekly schedules.   Accordingly, their declaration testimony regarding their

facility with the English-language should not be credited.   *See Upadhyay*, 2012 WL 3100601, at

*6-7 (rejecting plaintiff's testimony that she did not speak English after she "utilized certain

English words…when convenient" and "answered questions before the interpreter had finished

translating them and could tell when the interpreter was not translating her words correctly.").

Given Mr. Scotto's efforts to post Spanish-language wage-and-hour notices (and have Mr.

Baltodano sit in as a translator during meetings to discuss personnel matters, Def. Ex. K ¶¶ 9, 38;

Def. Ex. L ¶ 13.), any failure to provide a Spanish-language form in 2011 amounts to nothing

more than a no-harm-no-foul violation.   *Cf. Mendez*, 2014 WL 4276418, at *7 (declining to

credit plaintiffs' testimony "that they never received or signed a copy of the 2012 [annual] notice

---

[43] Although Plaintiffs argue that Defendants should be penalized for failing to provide them with
a copy (Pl. Br. at 18), the regulation only requires that copies of signed notices be retained by the
employer be kept on file for 6 years.   *See* 12 N.Y.C.R.R. § 146-2.2(c).   Plaintiffs' argument that
the notices were somehow deficient because the Restaurant should have listed the depressed
hourly rate of pay that they are advocating for in this litigation (as opposed to the $5.00 tipped
minimum wage rate actually listed on the forms) should also be rejected, as the regulation also
states that an employer's form will be deemed compliant so long as it meets the disclosure
requirements listed in 12 N.Y.C.R.R. § 146-2.2(d).

of pay" when it was "beyond reasonable dispute that they received and signed [annual notices in] 2011 and 2013 … and it [would be] illogical to conclude that Defendants would suddenly stop complying with the law in 2012 only to begin again in 2013.")   In any event, because Plaintiffs cannot prevail on their time-shaving claim (*see* Section I.C.I, *supra*), there is no evidence that they ever received *less* than the tipped minimum wage, and Defendants are entitled to the affirmative defense available under NYLL § 198(1-b).

## IV.   PLAINTIFFS ARE NOT ENTITLED TO A THREE-YEAR STATUTE OF LIMITATIONS PERIOD UNDER THE FLSA

Under the FLSA, a two-year limitations period is warranted unless Plaintiffs prove that any violations were willful, which would extend the limitations period to three years.  (Law Stip. 4.)  Plaintiffs have also failed to meet their burden of proof in this regard.[44]  (Pl. Br. at 47.)

"An employer willfully violates the FLSA when it either knew or showed reckless disregard for … whether its conduct was prohibited by the Act."  *Kuebel v. Black & Decker Inc.,* 643 F.3d 352, 366 (2d Cir.2011) (citation omitted).  "Mere negligence is insufficient."  *Young v. Cooper Cameron Corp.,* 586 F.3d 201, 207 (2d Cir.2009).  An employer may act unreasonably and yet not recklessly.  *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, n. 13 at 135 (1988). "Recklessness is defined as[,] at the least, … an extreme departure from the standards of ordinary care[,] to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.,* 553 F.3d 187, 198 (2d Cir.2009) (citation omitted).  Reckless disregard of a fact requires "subjective awareness" of the probability of the existence of the fact.  *See, e.g., Celle v. Filipino Reporter Enters.*, 209 F.3d 163, 182 (2d Cir. 2000) (citation omitted)

---

[44] Because the Court deferred consideration of damages until after making a determination on liability in its August 7, 2014 Bifurcation Order, Plaintiffs' arguments regarding the applicability of any liquidated damages under the FLSA or NYLL (for violations after November 24, 2009) aware are premature at this juncture.  (*See* Dkt. 49; Law Stips. 14-15.)

(defamation).

Here, Plaintiffs argue that "Defendants knew at the very least that there was a high likelihood that their pay practices violated the law" based on the fact that Fresco had previously been sued by a group of waiters in *Gillian v. Starjem Rest. Corp.*, 10-cv-6056-JSR (S.D.N.Y.). (Pl. Br. at 48.) But this is hardly evidence of willfulness, particular in light of the fact that Judge Rakoff <u>denied</u> summary judgment on the copycat theories of tip pool violations at issue here. *Gillian v. Starjem Rest. Corp.*, 2011 WL 4639842, at *5 (S.D.N.Y. Oct. 4, 2011). Judge Rakoff also denied class treatment of the *Gillian* plaintiffs' shift pay claims precisely because the length of each service employee's shift varied — a reality that Plaintiffs have steadfastly refused to acknowledge in this case. *Id.* at *6. The *Gillian* decision is hardly evidence that these practices were "so obvious[ly]" illegal that Defendants acted recklessly in continuing any of the challenged practices in its wake. Indeed, both the time clock and the 3% administrative fee were implemented in June 2011, *i.e.*, approximately four months <u>before</u> the *Gillian* decision was issued on October 3, 2011. (Fact Stip. 16; Def. Ex. M ¶ 45.) Accordingly, all Plaintiffs have established is that these practices were challenged — not that they were unlawful. *See Hart v. Rick's Cabaret Intern'l., Inc.*, 967 F.Supp. 2d 901, 938 (S.D.N.Y. 2013) (explaining that adhering to "a practice in the face of legal risk" does not imply a finding of recklessness).

To the extent Plaintiffs' rely on Mr. Scotto's testimony about his subjective understanding as to whether these practices were, in fact, unlawful, this is also insufficient. (Pl. Br. at 47.) Judge Cote's decision in *McLean v. Garage Mgmt. Corp.*, 2012 WL 1358739 (S.D.N.Y. Apr. 19, 2012) is instructive. In that case — like the Plaintiffs here — the plaintiff did not argue that the defendant employer had "actual knowledge" that its compensation practices were unlawful. *Id.* at *7. But they also failed to prove that the defendant was "subjectively

aware of a substantial danger that [its] compensation [practices] violated the FLSA, but chose to stick with it nonetheless." *Id.* Plaintiffs cite to no proof that Mr. Scotto actually knew (or should have known) that any of the practices at Fresco were illegal, but decided to keep in them in place anyway. (Pl. Br. at 48.) With respect to Plaintiffs' tip pooling claim, Mr. Scotto consistently and credibly testified at trial that it was always his understanding that owners and managers who performed hiring and firing functions could not participate in the tip pool. (Tr. 596:15-19; *see also* Def. Ex. K ¶¶ 33, 37-38, 44.) As he is the only individual with meaningful responsibility in this regard, allowing individuals whose primary responsibility is service to participate in the tip pool can hardly be said to be reckless.

With respect to Plaintiffs' shift pay claim, Mr. Scotto also credibly testified that he capped the number of scheduled shifts to seven per week so that they would actually work less than 40 hours, but be paid for more. *See* Section I.C.2, *supra*. This practice was also corroborated by Ms. Gelman. *Id.* This testimony completely undermines Plaintiffs' argument that the Restaurant paid shift pay (or for that matter, a tipped minimum wage) in order to save on labor costs. Without any proof that Defendants "knowingly risked violating the FLSA in order to save money," Plaintiffs' bid for a three-year statute of limitations period under the FLSA must be denied. *McLean*, 2012 WL 1358739 at *8 (citing *Reich v. Waldbaum*, 52 F.3d 35, 41 (2d Cir. 1995)).

## V.   PLAINTIFFS HAVE NO PROOF THAT MARION SCOTTO IS AN EMPLOYER

Most of the arguments set forth by Plaintiffs with respect to Marion Scotto's alleged personal liability, have already been addressed in Defendants' Brief and need not be repeated herein. (*See* Def. Br. at 49-50.) Their Brief in this regard is more notable for what it does not contain: citations to any record evidence as to the factors that matter when attempting to impose

personal liability on an individual.

Plaintiffs correctly cite to the applicability of the factors set forth in *Carter v. Dutchess Community College*, 735 F.2d 8 (2d Cir. 1984), but fail to come forward with record evidence concerning their applicability.  At page 45 of their brief, they assert that "Marion Scotto was actually involved in the hiring and firing of employees, and had authority to hire and fire employees."  Not surprisingly, they do not provide a single record citation to support this assertion concerning a principle *Carter* factor.  It does not stop there.  In the very next sentence, they claim that "she supervised or controlled employee schedules…."  Again, no citation to the record to support this assertion.  Next, they assert that "she determined the rate and method of payment…."  Yet again, no citation to the record for their claim that this *Carter* factor was satisfied.  Finally, they make no assertion at all with respect to the fourth *Carter* factor; maintenance of employment records.  In all, they have failed to come forward with any record evidence that Marion Scotto does any of the things set forth in *Carter*.

The lack of citations to record evidence concerning the *Carter* factors is telling.  It is yet another example of saying anything, regardless of whether it is true or finds support in the record, simply if they believe that it supports their claims.

Marion Scotto had very limited involvement with the Plaintiffs, and none whatsoever when it came to their terms and conditions of employment.  As a result, she cannot be held personally responsible under the applicable laws.

## CONCLUSION

For the reasons set forth above, Plaintiffs' minimum wage, overtime, misdirected tip claims, and uniform purchase claims should be dismissed, and Marion Scotto should be dismissed as a Defendant to this action.

Date:   January 28 2015
        New York, New York               Respectfully submitted,


                                         /s/ Craig R. Benson
                                         Craig R. Benson
                                         Naveen Kabir
                                         LITTLER MENDELSON, P.C.
                                         900Third Avenue
                                         New York, NY  10022.3298
                                         212.583.9600
                                         Attorneys for Defendants