UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ENRIQUE SALINAS, ALFREDO RODRIGUEZ,
ANGEL CEDENO, CHRISTIAN URGILES,
FRANCISCO LUGO, JOSE AMEZQUITA, LUIS
ROBALLO, MIGUEL CERVANTES, NAHUN
FLORES, PABLO ALVARADO, PABLO
FRANCISCO-LOPEZ, VALENTIN
XOCHIPILTECATL, and VICENTE LEON,
individually and on behalf of others similarly
situated,

Plaintiffs,

-against-

STARJEM RESTAURANT CORP. (d/b/a
FRESCO BY SCOTTO), MARION SCOTTO,
and ANTHONY SCOTTO,

Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _8/12/15_

13 Civ. 2992 (AT)

**OPINION**
**AND ORDER**

ANALISA TORRES, District Judge:

I.   Overview

In this action, Plaintiffs, current and former employees of the restaurant known as Fresco

by Scotto, allege that Defendants, Starjem Restaurant Corp. (d/b/a Fresco by Scotto), Marion

Scotto, and Anthony Scotto, violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et*

*seq.*, and the New York Labor Law ("NYLL"), §§ 190 and 650 *et seq.*  In particular, Plaintiffs

allege that Defendants: (1) improperly took a tip credit against Plaintiffs' wages; (2) failed to pay

Plaintiffs for all hours worked; (3) failed to provide Plaintiffs written notices and wage

statements compliant with NYLL § 195; (4) wrongly required Plaintiffs to cover the costs of

uniforms and crumbers; and (5) failed to pay Plaintiffs the "spread of hours" premium mandated

by the New York Commissioner of Labor's Minimum Wage Order, codified at N.Y. Comp.

Codes R. & Regs. tit. 12, § 146-1.6.

The Court held a bench trial from December 8 to 16, 2014, to determine Defendants' liability,[1] if any.[2]  Post-trial memoranda were fully submitted on January 28, 2015.

At trial, Plaintiffs called Pablo Alvarado, Jose Amezquita, Miguel Caravantes, Angel Cedeño, Nahun Flores, Pablo Francisco Lopez, Vicente Leon, Francisco Lugo, Luis Roballo, Alfredo Rodriguez, Enrique Salinas, Christian Urgiles, and Valentin Xochipiltecatl (*i.e.*, the 13 Plaintiffs) as witnesses.  Defendants called Natasha Gelman, Anthony Scotto, Marion Scotto, and Attilio Vosilla.  Defendants also submitted excerpts from the deposition of Brent Drill.  Plaintiffs adduced counter-designations from the deposition.

The Court finds the lion's share of Plaintiffs' testimony credible.  This determination is based on the substance of Plaintiffs' testimony and their demeanor at trial.  Although there were some inconsistencies in Plaintiffs' testimony, the Court considers them to be honest errors, not intentional lies.  The Court also finds the testimony of Marion Scotto and, for the most part, that of Gelman credible.  By contrast, the Court finds Anthony Scotto's and Vosilla's testimony less than credible.  This determination is likewise based on the substance of their testimony and their demeanor.  Anthony Scotto was a flippant, evasive, and combative witness.  *See, e.g.*, Tr. 516:19-517:5 ("Q. Were those answers [given at your deposition] correct and truthful?  A. Yes, sir.  Q. So, your mother had been present at some interviews?  A. Possibly I was taking things a little bit more lackadaisical on this conversation with you, sir.  Q. Referring to the conversation at the deposition?  A. Yes, sir.  I think I was . . . just being a little silly with you, sir.  Q. Okay. And you were under oath at that time, correct?  A. Still possibly being silly, sir."); Tr. 536:7-9

---

[1] By order dated August 7, 2014, the Court agreed to defer consideration of damages until after making a liability determination.  ECF No. 49 at 1.

[2] At the final pre-trial conference held on December 4, 2014, the parties stipulated that Plaintiffs were paid the "spread of hours" premium after, but not before, February 2011.

("Q. Friday we also discussed the Fresco employee policy guide. Do you recall that? A. Sorry, sir. Everything is a blur these days."); Tr. 579:8-13 ("Q. Other than your affidavit, is Mr. Vosilla described in any documents as a maître d' or service manager? A. I don't know. Q. At your deposition d[id] you ever refer to him as maître d'? A. Sir, if I wasn't getting sued would you really care what his title was?"). Vosilla was uncommonly reticent and appeared reluctant to provide testimony adverse to Defendants.

"In an action tried on the facts without a jury . . . the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). Following are the Court's findings of fact and conclusions of law.

II.    Findings of Fact

A.  The Parties

1.  Fresco by Scotto

Fresco by Scotto ("Fresco" or the "Restaurant") is an Italian restaurant located in the Midtown East neighborhood of Manhattan. The Restaurant is owned and operated by Starjem Restaurant Corp. ("Starjem"). Tr. 511:12-14.

2.  Plaintiffs

a.  Pablo Alvarado

Alvarado was employed at Fresco from October 8, 1998 until November 13, 2012. Joint Stipulation of Fact ("Jt. Stip.") ¶ 10, Nov. 11, 2014, ECF No. 56. He worked as a runner. *Id.*

b.  Jose Amezquita

Amezquita worked at Fresco from January 1, 2012 until August 27, 2013. *Id.* ¶ 6. Over the course of his employment, Amezquita worked in the following positions: (1) busser; (2)

barback; (3) coffee preparer; and (4) stocker.  Tr. 429:25-430:7; Amezquita Decl. ¶ 9, Pl. Ex. 114.

c.   Miguel Caravantes

Caravantes worked at Fresco from September 21, 1999 until February 21, 2013.  Jt. Stip. ¶ 8.  Over the course of his employment, Caravantes worked in the following positions: (1) busser; (2) barback; (3) coffee preparer; (4) stocker; and (5) runner.  Tr. 410:9-22, 417:14-15; Caravantes Decl. ¶ 9, Pl. Ex. 113.

d.   Angel Cedeño

Cedeño began working at Fresco on March 1, 2011.  Jt. Stip. ¶ 3.  At the time of trial, Cedeño was still employed there.  *Id.*  Over the course of his employment, Cedeño has worked in the following positions: (1) busser; (2) barback; (3) coffee helper; and (4) stocker.  Tr. 391:13-392:14; Cedeño Decl. ¶ 10, Pl. Ex. 112.

e.   Nahun Flores

Flores worked at Fresco from May 1, 1998 until May 1, 2013.  Jt. Stip. ¶ 9.  Over the course of his employment, Flores worked in the following positions: (1) busser; (2) barback; (3) coffee preparer; (4) stocker; and (5) runner.  *Id.*; Tr. 362:5-363:4; Flores Decl. ¶ 10, Pl. Ex. 111. During his last ten years at Fresco, Flores spent approximately 90 percent of his shifts in the coffee preparer position.  Tr. 362:5-17.

f.   Pablo Francisco Lopez

Francisco Lopez worked at Fresco from November 1, 2007 until January 15, 2012.  Jt. Stip. ¶ 11.  Over the course of his employment, Francisco Lopez worked in the following positions: (1) busser; (2) barback; (3) coffee preparer; and (4) stocker.  Tr. 279:2-6; Francisco Lopez Decl. ¶ 11, Pl. Ex. 108.

4

g.  Vicente Leon

Leon began working at Fresco on January 1, 1999.  Jt. Stip. ¶ 13.  At the time of trial,

Leon was still employed there.  *Id.*  Over the course of his employment, Leon has worked in the

following positions: (1) busser; (2) barback; (3) coffee helper; (4) coffee preparer; (5) stocker;

and (6) runner.  *Id*; Tr. 478:2-14, 482:23-24, 492:23-24; Leon Decl. ¶¶ 9-11, Pl. Ex. 116.

h.  Francisco Lugo

Lugo worked at Fresco from November 1, 2011 until February 7, 2014.  Jt. Stip. ¶ 5.

Over the course of his employment, Lugo worked in the following positions: (1) busser; (2)

barback; (3) coffee helper; and (4) stocker.  Tr. 460:10-24, 464:8-9; Lugo Decl. ¶ 10, Pl. Ex. 115.

i.  Luis Roballo

Roballo worked at Fresco from December 1, 2009 until April 4, 2013.  Jt. Stip. ¶ 7.  Over

the course of his employment, Roballo worked in the following positions: (1) busser; (2)

barback; (3) coffee preparer; and (4) stocker.  *Id.*; Tr. 333:25-334:10, 353:11-15; Roballo Decl. ¶

11, Pl. Ex. 110.

j.  Alfredo Rodriguez

Rodriguez began working at Fresco on March 1, 2011.  Jt. Stip. ¶ 2.  At the time of trial,

Rodriguez was still employed there.  *Id.*  Over the course of his employment, Rodriguez has

worked in the following positions: (1) busser; (2) barback; and (3) stocker.  Tr. 312:7-20;

Rodriguez Decl. ¶ 10, Pl. Ex. 109.

k.  Enrique Salinas

Salinas worked at Fresco from January 1, 2006 until April 26, 2013.  Jt. Stip. ¶ 1.  Over

the course of his employment, Salinas worked in the following positions: (1) busser; (2) barback;

(3) coffee preparer; (4) coffee helper; and (5) stocker.  Tr. 11:6-8, 48:7-9, 55:15-19, 70:9-20; Jt.

Stip. ¶ 1; Salinas Decl. ¶¶ 10-11, Pl. Ex. 104. Salinas spent 75 to 90 percent of his shifts in the stocker position. Tr. 70:9-20.

### l.   Christian Urgiles

Urgiles worked at Fresco from January 1, 2006 until April 23, 2013. Jt. Stip. ¶ 4. Over the course of his employment, Urgiles worked in the following positions: (1) busser; (2) barback; (3) coffee preparer; and (4) stocker. Tr. 137:21-23, 179:12-15, 189:4-6; Urgiles Decl. ¶ 10, Pl. Ex. 105.

### m.   Valentin Xochipiltecatl

Xochipiltecatl worked at Fresco from June 17, 2009 until November 3, 2010. Jt. Stip. ¶ 12. Over the course of his employment, Xochipiltecatl worked in the following positions: (1) busser; and (2) stocker. Tr. 261:6-8; Xochipiltecatl Decl. ¶ 10, Pl. Ex. 107.

### 3.   Individual Defendants

### a.   Anthony Scotto

Anthony Scotto is the general manager of Fresco. Tr. 511:8-11. He is also a shareholder and the secretary-treasurer of Starjem. Tr. 511:12-512:5; A. Scotto Aff. ¶ 3, Def. Ex. K. He is usually at the Restaurant every day that it is open. A. Scotto Aff. ¶ 4. On weekdays, he is there from 8:30 a.m. until 10:00 p.m. *Id.* On Saturdays, he is there for a short period at around 7:00 a.m., and again from 2:00 p.m. until 9:00 p.m. Tr. 512:12-18; A. Scotto Aff. ¶ 4. During the summer, he is often not at the Restaurant on Saturdays. Tr. 514:17-25. As general manager, Anthony Scotto is responsible for managing the business and running the day-to-day operations. A. Scotto Aff. ¶ 3. In particular, he is involved in: (1) hiring employees; (2) disciplining employees; (3) firing employees; (4) scheduling employees for shifts; (5) determining employee

compensation; and (6) maintaining employment records.  Tr. 236:10-23, 390:17-19, 409:19-410:8, 429:14-17; A. Scotto Aff. ¶¶ 4-5, 10, 13, 17-18; A. Scotto Supp. Decl. ¶ 12, Def. Ex. L.

        b.  Marion Scotto

        Marion Scotto is the chief executive officer, president, and majority shareholder of Starjem.  Tr. 511:24-512:2, 681:19-682:2, 682:14-16; M. Scotto Aff. ¶ 4, Def. Ex. O.  She is typically at the Restaurant every day that it is open.  Tr. 685:8-12; M. Scotto Aff. ¶ 11.  On weekdays, she is there from 12:00 p.m. until 8:00 p.m. or 8:30 p.m.  M. Scotto Aff. ¶ 11.  Marion Scotto's main duties include: (1) greeting customers when they arrive at the Restaurant; (2) helping the host seat customers; (3) checking on customers throughout their meal; and (4) making arrangements for private parties.  Tr. 524:5-10, 685:15-19; M. Scotto Aff. ¶¶ 7-8, 12.  In performing these duties, Marion Scotto may tell a busser to: (1) reset a table to accommodate additional or fewer customers; (2) arrange tables in a certain manner for a private party; (3) bring bread or an appetizer to a customer's table; or (4) clean up a spill or similar mess.  Tr. 122:20-123:5, 683:22-684:4; M. Scotto Aff. ¶¶ 15-16; Amezquita Decl. ¶ 36; Caravantes Decl. ¶ 47; Cedeño Decl. ¶ 41; Flores Decl. ¶ 48; Francisco Lopez Decl. ¶ 45; Leon Decl. ¶ 47; Lugo Decl. ¶ 43; Roballo Decl. ¶ 49; Rodriguez Decl. ¶ 44; Salinas Decl. ¶ 48; Urgiles Decl. ¶ 48; Xochipiltecatl Decl. ¶ 39.  It is also "not uncommon" for her to provide one of the two owner signatures on employees' paychecks.  M. Scotto Aff. ¶ 10; *accord* Tr. 523:18-524:4, 685:13-14.  In addition, Marion Scotto is sometimes involved in hiring hosts and hostesses.  Tr. 254:16-18, 515:20-516:20, 684:5-12; Alvarado Decl. ¶ 48, Pl. Ex. 106; Amezquita Decl. ¶ 40; Caravantes Decl. ¶ 51; Cedeño Decl. ¶ 45; Francisco Lopez Decl. ¶ 49; Leon Decl. ¶ 51; Urgiles Decl. ¶ 52; Xochipiltecatl Decl. ¶ 43.  She is not involved in: (1) hiring any other employees; (2) disciplining employees; (3) firing employees; (4) scheduling employees for shifts; (5) monitoring

7

employee attendance; or (6) determining employee compensation.  M. Scotto Aff. ¶¶ 4-5, 10, 13-14, 23.

### B.  Managers

#### 1.  Attilio Vosilla

Vosilla has worked as a manager at Fresco since 1999.  Tr. 663:24-665:6; Pl. Ex. 74 at 7996 ("Fresco Policy Document" dated October 2007 identifying Vosilla as a "restaurant manager").  His job duties have remained largely the same since the beginning of his employment.  Tr. 665:2-6, 676:22-24, 679:24-680:7.[3]  Vosilla is typically at the Restaurant on Tuesdays, Wednesdays, Thursdays, Fridays, and Saturdays from 3:00 p.m. or 4:00 p.m. until 12:30 a.m. or 1:00 a.m.  Vosilla Aff. ¶ 6, Def. Ex. N.  On occasion, Vosilla serves as a "party captain."  *Id.* ¶ 27.  A party captain is responsible for overseeing the service for one or more private parties.  *Id.* ¶¶ 28-30.  Vosilla's primary duty, though, is to oversee the dinner service at the Restaurant, which entails supervising and directing runners, bussers, and waiters and assisting customers as needed.  *Id.* ¶¶ 4, 22, 41; A. Scotto Decl. ¶¶ 30-31; Alvarado Decl. ¶ 73; Amezquita Decl. ¶ 62; Caravantes Decl. ¶ 72; Cedeño Decl. ¶ 65; Flores Decl. ¶ 75; Francisco Lopez Decl. ¶ 70; Leon Decl. ¶ 73; Lugo Decl. ¶ 72; Roballo Decl. ¶ 73; Rodriguez Decl. ¶ 72; Salinas Decl. ¶ 75; Urgiles Decl. ¶ 78; Xochipiltecatl Decl. ¶ 65.  Since at least 2007, Vosilla has prepared the initial draft of the weekly schedule of employees' shifts, which is submitted to Anthony Scotto for final approval.  Tr. 666:10-667:22, 676:20-21.  In connection with this duty, Vosilla takes into account scheduling requests from employees and is able to authorize shift swaps between employees after the schedule is posted.  Tr. 168:10-172:20, 668:18-669:8;

---

[3] The Court rejects Defendants' claim that Vosilla's job duties and managerial authority changed in January 2013.  *See* Tr. 561:2-12; 678:13-679:4.  Vosilla testified that his duties have "[n]ot [changed] too much" since 1999, Tr. 665:2-6, and that the promotion he received in January 2013 was "in title only," Tr. 679:24-680:7.

Alvarado Decl. ¶ 75; Amezquita Decl. ¶ 64; Caravantes Decl. ¶ 74; Cedeño Decl. ¶ 67; Flores

Decl. ¶ 77; Francisco Lopez Decl. ¶ 72; Leon Decl. ¶ 75; Lugo Decl. ¶ 74; Roballo Decl. ¶ 75;

Rodriguez Decl. ¶ 74; Salinas Decl. ¶ 77; Urgiles Decl. ¶ 80; Xochipiltecatl Decl. ¶ 67.   Vosilla

has also interviewed applicants and made suggestions to Anthony Scotto about whether a

particular applicant should be hired.  Tr. 672:12-21, 676:11-16; Pl. Ex. 96 (printout of Vosilla's

LinkedIn page, which states that Vosilla "[i]nterview[s] and hire[s] new employees" at Fresco);

Alvarado Decl. ¶ 79; Amezquita Decl. ¶ 70; Caravantes Decl. ¶ 77; Flores Decl. ¶ 83; Leon Decl.

¶ 79; Lugo Decl. ¶ 78; Roballo Decl. ¶ 80; Rodriguez Decl. ¶ 80; Urgiles Decl. ¶ 85;

Xochipiltecatl Decl. ¶ 70.  In addition, Vosilla has: (1) signed employment documents on behalf

of the Restaurant, Tr. 664:22-24, 672:22-674:14; Pl. Ex. 37 ("Employee Reference Guide

Receipt and Acknowledgment" dated July 6, 2007, which Vosilla signed as "Company

Representative"); Pl. Ex. 38 (wage notice dated March 9, 2011, which Vosilla signed as

"Company Representative"); Pl. Ex. 39 (I-9 form dated March 12, 2011, which Vosilla signed as

"Employer or Authorized Representative"); (2) disciplined employees orally and in writing, Tr.

324:13-17, 665:7-666:3; Amezquita Decl. ¶ 66; Roballo Decl. ¶ 77; Rodriguez Decl. ¶ 76; Pl.

Exs. 35, 63 (written disciplinary communications issued by Vosilla); (3) suspended employees,

Tr. 376:23-377:20, 379:10-381:14, 444:11-447:11; Amezquita Decl. ¶ 65; Flores Decl. ¶ 79; and

(4) fired employees, Tr. 105:18-106:14, 122:14-19, 172:21-178:10, 324:18-22, 396:10-25;

Cedeño Decl. ¶ 69; Flores Decl. ¶ 80; Rodriguez Decl. ¶ 77; Salinas Decl. ¶ 79; Urgiles Decl. ¶

82.[4]

---

[4] The Court does not credit Vosilla's claim in his trial affidavit that he lacks "the authority to suspend or terminate employees . . . without getting prior approval from Anthony" and "ha[s] not been involved in the decision to hire, suspend or terminate any bussers or runners," Vosilla Aff. ¶¶ 44-45, as these statements contradict: (1) Anthony Scotto's testimony that Vosilla has the authority to hire and fire employees, Tr. 561:2-4; (2) Vosilla's testimony that he has interviewed applicants and made suggestions to Anthony Scotto about whether a particular applicant should be hired, Tr. 672:12-21; (3) Vosilla's assertion on his LinkedIn page that he "[i]nterview[s] and hire[s] new employees" at Fresco, Pl. Ex. 96; and (4) Plaintiffs' examples of Vosilla wielding disciplinary authority, Tr. 105:18-

2. Brent Drill

Drill worked at Fresco from April 2002, Drill Dep. 12:25-13:4, Jan. 6, 2014, until July

25, 2014, A. Scotto Aff. ¶ 37.  He was hired to work as a waiter, but was promoted to the

position of "floor captain" after less than a year.  Drill Dep. 14:16-15:4.  By October 2007, Drill

had become a manager.  Pl. Ex. 74 at 7996 ("Fresco Policy Document" dated October 2007

identifying Drill as a "restaurant manager").[5]  Drill's primary duty as a manager was to oversee

the lunch service at the Restaurant, which entailed supervising and directing runners, bussers,

and waiters and assisting customers as needed.  *See* Drill Dep. 22:25-23:22, 25:9-13; A. Scotto

Decl. ¶¶ 36-37; Alvarado Decl. ¶¶ 62, 64-65, 70; Amezquita Decl. ¶¶ 50-51, 58; Caravantes

Decl. ¶¶ 60-61, 68; Cedeño Decl. ¶¶ 54-55, 60; Flores Decl. ¶¶ 61-63, 71; Francisco Lopez Decl.

¶¶ 59-61, 66, 68; Leon Decl. ¶¶ 62-63, 67; Lugo Decl. ¶¶ 57-61; Roballo Decl. ¶¶ 59-60, 64, 70;

Rodriguez Decl. ¶¶ 58-61, 68; Salinas Decl. ¶¶ 62-64, 70; Urgiles Decl. ¶¶ 63-66, 73;

Xochipiltecatl Decl. ¶¶ 53-54, 61.  He also oversaw the dinner service on Mondays.  *See* Drill

Dep. 101:17-20; Alvarado Decl. ¶ 71; Amezquita Decl. ¶ 60; Caravantes Decl. ¶ 71; Cedeño

Decl. ¶ 63; Flores Decl. ¶ 73; Francisco Lopez Decl. ¶ 67; Leon Decl. ¶ 71; Lugo Decl. ¶ 71,

Roballo Decl. ¶ 72; Rodriguez Decl. ¶ 71; Salinas Decl. ¶ 73; Urgiles Decl. ¶ 76; Xochipiltecatl

Decl. ¶ 64.  In addition, as a manager, Drill: (1) accepted resumes from applicants, asked them

about their availability, invited them to return to the Restaurant for training, and called their

---

106:14, 122:14-19, 172:21-178:10, 324:18-22, 376:23-377:20, 379:10-381:14, 396:10-25, 444:11-447:11; Amezquita Decl. ¶ 65; Cedeño Decl. ¶ 69; Flores Decl. ¶¶ 79-80; Rodriguez Decl. ¶ 77; Salinas Decl. ¶ 79; Urgiles Decl. ¶ 82.

[5] The Court rejects Defendants' claim that Drill did not take on a managerial role until January 1, 2013, *see* Tr. 591:7-9; Drill Dep. 15:24-16:11; A. Scotto Aff. ¶¶ 36-37, in light of: (1) Fresco's "Policy Document" identifying Drill as a "restaurant manager" since at least October 2007, Pl. Ex. 74 at 7996; (2) Anthony Scotto's testimony that in January 2013, Drill's job changed "in title and salary," but "what [Drill] did every day did not change at all," Tr. 591:16-592:19; and (3) Plaintiffs' assertions that they understood Drill to be a manager prior to January 2013 and did not observe any change in Drill's authority or responsibilities in or around January 2013, Tr. 100:16-101:2, 370:3-371:25, 495:13-499:22; Amezquita Decl. ¶ 61; Cedeño Decl. ¶ 64; Flores Decl. ¶ 74; Leon Decl. ¶ 72; Salinas Decl. ¶ 74; Urgiles Decl. ¶ 77.

references, Tr. 121:21-122:13, 156:10-159:18, 272:9-274:6, 541:17-23, 644:4-22; Drill Dep. 43:2-45:14; Francisco Lopez Decl. ¶ 4; Salinas Decl. ¶ 4; Xochipiltecatl Decl. ¶ 4; (2) oversaw new employee training, Tr. 153:22-154:12, 542:17-20; Amezquita Decl. ¶ 54; Caravantes Decl. ¶ 65; Cedeño Decl. ¶ 58; Flores Decl. ¶ 68; Francisco Lopez Decl. ¶¶ 5, 63; Leon Decl. ¶ 65; Lugo Decl. ¶ 64; Roballo Decl. ¶ 67; Rodriguez Decl. ¶ 65; Salinas Decl. ¶ 67; Urgiles Decl. ¶¶ 4, 70; Xochipiltecatl Decl. ¶ 58; (3) gave suggestions to Anthony Scotto about the number of bussers and runners to schedule per shift, Drill Dep. 37:2-18; (4) disciplined employees orally and in writing, Tr. 440:4-444:10, Drill Dep. 23:18-22, 36:11-14, 115:10-22; Amezquita Decl. ¶ 51; Flores Decl. ¶ 62; Francisco Lopez Decl. ¶ 60; Lugo Decl. ¶ 58; Roballo Decl. ¶ 60; Rodriguez Decl. ¶ 59; Salinas Decl. ¶ 63; Urgiles Decl. ¶¶ 64-65; Xochipiltecatl Decl. ¶ 54; (5) suspended employees, Tr. 164:6-168:9, 323:22-324:12, 373:9-379:7; Drill Dep. 104:18-21; Amezquita Decl. ¶ 52; Flores Decl. ¶¶ 65-66; Leon Decl. ¶ 63; Roballo Decl. ¶ 61; Rodriguez Decl. ¶ 63; Salinas Decl. ¶ 66; Urgiles Decl. ¶ 68; Xochipiltecatl Decl. ¶ 56; and (6) fired employees, Tr. 356:6-357:9, 439:16-440:3, 471:10-472:6, 494:8-495:5, 502:25-505:18, 592:20-593:15; Amezquita Decl. ¶ 53; Leon Decl. ¶ 63; Roballo Decl. ¶ 62; Pl. Exs. 36, 59 (written termination notices signed by Drill).

### C. Job Duties

#### 1. Bussers

At Fresco, bussers' main duties include: (1) pouring water for customers; (2) bringing bread to tables; and (3) clearing and resetting tables. Alvarado Decl. ¶ 7; Amezquita Decl. ¶¶ 7, 19; Caravantes Decl. ¶¶ 8, 19; Cedeño Decl. ¶¶ 8, 22; Flores Decl. ¶¶ 8, 22; Francisco Lopez Decl. ¶¶ 9, 22; Leon Decl. ¶¶ 7, 21; Lugo Decl. ¶¶ 8, 22; Roballo Decl. ¶¶ 9, 22; Rodriguez Decl. ¶¶ 8, 22; Salinas Decl. ¶¶ 8, 22; Urgiles Decl. ¶¶ 8, 22; Xochipiltecatl Decl. ¶¶ 8, 20; A. Scotto

Aff. ¶ 6.  At the beginning of a shift, before the Restaurant opens, bussers perform "side work," which includes: (1) folding napkins; (2) placing glasses at their proper stations; (3) filling and bringing ice buckets to their proper stations; (4) cleaning and polishing bread baskets, candleholders, pans, sugar bowls, coffee trays, and milk trays; (5) cleaning mirrors, coffee pots, tea pots, and water pitchers; and (6) sweeping the floor.  Amezquita Decl. ¶ 21; Caravantes Decl. ¶ 21; Cedeño Decl. ¶ 24; Flores Decl. ¶ 25; Francisco Lopez Decl. ¶ 24; Leon Decl. ¶ 24; Lugo Decl. ¶ 24; Roballo Decl. ¶ 25; Rodriguez Decl. ¶ 24; Salinas Decl. ¶ 24; Urgiles Decl. ¶ 24; Xochipiltecatl Decl. ¶ 22.  This beginning-of-shift side work takes approximately 30 minutes to complete.  Tr. 292:9-11, 295:17-296:3, 416:20-25, 460:25-461:16, 462:2-9; Amezquita Decl. ¶ 21; Caravantes Decl. ¶ 21; Cedeño Decl. ¶ 24; Flores Decl. ¶ 25; Francisco Lopez Decl. ¶ 24; Leon Decl. ¶ 24; Lugo Decl. ¶ 24; Roballo Decl. ¶ 25; Rodriguez Decl. ¶ 24; Salinas Decl. ¶ 24; Urgiles Decl. ¶ 24; Xochipiltecatl Decl. ¶ 22.  Bussers also perform side work at the end of their shifts, which includes: (1) cleaning the busser stations, the area of the kitchen where bread is made, and the Restaurant's walls; (2) dumping ice buckets at the busser stations; (3) bringing boxes of water to the bar; (4) sweeping the floor; (5) collecting candleholders; (6) moving tables and chairs; and (7) removing trash from the bar.  Amezquita Decl. ¶ 22; Caravantes Decl. ¶ 22; Cedeño Decl. ¶ 25; Flores Decl. ¶ 26; Francisco Lopez Decl. ¶ 25; Leon Decl. ¶ 25; Lugo Decl. ¶ 25; Roballo Decl. ¶ 26; Rodriguez Decl. ¶ 25; Salinas Decl. ¶ 25; Urgiles Decl. ¶ 25; Xochipiltecatl Decl. ¶ 23.  This end-of-shift side work takes approximately 20 minutes to complete.  Tr. 295:14-296:8; Amezquita Decl. ¶ 21; Caravantes Decl. ¶ 21; Cedeño Decl. ¶ 24; Flores Decl. ¶ 25; Leon Decl. ¶ 24; Lugo Decl. ¶ 24; Roballo Decl. ¶ 25; Rodriguez Decl. ¶ 24; Salinas Decl. ¶ 24; Urgiles Decl. ¶ 24; Xochipiltecatl Decl. ¶ 22.  In addition, bussers routinely perform the following tasks throughout their shifts: (1) cleaning the Restaurant's walls and the

12

photographs and paintings hanging on the walls; (2) stocking goods delivered from vendors; (3) sweeping rugs and carpets; and (4) bringing dishes, chairs, tables, and room dividers between the main dining area and the party rooms. Amezquita Decl. ¶ 20; Caravantes Decl. ¶ 20; Cedeño Decl. ¶ 23; Flores Decl. ¶ 24; Francisco Lopez Decl. ¶ 23; Leon Decl. ¶ 23; Lugo Decl. ¶ 23; Roballo Decl. ¶ 23; Rodriguez Decl. ¶ 23; Salinas Decl. ¶ 23; Urgiles Decl. ¶ 23; Xochipiltecatl Decl. ¶ 21. These tasks take approximately 30 minutes to complete. Amezquita Decl. ¶ 20; Caravantes Decl. ¶ 20; Cedeño Decl. ¶ 23; Flores Decl. ¶ 24; Francisco Lopez Decl. ¶ 23; Leon Decl. ¶ 23; Lugo Decl. ¶ 23; Roballo Decl. ¶ 23; Rodriguez Decl. ¶ 23; Salinas Decl. ¶ 23; Urgiles Decl. ¶ 23; Xochipiltecatl Decl. ¶ 21.

> 2. Runners

Runners' primary duty is to bring food from the kitchen to customers in the dining area. Alvarado Decl. ¶ 9; Caravantes Decl. ¶ 23; A. Scotto Aff. ¶ 7. At the beginning of their shifts, before the Restaurant opens, runners perform side work, which includes: (1) weighing pasta; (2) plucking basil leaves; (3) cutting lemons; (4) preparing artichokes for calamari; (5) setting up plates with artichokes and penne gratin; (6) cleaning dishes, containers, and bread baskets; (7) separating doilies to put on plates; (8) folding napkins; and (9) cutting linens to use for polishing dishes, silverware, and glasses. Alvarado Decl. ¶ 13; Caravantes Decl. ¶ 24. This beginning-of-shift side work takes approximately 15 to 20 minutes to complete. Alvarado Decl. ¶ 13. Runners also perform side work at the end of the lunch shift, which includes: (1) "turning in" plates from the dishwasher station; and (2) preparing artichokes for penne gratin. *Id.* ¶ 15. This end-of-shift side work takes approximately five to 10 minutes to complete. *Id.* In addition, runners routinely perform the following tasks throughout their shifts: (1) cleaning the Restaurant's walls and doors; (2) cutting rags for polishing silverware; and (3) making cookies.

Alvarado Decl. ¶ 11; Caravantes Decl. ¶ 24.  These tasks take approximately 30 to 60 minutes to complete.  Alvarado Decl. ¶ 11.

    3.  Barbacks[6]

Barbacks' duties include: (1) clearing and resetting tables in the bar area; (2) bringing ice, boxes of water, boxes of liquor, silverware, and glasses to the bar; (3) preparing non-alcoholic drinks (*i.e.*, soda and water); (4) serving house wine; (5) washing glasses; (6) cleaning bottles, mirrors, windows, and the bar area; and (7) sweeping the sidewalk in front of the Restaurant.  Tr. 55:15-56:4, 146:23-152:13, 192:21-196:10, 306:16-308:15, 312:19-315:20, 353:11-354:1; Amezquita Decl. ¶ 25; Cedeño Decl. ¶ 27; Flores Decl. ¶ 31; Francisco Lopez Decl. ¶ 28; Leon Decl. ¶ 29; Lugo Decl. ¶¶ 28-29; Roballo Decl. ¶ 30; Rodriguez Decl. ¶¶ 28-29; Urgiles Decl. ¶ 28; Vosilla Aff. ¶ 16.[7]

    4.  Stockers

Stockers' main duties include: (1) cleaning, polishing, and drying glasses, dishes, and silverware; (2) bringing these items from the kitchen to the stocking stations; (3) cleaning the stocker stations; (4) laying down small carpets; (5) cutting rags for polishing glasses, dishes, and silverware; and (6) sweeping the sidewalk in front of the Restaurant.  Alvarado Decl. ¶ 24; Amezquita Decl. ¶¶ 13-14; Caravantes Decl. ¶¶ 14-15; Cedeño Decl. ¶¶ 14-16; Flores Decl. ¶¶ 15-16; Francisco Lopez Decl. ¶¶ 16-17; Leon Decl. ¶¶ 14-15; Lugo Decl. ¶¶ 15-16; Roballo

---

[6] The barback, stocker, and coffee preparer positions are assignments rotated among the bussers.  Tr. 48:7-12, 333:2-10, 410:12-20, 460:13-21; Alvarado Decl. ¶ 6; Amezquita Decl. ¶ 6; Caravantes Decl. ¶ 7; Cedeño Decl. ¶ 7; Flores Decl. ¶ 7; Francisco Lopez Decl. ¶ 8; Leon Decl. ¶ 6; Lugo Decl. ¶ 7; Roballo Decl. ¶ 8; Rodriguez Decl. ¶ 7; Salinas Decl. ¶ 7; Urgiles Decl. ¶ 7; Xochipiltecatl Decl. ¶ 7; Vosilla Aff. ¶¶ 15-16.

[7] None of the witnesses testified as to the precise amount of time that barbacks spend performing each of these tasks.  Roballo and Urgiles, however, provided estimates about the total amount of time they spent doing traditional busser duties when they worked as barbacks.  Roballo Decl. ¶ 30 ("I would spend approximately half my time doing regular busser duties, and half my time doing duties specific to [barbacks]."); Urgiles Decl. ¶ 28 ("I . . . would have to clear and set tables in the bar area, and that would be approximately one hour of my shift as a [barback].  I spent more time doing the other jobs as a [barback] than I did clearing and setting tables."); *accord* Tr. 189:14-190:2, 195:4-8, 353:23-354:1.

Decl. ¶¶ 16-17; Rodriguez Decl. ¶¶ 15-16; Salinas Decl. ¶¶ 15-16; Urgiles Decl. ¶¶ 15-16;

Xochipiltecatl Decl. ¶¶ 14-15; *see also* Tr. 612:10-14, 670:3-7.   At times, stockers are also

required to wash dishes.   Amezquita Decl. ¶ 15; Cedeño Decl. ¶ 17; Flores Decl. ¶ 17; Francisco

Lopez Decl. ¶ 18; Leon Decl. ¶ 16; Lugo Decl. ¶ 17; Roballo Decl. ¶ 18; Rodriguez Decl. ¶ 17;

Salinas Decl. ¶ 17; Urgiles Decl. ¶ 17; Xochipiltecatl Decl. ¶ 16.   In addition, stockers are

sporadically ordered by the chef to "run" food to customers (*i.e.*, to carry food from the kitchen

to tables).   Tr. 23:9-19, 33:5-34:11, 315:21-23, 335:11-19, 414:2-415:13; Amezquita Decl. ¶ 17;

Caravantes Decl. ¶ 16; Cedeño Decl. ¶ 18; Flores Decl. ¶ 19; Francisco Lopez Decl. ¶ 19; Leon

Decl. ¶ 18; Lugo Decl. ¶ 19; Roballo Decl. ¶ 19; Rodriguez Decl. ¶ 19; Salinas Decl. ¶¶ 18-19;

Urgiles Decl. ¶ 19; Xochipiltecatl Decl. ¶ 17.   However, when this occurs during a shift, stockers

spend no more than approximately five to 15 minutes running food.   Tr. 116:16-117:5, 335:15-

19, 415:14-22; Amezquita Decl. ¶ 17; Caravantes Decl. ¶ 16; Cedeño Decl. ¶ 18; Flores Decl. ¶

19; Francisco Lopez Decl. ¶ 19; Leon Decl. ¶ 18; Lugo Decl. ¶ 19; Roballo Decl. ¶ 19;

Rodriguez Decl. ¶ 19; Salinas Decl. ¶ 19.[8]

     5.   Coffee Preparer

The coffee preparer's primary duty is to make coffee and tea.   Alvarado Decl. ¶ 29;

Amezquita Decl. ¶ 23; Caravantes Decl. ¶ 26; Cedeño Decl. ¶ 26; Flores Decl. ¶ 28; Francisco

---

[8] The Court does not credit Anthony Scotto's and Vosilla's claims that stockers run bread and appetizers to customers for the first hour or so of the lunch and dinner service. *See* A. Scotto Aff. ¶ 25; Vosilla Aff. ¶ 15. As an initial matter, these claims are at odds with Anthony Scotto's prior statements. During his deposition, when prompted with questions about the amount of time stockers spend running food, Anthony Scotto did not mention anything about stockers running bread and appetizers for the first hour or so of the service and could not provide an estimate of the amount of time stockers spend running food. Tr. 613:1-614:13. Moreover, Fresco typically schedules only one stocker per shift. *E.g.*, Urgiles Decl. ¶¶ 11-14; A. Scotto Aff. ¶¶ 21, 24; Vosilla Aff. ¶ 15; *see also* Pl. Ex. 26 (weekly shift schedules); Pl. Ex. 92 (sample floor map); Def. Ex. A (weekly shift schedules).   By contrast, Fresco typically schedules two or three runners per shift, Tr. 208:24-209:2; A. Scotto Aff. ¶ 21, and five to seven bussers per shift, *see* Pl. Exs. 26, 92; Def. Ex. A. The Court finds it unbelievable that with these runners and bussers on hand, the Restaurant nonetheless requires the assigned stocker to divert his attention from his main duties—for which he is solely responsible—and spend at least an hour running food. For the same reasons, the Court rejects as not credible Anthony Scotto's contention that a stocker spends half of his shift running food, serving coffee, and clearing and resetting tables. *See* Tr. 612:18-25, 614:14-17; A. Scotto Supp. Decl. ¶ 11.

Lopez Decl. ¶ 26; Leon Decl. ¶ 27; Lugo Decl. ¶ 26; Roballo Decl. ¶ 27; Rodriguez Decl. ¶ 26;

Salinas Decl. ¶ 26; Urgiles Decl. ¶ 26; Xochipiltecatl Decl. ¶ 24.  Additional responsibilities

include: (1) bringing cups, glasses, ice, milk, and assorted ingredients to the coffee station; (2)

cutting lemons, bread, and butter; and (3) filling sugar containers.  Tr. 137:24-138:2, 138:21-

139:11; Amezquita Decl. ¶ 24; Flores Decl. ¶ 28; Francisco Lopez Decl. ¶ 26; Leon Decl. ¶ 27;

Lugo Decl. ¶ 26; Roballo Decl. ¶ 27; Rodriguez Decl. ¶ 26; Salinas Decl. ¶ 26; Urgiles Decl. ¶

26.  The coffee station (*i.e.*, where the coffee preparer makes the drinks) is located in the kitchen.

Pl. Ex. 120 (photograph of coffee station); *see also* Tr. 14:3-8, 626:4-15.  With respect to the

preparation of coffee and tea and the delivery of those beverages to customers, the Court adopts

the majority of Plaintiffs' version of the facts.  During the dinner shift, the coffee preparer, as the

only employee assigned to the coffee station, not only makes coffee and tea, but also delivers

these drinks to customers.  Tr. 365:15-17; Amezquita Decl. ¶ 24; Flores Decl. ¶ 29; Francisco

Lopez Decl. ¶ 27; Leon Decl. ¶ 27; Lugo Decl. ¶ 27; Roballo Decl. ¶ 28; Rodriguez Decl. ¶ 27;

Salinas Decl. ¶ 28; Urgiles Decl. ¶ 27.  During the lunch shift, by contrast, the coffee preparer is

often assisted by a designated coffee helper.  Tr. 18:14-19:1, 141:7-12, 305:23-306:15, 363:5-

365:17; Amezquita Decl. ¶ 24; Cedeño Decl. ¶ 26; Flores Decl. ¶ 29; Francisco Lopez Decl. ¶

27; Leon Decl. ¶ 27; Lugo Decl. ¶ 27; Roballo Decl. ¶ 28; Rodriguez Decl. ¶ 27; Salinas Decl. ¶

28; Urgiles Decl. ¶ 27.[9]  When this occurs, the coffee preparer spends almost all of his time at the

coffee station making coffee and tea, while the coffee helper delivers the drinks to customers.

Tr. 48:22-49:3, 50:15-51:1, 53:18-23, 54:4-55:1, 119:5-120:8, 142:8-146:5, 363:5-14, 365:24-

---

[9] The Court acknowledges that Francisco Lopez responded affirmatively when asked whether it is "true that a coffee helper is only assigned during especially busy shifts, like during November and December."  Tr. 306:13-15. However, he also testified that the coffee helper is assigned during "most" lunch shifts.  Tr. 305:23-306:12. Moreover, Francisco Lopez stated in his trial declaration that the coffee preparer is assisted by the coffee helper "[o]n many lunch shifts."  Francisco Lopez Decl. ¶ 28.  The Court credits this broader account, which is corroborated by the other Plaintiffs' testimony.

366:19; Amezquita Decl. ¶ 24; Cedeño Decl. ¶ 26; Flores Decl. ¶ 29; Francisco Lopez Decl. ¶

27; Leon Decl. ¶ 27; Lugo Decl. ¶ 27; Roballo Decl. ¶ 28; Rodriguez Decl. ¶ 27; Salinas Decl. ¶

28; Urgiles Decl. ¶ 27.  The coffee preparer spends no more than a few minutes delivering drinks

to customers when he has a helper.  Tr. 365:24-366:19.  In addition, the coffee preparer is

sporadically ordered by the chef to run food to customers.  Tr. 20:5-21:18, 32:22-24, 55:2-14,

188:19-25, 221:21-222:13.  However, when this occurs during a shift, the coffee preparer spends

less than 10 minutes running food.  Tr. 117:6-9.

    D.  Hours Worked

      1.  Before June 26, 2011

    Prior to June 26, 2011, Fresco used a "shift pay concept" under which Plaintiffs were

compensated for "a set number of hours depending on whether they worked a lunch or dinner

shift."  A. Scotto Aff. ¶ 13; *see also infra* note 10.  Thus, Defendants did not track the exact

hours that Plaintiffs worked.  Defendants did, however, keep records of Plaintiffs' shifts.  *See* Pl.

Ex. 26 (weekly shift schedules); Pl. Ex. 77 ("Busboy Calculation Sheets"); Def. Ex. A (weekly

shift schedules).  Neither Plaintiffs nor Defendants contest the accuracy of these records.

Accordingly, the Court accepts these records as correct for the purpose of determining the shifts

that Plaintiffs worked prior to June 26, 2011.

    In the absence of records detailing their exact hours, Plaintiffs provided estimates of the

length of their shifts.  Plaintiffs asserted that prior to June 26, 2011, a busser's: (1) lunch shift

typically lasted five and a half hours, Tr. 57:10-59:4, 64:8-21, 130:21-131:4; Caravantes Decl. ¶

30; Cedeño Decl. ¶ 30; Flores Decl. ¶ 35; Francisco Lopez Decl. ¶ 32; Leon Decl. ¶ 34; Roballo

Decl. ¶ 33; Rodriguez Decl. ¶ 32; Salinas Decl. ¶ 31; Urgiles Decl. ¶ 31; Xochipiltecatl Decl. ¶

28; (2) weekday dinner shift typically lasted seven and a half hours, Caravantes Decl. ¶ 31;

Flores Decl. ¶ 36; Francisco Lopez Decl. ¶ 33; Leon Decl. ¶ 33; Roballo Decl. ¶ 34; Rodriguez

Decl. ¶ 33; Salinas Decl. ¶ 32; Urgiles Decl. ¶ 32; Xochipiltecatl Decl. ¶ 29; and (3) Saturday

dinner shift typically lasted eight and a half hours, Roballo Decl. ¶ 35; Rodriguez Decl. ¶ 34;

Salinas Decl. ¶ 33; Urgiles Decl. ¶ 34.  Alvarado, the only Plaintiff who regularly worked as a

runner prior to June 26, 2011, estimated that his lunch shift typically lasted four and a half or

four and three quarters hours and his dinner shift typically lasted six and a half hours.  Tr.

228:15-232:16; Alvarado Decl. ¶¶ 31-32.

      Defendants contend that Plaintiffs' estimates should not be credited because they exceed

the average length of shifts after June 26, 2011 (*i.e.*, when Fresco implemented a time clock

system, *see infra* Section II.D.2).  Plaintiffs, by contrast, claim that the average length of shifts

decreased markedly after this date.  *See* Tr. 59:2-71:5, 130:21-137:20, 232:6-24, 254:6-14,

254:24-255:11, 296:9-297:3, 346:15-348:1, 360:22-361:15, 486:11-487:25.  The Court credits

Plaintiffs and finds that the hours that Plaintiffs worked after June 26, 2011 are not coextensive

with the hours that Plaintiffs worked prior to June 26, 2011.  Moreover, Plaintiffs' estimates

regarding the lunch shift are consistent with the number of hours for which bussers and runners

were compensated prior to June 26, 2011.  *See infra* Section II.E.3.a.  And Plaintiffs' estimates

regarding the dinner shift are consistent with the Restaurant's hours of operation.  *See, e.g.*,

Vosilla Aff. ¶ 6 (noting that Fresco's "kitchen closes by 11 PM and the guests are usually gone

by that time").  Defendants have thus failed to "negative the reasonableness" of Plaintiffs'

estimates.  *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946); *see also infra*

Section III.C.  Accordingly, the Court accepts Plaintiffs' estimates for the purpose of

determining the amount of uncompensated work, if any, that Plaintiffs performed prior to June

26, 2011.

2.  After June 26, 2011

On June 26, 2011, the Restaurant implemented a punch-in-punch-out time clock system.[10]  Tr. 597:18-24, 610:5-19, 658:2-5; A. Scotto Aff. ¶¶ 13, 15; Alvarado Decl. ¶¶ 34, 39, 41; Amezquita Decl. ¶¶ 28, 31; Caravantes Decl. ¶¶ 33, 38, 42; Cedeño Decl. ¶¶ 34-36; Flores Decl. ¶¶ 41, 43; Francisco Lopez Decl. ¶¶ 34, 41; Leon Decl. ¶¶ 39, 41; Lugo Decl. ¶¶ 35, 38; Roballo Decl. ¶¶ 36, 41; Rodriguez Decl. ¶¶ 37, 40; Salinas Decl. ¶¶ 39, 41; Urgiles Decl. ¶¶ 35, 40, 42.  Thus, Plaintiffs' hours have been recorded in the time clock system—which generates "punch reports," Pl. Exs. 13-24—since that time.  Neither Plaintiffs nor Defendants contest the accuracy of the "in" and "out" times listed on the punch reports.  Accordingly, the Court accepts this information as correct for the purpose of calculating the hours that Plaintiffs worked after June 26, 2011.[11]  Plaintiffs do, however, challenge the accuracy of the figures listed in the "total" column on the punch reports.  Specifically, Plaintiffs contend that the figure listed in the "total" column is approximately 19 minutes less than the actual amount of time between the recorded "in" and "out" times.  A review of the punch reports verifies Plaintiffs' claim as of the dinner shift on July 1, 2011.  Pl. Ex. 24 at 1776; *see also generally* Pl. Exs. 13-24.  Moreover, at trial, Anthony Scotto admitted this miscalculation and explained that it was the result of a flaw in the time clock system.  *See* Tr. 611:16-612:6.  The Court, therefore, concludes that, beginning with

---

[10] Although it appears that some Plaintiffs began punching in and out as early as June 11, 2011, *see* Pl. Exs. 13, 15-17, 21-24, Fresco's records show that the Restaurant continued to use "shift pay" until June 25, 2011, *see* Pl. Ex. 76 at 4604-15 (ADP "Payroll Worksheet" for week ending June 25, 2011); Pl. Ex. 77 at 4617 ("Busboy Calculation Sheet" for week ending June 25, 2011).  It was not until June 27, 2011 that the Restaurant began to compensate Plaintiffs based on the hours recorded in the time clock system.  *See* Pl. Ex. 76 at 4564-76 (ADP "Payroll Worksheet" for week ending July 2, 2011); Pl. Ex. 77 at 4578 ("Busboy Calculation Sheet" for week ending July 2, 2011).  Therefore, the Court finds that June 26, 2011 marks the dividing line between the "shift pay" and "time clock" eras at Fresco.

[11] Because the documentary evidence indicates that the Restaurant did not begin compensating Plaintiffs based on the hours recorded in the time clock system until June 27, 2011, *see supra* note 10, the Court disregards the pre-June 27, 2011 entries.

19

the dinner shift on July 1, 2011, the figures listed in the "total" column on the punch reports undercount the length of Plaintiffs' shifts by approximately 19 minutes.

In addition, Leon, Roballo, and Urgiles claim that the punch reports do not show all of the hours that they worked because they were directed by Drill to not punch in for several shifts. Tr. 161:25-164:3; Leon Decl. ¶ 43; Roballo Decl. ¶ 44; Urgiles Decl. ¶ 45. Fresco's records support these claims. For example, the "Busboy Calculation Sheet" for the week ending December 29, 2012 notes that Urgiles received $181 in tips for a dinner shift on December 24, 2012. Pl. Ex. 77 at 9009. Urgiles' punch report, however, does not indicate that he punched in or out on that date. Pl. Ex. 24 at 1781. The Court, therefore, credits Leon, Roballo, and Urgiles' testimony that they worked hours beyond those recorded in the time clock system.

### 3. Family Meal

Fresco serves a "family meal" for employees during both the lunch and dinner shift. Jt. Stip. ¶ 15. This has been the Restaurant's practice before and after June 26, 2011. The family meal is scheduled at fixed times—from 10:30 a.m. until 11:00 a.m. for the lunch shift and from 4:30 p.m. until 5:00 p.m. for the dinner shift. *Id.* No work is performed during family meals, Tr. 87:12-22, 223:16-224:6, 462:13-17; A. Scotto Decl. ¶ 42; Vosilla Decl. ¶ 11, and employees are permitted to leave the Restaurant if they choose, Tr. 87:23-24, 224:7-227:1; A. Scotto Decl. ¶ 44; Vosilla Decl. ¶ 11.

### E. Compensation

#### 1. Wages

From May 2007 until July 24, 2009, Plaintiffs then-employed at Fresco were generally[12]

---

[12] The Court uses the term "generally" because Plaintiffs' "Employee Earnings Records" indicate that certain Plaintiffs were paid at higher rates for a number of weeks. *See* Pl. Exs. 1-12. Neither Plaintiffs nor Defendants challenge the accuracy of these records. Accordingly, the Court finds that they correctly state Plaintiffs' pay rates.

paid wages at the rate of $4.60 per hour.  Alvarado Decl. ¶ 35; Caravantes Decl. ¶ 34; Flores

Decl. ¶ 37; Francisco Lopez Decl. ¶ 37; Leon Decl. ¶ 35; Salinas Decl. ¶ 35; Urgiles Decl. ¶ 36;

Xochipiltecatl Decl. ¶ 31; *see also* Pl. Exs. 1-12 (Plaintiffs' "Employee Earnings Records").

From July 25, 2009 until January 7, 2011, Plaintiffs then-employed at Fresco were generally paid

wages at the rate of $4.65 per hour.  Alvarado Decl. ¶ 36; Caravantes Decl. ¶ 35; Flores Decl. ¶

38; Francisco Lopez Decl. ¶ 38; Leon Decl. ¶ 36; Roballo Decl. ¶ 38; Salinas Decl. ¶ 36; Urgiles

Decl. ¶ 37; Xochipiltecatl Decl. ¶ 32; *see also* Pl. Exs. 1-12.  Beginning on January 8, 2011, this

rate increased to $5.00 per hour.  Alvarado Decl. ¶ 38; Amezquita Decl. ¶ 29; Caravantes Decl. ¶

36; Cedeño Decl. ¶ 32; Flores Decl. ¶ 39; Francisco Lopez Decl. ¶ 39; Leon Decl. ¶ 37; Lugo

Decl. ¶ 36; Roballo Decl. ¶ 39; Rodriguez Decl. ¶ 35; Salinas Decl. ¶ 37; Urgiles Decl. ¶ 38; *see*

*also* Pl. Exs. 1-12.

    2.  Tips

      Plaintiffs were also compensated in tips.  Specifically, Plaintiffs participated in the

Restaurant's "tip pool," whereby tips received from customers during a shift are distributed

amongst the bussers, barbacks, stockers, the coffee preparer, runners, waiters, and the floor

captain pursuant to a point-based system.  Alvarado Decl. ¶¶ 51-52; Amezquita Decl. ¶¶ 42-43;

Caravantes Decl. ¶¶ 53-54; Cedeño Decl. ¶¶ 47-48; Flores Decl. ¶¶ 53-54; Francisco Lopez Decl.

¶¶ 51-52; Leon Decl. ¶¶ 54-55; Lugo Decl. ¶¶ 49-50; Roballo Decl. ¶¶ 50-51; Rodriguez Decl.

¶¶ 50-51; Salinas Decl. ¶¶ 54-55; Urgiles Decl. ¶¶ 54-55; Xochipiltecatl Decl. ¶¶ 45-46.  The tip

pool participants are assigned the following points: (1) 0.5 points for bussers, barbacks, and

stockers; (2) 0.6 points for the coffee preparer; (3) 0.75 points for runners; (4) 1.0 point for

waiters; and (5) 0.5 or 1.5 points for the floor captain.  Tr. 387:11-22; A. Scotto Aff. ¶ 8; Pl. Ex.

79 ("Tip Out Work Sheets").  Drill participated in the tip pool until December 31, 2012.  Jt. Stip.

¶ 17.  Vosilla never participated.  A. Scotto Aff. ¶ 33.  However, prior to June 2011, Vosilla did receive 15 percent of the 20 percent service charge imposed on private parties (*i.e.*, three percent of the bill), Jt. Stip. ¶ 16, when he served as a party captain.  Tr. 670:19-24; Vosilla Aff. ¶¶ 32-33; A. Scotto Decl. ¶ 34.  The remaining 85 percent of the service charge (*i.e.*, 17 percent of the bill) went into the tip pool.  Jt. Stip. ¶ 16.  Since June 2011, Fresco has imposed a 17 percent charge for gratuity and a three percent "administration fee" on private parties.  Vosilla Aff. ¶ 31; *see also* A. Scotto Aff. Ex. 1-J (private party receipt indicating a "SUBTOTAL" of $2,898.00, an "Admin" fee of $85.89, and a "GRATUITY" of $486.71).  The 17 percent charge goes into the tip pool, whereas the administration fee goes to the party captain.  Tr. 670:25-671:4; Vosilla Aff. ¶ 31; *see also* M. Scotto Aff. Ex. 3-A (Fresco private party confirmation forms stating, *inter alia*, that: (1) "17% of the food and beverage cost will be added to your account as a gratuity and will be fully distributed to the members of the service staff"; (2) "3% of the food and beverage cost will be added to your account as a[n] administration fee used to offset costs associated with the administration of the party"; and (3) "[t]his 3% is not a gratuity and will not be distributed to members of the service staff").  Vosilla receives the three percent administration fee when he serves as a party captain.  Vosilla Aff. ¶ 33; A. Scotto Aff. ¶ 34.

        3.  Hours

                a.  Before June 26, 2011

     From January 2007 until November 8, 2008, the Restaurant paid bussers and runners for five and a half hours of work for lunch shifts and seven hours of work for dinner shifts.  Gelman Aff. ¶ 33, Def. Ex. M; Pl. Ex. 76 at 1293-1326 (ADP "Payroll Worksheet" for week ending November 8, 2008); Pl. Ex. 77 at 1307 ("Busboy Calculation Sheet" for week ending November 8, 2008).  From November 10, 2008 until January 10, 2009, the Restaurant paid bussers and

runners for five hours of work for lunch shifts and six hours of work for dinner shifts. Pl. Ex. 76 at 2282-93, 2498-2511 (ADP "Payroll Worksheet" for weeks ending November 15, 2008 and January 10, 2009); Pl. Ex. 77 at 2280, 2514 ("Busboy Calculation Sheet" for weeks ending November 15, 2008 and January 10, 2009). From January 12, 2009 until December 4, 2010, the Restaurant paid bussers and runners for five hours of work for both lunch and dinner shifts. Tr. 654:17-20; Gelman Aff. ¶¶ 34-35; Pl. Ex. 76 at 2254-65, 5435-46 (ADP "Payroll Worksheet" for weeks ending January 17, 2009 and December 4, 2010); Pl. Ex. 77 at 2268, 5447 ("Busboy Calculation Sheet" for weeks ending January 17, 2009 and December 4, 2010). From December 6, 2010 until June 25, 2011, the Restaurant paid bussers and runners for five hours of work for lunch shifts and six hours of work for dinner shifts. Gelman Aff. ¶ 35; Pl. Ex. 76 at 4604-15, 5408-19 (ADP "Payroll Worksheet" for weeks ending December 11, 2010 and June 25, 2011); Pl. Ex. 77 at 4617, 5420 ("Busboy Calculation Sheet" for weeks ending December 11, 2010 and June 25, 2011).

However, the Restaurant did not always adhere to this compensation scheme. In particular, the Restaurant never compensated bussers and runners for more than 40 hours of work in a given week. For example, during the week ending May 3, 2008, Caravantes worked four lunch shifts and four dinner shifts, Flores worked two lunch shifts and six dinner shifts, Francisco Lopez worked three lunch shifts and four dinner shifts, and Salinas worked four lunch shifts and three dinner shifts. Pl. Ex. 77 at 903 ("Busboy Calculation Sheet" for week ending May 3, 2008). In accordance with Fresco's compensation scheme, Caravantes, Flores, Francisco Lopez, and Salinas should have been paid for 50, 53, 44.5, and 43 hours of work, respectively. Instead, they were each paid for 40 hours of work. Pl. Ex. 76 at 894-902 (ADP "Payroll Worksheet" for week ending May 3, 2008). Likewise, during the week ending December 13,

2008, Salinas worked five lunch shifts and six dinner shifts. Pl. Ex. 77 at 2399 ("Busboy Calculation Sheet" for week ending December 13, 2008). Thus, he should have been paid for 61 hours of work. Instead, he was paid for 40 hours of work. Pl. Ex. 76 at 2385-97 (ADP "Payroll Worksheet" for week ending December 13, 2008). During the week ending October 2, 2010, Flores worked three lunch shifts and six dinner shifts, and Roballo worked four lunch shifts and five dinner shifts. Pl. Ex. 77 at 3834 ("Busboy Calculation Sheet" for week ending October 2, 2010). Therefore, they should have each been paid for 45 hours of work. Instead, they were paid for 40 hours of work. Pl. Ex. 76 at 3822-33 (ADP "Payroll Worksheet" for week ending October 2, 2010). During the week ending February 12, 2011, Caravantes worked five lunch shifts and five dinner shifts. Pl. Ex. 77 at 5178 ("Busboy Calculation Sheet" for week ending February 12, 2011). Under Fresco's compensation scheme, he should have been paid for 55 hours of work. Instead, he was paid for 40 hours of work. Pl. Ex. 76 at 5163-76 (ADP "Payroll Worksheet" for week ending February 12, 2011). At trial, Natasha Gelman, Fresco's bookkeeper, testified that the Restaurant did not always adhere to its purported compensation scheme because Anthony Scotto instructed Gelman to pay bussers and runners for 40 hours of work even when they worked eight or more shifts in a week. Tr. 657:2-11, 659:23-660:18.[13]

      b.  After June 26, 2011

Since June 27, 2011, Fresco has paid bussers and runners based on the hours recorded in the time clock system. Specifically, the Restaurant compensates employees each week for the total amount of time listed on the weekly payroll report. Tr. 658:2-659:18. Like the punch

---

[13] Gelman also testified that the Restaurant "usually pa[id] 40 hours" even when a busser or runner worked only four or five shifts in a week. Tr. 655:18-22, 660:2-8. Fresco's records, however, undermine this testimony. *See generally* Pl. Ex. 76 (ADP "Payroll Worksheets"); Pl. Ex. 77 ("Busboy Calculation Sheets"). The records also discredit Anthony Scotto's testimony that if an employee was not paid for all shifts worked in a given week, that employee would be paid extra (*i.e.*, in the amount previously unpaid) the following week. *See* Tr. 604:13-15, 608:17-609:11.

reports, the weekly payroll reports accurately reflect employees' "in" and "out" times, but, as of

the dinner shift on July 1, 2011, undercount the length of employees' shifts by approximately 19

minutes. *See generally* Pl. Ex. 78 (weekly payroll reports). On occasion, the Restaurant has also

paid bussers and runners for shifts worked without punching in—namely, where the "Busboy

Calculation Sheet" notes that an employee received tips for a shift but neither the punch report

nor weekly payroll report shows any recorded time. Tr. 661:24-662:9; *see also* Gelman Aff. ¶¶

13, 17-19. For example, Urgiles' punch report and the weekly payroll report for the week ending

December 29, 2012 indicate that Urgiles only worked a 4.37-hour lunch shift on December 28,

2012. Pl. Ex. 24 at 1781; Pl. Ex. 78 at 9043. The "Busboy Calculation Sheet" for that week,

however, notes that Urgiles received $181 in tips for a dinner shift on December 24, 2012. Pl.

Ex. 77 at 9009. And, as reflected on the "Payroll Worksheet," the dinner shift was taken into

account because Fresco paid Urgiles for 12.54 hours of work for the week. Pl. Ex. 76 at 9004

(ADP "Payroll Worksheet" for week ending December 29, 2012).

   F.  Notice

     1.  Compensation Discussions

Anthony Scotto claims in his trial affidavit that he "meet[s] with all new hires to explain

how much and how often they will be paid by the [R]estaurant" and that, in doing so, he

"explain[s] how the tipped minimum wage rate works, *i.e.*, that they will be paid additional

makeup pay if they do not earn enough tips." A. Scotto Aff. ¶ 9. With the exception of

Amezquita,[14] each Plaintiff states in his trial declaration that "[w]hen [he] was hired[,] no one

discussed with [him] what [his] pay would be, and if [he] would be paid at a rate below the

regular minimum wage rate because [he] would be receiving tips." Alvarado Decl. ¶ 4;

---

[14] Amezquita did not indicate whether he was orally informed about his compensation or the tip credit.

Caravantes Decl. ¶ 5; Cedeño Decl. ¶ 5; Flores Decl. ¶ 5; Francisco Lopez Decl. ¶ 6; Leon Decl. ¶ 4; Lugo Decl. ¶ 5; Roballo Decl. ¶ 6; Rodriguez Decl. ¶ 5; Salinas Decl. ¶ 5; Urgiles Decl. ¶ 5; Xochipiltecatl Decl. ¶ 5. Although no live testimony was offered on this issue, based on these Plaintiffs' credibility on other issues, the Court accepts their account and does not credit Anthony Scotto's claim regarding compensation discussions with new employees.

### 2. Government Posters

Adjacent to a stairwell in the kitchen, Fresco displays government posters that include information in small print about "employee rights, payroll, hourly wages, sick pay, [and] sick day[s]." Tr. 625:7-25; *see also* Pl. Ex. 119 (photographs of government posters).

### 3. Written Notices

Since March 2011, the Restaurant "has provided food runners and bussers written notice of the hourly and overtime pay rates applicable to tipped food service employees at least once a year and/or at the time of hire." Jt. Stip. ¶ 14; *see also* Pl. Exs. 30, 32, 38, 40, 44, 46, 50, 54, 58, 61, 65, 68 ("For food service workers, the tip credit taken will be $2.25 per hour. Accordingly, you will be paid a tipped minimum wage of $5.00 per hour, and an overtime rate of $8.63."). These notices "explain that food service workers who do not receive sufficient tips to make up the difference between the tipped and full minimum wage and overtime hourly rates will be paid additional wages to make up the difference." Jt. Stip. ¶ 14; *see also* Pl. Exs. 30, 32, 38, 40, 44, 46, 50, 54, 58, 61, 65, 68 ("If you do not receive enough tips over the course of a week to bring you up to the minimum hourly rates of $7.25 for the first 40 hours and $10.875 per hour for hours over 40, you will be paid additional wages that week to make up the difference."). Fresco provided English-only notices until July 2012, when the Restaurant began issuing notices in both English and Spanish. Jt. Stip. ¶ 14; *see also* Pl. Exs. 30, 32, 38, 40, 44, 50, 54, 58, 61, 65, 68.

26

4.   Wage Statements

Since at least January 2007, the Restaurant has given bussers and runners a wage statement with each payment.  Alvarado Decl. ¶ 102; Amezquita Decl. ¶ 93; Caravantes Decl. ¶ 96; Cedeño Decl. ¶ 93; Flores Decl. ¶ 109; Francisco Lopez Decl. ¶ 97; Lugo Decl. ¶ 101; Roballo Decl. ¶ 103; Rodriguez Decl. ¶ 106; Salinas Decl. ¶ 108; Urgiles Decl. ¶ 111; Xochipiltecatl Decl. ¶ 85; *see also* Pl. Exs. 82-87 (sample wage statements).  The statement includes the following information: (1) the pay period date; (2) the employee's name; (3) the Restaurant's name and address; (4) the employee's pay rate; (5) the employee's hours worked; (6) the amount of tips the employee received; (7) deductions; and (8) the employee's gross and net wages.  Pl. Exs. 82-87.  It does not include any information about allowances claimed as part of the minimum wage.  *Id.*; Alvarado Decl. ¶ 102; Amezquita Decl. ¶ 93; Caravantes Decl. ¶ 96; Cedeño Decl. ¶ 93; Flores Decl. ¶ 109; Francisco Lopez Decl. ¶ 97; Lugo Decl. ¶ 101; Roballo Decl. ¶ 103; Rodriguez Decl. ¶ 106; Salinas Decl. ¶ 108; Urgiles Decl. ¶ 111; Xochipiltecatl Decl. ¶ 85.

G.  Uniforms and Crumbers

At Fresco, bussers and runners are required to wear particular clothing while at work. Specifically, they must wear a button-down shirt and tie in designated colors, black dress pants, black dress shoes, and a black belt.  Tr. 110:24-111:3; Alvarado Decl. ¶ 91; Amezquita Decl. ¶ 84; Caravantes Decl. ¶ 87; Cedeño Decl. ¶ 84; Flores Decl. ¶ 98; Francisco Lopez Decl. ¶ 87; Leon Decl. ¶ 93; Lugo Decl. ¶ 93; Roballo Decl. ¶ 91; Rodriguez Decl. ¶ 95; Salinas Decl. ¶ 96; Urgiles Decl. ¶ 100; Xochipiltecatl Decl. ¶ 80.  During their employment, Plaintiffs purchased the requisite shirts and ties directly from the Restaurant by paying Gelman in cash.  Tr. 111:7-114:13, 243:6-11, 425:8-426:20; Alvarado Decl. ¶ 93; Amezquita Decl. ¶ 85; Caravantes Decl. ¶

27

88; Cedeño Decl. ¶ 86; Flores Decl. ¶ 100; Francisco Lopez Decl. ¶ 89; Leon Decl. ¶ 95; Lugo

Decl. ¶ 95; Roballo Decl. ¶ 93; Rodriguez Decl. ¶ 97; Salinas Decl. ¶ 98; Urgiles Decl. ¶ 102;

Xochipiltecatl Decl. ¶ 81.[15]  Plaintiffs had to purchase two new shirts and one new tie

approximately every six months.  Tr. 243:20-245:7, 246:18-247:12; Alvarado Decl. ¶ 95;

Caravantes Decl. ¶ 89; Flores Decl. ¶ 102; Francisco Lopez Decl. ¶ 91; Leon Decl. ¶ 97; Lugo

Decl. ¶ 96; Roballo Decl. ¶ 95; Rodriguez Decl. ¶ 99; Salinas Decl. ¶ 100; Urgiles Decl. ¶ 104;

Xochipiltecatl Decl. ¶ 83.[16]  In addition, Plaintiffs had to purchase crumbers, Amezquita Decl. ¶

86; Flores Decl. ¶ 101; Francisco Lopez Decl. ¶ 90; Leon Decl. ¶ 96; Rodriguez Decl. ¶ 98;

Salinas Decl. ¶ 99; Urgiles Decl. ¶ 103; Xochipiltecatl Decl. ¶ 82, and plastic collar stays for the

shirts, Alvarado Decl. ¶ 94; Flores Decl. ¶ 101; Francisco Lopez Decl. ¶ 90; Leon Decl. ¶ 96;

Roballo Decl. ¶ 44; Rodriguez Decl. ¶ 98; Xochipiltecatl Decl. ¶ 82.  They were not reimbursed

for these purchases.

III.    Conclusions of Law

A.  Marion Scotto's Liability

An individual may be held liable under the FLSA if she is an "employer," which the

statute defines as "any person acting directly or indirectly in the interest of an employer in

relation to an employee."  29 U.S.C. § 203(d).  The Second Circuit has adopted an "economic

---

[15] The Court rejects as not credible Anthony Scotto's contention that "[a]t no point in time ha[s] [he] required employees to pay for [shirts and ties]."  A. Scotto Aff. ¶ 51.  As an initial matter, Scotto's denial conflicts with his muddled testimony at trial that "[i]t was [his] intention" for employees to purchase shirts and ties from the Restaurant, but he now "realize[s] it hasn't happened" because he cannot "find th[e] supposed money and receipts that [he] was handing out to people."  Tr. 616:9-617:20.  Moreover, Fresco's "Policy Document" dated October 2007 explicitly states that "Bus Staff must purchase a tie and a shirt" from the Restaurant.  Pl. Ex. 74 at 7998.  The Court likewise does not credit Gelman's assertion in her trial affidavit that neither she nor the Restaurant collected any money from Plaintiffs for shirts and ties.  See Gelman Aff. ¶ 55.

[16] The Court notes that Cedeño testified that he purchased only one shirt and one tie, Tr. 397:2-398:7, Flores asserted that his uniform did not change "[i]n the last two or three years of [his] work," Flores Decl. ¶ 102, and Alvarado stated that he sometimes received shirts for free, Tr. 244:17-25, 246:5-17.  Defendants suggest that these accounts undermine the other Plaintiffs' claims.  See Def. Post-Trial Mem. 48, ECF No. 93.  The Court disagrees, as it is not implausible that Plaintiffs had distinct experiences with respect to the Restaurant's uniform purchase policy.

reality" test to determine whether an individual meets this definition. *Irizarry v. Catsimatidis*, 722 F.3d 99, 104 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 1516 (2014). Under this test, courts consider "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Id.* at 104-05 (internal quotation marks and citation omitted). "No one of the four factors standing alone is dispositive," however, and the "totality of the circumstances" must be considered. *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999). "[T]he overarching concern is whether the alleged employer possessed the power to control the workers in question, with an eye to the 'economic reality' presented by the facts of each case." *Id.* (citation omitted). Thus, "[e]vidence that an individual is an owner or officer of a company, or otherwise makes corporate decisions that have nothing to do with an employee's function, is insufficient to demonstrate 'employer' status." *Irizarry*, 772 F.3d at 109. "Instead, to be an 'employer,' an individual defendant must possess control over a company's actual 'operations' in a manner that relates to a plaintiff's employment." *Id.*[17]

Here, there is no evidence that Marion Scotto: (1) has the power to hire and fire employees (although she may offer her opinion on prospective hosts and hostesses); (2) supervises and controls employees' work schedules or employment conditions; (3) determines the rate and method of employee compensation; or (4) maintains employment records. *See supra* Section II.A.3.b. Nevertheless, Plaintiffs argue that Marion Scotto is their employer because she:

---

[17] Although the New York Court of Appeals has not yet answered the question of whether the test for "employer" status under the NYLL is the same as under the FLSA, *Irizarry*, 722 F.3d at 117, "[d]istrict courts in this Circuit have interpreted the definition of 'employer' under the [NYLL] coextensively with the definition used by the FLSA," *Sethi v. Narod*, 974 F. Supp. 2d 162, 188 (E.D.N.Y. 2013) (internal quotation marks and citations omitted). The Court, therefore, analyzes whether Marion Scotto qualifies as an "employer" under the FLSA and the NYLL together, using the FLSA standard, because "any difference [between the two definitions] would be immaterial to the facts of this case." *Kalloo v. Unlimited Mech. Co. of NY, Inc.*, 977 F. Supp. 2d 187, 201 (E.D.N.Y. 2013).

(1) sometimes gives bussers directions; (2) is typically present at the Restaurant every day that it is open; (3) is the chief executive officer, president, and majority shareholder of Starjem; (4) signs employees' paychecks; (5) is considered to be a "boss" by Plaintiffs; (6) was described on Fresco's website as "[k]nown affectionately as 'The Boss'"; (7) stated that she "run[s] front-of-the-house duties" at Fresco, Tr. 682:17-20; and (8) provided input with respect to Fresco's "Policy Document." Pl. Post-Trial Mem. 43-44, ECF No. 92. The Court is not persuaded. First, an individual does not become an employer merely by directing employees to carry out tasks related to customer service. Second, Marion Scotto's daily presence at the Restaurant reveals nothing about her level of authority. Third, it is well-settled that "[o]wnership, or a stake in a company, is insufficient to establish that an individual is an 'employer' without some involvement in the company's employment of the employees." *Irizarry*, 772 F.3d at 111. Marion Scotto had no such involvement. Fourth, although "the authority to sign paychecks" is "key" to determining whether an individual is an employer, "[t]his—like all factors—is not dispositive." *Id.* at 115 (internal quotation marks and citation omitted). Moreover, Marion Scotto only signs paychecks because "[e]ach check has to be signed by two of the [Restaurant's] owners." M. Scotto Aff. ¶¶ 9-10. She is otherwise not involved in employee compensation. Thus, the fact that she signs paychecks is not probative in this case. Fifth, Plaintiffs' belief that Marion Scotto is a "boss" does not make her an employer. *See, e.g.*, *Copantitla v. Fiskardo Estiatorio, Inc.*, 788 F. Supp. 2d 253, 314 (S.D.N.Y. 2011) (explaining that "[plaintiff's] perception that [defendant] is an 'owner' does not make him an employer"); *Chao v. Vidtape, Inc.*, 196 F. Supp. 2d 281, 291 (E.D.N.Y. 2002), *aff'd as modified*, 66 F. App'x 261 (2d Cir. 2003) (summary order) (finding testimony that "most [employees] thought [defendant] was a 'boss' when asked" to be "insufficient to support a definition of employer under the economic

30

realities test"). Sixth, the use of the sobriquet "The Boss" on Fresco's website—which

apparently is a reference to Marion Scotto's "on-air personality," Tr. 527:4-20, 682:17-683:3—

does not make her an employer. Seventh, Marion Scotto explained that "run[ning] front-of-the-

house duties" primarily involves "help[ing] with the reservations, greet[ing] the people as they

come in the door," and checking in with customers when they leave the Restaurant. Tr. 683:7-

21. These responsibilities do not show control over Plaintiffs' employment. Finally, her input

concerning the "Policy Document" was limited to information about artwork in the Restaurant,

Tr. 536:10-538:10, 685:3-7, which "ha[s] nothing to do with an employee's function" and is,

consequently, "insufficient to demonstrate 'employer' status," *Irizarry*, 772 F.3d at 109. In sum,

based on the totality of the circumstances, the Court finds that Marion Scotto is not Plaintiffs'

employer under the FLSA or the NYLL. Accordingly, she may not be held liable with respect to

Plaintiffs' claims.

    B.  Tip Credit

    The FLSA and the NYLL require an employer to pay its employees at least minimum

wage. 29 U.S.C. § 206(a); N.Y. Lab. Law § 652(1).[18] However, both statutes also "permit an

employer to pay a tipped [employee] a cash wage that is lower than the statutory minimum wage,

provided that[, *inter alia*,] the cash wage and the employee's tips, taken together, are at least

equivalent to the minimum wage." *Inclan v. New York Hosp. Grp., Inc.*, 12 Civ. 4498, 2015 WL

1399599, at *3 (S.D.N.Y. Mar. 26, 2015) (citing 29 U.S.C. §§ 203(m), 206(a)(1); N.Y. Comp.

---

[18] Since July 24, 2009, the federal minimum wage rate has been $7.25 per hour. 29 U.S.C. § 206(a)(1). From January 1, 2007 until July 23, 2009, the New York minimum wage rate was $7.15 per hour. N.Y. Comp. Codes R. & Regs. tit. 12, § 137-1.2 (repealed eff. Jan. 1, 2011). From July 24, 2009 until December 30, 2013, the New York minimum wage rate was $7.25 per hour. *Id.*; *id.* § 146-1.2. From December 31, 2013 until December 30, 2014, the New York minimum wage rate was $8.00 per hour. *Id.* § 146-1.2. Since December 31, 2014, the New York minimum wage rate has been $8.75 per hour. *Id.*

Codes R. & Regs. tit. 12, § 146-1.3(b); *id.* § 137-1.5 (repealed eff. Jan. 1, 2011)).[19] This

allowance is known as a "tip credit."

    1.  Notice

    An employer may not take a tip credit under the FLSA unless the employer has

"inform[ed] the employee of the [statute's] tip credit provision." *Copantitla*, 788 F. Supp. 2d at

287 (internal quotation marks and citation omitted); *accord* 29 U.S.C. § 203(m). This

requirement is "strictly construed, and must be satisfied even if the employee received tips at

least equivalent to the minimum wage." *Chung v. New Silver Palace Rest., Inc.*, 246 F. Supp. 2d

220, 229 (S.D.N.Y. 2002). The employer "bear[s] the burden of showing that [it] satisfied the

FLSA's notice requirement by, for example, providing [the] employee[] with a copy of § 203(m)

and informing [the employee] that [her] tips will be used as a credit against the minimum wage

as permitted by law." *He v. Home on 8th Corp.*, 09 Civ. 5630, 2014 WL 3974670, at *5

(S.D.N.Y. Aug. 13, 2014) (internal quotation marks and citation omitted). "If the employer

cannot show that it has informed [the] employee[] that tips are being credited against [her]

wages, then no tip credit can be taken and the employer is liable for the full minimum-wage."

*Inclan*, 2015 WL 1399599, at *4 (internal quotation marks, citation, and alteration omitted).

    The regulations implementing the NYLL also impose notice requirements with respect to

the tip credit. Under the current regulations, an employer may not take a tip credit unless the

employer has given the employee written notice stating: (1) the amount of tip credit to be taken

from the basic minimum hourly rate; and (2) that extra pay is required if tips are insufficient to

---

[19] The FLSA defines "tipped employee" as "any employee engaged in an occupation in which he customarily and regularly receives more than $30 a month in tips." 29 U.S.C. § 203(t). Under the NYLL, "service employees" and "food service workers" are considered "tipped employees." N.Y. Comp. Codes R. & Regs. tit. 12, § 146-1.3; *accord id.* §§ 137-1.4, 137-1.5 (repealed eff. Jan. 1, 2011). A "food service worker" is "any employee primarily engaged in the serving of food or beverages to guests, patrons or customers in the hotel or restaurant industries . . . and who regularly receive[s] tips from such guests, patrons or customers." N.Y. Lab. Law § 651(9); *accord* N.Y. Comp. Codes R. & Regs. tit. 12, § 146-3.4(a); *id.* § 137-3.4(a) (repealed eff. Jan. 1, 2011).

bring the employee up to the basic minimum hourly rate. N.Y. Comp. Codes R. & Regs. tit., §
146-2.2(a); *see also id.* § 146-1.3 ("An employer may take a credit towards the basic minimum
hourly rate if [the tipped employee] receives enough tips and if the employee has been notified of
the tip credit as required in section 146-2.2 of this Part."). The employer must provide the notice
in English and "any other language spoken by the . . . employee as his/her primary language."
*Id.* § 146-2.2(a).

Prior to January 1, 2011, the written notice requirement of § 146-2.2 was not yet in effect.
Nevertheless, an employer could not take a tip credit unless "certain preconditions [we]re met."
*Copantitla*, 788 F. Supp. 2d at 290 (internal quotation marks and citation omitted). Specifically,
an employer was required to: (1) "furnish to [the] employee a statement with every payment of
wages listing . . . allowances . . . claimed as part of the minimum wage," N.Y. Comp. Codes R.
& Regs. tit. 12, § 137-2.2 (repealed eff. Jan. 1, 2011); and (2) "maintain and preserve for not less
than six years weekly payroll records . . . for [the] employee [showing] . . . allowances . . .
claimed as part of the minimum wage," *id.* § 137-2.1(a) (repealed eff. Jan. 1, 2011); *see also,
e.g.*, *Copantitla*, 788 F. Supp. 2d at 290.[20]

Applying these principles, the Court finds that Defendants were not entitled to take a tip
credit against Plaintiffs' wages under the FLSA prior to July 2012.[21] As an initial matter,
Plaintiffs were not orally informed about their compensation generally or the tip credit

---

[20] Defendants' suggestion that an employer was entitled to take a tip credit prior to January 1, 2011 even if the
employer did not comply with the requirements of §§ 137-2.1(a) and 137-2.2 is unpersuasive. *See* Def. Post-Trial
Reply 36-37, ECF No. 101. Indeed, the majority of courts in this Circuit have reached the opposite conclusion.
*E.g.*, *Inclan*, 2015 WL 1399599, at *4; *He*, 2014 WL 3974670, at *6; *Cuzco v. F & J Steaks 37th St. LLC*, 13 Civ.
1859, 2014 WL 2210615, at *2-3 (S.D.N.Y. May 28, 2014); *Shiu v. New Peking Taste Inc.*, 11 Civ. 1175, 2014 WL
652355, at *12 n.15 (E.D.N.Y. Feb. 19, 2014); *Cao v. Wu Liang Ye Lexington Rest., Inc.*, 08 Civ. 3725, 2010 WL
4159391, at *2 (S.D.N.Y. Sept. 30, 2010); *Padilla v. Manlapaz*, 643 F. Supp. 2d 302, 309-10 (E.D.N.Y. 2009).

[21] In July 2012, Defendants provided Plaintiffs written notices with tip credit information in both English and
Spanish. *See supra* Section II.F.3. The Court finds that these notices comply with NYLL § 146-2.2. Therefore,
once Plaintiffs received the notices, Defendants were entitled to take a tip credit against Plaintiffs' wages under both
the NYLL and the FLSA.

specifically when they began working at Fresco. *See supra* Section II.F.1. Moreover, the written

notices that Defendants provided beginning in March 2011, *see supra* Section II.F.3, did not

adequately apprise Plaintiffs of the tip credit provision because the notices were in English only

and Defendants have offered no evidence that Plaintiffs—all of whom testified at trial in Spanish

with the assistance of an interpreter—were sufficiently literate in English to be informed by the

notices. *See, e.g., Chan v. Sung Yue Tung Corp.*, 03 Civ. 6048, 2007 WL 313483, at *19

(S.D.N.Y. Feb. 1, 2007) (finding written tip credit notice to be insufficient under the FLSA

"because it is in English, a language that few of the plaintiffs can read"). Finally, the Court

rejects Defendants' contention that the government posters displayed at Fresco, *see supra*

Section II.F.2, satisfied the FLSA's notice requirement. Although "[a] generic government

poster could inform employees that minimum wage obligations exist, [it] could not possibly

inform employees that their employers intend to take the tip credit with respect to their salary."

*Copantitla*, 788 F. Supp. 2d at 289.

Defendants were likewise not entitled to take a tip credit under the NYLL prior to July

2012. First, the written notices provided beginning in March 2011 did not comply with § 146-

2.2 because they were in English only and Plaintiffs' primary language is Spanish. N.Y. Comp.

Codes R. & Regs. tit. 12, § 146-2.2(a). Second, prior to January 1, 2011, Defendants failed to

"furnish to [Plaintiffs then-employed at Fresco] a statement with every payment of wages listing

. . . allowances . . . claimed as part of the minimum wage." *Id.* § 137-2.2 (repealed eff. Jan. 1,

2011). Indeed, the wage statements issued by Defendants, *see supra* Section II.F.4, "show only

that [P]laintiffs earned tip-related income; they do not record that any of the tip income was

claimed as part of the minimum wage," *Copantitla*, 788 F. Supp. 2d at 290.

2.  Tip Sharing

The FLSA provides that "an employer may not avail itself of the tip credit if it requires tipped employees to share their tips with employees who do not 'customarily and regularly receive tips.'" *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 240 (2d Cir. 2011) (quoting 29 U.S.C. § 203(m)).[22]  "Thus, an employer loses its entitlement to the tip credit where it requires tipped employees to share tips with (1) employees who do not provide direct customer service or (2) managers." *Id.*  "When deciding whether an employee customarily and regularly receives tips, courts must determine whether the employee's job is historically a tipped occupation and whether he has more than '*de minimis*' interaction with customers as a part of his employment." *Chhab v. Darden Rests., Inc.*, 11 Civ. 8345, 2013 WL 5308004, at *6 (S.D.N.Y. Sept. 20, 2013).  When deciding whether a manager is tip ineligible, courts must "examine the economic reality of the employment relationship to determine whether [the manager is a] statutory employer[]." *Barenboim v. Starbucks Corp.*, 698 F.3d 104, 110 (2d Cir. 2012); *see also supra* Section III.A (describing the "economic reality" test).

The NYLL also "bars employers from requiring tipped employees to share tips with employees who do not perform direct customer service—i.e., employees who are not 'busboys or similar employees' and employees who are managers or 'agents' of the employer." *Shahriar*, 659 F.3d at 240 (quoting NYLL § 196-d) (brackets omitted); *see also Barenboim v. Starbucks Corp.*, 21 N.Y.3d 460, 471-72 (2013) (defining the term "similar employee," as used in § 196-d, to mean "employees who . . . are ordinarily engaged in personal customer service").[23]  The

---

[22] Section 203(m) states, in relevant part, that the tip credit "shall not apply with respect to any tipped employee unless . . . all tips received by such employee have been retained by the employee, except that this subsection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips." 29 U.S.C. § 203(m).

[23] Section 196-d states, in relevant part, that "[n]o employer or his agent . . . or any other person shall demand or accept, directly or indirectly, any part of the gratuities, received by an employee, or retain any part of a gratuity or of

NYLL standard for evaluating a non-manager's tip eligibility is similar to the FLSA standard. *See Shahriar*, 659 F.3d at 246; N.Y. Comp. Codes R. & Regs. tit. 12, § 146-2.14(e) ("[T]o receive shared tips, or to receive distributions from a tip pool, . . . [an] employee[] must perform, or assist in performing, personal service to patrons at a level that is a principal and regular part of [her] duties and is not merely occasional or incidental."). With respect to managers, however, "[m]eaningful authority, not final authority, [is] the standard" under the NYLL. *Barenboim*, 21 N.Y.3d at 473. In other words, employees with "meaningful or significant authority or control over subordinates" are ineligible to share in tips. *Id.* Indicators of meaningful authority include: (1) "the ability to discipline subordinates"; (2) the ability to "assist in performance evaluations"; (3) the ability to "participate in the process of hiring or terminating employees"; and (4) "having input in the creation of employee work schedules." *Id.*

    a.  Non-Service Employees

In light of the foregoing, the Court concludes that stockers and, on some shifts, the coffee preparer are improperly included in Fresco's tip pool.[24] Stockers' only interactions with customers occur when they are ordered to run food, which happens sporadically and takes no more than five to 15 minutes per shift. *See supra* Section II.C.4. The coffee preparer similarly spends less than 15 minutes running food and drinks to customers when he is assisted by a coffee helper. For the rest of the shift, the coffee preparer remains in the kitchen making coffee and tea. *See supra* Section II.C.5. These limited customer interactions are insufficient to justify the inclusion of stockers and the coffee preparer (when assisted by the coffee helper) in the tip pool

---

any charge purported to be a gratuity for an employee," but that "[n]othing in this subdivision shall be construed as affecting . . . the sharing of tips by a waiter with a busboy or similar employee." N.Y. Lab. Law § 196-d.

[24] Plaintiffs concede that bussers, runners, and barbacks permissibly participate in the tip pool. Pl. Post-Trial Reply 1, 2 n.1, ECF No. 100.

and, by extension, the application of the tip credit to their wages under both the FLSA and the

NYLL. Defendants are, therefore, liable for unlawfully: (1) requiring Plaintiffs to share tips with

non-service employees when they worked as bussers, runners, barbacks, or the unassisted coffee

preparer (*i.e.*, in tip-eligible positions); and (2) taking the tip credit against Plaintiffs' wages

when they worked as stockers or the coffee preparer assisted by the coffee helper.

      b.  Managers

      The Court also concludes that, prior to January 1, 2013, Defendants violated the NYLL

by requiring Plaintiffs to share tips with tip-ineligible managers when they worked in tip-eligible

positions. In particular, the Court finds that Drill and Vosilla each had meaningful authority over

subordinates. Indeed, as of at least October 2007, Drill: (1) had "the ability to discipline

subordinates," *Barenboim*, 21 N.Y.3d at 473, and did discipline subordinates both formally and

informally; (2) had the ability to "participate in the process of hiring or terminating employees,"

*id.*, and did participate in these processes; (3) oversaw new employees' training; and (4) gave

suggestions to Anthony Scotto about employee scheduling. *See supra* Section II.B.2.

Accordingly, Drill's inclusion in the tip pool prior to January 1, 2013, Jt. Stip. ¶ 17, was

improper under the NYLL.[25]

      During this period, Vosilla likewise: (1) had "the ability to discipline subordinates,"

*Barenboim*, 21 N.Y.3d at 473, and did discipline subordinates both formally and informally; (2)

had the ability to "participate in the process of hiring or terminating employees," *id.*, and did

participate in these processes; (3) "ha[d] input in the creation of employee work schedules," *id.*;

---

[25] Having considered the totality of the circumstances—including that Drill did not "supervise[] and control[]
employee work schedules or conditions of employment," "determine[] the rate and method of payment," or
"maintain[] employment records," *Irizarry*, 722 F.3d at 105 (internal quotation marks and citation omitted)—the
Court concludes that Drill was not a tip-ineligible manager under the FLSA. Moreover, although Drill played a role
in employee hiring and firing, the evidence suggests that his authority was circumscribed in these areas.

and (4) signed employment documents on behalf of the Restaurant. *See supra* Section II.B.1.

However, Vosilla did not participate in Fresco's tip pool. That said, prior to June 2011, he did

receive a portion of the 20 percent service charge imposed on private parties when he served as a

party captain. Since June 2011, he has received the three percent administration fee imposed on

private parties when he serves as a party captain. *See supra* Section II.E.2. Therefore, to decide

the extent of Defendants' liability with respect to Vosilla's tip ineligibility, the Court must

determine whether Fresco's service charge and administration fee should be deemed a gratuity.[26]

A mandatory service charge may constitute a "charge purported to be a gratuity" within

the meaning of NYLL § 196-d "when it is shown that employers represented or allowed their

customers to believe that the charge[] [was] in fact [a] gratuit[y] for their employees." *Samiento*

*v. World Yacht Inc.*, 883 N.E.2d 990, 996 (N.Y. 2008). Whether "a mandatory charge or fee is

purported to be a gratuity [is to] be weighed against the expectation of the reasonable customer."

*Id.* at 994. Prior to January 1, 2011, factors bearing on "whether a reasonable customer would

believe a particular service charge is a gratuity" included:

> (1) the font size and prominence of the notice; (2) the label used to denote the charge
> and whether such a label would confuse patrons (noting that the label
> 'administrative fee' is clearer than 'service charge'); (3) whether the purpose [of]
> the charge and manner in which the charge is calculated are described on the bill;
> (4) whether the notice discloses the portion of the charge that is being distributed
> to the service staff and informs . . . patrons to leave an additional payment as a tip;
> and (5) whether there exists a separate line for gratuity.

*Maldonado v. BTB Events & Celebrations, Inc.*, 990 F. Supp. 2d 382, 390 (S.D.N.Y. 2013)

(citing N.Y. State Dep't of Labor, Op. Letter (Mar. 11, 2010), *available at*

---

[26] The Court does not reach the question of whether Vosilla is a tip-ineligible manager under the FLSA because
"compulsory charge[s] for service"—like Fresco's service charge and administration fee for private parties—are not
considered tips under the FLSA, 29 C.F.R. § 531.55(a); *accord Barenboim*, 698 F.3d at 112, and, accordingly,
"cannot be counted as . . . tip[s] received in applying the [FLSA's tip credit] provisions," § 531.55(a). Thus,
Plaintiffs did not share tips with Vosilla within the meaning of the FLSA.

https://labor.ny.gov/legal/counsel-opinion-letters.shtm).  There is no record evidence from which the Court can evaluate whether Fresco "represented or allowed [its] customers to believe" that the 20 percent service charge imposed on private parties "was in fact [a] gratuit[y]." *Samiento*, 883 N.E.2d at 996.  Thus, the Court is unable to determine whether Vosilla received a "charge purported to be a gratuity" prior to January 1, 2011 and, consequently, whether Plaintiffs were required to share tips with him during this period.

   Since January 1, 2011, there has been rebuttable presumption under New York law that "any charge in addition to charges for food, beverage, lodging, and other specified materials or services, including but not limited to any charge for 'service' or 'food service,' is a charge purported to be a gratuity."  N.Y. Comp. Codes R. & Regs. tit. 12, § 146-2.18(b).  For such a charge to not be considered a gratuity, it must be "clearly identified as such" and customers must be "notified that the charge is not a gratuity or tip."  *Id.* § 146-2.19(a); *see also id.* § 146-2.19(c) (explaining that "[a]dequate notification" requires "a statement in the contract or agreement with the customer, and on any menu and bill listing prices, that the administrative charge is for administration . . . , is not purported to be a gratuity, and will not be distributed as gratuities to the employees who provided service to the guests" and that such statement must "use ordinary language readily understood . . . in a font size . . . no smaller than a 12-point font").  Moreover, "[t]he employer has the burden of demonstrating, by clear and convincing evidence, that the notification was sufficient to ensure that a reasonable customer would understand that such charge was not purported to be a gratuity."  *Id.* § 146-2.19(b).  Plaintiffs concede, and the Court agrees, that Defendants have satisfied their burden with respect to the notification provided to customers beginning in June 2011 concerning the three percent administration fee.  *See supra* Section II.E.2.  Therefore, the Court concludes that Vosilla has not received a "charge purported

to be a gratuity" since June 2011. By contrast, for the period between January 1 and June 2011, Defendants have adduced no evidence that they provided notification—let alone adequate notification—to customers regarding the nature of the 20 percent service charge. Thus, Defendants have not rebutted the presumption that the service charge was a "charge purported to be a gratuity." Accordingly, the Court finds that Defendants violated the NYLL by requiring Plaintiffs to share tips with Vosilla between January 1 and June 2011 on shifts where Vosilla served as a party captain and Plaintiffs worked in tip-eligible positions.

###### 3. Time Spent Performing Non-Tipped Work

Under the FLSA, "tipped employees who spend a substantial amount of time, or more than twenty percent of their [working time], engaged in related but non-tip-producing work must be paid the full minimum wage for the time spent performing the non-tipped work." *Chhab*, 2013 WL 5308004, at *3. New York law goes even further. Indeed, if a tipped employee performs non-tipped work "(a) for two hours or more, or (b) for more than 20 percent of his or her shift, whichever is less, the wages of the employee shall be subject to no tip credit *for that day*." N.Y. Comp. Codes R. & Regs. tit. 12, § 146-2.9 (emphasis added); *accord id.* § 146-3.4(b).

Since at least May 2007, Defendants have taken a tip credit against Plaintiffs' wages for almost all hours worked. *See supra* Section II.E.1. However, bussers at Fresco perform non-tipped work for approximately 80 minutes per shift, *see supra* Section II.C.1, and runners perform non-tipped work for approximately 70 minutes per lunch shift and 62.5 minutes per dinner shift, *see supra* Section II.C.2.[27] Moreover, prior to June 26, 2011, bussers typically

---

[27] The Court rejects Defendants' argument that the side work performed by bussers and runners "should not count towards any 80-20 claim" because it is "directly related to the core performance of their service responsibilities," Def. Post-Trial Mem. 43-46, and "directly affect[s] their ability to serve customers," Def. Post-Trial Reply 4. This proposed standard for determining whether work is non-tipped finds no basis in the FLSA or the NYLL. Moreover,

worked for five hours during a lunch shift, seven hours during a weekday dinner shift, and eight hours during a Saturday dinner shift. Runners typically worked for four or four and three quarters hours during a lunch shift and six hours during a dinner shift. *See supra* Sections II.D.1, II.D.3.[28] Thus, bussers and runners spent more than 20 percent of the lunch shift, but less than 20 percent of the dinner shift doing non-tipped work. Accordingly, Plaintiffs may recover unpaid wages under the FLSA and the NYLL based upon Defendants' improper application of the tip credit when Plaintiffs worked as bussers and runners during lunch shifts prior to June 26, 2011. For the period after June 26, 2011, the punch reports generated by the time clock system document the hours that Plaintiffs worked, *see* Pl. Exs. 13-24, and the Restaurant's weekly shift schedules indicate the positions to which Plaintiffs were assigned for particular shifts, *see* Pl. Ex. 26; Def. Ex. A. To the extent that these records show that a Plaintiff worked (1) a shift shorter than six hours and 40 minutes as a busser, (2) a lunch shift shorter than five hours and 50 minutes as a runner, or (3) a dinner shift shorter than five hours and five minutes as a runner,[29]

---

the regulations implementing the FLSA characterize tasks such as "cleaning and setting tables, toasting bread, making coffee and occasionally washing dishes or glasses" as non-tipped work. 29 C.F.R. § 531.56(e). The U.S. Department of Labor's Field Operations Handbook, *see infra* note 39, likewise describes "maintenance and preparatory or closing activities" as non-tipped work. U.S. Dep't of Labor, Field Operations Handbook § 30d00(e), *available at* http://www.dol.gov/whd/foh/index.htm. In addition, courts have considered tasks similar to the side work performed by bussers and runners at Fresco to be non-tipped work. *See, e.g., Mendez v. Int'l Food House Inc.*, 13 Civ. 2651, 2014 WL 4276418, at *3-4 (S.D.N.Y. Aug. 28, 2014); *Chhab*, 2013 WL 5308004, at *3-5, *10-11.

[28] The Court's findings with respect to the amount of time worked per shift do not include the 30-minute period allotted for the family meal, during which no work is performed. *See Thomas v. Apple-Metro, Inc.*, 14 Civ. 4120, 2015 WL 505384, at *4 n.1 (S.D.N.Y. Feb. 5, 2015) ("Employers may not take advantage of the tip credit [under the FLSA] with respect to hours worked by employees performing non-tipped tasks to the extent that such employees spend more than 20 percent of their *working time* performing non-tipped work." (emphasis added)); N.Y. Comp. Codes R. & Regs. tit. 12, § 146-2.9 (subtracting "1/2 hour meal period" from total amount of time worked by employee during a shift for purposes of determining whether employee spent more than 20 percent of shift doing non-tipped work).

[29] Once again, the 30-minute family meal is excluded from these totals. *See supra* note 28.

he is entitled to recover unpaid wages under the FLSA and the NYLL as, at these shift lengths, bussers and runners spent more than 20 percent of their time performing non-tipped work.[30]

### C. Compensation for All Hours Worked

The FLSA and the NYLL both "guarantee[] compensation for all work . . . engaged in by [covered] employees." *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 359 (2d Cir. 2011) (internal quotation marks, citation, and brackets omitted).  In particular, an employee must be paid at least minimum wage.  29 U.S.C. § 206(a); N.Y. Lab. Law § 652(1).  "[F]or any hours worked in excess of forty per week," the employee must "be compensated at a rate of no less than one and one-half times the regular rate of pay."  *Nakahata v. New York-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 200 (2d Cir. 2013); *accord* 29 U.S.C. § 207(a)(1); N.Y. Comp. Codes R. & Regs. tit. 12, § 146-1.4; *id.* § 137-1.3 (repealed eff. Jan. 1, 2011).  "[A]ll of the time worked during a continuous workday is compensable, save for bona fide meal [periods]."  *Hart v. Rick's Cabaret Int'l, Inc.*, 60 F. Supp. 3d 447, 475 n.15 (S.D.N.Y. 2014).  To qualify as a bona fide meal period, "[t]he employee must be completely relieved from duty for the purposes of eating regular meals.  Ordinarily 30 minutes or more is long enough for a bona fide meal period."  29 C.F.R. § 785.19(a).  "The employee is not relieved if he is required to perform any duties, whether active or inactive, while eating."  *Id.*

To establish liability on a claim for underpayment of wages, "a plaintiff must prove that he performed work for which he was not properly compensated, and that the employer had actual

---

[30] Plaintiffs contend that barbacks are also entitled to recover for this violation because barbacks "spen[d] approximately half their time . . . doing typical busser work, and half doing work specific to the [barback] position."  Pl. Post-Trial Reply 17.  This argument fails, as barbacks with responsibilities comparable to those of barbacks at Fresco are considered tip-eligible employees under both New York and federal law.  N.Y. Comp. Codes R. & Regs. tit. 12, § 146-2.14(e); U.S. Dep't of Labor, Wage & Hour Div., Op. Letter (January 15, 2009), *available at* http://www.dol.gov/whd/opinion/FLSA/2009/2009_01_15_12_FLSA.pdf.  Thus, "work specific to the [barback] position" is not synonymous with "non-tipped work."  Because Plaintiffs have not indicated the amount of time that barbacks spend performing particular non-tipped tasks, the Court is unable to assess whether Plaintiffs spent more than 20 percent of their time doing non-tipped work when they worked as barbacks.

or constructive knowledge of that work." *Kuebel*, 643 F.3d at 361.  Where an employer fails to maintain adequate or accurate records of its employees' hours, the employee need only "produce[] sufficient evidence to show the amount and extent of [the uncompensated] work as a matter of just and reasonable inference." *Anderson*, 328 U.S. at 687.  This burden is "not high." *Kuebel*, 643 F.3d at 362.  Indeed, the employee may satisfy his burden "through estimates based on his own recollection." *Id.*  "The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Anderson*, 328 U.S. at 687-88.  If the employer fails to do so, "the court may then award damages to the employee, even though the result be only approximate." *Id.* at 688.[31]

1. Before June 26, 2011

Defendants did not keep records of Plaintiffs' exact hours prior to June 26, 2011. Accordingly, the *Anderson* burden-shifting framework governs the analysis of Plaintiffs' claim. Drawing upon this framework, the Court credits Plaintiffs' estimates and finds that Defendants have failed to produce "evidence of the precise amount of work performed" or "evidence to negative the reasonableness" of the estimates.  *See supra* Section II.D.1.  Thus, the Court concludes that Defendants did not compensate Plaintiffs for all hours worked during this period.[32]  Specifically, from January 2007 until November 8, 2008, Defendants underpaid Plaintiffs who worked as bussers by one hour for every Saturday dinner shift.[33]  From November

---

[31] This burden-shifting framework applies under both the FLSA and the NYLL. *E.g., Ho v. Sim Enters., Inc.*, 11 Civ. 2855, 2014 WL 1998237, at *14 (S.D.N.Y. May 14, 2014); *Kalloo*, 977 F. Supp. 2d at 200.

[32] Defendants argue only that Plaintiffs' estimates should not be credited.  They do not disclaim "actual or constructive knowledge of th[e] work" performed by Plaintiffs prior to June 26, 2011. *Kuebel*, 643 F.3d at 361.

[33] Plaintiffs are not entitled to compensation for the 30-minute period allotted for the family meal, as Fresco employees are "completely relieved from duty" during this time.  29 C.F.R. § 785.19(a); *see also supra* at Section II.D.3.  It is, therefore, a bona fide meal period.  Accordingly, to determine the extent to which Plaintiffs were

10, 2008 until January 10, 2009, Defendants underpaid Plaintiffs who worked as bussers by one hour for every weekday dinner shift and two hours for every Saturday dinner shift. From January 12, 2009 until December 4, 2010, Defendants underpaid Plaintiffs who worked as bussers by two hours for every weekday dinner shift and three hours for every Saturday dinner shift. Moreover, Defendants underpaid Plaintiffs who worked as runners by one hour for every dinner shift. From December 6, 2010 until June 25, 2011, Defendants underpaid Plaintiffs who worked as bussers by one hour for every weekday dinner shift and two hours for every Saturday dinner shift. In addition, Defendants unlawfully refused to pay Plaintiffs for time worked in excess of 40 hours per week. *See supra* Section II.E.3.a. Plaintiffs are entitled to compensation for this time at the overtime rate.

2. After June 26, 2011

Plaintiffs were compensated for all hours worked from June 27, 2011 until the lunch shift on July 1, 2011, as Defendants paid Plaintiffs based on the full amount of time recorded in the time clock system. As of the dinner shift on July 1, 2011, however, Defendants began undercounting the length of Plaintiffs' shifts by approximately 19 minutes and compensating Plaintiffs accordingly. *See supra* Sections II.D.2, II.E.3.b. That said, with respect to shifts where Plaintiffs punched in before the family meal (*i.e.*, before 10:30 a.m. for the lunch shift and before 4:30 p.m. for the dinner shift), this 19-minute deduction does not give rise to a claim for underpayment of wages. The 30-minute family meal is a bona fide meal period for which employees are not entitled to compensation. *See supra* note 33. Defendants nevertheless did not subtract any time from Plaintiffs' hours to account for the family meal. Therefore, even with the

---

underpaid for a given shift, the Court subtracts the number of hours for which Plaintiffs were compensated, *see supra* Section II.E.3.a, from the estimated length of that shift, *see supra* Section II.D.1, and then subtracts an additional 30 minutes to account for the family meal.

19-minute deduction, Plaintiffs who punched in before the family meal were compensated for time (*i.e.*, approximately 11 minutes) beyond Defendants' legal obligation. *Cf. Desilva v. N. Shore-Long Island Jewish Health Sys., Inc.*, 27 F. Supp. 3d 313, 321 (E.D.N.Y. 2014) ("[C]ourts in this circuit have recognized[] [that] automatic meal deduction policies are not *per se* illegal."); *Zivali v. AT & T Mobility, LLC*, 784 F. Supp. 2d 456, 461 (S.D.N.Y. 2011) (finding that an employer's timekeeping system is lawful under the FLSA "as long as it allows for the complete and accurate recording of all time worked"); N.Y. State Dep't of Labor, Op. Letter 1 (Nov. 25, 2009), *available at* https://labor.ny.gov/legal/counsel-opinion-letters.shtm (explaining that "recordkeeping software that automatically deducts the lunch break from the amount of time worked" does not violate the NYLL "[s]o long as the practice[] . . . result[s] in the payment of wages for all hours worked"). By contrast, Plaintiffs who punched in more than 11 minutes after the family meal began (*i.e.*, after 10:41 a.m. for the lunch shift and after 4:41 p.m. for the dinner shift) were not compensated for all hours worked. Indeed, they were subjected to a 19-minute deduction even though their shifts included less than 19 minutes of non-compensable time. For example, on October 8, 2011, Salinas worked from 5:02 p.m. until 11:17 p.m. Pl. Ex. 78 at 5753 (weekly payroll report for week ending October 8, 2011). Thus, he should have been paid for 6.25 hours of work. Instead, due to the 19-minute deduction, he was paid for 5.93 hours of work. *Id.* Defendants do not disclaim "actual or constructive knowledge of [this uncompensated] work." *Kuebel*, 643 F.3d at 361. Accordingly, Plaintiffs who punched in more than 11 minutes after the family meal began are entitled to compensation for up to 19 minutes of work.

Leon, Roballo, and Urgiles contend that they are also entitled to compensation for shifts where they were directed to work without punching in. They assert that they received tips, but did not receive any wages for these shifts. *See supra* Section II.D.2. These claims fail. First,

Urgiles was, in fact, paid for the one shift that he worked without punching in (*i.e.*, the dinner shift on December 24, 2012). *Compare* Pl. Ex. 24 at 1781 (Urgiles' punch report), *and* Pl. Ex. 77 at 9009 ("Busboy Calculation Sheet" for week ending December 29, 2012), *with* Pl. Ex. 76 at 9004 (ADP "Payroll Worksheet" for week ending December 29, 2012), *and* Pl. Ex. 78 at 9043 (weekly payroll report for week ending December 29, 2012). Second, Leon's statement that he "worked approximately three or four shifts in December 2013 when [he] did not punch in and . . . only received tips," Leon Decl. ¶ 43, and Roballo's statement that he "was told approximately twice . . . in December . . . that [he] could come in to work and . . . get tips, but [he] could not punch in and punch out and would not be paid by the house," Roballo Decl. ¶ 44, are insufficient "to show the amount and extent of [their uncompensated] work as a matter of just and reasonable inference," *Anderson*, 328 U.S. at 687. Moreover, the fact that Urgiles was paid wages for the one shift that he worked without punching in, and Gelman's credible testimony that she ensures that all bussers and runners who earn tips during a particular shift are also paid wages for that shift, Tr. 661:24-662:9, suggest that Leon and Roballo were compensated for the few shifts that they worked without punching in.

D.  Written Notice – NYLL § 195(1)

Since April 9, 2011, the NYLL has required that, at the time of hiring,[34] employers provide their employees a written notice with the following information: (1) the rate or rates of pay and basis thereof;[35] (2) allowances, if any, claimed as part of the minimum wage, including tip, meal, or lodging allowances; (3) the regular pay day designated by the employer; (4) the

---

[34] Prior to December 29, 2014, employers were also required to provide the notice "on or before February first of each subsequent year of the employee's employment with the employer." N.Y. Lab. Law § 195(1)(a) (eff. April 9, 2011 to Dec. 28, 2014).

[35] For all non-exempt employees, "the notice must state the regular hourly rate and overtime rate of pay." N.Y. Lab. Law § 195(1)(a).

employer's name; (5) any "doing business as" names used by the employer; (6) the physical address of the employer's main office or principal place of business, and a mailing address if different; (7) the employer's telephone number; and (8) such other information as the commissioner deems material and necessary. N.Y. Lab. Law § 195(1)(a). Employers must provide this notice "in English and in the language identified by each employee as the primary language of such employee." *Id.* Here, Plaintiffs did not receive notices compliant with § 195(1) until July 2012, when the Restaurant began issuing notices in both English and Spanish. *See supra* Section II.F.3.[36] Prior to this date, the notices were deficient because they were in English only and Plaintiffs' primary language is Spanish.

E.  Wage Statement – NYLL § 195(3)

Since April 9, 2011, the NYLL has also required that employers "furnish each employee with a statement with every payment of wages, listing the following" information: (1) the dates of work covered by that payment of wages; (2) the employee's name; (3) the employer's name, address, and telephone number; (4) the rate or rates of pay and basis thereof;[37] (5) gross wages; (6) deductions; (7) allowances, if any, claimed as part of the minimum wage; and (8) net wages. N.Y. Lab. Law § 195(3). The wage statements that Fresco provided Plaintiffs failed to indicate that the tip credit (*i.e.*, an allowance claimed as part of the minimum wage) was being taken. *See*

---

[36] The Court rejects Plaintiffs' argument that the dual-language notices were defective because "they falsely stated that Plaintiffs would be paid at the regular rate of $5.00 per hour" when, "[i]n fact, Plaintiffs were paid at a lower rate because Fresco . . . automatically . . . deducted approximately nineteen minutes from Plaintiffs' shifts." Pl. Post-Trial Mem. 41. When the Restaurant issued these notices, Defendants intended to pay Plaintiffs at the regular rate of $5.00 per hour and were unaware of the 19-minute deduction. *See, e.g.*, Tr. 658:6-19, 659:14-18. Under these circumstances, the Court declines to find that the notices "falsely stated" Plaintiffs' rate of pay. The Court also rejects Plaintiffs' claim that Defendants violated § 195(1) even after providing dual-language notices because Plaintiffs were not given copies of the notices to keep. Pl. Post-Trial Mem. 41. Neither the statute nor its implementing regulations contains such a requirement. *See* N.Y. Lab. Law §§ 195(1), 198(1-b); N.Y. Comp. Codes R. & Regs. tit. 12, § 146-2.2.

[37] For all non-exempt employees, "the statement shall include the regular hourly rate or rates of pay; the overtime rate or rates of pay; the number of regular hours worked[;] and the number of overtime hours worked." N.Y. Lab. Law § 195(3).

*supra* Section II.F.4.  Indeed, the statements "show only that [P]laintiffs earned tip-related income; they do not record that any of the tip income was claimed as part of the minimum wage."  *Copantitla*, 788 F. Supp. 2d at 290.  Accordingly, Plaintiffs did not receive wage statements compliant with § 195(3).

F.  Uniforms

Under New York law, an employer cannot require its employees to pay for the cost of purchasing a required uniform.  N.Y. Comp. Codes R. & Regs. tit. 12, § 146-1.8 ("When an employee purchases a required uniform, he or she shall be reimbursed by the employer for the total cost of the uniform no later than the next payday."); *accord id.* § 137-1.8 (repealed eff. Jan. 1, 2011).[38]  A required uniform is "clothing required to be worn while working at the request of an employer . . . except clothing that may be worn as part of an employee's ordinary wardrobe," *id.* § 146-3.10(a); *accord id.* § 137-3.13 (repealed eff. Jan. 1, 2011), meaning "ordinary basic street clothing selected by the employee where the employer permits variations in details of dress," *id.* § 146-3.10(b).

Federal law, by contrast, mandates that an employer cover uniform costs only when "the employees' expenditures for these purposes would reduce their wages to below minimum wage." *Ayres v. 127 Rest. Corp.*, 12 F. Supp. 2d 305, 310 (S.D.N.Y. 1998).  The term "uniform" is also not expressly defined.  However, the U.S. Department of Labor's Field Operations Handbook (the "FOH")[39] suggests that, "[a]lthough there are no hard-and-fast rules in determining whether

---

[38] Prior to January 1, 2011, New York law prohibited employers from imposing uniform costs on employees only "if those costs would reduce [the employee's] pay below the full statutory minimum wage."  *Garcia v. La Revise Assocs. LLC*, 08 Civ. 9356, 2011 WL 135009, at *6 (S.D.N.Y. Jan. 13, 2011) (citing N.Y. Comp. Codes R. & Regs. tit. 12, § 137-1.8 (repealed eff. Jan. 1, 2011)).  Since January 1, 2011, employers have been required to pay for uniform costs "regardless of a given employee's rate of pay." N.Y. Comp. Codes R. & Regs. tit. 12, § 146-1.8(c).

[39] The FOH "is an operations manual that provides Wage and Hour Division (WHD) investigators and staff with interpretations of statutory provisions, procedures for conducting investigations, and general administrative guidance. . . .  The FOH reflects policies established through changes in legislation, regulations, significant court

certain types of dress are considered uniforms," where an employer "permits variations in details of dress," "a general type of ordinary basic street clothing [that is required] to be worn while working . . . would not be considered . . . [a] uniform[]." FOH § 30c12(f)(1). "On the other hand, . . . a specific type and style of clothing [that is required] to be worn at work, e.g. where a restaurant or hotel requires a tuxedo or a skirt and blouse or jacket of a specific or distinctive style, color, or quality, . . . would be considered [a] uniform[]." *Id.* § 30c12(f)(1)(b).

Based on these precepts, the Court concludes that the ties and shirts[40] worn by bussers and runners at Fresco constitute a required uniform under New York law and a uniform under federal law, as the Restaurant does not permit variation in these articles of clothing. Indeed, bussers and runners must wear ties and shirts of a particular color and style, both of which are sold to workers by the Restaurant. *See supra* Section II.G; *see also, e.g., Copantitla*, 788 F. Supp. 2d at 293 (noting that "[s]everal courts have found that requiring a specific color of clothing might reasonably be considered to make work clothing a uniform under New York law" and finding summary judgment to be inappropriate "where a reasonable factfinder could find that captains wore suits, ordered from a single retailer, that were of a color that they disliked, and busboys were required to wear aprons and vests of a particular color and style chosen by defendants"). Accordingly, Defendants are liable to Plaintiffs for the amounts expended on these items.[41]

The black dress pants, black dress shoes, and black belt, however, are not supplied by the Restaurant and there is no evidence that Fresco prohibits variation in these items, which all fall

---

decisions, and the decisions and opinions of the WHD Administrator." U.S. Dep't of Labor, Field Operations Handbook, *available at* http://www.dol.gov/whd/foh/index.htm.

[40] The Court considers the collar stays to be a component of the shirts.

[41] Because Plaintiffs were never paid wages at a rate above minimum wage, Defendants are liable not only under current New York law, but also under federal law and New York law prior to January 1, 2011.

within the scope of "ordinary basic street clothing." Thus, they do not constitute a required uniform under New York law or a uniform under federal law. *See, e.g.*, *Lu v. Jing Fong Rest., Inc.*, 503 F. Supp. 2d 706, 712 (S.D.N.Y. 2007) (concluding that "black dress pants, black socks, and black leather shoes . . . do not qualify as a 'uniform'" (internal quotation marks and citation omitted)); U.S. Dep't of Labor, Wage & Hour Div., Op. Letter 1-2 (May 15, 2008), *available at* http://www.dol.gov/whd/opinion/FLSA/2008/2008_05_15_04_FLSA.pdf (explaining that "dark-colored," closed-toed shoes with a non-slip sole, which may be of any "quality, brand, style, model, or type" and purchased from the employee's vendor of choice, are not a "uniform" under federal law). Defendants, therefore, bear no responsibility for the costs of these purchases.

G. Crumbers

An employer violates the FLSA if it requires an employee to purchase "tools of the trade which will be used in or are specifically required for the performance of the employer's particular work" and "the cost of such tools . . . cuts into the minimum or overtime wages required to be paid to [the employee]." 29 C.F.R. § 531.35. The same holds true under New York law. *E.g.*, *Lin v. Benihana Nat'l Corp.*, 755 F. Supp. 2d 504, 511-12 (S.D.N.Y. 2010); *see also* N.Y. Comp. Codes R. & Regs. tit. 12, § 146-2.7(c) ("If an employee must spend money to carry out duties assigned by his or her employer, those expenses must not bring the employee's wage below the required minimum wage."); *id.* § 137-2.5(b) (repealed eff. Jan. 1, 2011) ("The minimum wage shall not be reduced by expenses incurred by an employee in carrying out duties assigned by his employer."). The crumbers purchased by bussers and runners, *see supra* Section II.G, are "tools of the trade." Thus, Defendants are liable to Plaintiffs for the costs incurred in acquiring these items.

H.  FLSA Statute of Limitations

The statute of limitations for "a cause of action arising out a willful violation" of the

FLSA is three years.  29 U.S.C. § 255(a).  For non-willful violations, the statute of limitations is

two years.  *Id.*[42]  To prove a willful violation, an employee must establish "that the employer

either knew or showed reckless disregard for the matter of whether its conduct was prohibited by

the statute."  *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988).  Reckless disregard

"involves actual knowledge of a legal requirement, and deliberate disregard of the risk that one is

in violation."  *Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 937-38 (S.D.N.Y. 2013)

(internal quotation marks and citation omitted); *see also, e.g.*, *Pinovi v. FDD Enters., Inc.*, 13

Civ. 2800, 2015 WL 4126872, at *4 ("Recklessness is defined as, at the least, an extreme

departure from the standards of ordinary care, to the extent that the danger was either known to

the defendant or so obvious that the defendant must have been aware of it." (internal quotation

marks and citation omitted)).  "If an employer acts unreasonably, but not recklessly, in

determining its legal obligation, its action should not be considered willful."  *Parada v. Banco

Industrial de Venezuela, C.A.*, 753 F.3d 62, 71 (2d Cir. 2014) (internal quotation marks, citation,

and brackets omitted); *see also Young v. Cooper Cameron Corp.*, 586 F.3d 201, 207 (2d Cir.

2009) (explaining that a showing of "[m]ere negligence is insufficient" to establish willfulness).

Applying the foregoing principles, the Court concludes that Plaintiffs have established

that Defendants committed a willful violation by failing to compensate Plaintiffs for all hours

worked prior to June 26, 2011.  There is no question that Defendants knew that employees must

be paid for all hours worked.  This legal obligation is axiomatic.  Nevertheless, prior to June 26,

2011, Defendants capped Plaintiffs' compensation per shift and per week at levels below the

---

[42] By contrast, the statute of limitations under the NYLL is six years in all cases.  N.Y. Lab. Law §§ 198(3), 663(3).

number of hours Plaintiffs actually worked. *See supra* Sections II.D.1, II.E.3.a, III.C.1. Such conduct epitomizes a willful violation. Accordingly, Defendants' liability for this FLSA violation extends back to three years prior to the filing of the complaint. With respect to the other FLSA violations, the Court finds that Defendants acted, at most, unreasonably, which is insufficient to trigger the three-year limitations period.[43] Therefore, Defendants' liability for these violations extends back only two years.

IV.   Conclusion

For the reasons stated, the Court finds that Plaintiffs have proven, by a preponderance of the evidence, that Defendants Starjem and Anthony Scotto[44] violated the FLSA and the NYLL as set forth above. In light of this liability determination, the case will now proceed to the damages phase. Accordingly, it is ORDERED that:

1.  By **September 2, 2015**, based upon the Court's findings, Plaintiffs shall submit a detailed proposed order with a calculation of the amount owed to each Plaintiff;

2.  By **September 16, 2015**, Defendants shall submit any opposition; and

3.  By **September 23, 2015**, Plaintiffs shall reply.

SO ORDERED.

Dated: August 12, 2015
       New York, New York

_____
ANALISA TORRES
United States District Judge

---

[43] The Court rejects Plaintiffs' argument that Defendants acted with reckless disregard because "[m]any of the claims that are the subject of this action were the basis for a previous lawsuit against Fresco [filed in August 2010,] . . . in which Defendants[] moved for and were denied summary judgment on several of these same claims." Pl. Post-Trial Mem. 48. Neither the filing of a lawsuit nor the denial of a defendant's motion for summary judgment indicates, as Plaintiffs suggest, that "there [is] a high likelihood" that the defendant "violated the law." *Id.* Moreover, it is not "necessarily reckless [for an employer] to adhere to . . . a practice in the face of legal risk." *Hart*, 967 F. Supp. 2d at 938.

[44] Defendants do not dispute that Starjem and Anthony Scotto may each be held liable as Plaintiffs' employer under the FLSA and the NYLL.